IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE MICROSOFT CORP.
ANTITRUST LITIGATION.

This Document relates to:

*Burst.com, Inc. v.*
*Microsoft Corp.,*

Civil Action No JFM-02-cv-2952

MDL Docket No. 1332

Hon. J. Frederick Motz

## BURST.COM, INC.'S COLLATERAL ESTOPPEL BRIEF ON REMAND

Plaintiff Burst.com, Inc. joined in a motion to have collateral estoppel applied to various determinations made against Microsoft in *United States v. Microsoft Corp.* The Court's previous disposition of that motion was reversed by the Fourth Circuit and remanded for reconsideration of the application of one of the elements of the doctrine. The Court was directed to give collateral estoppel to those findings that were "necessary and essential" to the judgment in *United States v. Microsoft Corp.*

Burst submits that four categories of findings should be subject to collateral estoppel. First, there are the 266 findings that Microsoft has conceded in other forums were "necessary" to the D.C. Circuit's judgment. These findings were all necessary to the monopoly maintenance claims affirmed by the D.C. Circuit and encompass the "so-called" 12 specific acts of conduct for which the Court ascribed Sherman Act, Section 2 liability.[1] Second, there are an additional 41 findings that are necessary to the D.C. Circuit's monopoly power finding. These findings were essential to Judge Thomas Penfield Jackson's logic in finding monopoly power and were fully

---

[1]      Of the previously conceded findings, Burst seeks collateral estoppel for 265 of them.

litigated by Microsoft, including an appeal to the D.C. Circuit.  The D.C. Circuit affirmed Judge

Jackson's finding of monopoly power "in its entirety." 253 F.3d 34, 51. Third, there are Judge

Jackson's findings of harm to consumers that flowed from its conduct. These five findings were

necessary and essential to Judge Jackson's judgment in the context of the arguments that

Microsoft had advanced in its defense.  Fourth, there are 15 excerpts of the D.C. Circuit's

opinion that are non-duplicative and should be binding on Microsoft since they give further

definition to the judgment that was affirmed.[2]

In the following sections, Burst explains why each of these categories of findings meet

the Fourth Circuit's "critical and necessary" test.

## I.  **INTRODUCTION**

In 1998, the Department of Justice, 20 States and the District of Columbia brought suit

against Microsoft for a broad pattern of conduct designed to defeat middleware threats to its

operating system monopoly.  The case followed a series of previous actions by the Department

of Justice to investigate or regulate Microsoft's behavior.  One such investigation was begun in

1997 with a Civil Investigative Demand (CID) seeking information relating to a possible

antitrust violation in connection with the market for streaming media software.  Though the

lawsuit alleged numerous activities targeted to damage Netscape's browser, shortly after the

filing of the case, the plaintiffs made clear that they interpreted the complaint much more broadly

to include matters relating to Sun's Java, Intel's Native Signal Processing ("NSP"), IBM's office

suite product, and Microsoft relations with RealNetwork and Apple Quicktime, which were

discovered as a part of the streaming media investigation. Microsoft objected to plaintiffs

"dramatic expansion of the case" which, in its view, attempted "to convert their tightly-focused

---

[2]      Pursuant to previous rulings of the Court, the sole issue addressed here is which findings were "critical and necessary" to the judgment.  Issues of relevance to this case and the method of presenting those findings to a jury have been deferred to another day.

case into an omnibus Section 2 action." *See* Brief for Appellant-Defendant, p. 6 (Nov. 27, 2000) (Exhibit 1). The Court overruled the objection, heard evidence regarding these matters and entered findings of fact concerning them.

In its ruling on the merits after a 78 day trial, the District Court found Microsoft to have violated Section 2 of the Sherman Act by willfully maintaining a monopoly in the worldwide market for Intel-compatible PC operating systems. In order to prove its case the Department of Justice and co-plaintiff States had to prove two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 567 (1966). To prove these matters, the District Court found it necessary to make several other essential findings, including relevant market, market share, barriers to entry, power to exclude, anticompetitive conduct, causation and consumer harm.

In reaching his judgment of violation of the Sherman Act, Judge Jackson meticulously set forth his reasoning in 412 findings of fact and 23 pages of conclusions of law. Judge Jackson laid out the evidence supporting each of his conclusions. Facing a vigorous defense from Microsoft, Judge Jackson focused his analysis on a number of issues that were central to the defense. Microsoft argued that it had no monopoly power, claiming that its market share and the applications barrier to entry were simply reflections of Microsoft's superior skill and foresight. It further claimed that it had not engaged in any anticompetitive conduct. In Microsoft's view, the challenged conduct was simply vigorous competition, conduct that is permitted whether engaged in by a dominant firm or a non-dominant one. Though the conduct may well have damaged its competitors, Microsoft contended that competition and consumers were benefited, not harmed.

Microsoft pressed these arguments in the D.C. Circuit, though it had only challenged a few of Judge Jackson's findings as being clearly erroneous. Though the findings contested here directly rebutted the arguments it advanced, Microsoft made no Rule 52(a) challenge to any of them. The Court of Appeals affirmed the bulk of the monopoly maintenance claim, agreeing with Judge Jackson's analysis of the monopoly power issue in its entirety and affirming almost all of his conclusions regarding the anticompetitive nature of the conduct challenged by the DOJ. Finally, the D.C. Circuit affirmed Judge Jackson's conclusions that Microsoft's conduct harmed competition justifying injunctive relief and remanding for reconsideration of the form of the relief based on all 412 of the findings.

In this Court's initial ruling on Burst's motion, the Court found almost all of the findings for which collateral estoppel was sought to have been "supportive of" the judgment and thus entitled to a binding effect. The Fourth Circuit held that a "supportive of" standard appeared to sweep in too many findings resulting in unfairness to the defendant. Viewing that standard as equivalent to "consistent with" or relevant to," the Fourth Circuit thought such a standard would be unfair to the party to be bound in the context of offensive collateral estoppel, in that findings for which the litigant had no opportunity for appellate review would be binding. The Court of Appeals preferred to apply a "critical and necessary" to the judgment test.[3]

Beyond the explication of the standard, the Court of Appeals only provided guidance in two specific areas. First, it directed that the binding effect of alternative findings should be guided by the analysis discussed in *Ritter v. Mount St. Mary's College*, 814 F.2d 986 (4th Cir. 1987). *Ritter* noted that, in general, alternative findings should not be given collateral estoppel effect because neither of the findings can be considered essential to the judgment: "A corollary to the general rule of collateral estoppel is that, where the court in the prior suit has determined

---

[3]    Burst had joined Sun Microsystems, Inc. in a Petition for Rehearing that was refused.

two issues, either of which could independently support the result, then neither determination is

considered essential to the judgment.   Thus, collateral estoppel will not obtain as to either

determination.   4 Wright, *Law of Federal Courts* § 100A (1983)." *Id.* at 993. [4]

Second, the Court of Appeals cautioned that findings concerning matters overturned by

the D.C. Circuit should not be given collateral estoppel effect.  Slip Opinion at 13.  Microsoft has

never contended that any of the findings identified by Burst for collateral estoppel effect were

entered by Judge Jackson solely in connection with claims that were overturned by the D.C.

Circuit.

## II.   <u>ARGUMENT</u>

As the Fourth Circuit held, the requirement that findings be "necessary and essential to

the judgment" before they are entitled to collateral estoppel limits the doctrine to only those

findings that the second court can be sure were fully litigated at the trial court level and the party

to be bound had the ability and incentive to challenge the result on appeal.   *In re Microsoft Corp.*

*Antitrust Litig.*, 355 F.3d 322, 327 (4th Cir. 2004).  If a litigant has fully litigated an issue and

lost, judicial economy and uniformity of decision-making are promoted by not permitting a

second try.  Collateral estoppel requires actual litigation of an issue, as distinguished from res

judicata that can apply when a party fails to raise a claim or defense.  Collateral estoppel is keyed

to the narrow factual issues that the parties litigate, even if the role the particular facts play in the

proceedings is not identical.  Thus, in applying the necessary and essential standard, the Court

should view the previous litigation as it unfolded and avoid speculating on how the court in the

previous litigation could have reached the result it did. 18 Wright, Miller & Cooper, *Federal*

---

[4]       Professor Wright has suggested that the Restatement Second of Judgments position that independently sufficient alternative findings should be given collateral estoppel effect where the particular finding reflects a careful process of decision will probably carry the day.  Appellate review of the finding would automatically demonstrate a careful process of decision.  18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4421, p. 580 ( 2002).

*Practice and Procedure: Jurisdiction 2d* § 4421, p. 548. ("Courts occasionally have been tempted to speculate that a prior decision could have rested on narrower grounds than those actually chosen, so that resolution of broader issues was not necessary to the decision.  For the most part, such speculation should be resisted.")

Rather, the Court should take the findings as Judge Jackson made them and as the Court of Appeals accepted them.  As Judge Peterson observed in the Minnesota Microsoft case, *Gordon v. Microsoft*, 2003-2 Trade Cas. (CCH) ¶ 74,130 (Minn. D. Ct. Aug. 20, 2003) (Exhibit 2), that in a case such as this, where enormous judicial resources have been devoted, and detailed findings of fact published, the appropriate analysis of the necessity of a finding should look at necessity of the finding to the "factfinder's logic" not simply some hypothetical necessity to the ultimate finding of liability. *Id.* at 97,183.   In complex cases such as these, there are many issues which might not appear important to the ultimate result of liability, but were critical to the result reached because one party or the other had couched its arguments in a particular manner.

In *Hoult v. Hoult*, 157 F.3d 29 (1st Cir. 1998), the court pointed out that:

> a finding is "necessary" if it was central to the route that led the factfinder to the judgment reached, even if the result "could have been achieved by a different, shorter and more efficient route." *Commercial Associates v. Tilcon Gammino, Inc.*, 998 F.2d 1092, 1097 (1st Cir. 1993).  And in deciding whether the jury did make and rest centrally on a finding not expressly made, it is proper to consider – as *Dennis* [*v. Rhode Island Hospital Trust National Bank*, 744 F.2d 893, (1st Cir. 1984)] said – not only what was "logically" but also what was "practically" a "necessary component of the decision reached." *Dennis*, 744 F.2d at 899.

*Id.* at 32.

### 1.    Findings of Fact Conceded to be Necessary

In two previous actions (California and Minnesota), Microsoft had conceded that 266 of Judge Jackson's findings of fact were necessary and essential to the judgment affirmed by the

D.C. Circuit.  *See Microsoft's Memorandum Contesting 117 Out Of 383 Findings of Fact For Which Plaintiffs Seek Offensive Nonmutual Collateral Estoppel,* p. 1 (Dec. 16, 2002) (Exhibit 3).[5]  These findings included all, or nearly all, of the findings that were directly tied to Judge Jackson's conclusions on matters of relevant market, and the so-called "12 specific anticompetitive acts" which formed the behavioral portion of the liability verdict. They include only a small portion of the basis for Judge Jackson's monopoly power finding, another essential element of the monopoly maintenance claims covered by the judgment affirmed by the D.C. Circuit.

Of these findings, Microsoft has to date only challenged a few relating to Intel's Java multimedia efforts as inappropriate for collateral estoppel in the Burst case.  Microsoft's anticompetitive coercion of Intel directly damaged Burst, since it had worked with Intel, been provided its source code under a special NDA, and had been one of the very few developers to have distributed a product based on Intel's Java multimedia software.  Burst had staked its product development efforts on one of Intel's Java multimedia software efforts, the Intel Java Media Framework Player.  Seeing the critical relevance of these findings to Burst's case, Microsoft now (and for the first time) asks a court to change the scope of these findings.  Only by refuting its earlier concessions, and distorting the findings themselves, can Microsoft hope to avoid their most damaging aspects.

Regardless of how one reads the Fourth Circuit opinion, it does not give license to rewrite findings more to the liking of one party or the other in the subsequent litigation.  Moreover, with respect to these events, additional findings from the D.C. Circuit opinion are entitled to collateral estoppel.  In particular, the Court of Appeals expanded upon Judge Jackson's findings regarding Microsoft's coercion of Intel to drop its Java multimedia software efforts.  For example, in

---

[5]     Appendix A to Microsoft's memorandum identifies the 266 findings.

matters not specifically addressed in Judge Jackson's findings, the D.C. Circuit found:

> Microsoft's internal documents and deposition testimony confirm both the anticompetitive effect and intent of its actions. *See, e.g.,* GX 235, *reprinted in* 22 J.A. at 14502 (Microsoft executive, Eric Engstrom, included among Microsoft's goals for Intel: "Intel to stop helping Sun create Java Multimedia APIs, especially ones that run well ... on Windows."); Deposition of Eric Engstrom at 179 ("We were successful [in convincing Intel to stop aiding Sun] for some period of time.").

253 F.3d at 77.

In these findings, Microsoft was held to have violated the Sherman Act by using its monopoly position to threaten Intel with retaliation should it continue to develop Java multimedia software. As detailed in the findings, in the summer of 1997, Microsoft proposed to include some of Intel's technologies in its operating system, if "Intel would stop helping Sun create Java Multimedia APIs, especially ones that run well (ie native implementations) on Windows." *Finding of Fact* 406. At the time, Intel called its principal multimedia API the Java Media Framework Player. A Microsoft witness testified, and Judge Jackson accepted the testimony, that Microsoft was successful in getting Intel to stop aiding Sun's Java multimedia efforts. Discovery in Burst's case has shown that Intel dropped its JMF efforts in early 1998 as a result of the quid pro quo offered by Microsoft in the summer of 1997. Intel took this action, despite knowing that its implementation was two to three times faster than Sun's, because it found itself in "Microsoft's doghouse" with Bill Gates personally threatening a "nuclear war" if it continued on its path of competing with Microsoft in "system software."

Burst was directly injured by this agreement between Microsoft and Intel to offer only one set of multimedia APIs to developers. Burst was forced to abandon its product at a critical time in its development and the development of the market for video delivery over computer networks. Thus, the events recounted and conclusively determined in these findings are central to

one of the antitrust claims that Burst advances.

## 2.    Findings of Fact 78, 93-132.

*Findings of Fact* Nos. 78 and 93 through 132 all concern Microsoft's abuse of its

monopoly power through coercion and threats against competitive software vendors, and should

be accorded preclusive effect.  These findings detail threats against Intel[6] (Nos. 93 – 103,

primarily concerning Microsoft's attempts to prevent Intel's development of Native Signal

Processor software), Apple[7] (Nos. 104-110, primarily concerning Microsoft's attack on

QuickTime), RealNetworks[8] (Nos. 111-14, demand that RealNetworks abandon competing for

control of multimedia streaming standards) and IBM[9] (Nos. 115-132, Microsoft pressure to

reduce IBM's support for numerous rival products). Judge Jackson summarized the significance

---

[6]    "Microsoft was not content to merely quash Intel's NSP software. … Faced with Gates' threat, Intel agreed to stop developing platform-level interfaces that might draw support away from interfaces exposed by Windows." *Finding of Fact* 102.

[7]    "In their discussions with Apple, Microsoft's representatives made it clear that, if Apple continued to market multimedia playback software for Windows 95 that presented a platform for content development, then Microsoft would enter the authoring business to ensure that those writing multimedia content for Windows 95 concentrated on Microsoft's APIs instead of Apple's. The Microsoft representatives further stated that, if Microsoft were compelled to develop and market authoring tools in competition with Apple, the technologies provided in those tools might very well be inconsistent with those provided by Apple's tools.  Finally, the Microsoft executives warned, Microsoft would invest whatever resources were necessary to ensure that developers used its tools; its investment would not be constrained by the fact that authoring software generated only modest revenue." *Finding of Fact* 106.

[8]    Judge Jackson found that Bill Gates identified RealNetworks as an "adversary" and "authorized the payment of up to $65 million for a streaming software company in order to accelerate Microsoft's effort to seize control of streaming standards.  It then entered an agreement in which RealNetworks was to find an attractive value-added position in the market and abandon the base streaming business.  *Findings of Fact* 112 and 113.

[9]    "When IBM refused to abate the promotion of those of its own products that competed with Windows and Office, Microsoft punished the IBM PC Company with higher prices, a late license for Windows 95, and the withholding of technical and marketing support. … In July, Gates called an executive at the IBM PC Company to berate him about IBM's public statements denigrating Windows.   Just a few days later, Microsoft began to retaliate in earnest against the IBM PC Company. …  In sum, from 1994 to 1997, Microsoft consistently pressured IBM to reduce its support for software products that competed with Microsoft's offerings, and it used its monopoly power in the market for Intel-compatible PC operating systems to punish IBM for its refusal to cooperate." *Findings of Fact* 116, 121, and 132.

of all of these findings in explaining that Microsoft had adopted a "business strategy of directing its monopoly power toward inducing other companies to abandon projects that threaten Microsoft and toward punishing those companies that resist." *Finding of Fact* 132.

These findings are entitled to preclusive effect under the "necessary and critical" standard articulated by the Fourth Circuit. They constituted an essential part of Judge Jackson's monopoly power finding and were fully litigated by Microsoft. Contrary to Microsoft's contention, the D.C. Circuit's decision, in addition to "ascribing" liability to 12 anticompetitive acts, affirmed much more. For example, it found that the District Court had properly found an "applications barrier to entry" which prevented new rivals from entering the market, and that abundant evidence showed that Microsoft had monopoly power, in addition to the evidence of Microsoft's market share. It was Microsoft's conduct in maintaining the barrier to entry by excluding middleware threats that formed the central proposition of the government's case.

Monopoly power is, of course, defined as the ability to control price or exclude competition. Market share may be used to infer monopoly power, but direct proof can also be offered. And circumstantial evidence other than market share can be advanced. Although the parties to the Government proceedings debated the strength of the presumption of monopoly power that may arise from proof of a predominant and persistent market share, all agreed that monopoly power could not be irrefutably inferred from market share alone. As the Supreme Court held in *Eastman Kodak Company v. Image Technical Services, Inc.,* 504 U.S. 451:

> Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the "particular facts disclosed by the record." *Maple Flooring Manufacturers Assn. v. United States,* 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1925); *Du Pont,* 351 U.S., at 395, n. 22, 76 S.Ct., at 1007, n. 22; *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 70, 97 S.Ct. 2549,

> 2568, 53 L.Ed.2d 568 (1977) (WHITE, J., concurring in
> judgment).  In determining the existence of market power, and
> specifically the "responsiveness of the sales of one product to price
> changes of the other," *Du Pont,* 351 U.S., at 400, 76 S.Ct., at 1010;
> see also *id.,* at 394-395, and 400-401, 76 S.Ct., at 1007, and 1010,
> this Court has examined closely the economic reality of the market
> at issue.

504 U.S. at 466-67.

Judge Jackson found that Microsoft's large and persistent market share, combined with the applications barrier to entry created a presumption of monopoly power.  *See Conclusions of Law,* 87 F.Supp.2d 30, 36-37.  He allowed Microsoft to try to rebut that presumption by attempting to show that it had no power to control prices or exclude competition.

Microsoft claimed that its pricing and technically innovative behavior rebutted any presumed demonstration of market power.  Though Judge Jackson discounted Microsoft's evidence as not inconsistent with monopoly power, he expressly accounted for the possibility that that evidence did rebut to a certain extent the *prima facie* showing of monopoly power. *Conclusions of Law,* 87 F.Supp.2d 30, 37.[10]  Thus, Judge Jackson found it necessary to search the record for corroborative evidence of Microsoft's monopoly power.  He found such evidence in a series of instances of anticompetitive conduct that could not be explained absent a conclusion that Microsoft did, in fact, have monopoly power.  He further held that the same anticompetitive conduct showed that the barrier to entry protecting Microsoft's monopoly was in part due to its own pattern of anticompetitive conduct.  The offending pattern of conduct included numerous efforts to destroy nascent competition before it had the capability of diverting developer attention from Windows APIs.  Judge Jackson's discussion of this evidence was

---

[10]    Microsoft pointed out to the Court of Appeals that economists utilize two methods to assess monopoly power: a structural approach and a behavioral approach, examining such things as the defendant's pricing output and innovation.  Microsoft argued that the behavioral approach "is particularly appropriate here given the 'dynamic, vigorous competition' in the industry.  Microsoft argued that Judge Jackson had erred in analyzing competition in "static terms."  Brief for Defendant-Appellant, pp. 83-85 (Exhibit 1).

necessary and essential to the logic that led him to hold that Microsoft had monopoly power

protected by artificial barriers to entry in the relevant market.

Thus, in his conclusions, referring to his findings regarding Microsoft's response to

middleware threats as "additional indicia of monopoly power," Judge Jackson held:

> Moreover, over the past several years, Microsoft has comported itself in a way that could only be consistent with rational behavior for a profit-maximizing firm if the firm knew that it possessed monopoly power, and if it was motivated by a desire to preserve the barrier to entry protecting that power.   Findings ¶¶ 67, 99, 136, 141, 215-16, 241, 261-62, 286, 291, 330, 355, 393, 407.

> In short, the proof of Microsoft's dominant, persistent market share protected by a substantial barrier to entry, together with Microsoft's failure to rebut that *prima facie* showing effectively and **the additional indicia of monopoly power**, have compelled the Court to find as fact that Microsoft enjoys monopoly power in the relevant market. *Id.* ¶ 33.

87 F.Supp.2d 30, 37.

Thus, Judge Jackson reached his monopoly power conclusion based on four categories of

evidence: market share, barriers to entry, conduct not inconsistent with monopoly power, and

additional conduct evidence evidencing monopoly power.  Each of those categories of evidence

was necessary and essential to his holding; each could be characterized as independently

sufficient only by speculating how Judge Jackson would have ruled, had the particular evidence

not been present.

Cognizant that it needed to refute all four of these bases for the monopoly power

findings, Microsoft availed itself of that opportunity in its briefs to the D.C.Circuit.  Thus, in its

opening brief, it argued extensively that Judge Jackson incorrectly interpreted the evidence

regarding its activities in the streaming media market, though not claiming that any of his fact

findings were clearly erroneous.  *See* Brief for Appellant-Defendant, pp. 55-63 (Exhibit 1).

The D.C. Circuit affirmed the finding of monopoly power in its entirety, recognizing that the finding was in turn based on Judge Jackson finding of a pattern of anticompetitive conduct. In affirming his ultimate finding of monopoly power, the D.C. Circuit also affirmed each of the elements in Judge Jackson's logic. It rejected Microsoft claim that because the market was uniquely dynamic, market share data does not show monopoly power, leaving direct proof as the only way to satisfy the plaintiffs' burden of proof. Like Judge Jackson, it agreed with Microsoft that the plaintiffs had to prove more than just predominant market share. It rejected Microsoft's arguments that its innovative behavior and low pricing were inconsistent with the notion that it had monopoly power.

Finally, it explicitly affirmed Judge Jackson's reliance on evidence that Microsoft's conduct showed the existence of monopoly power. That evidence consisted of numerous threats against middleware software developers vividly showing that Microsoft thought it had the power to compel competitors to desist from engaging in competitive behavior. The D.C. Circuit affirmed the conclusion that Microsoft had monopoly power in the relevant market and Judge Jackson's reliance on such evidence:

> More telling, the District Court found that some aspects of Microsoft's behavior are difficult to explain unless Windows is a monopoly product. For instance, according to the District Court, the company set the price of Windows without considering rivals' prices, Findings of Fact ¶ 62, something a firm without a monopoly would have been unable to do. The District Court also found that Microsoft's pattern of exclusionary conduct could only be rational 'if the firm knew that it possessed monopoly power.' *Conclusions of Law*, at 37.

253 F.3d 34, at 57-58.

Microsoft's sole support for its claim that none of the findings regarding Intel, Apple, IBM and RealNetworks supported the conclusion that Microsoft had monopoly power is its contention that "the court carefully identified which actions supported" the determination of

monopoly power (*Microsoft's Memorandum Challenging Specific Findings As No Necessary to the Court of Appeals' 2001 Decision* at p. 17 (Nov. 20, 2002)) and did not identify any of findings concerning its conduct toward these companies other than Finding 99.[11]  This contention is incorrect.  In fact, Judge Jackson carefully explained his reasoning process in the text of the findings and conclusions, not in the summary citations contained in his *Conclusions of Law*. Even if one accepted Microsoft's contention, Finding 67 – a finding that Microsoft has conceded was necessary to the judgment – is a summarizing finding, incorporating all of the other findings from 68 to 132.

Thus, Judge Jackson began his discussion of the evidence regarding Microsoft's interactions with firms other than Netscape:

> Other firms in the computer industry have had encounters with Microsoft similar to the experiences of Netscape described above. These interactions demonstrate that it is Microsoft's corporate practice to pressure other firms to halt software development that either shows the potential to weaken the applications barrier to entry or competes directly with Microsoft's most cherished software products.

*Finding of Fact* 93.

At the end of the series of findings, Judge Jackson summed up their relevance to his conclusions, as well as those concerning the aborted market sharing demand Microsoft had made of Netscape, as follows:  "In any event, Microsoft's interactions with Netscape, IBM, Intel, Apple, and RealNetworks all reveal Microsoft's business strategy of directing its monopoly power toward inducing other companies to abandon projects that threaten Microsoft and toward punishing those companies that resist." *Finding of Fact* 132. If this were not enough, Judge

---

[11]     Finding 99 concerns Intel's NSP initiative.  Judge Jackson's citation of this finding is thus fundamentally at odds with Microsoft's contention that its actions with respect to Intel did not support the monopoly power conclusion.  But, as explained in the text, this finding and all of the others contained in this portion of Judge Jackson's Findings are clearly linked to Finding of Fact 67.  Indeed, it appears that the reference to Finding 99 was simply a typographic error. It appears likely given the logic of the argument that the intended reference was to the summarizing finding number 93.

Jackson reiterated his belief that Microsoft's exclusionary conduct with respect to these firms was motivated by its desire to preserve the applications barrier to entry in his conclusions of law, again citing these very same findings: "The same ambition that inspired Microsoft's efforts to induce Intel, Apple, RealNetworks and IBM to desist from certain technological innovations and business initiatives--namely, the desire to preserve the applications barrier--motivated the firm's June 1995 proposal that Netscape abstain from releasing platform-level browsing software for 32-bit versions of Windows. See *id.* ¶¶ 79-80, 93-132." *Conclusions of Law,* at 39. Clearly, such conduct of threats and inducements cannot succeed if the firm has no monopoly power; the fact that a company would embark on such a strategy is thus clear evidence that it believes that it has such market power and, as affirmed by the D.C. Circuit, is a "pattern of exclusionary conduct [that] could only be rational 'if the firm knew that it possessed monopoly power.'" *See* 253 F.3d 34, at 57-58.  Each of these findings is thus a part of the pattern of exclusionary conduct found, regardless of the fact of whether they individually would have constituted Section 2 violations.

### 3.    Findings of Fact 408-412

In the D.C. Circuit, Microsoft argued that the government had to show more than harm to its competitors to establish a violation of Section 2. The D.C. Circuit agreed:

> In a case brought by a private plaintiff, the plaintiff must show that its injury is "of 'the type that the statute was intended to forestall,'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Wyandotte Transp. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967));  no less in a case brought by the Government, it must demonstrate that the monopolist's conduct harmed competition, not just a competitor.[12]

Findings 408 through 412 contain Judge Jackson's findings directed at the issue of

---

[12]    In these cases, Microsoft has argued that plaintiffs must bear an even heavier burden to show injury to competition than the government had in its equitable enforcement action. Regardless of the relative burden, it is not disputed that both the government and the competitor plaintiffs must show harm to competition and that these findings did just that with respect to the conduct Judge Jackson identified.

consumer harm.  Finding 409 contains Judge Jackson's finding that "Microsoft also engaged in a concerted series of actions designed to protect the applications barrier to entry, and hence its monopoly power, from a variety of middleware threats, including Netscape's Web browser and Sun's implementation of Java."  As the rest of the findings make clear, the other middleware threats included RealNetworks, Apple, IBM and Intel initiatives.  Finding 410 specifically references Intel's NSP efforts. Finally, Judge Jackson assessed the effects of Microsoft's activities with respect to all the middleware threats that it confronted during the 1995 to 1999 period and found:

> Most harmful of all is the message that Microsoft's actions have conveyed to every enterprise with the potential to innovate in the computer industry. Through its conduct toward Netscape, IBM, Compaq, Intel, and others, Microsoft has demonstrated that it will use its prodigious market power and immense profits to harm any firm that insists on pursuing initiatives that could intensify competition against one of Microsoft's core products.  Microsoft's past success in hurting such companies and stifling innovation deters investment in technologies and businesses that exhibit the potential to threaten Microsoft.   The ultimate result is that some innovations that would truly benefit consumers never occur for the sole reason that they do not coincide with Microsoft's self-interest.

*Finding of Fact 412.*

Judge Jackson made these findings in response to Microsoft claim that its conduct benefited consumers, even though it harmed its competitors.  Microsoft, citing well-established principles of antitrust law, contended the government had to prove consumer injury in order to establish that Microsoft's conduct did not simply cause harm to its competitors without any corresponding harm to competition.

For example in its opening appeal brief, Microsoft contended:

> Even accepting the district court's findings, its conclusion that Microsoft violated the Sherman Act is unsustainable.  At bottom, the district court condemned Microsoft for competing on the merits against two other platforms: Navigator and Java.  Recognizing that

> those platforms had the potential to supplant Windows as a leading
> platform for applications, Microsoft (i) improved Windows to
> satisfy demand for Internet-related functionality, (ii) distributed
> those improvements broadly to users, and (iii) "evangelized" third
> parties to use Microsoft's new technologies in their products.  This
> conduct was unambiguously procompetitive: it benefited
> consumers by (i) lowering prices, (ii) insuring widespread
> availability of the new technology, and (iii) accelerating product
> improvement.

Brief of Appellant-Defendant, at 68.  Judge Jackson's consumer harm findings were, thus,

necessary support for the conclusion that Microsoft's conduct harmed competition.

### 4.    Excerpts from the D.C. Circuit Opinion

In addition to the excerpts relating to the pressure exerted on Intel discussed above,

certain other findings included in the D.C. Circuit opinion should be given collateral estoppel

effect.  They are listed in Appendix B and all relate to matters covered in the 266 findings that

form the conceded core of Judge Jackson's judgment.

## III.    CONCLUSION

For all these reasons, the Court should determine that collateral estoppel applies to the

findings identified in Appendices A & B.

DATED: June 7, 2004.

SPENCER HOSIE (Ca Bar # 101777)
BRUCE J. WECKER (Ca Bar # 078530)
HOSIE, FROST, LARGE & McARTHUR
One Market, Spear Street Tower, 22nd Floor
San Francisco, CA 941
Telephone: 415-247-6000


ROBERT YORIO (Ca Bar # 93178))
CARR & FERRELL, LLP
2200 Geng Road
Palo Alto, CA 94303
Telephone: 650-812-3400

By   /s/
        Bruce J. Wecker
Attorneys for Plaintiff Burst.com, Inc.

## PROOF OF SERVICE

I am employed in the State of California, County of San Francisco.  I am over 18 years of age and am not party to the within action.  My business address is One Market, Spear Tower, Suite 2200, San Francisco, California 94105.

On June 7, 2004, I served BURST.COM, INC.'S COLLATERAL ESTOPPEL BRIEF ON REMAND upon counsel named below as indicated:

Jonathan Treece *(via e-mail)*
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 South Dearborn Street
Chicago, IL  60603

Bryan Anderson *(via hand delivery)*
**SIDLEY AUSTIN BROWN & WOOD LLP**
555 California Street, Suite 5000
San Francisco, CA  94104-1715

Ralph Palumbo *(via Federal Express)*
**SUMMIT LAW GROUP**
315 Fifth Avenue South, Suite 1000
Seattle, WA  98104

James P. Ulwick *(via Federal Express)*
**KRAMON & GRAHAM, PA**
One South Street, Suite 2600
Baltimore, MD  21202-3201

Sean Gallagher *(via Federal Express)*
**BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP**
54 West Hubbard, Suite 300
Chicago, IL  60610

Executed this 7th day of June, 2004.

___/s/_____
Janine DeAndre