# APPENDIX B

### *UNITED STATES v. MICROSOFT CORP.*, 253 F.3d 34 (D.C. Cir. 2001)

---

All of the following statements are reprinted verbatim from the D.C. Circuit's unanimous opinion upholding Microsoft's liability.

1. "The [applications] barrier is … a characteristic of the operating system market, not of Microsoft's popularity, or, as asserted by a Microsoft witness, the company's efficiency." 253 F.3d at 56.

2. "[W]hen Microsoft introduced Windows 95 and 98, it was able to bypass the applications barrier to entry that protected the incumbent Windows by including APIs from the earlier version in the new operating systems." 253 F.3d at 56. .

3. "Most telling, in presentations to OEMs, Microsoft itself represented that having only one icon in a particular category would be 'less confusing for endusers.'" 253 F.3d at 61.

4. "Microsoft does not deny that the prohibition on modifying the boot sequence has the effect of decreasing competition against IE by preventing OEMs from promoting rivals' browsers. Because this prohibition has a substantial effect in protecting Microsoft's market power, and does so through a means other than competition on the merits, it is anticompetitive." 253 F.3d at 62.

5. "[W]e reject Microsoft's argument that we should vacate Finding of Fact 159 as it relates to the commingling of code, and we conclude that such commingling has an anticompetitive effect; as noted above, the commingling deters OEMs from pre-installing rival browsers, thereby reducing the rivals' usage share and, hence, developers' interests in rivals' APIs as an alternative to the API set exposed by Microsoft's operating system." 253 F.3d at 66.

6. "In this case, plaintiffs allege that, by closing to rivals a substantial percentage of the available opportunities for browser distribution, Microsoft managed to preserve its monopoly in the market for operating systems. The IAPs constitute one of the two major channels by which browsers can be distributed. *Findings of Fact* § 242. Microsoft has exclusive deals with 'fourteen of the top fifteen access providers in North America [, which] account for a large majority of all Internet access subscriptions in this part of the world.' *Id.* § 308. By ensuring that the 'majority' of all IAP subscribers are offered IE either as the default browser or as the only browser, Microsoft's deals with the IAPs clearly have a significant effect in preserving its monopoly; they help keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly. *See, e.g., id.* § 143 (Microsoft sought to 'divert enough browser usage from Navigator to neutralize it as a platform.'); *see also* Carlton, at 670." 253 F.3d at 70.

7. "In that light, one can tell from the record that by affecting the applications used by "millions" of consumers, Microsoft's exclusive deals with the ISVs had a substantial effect in further foreclosing rival browsers from the market. (Data introduced by Microsoft, *see* Direct

    Testimony of Cameron Myhrvold § 84, *reprinted in* 6 J.A. at 3922-23, and subsequently relied upon by the District Court in its findings, *see, e.g., Findings of Fact* § 270, indicate that over the two-year period 1997-98, when Microsoft entered into the First Wave agreements, there were 40 million new users of the internet.)  Because, by keeping rival browsers from gaining widespread distribution (and potentially attracting the attention of developers away from the APIs in Windows), the deals have a substantial effect in preserving Microsoft's monopoly, we hold that plaintiffs have made a prima facie showing that the deals have an anticompetitive effect."  253 F.3d at 72.

8.     "This exclusive deal between Microsoft and Apple has a substantial effect upon the distribution of rival browsers.  If a browser developer ports its product to a second operating system, such as the Mac OS, it can continue to display a common set of APIs.  Thus, usage share, not the underlying operating system, is the primary determinant of the platform challenge a browser may pose.  Pre-installation of a browser (which can be accomplished either by including the browser with the operating system or by the OEM installing the browser) is one of the two most important methods of browser distribution, and Apple had a not insignificant share of worldwide sales of operating systems.  *See id.* § 35 (Microsoft has 95% of the market not counting Apple and 'well above' 80% with Apple included in the relevant market).  Because Microsoft's exclusive contract with Apple has a substantial effect in restricting distribution of rival browsers, and because (as we have described several times above) reducing usage share of rival browsers serves to protect Microsoft's monopoly, its deal with Apple must be regarded as anticompetitive.  *See Conclusions of Law*, at 42 (citing *Findings of Fact* § 356) ('By extracting from Apple terms that significantly diminished the usage of Navigator on the Mac OS, Microsoft helped to ensure that developers would not view Navigator as truly cross-platform middleware.')."  253 F.3d at 73-74.

9.     "Because the cumulative effect of the deals is anticompetitive and because Microsoft has no procompetitive justification for them, we hold that the provisions in the First Wave Agreements requiring use of Microsoft's JVM as the default are exclusionary…" 253 F.3d at 76.

10.    "[O]ther Microsoft documents confirm that Microsoft intended to deceive Java developers, and predicted that the effect of its actions would be to generate Windows-dependent Java applications that their developers believed would be cross-platform; these documents also indicate that Microsoft's ultimate objective was to thwart Java's threat to Microsoft's monopoly in the market for operating systems.  One Microsoft document, for example, states as a strategic goal: "Kill cross-platform Java by grow[ing] the polluted Java market." 253 F.3d at 76.

11.    When specifically accused by a *PC Week* reporter of fragmenting Java standards so as to prevent cross-platform uses, Microsoft denied the accusation and indicated it was only "adding rich platform support" to what remained a cross-platform implementation.  An e-mail message internal to Microsoft, written shortly after the conversation with the reporter, shows otherwise:  "[O]k, i just did a followup call…. [The reporter] liked that i kept pointing customers to w3c standards [(commonly observed internet protocols)]….[but] he accused us of being schizo with this vs. our java approach, i said he misunderstood [--] that [with Java] we are merely trying to add rich platform support to an interop layer….this plays well….at this point its [sic] not good to create MORE noise around our win32 java classes. instead we should just quietly grow j++

    [(Microsoft's development tools)] share and assume that people will take more advantage of our classes without ever realizing they are building win32-only java apps." 253 F.3d at 76; GX 1332, *reprinted in* 22 J.A. at 14922-23.

12.     "Microsoft's conduct related to its Java developer tools served to protect its monopoly of the operating system in a manner not attributable to the operating system or the acumen of its makers and was therefore anticompetitive. Unsurprisingly, Microsoft offers no procompetitive explanation for its campaign to deceive developers." 253 F.3d at 77.

13.     "The District Court held that Microsoft also acted unlawfully with respect to Java by using its 'monopoly power to prevent firms such as Intel from aiding in the creation of cross-platform interfaces'… In 1995 Intel was in the process of developing a highperformance, Windows-compatible JVM. Microsoft wanted Intel to abandon that effort because a fast, cross-platform JVM would threaten Microsoft's monopoly in the operating system market." 253 F.3d at 77; 87 F. Supp 2d at 43.

14.     "Microsoft's internal documents and deposition testimony confirm both the anticompetitive effect and intent of its actions … (Microsoft executive, Eric Engstrom, included among Microsoft's goals for Intel: "Intel to stop helping Sun create Java Multimedia APIs, especially ones that run well…on Windows."); Deposition of Eric Engstrom at 179 ("We were successful [in convincing Intel to stop aiding Sun] for some period of time.")." 253 F.3d at 77.

15.     "Microsoft does not deny the facts found by the District Court, nor does it offer any procompetitive justification for pressuring Intel not to support cross-platform Java. Microsoft lamely characterizes its threat to Intel as 'advice.' The District Court, however, found that Microsoft's "advice" to Intel to stop aiding cross-platform Java was backed by the threat of retaliation, and this conclusion is supported by the evidence cited above. Therefore we affirm the conclusion that Microsoft's threats to Intel were exclusionary…" 256 F.3d at 77-78.