IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION. | MDL Docket No. 1332 |
| This Document relates to: | Hon. J. Frederick Motz |
| *Burst.com, Inc. v. Microsoft Corp.*, | **BURST.COM, INC.'S THIRD MOTION TO COMPEL MICROSOFT TO PROVIDE BASIC DISCOVERY CONCERNING ITS E-MAIL DESTRUCTION** |
| Civil Action No JFM-02-cv-2952 | |

## I.    INTRODUCTION AND SUMMARY.

In 1995, Bill Gates said that while "this antitrust thing will blow over," perhaps Microsoft should "change [its] e-mail retention policies." See Exhibit 1. Microsoft did. It adopted a written policy that e-mail should not be saved to servers subject to document retention back-up. See below § II.

In July 1997, the same month that Microsoft received a new round of CID's from the Department of Justice, Microsoft "added teeth" to its no retention policy by amending its internal guidelines to state "Due to legal issues, mail files (PST Files) cannot be stored on any corporate servers that are backed up to tape." See Exhibit 2. Microsoft later sharpened these teeth even more by programming its back-up computers to delete e-mails Microsoft's executives tried to save despite the policy. And in January 2000, mere weeks after Judge Jackson's decision, senior Microsoft executive Jim Allchin wrote an e-mail to numerous executives admonishing them not to save e-mail:

> Being even more hardcore.... This is not something that you get to decide. This is company policy. Do not think this is something that only applies to a few people. Do not think it will be ok if I do

this; it hasn't caused any problems so far. **Do not archive your e-mail. Do not be foolish.** 30 days.

See Exhibit 3 (emphasis ours).

In the face of these facts, and after two motions to compel and two abortive 30(b)(6) depositions, Microsoft still pretends it cannot answer even the most basic questions concerning its e-mail retention and destruction. It says it does not know who first decided that e-mails should not be saved on servers subject to back-up. It says it does not know who changed its internal documents to specify that this policy arose from "legal issues." It says it does not know what those legal issues were, not even most generally. See below § II. According to Microsoft, its entire institutional knowledge on these subjects reduces to gross speculation that some unknown I.T. staffer acting alone decreed that no e-mail should be saved – and deleted if saved - and then fabricated the "legal issues" language, all just to save a few dollars on server back-up tapes.

Worse yet, Microsoft's story keeps changing. In August of last year, Microsoft told this Court that the e-mail back-up exclusion went into effect in April 2000. This was explicit in Microsoft's briefing and argument, as it was in the sworn declaration of Microsoft's back-up manager Douglas Brown. Two months later, Mr. Brown testified that the e-mail back-up exclusion actually went into effect in 1996, pre-litigation, and that his earlier testimony was false. Then, just days ago, Mr. Brown had a third explanation. This time he testified that he personally ordered that the automatic exclusion go into effect in **April 2003**, in the midst of litigation, and he does not know if it were in place earlier. Mr. Brown can only explain his previous, and varying, sworn accounts by saying that he forgot in *August* 2003 what he did in *April* 2003, although he apparently remembers now a full year later.

None of this is remotely credible. As an institution, Microsoft undoubtedly knows [and can tell us] **who** adopted the e-mail destruction policy, **when**, and **why**. This was a hugely significant policy with real ramifications for Microsoft's business, its legal exposure, and its institutional recollection. It knows what the "legal issues" were, who exactly had those concerns, and who had those concerns addressed. And Microsoft knows – or certainly could find out – when it enforced the policy by automatically excluding e-mails from back-up. Microsoft simply refuses to provide serious discovery on these issues because it does not want to admit that it destroyed e-mails in anticipation of litigation and in violation of numerous document retention orders.

Burst brings this motion – its third – to compel Microsoft finally to answer these basic questions. In Section IV below, we list the things that Microsoft should do, but has not done, to educate properly its witnesses. It should interview the people with **real** knowledge, the senior lawyers and executives involved in the DOJ case who undoubtedly had a sharp interest in e-mail retention and destruction. It should look for documents in the one repository that does not get purged, the law departments' server. And it should talk to Martha Dawson, outside counsel at Preston, Gates & Ellis, who by her own admission has been handling Microsoft's document retention and collection problems for years. And if at the end of the day, Microsoft continues to refuse to provide discovery, Burst asks that this Court enter an order prohibiting Microsoft from offering innocent explanations for its e-mail destruction policies – and resulting document gaps – at trial.

## II.   THE RUN AROUND: MICROSOFT CONTINUES TO PRETEND IT DOES NOT KNOW WHO DECIDED TO PURGE E-MAILS, MUCH LESS WHEN OR EVEN WHY.

This motion turns on three distinct, separate decisions Microsoft made in an effort to root

out its e-mails. First Microsoft adopted in 1995 its no-retention policy, i.e., that e-mails should not be saved on servers subject to back-up. Second, in July 1997, someone at Microsoft strengthened this policy by tying the no-retention injunction to "legal issues." Third, at some indeterminate time, Microsoft decided to enforce the no retention injunction by programming its computers to delete e-mails executives tried to save notwithstanding the "do not be foolish" injunction. On each of these decisions, Microsoft pleads gross ignorance.

A.    **Burst's First Motion.**

Last August, Burst filed the first of what would become three motions to compel Microsoft to answer basic questions about its e-mail destruction and retention policies. Even then, it was apparent that there were significant – and strategic – gaps in Microsoft's e-mail production. For example, there were no e-mails relating to lengthy meetings between the parties, although Microsoft produced a profusion of innocuous e-mails both before and after key meetings. Nor had Microsoft produced more than 70 e-mails to and from Burst, although Burst had produced its copies of these e-mails from its own records. Accordingly, Burst moved that Microsoft be compelled to search its server back-up tapes and fill the e-mail gaps.

Microsoft responded that there were no errant e-mails, and that the perceived "gaps" reflected Burst counsel's confusing "fantasy with reality." Microsoft Opp. at 3. More substantively, Microsoft said that any search would be impossibly burdensome because it prefers not to know which employee used which server when. See Microsoft Opp. at Declaration of Microsoft counsel Martha Dawson at ¶ 12 ("Microsoft does not keep a record of which custodian's files are located on which file servers."). Microsoft accordingly told this Court that it would have to review "approximately 25,000 back-up tapes from Redmond located file servers alone," with each tape containing "approximately 50 gigabytes of data." See Opp. Douglas

Brown Declaration at ¶ 13. Absent such a "Herculean" effort, Microsoft concluded that any missing e-mails would remain forever lost. Id.

Apart from burden, Microsoft said that any back-up tape search would be a fool's errand. This was so, it explained, because Microsoft "generally directs employees **not** to store e-mail messages on file servers." Microsoft Opp. at 10 (emphasis in original). And lest employees disregard that policy, "no later than April 2000, the company enforced that policy by automatically excluding documents with ".pst" extensions – signifying e-mail messages – from being backed up." Microsoft Opp. at 10-11, citing Douglas Brown Declaration at ¶ 4. As Microsoft's counsel explained at the August hearing:

> The Court:    But I understood this [system change] did not affect pre-existing e-mail, but only e-mails that one tries to put on the server after April 2000. Is that right, Mr. Treece?
>
> Mr. Treece:    Yes, in terms of back-up. In other words, if it had been backed up prior to that time, it would be – if somebody had kept in **March of 2000** had violated company policy, **put an e-mail, it would have been backed up**.

See Exhibit 4, August 26 Hearing Tr. at p. 27:4-13.

Given these representations, the Court entered limited relief, directing Microsoft to search on a sample basis for missing e-mails for a short list of individuals. The Court also invited Burst to take additional depositions to develop the factual record.

Microsoft's story began to change right after the hearing. Within weeks, it had to acknowledge that there were indeed significant and Burst-specific gaps in its production. See Exhibit 5, September 23, 2003 letter from John Treece to Hon. J. Frederick Motz ("we discovered that the missing responsive documents were on the CD that we had provided to the vendor, but were not on the CD that the vendor had returned to us...."). The gaps were no "fantasy"; of course there were gaps, as even Microsoft conceded when it acknowledged purging

the files of two key Microsoft employees (Friedman and del Val) dealing with Burst when they left Microsoft's employ long after this Court entered its preservation of documents order.

Matters changed yet more when Microsoft produced its first corporate witness on e-mail destruction. Shortly after the August 28 hearing, Burst served a 30(b)(6) notice on Microsoft, seeking the person most knowledgeable concerning its decision "to discontinue the preservation of e-mails archived on file servers, including who made the decision, the reasons for the change, the actual date of implementation, and any notice of the change provided to plaintiff's counsel in any Microsoft antitrust litigation."[1] Microsoft selected Douglas Brown as its representative, the same individual who had submitted a declaration opposing Burst's initial motion. Mr. Brown joined Microsoft in April 2000, and worked as its back-up operations manager from November 2000 to the present. Conspicuously, Microsoft selected as its corporate representative a witness who did not even work for Microsoft when it adopted its no-e-mail retention policy.

Mr. Brown clarified that, while Microsoft carefully does not map custodians to servers, it does map business groups to servers. See Exhibit 6, September 30, 2003 Brown Depo. at 76:4-10 ("There is a database that tracks which business units own which servers"). Most of the key Burst Microsoft witnesses work for the Microsoft Digital Media Division Group. Because Microsoft knows which servers this **group** used, it knows which servers the **individuals** in the group used. If Microsoft wanted to restore documents from the Burst DMD custodians, it would not rummage randomly through 25,000 tapes, as it solemnly represented to the Court. Rather, it would simply go to the servers used by that group and retrieve the tapes for those few servers. This was never about 25,000 tapes, as Microsoft claimed, but rather perhaps 60 to 80 tapes. Microsoft's opposition, its declarations (including one from counsel Martha Dawson), and its

---

[1]    With the "notice of the change language" coming from this Court's April 2000 Preservation of Documents Order.

presentations to the Court were all profoundly misleading.

Nor were things what they seemed on why Microsoft told employees not to save e-mails on servers subject to back-up, one of the specific deposition topics. Mr. Brown initially professed to know nothing about the policy:

> Q:    Did you come to have an understanding of why company policy is that e-mail pst files should not be stored on file servers?
>
> A:    I have not been able to come to an understanding of why that was written the way it was.
>
> ***
>
> Q:    You have no knowledge of why that was the guidance given?
>
> A:    I don't.
>
> Q:    And nor could you learn in any of your multiple conversations to educate yourself for your testimony today?
>
> A:    I have not been able to learn that....

Id. at 40:12-16; 42:25-43:5.

But Microsoft produced a box of documents the evening before the deposition. Deep in the box was one that shed real light on Microsoft's decision to exclude e-mails. In pertinent part it said:

> **Due to legal issues, mail files (PST files), cannot be stored on any corporate servers that are backed up to tape.** This applies to all servers in the data center.

See Exhibit 7, Corporate Back-up Services document at MS-CC-BU 192887 (emphasis ours).

Although at deposition Mr. Brown stoutly denied knowing anything about any reasons for the policy, and had carefully avoided any reference to "legal issues," it turned out that Brown was very familiar with the document. In fact, *he* himself had posted it on the Microsoft internal

website as part of his general summary of policies and procedures governing document back-up.
Brown Depo. at 43:15-23. Had Burst not found this sentence in a document produced in a box
of paper the night before the deposition, Mr. Brown would have said nothing about "legal
issues," and the issue would have sunk with nary a ripple.

Once shown the document, Mr. Brown confessed to knowing about the "legal issues"
description, but said he could not explain why it was there:

> Q:    And what were the legal issues that resulted in this guidance being given?
>
> A:    I don't know that.
>
> Q:    Did you ask anyone in your many conversations to prepare yourself?
>
> A:    I asked to try to find out what that was, and I was unable to find anybody who could answer that question.
>
> Q:    Do you know who made the decision that resulted in this guidance that due to legal issues, they should not store archived e-mails?
>
> A:    I do not.
>
> Q:    Do you know when that decision was made?
>
> A:    I don't know….

Brown Depo. at 46:19-47:6. See also id. at 53:18-19 ("Like I said before, I don't know what the
legal issues they're referring to.").

Mr. Brown was quick to answer,[2] though, on the question of when Microsoft began
"enforcing" its anti-retention policy by excluding rebelliously archived e-mails from back-up.
Contradicting Microsoft's statements to the Court, Mr. Brown testified that the policy did not
originate in April 2000, but arose at some indefinite point much earlier, circa 1994-1996. That

---

[2]    At least initially; see below § II.B.

is, Mr. Brown was careful to testify that the automatic e-mail purge **predated** litigation, providing Microsoft with a safe harbor on this one issue at least.

Despite efforts to educate himself, Mr. Brown was unable to testify as to who created the policy, when exactly that decision was made, or even why. Brown Depo. at 42:7-43:5. He speculated that the e-mail back-up exclusion arose because Microsoft employees were instructed not to archive e-mails to file servers subject to back-up. Id. at 52 ("Since people are asked not to save PST files to the file servers, OTG excluded them from the backup routine."). But he was unable to explain why it made sense to exclude files which by definition should not exist. Id. at 54 ("Why have a file exclusion unless there's something to exclude?").

### B.    Burst's Second Motion.

On this record, Microsoft's institutional knowledge of how it came to exclude e-mails reduced to "we don't know, and we can't find out." But excluding an important class of documents from retention and back-up would not have been a ministerial decision casually made by a document back-up technician. A diligent investigation would uncover who made these decisions, when, and why. Accordingly, ten days after Mr. Brown's deposition, Burst renewed its motion, this time seeking a specific order requiring Microsoft to answer the questions and take the discovery seriously.[3]

Microsoft opposed this renewed motion, arguing now that the inquiry was not "relevant" because the "unambiguous evidence" established that Microsoft initiated its e-mail destruction policies long before Burst filed this lawsuit. See Microsoft Renewed Motion Opposition at 6 ("In the context of a case where the interaction between Burst and Microsoft began in 1999,

---

[3]    As Burst counsel explained to this Court at the February 6, 2004, renewed motion hearing, "If we didn't get an order, it would be much easier for Microsoft to say, well, it's just a discovery issue. You should have asked more, you should have asked differently, you should have brought on a motion to compel...." See Exhibit 8, February 6 Hearing Tr. at 34-35.

there is no basis for allowing discovery about 1994-96 facts.").

This Court granted Burst's Renewed Motion, and Burst counsel negotiated the precise text of an order with Microsoft counsel. Microsoft counsel approved every word of the order granting Burst's motion to compel. This Court signed the order on March 12, 2004.

In pertinent part, that order directed Microsoft to produce for deposition the person or persons most knowledgeable concerning:

- Microsoft's directive to "(1) not to store e-mails on servers that are subject to backup or (2) otherwise to exclude e-mails from being backed-up by Microsoft backup systems."

- "The reasons why the decisions that resulted in the directives… above were made, and the individuals involved in making, implementing or disseminating those decisions."

- "The nature of the legal issues and concerns, and/or matters referred to in MS-CC-BU-192887 [(one of the policy documents stating that 'due to legal reasons' e-mails should not be saved)], and the individuals involved in formulating the policy or procedure expressed by ¶ 1)."

- "When the decisions or other acts referenced above in specifications 1-5 were made or done, and when they were implemented."

See Exhibit 9.

On April 21, 2004, Microsoft once again produced Douglas Brown as its designee for this Court ordered deposition. Mr. Brown began by announcing that his prior declaration and sworn testimony were wrong. While he had previously testified that he was "very sure" that Microsoft's automatic e-mail exclusion was in place from 1994 to 1996 forward, he now claimed

that in April 2003, *just a few months before his initial declaration and deposition*, he learned

that the exclusion was <u>not</u> in place for Microsoft's Redmond based servers. <u>See</u> Exhibit 10,

Brown April 21, 2004 deposition at 12:20-13:14.  Mr. Brown recollected that **he** had directed

that the automatic exclusion be put into effect, and it was *as of April 2003*.  Mr. Brown conceded

that he still does not know if the back-up exclusion was in effect prior to April 2003.  <u>Id</u>. at

14:24-15:1 ("Q: And it might have been in place earlier, it might not have been?  A: It might

have been and it might not have been.").  And unless "people have been flitting in and out of the

data center turning" the exclusion on and off, which Mr. Brown agreed was unlikely, he admitted

that the exclusion was **not** in effect prior to April 2003, all his prior testimony to the contrary

notwithstanding.  <u>Id</u>. at 30:4-31:4.  Mr. Brown could only explain his prior false (but adamant)

testimony by saying that he forgot in **August** 2003 what happened in **April** 2003.  <u>Id</u>. at 27:9-14.

On the substance of the "not save" e-mail policy, Mr. Brown still had no concrete

information at all.  But he was prepared to volunteer a "guess": that the prior OTG manager – a

Ms. Candy Stark – created the policy all on her own and did so to conserve resources:

> A:     Her objective in this service was to reduce the number of
> servers and the amount of disk space required to serve the file
> server service.  So her team requested in that document via their
> policy document to not save PST files to those servers.
>
> Q:     So it's your understanding that [the] don't save e-mails to
> servers subject to back-up [policy] originated in a desire to
> conserve resources?
>
> A:     To conserve server and disk resources.

Douglas Brown April 21, 2004 Deposition at 35:1-9.  Mr. Brown could not say whether someone

outside the document back-up group directed Ms. Stark to adopt that policy, or even whether Ms.

Stark even discussed that policy with anyone beyond a few back-up technicians.  <u>Id</u>.  Nor could

he explain why only e-mails, as a class of documents alone, were excluded from back-up, other

than to speculate that e-mails consume lots of memory and were not important.  Id.

Nor was Mr. Brown able to shed any light on the repeated Microsoft documents stating that the policy directive was "due to legal issues."  He testified that he went back and checked the various iterations of Microsoft server file share requests, and that that language first appeared in July 1997.  He testified further that he spoke Ms. Stark about why this statement was added to the OTG's policy documents and file server share requests, and that Ms. Stark's unsworn speculation was as follows:

> Candy's best guess in our conversation this week was that those
> words "due to legal issues" were put in the document to give it
> teeth because her team was getting kickback from – excuse me,
> pushback from end-users who were wanting to challenge the policy
> to not store PST files on file servers.

Id. at 47:4-9.  This is not corporate knowledge; it is the rankest and most self-serving speculation.  Microsoft's corporate position now is that a back-up services manager acting alone decided that e-mails should not be saved and then published numerous false policy statements over many years to give that decision "teeth," all to save the cost of a few server back-up tapes.

Finally Mr. Brown was completely unable to say who decided to enforce the do not save policy by automatically deleting e-mails from back-up.  Id. at 56:2-10 ("Q: Who came up with that policy back in 1994?  A: I have -- I have not been able to determine that through any of my conversations... I can't tell you who derived that policy.").  He did hazard that the exclusion also found its justification in conserving back-up tapes and back-up resources.  Id. at 66.  ("It was to reduce the resources required to backup the servers that we backup.").  But Mr. Brown admitted this too was pure speculation:

> I don't know who made it and I don't know specifically why they
> made it [the decision to exclude]....

Id. at 67.  He also ventured that e-mails were "picked on" because they were not important, even

though e-mail was and remains the principal means by which Microsoft executives debate issues and decide strategy. <u>Id.</u> at 76. <u>See</u> Exhibit 11, November 16, 2000 Testimony of Senior Microsoft lawyer Thomas Burt at 97 ("[e-mail] is the central nervous system of the company").

## III.   **MICROSOFT'S CURRENT SPECULATIONS ARE DEMONSTRABLY FALSE.**

Excluding an entire category of documents, e-mails in this instance, from document retention was no small decision. E-mails are centrally important at Microsoft. E-mail remains the way most Microsoft executives communicate, debate issues, and decide strategy.

It is simply not possible that someone in the handful of IT technicians running Microsoft's back-up program unilaterally decided to exclude e-mails, and e-mails alone, from document back-up. Why e-mails? Why not Power Point presentation, spreadsheets, or other analyses? Where were the executives? Where were the lawyers, given Microsoft's important document retention obligations?

Nor is it possible that an IT staffer simply fabricated a "due to legal issues, mail files cannot be stored on any corporate servers that are backed up to tape" injunction to make a mere economy measure sound more urgent. Mr. Brown testified that this language first appeared in July 1997, and it appears thereafter in Microsoft's successive computer share request forms, as well as in the document summarizing back-up policies and procedures. What's more, this language was even changed over the years, becoming by early 2002 "Because of legal constraints, mail files (PST files) cannot be stored on any corporate servers that are backed up to tape." <u>See</u> Exhibit 2, at 236197. Who edited this language? Why? Would they, too, agree that it was just a fabrication?

Mr. Brown repeated Ms. Stark's speculation that "due to legal issues" was added to resist "push-back" from executives who wanted to save e-mails on servers subject to back-up. But if

Microsoft executives wanted to save e-mails to servers, how plausible is it that technical employees in Microsoft's document back-up group had the power not only say "no," but then go to the extreme measure of creating false documents to give force to their "no"? This is ridiculous.

Nor is it remotely possible that the injunction against archiving e-mails to servers, and enforcing that policy with tape dumps, originated in a desire to conserve resources. If conservation were the issue, why not the directive "please archive only documents that really matter"? If conservation were the issue, why e-mails and e-mails alone? And are we to believe that Mr. Allchin's "hard core" January 2000 "do not archive your e-mail, do not be foolish" e-mail was driven by this very senior executive's desire to control expenditures in the OTG group?

Nor is it accurate to say that Microsoft put teeth in the policy by programming its back-up computers to automatically delete e-mails as early as to the mid-1990's, <u>i.e.</u>, pre-litigation. One conclusive point of proof: in a discovery dispute in the <u>Sun I</u> case in 1999, Sun moved to compel Microsoft to search its back-up tapes for e-mails saved to servers in 1997 and 1998 and saved to server back-up tapes. But if the automatic exclusion were in place, these by definition could not exist. In all of the Microsoft employee depositions concerning that dispute, however, and in Microsoft's papers to the Court, *not once did Microsoft make the point that it had programmed its computers to exclude e-mails from back-up, and so Sun was asking Microsoft to search for materials that could not exist.* This surely would have been the very first point made, if it were true.

Microsoft is working hard not to admit that it made this change during litigation, and in violation of this Court's document preservation order. Its "speculations" to the contrary are silly. And they are false.

## IV.    **THE SPECIFIC RELIEF SOUGHT.**

This motion seeks several remedies.  First, Microsoft should be ordered to produce a truly knowledgeable witness and properly educate the witness.  This means talking to the full set of Microsoft lawyers and other employees likely to know about Microsoft's document retention issues and e-mail destruction decisions.  These would not be low level staff lawyers, but senior lawyers directly involved in the DOJ case and interacting with senior executives, such as Messrs. Gates and Allchin.  The deponent should be instructed to interview Microsoft lawyers Thomas Burt, Richard Wallis, and Steven Aeschbacher, and the others involved in these decisions.  And these lawyers should be asked to provide sworn declarations, as against unsworn speculation repeated by the witnesses (our "best guess").

Second, the deponent should speak with Messrs. Allchin and Gates.  They obviously were involved in e-mail retention and destruction issues, and both were central witnesses in the DOJ case (where it appears Microsoft first appreciated that life would be simpler with fewer e-mails).

Third, there will be a paper trail that reflects who made these decisions.  The Microsoft Law Department (known by the acronym "LCA") maintains several servers, at least one of which was actively in use in the mid-1990's forward (known as "Litigate 1").  It's Burst's understanding that these servers are not purged and are subject to back-up.  Accordingly, Microsoft should be instructed to review the contents of the server, and back-up tapes for the server, looking for correspondence or e-mails or other documents explaining who made the policy decisions, when, and why.  It should then produce all relevant documents.

Along the same lines, Microsoft's document retention and production has been handled for years by the outside law firm of Preston, Gates & Ellis.  By her own claim, much of that

work has been supervised by outside counsel Martha Dawson, who has submitted numerous declarations in opposing motions brought by plaintiffs in these competitor cases, including Burst's first motion on e-mails. See Exhibits 12 and 13 (prior Dawson Declarations). Surely Preston Gates has information on these policies, and the implementation of the policies. How could it not, being responsible for document retention and production issues in litigation going back to the mid-1990's? The firm's documents should be searched, and Ms. Dawson interviewed, with her testimony set forth in a sworn declaration.

In short, Microsoft should be ordered  (again) to take this discovery seriously. Discovery should not be some sort of Easter egg hunt, or a game of blind man's bluff. These are serious questions that go to the very integrity of discovery, and they have not yet been answered at all.

Finally, unless Microsoft can demonstrate who decided upon its e-mail destruction policy, when, and why, Burst respectfully requests that the Court to enter an order prohibiting Microsoft from offering to the jury **any** explanation in accounting for its e-mail destruction policies and resulting e-mail gaps. If Microsoft will not produce the facts, it should not be allowed to hide behind speculation.

## VI.    CONCLUSION.

For the compelling reasons set forth above, Burst respectfully requests that this Court grant this motion.

DATED: April 29, 2004

SPENCER HOSIE (Ca Bar # 101777)
BRUCE J. WECKER (Ca Bar # 078530)
JOHN BURRITT McARTHUR (Ca Bar # 159793;
    Texas Bar #13325650)
GEORGE F. BISHOP (Ca Bar # 89205)
JAMES T. McCARTT (Ca Bar # 121983;
    Texas Bar # 13376350)
HOSIE, FROST, LARGE & McARTHUR
One Market, Spear Street Tower, 22nd Floor
San Francisco, CA 94105
Telephone: 415-247-6000

ROBERT YORIO (Ca Bar # 93178)
COLBY B. SPRINGER (Ca Bar # 214868)
CARR & FERRELL, LLP
2225 East Bayshore Road, Suite 200
Palo Alto, CA 94303
Telephone: 650-812-3400

By: _____
    Spencer Hosie
    Attorneys for Plaintiff Burst.com, Inc.

## PROOF OF SERVICE

I am employed in the State of California, County of San Francisco. I am over 18 years of age and am not party to the within action. My business address is One Market, Spear Tower, Suite 2200, San Francisco, California 94105.

On April 29, 2004, I served upon counsel named below as indicated:

**BURST.COM, INC.'S THIRD MOTION TO COMPEL MICROSOFT TO PROVIDE BASIC DISCOVERY CONCERNING ITS E-MAIL DESTRUCTION**

John W. Treece *(via Facsimile and Federal Express)*
Susan Harris
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
Fax: 312.853.7036

Executed this April 29, 2004.

_____
Jerry Shaw