## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

```
————————————————————x
IN RE MICROSOFT CORP.            :
ANTITRUST LITIGATION             :      MDL Docket No. 1332
                                 :
This Document Relates To:        :      Hon. J. Frederick Motz
                                 :
BURST.COM, Inc.,                 :
                                 :
                  Plaintiff,     :
        v.                       :
                                 :
MICROSOFT CORPORATION,           :
                                 :
                  Defendant.     :
                                 :
Civil Action No. JFM-02–CV-2952  :
                                 :
————————————————————x
```

### MICROSOFT'S MEMORANDUM IN OPPOSITION TO BURST'S MOTION TO APPLY COLLATERAL ESTOPPEL TO 311 FINDINGS OF FACT AND 15 EXCERPTS FROM THE D.C. CIRCUIT'S OPINION IN THE GOVERNMENT CASE

John W. Treece
SIDLEY AUSTIN BROWN & WOOD
10 South Dearborn
One Bank Plaza
Chicago, Illinois  60603
(312) 853-2932

Richard J. Wallis
Steven J. Aeschbacher
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington  98052
(425) 936-8080

Michael F. Brockmeyer
Jeffrey D. Herschman
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland  21209
(410) 580-3000

David B. Tulchin
Richard C. Pepperman, II
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendant*
*Microsoft Corporation*

July 1, 2004

# TABLE OF CONTENTS

*Page*

BACKGROUND ................................................................................................3

A.    The Government Case..........................................................................3

B.    The Burst Complaint............................................................................7

C.    Burst's First Motion for Collateral Estoppel .....................................8

ARGUMENT ...................................................................................................10

I.    Burst Seeks To Alter the Fourth Circuit's Standard ...............................10

II.    Bust Bears the Burden of Showing Which Particular Findings
      Were "Critical and Essential" to the D.C. Circuit's Judgment................11

III.    Burst Has Not Satisfied Its Heavy Burden With Respect to the
       311 Findings and 15 Excerpts Encompassed by Its Motion...................14

      A.    Microsoft Has Not Conceded That 266 Findings Were
            Necessary to the Judgment in the Government Case
            under the Fourth Circuit's Standard .........................................15

      B.    Findings of Fact 78, 93-132 Were Not "Critical and
            Essential" to the D.C. Circuit's Determination That
            Microsoft Possessed Monopoly Power.....................................17

      C.    Findings of Fact 408-412 Were Not "Critical and
            Essential" to the D.C. Circuit's Judgment................................19

      D.    Burst Has Not Demonstrated That Collateral Estoppel
            Should Apply to Excerpts from the D.C. Circuit's Opinion........20

IV.    Sixteen of Judge Jackson's Findings Were "Critical and Essential"
       to the D.C. Circuit's Judgment under the Fourth Circuit's Test............21

      A.    Monopoly Power in a Relevant Market.....................................22

      B.    Anticompetitive Conduct............................................................23

CONCLUSION................................................................................................28

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Baitcher* v. *Baitcher*,
    781 F.2d 1529 (11th Cir. 1986)......................................................................20

*Blue Ridge Bank* v. *Veribanc, Inc.*,
    866 F.2d 681 (4th Cir. 1989)........................................................................20

*Connors* v. *Tanoma Mining Co.*,
    953 F.2d 682 (D.C. Cir. 1992) .....................................................................12

*DeMarco* v. *United States*,
    415 U.S. 449 (1974) .....................................................................................20

*Gordon* v. *Microsoft Corp.*,
    2003-2 Trade Cas. (CCH) ¶ 74,130 (Minn. Dist. Ct. Aug. 20, 2003)..................*passim*

*Gorham* v. *Mutual Ben. Health & Accident Ass'n of Omaha*,
    114 F.2d 97 (4th Cir. 1940).........................................................................16

*Hicks* v. *Quaker Oats Co.*,
    662 F.2d 1158 (5th Cir. 1981)......................................................................17

*Hoult* v. *Hoult*,
    157 F.3d 29 (1st Cir. 1998) ..........................................................................11

*In re Microsoft Corp. Antitrust Litig.*,
    355 F.3d 322 (4th Cir. 2004).................................................................*passim*

*Milens* v. *Richmond Redev. Agency*,
    665 F.2d 906 (9th Cir. 1982)........................................................................11

*Navieros Oceanikos, S.A.* v. *S.T. Mobil Trader*,
    554 F.2d 43 (2d Cir. 1977)...........................................................................20

*New York* v. *Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002) ..........................................................7, 17

*Niagara Mohawk Power Corp.* v. *Tonawanda Band of Seneca Indians*,
    94 F.3d 747 (2d Cir. 1996)......................................................................17-18

*Offshore Sportswear, Inc.* v. *Vuarnet Int'l, B.V.*,
    114 F.3d 848 (9th Cir. 1997).....................................................................2, 11

*Pool Water Products* v. *Olin Corp.,*
258 F.3d 1024 (9th Cir. 2001)............................................................12, 13

*S. Pac. Communications Co.* v. *AT&T,*
567 F. Supp. 326 (D.D.C. 1983),
*aff'd,* 740 F.2d 1011 (D.C. Cir. 1984)..................................................12

*Sedlack* v. *Braswell Servs. Group, Inc.,*
134 F.3d 219 (4th Cir. 1998)................................................................2, 11

*Stebbins* v. *Keystone Ins. Co.,*
481 F.2d 501 (D.C. Cir. 1973) .............................................................18

*United States* v. *Grinnell Corp.,*
384 U.S. 563 (1966).............................................................................22

*United States* v. *Microsoft Corp.,*
84 F. Supp. 2d 9 (D.D.C. 1999) .........................................................*passim*

*United States* v. *Microsoft Corp.,*
87 F. Supp. 2d 30 (D.D.C. 2000) ........................................................*passim*

*United States* v. *Microsoft Corp.,*
253 F.3d 34 (D.C. Cir.), *cert. denied,* 534 U.S. 952 (2001) ..................*passim*

## Statute

28 U.S.C. § 1292(b) ..............................................................................9

## Miscellaneous

18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE (3d ed. 2000)............11, 12

RESTATEMENT (SECOND) OF JUDGMENTS (1982) ........................................18

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

————————————————————x

|  |  |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION | : |
|  | : |
| This Document Relates To: | : |
|  | : |
| BURST.COM, Inc., | : |
|  | : |
| Plaintiff, | : |
| v. | : |
|  | : |
| MICROSOFT CORPORATION, | : |
|  | : |
| Defendant. | : |
|  | : |
| Civil Action No. JFM-02−CV-2952 | : |

MDL Docket No. 1332

Hon. J. Frederick Motz

————————————————————x

## MICROSOFT'S MEMORANDUM IN OPPOSITION TO BURST'S MOTION TO APPLY COLLATERAL ESTOPPEL TO 311 FINDINGS OF FACT AND 15 EXCERPTS FROM THE D.C. CIRCUIT'S OPINION IN THE GOVERNMENT CASE

In 2002, Burst and other plaintiffs asked this Court to preclude Microsoft under the doctrine of collateral estoppel from re-litigating 356 findings of fact entered by Judge Jackson in the Government Case. This Court granted that motion almost in its entirety, determining that 350 of those 356 findings were entitled to preclusive effect under a "supportive of the judgment" standard.

The Fourth Circuit reversed this ruling on the ground that the proper standard for applying offensive collateral estoppel is much more stringent than the one employed by this Court at the urging of Burst and the other plaintiffs. *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 325 (4th Cir. 2004). The Court of Appeals held that this Court's "supportive of the judgment" standard was both "substantially more inclusive than the

correct criterion of 'critical and necessary'" and "too broad to assure fairness" in apply-

ing collateral estoppel. *Id*. at 327. Now, after the appellate court rejected its assertions

about collateral estoppel, Burst asks this Court to rule that estoppel nevertheless applies

to nearly all of the same 350 findings—311 of them, to be exact.[1] Almost every propo-

sition advanced by Burst is contradicted by what the Fourth Circuit said earlier this year.

To accord preclusive effect to particular findings, Burst bears the burden of

demonstrating, with clarity and certainty, that each finding was necessary—*i.e.*, critical

and essential—to the prior judgment. *Sedlack* v. *Braswell Servs. Group, Inc.*, 134 F.3d

219, 224 (4th Cir. 1998); *Offshore Sportswear, Inc.* v. *Vuarnet Int'l, B.V.*, 114 F.3d 848,

850 (9th Cir. 1997). Burst has failed—and indeed does not seriously even try—to satisfy

this burden, offering only broad and unsupported generalizations. This alone is reason to

deny Burst's motion.

Moreover, Burst attempts to change the standard announced by the Fourth Circuit,

arguing that findings are "necessary and essential to the judgment" if they were "fully

litigated." (Burst Mem. at 5.) This is not what the Fourth Circuit held. The fact that a

finding was "fully litigated" does not establish that it was "critical and essential" to the

judgment.[2] Burst further argues that particular findings are of "critical relevance" or

"central" to Burst's claims. (*Id.* at 7-9.) Once again, even if a finding is relevant to

Burst's claims in this case, that alone says nothing about whether that finding was

---

[1] Indeed, Burst attempts to use the Fourth Circuit's remand as an occasion to expand the reach of preclusion, asserting that collateral estoppel also should apply to fifteen excerpts from the D.C. Circuit's opinion.

[2] The question of whether a fact was "fully litigated" is but one of *five* separate elements that Burst "must demonstrate" to succeed with respect to any given fact. *In re Microsoft*, 355 F.3d at 326.

"critical and essential" to the judgment in the Government Case. Burst also mischar-acterizes the D.C. Circuit's decision, incorrectly suggesting that the appellate court endorsed "all 412 of the findings." (*Id*. at 4.) As the Fourth Circuit stated, the D.C. Circuit "did not review the 412 factual findings to determine whether they were clearly erroneous or whether they should be affirmed on appeal." 355 F.3d at 329.

Burst's motion amounts to gross overreaching in view of the Court of Appeals' decision strongly rejecting Burst's prior position. As the court in Minnesota noted last year—in a decision cited by Burst (Burst Br. at 6)—"the *vast majority* of the findings from the government case are not necessary and essential to the antitrust violation affirmed by the Court of Appeals." *Gordon* v. *Microsoft Corp.*, 2003-2 Trade Cas. (CCH) ¶ 74,130, at 97,180 (Minn. Dist. Ct. Aug. 20, 2003) (emphasis added). According to Burst, the exact opposite is true: Burst contends that the "vast majority" of the findings are still entitled to preclusive effect even after the Fourth Circuit's ruling. This is wrong. As the Fourth Circuit recognized, "[t]he D.C. Circuit held that Microsoft illegally maintained a monopoly in the market of 'licensing of all Intel-compatible PC operating systems worldwide' through 12 specified acts of anticompetitive conduct." 355 F.3d at 328. Microsoft is precluded from litigating only those facts that were necessary—meaning critical and essential—to that judgment. *Id*. at 325, 328. As shown below, sixteen findings of fact meet that test.

## BACKGROUND

### A.    The Government Case

Burst attempts to create the impression that "streaming media software" played a central role in the Government Case. (Burst Br. at 2-3.) This is untrue. First, the

complaints in the Government Case never even mentioned streaming media software, much less alleged a "market for streaming media software." (*Id.* at 2.) Second, although the district court in the Government Case very briefly discussed streaming media software in its findings of fact, *United States* v. *Microsoft Corp.*, 84 F. Supp. 2d 9, 36-38 (D.D.C. 1999) (Findings ¶¶ 104-14), the D.C. Circuit did not cite or otherwise rely on those findings in holding that Microsoft was liable for twelve specific anticompetitive acts. Indeed, the D.C. Circuit's 85-page opinion contains not a single reference to streaming media software.

After Judge Jackson issued his findings of fact in November 1999, most of the claims asserted by the government—and addressed by his findings—were rejected as a matter of law. In his April 2000 conclusions of law, Judge Jackson dismissed the government's exclusive dealing claim, and no appeal was taken from that decision. *United States* v. *Microsoft Corp.*, 87 F. Supp. 2d 30, 51-54 (D.D.C. 2000). On appeal, the D.C. Circuit reversed outright Judge Jackson's conclusion that Microsoft was liable for attempted monopolization. *United States* v. *Microsoft Corp.*, 253 F.3d 34, 80-84 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001). The Court of Appeals also vacated Judge Jackson's conclusion that Microsoft's alleged tying of Internet Explorer ("IE") to Windows was *per se* unlawful and remanded that claim for a new trial. *Id.* at 84-97. The government later abandoned its tying claim.

Although the D.C. Circuit held that Microsoft improperly maintained a monopoly in Intel-compatible PC operating systems, it did so on substantially narrower grounds than had Judge Jackson. *Id.* at 50-80. Contrary to Burst's assertion, the D.C. Circuit did not "affirm[] almost all of [Judge Jackson's] conclusions regarding the anticompetitive

-4-

nature of the conduct challenged by the DOJ." (Burst Br. at 4.) Instead, the Court of Appeals *reversed* with respect to eight of the twenty acts held to be anticompetitive by the district court. 253 F.3d at 58-78. The appellate court also reversed Judge Jackson's conclusion that Microsoft's "course of conduct" was a separate violation. *Id.* at 78.

The D.C. Circuit affirmed Judge Jackson's monopoly-maintenance ruling with respect to twelve specific acts, holding that:

1.   Microsoft's Windows license agreements improperly prohibited computer manufacturers ("OEMs") from removing "visible means of user access" to IE (*i.e.,* desktop icons, folders and "Start" menu entries), *id.* at 61;

2.   Microsoft's Windows license agreements improperly prohibited OEMs from modifying the initial Windows boot sequence to promote the services of Internet Access Providers ("IAPs"), *id.* at 61-62;

3.   Microsoft's Windows license agreements improperly prohibited OEMs from promoting rival Web browsing software by adding to the Windows desktop "icons or folders different in size or shape from those supplied by Microsoft," *id.* at 62;

4.   Microsoft's Windows license agreements improperly prohibited OEMs from using the "Active Desktop" feature of Windows 98 to promote rival Web browsing software, *id.*;

5.   Microsoft improperly excluded IE from the "Add/Remove Programs" utility in Windows 98, *id.* at 65;

6.   Microsoft improperly "commingled browsing and non-browsing code" in the same files in Windows 98, *id.* at 66;

7.   Microsoft improperly "agreed to provide easy access to IAPs' services from the Windows desktop in return for the IAPs' agreement to promote IE exclusively

and to keep shipments of internet access software using Navigator under a specific percentage," *id.* at 68;

8.    Microsoft improperly agreed to provide "preferential support" to certain software developers in return for their agreement to use (i) IE as the default Web browsing software for any software they developed with a hypertext-based user interface and (ii) Microsoft's "HTML Help" to implement their applications' help system, *id.* at 71-72;

9.    Microsoft improperly agreed to release new versions of Office for the Apple Macintosh in return for Apple's agreement to preinstall IE and make it the default Web browsing software on new Macintosh computers, *id.* at 72-74;

10.    Microsoft improperly agreed to give certain software developers preferential access to Windows technical information in return for their agreement to use Microsoft's Java Virtual Machine ("JVM") as the default JVM for their software, *id.* at 75-76;

11.    Microsoft improperly deceived software developers regarding the "Windows-specific nature" of Microsoft's Java developer tools, *id.* at 76-77; and

12.    Microsoft improperly "pressur[ed] Intel not to support cross-platform Java" by threatening to support technology developed by one of Intel's competitors, *id.* at 77.

In sum, the 412 findings of fact entered in 1999 pertained to the government's four separate claims for exclusive dealings, attempted monopolization, tying and mono-poly maintenance. As the D.C. Circuit itself observed, "[o]nly liability for the § 2 monopoly-maintenance violation has been affirmed—and even that we have revised" from twenty to twelve anticompetitive acts. *Id.* at 104. Given this substantial narrowing, the vast majority of Judge Jackson's findings from 1999 are not critical and essential to

the liability determination upheld by the Court of Appeals.[3]  This key point is ignored by Burst, but was recognized by the district court in the Government Case.  As Judge Kollar-Kotelly emphasized when reviewing the proceedings on remand, the D.C. Circuit, "in its review of the district court's liability findings, . . . did not have occasion to rely upon the vast majority of factual findings entered by the district court, but not cited by the district court as a basis for § 2 liability." *New York* v. *Microsoft Corp.*, 224 F. Supp. 2d 76, 138 (D.D.C. 2002).

## B.    The Burst Complaint

The Burst action is primarily a patent case.  During the relevant time period, Burst was "a provider of client/server software for the delivery of video and audio information over networks."  (Burst Compl. ¶ 11.)  According to the complaint, Burst "owns a number of U.S. and International patents that cover the provision of video delivery at faster-than-real-time rates and that utilize methods of client-server communications to provide for dynamic rebuffering and network optimization."  (*Id.* ¶ 8.)

Burst alleges that (i) it had discussions with Microsoft between October 1999 and December 2000 regarding "Burst's core video streaming technology," (ii) Burst disclosed to Microsoft confidential information about Burst's products and business plans as part of those discussions, and (iii) Microsoft thereafter "used Burst's trade secrets and patented technologies, including its innovative video delivery methods," in Microsoft's "Corona" products.  (*Id.* ¶¶ 9-10.)

---

[3] These findings are also, as shown below (*see* pp. 7-8, *infra*), largely irrelevant to the claims made in Burst's complaint.

Although Burst also asserts antitrust claims, those claims bear at most a faint resemblance to those asserted by the government in 1998. When Netscape and Sun sought collateral estoppel in 2002, they emphasized that Netscape's Web browsing software and Sun's Java technologies were the focus of the Government Case. Burst's antitrust claims, in contrast, involve software for delivery of multimedia content that was never a large part of any claim in the Government Case. Indeed, there is no mention of Burst or its products anywhere in the record or the lengthy opinions of the district court or the D.C. Circuit in the Government Case, and only passing reference to streaming media software in the trial court's factual findings. (*See* pp. 3-4, *supra*.) All of this cautions against awarding Burst a broad collateral estoppel ruling on matters that are likely to be relevant at trial, if at all, in only the most tangential way.

## C.    Burst's First Motion for Collateral Estoppel

In September 2002, Burst moved to preclude Microsoft "from relitigating any of Judge Jackson's 412 Findings of Fact." (Burst Mot. & Mem. for Partial Summ. J. & for Determination of Issues under Rule 16(c) at 2.) Although it conceded that many of Judge Jackson's findings "may have little relevance to [its] claims," Burst asserted that "the Government Case should be given its broadest collateral estoppel effect." (*Id.*) Without citing a single case, Burst argued that collateral estoppel should apply to *all* issues that "were fully and fairly litigated, and finally decided," in the Government Case. (*Id.* at 1.)

In November 2002, this Court held that estoppel applies to findings of fact that were "necessary to the judgment in the government case." (Nov. 4, 2002 Op. at 1.) This Court further concluded, at Burst's urging, that every finding that was "supportive of the prior judgment" satisfies that requirement. (*Id.* at 6.) After additional briefing, this Court

-8-

ruled that 350 of Judge Jackson's 412 findings of fact—all but six of the findings as to

which Burst and the other plaintiffs then sought estoppel—"were supportive of the

liability judgment against Microsoft" in the Government Case.  (April 14, 2003 Letter to

Counsel.)  This Court later certified this ruling for appeal pursuant to 28 U.S.C.

§ 1292(b).

      After granting Microsoft leave to appeal, the Fourth Circuit reversed.  The

appellate court held that "the 'supportive of' standard is not the appropriate standard for

applying collateral estoppel" and that preclusive effect instead should be given "only to

factual findings that were necessary—meaning critical and essential—to the judgment

affirmed by the D.C. Circuit."  355 F.3d at 325.  The Fourth Circuit cautioned that "the

criteria for foreclosing a defendant from relitigating an issue or fact," such as the "neces-

sary to the judgment" requirement, must "be applied strictly."  *Id.* at 327.

      The Court of Appeals took pains to emphasize that this Court's interpretation of

the "necessary to the judgment" criterion "change[d] the criterion, rendering it too broad

to assure fairness in the application" of collateral estoppel.  *Id.*  It explained that "'[s]up-

portive of' is a term substantially more inclusive than the stated criterion of 'critical and

necessary.'"  *Id.*  "[U]nder a 'supportive of' standard," the appellate court stated, "unnec-

essary or collateral findings . . . would still foreclose further litigation, as long as they

tended generally to confirm the affirmed judgment."  *Id.*  The appellate court held that the

"necessary to the judgment" requirement is substantially more stringent than that:

> Because a fact that is "supportive of" a judgment may be consistent with it
> but not necessary or essential to it, the term "supportive of" is a broader
> term than "critical and necessary."  The term "supportive of" sweeps so
> broadly that it might lead to inclusion of all facts that may have been
> "relevant" to the prior judgment.

-9-

*Id.* In fact, the Court of Appeals noted that "if a judgment in the prior case is supported by either of two findings, neither finding can be found essential to the judgment" under the law of this Circuit. *Id.* at 328.

In his opinion concurring in part and dissenting in part, Judge Gregory noted that the appellate court had adopted a "rigid construction of the term 'necessary.'" *Id.* at 329. Under this "rigid construction," Judge Gregory explained, "preclusive effect is only accorded to findings deemed indispensable to a prior judgment." *Id.* at 331. As Judge Gregory correctly observed, "[v]ery few findings, while a material element of a prior judgment, can be considered indispensable." *Id.* at 331-32.

At its core, Burst's motion treats the Fourth Circuit's opinion as if it were an insignificant or even irrelevant piece of history. Burst seeks to regain what it lost by urging the Court effectively to readopt the test rejected by the Court of Appeals. Notwithstanding the Fourth Circuit's decision, Burst argues that 311 findings (instead of the 350 deemed subject to estoppel by this Court in 2003) are worthy of preclusive effect because they were relevant to the prior judgment and were "fully litigated." In one respect, Burst attempts to go even beyond this Court's 2003 ruling, requesting that preclusive effect also be given to fifteen excerpts from the D.C. Circuit's opinion. The holdings and instructions of the appellate court in this matter should not be so lightly disregarded.

## ARGUMENT

### I.    Burst Seeks To Alter the Fourth Circuit's Standard.

The Fourth Circuit held that collateral estoppel applies "only to factual findings that were necessary—meaning critical and essential—to the judgment affirmed by the

D.C. Circuit." 355 F.3d at 325.  The appellate court emphasized that those terms "are words of limitation." *Id.* at 327.

Burst seeks to modify that standard by arguing that collateral estoppel requires only "actual litigation of an issue." (Burst Br. at 5.)  According to Burst, "[i]f a litigant has fully litigated an issue and lost," collateral estoppel applies.  (*Id.*)  Burst thus asserts that a litigant may be estopped from contesting "issues which might not appear important to the ultimate result of liability" simply "because one party or the other . . . couched its arguments in a particular manner." (*Id.* at 6.)  That assertion finds no support in the Court of Appeals' decision, which requires that Burst demonstrate each of the five pre-requisites for collateral estoppel, including that a given issue was "critical and essential" to the judgment.  In arguing otherwise, Burst relies upon the First Circuit's decision in *Hoult* v. *Hoult*, 157 F.3d 29 (1st Cir. 1998).  (Burst Br. at 6.)  As Judge Gregory correctly observed in his opinion dissenting in part from the Fourth Circuit's decision, the First Circuit's conclusion in *Hoult* "is directly in conflict with the one reached by the majority today." 355 F.3d at 331.

## II.    Burst Bears the Burden of Showing Which Particular Findings Were "Critical and Essential" to the D.C. Circuit's Judgment.

The proponent of estoppel—Burst—bears the burden of showing, with clarity and certainty, which findings were necessary to the prior judgment. *Sedlack*, 134 F.3d at 224; *Offshore Sportswear*, 114 F.3d at 850; *Milens* v. *Richmond Redev. Agency*, 665 F.2d 906, 908 (9th Cir. 1982); *see also* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 132.05[1], at 132-177 (3d ed. 2000) ("The party asserting issue preclusion or collateral estoppel bears the burden of showing with clarity and certainty what was determined by

-11-

the prior judgment."); *id.* § 132.03[2][g], at 132-83 ("The burden of persuasion to establish the prerequisites of issue preclusion is on the party seeking preclusion.").

This "heavy burden" becomes "even more substantial where, as here, plaintiff seeks to invoke the doctrine offensively." *S. Pac. Communications Co.* v. *AT&T*, 567 F. Supp. 326, 328 n.1 (D.D.C. 1983), *aff'd*, 740 F.2d 1011 (D.C. Cir. 1984). If there is any ambiguity about whether a particular issue was necessary to the prior judgment, collateral estoppel cannot be applied. *Connors* v. *Tanoma Mining Co.*, 953 F.2d 682, 684 (D.C. Cir. 1992).

Burst falls far short of satisfying its burden. Rather than presenting specific reasons why particular findings qualify for collateral estoppel under the Fourth Circuit's test, Burst offers only broad and conclusory generalizations. In lumping together large clusters of findings—for instance, Burst addresses 266 findings in a single section of its brief—Burst paints with much too broad a brush.

In *Pool Water Products* v. *Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001), plaintiffs similarly sought to accord prima facie weight to 895 findings of fact, entered by an administrative law judge as part of an FTC proceeding, pursuant to Section 5 of the Clayton Act. *Id.* at 1030-33. Plaintiffs "did not identify for the district court which findings . . . were necessary to support the judgment," but rather "simply argued that they were entitled to the wholesale admission of all of the ALJ's findings." *Id.* at 1032. The district court rejected this approach.

On appeal, plaintiffs in *Pool Water* "argue[d] that the district court should have admitted all of the findings and conclusions and that defendants should have filed motions in limine to exclude the impermissible findings." *Id.* at 1033. The Ninth Circuit

-12-

held that this argument "misstates the parties' respective burdens" and that "[i]t is up to the party seeking prima facie weight to establish that it has met the requirements of Section 5 for each issue as to which it seeks prima facie weight." *Id.* Noting that "the great majority of the ALJ's findings of fact were not necessary to the FTC's ultimate judgment," *id.* at 1032, the Ninth Circuit stressed that plaintiffs must identify the handful of essential findings. As the Ninth Circuit put it, "[n]either the district court nor the defendant is required to engage in a 'hunt and peck' exercise to ferret out potentially relevant and necessary findings." *Id.* at 1033.

As it did in 2002, Burst makes the same error as did plaintiffs in *Pool Water*. It is not up to the Court, or Microsoft, to analyze individual factual findings or to come up with reasons why collateral estoppel should not be applied. It is Burst's burden to show how a particular factual finding was critical and essential to the eventual appellate judgment in the Government Case. Burst does not even attempt to do so, but instead seems to adhere to the wrongheaded view that Microsoft must prove a negative for each of hundreds of findings.

The approach taken by Burst was rejected by the Minnesota court in *Gordon*, where plaintiffs sought, with minimal explanation, to apply estoppel to 361 of Judge Jackson's findings. 2003-2 Trade Cas. (CCH) ¶ 74,130, at 97,180. Applying a "necessary and essential to the prior judgment" standard, the *Gordon* court denied this request. *Id.* at 97,181. As the court noted, plaintiffs "want collateral estoppel applied to hundreds of factual findings with greatly different degrees of importance to the prior judgment." *Id.* at 97,183. The court asked rhetorically, "Can hundreds of findings

-13-

containing thousands of facts from any one trial all be important enough to be set in stone forever?" *Id*. The answer, of course, was "no."

In rejecting plaintiffs' request, the *Gordon* court correctly observed that "[t]he result Plaintiffs seek apparently is unprecedented." *Id*. The court remarked that "[n]either party has cited a single case in which an appellate court has affirmed the application of collateral estoppel to hundreds of findings of fact by a judge in an earlier case." *Id*. In addition, the Minnesota court noted that each of Judge Jackson's factual findings "is usually a narrative paragraph, often containing numerous subsidiary facts such as names, dates, and other details." *Id*. It rejected the notion that each of those subsidiary facts was necessary and essential to the prior judgment:

> The dates, the people, the details of Microsoft's interactions and communications with other companies, and the specifics of its internal activities are merely incidental to the ultimate conclusion that Microsoft illegally maintained its monopoly. Most of those subsidiary facts could be changed or even dropped from the findings without affecting the ultimate result. They are simply not material.

*Id*. at 97,185. Even though it bears the burden of proof here, Burst offers no explanation why each of the thousands of subsidiary facts contained in the 311 paragraphs of findings encompassed by its motion was "critical and essential" to the D.C. Circuit's judgment in the Government Case.

## III.    Burst Has Not Satisfied Its Heavy Burden With Respect to the 311 Findings and 15 Excerpts Encompassed by Its Motion.

Burst does not attempt to show that particular findings were critical and essential to the D.C. Circuit's judgment, but instead offers only generalizations in support of three broad categories of findings. This is inadequate.

**A.    Microsoft Has Not Conceded That 266 Findings Were
Necessary to the Judgment in the Government Case
under the Fourth Circuit's Standard.**

Ignoring the effect of the Fourth Circuit's decision, Burst asserts that "[i]n two
previous actions (California and Minnesota), Microsoft had conceded that 266 of Judge
Jackson's findings of fact were necessary and essential to the judgment affirmed by the
D.C. Circuit." (Burst Br. at 6-7.) Of those 266 findings, "Burst seeks collateral estoppel
for 265 of them." (*Id*. at 1 n.1.)

There was no concession by Microsoft. The 266 findings at issue are the same
findings that Microsoft did not challenge in this action in November 2002 when (prior to
the Fourth Circuit's ruling) the law of the case was this Court's "supportive of" standard.
A month later in December 2002, Microsoft decided in the California action, as part of
"meet-and-confer" discussions with counsel for the California plaintiffs, not to oppose
application of collateral estoppel to those same 266 findings. (Burst Br. Ex. 3 at 1.)[4]  In
instructing Microsoft to engage in these discussions, the California court had emphasized
that Microsoft was not waiving any of its objections to collateral estoppel. (*Id*.) In June
2003—again, prior to the Fourth Circuit's ruling—Microsoft similarly decided at oral
argument in the *Gordon* case in Minnesota not to dispute that those same 266 findings
were necessary to the judgment under Minnesota law. 2003-2 Trade Cas. (CCH)
¶ 74,131, at 97,187. Microsoft instead elected, in the course of a colloquy in which the
Minnesota court revealed its own preference on the subject, to press a broader argu-
ment—which the Minnesota court found "compelling"—that applying estoppel to

_____

[4] The California court had asked the parties to attempt to reach an agreement on which of
Judge Jackson's findings "support" nine specific legal conclusions. (Burst Br. Ex. 3 n. 1.)

hundreds of detailed factual findings from a prior case would be unjust. *Id.* at 97,182, 97,187.

Microsoft should not be bound by decisions made in other actions under different circumstances—including this Court's November 2002 decision—that responded to the dynamics of those situations and that took place long before the Fourth Circuit's January 2004 decision on collateral estoppel. In arguing otherwise, Burst does not rely upon any legal doctrine such as judicial estoppel, and no such doctrine applies here in any event. Burst simply asserts, without citing any authority, that Microsoft is bound by positions it supposedly took under different law in related state-court actions. There is no basis for this assertion. *Gorham* v. *Mutual Ben. Health & Accident Ass'n of Omaha*, 114 F.2d 97, 99 (4th Cir. 1940) ("As this is a separate case, the parties are not bound by concessions made upon the trial in the state court, which were made solely with reference to that case.").

Apart from Microsoft's supposed concession, Burst offers no reason why estoppel should apply to these 266 findings. Burst instead argues that particular findings are of "critical relevance . . . to Burst's case" (Burst Br. at 7) or are "central to one of the anti-trust claims that Burst advances" (*id.* at 8-9). Even if certain findings are relevant to one of Burst's claims, that does not establish that such findings "were necessary—meaning critical and essential—to the judgment affirmed by the D.C. Circuit." *In re Microsoft*, 355 F.3d at 325. Burst does not address that question—because very few of the district court's factual findings in the Government Case were, in fact, critical and essential to the judgment ultimately affirmed by the D.C. Circuit.

**B.    Findings of Fact 78, 93-132 Were Not "Critical and Essential" to the D.C. Circuit's Determination That Microsoft Possessed Monopoly Power.**

Burst contends that Findings 78, 93-132 "are entitled to preclusive effect" because "[t]hey constituted an essential part of Judge Jackson's monopoly power finding."  (Burst Br. at 10.)  Without citing a single page of the D.C. Circuit's opinion, Burst also asserts:

> The D.C. Circuit affirmed the finding of monopoly power in its entirety, recognizing that the finding was in turn based on Judge Jackson's finding of a pattern of anticompetitive conduct.  In affirming his ultimate finding of monopoly power, the D.C. Circuit also affirmed each of the elements in Judge Jackson's logic.

(*Id.* at 13.)  These assertions are wrong.  In fact, the Court of Appeals expressly reversed Judge Jackson's conclusion that Microsoft's "course of conduct" was a basis for liability.  253 F.3d at 78.[5]

The findings in question concern Microsoft's dealings with (i) Intel regarding Native Signal Processing software, (ii) Apple regarding QuickTime multimedia playback software, (iii) RealNetworks regarding streaming media software, and (iv) IBM regarding its Lotus Notes groupware product and its SmartSuite package of business productivity applications.  84 F. Supp. 2d at 30, 34-43.  The D.C. Circuit did not mention any of those topics in its 85-page opinion.  Nor did the D.C. Circuit rely on these findings in holding that Microsoft had monopoly power.  253 F.3d at 54-58.

When "a judgment is appealed, collateral estoppel only works as to those issues specifically passed upon by the appellate court."  *Hicks* v. *Quaker Oats Co.*, 662 F.2d 1158, 1168 (5th Cir. 1981); *accord Niagara Mohawk Power Corp.* v. *Tonawanda Band*

---

[5] On remand, Judge Kollar-Kotelly also emphasized that these findings were not a basis for liability.  *New York*, 224 F. Supp. 2d at 138, 163 n.68.

*of Seneca Indians*, 94 F.3d 747, 754 (2d Cir. 1996) ("[O]nly the basis that is actually considered [on appeal] can have any preclusive effect in subsequent litigation."); *Stebbins v. Keystone Ins. Co.*, 481 F.2d 501, 507 n.13 (D.C. Cir. 1973) ("[O]nly those issues expressly considered by the appellate court can be used, as the basis for a plea of collateral estoppel."). The D.C. Circuit did not specifically pass upon Findings 78, 93-132. Nor can it be said that the Court of Appeals' determination that Microsoft possessed monopoly was "dependent upon" these findings. RESTATEMENT (SECOND) OF JUDGMENTS § 27 & cmt. h (1982) ("essential to the judgment" means that judgment must be "dependent upon the determinations"). The appellate court did not cite any of these findings or even mention their contents. It is entirely far-fetched under these circumstances to assert that they were "critical and essential" to the appellate judgment.

To the extent relevant here, Judge Jackson's monopoly power conclusion also was not dependent upon Findings 78, 93-132. Judge Jackson explicitly addressed the issues of market share, barriers to entry and monopoly power elsewhere in his findings of fact. 84 F. Supp. 2d at 19-28 (Findings 33-67). Moreover, in his conclusions of law, Judge Jackson did not rely upon or even refer to Findings 78, 93-132 in holding that Microsoft possessed monopoly power. 87 F. Supp. 2d at 36-37. Although Judge Jackson stated in his findings of fact that Microsoft's actions toward other firms were evidence of monopoly power, 84 F. Supp. 2d at 28 (Finding 67), he specified which actions supported that determination in his conclusions of law. 87 F. Supp. 2d at 37. With one exception—Finding 99—Findings 78, 93-132 were not among those cited by Judge Jackson as evidence of monopoly power, and Burst concedes that Judge Jackson's "reference to Finding 99 was simply a typographic error." (Burst Br. at 14 n.11.)

-18-

C.    **Findings of Fact 408-412 Were Not "Critical and Essential"
to the D.C. Circuit's Judgment.**

Neither Judge Jackson nor the Court of Appeals ascribed liability based on

Findings 408-412.  In his conclusions of law, Judge Jackson cited only two of those

findings—Findings 411 and 412—and did so *only* in the section of his conclusions

devoted to the so-called "course of conduct" violation.  87 F. Supp. 2d at 44.  The D.C.

Circuit *reversed* Judge Jackson's conclusion that Microsoft's "course of conduct"

separately violated the Sherman Act.  253 F.3d at 78.  Although the appellate court twice

cited Finding 411, *id.* at 78, 107, it did so not in imposing liability, but in pointing out

that "the District Court expressly did *not* adopt the position that Microsoft would have

lost its position in the OS [operating system] market but for its anticompetitive behavior."

*Id.* at 107 (emphasis added).  As a result, by any measure, Findings 408-412 were not

critical and essential to the appellate judgment.

For these same reasons, the court in *Gordon* held that Findings 408-412 do "not

appear necessary and essential to the violation affirmed by the Court of Appeals."  2003-

2 Trade Cas. (CCH) ¶ 74,130, at 97,186-97,187.  The *Gordon* court noted that "[t]he

Court of Appeals certainly found it unnecessary to evaluate Judge Jackson's findings

about harm [Findings 408-412] in affirming the Section 2 violation," *id.* at 97,186, and

further emphasized that "even if details of the harm were material, some of Judge

Jackson's references in Findings 408 through 412 appear to be to some of the 8 acts of

anticompetitive conduct which he found but which the Court of Appeals disallowed."  *Id.*

at 97,187.

**D.    Burst Has Not Demonstrated That Collateral Estoppel Should Apply to Excerpts from the D.C. Circuit's Opinion.**

Burst asserts that fifteen "other findings included in the D.C. Circuit's opinion should be given collateral estoppel effect." (Burst Br. at 17.) These fifteen excerpts from the D.C. Circuit's opinion are not appropriate for estoppel.

As an initial matter, it is incorrect to say, as Burst does, that the D.C. Circuit "expanded upon Judge Jackson's findings." (*Id.* at 7.) Appellate courts "cannot and do not make findings of fact." *Baitcher* v. *Baitcher*, 781 F.2d 1529, 1534 (11th Cir. 1986).[6] That is the trial court's role.

More fundamentally, Burst should not be allowed to select from a lengthy appellate opinion a few stray phrases or sentences that it finds useful. The excerpts selected by Burst illustrate some of the pitfalls inherent in attempting to accord preclusive effect to isolated sentences from a long appellate opinion. Many of Burst's quotations are confusing because they are devoid of context, and others are duplicative of Judge Jackson's findings, characterize the positions taken by Microsoft on appeal or comment on particular pieces of evidence in the record. Such excerpts are not appropriate for estoppel, and the idea that a jury should be given instructions of the sort Burst seems to envision is without precedent.

In *Gordon*, plaintiffs similarly sought to accord estoppel effect to "33 excerpts from the D.C. Circuit's opinion." 2003-2 Trade Cas. (CCH) ¶ 74,131, at 97,187. The

---

[6] *Accord, e.g., DeMarco* v. *United States*, 415 U.S. 449, 450 n.* (1974) ("[F]act finding is the basic responsibility of district courts, rather than appellate courts . . . ."); *Blue Ridge Bank* v. *Veribanc, Inc.*, 866 F.2d 681, 690 (4th Cir. 1989) ("[w]e are not the trier of fact"); *Navieros Oceanikos, S.A.* v. *S.T. Mobil Trader*, 554 F.2d 43, 45 (2d Cir. 1977) ("We do not sit to make de novo findings of fact.").

-20-

court rejected that request, noting that many of the excerpts "are either redundant, unnecessary, or irrelevant (such as comments about procedural matters)." *Id.* Having outlined the important results of the Government Case, the *Gordon* court declined plaintiffs' invitation to present to the jury "miscellaneous comments by . . . the Court of Appeals taken out of context." *Id.* There is no greater reason to do so here.

In any event, this Court has already concluded that "it is premature to ascertain which of the statements made by the Court of Appeals should be incorporated into the jury instructions relating to preclusive findings." (April 4, 2003 Letter to Counsel.) Burst does not provide the Court with any reason to alter that decision now.[7]

## IV.    Sixteen of Judge Jackson's Findings Were "Critical and Essential" to the D.C. Circuit's Judgment under the Fourth Circuit's Test.

This Court "must take care to limit application [of collateral estoppel] to facts that were necessary to the judgment *actually affirmed* by the D.C. Circuit." *In re Microsoft*, 355 F.3d at 328 (emphasis in original). As the Fourth Circuit noted, "[t]he D.C. Circuit held that Microsoft illegally maintained a monopoly in the market of 'licensing of all Intel-compatible PC operating systems worldwide' through 12 specified acts of anti-competitive conduct." *Id.* Collateral estoppel applies only to the "facts necessary to this judgment." *Id.* The offense of monopoly maintenance under Section 2 of the Sherman

---

[7] In its April 4, 2003 letter to counsel, the Court stated that issues related to jury instructions "can be deferred until another day." This Court also declined to decide whether specific findings are relevant to particular plaintiffs' claims. In its November 4, 2002 opinion, the Court stated: "By finding that preclusive effect is to be given to the factual findings in the government case, I am not deciding that these findings are relevant to the claims of any particular plaintiff. That is an issue (more accurately, a series of issues) that awaits decision on a later occasion." (Nov. 4, 2002 Op. at 1 n.2) Such relevancy questions, which will be particularly important in this case because Burst's claims are so different from the government's claims, should be decided by the trial court after remand in connection with the preparation of jury instructions.

Act has two elements: (i) the possession of monopoly power in a relevant market and (ii) the maintenance of that power through anticompetitive conduct. *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Microsoft*, 253 F.3d at 50. Although it is not Microsoft's burden to set forth findings as to which preclusion applies, it here identifies, in the interest of advancing a resolution of Burst's motion, the sixteen findings of fact that were critical and essential to the D.C. Circuit's monopoly-maintenance ruling.

## A.     Monopoly Power in a Relevant Market

Findings 18, 33 and 34 were critical and essential to the Court of Appeals' determination that Microsoft possessed monopoly power in a relevant market. This is consistent with the ruling in *Gordon*. 2003-2 Trade Cas. (CCH) ¶ 74,130, at 97,185-97,186 (according preclusive effect to Findings 18, 33 and 34). Those findings provide:

> 18.     Currently there are no products, nor are there likely to be any in the near future, that a significant percentage of consumers worldwide could substitute for Intel-compatible PC operating systems without incurring substantial costs. Furthermore, no firm that does not currently market Intel-compatible PC operating systems could start doing so in a way that would, within a reasonably short period of time, present a significant percentage of consumers with a viable alternative to existing Intel-compatible PC operating systems. It follows that, if one firm controlled the licensing of all Intel-compatible PC operating systems worldwide, it could set the price of a license substantially above that which would be charged in a competitive market and leave the price there for a significant period of time without losing so many customers as to make the action unprofitable. Therefore, in determining the level of Microsoft's market power, the relevant market is the licensing of all Intel-compatible PC operating systems worldwide.

84 F. Supp. 2d at 14.

> 33.     Microsoft enjoys so much power in the market for Intel-compatible PC operating systems that if it wished to exercise this power solely in terms of price, it could charge a price for Windows substantially above that which could be charged in a competitive market. Moreover, it could do so for a significant period of time without losing an unacceptable

-22-

amount of business to competitors. In other words, Microsoft enjoys monopoly power in the relevant market.

> 34.     Viewed together, three main facts indicate that Microsoft enjoys monopoly power. First, Microsoft's share of the market for Intel-compatible PC operating systems is extremely large and stable. Second, Microsoft's dominant market share is protected by a high barrier to entry. Third, and largely as a result of that barrier, Microsoft's customers lack a commercially viable alternative to Windows.

*Id.* at 19. These are the only findings that were "critical and essential" to the Court of Appeals' ruling that Microsoft possessed monopoly power in a relevant market. None of Judge Jackson's other findings of fact were "necessary" to that determination under the Fourth Circuit's standard.

### B.     Anticompetitive Conduct

Findings 161, 164, 170, 213, 244, 245, 339, 350, 351, 352, 394, 401 and 406 were critical and essential to the Court of Appeals' determination that Microsoft engaged in twelve specific acts of anticompetitive conduct. This is also consistent with the ruling in *Gordon.* 2003-2 Trade Cas. (CCH) ¶ 74,130, at 97,185-97,186 (utilizing "the Court of Appeals' characterization of the 12 acts of anticompetitive conduct which it affirmed"). These findings provide:

> 161.     Microsoft bound Internet Explorer to Windows 95 by placing code specific to Web browsing in the same files as code that provided operating systems functions. Starting with the release of Internet Explorer 3.0 and "OEM Service Release 2.0" ("OSR 2") of Windows 95 in August 1996, Microsoft offered only a version of Windows 95 in which browsing-specific code shared files with code upon which non-browsing features of the operating system relied.

> 164.     Starting with Windows 95 OSR 2, Microsoft placed many of the routines that are used by Internet Explorer, including browsing-specific routines, into the same files that support the 32-bit Windows APIs. Microsoft's primary motivation for this action was to ensure that the deletion of any file containing browsing-specific routines would also

delete vital operating system routines and thus cripple Windows 95.
Although some of the code that provided Web browsing could still be
removed, without disabling the operating system, by entering individual
files and selectively deleting routines used only for Web browsing,
licensees of Microsoft software were, and are, contractually prohibited
from reverse engineering, decompiling, or disassembling any software
files. Even if this were not so, it is prohibitively difficult for anyone who
does not have access to the original, human-readable source code to
change the placement of routines into files, or otherwise to alter the inter-
nal configuration of software files, while still preserving the software's
overall functionality.

84 F. Supp. 2d at 50.

170.    [Microsoft] did not provide users with the ability to
uninstall Internet Explorer from Windows 98. The omission of a browser
removal function was particularly conspicuous given that Windows 98 did
give users the ability to uninstall numerous features other than Internet
Explorer—features that Microsoft also held out as being integrated into
Windows 98. Microsoft took this action despite specific requests from
Gateway that Microsoft provide a way to uninstall Internet Explorer 4.0
from Windows 98.

*Id.* at 52.

213.    In an effort to thwart the practice of OEM customization,
Microsoft began, in the spring of 1996, to force OEMs to accept a series of
restrictions on their ability to reconfigure the Windows 95 desktop and
boot sequence. There were [four] such restrictions, which were mani-
fested either as amendments to existing Windows 95 licenses or as terms
in new Windows 98 licenses. First, Microsoft formalized the prohibition
against removing any icons, folders, or "Start" menu entries that Microsoft
itself had placed on the Windows desktop. Second, Microsoft, prohibited
OEMs from modifying the initial Windows boot sequence. [Third],
Microsoft prohibited OEMs from adding icons or folders to the Windows
desktop that were not similar in size and shape to icons supplied by
Microsoft. Finally, when Microsoft later released the Active Desktop as
part of Internet Explorer 4.0, it added the restriction that OEMs were not
to use that feature to display third-party brands.

*Id.* at 61.[8]

---

[8] The Court of Appeals reversed the district court's conclusion that the third restriction
discussed in this finding (and omitted from the above quotation) was anticompetitive. 253 F.3d at
63.

244.    [Microsoft] develop[ed] and include[d] with Windows an Internet signup program that made it simple for users to download access software from, and subscribe to, any IAP appearing on a list assembled by Microsoft. In exchange for their inclusion on this list, the leading IAPs agreed, at Microsoft's insistence, to distribute and promote Internet Explorer, to refrain from promoting non-Microsoft Web browsing software, and to ensure that they distributed non-Microsoft browsing software to only a limited percentage of their subscribers. Although the percentages varied by IAP, the most common figure was twenty-five percent.

245.    . . . Microsoft created an "Online Services Folder" and placed an icon for that folder on the Windows desktop. In exchange for the pre-installation of their access software with Windows and for the inclusion of their icons in the Online Services Folder, the leading OLSs agreed, again at Microsoft's insistence, to distribute and promote Internet Explorer, to refrain from promoting non-Microsoft Web browsing software, and to distribute non-Microsoft browsing software to no more than fifteen percent of their subscribers.

*Id*. at 70.

339.    In dozens of "First Wave" agreements signed between the fall of 1997 and the spring of 1998, Microsoft has promised to give preferential support, in the form of early Windows 98 and Windows NT betas, other technical information, and the right to use certain Microsoft seals of approval, to important ISVs that agree to certain conditions. One of these conditions is that the ISVs use Internet Explorer as the default browsing software for any software they develop with a hypertext-based user interface. Another condition is that the ISVs use Microsoft's "HTML Help," which is accessible only with Internet Explorer, to implement their applications' help systems.

*Id*. at 93.

350.    [Microsoft and Apple entered into] three agreements, all of which were signed on August 7, 1997. Under the agreement titled "Technology Agreement," which remains in force today, Microsoft's primary obligation is to continue releasing up-to-date versions of Mac Office for at least five years. Among the obligations that the Technology Agreement placed on Apple are several relating to browsing software.

351.    First, Apple has agreed, for as long as Microsoft remains in compliance with its obligation to support Mac Office, to "bundle the most current version of Microsoft's Internet Explorer for Macintosh . . . with all systems software releases for Macintosh Computers ('MacOS') sold by Apple." The Technology Agreement also provides: "While Apple may

-25-

bundle browsers other than Internet Explorer with such Mac OS systems software releases, Apple will make Internet Explorer for Macintosh the default selection in the choice of all included internet browsers (i.e., when the user invokes the "Browse the Internet" or equivalent icon, the Mac OS will launch Internet Explorer of Macintosh). In fulfillment of this requirement, Apple did not include Navigator in the default installation of the Mac OS 8.5 upgrade product. In other words, Navigator is not installed on the computer hard drive during the default installation, which is the type of installation most users elect to employ. Therefore, most users who upgraded their Macintosh systems to Mac OS 8.5 were unable to access Navigator without doing a customized installation. Having already installed an altogether adequate browser (Internet Explorer) when the Mac OS 8.5 upgrade completed its default installation process, however, most users are unlikely to trouble to install Navigator as well.

352.    The Technology Agreement further provides that "[a]ny other internet browsers bundled in the Mac OS system software sold by Apple shall be placed in folders in the software as released." In other words, Apple may not position icons for non-Microsoft browsing software on the desktop of new Macintosh PC systems or Mac OS upgrades. Moreover, the agreement states that "Apple will not be proactive or initiate actions to encourage users to swap out Internet Explorer for Macintosh." Both Apple and Microsoft read this term to prohibit Apple from promoting non-Microsoft browsing software. The Agreement even states that Apple will "encourage its employees to use Microsoft Internet Explorer for Macintosh for all Apple-sponsored events and will not promote another browser to its employees." Pursuant to this provision, Apple's management has instructed the firm's employees to not use Navigator in demonstrations at trade shows and other public events. Also with regard to the promotion of browser technology, the agreement requires Apple to display the Internet Explorer logo on "all Apple-controlled web pages where any browser logo is displayed." Finally, the agreement grants Microsoft the right of first refusal to supply the default browsing software for any new operating system product that Apple develops during the term of the agreement.

*Id.* at 95-96.

394.    . . . Microsoft designed its Java developer tools to encourage developers to write their Java applications using certain "keywords" and "compiler directives" that could only be executed properly by Microsoft's version of the Java runtime environment for Windows. Microsoft encouraged developers to use these extensions by shipping the developer tools with the extensions enabled by default and by failing to warn developers that their use would result in applications that might not

run properly with any routine environment other than Microsoft's and that would be difficult, and perhaps impossible, to port to JVMs running on other platforms . . . .

*Id.* at 106-107.[9]

401.    [I]n the First Wave agreements that it signed with dozens of ISVs in 1997 and 1998, Microsoft conditioned early Windows 98 and Windows NT betas, other technical information, and the right to use certain Microsoft seals of approval on the agreement of those ISVs to use Microsoft's version of the Windows JVM as the "default." Microsoft and the ISVs all read this requirement to obligate the ISVs to ensure that their Java applications were compatible with Microsoft's version of the Windows JVM. The only effective way to ensure compatibility with Microsoft's JVM was to use Microsoft's Java developer tools, which in turn meant using Microsoft's methods for making native calls and (unless the developers were especially wary and sophisticated) Microsoft's other Java extensions. Thus, a very large percentage of the Java applications that the First Wave ISVs wrote would run only on Microsoft's version of the Windows JVM. With that in mind, the First Wave ISVs would not have any reason to distribute with their Java applications any JVM other than Microsoft's. So, in exchange for costly technical support and other blandishments, Microsoft induced dozens of important ISVs to make their Java applications reliant on Windows-specific technologies and to refrain from distributing to Windows users JVMs that complied with Sun's standards . . . .

*Id.* at 108-09.

406.    In February 1997, one of Intel's competitors, called AMD, solicited support from Microsoft for its "3DX" technology, which provided sophisticated multimedia support for games. Microsoft's Allchin asked Gates whether Microsoft should support 3DX, despite the fact that Intel would oppose it. Gates responded: "If Intel has a real problem with us supporting this then they will have to stop supporting Java Multimedia the way they are. I would gladly give up supporting this if they would back off from their work on JAVA which is terrible for Intel." Near the end of March, Allchin sent another message to Gates and Maritz. In it he wrote, "I am positive that we must do a direct attack on Sun (and probably

---

[9] In its 2003 appeal brief in support of the consent decree ultimately entered as relief in the Government Case, the Department of Justice described this anticompetitive act as "deceptive conduct without consequences," noting that "the trial court did not find that Microsoft's failure to warn actually resulted in any unintended Windows-only applications." (Brief for the United States at 32, *United States* v. *Microsoft Corp.*, No 03-5030 (D.C. Cir.).)

> Oracle) . . . . Between ourselves and our partners, we can certainly hurt their (certainly Sun's) revenue base . . . . We need to get Intel to help us. Today, they are not." Two months later, Eric Engstrom, a Microsoft executive with responsibility for multimedia development, wrote to his superiors that one of Microsoft's goals was getting "Intel to stop helping Sun create Java Multimedia APIs, especially ones that run well (ie native implementations) on Windows." Engstrom proposed achieving this goal by offering Intel the following deal: Microsoft would incorporate into the Windows API set any multimedia interfaces that Intel agreed to not help Sun incorporate into the Java class libraries. Engstrom's efforts apparently bore fruit, for . . . Intel's IAL subsequently stopped helping Sun to develop class libraries that offered cutting-edge multimedia support.

*Id.* at 110. Once again, these are the only findings that were "critical and essential" to the Court of Appeals' ruling that Microsoft engaged in twelve specific acts of anticompetitive conduct in violation of the Sherman Act. No other factual findings by the trial judge were "necessary" to that ruling under the Fourth Circuit's standard.

In Microsoft's view, it is unnecessary for this Court now to determine the exact shape or scope of any collateral estoppel instructions to the jury. Instead, trial management questions and relevancy issues (*see* p. 21, n.7, *supra*) should be resolved by the trial court after remand by this Court. But the universe of applicable findings as to which collateral estoppel might be appropriate—those that are "critical and essential" to the D.C. Circuit's judgment—should be limited to those sixteen set forth above.

## CONCLUSION

Burst's present motion comes close to pretending that the 2004 decision of the Fourth Circuit changed nothing or is of only minor importance in evaluating a claim for collateral estoppel in this case. This is incorrect and threatens again to lead the Court down the wrong path.

Burst has failed to establish, as it must, that any particular finding should be accorded preclusive effect under the Court of Appeals' standard—"critical and essential" to the appellate judgment. Its motion merely glosses over the law and fails to show how and why particular findings meet the true test.

The Court therefore should deny Burst's motion in its entirety. In the alternative, the Court should determine that sixteen of Judge Jackson's findings (Findings 18, 33, 34, 161, 164, 170, 213, 244, 245, 339, 350, 351, 352, 394, 401 and 406) satisfy the "critical and essential" standard.

Dated:  July 1, 2004

Respectfully submitted,

John W. Treece
SIDLEY AUSTIN BROWN & WOOD
10 South Dearborn
One Bank Plaza
Chicago, Illinois  60603
(312) 853-2932


Richard J. Wallis
Steven J. Aeschbacher
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington  98052
(425) 936-8080

Michael F. Brockmeyer
  (Fed. Bar No. 02307)
Jeffrey D. Herschman
  (Fed. Bar No. 00101)
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland  21209
(410) 580-3000
David B. Tulchin
Richard C. Pepperman, II
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

*Attorneys for Defendant*
*Microsoft Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of July, 2004 I sent a copy of the foregoing Microsoft's Memorandum in Opposition to Burst's Motion to Apply Collateral Estoppel to 311 Findings of Fact and 15 Excerpts from the D.C. Circuit's Opinion in the Government Case via overnight delivery to:

James P. Ulwick
Kramon & Graham, PA
One South Street, Suite 2600
Baltimore, Maryland  21202


Spencer Hosie, Esq.
Hosie, Frost, Large & McArthur
One Market, Spear Street Tower, 22nd Fl.
San Francisco, California  94105

Michael F. Brockmeyer