SPENCER HOSIE (Ca Bar # 101777)
BRUCE J. WECKER (Ca Bar # 078530)
GEORGE BISHOP (Ca Bar # 089205)
JOHN McARTHUR (Ca Bar #159793)
HOSIE, FROST, LARGE & McARTHUR
One Market, Spear Street Tower, 22nd Floor
San Francisco, CA 94105
Telephone: 415-247-6000

ROBERT YORIO (Ca Bar # 93178)
CARR & FERRELL, LLP
2200 Geng Road
Palo Alto, CA 94303
Telephone: 650-812-3400

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

---

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION. | MDL Docket No. 1332<br><br>Hon. J. Frederick Motz |

---

| | |
|---|---|
| BURST.COM, INC.<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Civil Action No. JFM-02-cv-2952<br><br>FIRST AMENDED AND SUPPLEMENTAL COMPLAINT AND JURY DEMAND |

## <u>FIRST AMENDED AND SUPPLEMENTAL COMPLAINT</u>

Plaintiff Burst.com, Inc. ("Burst") brings this action for damages and other relief for

Defendant Microsoft Corporation's ("Microsoft") wrongful theft of Burst's intellectual property

and damage to its business by means of anticompetitive, collusive and exclusionary business

practices. Burst spent years and many millions of dollars developing innovative technology to deliver high quality video over computer networks such as the Internet. Upon seeing the threat posed by Burst's innovative technology, as it had in the cases of many other smaller competitors that have stood in its path to market dominance, Microsoft determined to "embrace, extend and extinguish" Burst. Having successfully weakened Burst through anticompetitive practices and agreements in restraint of trade, Microsoft misappropriated Burst's intellectual property by violating its patents, breaching its Non-Disclosure Agreements, and using confidential proprietary information of Burst for its own purposes. The illegal acts alleged herein have caused Burst serious and continuing damage and have deprived consumers of valuable new technologies that threatened to disturb Microsoft's strategy to maintain and expand its operating system's dominance to the delivery of high quality video over the Internet.

## INTRODUCTION

1.      This is an action under Sections 1 and 2 of the Sherman Act, the Cartwright Act, the Unfair Competition Act, the common law of California to remedy the anticompetitive and collusive conduct by defendant Microsoft, the world's largest supplier of computer software for personal computers ("PCs"). It is also an action to remedy defendant's theft of plaintiff's intellectual property under the Patent Act, the California Trade Secrets Act and for breach of contract. All facts alleged herein are alleged on information and belief except those facts concerning Burst's own conduct. Many of the facts have, however, been found by the courts of the United States in previous cases against Microsoft, and thus must be accepted for the purposes of this case.

2.      Microsoft possesses (and for several years has possessed) and willfully has maintained monopoly power in the personal computer operating systems market. Most of the

PCs sold in the United States are based on Intel microprocessor chips.  More than 95% of new Intel-based PCs are shipped with a version of Windows pre-installed.  PC manufacturers (often referred to as Original Equipment Manufacturers, or "OEMs") have no commercially reasonable alternative to Microsoft operating systems for the PCs that they distribute.

3.     On November 5, 1999, the United States District Court for the District of Columbia, Hon. Thomas Penfield Jackson, issued Findings of Fact in *United States v. Microsoft Corporation*, Civil Action No. 98-1232 and 98-1233 (TPJ), a consolidated civil antitrust action brought by the Department of Justice and attorneys general of 20 states, including California, and the District of Columbia ("*U.S. v. Microsoft*"). On June 28, 2001, the United States Court of Appeals for the District of Columbia Circuit issued an opinion affirming in part, reversing in part and remanding the District Court's rulings.  *United States of America v. Microsoft Corp.*, 253 F.3d 34 (D.C.Cir. 2001).

4.     In its *U.S. v. Microsoft* Findings ("Findings"), the District Court found that a relevant market exists for "the licensing of all Intel-compatible PC operating systems worldwide," and that Microsoft, with its Windows operating system, enjoys monopoly power in that market.  Findings, ¶¶ 18, 33.  The District Court further found that Microsoft "engaged in a concerted series of actions designed to protect the applications barrier to entry, and hence its monopoly power…Many of these actions have harmed consumers in ways that are immediate and easily discernible.  They have also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition."  Microsoft has demonstrated by its conduct that it will "use its prodigious market power and immense profits to harm any firm that insists on pursuing initiatives that could intensify competition against one of Microsoft's core products…The ultimate result is that some innovations that would truly benefit consumers never

occur for the sole reason that they do not coincide with Microsoft's self-interest."  Findings, ¶¶ 409, 412.

5.      Burst is one such firm that sought to market innovative technologies in a manner that did not coincide with Microsoft's interest.

6.      Microsoft has engaged in a series of anticompetitive activities to protect its valuable Windows monopoly against potential competitive threats, and to extend its operating system monopoly into other software markets.  Microsoft's conduct includes agreements tying other Microsoft software products to Microsoft's Windows operating system; exclusionary agreements precluding companies from distributing, promoting, buying, or using products of Microsoft's software competitors or potential competitors, including Burst's Burstware product; and exclusionary agreements restricting other companies from providing services or resources to Microsoft's software competitors or potential competitors, including Burst.  Microsoft also uses its control and proprietary information concerning the Windows operating system to disadvantage applications competitors who must design their software to interface with the operating system and rely on its established interfaces through successive versions of the software.

7.      Microsoft combined, conspired or contracted with Intel Corporation, ("Intel"), one of its earliest and most potent competitors in the business of providing software for multimedia delivery over computer networks using the Internet Protocol (IP). The purpose and effect of Microsoft's agreements with Intel was to restrain trade in the markets for software and services for the delivery of video over computer (IP) networks and in the licensing of Intel-compatible PC operating systems.  Among other things, the Microsoft/Intel combination eliminated competition between the companies in developing and exploiting innovations in video

delivery software.  In return for Intel's agreement to not distribute, promote and improve its

innovative Java multimedia software, Microsoft agreed to forego acting on its threat of

retaliation to use its operating system monopoly to disadvantage Intel's business and agreed to

incorporate certain of Intel's technologies into its dominant operating system.  As a result, Intel

withdrew its Java multimedia playback software from the market and Burst's product that relied

upon that software was excluded from the market and Burst was damaged in its business and

property.

        8.      Burst has developed valuable intellectual property, including patents and trade

secrets, over the course of more than a decade of research and development in the fields of video

storage and manipulation, interactive television and video delivery over networks.  Burst owns a

number of U.S. and International patents that cover the provision of video delivery at faster-than-

real-time rates and that utilize methods of client-server communications to provide for dynamic

rebuffering and network optimization.  Burst invested many tens of millions of dollars

developing products utilizing these patents and incorporating other valuable trade secrets.  Its

products both (a) provided a superior user experience in the delivery of video over the Internet

and other computer (IP) networks, and (b) significantly increased the operating efficiency of

these networks.

        9.      Between October 1999 and December 2000, Burst described in detail to

Microsoft, under a strict non-disclosure agreement, to its core video streaming technology which

would enable a provider to perform faster-than-real-time transmissions of time-based media from

servers to clients, or cache time-based contents between servers when transmitted at a faster-

than-real-time rate.  Burst provided Microsoft with proprietary information describing its

products and the technical nature of Burst's innovative approach to video delivery over IP

networks.  Burst also disclosed its confidential strategic business plans and other information that would be of enormous value to market participants in the business of supplying video over IP networks, including Microsoft.

10.    In December of 2001, Microsoft announced its "Corona" project, now named Windows Media 9 Series.  As part of Corona, Microsoft used and incorporated Burst's trade secret and patented technologies, including its innovative video delivery methods.  . Microsoft's use of Burst's patents and trade secret information is without permission and infringes on Burst's intellectual property and trade secret rights.

11.    In September of 2004, Microsoft released Microsoft Windows Media Player 10. Microsoft declares Windows Media Player 10 to be "buil[t] on the award-winning features of Windows Media Player 9 Series."  As Windows Media Player 10 is built upon, and essentially incorporates, the Windows Media 9 Series product that uses and incorporates Burst's trade secret and patented technologies, Windows Media Player 10 represents a continued and ongoing use of Burst's patents and trade secret information without permission and therefore infringes on Burst's intellectual property and trade secret rights.

12.    On September 1, 2004, Microsoft launched a preview release of its MSN® Music Service.  A final release is scheduled to be made available in October 2004.  Through the MSN® Music Service, "[m]usic fans can browse, sample and download songs via Microsoft® Internet Explorer or as a feature of the new Windows Media Player 10, with direct access to the music library and playback experience, as well as automatic transfer to portable devices."  Microsoft digitally encodes its content using Windows Media formats.

13.    The MSN® Music Service and its integration with Windows Media Player 10 represents an ongoing incorporation of Burst's trade secret and patented technologies as is the case with Windows Media 9 Series.

14.    On September 2, 2004, Microsoft made available its new Portable Media Center—"a new class of device that allows consumers to take all the digital entertainment that they store and manage on their Windows XP-based PC with them wherever they go."  The Portable Media Center is a handheld, portable device for viewing stored movies, television programs and pictures and listening to downloaded audio tracks.  In conjunction with Windows Media Player 10, users can transfer recorded television, home videos and music to their Portable Media Center.

15.    Microsoft's Portable Media Center is currently available from Creative Labs Inc. and it has been announced that it will soon be available from Samsung Electronics and iRiver International.  The Portable Media Center is presently available in retail outlets such as Best Buy and at Creative.com.  The Portable Media Center will soon be available from other electronics retailers such as Amazon.com, Inc., CompUSA Inc., Fry's Electronics and Good Guys Inc.

16.    Microsoft's Portable Media Center and its integration with Windows Media Player 10 represents an ongoing incorporation of Burst's trade secret and patented technologies as is the case with Windows Media 9 Series.

17.    The launch of the MSN® Music Service, according to Microsoft, represents "ongoing progress for Microsoft Corp.'s digital entertainment vision to make it easier for consumers to find and enjoy digital content such as music and videos."  With the preview of the MSN Music Service, the availability of Windows Media Player 10 and the Portable Media Centers, Microsoft is "delivering comprehensive digital media scenarios for consumers."

18.    The coordinated launch of MSN® Music Service, the release of Windows Media Player 10 and the Portable Media Center represents Microsoft pursuit of its "digital entertainment vision" through the unauthorized and manifest usurpation of Burst's trade secret and patented technologies.

## THE PARTIES

19.    Plaintiff Burst is a Delaware Corporation with a principal place of business in Santa Rosa, California.  During the relevant time period, Burst was a provider of client/server software for the delivery of video and audio information over networks. It and its predecessors, Instant Video Technologies, Inc. and Explore Technologies, Inc., developed software, including a suite of products, named Burstware.®  Burstware allows for high quality video and audio to be provided over the Internet and other computer networks without the poor resolution and jerky motion that has plagued "real-time" video streaming technologies to date.

20.    Burst was founded in 1988 and incorporated 1990.  Throughout its existence, Burst has devoted time and resources to the development of innovative techniques for video delivery over digital networks.  Burst's software manages the delivery of video and audio content over a variety of networks, optimizing network efficiency and quality of service.  Burst's Burstware suite of software products enables companies to transmit video and audio files at Faster-Than-Real-Time® speed.   Faster-Than-Real-Time speed uses available bandwidth capacity in conjunction with data compression to send more video or audio data to users than the players are consuming in real time.  This data is stored on the user's machine (PC or set-top box) for playing on demand, thus isolating the user from noise due to network congestion and other network interference.  The result is high quality, full-motion video and CD-quality audio to the end-user.

21.     Burst's core patents describe systems that are able to send and receive a high-quality video or audio segments or programs at a faster-than-real-time rate, store received information locally in PCs, set-top boxes or other appliances, manipulate that information with editing, processing, compression and decompression tools, display the signal for viewing and optionally re-send the manipulated information at faster-than-real-time rates on to other such machine systems.

22.     Defendant Microsoft Corporation is a corporation organized under the laws of the state of Washington, with its principal place of business in Redmond, Washington.  In the fiscal year ended June 30, 2001, Microsoft had revenues of approximately $25 billion, and net income of approximately $7.3 billion.  Microsoft is the world's largest supplier of computer software for personal computers.  Microsoft does business in California and throughout the world.


## JURISDICTION

23.     Plaintiff brings this action under the federal antitrust and patent laws to recover damages for injury it has sustained to its business and property.  The Court has jurisdiction over this matter pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. §§ 1331 and 1337.  The Court has jurisdiction over Plaintiff's patent claims pursuant to 35 U.S.C. § 271 and 28 U.S.C. § 1338.  The Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.   The Court also has jurisdiction over those claims pursuant to 28 U.S.C. § 1332 because this is an action between citizens of different States and because the amount in controversy substantially exceeds $75,000.

## VENUE

24.     Venue is proper in this district under 15 U.S.C. §§ 15 and 22, and under 28 U.S.C. §1391(b) and (c) because defendant Microsoft transacts business and is found within this district, and plaintiff's principal place of business is in this district, and a substantial part of the events giving rise to the causes of actions alleged herein occurred within this district. With respect to Burst's patent claims, venue is proper in this district under 28 U.S.C. § 1400 because Microsoft may be found in this district and Microsoft has committed acts of infringement and has a regular and established place of business in the district.

## INTRADISTRICT ASSIGNMENT

25.     Pursuant to Civil LR 3-2(c), this case should be subject to district-wide assignment since it involves claims of patent infringement.  At all relevant times, plaintiff's principal place of business was located in either San Francisco or Sonoma Counties, California, and a substantial part of the events that gave rise to the causes of action alleged herein occurred in those counties.

## ANTITRUST VIOLATIONS

### The Relevant Markets

### Intel-Compatible PC Operating Systems

26.     "A personal computer (PC) is a digital information device designed for use by one person at a time."  "An Intel-compatible PC is one designed to function with Intel's 80x86/Pentium families of microprocessors or with compatible microprocessors manufactured by Intel or by other firms."  Findings, ¶¶ 1, 3.

27.    "An 'operating system' is a software program that controls the allocation and use of computer resources [and] supports the functions of software programs, called 'applications,' that perform specific user-oriented tasks. [Examples of such applications are Microsoft Office, Microsoft Word and Microsoft Excel.]  The operating system supports the functions of applications by exposing interfaces, called 'application program interfaces' or 'APIs'."  "An operating system designed to run on an Intel-compatible PC will not function on a non-Intel-compatible PC, nor will an operating system designed for a non-Intel compatible PC function on an Intel-compatible one.  Similarly, an application that relies on APIs specific to one operating system will not, generally speaking, function on another operating system unless it is first adapted, or 'ported,' to the APIs of the other operating system."  Findings, ¶¶ 2, 4.  The operating system constitutes the critical layer of software in every PC.  All other software programs installed by a PC user must work with and be compatible with the particular operating system running on the PC.

28.    The market for personal computer operating systems consists of operating systems written for the Intel 80x86/Pentium (or "PC") class of microprocessors.  These microprocessors perform central processing unit ("CPU") functions for the vast majority of personal computers, and their operating systems manage the interaction between the CPU and the various pieces of hardware, such as a monitor or printer, attached to such computers.  Operating systems also control and direct the interaction between applications, such as word processing or spreadsheet programs, and the CPU.  No other product duplicates or fully substitutes for the operating system.  Thus, there exists a relevant product market of Intel-compatible PC operating systems.  The geographic market for PC operating systems is worldwide.

29.    "Currently there are no products, nor are there likely to be any in the near future, that a significant percentage of consumers world-wide could substitute for Intel-compatible PC operating systems without incurring substantial costs.  Furthermore, no firm that does not currently market Intel-compatible PC operating systems could start doing so in a way that would, within a reasonably short period of time, present a significant percentage of consumers with a viable alternative to existing Intel-compatible PC operating systems.  It follows that, if one firm controlled the licensing of all Intel-compatible PC operating systems world-wide, it could set the price of a license substantially above that which would be charged in a competitive market and leave the price there for a significant period of time without losing so many customers as to make the action unprofitable.  Therefore, in determining the level of Microsoft's market power, the relevant market is the licensing of all Intel-compatible PC operating systems worldwide."  Findings, ¶ 18.

**Video Delivery over Computer (IP) Networks Market**.

30.    Delivery of video over the Internet and other IP networks requires compatible software on both the sending and receiving computers.  The sending computer (or network of computers) is equipped with specialized "server" software; the receiving computer is equipped with "client" software, often referred to as the "media player."  The player software can also be embedded in an Internet browser allowing for the playing of audio or video clips directly in the browser window without the users awareness that the player is running. Streaming media players have traditionally been software programs that allow PC users to display multimedia video and audio content located on the web without having to download files to their hard drives, saving both time and storage space.  This is accomplished by filling a small amount of storage space called a "buffer" at "real-time" rates.  Once this buffer has been filled the content contained

within it is displayed while the server continues to attempt (at real-time rates) to keep the buffer filled. Streaming video allows for the relatively quicker initial viewing of the video clip without the delay entailed by downloading large video files.  Also, "real-time" streaming allows the user to play the clip once without consuming hard drive storage space (except temporarily while the clip is playing), but prevents users from having permanent access to the clip.  Content providers appreciate the latter feature because it protects their copyrighted material from unauthorized distribution. No other product duplicates or fully substitutes for the client and server software that enables video delivery over computer (IP) networks.  Thus, there exists a relevant product market of software and services for video delivery over computer (IP) networks (sometimes referred to herein as the "video delivery over computer networks market" or the "streaming media video market").  The geographic market for software and services for video delivery over computer (IP) networks is worldwide.

31.     Though for a time, two media players dominate the market for media players compatible with Windows-based PC computers– Microsoft's Windows Media Player and RealNetworks' RealPlayer, since the introduction of Windows Media 9 Series, Microsoft has built a substantial lead in both distribution and usage of its media player.  While Apple also produces a QuickTime for Windows player, it currently has a very small share of the Windows– based PC streaming media video market.  Streaming media also requires specialized server software to respond to the requests by a PC user to deliver media content files.  RealNetworks and Microsoft are the primary suppliers of this server software, though again RealNetworks' server sales have been declining precipitously.  Apple only began to provide a server capable of streaming files over IP networks in 1999 and has obtained only a very small share of the market. In addition to the basic delivery of media content, streaming media servers can be equipped to

serve multiple PC users while managing network resources and optimizing the end-user's

viewing or listening experience with the varying demands of available bandwidth both in the

network and to the end-user.  Streaming media software is also essential to a variety of other

video-on-demand applications that may be embedded in electronic devices other than desktop

PCs.  New generation television set-top boxes have opened up an important new use for

streaming media software.  No other product duplicates or fully substitutes for the functionality

of the media players and servers of Microsoft, RealNetworks and Apple.

   32.  Burst was, and could in the future be, an important competitor in the video

delivery over computer (IP) networks market.  Prior to the acts alleged herein, Burst had

developed and was refining innovative software that provided for data storage and delivery and

included network management functions that provided the means to deliver high quality video

over bandwidth constrained or broadband networks.  As early as 1991, Burst demonstrated to the

industry its superior video delivery technology.  But for the anticompetitive actions of Microsoft

and those Microsoft enlisted in anticompetitive agreements, Burst would be a profitable ongoing

business providing customers with higher quality television-like programming over the Internet

and other IP networks than currently exists today.

**Microsoft's Combinations To Restrain Trade And Its Efforts To Monopolize or Attempt to Monopolize The Relevant Markets.**

**Microsoft's Position in the Intel-Compatible PC Operating System Market**

   33.  Microsoft has maintained a monopoly share (in excess of 80%) of the PC

operating system market over an extended period of time.  The durability of Microsoft's market

power is due, in part, to what are referred to as "network effects."  In other words, the PC

operating system for which there are the greatest number, variety, and quality of applications will

be selected by the large majority of PC users, and in turn writers of applications will write their programs to work with the most commonly used operating system, in order to appeal to as many potential customers as possible.  Economies of scale and network effects, which reinforce one another, result in high barriers to entry.

34.    Microsoft has monopoly power in the relevant market of Intel-compatible PC operating systems.  Microsoft's monopoly power is based on three main factors:  (a) its high and stable market share of over 90 percent, (b) a high "applications barrier to entry," a "chicken and egg" problem caused by the inability of would-be competitive operating systems to attract the development of sufficient software applications compatible with those systems to satisfy consumer demand; and (c) the resulting lack of a commercially viable alternative to Windows. In its Findings, the District Court stated:  "[T]he size of Windows' installed base impels [software developers] to write applications first and foremost to Windows…The large body of applications thus reinforces demand for Windows, augmenting Microsoft's dominant position and thereby perpetuating [software developer] incentives to write applications principally for Windows.  This self-reinforcing cycle is often referred to as a 'positive feedback loop.'  What for Microsoft is a positive feedback loop is for would-be competitors a vicious cycle."  Findings, ¶¶ 39-40.  The lack of a viable alternative to Windows emerging any time soon "is too low to constrain Microsoft from raising prices or imposing other burdens on consumers and users." Findings, ¶¶ 34, 55.

**Microsoft Has Willfully Acquired, Maintained, and Used Its Monopoly in Intel-<u>Compatible PC Operating Systems</u>**

35.    Microsoft has exercised monopoly power in the relevant market of Intel-compatible PC operating systems throughout the period of this complaint

36.    In *U.S. v. Microsoft*, the Court of Appeals held that "it would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will – particularly in industries marked by rapid technological advance and frequent paradigm shifts." 253 F.3d at 79.

37.    Microsoft has, through exercise of its monopoly power, imposed upon others a variety of restrictive arrangements and other practices to exclude competition in the relevant markets defined above and to build and reinforce its monopoly power.  These restrictive agreements have included exclusive dealing arrangements with Intel and others.  Other practices include (1) creating fear, uncertainty and doubt with respect to the present and future interoperability of plaintiffs' and other competitors' products with the Windows operating system, Internet Explorer and/or the Windows Media Player, a matter over which Microsoft's own operating system designers play a substantial role, (2) intentionally changing its own software that others must interoperate with in order to strategically leverage its control over those interfaces knowing that Burst and other software companies had developed and were marketing competitive products that depended upon the interoperability provided by those interfaces, and (3) providing Burst with solutions to its interoperability problems that were ineffective or were defeated with later product changes for the purpose of raising Burst's costs and delaying its product release and acceptance. Both the purpose and the effect of Microsoft's arrangements and business practices have been to restrain competition in the relevant markets, thereby enabling Microsoft to establish, maintain and exploit monopolies over those markets.

38.    By imposing such restrictive agreements on others, including Intel, Microsoft has engaged in unfair competition and has entered into combinations of capital, skill and acts with

others for the purpose and with the intent and effect of creating and carrying out restrictions in trade and commerce; and restraining trade and preventing competition in the relevant markets.

### Microsoft's Position in the Video Delivery over Computer Networks Market

39.    During the 1980s and early 1990s, PCs were extremely limited in their ability to display full-motion video.  CPU speeds were simply inadequate to the task.  Thus, Microsoft and others participating in the personal computer business, focused on other matters.  One exception was Apple, who developed innovative software, branded QuickTime, which was designed to play video files already resident on the computer's hard-drive. At the same time, however, other companies in the interactive television business whose business focused on video delivery, such as Burst, were developing innovative means to deliver video to broad based audiences at the viewer's individual request, sometimes referred to as video-on-demand.  Among the innovative techniques that Burst and others were improving and perfecting was the application of digital technologies to replace components of the broadcasting and recording industries.

40.    In the mid-1990s, Microsoft and many others were jolted by the tidal wave of the growth of the Internet. The first Internet browser widely used by the general public was Netscape Navigator, which was introduced to the market in 1994. The long anticipated and long delayed combining of the computer and communications businesses was finally becoming a reality.

41.    Microsoft was caught flat-footed.  Its operating system monopoly faced its first serious potential competitor in years.  Microsoft responded by moving aggressively to exclude Netscape from the market.  In the months that followed, Microsoft repeatedly engaged in anticompetitive acts and forced others in the industry to exclude Netscape, Sun Microsystems and others from using the advent of the Internet to develop competitive operating systems or to lessen Microsoft's stranglehold on the Intel-compatible PC operating system market.

42.     In those early days of the Internet, however, video delivery was still constrained by hardware and communications bandwidth considerations.  Most user access to the Internet came through dial-up modems using ordinary telephone lines.  Modems were limited to receiving data at speeds of 14.4 or 28.8 kilobits per second.  With the widespread success of the Internet, a few well-positioned innovative companies raced to apply their technologies to bring video or audio to a bandwidth-constrained network.  Each had solutions (or parts of solutions) to the complex problem of bringing high quality video over a network designed largely for voice and low-bit data communications. Rob Glaser, a former employee of Microsoft, founded RealNetworks, then known as Progressive Networks.  It applied real-time streaming technology to mainly audio files so that the user would not have to wait to download a whole song before beginning to listen to the first part of the song.  Beginning in about 1997, RealNetworks began to apply its streaming technologies to video, but playback was limited to postage stamp size screens, jerky motion, and frequent network disruption.

43.     Once again, Microsoft was caught flat-footed. However, this time (as opposed to its failure with respect to Internet browsers) Microsoft perceived its battle against RealNetworks would be substantially less difficult since Microsoft perceived RealNetworks' threat much earlier.  On June 5, 1997, Microsoft's Jim Durkin reported on an internal Microsoft strategy meeting attended by Messrs. Gates, Maritz and Muglia. Durkin quoted Microsoft Vice-President Muglia as saying: RealNetworks "is like Netscape. The only difference is we have a chance to start this battle earlier in the game."

44.     Although streaming media may not have posed the broad direct threat to the applications barrier that Netscape and Sun's middleware software had, in that it did not expose a broad range of application programming interfaces (APIs) to independent software vendors, it

was potentially an even more potent threat to Microsoft's operating system monopoly.  Since it promised to provide users with such an important application that could serve to revolutionize computing itself, Microsoft quickly concluded that it had to be incorporated in its operating system and all nascent threats should be neutralized.

45.    In the following months, Microsoft moved to either reach détente with or to exclude from the market each of the companies that could offer innovative streaming media technologies that threatened its plan to control and dominant the software and services market for video delivery over IP networks and maintain its applications barrier to entry in the operating system market. Burst, along with others who stood in its path were either pressured to move out of the way or extinguished.

46.    "In 1997, senior Microsoft executives viewed RealNetworks' streaming software with the same apprehension with which they viewed Apple's playback software — as competitive technology that could develop into part of a middleware layer that could, in turn, become broad and widespread enough to weaken the applications barrier to entry." Findings, ¶ 111.

47.    First, Microsoft attempted to eliminate competition from RealNetworks by seeking a broad express horizontal agreement not to compete. RealNetworks was, in 1997, the leader, in terms of usage share, of streaming media.  RealNetworks' streaming software presented a set of APIs that competed for developer attention with APIs exposed by the streaming technologies in Microsoft's DirectX.  RealNetworks had developed versions of its software for multiple operating systems.  In 1997, senior Microsoft executives viewed RealNetworks' streaming software with apprehension— it was competitive technology that

could develop into part of a middleware layer that could, in turn, become broad and widespread enough to weaken the applications' barrier to entry.

48.    "At the end of May 1997, Gates told a group of Microsoft executives that multimedia streaming represented strategic ground that Microsoft needed to capture.  He identified RealNetworks as the adversary and authorized the payment of up to $65 million for a streaming software company in order to accelerate Microsoft's effort to seize control of streaming standards.  Two weeks later, Microsoft signed a letter of intent for the acquisition of a streaming media company called VXtreme." Findings, ¶¶ 112.

49.    "Perhaps sensing an impending crisis, executives at RealNetworks contacted Microsoft within days of the VXtreme deal's announcement and proposed that the two companies enter a strategic relationship.  The CEO of RealNetworks told a senior vice president at Microsoft that if RealNetworks were presented with a profitable opportunity to move to value-added software, the company would be amenable to abandoning the base streaming business.  On July 10, [1997,] a Microsoft executive, Robert Muglia, told a RealNetworks executive that it would indeed be in the interests of both companies if RealNetworks limited itself to developing value-added software designed to run on top of Microsoft's fundamental multimedia platform. Consequently, on July 18, [1997,] Microsoft and RealNetworks entered into an agreement whereby Microsoft agreed to distribute a copy of RealNetworks' media player with each copy of Internet Explorer; to make a substantial investment in RealNetworks; to license the source code for certain RealNetworks streaming technologies; and to develop, along with RealNetworks, a common file format for streaming audio and video content.  Muglia, who signed the agreement on Microsoft's behalf, believed that RealNetworks had in turn agreed to incorporate Microsoft's streaming media technologies into its products." Findings, ¶ 113.

50.    Microsoft told RealNetworks that it viewed the "core" multimedia streaming functionality on the client as part of the operating system and requested that RealNetworks cease competing with Microsoft in offering that functionality. Bruce Jacobsen, Chief Operating Officer of RealNetworks and a former Microsoft employee, testified that he spoke with Microsoft Vice-President Robert Muglia in the summer of 1997, and discussed, among other things, Microsoft's distribution of RealNetworks software with Windows and Internet Explorer. Mr. Jacobsen recorded a summary of the discussion shortly after the call. Mr. Jacobsen summarized the call as follows: "Was cordial but pointed. His basic message was the [sic] wanted us out of core AV. He said that MSFT had concluded that fundamental datatypes like words and numbers were in essence a core part of the operating system . ...  He said that he thought video was one of the most exciting datatypes -- since monitors were visual things, video had to be though [sic] like 'words'. and microsoft had to control this franchise. He said that anyone who competed against MSFT in the operating system 'lost' -- that there were only two people left in town who still competed against msft as a potential OS vendor -- Sun and Oracle -- and the rest had been obliterated, and MSFT was targeting these last two. He referenced their scalability day as part of killing Sun. So the message was that if we wanted to do value add on top of their video, fine; if not, we were an OS contender and msft would target us for obliteration. He cited PeopleSoft as ok -- he said adobe had pretensions of OS, but had basically backed off.  Per my prepared notes, I said that we weren't moving out because their baseline solution was so bad and because the "add-on" market was so small, and that maybe in a couple of years we'd move "up" when/if core A/V delivery was commoditized by us, MSFT, or technology like mpeg on motherboards."

51.    In order to induce RealNetworks to cease competing in core streaming, Microsoft proposed that, if RealNetworks stopped competing in base level streaming, Microsoft would give

its full support to RealNetworks as a value-added software provider; but if RealNetworks continued to compete, Microsoft would use its resources to injure it. Mr. Jacobsen testified that Muglia explained that Microsoft would seek to injure RealNetworks' business if RealNetworks continued to compete in the fundamentals of audio/visual streaming. Mr. Jacobsen quotes Muglia as saying that Microsoft had won most of the operating system wars and the only remaining threats were Oracle and Sun. Muglia said Microsoft was trying "to reduce the economic viability of those companies so they wouldn't have the wherewithal to invest and position themselves as operating system competitors of Microsoft." Muglia told Jacobsen that a company like Adobe had at one point "operating system pretenses" or "pretensions" but had been chased out of that space. Muglia told Jacobsen that Microsoft wanted RealNetworks to be like PeopleSoft, a value-added provider that builds applications on top of operating systems but does not threaten any core part of Microsoft's environment. Muglia continued: "On the other hand, if you try to do the fundamentals of streaming audio and video, then we would view you as a core competitor and use all our resources to hurt you in your core businesses." (Jacobsen asked Muglia whether Microsoft was asking RealNetworks to abandon core streaming audio and video and Muglia replied affirmatively).

52.     Mr. Muglia warned RealNetworks, Jacobsen testified, that "Microsoft would aggressively target us as a company, using all of Microsoft's resources, if we stayed in the audio and video space . . . . Bob also said, and I agreed with him, that Microsoft had been successful prior in targeting companies and having severe economic effects on them. Bob did not use Borland as an example, but Borland certainly popped to my mind . . . . The phrase that runs through the industry is that Microsoft performed a cashectomy on Borland, that it lowered the prices of its product, which caused severe disruptions in Borland's cash flow and also in the stock

price, which caused Borland to take a series of significant steps, including disposing of some

products which historically had been significant competitors to Microsoft products . . . . The

example he did use of Adobe . . . where Microsoft had had a very significant effort and success

in changing the destiny of a company . . . . So, there was very clear message that they wanted us

to leave the space, and that there would be consequences if we didn't.  Muglia admitted citing

SAP, not PeopleSoft, another software company that builds on top of, but does not compete with,

Windows, as a model for what Microsoft expected from RealNetworks.

      53.     At about the time that Microsoft reached a temporary alliance with RealNetworks,

it also threatened Apple with severe retaliation should it try to aggressively compete in the space

that Microsoft deemed core streaming technology.  "QuickTime is Apple's software architecture

for creating, editing, publishing, and playing back multimedia content (e.g., audio, video,

graphics, and 3-D graphics).  Apple has created versions of QuickTime to run on both the Mac

OS and Windows, enabling developers using the authoring software to create multimedia content

that will run on QuickTime implementations for both operating systems.  QuickTime competes

with Microsoft's own multimedia technologies, including Microsoft's multimedia APIs (called

"DirectX") and its media player.  Because QuickTime is cross-platform middleware, Microsoft

perceives it as a potential threat to the applications barrier to entry." Findings, ¶ 104.

      54.     Microsoft repeatedly pressured Apple to abandon its business of providing

software that enables users to view multimedia content.  "Beginning in the spring of 1997 and

continuing into the summer of 1998, Microsoft tried to persuade Apple to stop producing a

Windows 95 version of its multimedia playback software, which presented developers of

multimedia content with alternatives to Microsoft's multimedia APIs.  If Apple acceded to the

proposal, Microsoft executives said, Microsoft would not enter the authoring business and would

instead assist Apple in developing and selling tools for developers writing multimedia content. Just as Netscape would have been free, had it accepted Microsoft's proposal, to market a browser shell that would run on top of Microsoft's Internet technologies, Apple would have been permitted, without hindrance, to market a media player that would run on top of DirectX. But, like the browser shell that Microsoft contemplated as acceptable for Netscape to develop, Apple's QuickTime shell would not have exposed platform-level APIs to developers. Microsoft executives acknowledged to Apple their doubts that a firm could make a successful business out of marketing such a shell. Apple might find it profitable, though, to continue developing multimedia software for the Mac OS, and that, the executives from Microsoft assured Apple, would not be objectionable. As was the case with the Internet technologies it was prepared to tolerate from Netscape, Microsoft felt secure in the conviction that developers would not be drawn in large numbers to write for non-Microsoft APIs exposed by platforms whose installed bases were inconsequential in comparison with that of Windows." Findings ¶ 105.

55.    "In their discussions with Apple, Microsoft's representatives made it clear that, if Apple continued to market multimedia playback software for Windows 95 that presented a platform for content development, then Microsoft would enter the authoring business to ensure that those writing multimedia content for Windows 95 concentrated on Microsoft's APIs instead of Apple's. The Microsoft representatives further stated that, if Microsoft was compelled to develop and market authoring tools in competition with Apple, the technologies provided in those tools might very well be inconsistent with those provided by Apple's tools. Finally, the Microsoft executives warned, Microsoft would invest whatever resources were necessary to ensure that developers used its tools; its investment would not be constrained by the fact that authoring software generated only modest revenue." Findings, ¶ 106.

56.     "If Microsoft implemented technologies in its tools that were different from those implemented in Apple's tools, then multimedia content developed with Microsoft's tools would not run properly on Apple's media player, and content developed with Apple's tools would not run properly on Microsoft's media player.  If, as it implied it was willing to do, Microsoft then bundled its media player with Windows and used a variety of tactics to limit the distribution of Apple's media player for Windows, it could succeed in extinguishing developer support for Apple's multimedia technologies." Findings, ¶ 107.

57.     In April 1997, Microsoft Eric Engstrom and Christopher Phillips met with Apple representatives.  They suggested that Apple cede the playback market to Microsoft and focus solely on the "authoring" area of multimedia.  A similar request was made at meetings in August, September and October of 1997.  In the September meeting, Engstrom warned that if Apple refused, Microsoft would take over the authoring segment of the market, and would assign 150 engineers, if necessary, to do so. At the same time, Engstrom informed Apple that Bill Gates was really not interested in the authoring market because of its small size.  Microsoft also threatened to "kill" Apple in the media playback market, if it did not bow to its demand that it cede that market to Microsoft.

58.     In early April 1998, Mr. Engstrom informed Apple of Microsoft's effort to develop a new file format called Advanced Authoring Format ("AAF"). At the conclusion of one discussion concerning the possibility of Apple working with Microsoft on the new format, Mr. Engstrom bluntly warned the Apple representative: "We're going to compete fiercely on multimedia playback, and we won't let anybody have playback in Windows.  We consider that part of the operating system, so you're going to have to give up multimedia playback on Windows."

59.     "The discussions over multimedia playback software culminated in a meeting between executives from Microsoft and Apple executives, including Apple CEO, Steve Jobs, at Apple's headquarters on June 15, 1998.  Microsoft's objective at the meeting was to secure Apple's commitment to abandon the development of multimedia playback software for Windows.  At the meeting, one of the Microsoft executives, Eric Engstrom, said that he hoped the two companies could agree on a single configuration of software to play multimedia content on Windows.  He added, significantly, that any unified multimedia playback software for Windows would have to be based on DirectX.  If Apple would agree to make DirectX the standard, Microsoft would be willing to do several things that Apple might find beneficial.  First, Microsoft would adopt Apple's ".MOV" as the universal file format for multimedia playback on Windows.  Second, Microsoft would configure the Windows Media Player to display the QuickTime logo during the playback of ".MOV" files.  Third, Microsoft would include support in DirectX for QuickTime APIs used to author multimedia content, and Microsoft would give Apple appropriate credit for the APIs in Microsoft's Software Developer Kit." Findings, ¶ 108.

60.     "Jobs reserved comment during the meeting with the Microsoft representatives, but he explicitly rejected Microsoft's proposal a few weeks later." Findings, ¶ 109.

61.     Microsoft's response was simple: Microsoft would drive Apple out of the multimedia business.  Apple experienced an unusually large number of technical issues with the interoperability of QuickTime with Windows and Internet Explorer as compared to with Netscape Navigator.  Also, although relatively full interoperability was reached between QuickTime and Internet Explorer 3.0, subsequent versions of Internet Explorer and of the Windows operating system degrade QuickTime's ability to playback many file formats.  This degradation occurred in part because Microsoft desired to no longer support Netscape's open

standard for browser plug-ins.  Having monopolized the browser market through its abuse of its operating system monopoly, Microsoft had no use for promoting interoperability among plug-in software vendors.  Microsoft also used its control over the Windows "Registry" to degrade users' experience with QuickTime and steer them to Windows Media Player, leveraging its Windows monopoly to extend its dominance into the provision of multimedia players and servers.

62.    Microsoft's conduct with respect to its streaming media competitors was designed to thwart any software that may erode the applications barrier to entry and to ultimately extend its operating system monopoly to include streaming media functions.

**Microsoft Has Restrained Trade and Monopolized and/or
Attempted to Monopolize the Market
For Video Delivery Over Computer (IP) Networks**

**Microsoft's Agreements With Intel to Reduce Competition in the Relevant Markets**

63.    Sun announced in May 1995 that it had developed the Java programming language.  Mid-level executives at Microsoft began to express concern about Sun's Java vision in the fall of that year, and by late spring of 1996, senior Microsoft executives were deeply worried about the potential of Sun's Java technologies to diminish the applications barrier to entry.  Particularly worrisome was the fact that industry leaders such as Intel, Netscape, RealNetworks, and Cisco Systems, Inc. might rally around Java as a way to break its choke-hold on the PC computing business.

64.    Intel Corp. ("Intel"), although primarily a hardware manufacturer, engages in software development, which, for the most part, takes place at the Intel Architecture Labs ("IAL").  Intel had long devoted resources to developing video delivery software, believing that soft data intensive applications would showcase its fast microprocessors as well as spur enormous expansion of the market for computer microprocessor chips.  Among its early

accomplishments, were improvements in hardware chips designed for the compression of video files, development of software versions of video compression, the development of Native Signal Processing (NSP) software to allow video application software writers direct access to video hardware without reliance on Windows APIs, and the implementation of special instruction sets in its microprocessors to speed multimedia applications, called MMX.

65.    In 1995 Intel was developing a high performance, Windows-compatible Java Virtual Machine (JVM). Microsoft wanted Intel to abandon that development effort because a fast, cross-platform JVM would threaten Microsoft's monopoly in the operating system market. At an August 1995 meeting, Microsoft's Gates told Intel that its "cooperation with Sun and Netscape to develop a Java runtime environment ... was one of the issues threatening to undermine cooperation between Intel and Microsoft." Findings, ¶ 396. Three months later, "Microsoft's Paul Maritz told a senior Intel executive that Intel's [adaptation of its multimedia software to comply with] Sun's Java standards was as inimical to Microsoft as Microsoft's support for non-Intel microprocessors would be to Intel." *Id*. ¶ 405.

66.    Intel nonetheless continued to undertake initiatives related to Java. By 1996 "Intel had developed a JVM designed to run well ... while complying with Sun's cross-platform standards." Findings, ¶ 396. In April of that year, Microsoft again urged Intel not to help Sun by distributing Intel's fast, Sun-compliant JVM. *Id*.  Microsoft threatened Intel that if it did not stop aiding Sun on the multimedia front, then Microsoft would refuse to distribute Intel technologies bundled with Windows. Findings, ¶ 404.

67.    In January of 1997, Microsoft's multimedia team warned that Intel's foray into Java development might result in a crop of Intel-based network computers (NCs) running Java and including multimedia APIs controlled by Intel.  Into the summer of 1997, Microsoft worried

that its own multimedia technologies were among the worst and that that state of affairs was harming its ability to threaten outsiders with incompatibility with its operating system.  By late 1997, Microsoft had reached an agreement with Intel whereby Intel would phase out its support for its Java Media Framework.

68.     In October of 1997, Bill Gates sent Andy Grove an e-mail, which another Microsoft characterized as a well delivered threat of "thermal nuclear war," criticizing Intel's effort to develop a set-top box running Java on a non-Microsoft operating system.  In particular, he questioned the wisdom of offering developers the opportunity to build on APIs incorporated on inexpensive client machines that would compete with Windows-based personal computers. Such computers, equipped with JAVA and running cross-platform applications, could find strong distribution through advanced multimedia applications – applications that Microsoft viewed itself as being behind other firms in development, including Intel, Apple and RealNetworks, – and eventually provide a platform for many other types of applications, competing directly with the Windows API set. Increasing Microsoft's fear of the NCs running Java was its own recognition that Windows would never be as fast as a JavaOS.  Thus, when Mr. Grove advised Mr. Gates the success of a demonstration of a set-top box using Java and the corresponding failure of one using Microsoft's WindowsCE, Mr. Gates responded with alarm and issued his threat.

69.     Weeks later, Intel's strategy changed and it began de-emphasizing its Java work, renouncing its leadership role in promoting Java multimedia.

70.     In the words of the Court of Appeals for the District of Columbia Circuit, Intel finally capitulated in 1997, after Microsoft delivered the "coup de grace."  "[O]ne of Intel's competitors, called AMD, solicited support from Microsoft for its '3DX' technology....

Microsoft's Allchin asked Gates whether Microsoft should support 3DX, despite the fact that Intel would oppose it. Gates responded: "If Intel has a real problem with us supporting this then they will have to stop supporting Java Multimedia the way they are. I would gladly give up supporting this if they would back off from their work on JAVA." Findings, ¶ 406. As Intel's Chairman, Andrew Grove, later reported: "We caved." "Introducing a Windows-based software initiative that Microsoft doesn't support . . . well, life is too short for that."

71.     In July of 1998, Intel announced to the public that it was withdrawing its JMF Player. Burst's product Burstware relied on Intel's implementation of the JMF player as its client software. Intel's action came shortly after Burst had distributed its first Burstware software product to customers and severely hampered Burst's marketing efforts. Burst had relied on Intel's implementation of the JMF player because of its superior quality and because of Intel's dedication to maintain and improve it in the rapidly evolving video delivery over IP networks business. Indeed, Burst had worked closely with Intel software engineers to ensure a seamless and superior quality Burstware-equipped JMF player. Although Sun and IBM teamed up many months later to continue the development of an improved JMF player, many of the issues that led Burst to prefer the Intel implementation were never resolved to Burst's satisfaction. Additionally, the uncertainty and delay in JMF Player improvements caused by Intel's withdrawing from the market, gave RealNetworks and Microsoft an open field to get to market first to establish dominant positions on the resource limited desktops of millions of PC users with their respective media players. As a result, Burst was forced to focus and devote substantial developer time on building a Windows Media Player plug-in.

72.     Microsoft's internal documents and deposition testimony confirm both the anticompetitive effect and intent of its actions. Microsoft executive, Eric Engstrom, included

among Microsoft's goals for Intel: "Intel to stop helping Sun create Java Multimedia APIs, especially ones that run well ... on Windows." He testified, "We were successful [in convincing Intel to stop aiding Sun] for some period of time."

73.    Thus, Microsoft began, and continues today, a pattern of anticompetitive practices designed to thwart competition on the merits, to deprive customers of a choice between alternative media players, alternative video delivery suppliers and technologies, and to exclude Microsoft's software competitors, including Burst. Only now, seven years later are advanced set-top boxes becoming widely available, now that Microsoft has the technology to compete through having misappropriated Burst's intellectual property.

**Microsoft's Monopolistic Practices Continue Despite the Findings
and Conclusions of Two Federal Courts.**

74.    Microsoft has not been willing simply to compete on the merits, especially where it involves potentially innovative products that have the potential to weaken its operating system monopoly. Still lagging in the video delivery over IP networks market, Microsoft decided to step up its pressure to dominate the market. A Jan. 3, 1999, e-mail to Microsoft chairman Bill Gates outlined a plan to use the dominant Windows operating system to promote Microsoft's Netshow media streaming software over that offered by RealNetworks Inc. Microsoft executive Anthony Bay urged Gates to "reposition streaming media battle from Netshow vs. Real to Windows vs. Real" and "follow the [Internet Explorer] strategy where ever appropriate."

75.    Ignoring the findings of the District Court, Microsoft continued its monopolistic tactics in the video streaming market in 2000. In June 2000, a Microsoft executive wrote regarding a plan for Microsoft's media player to play music files in proprietary formats by rivals RealNetworks and Apple. "Remember the 'embrace and extend' campaigns we've used in the

past," Microsoft employee Frasier Mocke wrote to colleagues, "and personally I want us to rule the airwaves." Another Microsoft executive, Dave Foster, cut the discussion short: "No more replies." "We need to keep all of this off the airwaves."

76. At about the same time, Burst was ramping up its promotion of its video delivery product utilizing its Windows Media Player plug-in. Beginning in the fall of 1999, Burst had been distributing a product that delivered video from Burst's servers to desktop PC's through Microsoft's Windows Media Player versions 6.0 through 6.4. Microsoft supported Burst's efforts, finding that "bursting" provided a better consumer experience, thus giving Microsoft a competitive advantage relative to RealNetworks and Apple Quicktime. In particular, after hearing of the confidential trials of major broadband suppliers, including Excite@home, and being told by Excite@home that Burstware was "fundamental technology" and that it would choose between Microsoft and RealNetwork based on which company implemented Burst's technology, Microsoft concluded that Burst's technology "was a necessary feature" to its video delivery solutions. In March and April of 2000, Microsoft introduced for customer download its new version of the Windows Media Player 7.0. Whereas Burst's product interoperated well with Microsoft's previous version of its player, the new version would not permit Burst's server to send video files using popular formats to the Windows Media Player for playback. The new software simply blocked Burst's software from using another part of Microsoft's Windows operating system that was fully capable of rendering the Burst delivered files. One Microsoft document recounts a key employee colorfully describing how Microsoft's altered software "nuke[s]" Burst and "kills Burst."

77. The interoperability problem was quickly isolated and easy fixes identified, and, at an early technical meeting, Microsoft specifically promised to provide these fixes to Burst.

Microsoft, however refused to provide the fixes to Burst.  Microsoft strategically denied Burst a simple fix because Burst refused to commit exclusively to the use of Microsoft's proprietary server software. Having "led Burst down the plugability path," Microsoft denied Burst the ability to stream to its Windows Media Player, something it had explicitly encouraged Burst to do earlier. It also recognized that Burst had relied on Microsoft's earlier promises and had not recognized that Microsoft would not let its servers interoperate with Windows Media Player 7.0. But, because Microsoft concluded that Burst was a cross-platform "foe" rather than a Microsoft-exclusive "friend," it withheld technical information concerning its monopoly Windows product that could have solved the interoperability problem, and demanded that Burst cede the multimedia delivery server space to Microsoft as a condition for being able to interoperate with its monopoly operating system. Yet, when working with "friends," Microsoft provided the very interoperability that it refused to provide to Burst.  It thus used its power to disadvantage and delay Burst. In particular, after have fostered a relationship which Microsoft believed benefited both it and its customers, Microsoft decided that Burst's cross-platform server should not be permitted to interoperate with its Windows operating system and discriminatorily refused to provide a software interface which would have solved the problem.

78.     Microsoft's actions delayed and prevented Burst from developing and releasing a satisfactory product compatible with Windows Media Player 7.0.  Microsoft's actions delayed and prevented Burst from selling its product and undermined its credibility with potential customers.  The inability to transition properly to Windows Media Player 7.0 compelled Burst's corporate customers and partners to be wary of committing to Burst's products without also having Microsoft's support.  Having no standalone media player and no prospect for a new widely distributed player appearing on users PCs, Burst's potential customers had to assess

whether Burst could continue to rely on Microsoft through subsequent product changes, given Burst's appearance in a market segment that Microsoft had publicly proclaimed was critical to its own business plans. The experience thus put Burst in the untenable position that many past competitors of Microsoft had experienced. Microsoft was choking off their "air supply."

79.    At the same time, Microsoft was continuing its efforts to maintain the reputation of a company that helps those who disdain competition with it and hurts those that deign to compete with it in its chosen software markets. Two months later, Microsoft brashly ignored the findings of the federal courts concerning its discriminatory practices towards companies such as Intel. In an August 2000 e-mail, Joachim Kempin, VP for Microsoft's OEM division, complained that Intel was contacting computer makers "who are not (Microsoft) friendly in the first place and ... encouraging them to go to Linux," a free operating system that competes with Microsoft's Windows. Kempin wrote to Microsoft chairman Bill Gates that Kempin planned to "stop any go-to-market activities with Intel (and) only work with their competitors." Kempin said Microsoft should withhold technical information from Intel and "work underground" to promote its competitors in the computer chip industry, according to portions of the memo. "I would further try to restrict source code deliveries where possible and be less gracious when interpreting agreements -- again without being obvious about it," Kempin wrote.

80.    Microsoft's conduct adversely affected and continues to affect innovation, including by:

a.    impairing the incentive of Microsoft's competitors and potential competitors to undertake research and development, because they know that Microsoft will be able to limit the rewards from any resulting innovation;

b.  impairing the ability of Microsoft's competitors and potential competitors to obtain financing for research and development;

c.  inhibiting Microsoft's competitors that nevertheless succeed in developing promising innovations from effectively marketing their improved products to customers; and

d.  reducing competition and the spur to innovation by Microsoft and others that only competition can provide.

81.    The purpose and effect of Microsoft's conduct with respect to video delivery have been and, if not restrained, will be:

a.  to preclude competition on the merits between Microsoft's video delivery software and that of competitors;

b.  to extend Microsoft's Windows operating system monopoly to the video delivery software market; and

c.  to maintain Microsoft's Windows operating system monopoly.

82.    Aided by Microsoft's anticompetitive conduct, Microsoft's share of the streaming video media market has increased dramatically from 0% in early 1997 to 50% or more in early 2002.

83.    So long as the tie-in and Microsoft's other exclusionary practices continue Microsoft's video delivery competitors will be effectively foreclosed from important opportunities to supply alternative products.  Further, these practices combined with the market's powerful network effects, will result in the continuation of Microsoft's significant increase in its share of the video delivery market until it monopolizes that market as well.  If Microsoft is permitted to continue to use its market power to squeeze competitors out of the streaming media delivery market, there will be no more competitors.

84.     In addition, the barriers that exist to the entry of new competitors or the expansion of smaller existing competitors, including network effects, means that dominance once achieved cannot readily be reversed.

## INTELLECTUAL PROPERTY VIOLATIONS

85.     On or around October 14, 1999, Microsoft and Burst entered into a written non-disclosure agreement, the primary purpose of which was the exchange of confidential and proprietary technical information of Burst with Microsoft in anticipation of entering into a mutually beneficial licensing or other collaborative arrangement.  Between October 1999 and December 2000, Burst introduced Microsoft to Burst's core video streaming technology that enables a provider to perform faster-than-real-time transmissions of time-based media from servers to clients, or cache time-based contents between servers when transmitted at a faster-than-real-time rate.

86.     The highly valuable and proprietary information shared by Burst with Microsoft included Burst's technical information utilized in the Burstware suite of software products, a copyrighted "how to" Burst simulator, a confidential draft patent application setting forth a method for connection acceptance control and rapid determination of optimal multi-media content deliveries over networks, and various related technical papers describing in detail the algorithmic basis for the use of an optimal delivery system.  In addition, in November and December 2000 Burst inventors conducted a tutorial for Microsoft technical personnel describing in detail the technology set forth in the aforementioned intellectual property and particularly the mathematical concepts and algorithms underlying the draft patent application.

87.     Having the protection of the October 14, 1999 agreement, Burst provided Microsoft with proprietary information that Burst had previously kept highly confidential.  The

trade secrets that Burst disclosed to Microsoft had substantial economic value to Burst and were the subject of reasonable efforts by it to maintain their secrecy.

88.     During its education about Burst's technology, Microsoft learned precisely how to replicate an enterprise quality video and audio delivery system that would significantly improve a user's viewing experience. Specifically, Microsoft learned about Burst's technology pertaining to, among other things, faster-than-real-time buffering, the development of an enterprise quality delivery system with maximum scalability substantially greater than that available under previous versions of Windows Media Services on Windows 2000, the development of a system with sophisticated traffic shaping and quality of service capabilities, and the development of a system for optimizing the economics and efficiencies of end content delivery directly from origin servers to clients without the need of intervening edge-caching technology.

89.     During this educational period, Burst also presented to Microsoft the evaluation done by an independent third party testing Burstware for efficiency and scalability benchmarks. The Burstware received a highly favorable valuation from that third party testing service, which convinced Microsoft of the substantial value of Burst's technology.

90.     At the conclusion of this educational and evaluation process in December 2000, Microsoft acknowledged the substantial technological improvements achieved by Burst and indicated that there were several Burst patents that were of interest to Microsoft. Microsoft, however, eventually declined to license any of Burst's technologies. Business and licensing discussions between the parties ceased by early 2001.

91.     In December 2001, Microsoft unveiled the so-called "newest" version of its Windows Media technology, code-named "Corona" at the Streaming Media East Conference. In its announcement, Microsoft claimed that the new Beta version Corona product, which it touted

as "3rd generation streaming", would allow for immediate streaming of media using all available bandwidths to deliver as much data as possible to the client immediately thereby allowing the media stream to begin playing instantly and would use bandwidth caching, where downstream bandwidth above and beyond what is actually being used for the media stream being played is used to cache unplayed content.

92.   On September 4, 2002, Microsoft released a beta version of Windows Media Player 9 Series.  Windows Media Player 9 represented a key component of the larger Windows Media 9 Series that was released the same day.  Windows Media Player 9, according to Microsoft, "offer[ed] a host of new and improved features for both digital media enthusiasts and the power users who demand ultimate control and audiophile-level quality for creating, managing and playing back their digital music and video collections."

93.   Windows Media 9 Series provides a dramatically improved playback experience in conjunction with the Windows .NET Server and its built-in support for Fast Streaming technology that offers instant on/always on streaming for broadband users and a dramatic improvement for dial-up users.  Windows Media Player 9 and the Windows Media 9 Series Platform offer digital content more reliably and without waiting for buffering.

94.   On January 7, 2003, Microsoft released the final version of Windows Media Player 9 and Windows MovieMaker 2 for Windows XP Operating System.

95.   Microsoft concurrently announced a new licensing program for certain aspects of the Windows Media Platform—Windows Media Audio and Video 9—that enables device manufacturers and software developers to build high-quality digital audio and video features into a broader range of their products with longer terms and lower prices than other media technologies.  Various aspects of the Windows Media 9 platform, by this time, had been adopted

by device manufacturers, software vendors and content providers with more than 170 devices and hundreds of applications.

96.    By February 6, 2003, Windows Media Player 9 had been downloaded by more than 12 million users.

97.    In June 2004, Microsoft released a beta version of Microsoft Windows Media Player 10.  Windows Media Player 10, according to Microsoft, offers four features providing seamless digital content distribution and playback:  a simplified interface, enhanced device support, an all-in-one jukebox and a "Digital Media Mall."

98.    On September 2, 2004, Microsoft released the final version of Windows Media Player 10.  Windows Media Player 10 makes it "faster and easier for consumers to discover, download, play and transport their digital media" in addition to enabling consumers to "browse and acquire music and video from a broad number of online stores."

99.    Windows Media Player 10 also enables consumers to transfer their music to more than 70 portable device and automatically sync their entire media library—music, video and recorded TV—to new Windows Mobile-based Portable Media Centers which were made available at retail on September 3, 2004.

100.    U.S. Patent No. 4,963,995 ("the '995 patent"), entitled "Audio/Video Transceiver Apparatus Including Compression Means," is held by Burst. The '995 patent was filed on December 27, 1988 and issued on October 16, 1990. A true and exact copy of the '995 patent is attached hereto as Exhibit A, and made a part hereof.

101.    U.S. Patent No. 5,164,839 ("the '839 patent"), entitled Method for Handling Audio/Video Source Information," is held by Burst. The '839 patent was filed on October 11,

1991, issued on November 17, 1992, and relates back to the '995 patent. A true and exact copy of the '839 patent is attached hereto as Exhibit B, and made a part hereof.

102.    U.S. Patent No. 5,995,705 ("the '705 patent"), entitled "Burst Transmission Apparatus and Method for Audio/Video Information," is held by Burst. The '705 patent was filed on July 18, 1997, issued on November 30, 1999, and relates back to the '995 patent. A true and exact copy of the '705 patent is attached hereto as Exhibit C, and made a part hereof.

103.    The '995 patent covers an improved audio/video transceiver capable of capturing, storing, editing, copying, and transmitting compressed audio/video information to another device.

104.    The '839 patent covers a method for employing an improved transceiver with capabilities including editing and/or copying. The method includes transmitting program information in faster-than-real-time communications, and in either compressed or decompressed formats. The method allows the information in these communications to be edited or copied before being played or retransmitted.

105.    The '705 patent covers an improved transceiver with capabilities including editing and/or copying. The improved transceiver is capable of transmitting program information in faster-than-real-time communication, and in either compressed or decompressed format. The information contained in these communications may be edited or copied before being played or retransmitted.

106.    Microsoft offers for sale, manufactures, uses, distributes and/or imports products that include the Windows Media 9 Platform and the Windows Media 10 Player in addition to Microsoft's new MSN® Music Service and its Portable Media Center, which incorporates Plaintiff's patented technology. Microsoft's products are marketed, sold and/or distributed in the

same retail channels, including on-line business establishments, in which Plaintiff's Burstware

products are marketed and sold.

## CLAIMS FOR RELIEF

### First Claim for Relief:  Unlawful Exclusive Dealing
### and Other Exclusionary Agreements
### (Section 1 of the Sherman Act, Section 3 of the Clayton Act)

107.    Plaintiff incorporates the allegations of paragraphs 1 through 106 above.

108.    Microsoft's agreements with others pursuant to which such companies agree not

to license, distribute, or promote the products of third party competitors (or to do so only on

terms that materially disadvantage such products), and its agreements with Intel and others

restricting the development of competitive video media players, unreasonably restrict

competition and thus violate Section 1 of the Sherman Act.  These agreements unreasonably

restrain trade and restrict the access of Microsoft's competitors to significant channels of

distribution, thereby restraining competition in the video delivery of computer networks market,

among other markets.

109.    The purpose and effect of these agreements are to restrain trade and competition

in the video delivery over computer (IP) networks and PC operating system markets.

110.    There is no legitimate business justification for Microsoft's agreements and any

purported legitimate business justifications are mere pretexts. These agreements violate Section 1

of the Sherman Act, 15 U.S.C. § 1 and Section 3 of the Clayton Act, 15 U.S.C. § 14.

111.    As a direct and proximate result of Microsoft's unlawful combinations and

agreements to restrain trade, plaintiff has suffered injury to its business or property and has been

deprived of the benefits of free and fair competition on the merits.  That injury is of the kind that

the antitrust laws were intended to prevent, and therefore constitutes antitrust injury.

### Second Claim for Relief:  Monopolization of the PC Operating
### Systems Market
### (Section 2 of the Sherman Act)

112.    Plaintiff incorporates the allegations in paragraphs 1 through 111 above.

113.    Microsoft possesses monopoly power in the market for Intel-compatible PC operating systems.  Through the anticompetitive conduct described herein, Microsoft has willfully maintained that power by anticompetitive and unreasonably exclusionary conduct.  Microsoft has acted with the intent to maintain its monopoly power in the PC operating system market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

114.    There are no legitimate business justifications for Microsoft's exclusionary and anticompetitive conduct.  To the extent that Microsoft has sought to achieve any legitimate business purpose through its conduct, it has not used the least restrictive means of doing so, any claimed procompetitive benefit is outweighed by the anticompetitive harm, and any purported legitimate business justifications are mere pretexts.

115.    Microsoft's conduct has injured consumers and harmed competition.

116.    As a direct and proximate result of Microsoft's unlawful monopolization of the Intel-compatible PC operating systems market, plaintiff has suffered injury to its business or property and has been deprived of the benefits of free and fair competition on the merits.  That injury is of the kind that the antitrust laws were intended to prevent, and therefore constitutes antitrust injury.

### Third Claim for Relief:  Monopolization and Attempted Monopolization of the Market
### For Video Delivery Over Computer (IP) Networks
### (Section 2 of the Sherman Act)

117.    Plaintiff incorporates the allegations of Paragraphs 1 through 116 above.

118.    There exists a relevant world-wide market for software and services for the delivery of video over computer (IP) networks.  Due to various circumstances, including the network benefits of seamless inoperability, participants in the delivery of video over computer (IP) networks market are protected from competition by high barriers to entry. In addition, given the welter of technologies used in the Internet and file types for formatting video content, web page designers and content providers will necessarily support only a limited number of multimedia players.

119.    Microsoft has targeted software products that have the potential to compete with (or facilitate the development of products to compete with) it in the market for software and services for the delivery of video over computer (IP) networks.

120.    Microsoft has willfully engaged, and is engaging, in a course of conduct, including unreasonably exclusionary agreements, in order to obtain a monopoly in the video delivery over computer (IP) networks market, and there is a dangerous probability that it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Microsoft has acted with a specific intent to monopolize, and to destroy effective competition in the video delivery over computer networks market.

121.    There are no legitimate business justifications for Microsoft's exclusionary and anticompetitive conduct.  To the extent that Microsoft has sought to achieve any legitimate business purpose through its conduct, it has not used the least restrictive means of doing so, any claimed procompetitive benefit is outweighed by the anticompetitive harm, and any purported legitimate business justifications are mere pretexts.

122.    Microsoft's conduct has injured consumers and harmed competition.

123.    As a direct and proximate result of Microsoft's unlawful monopolization or attempt to monopolize the market for the licensing of software for the delivery of video over computer (IP) networks, plaintiff has suffered injury to its business or property and has been deprived of the benefits of free and fair competition on the merits.  That injury is of the kind that the antitrust laws were intended to prevent, and therefore constitutes antitrust injury.

**Fourth Claim for Relief:  The Cartwright Act**
**(Calif. Bus. And Prof. Code §§ 16720 *et seq.*)**

124.    Plaintiff incorporates the allegations of Paragraphs 1 through 123 above.

125.    Microsoft has engaged in combinations of capital, skill, and acts with others with the intent, purpose and effect of creating and carrying out restrictions in trade and commerce; and restraining and preventing competition in the relevant markets, thereby enabling Microsoft to perpetuate its monopolies of those markets.

126.    As a direct and proximate result of Microsoft's unlawful combinations and contracts to restrain trade and monopolize the relevant markets, plaintiff has suffered injury to its business or property and has been deprived of the benefits of free and fair competition on the merits.  That injury is of the kind that the antitrust laws were intended to prevent, and therefore constitutes antitrust injury.

**Fifth Claim for Relief:  Unfair Competition Act**
**(Calif. Bus. And Prof. Code §§ 17200 *et seq.*)**

127.    Plaintiff incorporates the allegations of Paragraphs 1 through 126 above.

128.    Microsoft's violations of the federal antitrust laws, the California Cartwright Act, constitute unfair competition and unlawful and unfair business acts and practices within the meaning of California Business and Professions Code § 17200.

129.     As a result of Microsoft's violation of California Business and Professions Code §

17200, Microsoft has unjustly enriched itself at the expense of plaintiff.

130.     To redress this unjust enrichment, Microsoft should be required to disgorge its

illegal gains for the purpose of making full restitution to plaintiff.

**Sixth Claim for Relief:  Patent Infringement**
**(Declaratory Judgment of Patent Infringement)**

131.     Plaintiff incorporates the allegations of paragraphs 1 through 130 above.

132.     Plaintiff is the owner valid United States patents, the '995 patent, the '839 patent,

and the '705 patent.

133.     Microsoft has manufactured, used, offered for sale, distributed, imported, and/or

sold products, such as, but not limited to, its Corona product, its Corona Media Services

software, its .NET Media Server, which runs its Corona Media Services software, the Windows

Media 9 Series Platform, the Windows Media 9 Player, the Windows Media 10 Player, the

Movie Maker software product, the Portable Media Center and the MSN® Music Service that all

allow for the downloading and delivery of audio and video content to various portable devices –

that utilize, incorporate and/or encompass the apparatus or methodology of the '995 patent, the

'839 patent, and the '705 patent.

134.     Burst seeks a judicial determination that Microsoft has infringed and/or is

infringing the '995 patent, the '839 patent, and the '705 patent.  A declaration of this kind is

necessary and appropriate, in order to determine the parties' rights and obligations with respect

to the matters in dispute between them, and to avoid a multiplicity of lawsuits with possibly

inconsistent results.

**Seventh Claim for Relief:  Patent Infringement**
**(Patent Infringement Under The Patent Act, 35 U.S.C. §§ 100, *et seq.*)**

135.    Plaintiff incorporates the allegations of paragraphs 1 through 134 above.

136.    Plaintiff is the owner of valid United States patents, the '995 patent, the '839 patent, and the '705 patent.

137.    Microsoft's conduct in manufacturing, using, offering for sale, distributing, importing, and/or selling products, such as, but not limited to, its Corona product, its Corona Media Services software, its .NET Media Server, which runs its Corona Media Services software, the Windows Media 9 Player, the Windows Media 10 Player, the Movie Maker software product that all allow for the downloading and delivery of audio and video content to various portable devices in addition to the Portable Media Center, the MSN® Music Service, that utilize, incorporate and/or encompass the apparatus or methodology of the '995 patent, the '839 patent, and the '705 patent, constitute infringement of Plaintiff's rights under the '995 , '839, and '705 patents.

138.    As a direct and proximate result of Microsoft's acts of patent infringement, Microsoft is liable to Plaintiff for actual damages suffered by Plaintiff, and any profits realized on the sale of Microsoft's Corona product, its Corona Media Services software, its .NET Media Server, which runs its Corona Media Services software, the Windows Media 9 Series Platform, the Windows Media 9 Player, the Windows Media 10 Player, the Movie Maker software product, the Portable Media Center, the MSN® Music Service and/or other  products utilizing, incorporating, and/or encompassing the apparatus or methodology of the '995 patent, the '839 patent, and the '705 patent, which are not taken into account in the computation of actual damages, as well as statutory damages, including treble damages.

139.    Microsoft's infringing conduct interferes with Plaintiff's ability to control the use of its patented technology, and interferes with Plaintiff's ability to establish and create business relationships in the market.  Microsoft's continued infringement is likely to have a further and substantial deleterious impact on Plaintiff's business diminishing its market share and depriving it of profits.

140.    Plaintiff is therefore entitled to additional remedies of preliminary and permanent injunctions, and the impoundment and destruction of all infringing materials, including materials used in making the infringing Corona product, the Corona Media Services software, its .NET Media Server, which runs its Corona Media Services software, the Windows Media 9 Series Platform, the Windows Media 9 Player, the Windows Media 10 Player, the Movie Maker software product, the Portable Media Center and the MSN® Music Service that allows for the downloading and delivery of audio and video content to various portable devices in order to prevent Microsoft and its agents from further violations of The Patent Act.

### Eighth Claim for Relief:  Trade Secrets Act
**(Calif. Civil Code §§ 3426, *et seq.*)**

141.    Plaintiff incorporates the allegations of paragraphs 1 through 140 above.

142.    Microsoft's actions in receiving Burst's confidential trade secret information and utilizing it in its own product offerings without Burst's permission constitutes misappropriation within the meaning of California Civil Code §3426(b).  Burst's information contained trade secrets, including formulas, patterns, compilations, programs, devices, methods, techniques and processes that derived independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use and was subject to reasonable efforts by Burst to maintain their secrecy.

143.    Microsoft has utilized the misappropriated trade secret information to receive profits that Burst is entitled to and thereby damaged Burst.

144.    Microsoft's infringement was willful and malicious entitling Burst to twice its actual damages.

## Ninth Claim for Relief:  Common Law Unfair Competition
### (Common Law of the State of California)

145.    Plaintiff incorporates the allegations of paragraphs 1 through 144 above.

146.    The actions and conduct in which Microsoft engaged, more fully described hereinabove, constitute common law unfair competition.

147.    Microsoft's actions in receiving Burst's confidential trade secret information and utilizing it in its own product offerings without Burst's permission constitutes a breach of a confidential relationship existing between Plaintiff and Microsoft created by the non-disclosure agreement between them as well as their course of dealings.

148.    Microsoft's actions in receiving Burst's confidential trade secret information and utilizing it in its own product offerings without Burst's permission constitutes common law misappropriation

149.    As a direct and proximate result of the Microsoft's acts of unfair competition, Plaintiff has suffered, and continues to suffer, damages to its business and property.

150.    In engaging in the acts of unfair competition alleged herein, Microsoft acted willfully, with malice and with conscious disregard for the rights of Plaintiff, thereby entitling Plaintiff to an award of exemplary or punitive damages, pursuant to California Civil Code § 3294, in an amount to be determined by the trier of fact.

### Tenth Claim for Relief:  Breach of Contract
### (Common Law of the State of Washington)

151.    Plaintiff incorporates the allegations of paragraphs 1 through 150 above.

152.    Microsoft and Burst entered a written non-disclosure agreement providing for the protection of shared confidential information.

153.    Burst has substantially performed all of its obligations under the contract.

154.    Microsoft breached the agreement by using Burst's confidential information in its own product development, by disclosing that information to employees who had no need-to-know it for the purposes of the agreement, and by disclosing the information to third parties in the distribution of its Corona products.

155.    Burst has suffered damage to its business as the direct result of Microsoft's breach of the agreement.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable of right by a jury.

### PRAYER FOR RELIEF

1.    For compensatory damages in an amount to be proven at trial;

2.    For an order trebling the amount of compensatory damages to be awarded pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

3.    For an order trebling the actual damages plaintiff has sustained pursuant to California Business and Professions Code § 16750;

4.    For an order requiring defendant to make full restitution for its violations of California Business and Professions Code § 17200, pursuant to California Business and Professions Code § 17203;

5.      For an order trebling the amount of damages to be awarded pursuant to The Patent Act, 35 U.S.C. § 284.

6.      For an award of actual damages and unjust enrichment for its misappropriation of Burst's trade secrets, pursuant to California Civil Code § 3426.3(a), and for its breach of contract.

7.      For exemplary damages in an amount equally twice its actual and unjust enrichment damages, pursuant to California Civil Code § 3426.3(c).

8.      For exemplary damages for its violations of California common law, pursuant to California Civil Code § 3294.

9.      For an award of the costs of this action, including its attorneys' fees.

10.     For an award of pre-judgment and post-judgment interest on the above sums, to the extent permitted by law.

11.     For a declaration that Microsoft's products infringe Burst's patents.

12.     For an order that defendant, all persons acting on its behalf or under its direction or control, and all successors thereto, be permanently enjoined from:

a.          Infringing plaintiffs' patents,

b.          Using plaintiffs' trade secrets without permission,

c.          Continuing any practice that excludes competitors or maintains a monopoly in the relevant markets.

13.     For such other permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by Microsoft's unlawful conduct.

14.     For such additional relief as the Court may find just and proper.

Dated:  September 10, 2004

                                    SPENCER HOSIE (Ca Bar # 101777)
                                      BRUCE J. WECKER (Ca Bar # 078530)
                                      JOHN McARTHUR (Ca Bar #159793)
                                      HOSIE, FROST, LARGE & McARTHUR
                                      One Market, Spear Street Tower, 22nd Floor
                                      San Francisco, CA 94105
                                      Telephone: 415-247-6000

                                      ROBERT YORIO (Ca Bar # 93178)
                                      CARR & FERRELL, LLP
                                      2200 Geng Road
                                      Palo Alto, CA 94303
                                      Telephone: 650-812-3400


                              By   /s/                        
                                  Spencer Hosie
                                  Attorneys for Plaintiff Burst.com, Inc.

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil LR 3-16, the undersigned certifies that the following listed persons, associations of persons, firms, partnerships, corporations (including parent corporations) or other entities (i) have a financial interest in the subject matter in controversy or in a party to the proceeding, or (ii) have a non-financial interest in the subject matter or in a party that could be substantially affected by the outcome of this proceeding:

Microsoft Corporation and its shareholders

Burst.com, Inc. and its shareholders

Currently, Microsoft and Burst.com, Inc. are public companies.  Microsoft has thousands shareholders; as of December 31, 2001, Burst.com, Inc. had approximately 288 shareholders of record.

            /s/
            Spencer Hosie
            Attorney of Record for Plaintiff Burst.com,
            Inc.

## PROOF OF SERVICE

I am employed in the State of California, County of San Francisco.  I am over 18 years of

age and am not party to the within action.  My business address is One Market, Spear Tower,

Suite 2200, San Francisco, California 94105.

On September 10, 2004, I served FIRST AMENDED AND SUPPLEMENTAL

COMPLAINT AND JURY DEMAND upon counsel named below as indicated:

John W. Treece *(via facsimile)*
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 South Dearborn Street
Chicago, IL  60603
Fax:  312.853.7036


Executed this 10th day of September, 2004.

_/s/_____
Janine DeAndre
