# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION. | MDL Docket No. 1332 |
| This Document relates to: | Hon. J. Frederick Motz |
| *Burst.com, Inc. v. Microsoft Corp.,* | **BURST.COM, INC.'S MOTION TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS RELATING TO ITS DOCUMENT PRESERVATION POLICY AND PRACTICE (UNDER SEAL)** |
| Civil Action No JFM-02-cv-2952 | |
| | **HIGHLY CONFIDENTIAL** |

## I.    INTRODUCTION AND SUMMARY.

Since 1995, Microsoft has been a defendant in many serious antitrust cases.  As its legal problems worsened, the company did not adopt a reasonable document retention policy, as was its obligation.  Instead, it told employees not to save e-mails to servers subject to back-up (1995).  It added that this was due to "legal reasons" (1997).  It then enforced that policy by programming its back-up system to delete archived e-mails (variously 1995, April 2000, or March 2003, according to Microsoft).  And, mere weeks after Judge Jackson issued his findings, Microsoft's Windows V.P. Jim Allchin twice instructed thousands of employees to delete **all** e-mails within 30 days, again as a matter of "company policy." Exhibit 1.

Even though crafted and implemented during years of intense litigation, these are policies of destruction not retention.  Microsoft now excuses these policies by saying that it saved key documents from destruction by: (1) sending document retention notices to the right executive "custodians"; and (2) listing key people as document custodians in the DOJ case (and

other related antitrust litigations), and searching their files and preserving their documents for production in subsequent cases. That is, Microsoft defends its policies and argues it honored this Court's preservation order precisely by virtue of its retention notice/custodian practices.

But even as Microsoft relies on these policies, it refuses to produce basic discovery about what it in fact did. It refuses to produce the retention notices themselves, claiming privilege. It refuses to produce the text of e-mails setting forth the company's retention policies. And it will not confirm who received notices when, much less who was released from retention, when and how. Microsoft has made its document retention/destruction a black box, insisting that its own assertions be taken on faith alone.

These are not privileged communications. These are the basic **facts** constituting a corporate retention policy. Lawyers are always involved in retention issues. If Microsoft can shield these facts here, no corporation will ever have to account for its retention practices. And even were these facts and documents privileged, Microsoft cannot at once rely on its notices and policies in claiming preservation compliance, while thwarting discovery to test what it in fact did. *See Chevron v. Pennzoil,* 974 F.2d 1156 (9th Cir. 1992) ("Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived.").

Burst brings this motion on shortened time because it has become apparent that Microsoft's carefully did not give retention notices to those executives most likely to have incriminating documents. These omissions are so glaring that one has to question the integrity of the process overall.[1] For example, Microsoft's Chris Phillips personally negotiated the July

---

[1] These omissions also must be viewed in the context of Microsoft's other e-mail retention practices which have engendered three motions to compel, and a continuing evolving story. Those practices are the subject of continuing discovery by Burst.

1997 agreement with RealNetworks, in which Microsoft sought Real's agreement to stop competing in the "platform space." Recognizing Phillip's role as the deal architect, Microsoft internally called this July agreement the "Chris Phillips deal." <u>See</u> below § II.A. But when the Government issued a CID addressing Microsoft's streaming media conduct, a CID which squarely targeted the RealNetworks deal, Microsoft provided a list of people involved and it did not list Mr. Phillips! Mr. Phillips was, accordingly, not a custodian. Nor does it appear that Mr. Phillips got a retention notice. As a result, Mr. Phillips' files were not searched, and his documents were not produced to the DOJ. And since Microsoft simply reproduced files from its law department production library in subsequent cases, this initial failure infected Microsoft's production in all subsequent cases, including this one.

This is just one example. There are others, equally egregious. <u>See</u> below § II (Eric Engstrom and the Microsoft Intel agreement to have Intel abandon its JMF). Burst is entitled to discover exactly which documents Microsoft preserved, and which it did not.

In sum, Microsoft has neither complied with the spirit of its discovery obligations nor the letter of this Court's Document Preservation Order. Microsoft should be compelled to disclose all document retention notices distributed to Burst custodians, or individuals that would have been custodians had their files not been destroyed. It should be compelled to disclose its general document retention policy, a written policy Microsoft distributed to thousands of Microsoft employees in the Windows Division. And finally, Microsoft should be compelled to give an account of what happened to the e-mails relating to streaming media maintained by certain critical players, including Messrs. Gates, Brumer, Phillips and Engstrom

## II.    FACTUAL BACKGROUND.

### A.    Microsoft's Failure to Respond to the DOJ Streaming Media CID.

#### 1.    The "Chris Phillips Deal."

In February of 1997, RealNetworks introduced its RealVideo internet streaming product. Microsoft immediately recognized that media streaming was a strategic platform business that it could not cede to a third party.  Accordingly, in May, Microsoft told Bruce Jacobsen of RealNetworks that "if [Real] wanted to do value add on top of their video, fine; if not, we were an OS contender and msft would target us for obliteration."  Exhibit 2.

Shortly thereafter, the parties embarked on a negotiation that resulted in two agreements signed in June and July of 1997.  One agreement called for Microsoft to make an investment in Real in return for a snapshot of source code.  The other agreement, dated July 18, 1997 ("July 1997 agreement"), provided for a fundamental cross-license of technology, bundling of RealNetworks' product in Internet Explorer, and future roadmap for Real's technological development.  Microsoft's goal in this agreement was explicit: it wanted Real to agree to leave the platform business.

Chris Phillips was the Microsoft employee most intimately involved in the negotiation of the July 18 agreement.  Mr. Phillips was so instrumental in those negotiations that the agreement was referred to internally at Microsoft as the "Chris Phillips deal."  Exhibit 3.  (Anthony Bay e-mail referring to "the second PN contract (the *chris phillips deal it is called*)") Exhibit 4 (Jim Durkin writing: "*The issue is that we already agreed to terms on the Chris Phillips deal*"); Exhibit 5 ("Chris Phillips – deal includes, requirement that we promptly conclude DirectShow/ASF contract); Exhibit 6 (Anthony Bay urging the quick close of the chris phillips deal: **"[I] still hope we can make this relationship work as conceived during the midnight negotiations[,] where PN licenses us platform technology which we integrate into our**

**products sell in volume so they can build added value products on top."**). Ultimately, Microsoft and RealNetworks agreed that the latter would support Microsoft's streaming media platform , called DirectX at the time, and would only be permitted to bundle with Internet Explorer a player that was no better than its version 4.0 (Microsoft having bought the source code to that player) without getting Microsoft's explicit signoff and Microsoft getting the source code for any "new streaming media features in the PN client." MS8 006592-94; Exhibit 7. This permitted Microsoft to "hold their client at the [version 4] level, " if RealNetworks did not agree to give the Microsoft the tools to implement the advance in their own player. *Id.*

Supporting Mr. Phillips was his boss, Eric Engstrom. *See, e.g.,* Exhibit 4 (Engstrom and Phillips meeting with Bruce Jacobsen, RealNetworks' chief negotiator, in a key meeting regarding RealNetworks migration out of the OS space); Exhibit 8 (Engstrom reporting on his meeting with Bruce Jacobson wherein Engstrom conveyed that "DirectX (specifically DirectShow) would be their exclusive client technology on Win32, even in NetScape browsers."); Exhibit 9 (Engstrom in direct e-mail contact with Mr. Jacobsen); Exhibit 10 (Bruce Jacobsen reporting: "Eric/Chris want source to all PN code that relates to codecs and protocols.").

In short, Phillips and Engstrom were **the** Microsoft executives most closely involved in the July Agreement. But, remarkably enough, Microsoft did not send them retention notices, nor make them custodians.

### 2.    Microsoft Did Not Identify Mr. Phillips – The Deal Architect – As A Custodian And Did Not Send Him A Retention Notice.

In 1997, the Department of Justice served a Civil Investigative Demand on Microsoft seeking documents concerning its streaming media business as part of an investigation of whether Microsoft was monopolizing the market. MS-CC-Bu 9001721-33; Exhibit 11

(hereinafter "Streaming Media CID"). The CID was broad. For example, Request No. 6 asked Microsoft to "[s]ubmit all documents relating to competition in the development or sale of audio or video streaming software, including, but not limited to …" Request No. 8 asked for "[a]ll documents relating or referring to any plan, proposal, budget, study or report relating to the development, marketing, or sale by Microsoft of audio or video streaming technology or software in (i) Microsoft's Netshow [streaming media server] …" Request No. 11 sought information regarding the technical integration or bundling of streaming software with Microsoft's Windows and Internet Explorer products. Request No. 17 requested all documents regarding Microsoft's plans with respect to its ASF file format. The DOJ simultaneously served interrogatories on Microsoft including one asking it to identify each person within Microsoft who was directly involved in the negotiations with RealNetworks, VDOnet or Vxtreme. In sum, the CID corresponded to the broad nature of the inquiry, that is, an investigation of attempted monopolization of audio and video streaming software.

In a September 25, 1997 letter to Microsoft, the DOJ delineating the broad scope of the investigation. (MS-CC-Bu 9001672-76; Exhibit 12). In addition to the investigation of the investments in Vxtreme, RealNetworks and VDOnet, DOJ explained that Microsoft's agreement with RealNetworks to license source code and trademarks together with certain prohibitions on RealNetworks dealing with other competitors were a part of the investigation.[2] DOJ further identified Microsoft's activities in relation to its file format for streaming, called Advanced Streaming Format ("ASF") as within the scope of the investigation. Finally, and importantly, DOJ reiterated that "Microsoft's actions relating to its own Netshow and Netmeeting products,

---

[2]    These prohibitions were contained in the July agreement that is described in Judge Jackson's Finding of Fact Nos. 113 and 403, Exhibit 13.

as well as **agreements between Microsoft and other actual and potential competitors ... are**

**also part of the investigation.**"

To make absolutely sure that Microsoft did not arbitrary limit its response to the CID, the

DOJ attorney explained:

> In sum, it is clear that Microsoft -- a significant competitor in
> various product markets relating to or affected by streaming media
> – has been informed quite specifically that the Department is
> investigating Microsoft's recent history of acquisitions, partial
> acquisitions and other agreements with actual or potential
> streaming media competitors, its future plans in the area, its
> ongoing attempts to set <u>de facto</u> or <u>de jure</u> standards for streaming
> media formats, and whether these actions adversely affect
> competition.

*Id.* at MS-CC-Bu 9001674.

Still resistant, Microsoft tried once again to force DOJ to narrow its investigation,

complaining that the CID on its face made clear that the DOJ was "investigating essentially

every aspect of Microsoft's participation in the development of streaming media technology...."

MS-CC-Bu 9001665; Exhibit 14. Though some of these requests were narrowed in subsequent

negotiations, DOJ pressed requests for all documents relating to Microsoft's development of

audio or video streaming technology or software and "any other person's development,

modification, marketing, sale, or licensing of audio or video technology or software."

In the meantime, Microsoft answered DOJ Interrogatory No. 2 which required Microsoft

to identify those Microsoft employees involved in the RealNetworks negotiations. With respect

to the technology licensing portions of the negotiations, Microsoft identified Bob Muglia,

Anthony Bay, and Jim Durkin. Exhibit 15. **Incredibly and inexplicably, Microsoft did not**

**identify Chris Phillips or Eric Engstrom, the two Microsoft executives who actually**

**negotiated the deal.**

On October 15, 1997, DOJ sent Microsoft two letters recounting the agreements that the parties reached with respect to the CID. In addition, to the request regarding the development of third parties streaming media software, DOJ pressed its request for "all documents relating to actual or potential competition in the development or licensing of audio or video streaming technology or software, including all documents discussing, analyzing, commenting on, studying, or reviewing the market share or competitive position of Microsoft or any other person providing or potentially providing audio or video streaming technology or software." Exhibit 16 at 9001605. DOJ's second letter identified the employee files it expected to be searched. Exhibit 17. Understandably, the list was almost entirely constructed based on Microsoft's answers to the interrogatories purportedly to identify those involved. Muglia, Bay and Durkin were included; Phillips and Engstrom were not. Though DOJ ultimately added Mr. Engstrom to those identified in the interrogatory, it appears that Microsoft never produced documents from his files. *See below.*

Confirmation of the seriously flawed nature of Microsoft's custodian selection process abounds.[3] The individuals whose files were actually searched is corroborated by the listing of employees that got retention notices. Exhibit 19 at 194082. In responding to the CID, Microsoft identified 26 employees to receive retention notices. Bay, Muglia, and Durkin are on the list; **Phillips and Engstrom are not.** Review of the actual production to the DOJ also shows a marked absence of documents from Mr. Phillips, and only a few e-mails from Mr. Engstrom. Throughout, there is a pronounced pattern of exclusion from retention and search of the documents of the people most involved.

---

[3]    Microsoft has identified the individuals it sent document preservation notices to in a privilege log originally produced to the plaintiff's in the California indirect purchaser action. Exhibit 18.

When Mr. Engstrom was deposed in the DOJ case in the fall of 1998, he was asked what he had done to comply with the various document requests served on Microsoft in connection with the litigation and with the previous DOJ investigations. He testified that approximately two months before his deposition, he had searched his e-mail files for the word Apple and related words, such as Quicktime or Steven Jobs, as he had been instructed to do. Deposition of Eric Engstrom, 86-89 (Sept. 28, 1998), Exhibit 20. He specifically disclaimed searching for "RealNetworks" documents of "streaming" in general. *Id.* at 89. And when asked whether he had done anything early than the Apple search to comply with any document request or subpoena by the Department of Justice of the States, he responded "I haven't gotten any." And when asked whether anyone else had searched his documents, he responded that he had received a document preservation notice in a matter that he really had not role in. *Id.* at 90. He then explained that his practice is to delete e-mail after approximately two months. *Id.* at 90-91.

Review of the documents produced also shows a total absence of documents relating to Intel's streaming media software, though those documents were both within the scope of the request and likely in the files of many of the individuals directly involved in the CID response.[4] At the time, Microsoft was well aware of Intel competitive product and the agreement it had reached with Intel to phase out that product. Yet none of those documents were included in

---

[4]     Indeed, though much of the e-mail production appears to have come from Mr. Durkin's e-mail store, one document, which later became a exhibit in the DOJ trial, was sent to Mr. Durkin but not produced with the streaming media production. This document, a May 28, 1997 e-mail, forwarded to Mr. Durkin, is Mr. Engstrom's analysis of proposed collaborative multimedia efforts between Intel and Microsoft, including Microsoft's proposals to have "Intel stop helping Sun create Java Multimedia APIs, especially ones that run well (ie native implementations) on Windows," and its proposal to have Intel "augment DirectX rather than compete with it." Exhibit 21. The Engstrom analysis was passed on from Muglia to Maritz and Bay adding the comment that it presented some background relative to Netshow. Thus, this document was responsive to at least three of the DOJ's narrowed requests, i.e., Request R-1 (d) requesting all documents discussing "any other person's development, modification, marketing, sale or licensing of audio or video streaming technology or software," and Request R-1 (c) requesting documents discussing Microsoft's development of audio or video streaming technology, "including as relates to: (i) Microsoft's Netshow or NetMeeting products," and Request R-4 (b) requesting all documents relating to "actual or potential competition in the development or licensing of audio or video streaming technology or software."

Microsoft's response to the CID. *See below.* Apparently, having failed to convince the DOJ lawyer to substantially narrow the CID, Microsoft just unilaterally restricted the scope of its search to RealNetworks, Vxtreme, VDOnet documents and certain Netshow, NetMeeting, and ASF file format documents.

Also missing are critical e-mails from or to Bill Gates. For example, on May 30, 1997, Gates met with Maritz, Muglia, Bay and Durkin. Among the topics discussed were Microsoft's acquisition of Vxtreme, Microsoft's efforts to make the ASF file format the *de facto* standard for streaming audio video files to the Windows desktop computers, and the effort to get RealNetworks to abandon the core streaming business. Durkin's slides from the meeting made the following points:

- **We Must Be The Dominant Software Platform In This Space.**

- Establish a single, universal client for local, http, and streaming media playback.

- Win media server market.

- Co-opt other streaming server vendors to support: AM team getting PN to abandon RMFF, get Vxtreme to abandon Vx, get Vivo to abandon VIV.

Exhibit 22. Karl Empey, a Microsoft employee working on the Vxtreme deal, foresaw and eventful meeting: "Probably not unreasonable to assume that all hell will break lose (sic) after the billg meeting today." Exhibit 23.

After the meeting, Mr. Durkin related:

> Basically, Billg and Paulma made the decision that (1) we need to win the streaming battle against Progressive Networks, (2) gave the approval for me to go buy a $65 million company (5th largest microsoft acquisition ever) in order to win the battle, (3) Winning the streaming battle means three things – winning the file format war, winning the client architecture war, winning the server wars.
>
> **Bill's comment was "this is a strategic area and we need to win it." Muglia's comment was "PN is like Netscape, the only**

**difference is we have a chance to start this battle earlier in the game.**

Exhibit 24.

A few days later, Mr. Durkin sent out a slightly different description of the May 30 meeting:

> Billg last Friday decided that we are at all-out war with Progressive Networks/Oracle/IBM and **that media streaming is the equivalent of Web-browsing 2 years ago: we can't afford to lose but we're catching this market early enough to win.** We will spend above $50 Million winning this battle. The three things critical to win are the streaming server (NetShow), the streaming file format (ASF), and the streaming client (DirectShow).

Exhibit 25. And finally, Durkin characterized the result of the meeting as a "'mandate from god' (or at least billg) to characterize this as an all out, full frontal assault decision to go to war."

Exhibit 26. On June 6, Mr. Empry sent an e-mail to Mr. Durkin saying that "I heard that Billg sent out a mail yesterday saying that NetShow was now a high priority." This June 5 e-mail was not included in Microsoft's production; nor are there any e-mails from other participants concerning the meeting.

According to Thomas Burt, Microsoft's chief litigation counsel, the streaming media investigation was "melded into" the DOJ's complaint filed in the District Court for the District of Columbia. Deposition of Thomas Burt, p. 46-47 (Nov. 16, 2000). And, indeed, on June 27, 1998, Microsoft was served with "Plaintiffs' First Joint Request for Production of Documents" which requested further documents relating to streaming media issues. For example, Microsoft's project code-named Chrome which was designed to integrate multimedia streaming into the Internet Explorer browser was the target of a request. Exhibit 27 at MS-CC-MDL 0000048.[5]

---

[5]       Among the principal objectives of the Chrome project was to "[d]ivert Intel from Java multimedia efforts to Windows-friendly efforts." Exhibit 28 at MS-CC-Bu 9016912. A long-term success criteria of the project was

**B.**     **The Intel Deal.**

      **1.**     **Eric Engstrom and Chris Phillips Pressure Intel to Drop its Java Media Framework Products.**

    At the same time that RealNetworks was introducing its video streaming solution, an even more serious threat was looming in Intel's work with Sun, Silicon Graphics, Inc. and Apple to develop cross-platform Java Media APIs. The Java Media Framework APIs were designed to playback video files including those received by streaming across networks, including the internet. Intel was particularly devoted to working on an implementation of the API that, by relying on native calls to the Windows OS and potentially even to the underlying Intel MMX equipped microprocessor, gave a far superior performance over other implementations. Microsoft recognized that Intel's in-house expertise made it a very strong competitor in the audio/video space:[6] "Intel has a bunch of technologies in house/experience with our technologies that have enabled them to quickly implement these specs on the Win32 platform and get them out of the door. They may even have been able to do implementations of all the JavaMedia APIs, which would be particularly grim." Exhibit 29. Quick agreement on a détente was called for: "We need to bring them into the fold ... despite the directive from Intel management about working better with MS in this space, it is clear that they intend to keep their feet firmly in both camps. The fact that much, if not all, of JavaMedia will be out there on our platform already by sometime in March is not good...." *Id.* By the middle of the month, Microsoft's strategy was solidifying: "I want IAL (Intel Architecture Labs) deemphasizing their Java investments with Sun by the time JMF stuff gets announced." Exhibit 30.

---

that "Java has ceased to a platform threat because content is tied to our platform through Chrome and through the Windows-based multimedia effect plug-ins." Id. at MS-CC-Bu 9016915.

[6]     In addition to pioneering one of the earliest video compression technologies (DVI/Indeo), Intel had developed MMX capabilities into its microprocessors that dramatically reduced the number of instructions necessary to interpret digital multimedia.

Motion to Compel Information Regarding Document Retention Notices

On January 31, 1997, Intel and Microsoft met face to face to discuss among other topics, Java strategy. John Ludwig of Microsoft presented Microsoft's Java strategy. With respect to multimedia, Microsoft's note taker reported: "This is the area of most contention since Intel does not see their work with Sun and others as bad for the overall PC space, only as good for Intel." Exhibit 31. Particularly harmful in Microsoft's view, was the fact that Intel was validating the work of others in this software space. *Id.*

Thus, began Microsoft's effort to obtain Intel's agreement to stop development of the JMF, and in return provide it with preferential placement of Intel's code in Windows. The hammer for Microsoft to get Intel's agreement also quickly appeared. As Bill Gates prepared for a phone conversation with Andy Grove, he observed: "If Intel has a real problem with us supporting this [innovative AMD chip instructions to support multimedia processing] then they will have to stop supporting Java Multimedia the way they are. I would gladly give up supporting this if they would back off from their work on JAVA which is terrible for Intel." Exhibit 32.

By May, the details of the Intel/Microsoft agreement began to emerge. Eric Engstrom reported, "[w]e are working with Intel aggressively on three fronts (listed here in priority order), not including Chrome: getting Intel to drop its involvement in Interactive MPEG4.... They have totally revectored their standalone client work in favor of a completely DirectShow dependent client.... Intel to stop helping Sun create Java Multimedia APIs, especially ones that run well (i.e., native implementations) on Windows.... Proposed Actions: Intel agrees to stop helping Javasoft in any area where Microsoft agrees to ship Intel technology as part of DirectX media.... Intel to augment DirectX rather than compete with it.... We want them pushing DirectX rather than some bits of Javasoft and Intel technology." Exhibit 33.

In July, another press report emerged about Intel's JMF work. Eric Engstrom immediately shot off an inquiry to Intel regarding what was going on. Intel's Barbara Dawson responded, assuring Engstrom that she had talked with Microsoft's Charles Fitzgerald about the call and that they had agreed that the prime point of the interview would be to criticize Sun for its closed Java process. She further assured Engstrom that Intel would not be introducing its JMF implementation at a trade show in August. Engstrom responded with his approval of the explanation, but reiterated the concern Microsoft had for Intel's work in this area: "I am very sensitive (perhaps overly) to JMF related issues (especially as regards Intel) at the moment." Exhibit 34. Chris Phillips added his own comment in passing on Engstrom's response: "FYI, as you can image, we are VERY sensitive (sic) about JMF." *Id.*

In October 1997, Bill Gates had simply had it with Intel's support for Java multimedia. The Java Media work was compounded by Intel support of the Network Computer (NC) efforts of Oracle and others.[7] In early October, Intel's CEO Andy Grove told Gates, Windows CE was far behind in supporting applications that would power the next generation of digital set-top boxes.[8] Mr. Gates understandably viewed these developments as putting Microsoft in a "crisis mode" with Intel. It was a crisis that Gates handled personally, both in private meetings with Mr. Grove and remarkably blunt e-mails. Exhibit 37 at MS-CC-BU 203583("Billg talked to Andy Grove at least twice about this situation, so it is clear that their direction here and relationship to us on STB,[9] TV, and WebTV is completely lucid and sanctioned from the top."). *See also, e.g.,*

---

[7]    One Microsoft manager reported: "Intel's foray into Java development may result in a crop of Intel-based network computers running native JavaOS and applications." Exhibit 35.

[8]    Of course, it was not the consumers' interest that drove the Intel/Microsoft collaboration. It was all about protecting their joint monopoly in the personal computer market. *See* Gates to Allchin and others, April 9, 1997, Exhibit 36 at MS-CC-BU 203558 ("He [Grove] asked why they shouldn't view WindowsCE as being as bad as JAVA. I said the difference is that Windows CE will not be allowed to compete with the PC whereas JAVAOS is focused on replacing the PC.").

[9]    Set top box.

Exhibit 38 ("I have a critical meeting with Intel a week from Wednesday. I want to convince them that they need to stay away from Oracle NCs and work more closely with Microsoft.... I want them to understand that helping NCs and JAVA will push us to do Windows and other software in SUN byte codes...." Exhibit 39 ("[W]e are in crisis mode with Intel. If they go ahead with their NC plans we certainly will not be working with them on Windows CE and most other things as well. Until I say so every conversation with Intel should say that you have been told that we are reevaluating all of our work with them based on their NC plans and what happened on the set top box."); *id.* at MS-CC-Bu 000000203586 ("We have entered into a Cold War with Intel. The only way to maintain our current largely favorable relationship is to clearly outline mutually assured destruction.... [w]e should have clear boundaries we don't want them to cross and if they do there should be equally clear consequences.").

On Wednesday, October 15, 1997, Gates e-mailed Grove that "Intel seems now to think exposing APIs on cheap clients and directing development there is a good idea. I need to understand this better." *See* Exhibit 40 at MS-CC-BU 203589. (Exhibit 25). He then threatened Mr. Grove with pulling Microsoft support for the Intel microprocessor. *Id.* As Microsoft's Jonathan Roberts responded to his copy of the Gates' mail: "[T]his is a great piece of mail. It is not a rant, but a very logical dissection of the issue with *the threat of thermal nuclear war* very well and politely delivered." *Id.*

On October 22, 1997, Gates made a presentation to Intel's Strategic Long Range Planning group. According to Marshall Brumer's summary of the meeting, "[t]he meeting was very cordial with both sides keeping most emotions in check. Only real flare was at the end were (sic) Bill clearly articulated our concerns around their work on STB and NC all happening at the same time to heat things up at MS and make us wonder whether we should be pulling

away from work with Intel" Exhibit 41 at MS-CCPMDL 000000148285.  At the meeting, Gates

"gave our 3 part Java positioning and Intel essentially agreed.  Clear direction that MS was not

OK with Java as a platform for all the standard reasons." *Id.* at MS-CCPMDL 000000148286.

With respect to the Media MOU, Brumer reported:

> Gelsinger said that he thinks we are now in sync on Java although
> Bill still sees them supporting their Java MM Libs.  Gelsinger
> stated that **they have taken all their folks off of this work** and are
> only getting out what they committed to the industry.  They are
> now engaging in other areas that are more in sync with MS via the
> Media MOU in work with DX Media/Chrome group.  It is true that
> we are getting more in sync here, but we cannot drop the focus
> here at MS on this.

*Id.* (Emphasis added).

Shortly after the October meeting, Bill Gates had a one-on-one meeting with Andy

Grove.  Gates reported: "I think Intel understands better that SUN byte codes are bad for them

and that NCs are just incompatible PCs that use SUN byte codes.  Intel claims they are doing

nothing on JAVA now."  He reiterated the long held direction that Intel was to stay in the chip

selling business and to stay out of the operating and system software development businesses

which were reserved to Microsoft.  Rather than let its software projects get "out of control" as

they had in the past, Gates asked Grove to write up each year all of their ideas for new

applications.  *Id.* at MS-CCPMDL 000000148284.  On November 7, 1997, Gates wrote "JAVA

is the biggest threat to us" and that Apple needed to help defeat Sun.  DOJ Exh. 590.  Exhibit 42.

Over the following few months the threat to Intel worked, war was averted, and Intel

dropped its JAVA work.  *See* Exhibit 43 ("Pat [of Intel] indicated that we undoubtedly read

about the Java Media Framework activity between Sun and Intel and he promises that they are

doing everything possible to let it die a natural death.  It is a very, very low priority for them").

Intel also agreed to 90 percent of what Microsoft wanted regarding network computers "thx to

bill's mail" Exhibit 44. By early spring, Intel and Microsoft had made substantial progress on completing their obligations under the Engstrom agreement. One Microsoft employee reported: "until recently there was a whole group of Intel engineers focused on JAVA Media. Eric and Chris now have that team refocused to create Chrome plug-ins and effects." Exhibit 45.[10]

One episode in late November of 1997 generated some particularly direct evidence of the agreement Engstrom and Phillips reached with Intel. Midday on November 25, 1997, InfoWorld's on-line reporting service was reporting that Intel had begun licensing its Media Framework for Java with JavaBeans components. Later that afternoon, Eric Rudder passed the report on to Bill Gates saying: "[I] know you talked abt this w. gelisinger (sic) ... even if they had a 'commitment' this is still kind of an odd announcement." Exhibit 47. One hour later, Marshall Brumer sent an e-mail message to Russell Barck, Dan Russell and Frank Ehrig all of Intel: "This stuff sure confuses us. We were told a while ago that you guys had stopped working on any of the Java Media Framework stuff. What's up here?" Exhibit 48. Three days later Carl Stork also questions Mr. Brumer about the report: "Boy this sounds random. ... More friction for Chrome?" Brumer responds: "already asked intel about this and still no answer. Fyi – billg also flagged low priority. [Y]ou'll be on the mail when we resolve with him." Exhibit 49. On December 1, 1997, Mr. Brumer got responses from two of his Intel contacts. Mr. Barck reported: "My understanding of the **original agreement** was that we would stop new evangelism efforts, but could continue to support existing customer commitments. As far as I can tell, this is one of them." Exhibit 48. Mr. Russell responded: "Talk to Eric Engstrom about this. We have stopped development on this, but are sustaining product and the customers we have. As I understand it, we have been in close touch with Eric." Exhibit 50. Microsoft has not produced a

---

[10]      In addition to their coordination of the anticompetitive agreements with Intel and RealNetworks, Engstrom and Phillips were key players in the proposed market sharing agreement Microsoft offered to Apple with respect to

Motion to Compel Information Regarding Document Retention Notices

single e-mail between Eric Engstrom and anyone at Intel to the best of Burst's knowledge. On December 3, 1997, Brumer reported back to Stork: "**ericeng has done a deal with them** and we agreed that they could complete the work they are already doing. [T]hey are claiming that this release was part of the deal with their partners and were obligated to do this. If that's eric's position also, then we cannot balk much except to say that we want to understand any/all other areas this will be coming in." Exhibit 51. Shortly thereafter, Mr. Engstrom responded to Brumer's earlier inquiry confirming that 'infoworld mis reported. [T]hey haven't done anything new. [I] am okay with this. **[T]he (sic) tried to get in touch with charlesf [of Microsoft]** ahead of time as well." Exhibit 52.

On January 22, 1998, Intel adopted an official Plan of Record to make its 1.5 release as its last major release of the JMF. Exhibits E-12, E-13. (Exhibit 53).

When Intel perceived that Microsoft was balking on fulfilling its obligations to incorporate Intel's technologies in the operating system, Mr. Gelsinger reminded Messrs Maritz and Allchin that Intel had changed direction on its support for Java multimedia APIs to accommodate the Intel/Microsoft collaboration. Exhibit 54. Intel decided to drop the JMF, citing Microsoft's hatred for the product and that the team working on the project was simply "tired" of contending with the complaints coming from both Microsoft and from Intel's own senior management that wondered how their Java strategy could succeed with Microsoft's open opposition. Exhibit 55.

### 2. Microsoft's Faulty Search for Relating to Intel's Streaming Media Efforts.

In the fall of 1997, Sun Microsystems, Inc. sued Microsoft in the Northern District of California citing unfair competition with respect to its JAVA activities. ("*Sun 1*"). Early in its

---

its Quicktime product. *See* Exhibit 46, Findings of Fact ¶¶104-110.

Burst-specific document production, Microsoft provided to Burst selected documents from its productions in the Sun 1 case. The documents included some concerning Intel's Java Media Framework. Those documents appear to have come from the files of three custodians listed as having received document retention notices in the Sun case – Russ Arun, Kate Seekings, and Charles Fitzgerald. *See* Exhibit 19, at MS-CC-Bu 000000194091.

As was true for the RealNetworks episodes, Microsoft failed to identify as custodians or send retention notices to the executives centrally involved. This time, Messrs. Phillips and Engstrom are joined by Microsoft's primary technical contact with Intel, Marshall Brumer, as obvious omissions from the search. No Bill Gates e-mails appear to have been produced. **Phillips, Engstrom and Brumer appear not to have received retention notices in that case.**

In this instance, though, the ramifications of Microsoft's faulty search are even more concretely demonstrable. After Burst served a motion to compel regarding Microsoft's production of documents concerning Intel, the parties reached agreement on an additional search of files that Microsoft had earlier asserted were unlikely to have any relevant materials. In fact, critical documents were found in Mr. Brumer's materials. As described above, these documents explicitly describe an "agreement" (Microsoft's word) reached between Microsoft's Phillips and Engstrom, and possibly Intel's Dan Russell and Russell Barck, whereby Intel would phase out its support for the Java Media Framework. Though these documents survived, it is unclear whether Brumer has scrupulously complied with retention notices, or just happenstance resulted in their survival.[11] Mr. Brumer testified that his current practice was in line with the Allchin directive to auto-delete e-mails after thirty days or so, but couldn't remember his practice during the period he served as primary contact with Intel. Brumer Depo. at 14-15, Exhibit 56. He could not say

that he remembered changing the way he handled the deletion of his e-mail on the basis of receiving a retention notice. *Id.*. What is clear is that few, if any, documents concerning Intel have ever been produced from Phillips or Engstrom's files.[12] And neither of those individuals appear to have received any document retention notices.

Though it is of course impossible to know actually what documents have not survived because of these flaws in Microsoft's documents, it appears that Bill Gates e-mails were lost on this issue as well. For example, a November 30, 1997 Brumer e-mail, refers to Mr. Gates having flagged a press report regarding Intel's JMF and assures Carl Stork that he will be copied on the e-mail to Gates in response to his inquiry. Exhibit 58.[13] Neither the Gates mail nor the Brumer response have been produced to Burst.

## C.    The Flaws In Microsoft's Handling of Documents in Previous Litigation Have Resulted In Violations of This Court's Preservation Order.

On May 3, 2000, this court entered Order No.1 which was explicitly made applicable to related cases "later filed in, removed to, or transferred to this court." Paragraph 5. The order provided that until otherwise ordered, "each party shall preserve all documents and other records containing information potentially relevant to the subject matter of this litigation." Paragraph 4(d). The order provided for the continuation of "routine erasures of computerized data pursuant to existing programs, but only after notifying opposing counsel about such erasures and preserving printouts of the deleted data. *Id.*

---

[11]    Brumer appears to have received a retention notice in the consumer overcharge cases on September 11, 2000. Exhibit 18 at MS-CC-Bu 000000194069. He testified that he thinks he got others but couldn't remember when. Deposition of Marshall Brumer, 16-17 (July 16, 2004), Exhibit 56.

[12]    Perhaps Phillips' colorful language has had something to do with Microsoft's reluctance to identify him as a custodian. In one e-mail that was apparently produced by one of the recipients, Mr. Phillips writes with respect to RealNetworks: "[G]ot it! [D]o what you can and we will do whatever you all want including helping you kick their slimey butts!" Exhibit 57.

[13]    Gates got the press report from Eric Rudder on November 25. Exhibit 46.

Apparently, on entry of this order, no document retention notices went out to Microsoft employees. Rather, Microsoft seems to have assumed that the new lawsuits were copy-cats of the DOJ action and other previous litigation, such as the Caldera case, and thus, that maintaining documents produced in that litigation would be sufficient for the private MDL actions. Burt Depo., p. 49-52, Exhibit 59. Months later additional retention notices were sent to those employees that Microsoft self-selected as "document custodians" for the purpose of responding to specific document requests. *Id.*

In one respect Microsoft was correct. The consumer complaints did copy the DOJ allegations regarding streaming media, alleging that Microsoft's anticompetitive exclusion of streaming media competition helped maintain its operating system monopoly. On July 12, 2000, the consumer plaintiffs' served their "Consolidated Class Action Complaint" alleging, *inter alia*, that Microsoft responded "predatorily" to a series of middleware threats, including Apple's and RealNetworks' multimedia playback technologies. *See* Complaint, ¶¶ 110-111, Exhibit 60. That complaint mirrored earlier complaints filed in California. At one point, Microsoft characterized the California case as having "extraordinary breadth," with the plaintiffs pursuing discovery concerning a myriad of markets and submarkets including various middleware markets. "Microsoft Corporation's Status Conference Statement," pp. 1, 12, n. 6 (May 3, 2002), Exhibit 61. Microsoft described the plaintiffs' case as venturing "far outside the narrow time period and range of issues that were addressed in the government case," covering "at least 29 broad categories of conduct." *Id.* at 2.

Despite the fact that Microsoft's conduct in the streaming market was subject to continuing attack in the DOJ remedies proceedings, under attack in the European Union, and the subject of consumer cases throughout the country, Microsoft continued to destroy e-mails of

hundreds of digital media employees. Only a handful had been under retention obligation, and it

is unclear what the scope of the retention requirement was for those who had received notices.

As a result, many employees that had potentially relevant document likely destroyed thousands

of e-mails directly relevant to Burst's case.[14]

### D.    Microsoft's Slipshod Compliance With The Preservation Order Has Continued Into the Burst Case.

In August of 2002, the Burst case was transferred to this court and Microsoft's

documents potentially relevant to this action became subject to the Preservation Order. Once

again, no general notice of the order was sent to employees likely to have relevant documents.

Indeed, the manager in charge of the servers located in the Digital Media Division, Mr. Richard

Ochs, was not aware of the litigation until he was asked to give a deposition over a year later.

"30(b)(6) Deposition of Richard Ochs," p. 70 (Oct. 3, 2003), Exhibit 62. In the meantime, he

supervised annual clean-ups of the servers under his control, deleting files that employees

thought were not needed for current business operations. Ochs Depo., pp. 43-50.

## III.    ARGUMENT.

Compliance with document preservation orders is an important component of our judicial

system. Even before a court issues a preservation order, parties are obligated to take reasonable

effort to maintain their documents under common law doctrines. When served with a DOJ CID,

criminal sanctions attach to any obstruction of the investigation. Specifically, CID's are

accompanied by a reprint of 18 U.S.C. §1505 stating "Whoever, with intent to avoid, evade,

prevent, or obstruct compliance... with any civil investigative demand ... willfully withholds ...

---

[14]    Microsoft has previously argued that any such destruction could be excused since Microsoft could not have foreseen the Burst complaint filed two years later in 2002. Of course, that fact, even if it were accepted, could not excuse the willful violation of the court's order. Moreover, even Microsoft has not treated its obligation to preserve documents in such a segmented fashion. Thomas Burt, Microsoft's lawyer testified: "again you're getting confused about the fact that once the stuff is preserved, it is preserved. It doesn't matter what case it is preserved for. Our obligation is to preserve it." Burt Depo. at 60; Exhibit 59.

any documentary material, answers to written interrogatories ... which is the subject of such demand ... [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both." *See* Exhibit 11 at MS-CC-Bu 9001724.

Just recently, Judge Gladys Kessler issued an order sanctioning Philip Morris in the Justice Department's action against the major tobacco companies. Philip Morris had engaged in negligent compliance with document preservation orders entered in the case by allowing its executives to continue to delete e-mails which were over sixty days old during the pendency of the action. Judge Kessler was simply astounded when she learned that employees at the highest corporate levels with significant responsibilities pertaining to issues in the lawsuit failed to follow her Order #1 mandating the preservation of potentially relevant documents. Since Philip Morris was a particularly sophisticated corporate litigant involved in many lawsuits, the lack of compliance was even more disturbing. As a result Judge Kessler imposed a $2,750,000 fine because in her words, "it is essential that such conduct be deterred, that the corporate and legal community understand that such conduct will not be tolerated, and that the amount of the monetary sanction fully reflect the reckless disregard and gross indifference displayed by Philip Morris and Altria Group toward their discovery and document preservation obligations." *United States v. Philip Morris USA Inc., et al.*, CA No. 99-2496 (GK), slip opinion, at 6-7 (July 21, 2004); Exhibit 63.

Microsoft has claimed privilege on two categories of documents directly relevant to its compliance with the Court's Document Preservation Order. First, Microsoft refuses to produce the document retention notices sent to selected individuals. Second, Microsoft refuses to produce its general document retention guidelines, a version of which was distributed to the entire Windows Division shortly after Mr. Allchin had advised those employees to be "hardcore" about

deleting e-mail after thirty days. Although Microsoft's lawyers participated in setting
Microsoft's document preservation policies, the documents that convey those policies to
employees either are (1) not privileged, and (2) any privilege that covers them is waived by the
Microsoft's assertion that it compiled with its document preservation obligations.

### A. Microsoft's Document Retention Directives Do Not Represent Confidential Lawyer Client Communications.

The communication between Mr. Allchin and his employees is not privileged as it did
not involve any lawyers. Although a communication among non-lawyers can be privileged if it
relays information from a previous privileged communication, the subsequent dissemination
must have been made only for the purpose of obtaining or passing on the legal advice to other
clients, that is that the "dominant purpose of the communication is to facilitate the rendition of
legal services to the client." *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 39 (D.Md.
1974). In the case of Mr. Allchin's e-mail to thousands of employees, the dominant purpose was
clearly the operation of Microsoft's business, not the rendition of legal advice. Though
communications with low-level employees can be privileged, they must be made for the purpose
of seeking or rendering legal advice, neither or which purposes are present in the attachment to
the Allchin e-mail. Finally, only those portions of a document conveying legal advice as
opposed to business advice are privileged. If the document can be redacted to separate legal
from business advice, only the portion devoted to legal advice should be withheld.

### B. Microsoft's Assertion of Compliance With Its Retention Obligations Waives Any Privilege.

Microsoft has waived any claim of privilege as to any documents discussing the subject
matter of the document retention program, including why it was adopted and how it was
implemented, because Microsoft, for its own purposes: (1) has disclosed, in other cases (through
depositions), the substantive contours and components of its document retention policy; and (2)

Motion to Compel Information Regarding Document Retention Notices

has testified about the asserted reasons for the policy's implementation and how it was

implemented. Particularly, Thomas Burt, one of Microsoft's chief litigation attorneys, testified

that Microsoft has been in full compliance with its document preservation obligation and has

assured compliance by, *inter alia*, sending out retention notices to each custodian in prior cases.

Burt Depo. at 49-52, 61-62, 64-95; Exhibit 59.

Furthermore, Burt has given specific testimony regarding the substance of the notices.

He testified that all the matters covered by the overcharge case were encompassed in the

previous case notices. For example, he described the Caldera notice as covering subject matters

relevant to the consumer action. *Id.* at 89. He further testified that viewing all of the notices

together, and the actual productions in those prior cases that "we can be sure that all of the

relevant stuff was collected." *Id.* at 90. With respect to Microsoft's general retention guidelines

distributed to the entire company in June of 1996 (apparently the same guidelines that were

again distributed to the Windows group by Mr. Allchin in January 2000), Mr. Burt testified that

it included the direction that since a number of major matters had been resolved, it was an

opportunity to clear up the situation, and to advise individuals that had no continuing obligation

to preserve documents that they could return to normal document preservation. Burt Depo. at

99-103. Further, Mr. Burt's testimony ventured deeply into the substance of the document

preservation requirements, revealing a portion of the substance of the document. Burt Depo.

114-115 ("The ordinary practice to which people were encouraged to return to was to retain

information that they needed to do their job. And it was a rule of thumb that they should retain

things that – things that were older than six months old, they should think about deleting.")

Clearly, Microsoft has disclosed what it thinks is helpful from this document and from the

litigation retention notices, while refusing to produce the documents under the cloak of privilege.[15]

## IV.    CONCLUSION.

Microsoft's failure to comply with this Court's Document Preservation Order, and its failure to preserve documents potentially relevant to litigation that preceded this MDL merit strong sanctions. It appears that e-mails directly relevant to Burst's case have been lost. Based upon the showing laid out in this motion, Burst is entitled to full discovery of the circumstances that led to these failures of document preservation, discovery that should proceed unobstructed by meritless privilege claims. Microsoft should be compelled to disclose all document retention notices distributed to Burst custodians, or individuals that would have been custodians had their files not been destroyed. It should be compelled to disclose its general document retention policy that was distributed to thousands of Microsoft employees in the Windows Division. And finally, Microsoft should be compelled to give an account of what happened to the e-mails relating to

---

[15]    In this case, Burst submits the facts of Microsoft's continued e-mail destruction present a real issue of spoliation. Last year, Magistrate Judge Grimm issued what appears to be the first opinion concerning electronic discovery in this District. In *Thompson v. U.S. Dept. of Housing and Urban Devel.*, 219 F.R.D. 93 (D. Md. 2003), Judge Grimm analyzed the defendants' duty to preserve electronic records. Absent a court order, he held a party still has a duty to preserve electronic records and that entailed in this is a duty to suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure preservation of relevant documents. *Id.* at 100. Failure to maintain documents that a party has a duty to maintain raises the issue of spoliation of evidence. With respect to an adverse inference instruction, Judge Grimm adopted a three element test: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought discovery of the spoliated evidence." *Id.* at 101. The culpability element can be satisfied by three possible states of mind: bad faith/knowing destruction, gross negligence, or ordinary negligence. If a party relies on mere negligence, it must more directly prove the relevance of the destroyed evidence.

Microsoft's document retention policies here were clearly crafted with its ongoing litigation in mind. Decisions to not send notices upon the filing of various lawsuits and to restrict notices to only selected custodians are clearly not the type of document freeze suggested by Judge Grimm. The document retention notices likely include statements restricting their scope. If Microsoft's treatment of the streaming media CID is any guide, this notice probably have little relationship to the scope of the litigations in which they were distributed. And as made clear by e-mails such as Mr. Allchin's, any suggestion of a narrow scope in a recipient's retention obligation simply told the recipient that they were free to abide by the general e-mail retention policy of thirty days, then get rid of it; "do not archive your mail. Do not be foolish. 30 days."

streaming media maintained by certain critical players, including Messrs. Gates, Brumer,

Phillips and Engstrom.

DATED:  August 23, 2004

> SPENCER HOSIE (Ca Bar # 101777)
> BRUCE J. WECKER (Ca Bar # 078530)
> GEORGE F. BISHOP (Ca Bar # 89205)
> HOSIE, FROST, LARGE & McARTHUR
> One Market, Spear Street Tower, 22nd Floor
> San Francisco, CA 94105
> Telephone: 415-247-6000
>
> ROBERT YORIO (Ca Bar # 93,178))
> CARR & FERRELL, LLP
> 2200 Geng Road
> Palo Alto, CA 94303
> Telephone: 650-812-3400
>
> By:_____
>     Spencer Hosie
>     Attorneys for Plaintiff Burst.com, Inc.

## <u>PROOF OF SERVICE</u>

I am employed in the State of California, County of San Francisco. I am over 18 years of age and am not party to the within action. My business address is One Market, Spear Tower, Suite 2200, San Francisco, California 94105.

On August 23, 2004, I served BURST.COM, INC.'S MOTION TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS RELATING TO ITS DOCUMENT PRESERVATION POLICY AND PRACTICE (UNDER SEAL) upon counsel named below as indicated:

John W. Treece *(via facsimile)*
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
Fax: 312.853.7036

Executed this 23rd day of August, 2004.

Jerry Shaw

# EXHIBITS 1 THROUGH 63

# FILED MANUALLY

# (VOLUMINOUS)