# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION. | MDL Docket No. 1332 |
| This Document relates to: | Hon. J. Frederick Motz |
| *Burst.com, Inc. v. Microsoft Corp.,* | **UNDER SEAL** |
| Civil Action No JFM-02-cv-2952 | |

**BURST'S REPLY TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS
RELATING TO ITS DOCUMENT PRESERVATION POLICY**

**I.    INTRODUCTION: MICROSOFT SIDESTEPS THE POINT.**

Microsoft's opposition neatly sidesteps the point. Because Microsoft has been a defendant in major antitrust cases since at least 1995, it had a duty – sharpened by document preservation orders – to preserve potentially relevant evidence. Yet it did not. Microsoft has conceded that it destroyed the files of the witnesses most important in this <u>Burst</u> case. <u>See</u> below § III.A. It also emerges that Microsoft adopted policies that, to put it mildly, encouraged document destruction from 1995 forward. <u>See</u> below, § II.A (systems at Microsoft "misconfigured" unless they were set to "auto-delete" e-mail). As a consequence of these policies, thousands of documents that should have been preserved were not.

Microsoft's answer is simply that it sent retention notices[1] to the right people at the right time on the right topics. It says that its conduct is beyond reproach because it honored its written

---

[1] Notices that it will not let Burst see.

document preservation and retention policies.[2]  In this way, Microsoft affirmatively uses its retention practices to excuse gaps in the documentary record.

Though quick to wield the sword, Microsoft refuses to yield the shield.  It refuses to provide basic discovery on what it actually did.  It will not produce the very policy documents that it relies on.  It is eager to offer its own explanation of what these documents say, but it won't produce the documents themselves.  Instead, it asks Burst to accept its lawyers' characterizations as a substitute for real evidence.  One example: in the summer of the 1996, General Counsel William Neukom circulated an e-mail concerning document retention and destruction to tens of thousands of Microsoft employees.  This is the e-mail that Mr. Allchin refers to in his "**Do not archive your mail.  Do not be foolish.  30 days.**" e-mail.  And, significantly, this Neukom e-mail appears to be the source for the mysterious language added to Microsoft's policy that "*Due to legal issues,*" e-mails should not be saved to servers subject to back-up.  Evidently, the Neukom e-mail sets forth the very "legal issues" that resulted in this language adding the "do not save" admonition.  <u>See</u> below, § II.B.  While Microsoft offered to have its lawyer describe that e-mail, it refused to produce the e-mail itself.  <u>See</u> below § II.C.

With Microsoft's default being that documents were likely destroyed, it became critical that Microsoft responsibly select the individuals to receive retention notices, properly communicate the scope of their obligations, and ensure compliance.  Absent these steps, documents would not be preserved.  This is the linkage between retention notices and policies and document destruction that Microsoft professes not to understand.

There is a document spoliation issue in this case.  What that may mean, however, is a question for another day (although one rapidly approaching).  This motion seeks very narrow,

---

[2]       Written policies it will not produce.

modest relief. Specifically, it requests that Microsoft be ordered to produce for *in camera* review the William Neukom 1996 e-mail setting forth Microsoft's document retention policies and practices, along with the actual document retention notices (and release from retention notices) served on the individuals Microsoft has identified as custodians in this <u>Burst</u> case. If the Court determines that these documents were not properly withheld, they should be produced. With this production, the parties will know what Microsoft's written retention policies said and did not say; the facts will be out.

II.   **MICROSOFT ADOPTED PROCEDURES TO ENSURE THAT DOCUMENTS WOULD BE DESTROYED, UNLESS SAVED BY A DOCUMENT RETENTION NOTICE.**

Microsoft has defended its e-mail retention practices, in part, by arguing that Microsoft employees can save e-mails several different ways. E-mails can be saved, says Microsoft on (1) its e-mail Exchange servers, (2) on the individual's hard drive, (3) on central file servers, or (4) on servers maintained by the business groups' I.T. administrator, <u>e.g.</u>, a Mr. Ochs for the Multimedia group. But after three motions to compel, repeated 30(b)(6) depositions, considerable stubbornness, and a little luck, it now emerges that Microsoft has policies to try to ensure that e-mail would be preserved in *none* of these locations. And, as best we can tell, much of this is information produced in no prior Microsoft case.

A.   **The First Repository: E-Mails Saved On Individual Hard Drives.**

In early January 2000, Jim Allchin emphatically told all Windows division employees to purge e-mails on their hard drives after 30 days. "Do not be foolish," he said, "do not archive your e-mail." <u>See</u> Exhibit 1, Microsoft's written response to Burst's May 13, 2004 30(b)(6) notice regarding the prior production of the Allchin e-mail.

3

People questioned this injunction, and Mr. Allchin kicked the questions to Microsoft's

COO, Bob Herbold, who in turn called on Microsoft's lawyers.  Id.  In a string of e-mails – all

redacted – the lawyers weighed in, including senior Microsoft in-house litigation counsel

Thomas Burt.  Id. at MS-CC-BU 372871-72.  After consulting with counsel, including Mr. Burt,

Mr. Allchin repeated his injunction, this time in an e-mail sent to the entire "Platforms group,"

adding only that people should not purge if they had received a specific retention notice:

> My recent email concerning email retention has lead [sic] to many
> questions.…  In an effort to answer the many questions I have
> received, I've contacted Legal and HR.…
>
> In the meantime, some of you asked for pointers to the "official
> policy."  *Below is email from Legal that Legal and HR confirm is
> the only written "official policy" on general document retention
> (this was first sent company-wide in the summer of 1996).  It
> discusses 6 months maximum unless it is critical to save.*[3]  My mail
> (and brian's e-mail) discussed 30 days for email; I didn't mention
> documents in the most general sense.
>
> To the best of your ability I would like us to follow the general rule
> of around 30 days for **EMAIL**.  Some of you may be in unique
> circumstances that require particular information to be kept for
> longer than 30 days to do your job effectively.  My direction to you
> is that I want you to think about this issue at least once a month
> and delete items that are no longer needed, including all your
> general email.  Don't just blindly archive email!
>
> Also, many of you have received specific instructions from Legal
> to retain certain documents or email that may be related to pending
> litigation.  These instructions override the general policy.  You
> should follow this instruction carefully and ask Legal if you have
> any questions.

Id. at MS-CC-BU 372870.  Jim Allchin to Platforms Group, January 28, 2000 (bold in emphasis

in original; italics ours).

---

[3]    It appears that this is the same William Neukom e-mail that Microsoft declines to produce.

Through this e-mail, Jim Allchin established a general rule for e-mail destruction: delete every 30 days, subject to retention obligations. This became the new policy for e-mail as of January 2000 forward for all Windows Group employees. It was the rule under which the company operated.

Microsoft has now confirmed that it did not produce any of the e-mails in this string, including Mr. Allchin's final e-mail, in twelve prior cases, including the DOJ liability and remedies cases, the Sun case, the Be case, and the Netscape case. See Exhibit 1 at 2-3, listing the cases and confirming that "*Microsoft has concluded that the subject document was not previously produced in any of the cases.*" Microsoft now says that it never previously produced these Allchin e-mails **because no prior plaintiff asked for them**. See, e.g., Tom Burt Depo., September 8, 2004 at 81:21-25 ("Presumably because they weren't called for."), Exhibit 2.

This is incorrect. To take just one of the prior cases, the recently settled Sun case: Sun served in 2002 a document production request, which included Request No. 212 calling for documents showing "Microsoft policies, practices, guidelines, course of business and procedures for maintaining, storing or retaining or destroying documents of any kind...." Exhibit 3.

Microsoft objected and said no. Sun insisted.[4] But Microsoft objected again, and again said no.[5] Sun again insisted,[6] and Microsoft finally said yes:

> As you know, Microsoft objects to commencing discovery on broad issues of document retention. However, given Sun's insistence on pursuing this issue now, *Microsoft will agree to*

---

[4]    See Exhibit 4, February 19, 2003, Paul Grewal to Dale Rice, at 37. "Sun's request for documents sufficient to reflect Microsoft's policies for document retention and its policies, practices, and procedures for producing, storing and transmitting information within the company is necessary for Sun to effectively conduct the discovery to which it is entitled."

[5]    "Microsoft objects to commencing discovery on broad issues of document retention and, for that reason, has not propounded any discovery to Sun on this issue.... There are also significant privilege and work product issues relating to current retention at Microsoft and we are not going to disclose protected communications about litigation-related retention." See Dale Rice to Paul Grewal, March 18, 2003, Exhibit 5.

[6]    See Grewal to Rice, March 25, 2003, Exhibit 6.

> *produce documents concerning Microsoft business policies,*
> *procedures or guidelines for document retention, to the extent such*
> *documents exist, for the period January 1, 1998 to November 30,*
> *2002.*

Dale Rice to Paul Grewal, April 8, 2003, Exhibit 7. The Allchin e-mails setting forth the 30 day

e-mail policy falls squarely within this Microsoft-authored promised production.

The final chapter came on January 28, 2004, when Microsoft wrote "to confirm that

Microsoft [had] completed its production of documents...."[7] **But Microsoft did not produce**

**either of the two Allchin e-mails, nor any of the others in the string.** This was true

notwithstanding that Mr. Burt, who saw the e-mails and specifically spoke with Mr. Allchin

about them, was actively involved in the <u>Sun</u> case. Indeed, he is listed as counsel of-record on

all pleadings and correspondence, including those cited above. <u>See</u>, <u>e.g.</u>, cover page from

Microsoft Corporation's response to Sun's Fourth Request for Documents.

**B.** <u>**The Second Repository: E-Mail Saved On The E-Mail Servers – The**</u>
<u>**Exchange Servers.**</u>

Nor could Microsoft employees save e-mails on the exchange servers. It turns out

Microsoft carefully capacity limits the amount of e-mails any individual Microsoft employee can

store on the exchange servers. Once the capacity limit is reached, the user can no longer send or

receive e-mails until saved e-mails are deleted. As Microsoft's 30(b)(6) deponent Doug Brown

testified less than two weeks ago:

> Q:    Are you aware, sir, of limitations on size imposed on
> Microsoft employees for their live e-mail files on Exchange
> servers?
>
> A:    Yes.
>
> Q:    What are those limitations, please?

---

[7]    Dale Rice to Michael Schlanger, January 28, 2004, Exhibit 8.

A:     I believe my limitation is 200 megabytes.

\*\*\*

Q:     And have you ever been capacity constrained where the Exchange server says you've got too much, you've got to clear it up before it'll let you get more?

A:     Yes.

\*\*\*

Q:     How often has that happened to you?

A:     It's happened in the – it hasn't happened for probably a year, but it happened **when I had my system misconfigured to not purge deleted mail**.

Q:     What's your auto delete option, you personally?

A:     **I auto delete every time I exit Outlook.**

<u>See</u> Doug Brown, September 14, 2004 Deposition at 60:18-61:23, Exhibit 9.  At Microsoft, systems were "misconfigured" if they did not automatically delete e-mail.  And how many e-mails would be covered by a 200 meg limit?  For the typical Microsoft user, it would appear to be about one month's supply.[8]

Numerous other Microsoft employees have testified to being capacity constrained, and so being forced to delete e-mails.  <u>See</u>, <u>e.g.</u>, Deposition of A. Majidimehr, August 6, 2004, at 123:20-124:3 ("If I'm traveling my e-mail fills up much quicker, and then when I come back I may have to clean it up to be able to use my e-mail functionally."), Exhibit 10.

---

[8]     Burst has served a 30(b)(6) notice inquiring into whether this capacity limit came on the heels of the Allchin purge after 30 days e-mail.  Microsoft has not yet said whether it will let this discovery go forward.

C.    **The Third Repository: Servers Subject To Back-Up.**

The third place Microsoft employees could save e-mails are on the servers maintained by the Operations Technology Group ("OTG"). These are the centrally maintained on the Redmond Campus. They are also the servers that are routinely backed up. But this also is not quite right.

As the Court knows from prior briefing, in 1995 Microsoft adopted a policy that e-mails should not be archived on servers "subject to back-up." In 1997, the policy was strengthened by adding the language "Due to legal reasons...." After two depositions on what those legal reasons were, with the second being court-ordered, Microsoft's position remains that an information technology employee, Candy Stark, decided to exclude e-mails from back-up as an economy measure, and then simply made up the "due to legal reasons" language to combat three years of "push back" from Microsoft executives and employees who wanted to save mail. Microsoft says that she acted alone, and that her decision and subsequent fabrication reflected nothing more than her desire to save money, including costs of servers and, now, air conditioning. See Doug Brown Depo. at 54, Exhibit 9.

It appears, however, that the "due to legal issues" language may well have originated from the still-unproduced, document retention e-mail General Counsel William Neukom circulated in the summer of 1996. As Mr. Brown recently testified about how Ms. Stark dealt with the "pushback":

> A:    In spring of '96 or sometime like that, her team continued to receive feedback and began referring people back to Microsoft's document retention policies and continued to get feedback or get pushback, and then added – added those words.... *And then they refer it back to, this isn't my rule but look at Microsoft's general document retention policy.* That didn't work. And then added "due to legal issues."
>
> Q:    In November '96?

8

> A:    I believe it was November '96.

Id. at 71-72.

This "isn't my rule?" Well, whose rule is it? Mr. Brown told us:

> Q:    And please tell me as precisely as you can what she told you about that pushback and a response in the spring of '96.

> A:    She said she began referring people back to the general Microsoft retention practices that were *referred to in an e-mail from Bill Neukom...* she said in my conversation with her that – and I believe she said in the spring of '96 that she asked her team to refer people to that general Microsoft retention policies that were outlined in that e-mail.

> Q:    And by "that mail" you mean the Neukom e-mail?

> A:    Correct.

Id. at 74-76.    This is the very e-mail that Microsoft refuses to produce now.

Microsoft was willing to let Mr. Burt testify about his recollections of the e-mail, but refused to produce the e-mail itself. Burt Depo. at 47:3-24, Exhibit 2. Burst counsel was not willing to accept this one-sided agreement, but offered that Burst would not "cite the production of that e-mail in and of itself as working a broader waiver." Burt Depo. at 48, id. ("What I'm not willing to do is forego looking at the actual document and rely on this witness' recollection and exposition of it here."). This was unacceptable to Microsoft.

**D.    The Fourth Repository: Business Group Servers.**

Microsoft says that the fourth place individuals may save e-mails are on the servers maintained by the I.T. person for each individual business group. For Microsoft's multimedia group, this would be a Mr. Ochs. In past briefing on these document issues, Microsoft has claimed that it was the servers under Mr. Ochs' control that were most relevant to the Burst case.

9

If this were true, one would assume that Mr. Ochs would have received a retention notice. But he did not. In deposition, he testified that he routinely destroyed documents in calendar years 2002 and 2003. He had annual cleanups, and deleted files wholesale. See Ochs Depo. at 49 ("Q: And as a result of the audit, are all the shares [computer folders] that are identified as unnecessary then deleted? A: On the request of the user. So a user comes to me, he says, I got your note, we don't need this anymore. Q: But you do the deletion, you don't rely on the user to do that? A: At that point I do the deletion, yes."), Exhibit 11.

In addition, these are the very servers that Microsoft said it could not search, *for it carefully does not map custodians to servers.* There is no small irony here; on the one hand, Microsoft claims that it honored preservation policies because of the presence of business group servers; on the other hand, it has filed declarations with this Court claiming that it cannot reasonably search those servers because it does not know which individuals use which servers when. See, e.g., Microsoft's Opp. to Burst's First Motion Re: E-Mail Gaps at 11:

> As a result of the way Microsoft's back-up system has developed, Microsoft's ability to locate documents that a particular individual may have saved to a file server is severely limited. **Microsoft does not have records identifying which employee's materials were saved to a particular file server**

Id. at ¶ 2; Dawson Decl. at ¶11. . Small comfort then, in saying e-mails can be saved to these server!

## III.    WHY THIS MATTERS: DOCUMENTS HAVE NOT BEEN PRESERVED.

This is not an academic debate about proper document retention policies. Microsoft concedes that it has destroyed Mr. Friedman's files, even though Mr. Friedman was a Microsoft media executive squarely charged with dealing with Microsoft's competitors. It has destroyed the files of David del Val, one of its claimed inventors, as well. It even destroyed the files of Jim

Durkin, who was under retention notice, when Mr. Durkin left the company. <u>See</u> letter of May 30, 2003 from Susan V. Harris, Exhibit 12. And Mr. Schiefelbein, a key Microsoft multimedia employee testified that he deleted all of his mail in 2001. And there are many other such examples.

These specific illustrations of document destruction underscore a larger underlying problem. Unless a specific employee received a specific retention notice on the right subjects at the right time, Microsoft's underlying retention policies pushed documents toward deletion. Given Microsoft's own policies, it became critical for Microsoft to identify potentially relevant documents promptly, and ensure that documents were preserved. And this it did not do. We set forth several examples below.

A.    **The "Chris Phillips Deal:" An Example Of Key Executives Not Identified, Key Files Not Saved, And Critical Documents Not Preserved.**

In 1997, the Department of Justice served an interrogatory asking Microsoft to identify "each person… involved in the negotiations with… Progressive [Networks]." Microsoft concedes that it did not identify Mr. Phillips, just as it concedes that it did not send Mr. Phillips a document retention notice. It likewise concedes that it did not identify Eric Engstrom, Mr. Phillips' boss. It justifies these omissions by saying that "Messrs. Phillips and Engstrom *played little or no role* in the negotiations…." Microsoft Opp. at 8 (emphasis ours).

This is simply untrue. From e-mails produced from the files of *other* Microsoft employees, it is plain that Chris Phillips directly negotiated the agreements with RealNetworks. Far from having "little or no role," Phillips met repeatedly with Bruce Jacobson, Real's President and Chief Operating Officer. He personally negotiated the "core deal" with Real's Jacobson, just as he personally "agreed on major business issues" with Jacobson. Phillips briefed his superiors on his progress, and was the person at Microsoft that others came to with questions about the

11

Real deal. It is no wonder that many within the company, *including the Microsoft lawyer who reduced the Phillips/Jacobson agreement to legal form*, referred to the Real contract as the "Chris Phillips" deal.

Nor was Eric Engstrom much less included. He also worked directly with Jacobson, briefed Phillips on what to do, and explained the deal to others at Microsoft.

None of this is speculative, as shown by the following:

- **April 4, 1997**

In April, Microsoft's Maritz wrote Rob Glaser to say that Maritz had briefed Phillips and would send Phillips out to negotiate with Real:

> "I met yesterday with Chris Phillips and Ralph Lipe to brief them on goals draft you sent me, and give them my thoughts. ***Chris should be contacting PN [RealNetworks] to get mtg under way.***"

> Paul Maritz to Rob Glaser, April 4, 1997,
> Exhibit 13 (emphasis ours).

- **May 5, 1997**

By May, Phillips and Jacobson had a written summary of the "core deal" they had struck. As Jacobson summarized his progress with Phillips:

> "*We have had productive discussions with Chris*, and wrote that up, as you know…. *To tersely summarize the basic deal as built up with Chris is*: we support ASF and AM, including working with you on new versions. We agreed on what's exclusive here…. An adder we propose that we also reviewed with Chris: you position us and our content offerings prominently in AD…. A 2nd adder we propose we reviewed briefly with Chris: we support NT server side architectures super well/first/uniquely, you position our stuff as an upsell, joint seminars and promos etc.

> ***Conversations with Chris have basically covered the core deal, more focused on the client side,*** and have talked about the first 'adder.'"

> Bruce Jacobson to Paul Maritz and others at
> Microsoft, Exhibit 14 (emphasis ours).

- **June 3, 1997**

By June, Phillips and Jacobson had agreed on all major business issues:

> "*Chris came by today.* Just a couple of headlines.
>
> *a.* *[W]e agreed on major business issues.*
>
> ***
>
> c.    We set some goals which I'd really, really like to achieve:
> write a contract in the next 2 weeks. Aggressive, but this just ain't
> rocket science. *So Chris said he would check with your lawyer....*
> ***Chris and I also discussed us coming to MSFT next week and***
> ***finalizing the contract.***"

> Bruce Jacobson to Bob Muglia and Chris
> Phillips, Exhibit 15 (emphasis ours).

- **June 3, 1997**

Not only had the two agreed, they reduced their agreement to writing and circulated it to

brief others at Microsoft (ironically, Microsoft would identify several of the passive recipients of

this briefing to the DOJ as persons involved in the negotiations). As Chris Phillips said as he

forwarded the summary:

> "*Here is the doc that Bruce produced from last meeting* [with Chris
> Phillips]…

And the Jacobson summary:

> *This is a summary of the business terms.* I will be as precise as I
> can, but expect a lawyer to turn this into 'contract.' *Chris, I have*
> *some comments intended solely for you....*"

> Chris Phillips to Anthony Bay, John
> Ludwig, and others re: "locking and loading
> (PN)," Exhibit 16 (emphasis ours).

13

- **June 3, 1997**

And Eric Engstrom worked with Phillips:

> *"I believe Chris and I have worked out a plan for this. Chris is calling PN now to float it with them. More later."*
>
>> Eric Engstrom to Anthony Bay, Chris Phillips, and others, Exhibit 17 (emphasis ours).

- **June 6, 1997**

But some issues arose. Microsoft had Phillips quiet the uneasy waters:

> "Chris Phillips is talking to BruceJ and RobG [Jacobson and Glaser respectively] about a TimeCast Platinum channel. Apparently this is part of a bigger PaulMa-driven deal."
>
>> Nevet Basker to Jim Durkin, Exhibit 18.

- **June 6, 1997**

He did:

> "Why are we talking about Platinum level? I already set their [RealNetworks'] expectations that this level was already accounted for."
>
>> Chris Phillips to Jim Durkin and others, Exhibit 19.

- **July 2, 1997**

Through early July, Chris remained Microsoft's point-man on this negotiation:

> *"I had sent copy of this mail to Chris to insure we agreed on issues,* but he didn't get a chance to respond to my summary, so i thought better to ship on and let him make any corrections as he has time....
>
> A.    Eric/Chris want source to all PN code that relates to codecs and protocols" (remainder of the Jacobson e-mail summarizes negotiations with Eric Engstrom and Chris Phillips).

14

> Bruce Jacobson to Paul Maritz, Chris
> Phillips, and others, Exhibit 20 (emphasis
> ours).

- **July 1997**

Not only that, others at Microsoft came to Phillips – the person Microsoft told Justice had

"little or no involvement" – for explanations of what the deal meant:

> "OUCH! [re draft PN deal]. We need to understand this right
> away.  Jim do you know who Bruce [Jacobson] met with after us?
> (who he is working with at Microsoft)."

> Russell Stockdale to Michael Ahern and
> Jim Durkin, Exhibit 21.

- **July 1997**

And the response?

> "He met with Chris Phillips and Eric engstrom"

> <u>Id</u>., Jim Durkin to Russell Stockdale and
> Michael Ahern.

- And so it was that the Real deal became known as the "Chris Phillips" deal:

> "bob in addition to getting very involved in the second PN contract
> (*the chris phillips deal it is called*) i think you may also have to
> play a role in sorting out final resolution of some other related
> things."

> Anthony Bay to Bob Muglia, Cory Van
> Arsdale [Microsoft lawyer], Exhibit 22
> (emphasis ours).

- **July 3, 1997**

And even Microsoft's in-house lawyer – a person identified to the DOJ – called it the

"Chris Phillips deal":

> "Microsoft's initial draft *of the 'Cphillip' deal*: ProgNet Marketing
> Promotion Agreement."

> Cory Van Arsdale to Anthony Bay and
> others, forwarding a draft copy of the PN
> contract, <u>Id</u>. (emphasis ours).

- **July 4, 1997**

As did co-workers:

> "All I got was an email from Bruce [Jacobson] yesterday saying
> that the code drop was harder to pull together than ***they thought
> and that the Chris Phillips deal*** was causing them to waste too
> many cycles and thus causing delay.

> > Jim Durkin to Russell Stockdale and others
> > re: "my views on PN issues… and please
> > keep me in the loop on PN negotiations,"
> > Exhibit 23 (emphasis ours).

- **July 1997**

As did Engstrom's boss, Anthony Bay:

> "[T]hey [Progressive Networks] ***appear to be stalling on the chris
> phillips deal*** to have an out to not include asf and directshow in our
> announce. that must not happen. we should make closing the chris
> phillips deal before the 14th a shared goal with PN and include this
> info in the announce."

> > Anthony Bay to Michael Ahern, <u>Id</u>. at MS-
> > CC-BU 9005921 (emphasis ours).

- **July 5, 1997**

More:

> "***Bruce has previously agreed to provide this to Chris*** and I and I
> [sic] believe that if we do not hold him to that we will be back in a
> similar situation to the one we are in now shortly."

> > Eric Engstrom to Chris Phillips and others,
> > Exhibit 24 (emphasis ours).

- **July 2, 1998**

And finally a Chris Phillips retrospective on the "Chris Phillips deal" a year later:

"of course, we want beyond G2 [Real product] for this as we cannot tolerate another f*****g like last time."

> Chris Phillips to Eric Engstrom re: "Rob Glaser: Brief Briefing for 10am RN meeting," Exhibit 25.

This is just the start of it. Microsoft's privilege log reflects 39 e-mails either to or from Messrs. Phillips or Engstrom explicitly addressing the RealNetworks' negotiation and contract in a five-week period in the summer of 1997. See, e.g., privilege log at 377 (of 1093), referencing an e-mail authored by Chris Phillips, and sent to numerous Microsoft employees, with the subject matter description of "E-mail thread requesting and containing legal advice re attached draft PN agreement." See Exhibit 26.

Against this background, it is incredible that Microsoft identified neither Phillips nor Engstrom to the DOJ. How possibly could this be mere oversight? The company even identified the in-house lawyer who drafted the "Chris Phillips deal" contracts, but not Phillips himself.

Because they were not identified to the DOJ, Justice did not insist that Phillips and Engstrom became document custodians. Because they were not custodians, they did not get retention notices. And because they did not get retention notices, they destroyed their documents.

For example, as Mr. Engstrom himself testified:

> Q:    What – do you retain your – what's your policy with regard to E-mail retention?

> A:    I tend to remove E-mail off my machine after approximately two months. I have a laptop I do all my work off of, and two things happens. I search my mail frequently, and I get a very large amount of mail; so the product simply slows to a crawl if I don't do that.

Q:    And do you go through and delete them one by one or do you have an automatic delete?

**A:    What I do is every month I go mark all the ones from last month and just whack them.**

Deposition of Eric Engstrom, September 28, 1998, at 90-91, Exhibit 27.

### B.    Intel And Java: Documents Not Preserved.

The Chris Phillips example is not by any means the only instance of poor custodian identification, though perhaps the most egregious. In its opening brief, Burst also pointed out that Microsoft unreasonably restricted the scope of its CID response, even after laborious negotiations had resulted in some narrowing of the subpoena. For example, Burst pointed out that Microsoft was asked to produce all documents relating to actual or potential competition in the streaming media software, which clearly encompassed documents concerning the Intel JMF, a Java Media Player designed to receive audio and video streamed over the Internet. Rather, than address this point it simply asserts, with no record support, that DOJ didn't have any interest in Intel's streaming media JMF. In fact, DOJ's interest was obvious and is indisputable: DOJ requested files concerning potential streaming media competition and never relented despite Microsoft substantial efforts to force a narrowing of the request.[9] It pursued a finding that Microsoft illegally pressured Intel to abandoning its Java Media APIs. The JMF was prominent among the Java APIs that Mr. Gates was concerned about having received a report on it just before calling Mr. Grove. MS-CC-Sun 520903-04, Exhibit 29. In the end, it appears Microsoft ignored the request to the extent that it called for JMF-related documents. It simply

---

[9]    It also appears that DOJ was interested in Microsoft's failure to properly search and preserve documents. In 1998, after it learned that Microsoft had pressured Apple to get out of the streaming media market, DOJ questioned Tim Shaaff of Apple regarding meetings he had with Chris Phillips. They learned that Mr. Phillips had boasted to Schaff that the DOJ's Antitrust Division would never catch up with Microsoft, and that he was continuing to destroy his own e-mails because they "create a paper trail that can be used against you . GX 1458, Depo. Excerpts of Tim Shaaff, at pp. 209-11, Exhibit 28.

failed to produce those documents, including any that were located in the identified custodian's files. Finally, Microsoft did not send retention notices to any of the Microsoft employees actively discussing the JMF with Intel, including material witnesses in the Burst case such as Marshall Brumer, Charles Fitzgerald, Russ Arun and Kate Seekings.[10]

## IV.    ARGUMENT: THESE POLICES ARE NOT PRIVILEGED.

### A.    Microsoft's Document Retention Policies Including Its Litigation Overrides To That Policy Are Not Privileged Communications.

As pointed out above the central issue raised by this motion is simply whether Microsoft should be compelled to produce documents which constitute its document retention policies. The issue doesn't often come up in litigation. Normally, companies are proud of their retention policy and, indeed, have adopted those policies for the very purpose of showcasing that they are unafraid to have their business conduct scrutinized by outsiders. In the litigation context, lawyers have long been advising their clients that adopting **reasonable** document preservation policies is the way to convince courts and juries that no adverse inferences should be drawn from the routine destruction of documents having nothing to do with the litigation at hand.[11] While as suggested by Microsoft's brief, there have occasionally been disputes over the privileged nature

---

[10]    Microsoft chides Burst for having asserted that no e-mails between Eric Engstrom and Intel had been produced, when it identifies one such e-mail in its own memorandum. This oversight, however, takes away nothing from the more general point: Despite documentation showing that Engstrom's communications with Intel were instrumental in persuading Intel to drop development of the JMF, few e-mails have survived, none around the period of October 1997 to January 1998, when Engstrom was in "close touch" with Intel. This result is, of course, not surprising given that Mr. Engstrom testified that he had not received a retention notice, had deleted his own e-mail from the time period, and had not turned over to the lawyers any e-mails other than ones relevant to Apple Quicktime. See above.

[11]    For example, Preston, Gates and Ellis advises its clients: "Another important purpose of any document retention policy is to avoid problems once a lawsuit (or other proceeding) has been threatened or filed against the company. If evidence is found to have been improperly destroyed in the context of a lawsuit or investigation (referred to as spoliation), then a court, among other things, may instruct the jury that negative inferences can be made as a result of such destruction (i.e., that the evidence was damaging to the company). Companies can avoid this negative inference instruction by demonstrating that records were destroyed in conformance with a proper document retention policy. Courts have ruled that a proper destruction program is one which (i) is not instituted in bad faith; (ii) is not selectively applied and (iii) incorporates retention periods which are reasonable (i.e., based upon

19

of legal memorandum prepared in the course of developing a retention policy, none of the cases Microsoft cites involve refusals to produce the actual retention policies themselves. The typical document retention policy is simply a document that directs employees as to what they should do in the conduct of business. Regardless of whether lawyers are involved in the creation of such a policy, the document itself generally contains no legal content. In this case, Microsoft has offered no means to determine whether appropriate redactions can be made to separate out legal opinions from the business directives that clearly were disseminated in a policy sent to thousands of lower level employees.

Microsoft primarily relies on *In re Honeywell Int'l Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 20602, 20003 WL 22722961 (S.D.N.Y. 2003), to support the claim that attorney directed retention policies can be protected by the privilege. The case holds nothing of the sort. The court did not address the issue of whether document retention policies were privileged. Rather, it denied discovery on the basis of "no concrete showing" was made to justified the discovery. The plaintiff had sought discovery of a third party, PriceWaterhouseCoopers – Defendant Honeywell's accountant. The workpapers being sought were of recent vintage and PriceWaterhouseCoopers disclosed to the court that its retention policy for such workpapers was seven years. Though the plaintiff argued that the accounting firm had been found to have destroyed documents in an entirely unrelated matter, the Court simply did not see any need to draw PriceWaterhouseCoopers further into the matter.

Microsoft also cites *Ziemack v. Centel Corp.*, 1995 WL 314526 (N.D.Ill. 1995). In that case the court did conditionally protect a document concerning Centel's document retention policy, specifically distinguishing *In re Air Crash Disaster at Sioux City, Iowa*, 133 F.R.D. 515,

proper legal research)." http://www.prestongates.com/publications/article.asp?pubID=439. visited September 25, 2004.

521 (N.D. Ill. 1990). In *Sioux City*, a party's in-house memorandum had been sent to 500 employees. Thus, the court reasoned that there could be no expectation of confidentiality. *Id.* The court in *Ziemack* pointed out that the record did not indicate how many employees got the subject memo, but because it had been given to third parties such as Centel's investment banker, no attorney-client privilege could be asserted. Thus, only if a valid work product claim were advanced, was the document exempt from production. Though the description of the document is unclear, it appears it was a memorandum of counsel discussing the document retention policies, not the actual policies themselves. The distribution list was restricted to Centel's officers and directors, representatives of Goldman Sachs & Co. (investment bankers), representatives of Morgan Stanley & Co. (investment bankers), and Skadden Arps Slate Meagher & Flom (Centel's attorneys). The Neukom memo (and other general retention notices such as the one attached to Allchin's e-mail) was distributed to thousands of Microsoft employees, far beyond its officers and directors.[12]

Microsoft also claims that the work product privilege applies to these notices citing *Hanson v. United States Agency for Int'l Dev.*, 372 F.3d 286, 292 (4th Cir. 2004). This case is not even remotely similar to the issues in this motion. The document involved there was described as "prepared by a consultant attorney for a USAID financed project, it contains the attorney's analyses, opinions and recommendations and was prepared in anticipation of litigation." *Id.* at 293. There has been no showing by Microsoft that the litigation retention notices disclose any litigation opinions or analyses. They have been described as directive in nature, not analytical.

---

[12]    Though Microsoft cites the holding of the case as protecting the document retention policy under the work product privilege, there is nothing in the discussion of the case that equates the subject document with the policies. It is also counter-intuitive to expect that a company creates its general retention policies in anticipation of specific litigation as is required by the work product doctrine.

Though the document retention notices may have been prepared in connection with litigation, they presumably do not contain either opinion work product or any other information regarding litigation strategy. Indeed, because the information is needed to assess the adequacy of Microsoft's claim that it has maintained documents as ordered, this information is much more analogous to the search terms issue previously litigated in this case than to the report of the dispute that the government commissioned to try to settle the matter involved in *Hanson*. Certainly, it is beyond dispute that the document retention notices fall outside the "'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories" described in that case. <u>Id</u>. at 292.

## B.   Microsoft Has Waived Privilege With Respect To Its Document Retention And Destruction Policies.

Microsoft has been quick to disclose privileged materials when it supports the proposition that it has complied with this Court's preservation order and its common law retention obligations; it only attempts to prevent disclosure of communications that may not support that rosy view of its compliance. Both with respect to its general document retention notices and with respect to its individual litigation retention notices, Microsoft has disclosed the substance of the documents.[13] To illustrate this point, the attached Appendix A provides the view of Microsoft's document retention policies that it would like Burst and the Court believe compared to the reality of what the record suggests about that policy.

---

[13]      During the recent deposition of Thomas Burt, Microsoft produced to Burst a copy of an e-mail that was attached to Mr. Allchin's January 28, 2000 e-mail that had previously been withheld as privileged. It made this production pursuant to non-waiver agreement, whereby Burst would not use the fact of that disclosure to argue for further subject-matter waiver. In fact, a good part of the substance of the document had already been produced to Burst in the form of Mr. Allchin's covering e-mail which referred to Microsoft's policy that documents should not be maintained more than six-months.

With respect to the general document retention notices, Microsoft contends that it has never disclosed the substance of any of those communications.[14]  Oddly, when Burst pointed out that Microsoft has told adversaries that its provision for documents specifies six month, Microsoft says true, but that part of it was not confidential, pointing to its own disclosure of the Allchin e-mail.  Once again, Microsoft discloses what it likes and shields what it does not.

In circumstances very similar to these, Judge Payne recently ruled that the selective disclosure of part of a privileged communication, waives the privilege as to all communications relating to that subject matter.  See *Rambus v. Infineon Technologies AG*, Slip Opinion, (E.D.Va. 2004) (Exhibit 31).  To counter charges that its adoption of a document retention policy was in furtherance of its overall scheme to use patent litigation to monopolize the market, Rambus argued that its policy was created for legitimate reasons.  In making this argument, Rambus disclosed the parts of its attorney advice relating to the formation of the policy that it liked, but refused to produce other documents regarding its creation.  In overruling the claim of privilege, Judge Payne pointed to Rambus' testimony that it adopted its policy for legitimate purposes such as limiting the cost of subsequent document productions.

Relying on *Hawkins v. Stables*, 148 F.3d 379 (4th Cir. 1998), Judge Payne held that since the privilege "impedes [the] full and free discovery of the truth," it is to be construed narrowly "and recognized only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rationale (sic) means for

---

[14]    Microsoft's asserts that Burst should not be permitted to argue subject matter waiver based on the testimony of Thomas Burt because it was given pursuant to a no waiver agreement between class consumer lawyers and Microsoft counsel.  This is a rather odd argument in light of the fact that Microsoft has now produced the transcript in numerous cases, itself attached it in support of its opposition, and not claimed any further confidentiality with respect to it.  See Exhibit 30, *et seq.* (production copy indicating no confidentiality designation).  The Court need not address this argument, in any event, since Mr. Burt repeated all of the same information in the recent deposition taken by Burst. See Depo. of Thomas W. Burt, pp. 42-43, 45 (Sept. 8, 2004), Exhibit 2.  No non-waiver agreement was made during that deposition, except as to the one document described above.  Id. at 46-47.

ascertaining truth." Slip Op. at 12.  Judge Payne summarized the law of waiver in the Fourth

Circuit:

> It is also settled that the selective disclosure of attorney-client
> materials for tactical purposes waives the attorney-client privilege
> as to any other documents and communications pertaining to the
> same subject matter. *Jones*, 696 F.2d at 1072.  "Selective
> disclosure occurs not only when a party reveals part of one
> privileged communication, but also when a party reveals one
> beneficial communication but fails to reveal another, less helpful,
> communication on the same matter." *United States ex rel. Mayman
> v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1252 (D. Md. 1995).
> That is because a party cannot use favorable protected materials as
> a sword while simultaneously asserting the attorney-client
> privilege as a shield to prevent disclosure of other related materials
> that might harm its position. *Jones*, 696 F.2d at 1072; *see also
> Beneficial Finance Co. v. Bank One, N.A.,* 205 F.R.D. 212, 217
> (N.D. Ill. 2001), ("Having opened the door to certain privileged
> information in an effort to advance its cause, as a matter of
> fairness, a party must disclose other privileged materials involving
> the subject matter of the disclosed communications.").

Id. at 14.

The Court ruled that Rambus waived the privilege when it disclosed a portion of the

privileged information in defending itself against charges of spoliation.  Id. at 17.  Rambus had

offered testimony of its lawyers and executives to prove that it conceived, adopted and

implemented its document retention policies for benign and legitimate reasons.  Judge Payne

further concluded that as a result of his *in camera* review of the documents, the purpose of the

policy was different that Rambus had disclosed in its defense.   Rambus' strategy in that case is

strikingly similar to that of Microsoft's has been in these cases.  The following chart illustrates

the close similarities.  The result here should be the same, a finding that Microsoft has waived

any privilege.

| Microsoft's Partial Disclosure | Rambus' Partial Disclosure |
|---|---|
| "Microsoft's Corporate Document Retention Policies and Practices Reflect Business Judgment and Comply with | "Rambus in this action and/or the FTC litigation, has also offered the testimony of Karp, Johnson, Barth, Frederick Ware, and |

24

| | |
|---|---|
| Applicable Legal Retention Obligations. The most spurious contention in Burst's current motion is its suggestion that Microsoft for a decade has promulgated document retention policies and practices deliberately intended to frustrate discovery in pending and anticipated litigation. The facts of record in this and every other Microsoft case demonstrate beyond doubt the lack of substance in Burst's allegations. Rather than manifesting any orchestrated effort to frustrate litigation opponents, Microsoft's document retention policies and practices instead rest upon appropriate business judgment." Microsoft's Memorandum in Opposition to Burst.com's Third Motion to Compel Microsoft to Provide Basic Discovery Concerning Its (Purported) E-mail Destruction, at 9 ("Opp. Memo. to Third Mot. To Compel") (May 13, 2004). | Tony Diepenbrock, in an effort to explain that it conceived, adopted, and implemented its document retention policies for benign and legitimate reasons. In other words, Rambus made a tactical election to allow testimony on otherwise privileged topics to produce otherwise privileged documents in an effort to defeat charges of spoliation. In so doing, it has waived whatever privilege attached to those communications and to others that pertain to the same subjects. … The complete picture is that Rambus has foresworn its claims of privilege as to some communications and documents respecting this program, while simultaneously shielding behind privilege documents that demonstrate a different motivation and purpose for the document retention plan that has resulted in the destruction of more than two million documents. Once Rambus made the tactical decision to disclose some parts of the advice it received respecting its document retention program, why it was conceived, how it was implemented, and the circumstances of its adoption, the rest of the assertedly privileged material must be disclosed to make the record complete and accurate." *Rambus v. Infineon Technologies*, Slip Opinion, at 17-19 (Exhibit 31). |

**C.    Microsoft's Errant Compliance With Document Preservation Orders Was Abetted By The Documents At Issue Here And Therefore The Crime/Fraud Exception To The Privilege Should Apply.**

In a separate opinion in *Rambus,* Judge Payne held that the crime/fraud exception to the attorney client privilege can apply to activities of a lawyer that result in the spoliation of evidence. The court reasoned that, though spoliation does not qualify as a crime or tort, the term "crime/fraud exception" is a bit of a misnomer. Court's have applied the exception to "unprofessional conduct" and to "bad faith litigation conduct." Judge Payne, thus, anticipated that "Although the United States Court of Appeals for the Fourth Circuit has not set forth a

precise test for application of the crime/fraud exception in cases of spoliation, it is inconceivable

that our Court of Appeals would find that a client's interest in confidential communications and

work product respecting destruction of documents in anticipation of litigation would outweigh

the societal need to assure the integrity of the process by which litigation is conducted which, of

course, is the purpose of prohibiting spoliation of evidence." Exhibit 32 at *8. Judge Payne then

enumerates some of the types of untoward conduct that have led courts to apply the crime/fraud

exception:

> For instance, the United States Court of Appeals for the District of
> Columbia Circuit teaches that the crime/fraud exception applies
> when the work or communication was made for, or in furtherance
> of a crime, fraud, *"or other type of misconduct fundamentally
> inconsistent with the basic premises of the adversary system." In
> re Sealed Case,* 676 F.2d 793, 812 (D.C.Cir.1982) (emphasis
> added).

Id.

    In Judge Payne's opinion, construing spoliation as within the contours of the crime/fraud

exception was fully consistent with Fourth Circuit precedent. "In the Fourth Circuit, the

attorney-client and work product privileges are to be 'strictly confined within the narrowest

possible limits consistent with the logic of [their] principle[s].' *In re Grand Jury Proceedings,*

727 F.2d 1352, 1355 (4th Cir.1984) (internal citations and quotations omitted). ...

Communications between lawyer and client respecting spoliation of evidence, however, is

fundamentally inconsistent with the asserted principles behind the recognition of the attorney-

client privilege, namely, "observance of law" and the "administration of justice." Id. at *9.

    Rambus was found to have engaged in wholesale document destruction while it was

anticipating litigation and for purposes of avoiding producing the documents in subsequent

litigation. Though Rambus claimed that its retention policy was similar to that used by many

other corporations, the court refused to credit that excuse: "even if Rambus had been instituting

a valid purging program, it disregarded the principle that even valid purging programs need to be put on hold so as to avoid the destruction of relevant materials when litigation is 'reasonably foreseeable.'" Id. at *16.  Among other documents at issue in the Rambus case, was a document retention policy drafted by Rambus' Vice president of Intellectual Property with information supplied by the law firm of Cooley, Godward, LLP.  Ultimately, the court found that the retention policy was simply a part of Rambus' destruction policy "clothed with propriety merely by calling it a 'document retention program,'" and that all legal advice in connection with it had to be disclosed. Id. at *19.

In this case, Burst submits the facts of Microsoft's continued e-mail destruction in the midst of broad-ranging litigation presents a real issue of spoliation.  Last year, Magistrate Judge Grimm issued what appears to be the first opinion concerning electronic discovery in this District.  In *Thompson v. U.S. Dept. of Housing and Urban Devel.*, 219 F.R.D. 93 (D. Md. 2003), Judge Grimm analyzed the defendants' duty to preserve electronic records.  Absent a court order, a party still has a duty to preserve electronic records, including a duty to suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure preservation of relevant documents.  Id. at 100.  Failure to maintain documents that a party has a duty to maintain raises the issue of spoliation of evidence.    With respect to an adverse inference instruction, Judge Grimm adopted a three element test: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind;' and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought discovery of the spoliated evidence." Id. at 101.  The culpability element can be satisfied by three possible states of mind:

27

bad faith/knowing destruction, gross negligence, or ordinary negligence. If a party relies on mere negligence, it must more directly prove the relevance of the destroyed evidence.

Microsoft's document retention policies here were clearly crafted with its ongoing litigation in mind. Senior Microsoft employees felt free to destroy documents relevant to ongoing investigations and litigations because it would assist the company in "staying ahead" of the DOJ. Microsoft adopted very short retention periods for e-mail (actually non-existent ones) because it had been embarrassed so badly by the lawyers representing the government in the trial before Judge Jackson. Its executives urged employees to destroy e-mails as soon as possible and directed them not to store them on servers were they could be preserved.

When new allegations were raised, Microsoft seldomly, if ever, proactively searched out for key employees in order to urge them to maintain their documents. Only when employees became the focus of specific document requests and thus likely to be deposed in the relevant action, did Microsoft send one of its document retention notices. Even then, there is little evidence to suggest that employees paid any attention to the notices. Decisions to not send notices upon the filing of various lawsuits and to restrict notices to only selected custodians are clearly not the type of document freeze suggested by Judge Grimm. The document retention notices likely include statements restricting their scope. If Microsoft's treatment of the streaming media CID is any guide, this notice probably had little relationship to the scope of the litigations in which they were distributed. And as made clear by e-mails such as Mr. Allchin's, any suggestion of a narrow scope in a recipient's retention obligation simply told the recipient that they were free to abide by the general e-mail retention policy of thirty days, then get rid of it; "[d]o not archive your mail. Do not be foolish. 30 days," Exhibit 33.

28

In *United States v. Philip Morris USA, Inc.*, Civ. No. 99-2496 (GK) (D.D.C. July 21, 2004), Judge Kessler granted the Government's motion for sanctions based on Philip Morris' negligent failure to comply with the court's document preservation order. In language similar to this Court's order in this case, Defendants had been order to preserve all documents containing information "potentially relevant to the subject matter of this litigation." Slip Op. at 1. Unlike this Court's order, Judge Kessler's order had no provision specifically addressing the continuation of routine document destruction. The Government learned years into the litigation that Philip Morris had continue to engage in routine destruction of e-mail that was over sixty days old. As a result, the e-mails of a number of individuals with responsibility for matters pertinent to the lawsuit were lost. In addition to violating the court's order, these deletions violated Philip Morris' own document retention policy which had a "print and retain" policy for the e-mails that had been deleted. Making the violation even more egregious was the fact that Philip Morris was a "sophisticated litigant" having hundreds, or even thousands, of lawsuits against it. Id. at 4. Having irretrievably lost the e-mail, it was impossible to assess the prejudice to the government caused by the destruction. Judge Kessler concluded that Philip Morris should be fined almost $3,000,000 and precluded from offering at trial the testimony of any of the executives whose e-mails got deleted.

## V.    CONCLUSION.

Burst respectfully requests that the Court order Microsoft to submit the subject documents to it for *in camera* review, and that those portions of the documents not entitled to protection under the attorney-client and work product privileges be ordered produced.

29

DATED:  September 27, 2004

SPENCER HOSIE (Ca Bar # 101777)
BRUCE J. WECKER (Ca Bar # 078530)
JOHN BURRITT McARTHUR (Ca Bar # 159793;
    Texas Bar #13325650)
GEORGE F. BISHOP (Ca Bar # 89205)
JAMES T. McCARTT (Ca Bar # 121983)
HOSIE, FROST, LARGE & McARTHUR
One Market, Spear Street Tower, 22nd Floor
San Francisco, CA 94105
Telephone: 415-247-6000

ROBERT YORIO (Ca Bar # 93478))
CARR & FERRELL, LLP
2200 Geng Road
Palo Alto, CA 94303
Telephone: 650-812-3400

By:_____
        Spencer Hosie
Attorneys for Plaintiff Burst.com, Inc.

30

## **PROOF OF SERVICE**

I am employed in the State of California, County of San Francisco. I am over 18 years of age and am not party to the within action. My business address is One Market, Spear Tower, Suite 2200, San Francisco, California 94105.

On September 27, 2004, I served BURST'S REPLY TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS RELATING TO ITS DOCUMENT PRESERVATION POLICY upon counsel named below as indicated:

John W. Treece *(via facsimile)*
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 South Dearborn Street
Chicago, IL  60603
Fax:  312.853.7036

Executed this 27th day of September, 2004.

Jerry Shaw

31

# APPENDIX A

## SELECTIVE DISCLOSURE

| Microsoft's Claims Regarding Its Policies | What the Record Shows |
|---|---|
| 1.  In the summer of 1996, Microsoft advised its employees that because there was a period of less litigation that all employees could go back to ordinary "document retention" policies unless they got a new notice from the legal department directing them to retain documents for particular litigations.  Burt Depo., p. 75, Exhibit 2; Burt 2025 Depo. 103, Exhibit 34. | 1.  Mr. Neukom sent out a notice that apparently urged employees to destroy their documents, on which Candy Stark relied to suggest that OTG's policy not to save e-mails on servers subject to back up was backed up by legal reasons. Proof of initial proposition is blocked by Microsoft's refusal to produce the Neukom document.  In light of Mr. Burt's testimony and Mr. Allchin's description of the policy, it appears likely that it is not a document retention policy at all. |
| 2.  In 1996, Microsoft distributed a "document retention policy" that provided for employees retaining documents up to six months.  Allchin January 28, 2000 e-mail; Exhibit 1 at MS-CC-BU 372870. | 2. This policy actually appears to be a "document destruction policy" that encourages employees to get rid of documents as soon as they are no longer needed but in no event to save documents more than six months.  Burst cannot confirm this because Microsoft refuses to produce the document itself. |
| 3.  On August 12, 1997, Microsoft advised 26 employees to save their documents based on receipt of DOJ's streaming media CID. As a result, Burt claims that "Microsoft would have identified those people that on reasonable inquiry we believed were likely to have responsive information, and to have taken whatever steps we reasonably thought necessary to ensure that no one destroyed any evidence relative – relevant to the investigation." Burt Depo. at 94-95, Exhibit 2. | 3.  At the time of the distribution of notices, the scope of the CID has not been narrowed, leading Microsoft to complain that the DOJ was "investigating essentially every aspect of Microsoft's participation in the development of streaming media technology." Engstrom and Phillips, two participants in the RealNetworks and Intel streaming media agreements are not sent retention notices, despite their direct involvement in the RealNetworks negotiation and their role in the development of streaming media technology. The true scope of the obligation to preserve documents on the part of identified custodians is blocked by Microsoft's refusal to produce the notices themselves. |

| | |
|---|---|
| 4. In 2000, Allchin sends an e-mail to the Windows Division alias establishing a new policy for that division providing for document destruction as soon as possible but in no event more than 30 days, except when under document retention. Allchin purported justifies the policy by the fact that e-mail stores can be corrupted if to many e-mails are saved. See Burt Depo. at 58-59, Exhibit 2 ("My understanding, to the extent it was based on something other than attorney-client communication, .. the reason was they didn't want to have PST files become totally corrupted because people were keeping vast quantities of e-mail...") | 4. Burst is unable to test this assertion because Microsoft refuses to disclose the full nature of its document retention efforts. Microsoft's "document destruction policy" provides for a maximum of six month retention for hard copy documents such as handwritten notes, as well as e-mails, prompting one to question the corrupt file explanation and believe that more sinister motivations drove the policy. Clearly the timing and emotion behind Mr. Allchin's e-mail suggest that the stinging experience of the DOJ case and Judge Jackson's findings had more to do with the new policy than the potential corruption of e-mail stores. |
| 5. Individuals placed under document retention notices in one case do not have to be advised about other cases because "any employees covered by [the Court's] order were already under document retention obligations, and these notices continued in effect. Microsoft Opp. Memo. at 11-12. ("people were under a continuing obligation to retain documents."). | 5. Burst has no way to confirm that the notices continued in effect because Microsoft refuses to produce the notices themselves. Burst has no way to test the assertion that additional notices were not required by this Court's order because the scope of the notices cannot be understood without reference to the notices themselves. In one significant example, the streaming media CID, the scope of the investigation was not clear in Microsoft's lawyers' minds at the time the notices were sent. For example, Burst has no way to know whether the 26 individuals (including Gates) were directed to keep all of their streaming media documents or just their documents relating to the RealNetworks, Vxtreme and VDOnet negotiations. |
| 6. Microsoft has a reasonable document retention policy that is motivated by the legitimate purposes of cleaning up files in order to save money and effort and speed litigation. Burt Depo., at 67-68, Exhibit 2. ("Among my responsibilities was paying for the costs of that litigation, and as we had gone through that time period it had become painfully obvious to me, as the person responsible for our litigation budget, that it was costing the company an amazingly large amount of money to | 6. Burst is unable to test this assertion because Microsoft refuses to disclose the full nature of its document retention efforts. Its "document destruction policy" provides for a maximum of six month retention for hard copy documents such as handwritten notes, prompting one to believe more sinister motivations drove the policy. Clearly the timing and emotion behind Mr. Allchin's e-mail suggest that the stinging experience of the DOJ case and Judge Jackson's findings had more to do with the |

| | |
|---|---|
| collect, review and produce documents in litigation because people were retaining huge quantities of completely useless information …   That was costing the company a lot of money, and it was also making the litigation process slower than I would like, so for both of those reasons I thought it would be appropriate to investigate whether some different document retention policy could be implemented at the company that would ultimately mean that vast quantities of useless information wasn't being retained on a regular basis.") | new policy than litigation costs. |
| 7. Microsoft is diligent in assuring that employees abide by their document retention obligations.  Burt Dep. at 123, Exhibit 2 ("we would get questions, I'm under retention.  It's been three years.  Do I still have to keep this stuff? Unfortunately, all too often the answer was yes.") | 7.  Whether Microsoft has reasonably reminded its employees of retention obligations depends on the substance of the retention notices which Microsoft refuses to disclose.  Whether employees are told they can ignore the notices in the face of strong directives like the Allchin e-mail is undisclosed as Burt has only chosen to testify about the many times in which the legal advice given the employee is "no, you're still on retention" |
| 8.  Microsoft has taken all reasonable steps to ensure that when employees leaving Microsoft may have relevant documents, human resources does not delete all their files as is standard for employees having no document retention obligations.  Burt Depo. at 129, Exhibit 2 (" I was satisfied that there was something in place so that if that occurred, we would be able to retain the documents of the people that were under retention, or else verify that there was nothing that they had other than what we had already collected.") | 8.  Burst has no way to test this as Microsoft refuses to allow disclosure of the details of communications between legal and human resources regarding document retention.  A number of employees working with Burst left Microsoft and their document stores were apparently wiped but Burst does not know whether any of these individuals had received retention notices. (Microsoft has not updated the privilege log regarding these notices since one was prepared in the consumer cases sometime in 2000.). |
| 9.  Microsoft has complied with its document retention obligations by maintaining a large file of electronic documents from past litigations.  These collections largely obviate any need for people to save documents on an ongoing basis because matters relevant to the type of litigation that Microsoft has been | 9.  Burst has no way to test these assertions since Microsoft refuses to identify the scope of prior productions (e.g., refuses to disclose time frames of e-mail stores that it has searched for the production in either this case or in the prior case).  Furthermore, Microsoft's assertion that previous collections covered the entire landscape is |

embroiled in largely concern historical facts not ongoing business obligations. Burt Depo, at p. 80, Exhibit 2 ("... given the litigation risks that we were facing at this time, I also wasn't hugely concerned because the litigation that we were facing was all about past conduct – not all. The litigation that we were facing relative to the antitrust cases that were filed were in substantial measure about past conduct, and we had already collected vast, vast quantities of documents that I believed covered the entire landscape, and I thought we had made reasonable efforts to ensure that we had collected the documents and preserved the documents that related to those allegations.

demonstrably wrong since files of individuals like Phillips and Engstrom were not collected in those previous litigations. Moreover, Microsoft's notion that the DOJ litigation was in substantial measure about past conduct (meaning conduct occurring before documents are collected), is unsupportable. In fact, DOJ was pursuing allegations of attempted monopolization in both the browser and streaming media markets. Evidence was offered at the trial of very current events, such as AOL's purchase of Netscape. It is particularly ironic for Microsoft to be viewing its "litigation risks" in this fashion, since it often argued that after years of litigation and finding of anticompetitive conduct, no proper remedy could be crafted to fit the violation as the software markets at issue had evolved quickly, making the conduct evidence stale.

10. Microsoft has complied with this Court's preservation order and its litigation preservation obligations. Microsoft's Memorandum in Opposition to Burst.com's Third Motion to Compel Microsoft to Provide Basic Discovery Concerning Its (Purported) E-mail Destruction, at 8-10 ("Opp. Memo. to Third Mot. To Compel") (May 13, 2004). ("Microsoft's (sic) Has Complied with the Court's Retention Order ...At the time the order was entered, the relevant claims concerned overcharges for certain Microsoft operating systems and applications, not the issues involving Burst .. Once Microsoft did have notice of Burst's claims, individuals were placed on litigation hold and directed to retain potentially relevant documents. ... Microsoft's Corporate Document Retention Policies and Practices Reflect Business Judgment and Comply with Applicable Legal Retention Obligations. The most spurious contention in Burst's current motion is its suggestion that Microsoft for a decade has promulgated document

10. All of the questions raised above remain unanswered, yet Microsoft proclaims trust us, our lawyers have guided us and have been reasonably vigilant to ensure that no evidence is destroyed. Much of what Microsoft proclaimed in its May 13 filing has been proven to be false: Microsoft did and does have a policy of deleting emails from servers, backup tapes and any other place they may be found; Microsoft does have a policy to purge emails; Microsoft does not have a policy simply directing e-mail to be stored on particular computers and servers intended for email storage – its policy is designed to ensure that emails are not retained anywhere. Even with all of this proven, Burst still does not know the full details of what Microsoft document retention policies provide, and has been prevented from discovering whether the so-called "appropriate business judgment" truly motivated the policy. Burst also has been prevented from testing Microsoft's assertion that it adopted a reasonable

retention policies and practices deliberately intended to frustrate discovery in pending and anticipated litigation. The facts of record in this and every other Microsoft case demonstrate beyond doubt the lack of substance in Burst's allegations. Rather than manifesting any orchestrated effort to frustrate litigation opponents, Microsoft's document retention policies and practices instead rest upon appropriate business judgment. Furthermore, the record demonstrates that *all* Microsoft policies on document retention are subject to overriding retention obligations related to current or threatened litigation. Nonetheless, Burst persists in consistently misrepresenting to the Court Microsoft's actual policies and practices. As explained, Microsoft had no policy to <u>delete</u> emails from servers or backup tapes. Microsoft had no policy to <u>purge</u> emails. Microsoft did not even exclude email from backup on appropriate computers and servers. Microsoft's policy was only that email be stored on particular computers and servers intended for email storage.")

litigation hold on the transfer of this case to this Court. Certainly Microsoft made no effort to contact Burst to discuss any continuation of routine document destruction programs. It has not disclosed who got retention notices and when they got them, and refuses to disclose the scope of the obligations that any such retention notices seek to impose on their recipients. Microsoft is wrong when it says it has told Burst who got notices and when they got them. Burst did obtain the privilege log prepared in 2000 used in the consumer Burst deposition, but has received nothing of more recent vintage.

# EXHIBITS 1 THROUGH 34

# FILED MANUALLY

# (VOLUMINOUS)