# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP.<br>ANTITRUST LITIGATION.<br><br>This Document relates to:<br><br>*Burst.com, Inc. v.*<br>*Microsoft Corp.,*<br><br>Civil Action No JFM-02-cv-2952 | MDL Docket No. 1332<br><br>Hon. J. Frederick Motz<br><br>**UNDER SEAL** |

### BURST'S SUPPLEMENTAL REPLY TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS RELATING TO ITS DOCUMENT PRESERVATION POLICY

Burst deposed Chris Phillips on September 28, 2004, the day after it served its reply brief. Accordingly, we submit this very short supplemental brief to include in the motion record Mr. Phillips' testimony.

Mr. Phillips testified that Eric Engstrom asked him to negotiate a contract with RealNetworks in the spring of 1998. Phillips Deposition, September 28, 2004 at 10:20-25. After an internal meeting at Microsoft to discuss strategy, he started the negotiations. Id. at 46:6-10. He began the process in late March, and worked on the matter for more than three months. Id. at 96:12-15. He personally met with numerous RealNetworks' representatives, including having two meetings with the president of the company, Bruce Jacobson. Through this negotiation, he and Mr. Jacobson first arrived at a "deal" sheet, or term sheet, which reflected their agreement on the central business issues. Id. at 50:13-14 ("We had a deal understanding....").

Mr. Phillips brought an in-house lawyer, Cory Van Arsdale, to the final meeting with Mr. Jacobson. Mr. Jacobson attended the meeting with RealNetworks' General Counsel, Kelly-Joe

McArthur. Id. at 49:13-20. At this meeting, the parties hashed out the terms of an actual contract, which Mr. Phillips believes they reduced to writing. Id. at 49:13-14 ("Well, we had a draft of an agreement that the lawyers had produced.").

Mr. Phillips testified he was taken "out of the loop" in late June to early July. The contract was signed in mid-July. He does not know how many of the deal points he negotiated ended up in the executed contract. He recognizes however that Microsoft executives frequently referred to the contract as the "Chris Phillips deal." Id. at 96:16-102:25.

Mr. Phillips does not know why he was not identified to the Department of Justice in Microsoft's interrogatory response. Id. at 103:3-105:22. He testified that he did not even know about the streaming media investigation until almost a year later, in the fall of 1998. Id. at 103:13-18. See also p. 145:21-146 (denying in Microsoft counsel's examination that he knew about the CID investigation prior to fall 1998). He testified that he did not receive a document retention notice in 1997, nor did any Microsoft counsel review his documents at that time. Id. at 112:3-25. As a consequence, he routinely deleted all of his e-mail through 1997 and 1998. Id. at 112:8-11 ("if I'm not under retention then yes, I mass delete.").

DATED: September 29, 2004

SPENCER HOSIE (Ca Bar # 101777)
BRUCE J. WECKER (Ca Bar # 078530)
JOHN BURRITT McARTHUR (Ca Bar # 159793;
  Texas Bar #13325650)
GEORGE F. BISHOP (Ca Bar # 89205)
JAMES T. McCARTT (Ca Bar # 121983)
HOSIE, FROST, LARGE & McARTHUR
One Market, Spear Street Tower, 22nd Floor
San Francisco, CA 94105
Telephone: 415-247-6000

ROBERT YORIO (Ca Bar # 93178))
CARR & FERRELL, LLP
2200 Geng Road
Palo Alto, CA 94303
Telephone: 650-812-3400

By: _____
      Spencer Hosie
Attorneys for Plaintiff Burst.com, Inc.

3

## **PROOF OF SERVICE**

I am employed in the State of California, County of San Francisco. I am over 18 years of age and am not party to the within action. My business address is One Market, Spear Tower, Suite 2200, San Francisco, California 94105.

On September 29, 2004, I served BURST'S SUPPLEMENTAL REPLY TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS RELATING TO ITS DOCUMENT PRESERVATION POLICY upon counsel named below as indicated:

John W. Treece *(via facsimile)*
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
Fax: 312.853.7036

Executed this 29th day of September, 2004.

*(signature)*
Jerry Shaw

Phillips Rough Draft; September 28, 2004

Page 1

```
 1          VIDEO OPERATOR:  Today is September 28, 2004.
 2   The time on the monitor is 9:39 a.m.  This is Volume 1,
 3   Tape No. 1 in the deposition of Chris Phillips in the
 4   United States District Court for the District of
 5   Maryland in the matter of Burst versus Microsoft, Civil
 6   Action No. JPM-02-CV-2952.
 7          We are on at the offices of Preston Gates and
 8   Ellis, the address is 925 Fourth Avenue, 29th floor,
 9   Seattle, Washington.  My name is Michael Mattson, I am
10   employed by Royal Video Productions, Incorporated whose
11   principal place of business is 950 Northwest Firwood
12   Boulevard, Issaquah, Washington, 98027.  The phone
13   number is 425-391-6809.
14          Are there any stipulations anyone would like
15   to put on record?
16          MR. HOSIE:  There are none, thank you.
17          MS. HARRIS:  There are none.
18          VIDEO OPERATOR:  Today's court reporter is
19   Diane Mills of Yamaguchi, Obien & Mangio.  At this time
20   I'd like to ask all persons except for the witness and
21   the court reporter to introduce themselves for the
22   record.  Please state your fame, the firm you're
23   working for, and whom you're representing in this
24   matter starting from my left.
25          MR. HOSIE:  Good morning.  Spencer Hosie, I
```

**Draft Copy**

Page 10

1  A. Application programming interface.
2  Q. Which is what?
3  A. They are interfaces that programmers would use
4  to build applications that provide services underneath
5  them that the operating system provides.
6  Q. Do you recall negotiating a contract with
7  RealNetworks, then Progressive Networks, in June and
8  July of 1997, sir?
9  A. I was given the responsibility for a brief
10 period of time in '97 in the spring of '97 to negotiate
11 with, in those days it was called progressive networks.
12 Q. Will you be confused if I refer to it as
13 RealNetworks here today?
14 A. No, I will not.
15 Q. And just so we're clear for the record, I
16 appreciate that it was then known as Progressive
17 Networks, but we're just going to call it RealNetworks
18 which is its current name; correct?
19 A. Okay.
20 Q. So you were given the responsibility of
21 negotiating a contract with RealNetworks in the spring
22 of 1997?
23 A. Yes.
24 Q. And who gave you that job?
25 A. Probably Eric.

Page 11

1  Q. By Eric you mean Eric Engstrom?
2  A. Yes.
3  Q. And Mr. Engstrom was your boss then, was he
4  not?
5  A. Yes, he was.
6  Q. And Mr. Engstrom reported to Mr. Muglia?
7  A. No, he reported -- we reported up to David
8  Cole and John Ludwig. We were part of the IE
9  organization.
10 Q. IE, Internet Explorer organization?
11 A. Yes.
12 Q. And did you actually go forth and negotiate
13 with representatives of RealNetworks?
14 A. Very briefly.
15 Q. You use the word briefly twice, sir, in the
16 last minute or so. What do you mean by briefly, as
17 you've used it?
18 A. I was given the responsibility to renegotiate
19 the agreement. There was an older agreement that
20 RealNetworks had with Microsoft that was expiring, and
21 they wanted to renegotiate that agreement or extend it.
22 I was given that responsibility, but what subsequently
23 occurred was it was taken out of my hands and other
24 executives took on that responsibility.
25 Q. Did you have face to face meetings with people

Page 12

1  from RealNetworks in the course of your negotiations?
2  A. I did.
3  Q. You met, for instance, with Mr. Bruce
4  Jacobsen, did you not, sir?
5  A. I did.
6  Q. And Mr. Bruce Jacobsen was the then COO of
7  RealNetworks; correct?
8  A. My recollection was he was the president of
9  RealNetworks.
10 Q. All right, sir. And you had more than one
11 negotiating session with Mr. Jacobsen, the president of
12 RealNetworks, did you not, sir?
13 A. I believe I had two.
14 Q. And one of those was attended by Cory Van
15 Arsdale, Microsoft in-house lawyer, also true?
16 A. That is true.
17 Q. So Mr. Van Arsdale understood that you were
18 negotiating personally this contract with the president
19 of RealNetworks; fair?
20     MS. HARRIS: Objection. Calls for
21 speculation.
22 A. Can you repeat the question?
23 Q. (BY MR. HOSIE) Mr. Van Arsdale understood
24 that you were negotiating this contract personally with
25 the president of RealNetworks, Bruce Jacobsen, isn't

Page 13

1  that true, sir?
2      MS. HARRIS: Same objection.
3  A. Can you explain what you mean by personally?
4  Q. (BY MR. HOSIE) Well, he was there with you
5  when you did it. Isn't that personal enough, sir?
6      MS. HARRIS: Objection. Argumentative.
7  A. Cory was with me, and he was with me in that
8  meeting with Bruce Jacobsen and the in-house lawyer
9  from RealNetworks.
10 Q. (BY MR. HOSIE) And that was a negotiation
11 session?
12 A. Yes.
13 Q. And you talked about the potential terms of a
14 potential contract with the president of RealNetworks
15 at that meeting?
16 A. Yes, we did.
17 Q. How long was that meeting?
18 A. I don't recall, maybe an hour.
19 Q. And that was the second of your two face to
20 face meetings with the president of RealNetworks about
21 this contract?
22 A. About an agreement, yes.
23 Q. And you also personally met with others from
24 RealNetworks in the course of negotiating this
25 agreement, correct?

4 (Pages 10 to 13)

Page 46

1  were charged by the people you reported to to go forth
2  and negotiate the deal with Microsoft with
3  RealNetworks?
4      MS. HARRIS: Objection. Vague and ambiguous.
5      A. Can you repeat that question?
6      Q. (BY MR. HOSIE) Sure. After the meeting with
7  Paul Maritz, it was your responsibility as you
8  understood it to go forward and start the negotiation
9  with RealNetworks?
10     A. Yes.
11     MR. HOSIE: Off the record, please.
12     VIDEO OPERATOR: We're going off the record,
13 the time is 10:37 a.m.
14     (Recess taken.)
15     (Deposition Exhibit No. 3 was marked for
16     identification.)
17     VIDEO OPERATOR: The time is 10:48 a.m. We're
18 back on the record.
19     Q. (BY MR. HOSIE) Mr. Phillips on our brief
20 break I've marked as Exhibit 3 our next e-mail. This
21 is dated on the top, May 5th. I'd like you to read the
22 e-mail and tell me when you're done, please.
23     A. (Witness reading document.) Okay, I've read
24 it.
25     Q. On May 5th Bruce Jacobsen sends an e-mail to

Page 47

1  Paul Maritz and copies is to you, does he not?
2      MS. HARRIS: Objection. Lack of foundation.
3      A. That's what this looks like. I'm cc'd.
4      Q. (BY MR. HOSIE) So your lawyer has objected to
5  my question. Does this e-mail not originate from Bruce
6  Jacobsen, sir?
7      A. It appears to, sir.
8      Q. Did he not send it to Paul Maritz?
9      A. Yes.
10     Q. Did he not copy you on the e-mail?
11     A. I am copied on this e-mail, yes.
12     Q. That's what CC means, right, carbon copy?
13     A. Yes, it does.
14     Q. So you would have received this e-mail on or
15 about May 5, 1997; correct?
16     MS. HARRIS: Objection. Calls for
17 speculation.
18     A. Yes, apparently around that time period.
19     Q. (BY MR. HOSIE) All right, sir. And it would
20 have been your practice to read it upon receipt;
21 correct?
22     A. Yes, somewhere near that time frame.
23     Q. Because the subject of the e-mail was your
24 negotiation with Bruce Jacobsen; correct?
25     MS. HARRIS: Objection. Characterization.

Page 48

1      A. It's what Bruce says the subject of the
2  negotiations were.
3      Q. (BY MR. HOSIE) So a subject you were
4  personally involved in?
5      A. I had discussions with Bruce on an agreement.
6  You know, quite frankly in reading this, I don't recall
7  reading this before, and I wouldn't -- I don't even
8  understand some of the points he makes in here.
9      Q. So you started your negotiation I think the
10 other e-mails established early April '97; correct?
11     MS. HARRIS: Objection. Calls for
12 speculation.
13     A. Yeah, about that time.
14     Q. (BY MR. HOSIE) And this is dated about a
15 month later, May 5th.
16     A. Uh-huh.
17     Q. And over that course of the month you had two
18 meetings face to face meetings with Mr. Jacobsen;
19 correct?
20     MS. HARRIS: Objection. Calls for
21 speculation.
22     A. That's my recollection that we had two
23 meetings.
24     Q. (BY MR. HOSIE) And the second of those
25 meetings would have involved Mr. Van Arsdale, Microsoft

Page 49

1  in-house lawyer?
2      A. Yes.
3      Q. And Mr. Jacobsen writes on May 5th that he has
4  had productive discussions with Chris; correct?
5      A. Yes.
6      Q. And you would be the Chris he's referencing
7  here?
8      A. I believe so.
9      Q. And Mr. Jacobsen says, and wrote that up as
10 you know.
11 Sir, did Mr. Jacobsen and you sit down and write
12 something up?
13     A. Well, we had a draft of an agreement that the
14 lawyers had produced.
15     Q. And the lawyer was Cory Van Arsdale, the one
16 you just mentioned?
17     A. And progressive networks or RealNetworks
18 lawyer was a woman.
19     Q. (BY MR. HOSIE) Kelly Joe McArthur?
20     A. Yeah, that's her name. The reason why I'm a
21 bit befuddled is I don't know what these atters are,
22 and even on the tersely summarize the basic deal as
23 built with Chris --
24     Q. Let me ask you this, Mr. Phillips, because
25 we're going to walk through the substance the mail.

13 (Pages 46 to 49)

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

Page 50

1  Mr. Jacobsen says to tersely summarize the basic deal
2  as built up with Chris, do you see that?
3      A. Yes.
4      Q. Was it your recollection, sir, that as of
5  early May you had built up the basic deal with
6  Mr. Jacobsen?
7      MS. HARRIS: Objection. Vague and ambiguous.
8      A. I can't recall the exact time.
9      Q. (BY MR. HOSIE) But at some point you had
10 built up the basic deal with Mr. Jacobsen?
11     MS. HARRIS: Objection. Vague and ambiguous,
12 overbroad.
13     A. We had a deal understanding, or I had an
14 understanding with Bruce of what the deal was.
15     Q. (BY MR. HOSIE) And you just can't tell me
16 whether that was in early May or a little bit later or
17 a little earlier?
18     A. Yeah.
19     Q. Fair enough. The bottom paragraph says,
20 conversations with Chris have basically covered the
21 core deal, do you see that?
22     A. I see that, yes.
23     Q. Would you agree with Mr. Jacobson's
24 characterization that his discussions with you
25 basically covered the core deal?

Page 51

1      MS. HARRIS: Objection. Lack of foundation,
2  calls for speculation.
3      A. Well, I don't know what he means really by
4  core deal. We had a deal on them adopting DirectX
5  technology, collaboration on ASF, and they would
6  support ASF, and that we would provide distribution in
7  IE 4 and of course Windows '95, you know, whatever
8  the --
9      Q. (BY MR. HOSIE) Now, what was your leverage,
10 if I can use that word in going into these
11 negotiations?
12     MS. HARRIS: Objection. Vague and ambiguous.
13     Q. (BY MR. HOSIE) And if you're uncomfortable
14 with the way I put that, I can ask it differently,
15 Mr. Phillips.
16     A. Why don't you ask it differently.
17     Q. Sure. You understood that Microsoft had
18 something Real wanted, specifically Real wanted
19 Microsoft to continue to distribute the Real player;
20 correct?
21     A. Yes, they wanted us to continue to distribute
22 their bits.
23     Q. And that gave Microsoft some leverage, if you
24 will, in going in to this negotiation, the fact that
25 Real wanted something that only Microsoft could do for

Page 52

1  it?
2      MS. HARRIS: Objection. Form of the question.
3      A. No, I just looked at it as another channel for
4  Real to distribute their bits. You know, Real was
5  having huge success downloading and they were very
6  proud of that huge success, and that people had access
7  to it. They also had other channels through OEMs and
8  all kinds of distribution channels, so this was another
9  one.
10     Q. (BY MR. HOSIE) Well, as you understood it,
11 what Real got out of this deal was Microsoft's
12 continuing commitment to distribute the Real player
13 with Microsoft IE?
14     MS. HARRIS: Objection. Calls for
15 speculation.
16     A. They wanted to continue that part of the
17 agreement that they had.
18     Q. (BY MR. HOSIE) And that was something good
19 from their perspective for Real?
20     MS. HARRIS: Objection. Calls for
21 speculation.
22     A. I can only imagine that because that's -- that
23 was their motivation was to continue the contract.
24     Q. (BY MR. HOSIE) Sure. And so this is a
25 negotiation. Microsoft wants something, Real wants

Page 53

1  something and you go back and forth and eventually you
2  reach I think your phrase was a deal understanding?
3      MS. HARRIS: Objection. Overbroad.
4      A. Yeah, I think also at the time, at least what
5  Real had characterized to us that they wanted to
6  support a common file format, and they wanted to take
7  advantage of hardware acceleration and you're APIs.
8      Q. (BY MR. HOSIE) And Mr. Jacobsen's
9  summarization of the basic deal he built up with you,
10 Chris, was that Real would support ASF and AM, do you
11 see that?
12     A. I do.
13     Q. That was your understanding of part of the
14 core deal you built up with Mr. Jacobsen as of
15 approximately May 1997?
16     MS. HARRIS: Objection. Form of the question.
17     A. Well, I can only speculate that what he meant
18 by AM is Active Movie, which was indeed not what we
19 were calling the technology at that time. It was an
20 older name for it.
21     Q. (BY MR. HOSIE) The better name would have
22 been --
23     A. Direct Show.
24     Q. Direct Show. Mr. Jacobsen goes on to say that
25 he agreed with you on what's exclusive here, do you see

14 (Pages 50 to 53)

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

Page 94

1  point Eric Engstrom stepped in and had some
2  responsibility for closing this deal the?
3     A. No.
4        MS. HARRIS: Objection. Vague and ambiguous.
5     A. Basically my understanding is that the June
6  18th deal was very different than anything that I had
7  ever discussed with them, and after that --
8     Q. (BY MR. HOSIE) You mean July 18th?
9     A. No, I mean June 18th, Paul's deal with Rob.
10    Q. Oh, thank you.
11    A. So kind of after that went down -- well, even
12 before that, because I had been kind of pulled off, I
13 think they wanted it done at a higher level. So there
14 was stuff still probably going back and forth on terms
15 of specifics, and I was probably getting cc'd on stuff.
16 But I didn't -- you know, I wasn't feeling like I was a
17 deal point guy except maybe trying to close the ASF
18 DShow.
19       (Deposition Exhibit No. 13 was marked for
20       identification.)
21    Q. (BY MR. HOSIE) Let me show you what's been
22 marked as Exhibit 13 and ask you about two mails in the
23 middle of the page, one from Russell Stockdale to Jim
24 Durkin and Jim Durkin's response. Now, on July 3, 1997
25 Russell Stockdale writes Jim Durkin and asks Jim, do

Page 95

1  you know who Bruce Jacobsen met with after us, who he
2  is working with at Microsoft? Do you see that, sir?
3     A. I do.
4     Q. And could you please read Mr. Durkin's
5  response into the record?
6     A. Jim Durkin said on the Thursday, July 3rd to
7  Russell Stockdale and Michael Ahern, he met with Chris
8  Phillips and Eric Engstrom.
9     Q. That would be you and your boss?
10    A. I don't recall having that meeting.
11    Q. Okay, sir. Do you have any reason to believe
12 that Mr. Durkin's e-mail is inaccurate?
13    A. Yes.
14       MS. HARRIS: Objection. Vague.
15    Q. (BY MR. HOSIE) And that's because you're
16 saying that you were out of the loop as of July 3rd?
17    A. Yeah, and I think that they -- yeah, he was
18 probably just being asump active.
19    Q. The e-mail on the top of the page, Mr. Durkin
20 says, Bruce is basically trying to weasel out of giving
21 client source as part of the Chris Phillips deal. Do
22 you see the reference deal?
23    A. I do.
24    Q. The Chris Phillips deal, you would be the
25 Chris Phillips?

Page 96

1     A. I believe that's what he's referring to.
2     Q. That would be the ASF deal?
3        MS. HARRIS: Objection. Calls for
4  speculation.
5     A. I can only assume it's -- I mean, that it's
6  the ASF/DShow deal.
7     Q. (BY MR. HOSIE) The one you were working on?
8        MS. HARRIS: Objection. Mischaracterizes the
9  witness's testimony.
10    A. The one that I -- yeah, the one that I had
11 been working on prior -- I mean earlier in the year.
12    Q. (BY MR. HOSIE) For months?
13    A. For a couple months, yeah.
14    Q. Three months at this point?
15    A. Okay.
16    Q. Okay? And then do you see Mr. Durkin say, the
17 issue is that we already agreed to terms on the Chris
18 Phillips deal so they are being very dishonest with the
19 tactic. Do you see that, sir?
20    A. I do.
21    Q. You were aware in July of 1997 that people at
22 Microsoft internally called the ASF deal the, open
23 quote, Chris Phillips deal, closed quote?
24       MS. HARRIS: Objection. Calls for
25 speculation, lack of foundation.

Page 97

1     A. Well, I'm not on this mail thread.
2     Q. (BY MR. HOSIE) My question's a little
3  different, sir. You were aware that people at
4  Microsoft called that ASF deal the Chris Phillips deal,
5  true or false?
6        MS. HARRIS: Objection. Lack of foundation.
7     A. I don't recall until, you know, re-seeing
8  these documents that that was a reference.
9     Q. (BY MR. HOSIE) But having reseen these
10 documents, it refreshed your recollection that in the
11 summer of 1997, people at Microsoft called this deal
12 the Chris Phillips deal?
13       MS. HARRIS: Objection. Lack of foundation,
14 calls for speculation.
15    A. I believe that when people said the Chris
16 Phillips deal in reference, they were thinking
17 specifically about the DShow/ASF terms.
18    Q. (BY MR. HOSIE) And in fact, isn't it true
19 that Cory Van Arsdale, the very lawyer who met with you
20 and Bruce Jacobsen called it the Chris Phillips deal?
21       MS. HARRIS: Objection. Lack of foundation.
22    A. I don't know.
23    Q. (BY MR. HOSIE) I'll show you what's been
24 marked as Exhibit 14, sir.
25       (Deposition Exhibit No. 14 was marked for

Draft Copy

25 (Pages 94 to 97)

Phillips Rough Draft; September 28, 2004

Page 98
1  identification.)
2  Q. (BY MR. HOSIE) You'll see this is an e-mail
3  from Cory Van Arsdale?
4  A. Okay.
5  Q. And it's dated July 3rd, is it not?
6  A. It is.
7  Q. And it attaches the RealNetworks contract?
8  MS. HARRIS: Objection. Calls for
9  speculation.
10  A. I don't know.
11  Q. (BY MR. HOSIE) Look at the second page, sir.
12  MS. HARRIS: Calls for speculation, lack of
13  foundation.
14  A. Okay.
15  Q. (BY MR. HOSIE) And on the cover page of the
16  e-mail do you see the language, Microsoft's initial
17  draft of the C Phillip deal?
18  A. Okay.
19  Q. That C Phillip would be Chris Phillips?
20  A. It would be my e-mail, yes.
21  Q. This is Cory Van Arsdale calling that deal the
22  Chris Phillips deal?
23  A. Yes, he is.
24  Q. And it is the very lawyer you worked with?
25  A. It is.

Page 99
1  Q. Now, isn't it true that Mr. Anthony Bay also
2  called it the Chris Phillips deal?
3  MS. HARRIS: Objection. Lack of foundation.
4  A. Do you have an e-mail that says that?
5  Q. (BY MR. HOSIE) I do. Would you like to see
6  it, sir? Do you have a recollection of Mr. Bay calling
7  it the Chris Phillips deal as well?
8  A. No, but it wouldn't surprise me.
9  Q. Why wouldn't it surprise you, sir?
10  A. Because obviously people are calling it the
11  Chris Phillips deal in other mails.
12  (Deposition Exhibit No. 15 was marked for
13  identification.)
14  Q. (BY MR. HOSIE) Let me show you what's been
15  marked as Exhibit 15.
16  A. So these are drafts.
17  Q. Yeah, it's a draft of the contract.
18  A. Okay.
19  Q. Did you ever see the final contract, sir?
20  A. I don't recall ever seeing a final contract.
21  Q. Let me show you Exhibit 15. I'll direct your
22  attention to the e-mail at the bottom of the page, it's
23  from Anthony Bay to other, and I will cite to you the
24  first sentence of the third paragraph, and I'd like you
25  to ask you to read that aloud into the record.

Page 100
1  A. This is an e-mail from Anthony Bay, Thursday,
2  July 3rd at 4:29 p.m. to Michael Ahern, Russell
3  Stockdale, and carbon copy Bob Muglia. Third
4  paragraph, they appear to be stalling on the Chris
5  Phillips deal to have an out to not include ASF and
6  Direct Show in our announce. That must not happen. We
7  should make closing a Chris Phillips deal before the
8  14th a shared goal with PN and include this info in the
9  announce.
10  Q. Now, is this an example of Mr. Bay calling it
11  the Chris Phillips deal; correct?
12  MS. HARRIS: Objection. Calls for
13  speculation.
14  A. That's what he wrote.
15  Q. (BY MR. HOSIE) What was Mr. Bay's position
16  with the company in 1997 in July, sir?
17  A. I think I've already testified to that. I
18  think he was a GM.
19  Q. GM of the what group?
20  A. I know NetShow reported up to him. I don't
21  know if he was the General Manager of NetShow or if he
22  had more stuff than that. He did servers.
23  Q. And isn't it true that Mr. Jim Durkin, the
24  NetShow guy himself called it the Chris Phillips deal?
25  MS. HARRIS: Objection. Lack of foundation.

Page 101
1  A. I don't know. Do you want to show me an
2  e-mail that says that?
3  Q. (BY MR. HOSIE) I would. I would show you
4  Exhibit 16.
5  (Deposition Exhibit No. 16 was marked for
6  identification.)
7  Q. (BY MR. HOSIE) I'll direct your attention to
8  the e-mail from Jim Durkin dated Friday, July 4, to a
9  whole series of folks.
10  A. Okay.
11  Q. Do you see your name referenced in
12  Mr. Durkin's e-mail?
13  A. Yes.
14  Q. And he's talking about the ASF contract, is he
15  not?
16  MS. HARRIS: Objection. Calls for
17  speculation.
18  Q. (BY MR. HOSIE) As you read it, sir?
19  MS. HARRIS: Objection. Calls for
20  speculation.
21  A. I can only assume that.
22  Q. (BY MR. HOSIE) How would you read it?
23  MS. HARRIS: Objection. Calls for
24  speculation.
25  A. I can only speculate. I don't know. I mean,

26 (Pages 98 to 101)

Phillips Rough Draft; September 28, 2004

**Page 102**

1  he's saying that they thought the Chris Phillips was
2  causing them to waste too many cycles.
3      Q. (BY MR. HOSIE) So is this an illustration of
4  Mr. Durkin calling the ASF deal the Chris Phillips
5  deal?
6          MS. HARRIS: Objection. Calls for
7  speculation.
8      A. I don't know if he's characterizing something
9  that Bruce said to him.
10     Q. (BY MR. HOSIE) And what does he call the
11 contract, sir?
12     A. He refers to a Chris Phillips deal.
13     Q. And what deal do you believe he's referring
14 to, please?
15         MS. HARRIS: Objection. Calls for
16 speculation.
17     A. Well, if it hasn't changed, it would be the
18 Direct Show/ASF.
19     Q. (BY MR. HOSIE) The deal you worked on for
20 three months?
21         MS. HARRIS: Objection. Calls for
22 speculation.
23     Q. (BY MR. HOSIE) Correct?
24         MS. HARRIS: Same objection.
25     A. Approximately that amount of time, yes.

**Page 103**

1      (Deposition Exhibit No. 17 was marked for
2          identification.)
3      Q. (BY MR. HOSIE) Let me show you what's been
4  marked as Exhibit 17, Mr. Phillips. Before I ask you
5  about Exhibit 17, Mr. Phillips, let me ask you this.
6  I'll need your attention for this question, sir.
7  You were not aware in the summer of 1997 that the
8  Department of Justice had initiated an investigation
9  into Microsoft's acquisitions in the video streaming
10 business, were you?
11         MS. HARRIS: Objection. Vague.
12     A. No, I wasn't.
13     Q. (BY MR. HOSIE) In fact, you didn't learn
14 about that investigation until well over a year later
15 after meetings with Apple in the summer of 1998, isn't
16 that also true?
17         MS. HARRIS: Objection. Vague and overbroad.
18     A. That's probably true.
19     Q. (BY MR. HOSIE) All right, sir. Were you
20 aware, sir, in 1998 or did you become aware that the
21 Department of Justice asked Microsoft to identify in
22 writing everybody who had any direct involvement in
23 negotiating with Real?
24         MS. HARRIS: Objection. Lack of foundation.
25     Q. (BY MR. HOSIE) Were you aware of that, sir?

**Page 104**

1          MS. HARRIS: I don't recall that.
2      Q. (BY MR. HOSIE) Were you aware, sir, that
3  Microsoft did not identify to the Department of Justice
4  either you or your boss, Eric Engstrom. Were you aware
5  of that?
6          MS. HARRIS: Lack of foundation, objection.
7      A. I have no idea.
8      Q. (BY MR. HOSIE) Certainly no one talked to you
9  in the summer of 1997 or the fall of 1997 about whether
10 you should be identified to the Department of Justice,
11 did they?
12     A. I don't recall.
13     Q. All right, sir. Nor did someone come to you
14 and say in the summer of 1997 or the fall of '97,
15 Chris, we want all of your documents? That didn't
16 happen, did it?
17         MS. HARRIS: Objection. Overbroad, vague and
18 ambiguous.
19     A. When you say that, can you -- repeat the
20 question.
21     Q. (BY MR. HOSIE) Sure. Not focusing later,
22 because they came to you in '98 about Apple and asked
23 for some documents, but in the summer and fall of '97
24 did a Microsoft lawyer come to you and say, Chris, we
25 need your files and your documents?

**Page 105**

1          MS. HARRIS: Objection. Overbroad, lack of
2  foundation.
3      A. For what purpose?
4      Q. (BY MR. HOSIE) For the DOJ investigation into
5  the streaming media space.
6      A. I don't recall that.
7      Q. Because you didn't even know about this
8  investigation until a year later; correct?
9          MS. HARRIS: Objection. Mischaracterizes his
10 testimony.
11     A. I was not aware of it.
12     Q. (BY MR. HOSIE) All right, sir. Do you have
13 any explanation as you sit here now as to why neither
14 you nor Mr. Engstrom were identified to the Department
15 of Justice?
16         MS. HARRIS: Objection. Calls for
17 speculation, lack of foundation.
18     Q. (BY MR. HOSIE) Based on anything you now
19 know, sir?
20         MS. HARRIS: Same objection. Relies on
21 evidence and facts not this the record.
22     A. I have no idea.
23     Q. (BY MR. HOSIE) Of course, you were involved
24 in negotiations over a three-month period with Real,
25 were you not, sir?

*Draft Copy*

27 (Pages 102 to 105)

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

### Page 110

1  Exhibit 18, Mr. Phillips.
2      (Deposition Exhibit No. 18 was marked for
3      identification.)
4      A. (Witness reading document.)
5      Q. (BY MR. HOSIE) I'm going to be asking you
6  about an e-mail from Harel Kodesh to Craig Mundie and
7  Bob Muglia dated July 2829, 1997, it's on the first
8  page of the do you see that e-mail, Mr. Phillips?
9      A. Yes.
10     Q. Who was Harel Kodesh?
11     A. Harel at that time, again, I don't know if he
12 was a VP yet, might have just been a General Manager,
13 but he ran the CE organization.
14     Q. The subject matter of this e-mail, please?
15     A. From Harel to Craig and Bob?
16     Q. Yes.
17     A. Progressive -- regarding progressive?
18     Q. And that would be progressive networks, that
19 is RealNetworks?
20     MS. HARRIS: Objection. Calls for
21 speculation.
22     Q. (BY MR. HOSIE) As you read it, sir?
23     A. I believe so.
24     Q. And Harel says Chris Phillips briefed me so I
25 know the basics of the deal there.

### Page 111

1      Did you brief Harel Kodesh on the basics of
2  deal with RealNetworks in late July 1997?
3      MS. HARRIS: Objection. Overbroad, vague and
4  ambiguous, form of the question.
5      A. I don't recall doing it. I might have.
6      Q. (BY MR. HOSIE) Do you have any reason to
7  believe that this e-mail inaccurately captures what
8  actually happened?
9      MS. HARRIS: Objection. Form of the question.
10     A. Well, I don't know what, you know, the deal at
11 that time was that deal that Paul did.
12     Q. (BY MR. HOSIE) I'm sorry, the deal at that
13 time was?
14     A. Well, the deal with RealNetworks was basically
15 the deal that Paul did where we invested money in their
16 company and they gave us a drop of the software and
17 that kind of stuff.
18     Q. That's distinct from the ASF deal you worked
19 on for three months?
20     A. No, I believe that Paul and whoever, you know,
21 continued with Real tried to roll everything up under
22 an uber agreement or set of agreements.
23     Q. All right, sir. Let me change the subject.
24     A. Okay.
25     Q. I'd like to talk to you about your own

### Page 112

1  personal e-mail retention habits.
2      A. Okay.
3      Q. Not the sexiest topic, I admit. It's true
4  that starting certainly in 1997 it's been your practice
5  to mass delete your e-mail?
6      MS. HARRIS: Objection. Vague and ambiguous,
7  overbroad.
8      A. I manage my inbox and out box based on load
9  and I optimize for being able to sort. So when I'm not
10 under -- if I'm not under retention then yes, I mass
11 delete.
12     Q. (BY MR. HOSIE) When do you recall first
13 getting a retention or a retain documents notice from
14 Microsoft's lawyer. Strike that.
15     Have you ever gotten a retention notice from
16 Microsoft's lawyers?
17     A. Yes.
18     Q. When?
19     A. It's been various times.
20     Q. When was the first time?
21     A. I thought it was with respect to the DOJ case.
22     Q. 1998 sometime?
23     MS. HARRIS: Objection. Calls for
24 speculation.
25     A. I believe sometime.

### Page 113

1      Q. (BY MR. HOSIE) And what did the retention
2  notice say?
3      MS. HARRIS: Objection. I'll instruct you not
4  to answer, calls for legal advice.
5      Q. (BY MR. HOSIE) Sir, as of 1998, what was your
6  understanding of Microsoft's corporate e-mail document
7  retention policy, please?
8      A. I don't know if we had a specific policy per
9  se. It was keep the documents you need, I guess.
10     Q. Do you recall seeing an e-mail from general
11 counsel William Neukom in the summer of 1996 that had
12 as its subject document retention and destruction
13     A. No.
14     Q. In your testimony in the DOJ case you were
15 asked, do you have any understanding of whether or not
16 Microsoft has a retention policy with regard to e-mail,
17 and your answer was, one time a few years ago I saw an
18 e-mail from legal which said, and then your lawyer cut
19 you off.
20     What e-mail were you thinking of, sir?
21     MS. HARRIS: Objection. Calls for
22 speculation.
23     A. I don't remember what I was thinking of when I
24 gave that testimony.
25     Q. (BY MR. HOSIE) Wasn't it an e-mail from the

29 (Pages 110 to 113)

Yamaguchi Obien Mangio, LLC   *   www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101   *   (206) 622-6875   *   1(800) 831-6973

*Draft Copy*

Phillips Rough Draft; September 28, 2004

Page 146

1  Q. Do you recall that you did not have the
2  information previously? Is it possible?
3  A. I think it's very doubtful. I don't
4  remember -- I mean, I know that I had it in '98, the
5  fall of '98 or summer of '98. I don't remember having
6  it prior to that.
7  MS. HARRIS: I have no other questions.
8
9  FURTHER EXAMINATION
10
11 BY MR. HOSIE:
12  Q. Mr. Phillips, you testified in the DOJ case in
13 late 1998 are. Do you recall that, sir?
14  A. Yes.
15  Q. And then you testified that you first learned
16 about this streaming media investigation in the fall of
17 1998. Was your memory of the chronology clearer then
18 than it is now?
19  MS. HARRIS: Objection. Calls for
20 speculation.
21  A. I can only imagine, yes, because of the fact
22 that it was closer. I mean, it's six, seven years now.
23  Q. (BY MR. HOSIE) Second and finally, please
24 tell me what concepts from your negotiations with Bruce
25 Jacobsen were used in the final contracts with

Page 147

1  RealNetworks.
2  MS. HARRIS: Objection. Calls for
3  speculation. Lack of foundation.
4  A. I don't know.
5  Q. (BY MR. HOSIE) Are you prepared to say, sir,
6  that none were?
7  MS. HARRIS: Objection. Lack of foundation,
8  calls for speculation. He's already testified he's
9  never seen the final agreements.
10  A. I never read the final agreement. The only
11 final agreement that I read from Real was in '96 or --
12 whenever the first IE 3 agreement was.
13  Q. (BY MR. HOSIE) Now, you saw drafts of the
14 contract you negotiated drafted by Cory Van Arsdale?
15  A. Yes.
16  Q. How many drafts did you see?
17  A. I think there was only one.
18  Q. Would have been e-mailed to you?
19  A. Probably.
20  Q. Have you seen a draft, that draft in the last
21 year or so, sir?
22  MS. HARRIS: I'm sorry, what was that
23 question?
24  Q. (BY MR. HOSIE) Have you seen that draft in
25 the last year or so?

Page 148

1  A. Have I seen it. I can't remember if there was
2  one that was included in one of these docs. Was it
3  included in one of these docs?
4  MR. AESCHBACHER: Mr. Hosie is shaking his
5  head no.
6  Q. (BY MR. HOSIE) It's not for me to testify but
7  also I don't know, sir, because I don't know what you
8  have in mind, but I believe from your answer to
9  Microsoft's lawyer that the answer is no. You have in
10 mind it would seem a different draft contract.
11  A. No, if you showed it to me today, if it's in
12 one of these files. But my deal never happened.
13  Q. It got to the point it had been drafted by
14 Cory Van Arsdale?
15  A. I think there was a draft.
16  MR. HOSIE: Counsel, I would ask that
17 Microsoft immediately produce that draft. As far as I
18 can tell it's never been produced.
19  A. It might not have been. It might have been
20 that we were still dealing on the terms sheet.
21  MR. HOSIE: We haven't seen a terms sheet
22 either so I'll take that too.
23  A. But I'll refer to that with Bruce's -- the
24 thing you showed this morning, Bruce's list of what he
25 thought the deal should be.

Page 149

1  MR. HOSIE: In fairness to you, Chris, this is
2  an issue between lawyers and I won't take your time
3  with it. Thank you. Off the record.
4  MS. HARRIS: We reserve signature.
5  VIDEO OPERATOR: There were two tapes used in
6  today's deposition. This concludes today's deposition
7  of Chris Phillips. We're going off the record, the
8  time is 2:16 p.m.
9  (End of rough draft.)

Draft Copy

38 (Pages 146 to 149)

Phillips Rough Draft; September 28, 2004

Page 142

1  A. No, I don't believe so. It was my choice. I
2  went to work actually in Windows C E to work on the
3  Sega Dreamcast and some other projects.
4      MR. HOSIE: Mr. Phillips, I have nothing
5  further. Thank you for your courtesies this morning,
6  and I pass the witness.
7      MS. HARRIS: I have a few follow-up questions.
8
9           EXAMINATION
10
11 BY MS. HARRIS:
12     Q. Mr. Phillips, do you recall earlier today
13 Mr. Hosie showed you some exhibits that were relating
14 to RealNetworks?
15     A. Yes.
16     Q. And some of those exhibits had draft
17 agreements attached to them, do you recall that?
18     A. Yes.
19     Q. Were any of the documents that you were shown
20 signed contracts?
21     A. No, they were all drafts.
22     Q. Were you involved in the negotiation of either
23 of the deals or any deal that was ultimately entered
24 into with Real?
25     A. No, not that I'm aware of.

Page 143

1      Q. To your understanding was the deal or the
2  agreement that you were working on or talking about
3  with Mr. Jacobsen ever signed?
4      A. No. The drafts that we were working on, that
5  was never signed, at least not in that form. I mean,
6  some of the concepts might have gotten pulled up into
7  another agreement but I wasn't working on it. It had
8  to have been something that Bob or Anthony or somebody
9  else --
10     Q. Earlier, actually early today you did testify
11 that you had met with members of Real to discuss some
12 limited issues such as, I think you've discussed ASF.
13 Do you recall that testimony?
14     A. Right.
15     Q. Were the provisions that you discussed with
16 them included in any of the final deals with Real, to
17 your knowledge?
18     A. I don't know.
19     Q. Are you aware of how any deal that -- any
20 final deal with Real may have differed from the
21 discussions that you had with Mr. Jacobsen or others at
22 Real?
23     A. They different dramatically. We came in and
24 found out that Paul had done a deal over that
25 when Bob got back from vacation he would know

Page 144

1  Bob was on point because it was -- and would represent
2  all the different parties, different groups who had any
3  interest. And we came in and found out that stuff that
4  we had never even thought of or knew was an issue for
5  them or anything had been consummated.
6      Q. And when you learned of this final contract
7  that Paul worked on, how is it different from what you
8  discussed earlier with Real, to your knowledge?
9      A. Well, I mean, there was money, there was a
10 stock ownership, there was buying code drops. None of
11 those were discussed or anticipated or anything.
12     Q. Did you ever talk to anyone at Real regarding
13 something called a marketing and promotion agreement?
14     A. Not about a marketing and promotion agreement.
15 There was the notion that there would be a press
16 release around ASF and we'd do a design preview, and
17 there might be some marketing of gives and gets around
18 that or around -- when they shipped a Direct Show
19 product, but I believe what you're referring to is
20 stuff that was with respect to IE and active desktop
21 and things like that. I was not -- I didn't do those
22 things.
23     Q. You were not involved in those?
24     A. No, that was all run -- I had the same
25 attorney that did both of those but that was done by

Page 145

1  Will Poole's team at the time.
2      Q. Did you ever see either of the final
3  agreements or any final agreement that was entered into
4  between Microsoft and Real?
5      A. I never read the final agreement. I don't
6  know if there's other agreements after that.
7      Q. So you have not seen any final agreement with
8  Real?
9      A. No.
10     Q. Earlier today Mr. Hosie also asked you some
11 questions about a government investigation. Do you
12 recall --
13     A. Yes.
14     Q. Were you aware that the government at some
15 point was investigating Microsoft with respect to
16 streaming media?
17     A. I was aware at some point, but I believe
18 that's when it was the DOJ and I was told that I would
19 have my -- they wanted LCA wanted to come in and see my
20 hard disk and documents.
21     Q. Is it possible that you found out about that
22 sometime in 1997 prior to the DOJ investigation, the
23 DOJ case?
24     A. I don't remember being -- having that
25 information then.

Draft Copy

37 (Pages 142 to 145)