# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION<br><br>This Document relates to:<br><br>*Burst.com, Inc.* v. *Microsoft Corp.*,<br>Civil Action No. C-02-2952 | MDL Docket No. 1332<br><br>Hon J. Frederick Motz<br><br>**FILED UNDER SEAL** |

## MICROSOFT'S MEMORANDUM IN OPPOSITION TO BURST'S MOTION TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS RELATING TO ITS DOCUMENT PRESERVATION POLICY

David B. Tulchin
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Michael F. Brockmeyer
(Fed. Bar No. 02307)
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-3000

Charles W. Douglas
John W. Treece
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza, 10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

Thomas W. Burt
Richard J. Wallis
C. Andrew Culbert
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052-6399
(425) 706-8080

*Attorneys for Defendant Microsoft Corporation*

September 17, 2004

# TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ................................................................................2

A.    Microsoft's Response to the 1997 Streaming Media CID ...................................3

    (1) Microsoft's Negotiations with the DOJ To Limit the CID ...........................4

    (2) The July 18, 1997 Agreement with Real.................................................8

    (3) Microsoft's Discussions with Intel about the JMF........................................10

    (4) Documents from the Files of Bill Gates.........................................11

B.    Microsoft's Compliance with this Court's Discovery Order ............................12

ARGUMENT .........................................................................................14

A.    Advice Concerning Document Retention Given to Employees
    by Microsoft's Legal Department Counsel Is Privileged....................................14

B.    Microsoft Has Not Waived Privileges Applicable to
    Specific Document Retention Notices .................................................16

CONCLUSION.........................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ames* v. *Black Entertainment Television*,
    1998 U.S. Dist. LEXIS 18053 (S.D.N.Y. 1998)....................................................17

*Dowd* v. *Calabrese*, 101 F.R.D. 427 (D.D.C. 1984)....................................................17

*Garfinkle* v. *Arcata National Corp.*, 64 F.R.D. 688 (S.D.N.Y. 1974)........................18

*Hanson* v. *United States Agency for International Development*,
    372 F.3d 286 (4th Cir. 2004) ................................................................16, 17, 18, 19

*In re Honeywell International, Inc. Sec. Litigation*,
    2003 U.S. Dist. LEXIS 20602 (S.D.N.Y. 2003)...................................................15

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982)........................................................18

*Sheet Metal Workers International Association* v. *Sweeney*,
    29 F.3d 120 (4th Cir. 1994) .............................................................................17, 20

*United States* v. *Jones*, 696 F.2d 1069 (4th Cir. 1982) ..........................................18, 20

*United States* v. *Under Seal (In re Grand Jury Subpoena)*,
    341 F.3d 331 (4th Cir. 2003) ..............................................................................15

*Ziemack* v. *Centel Corp.*, 1995 U.S.Dist. LEXIS 6942 (N.D. Ill. 1995) ....................16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN RE MICROSOFT CORP. ANTITRUST
LITIGATION

This Document relates to:

*Burst.com, Inc.* v. *Microsoft Corp.*,
Civil Action No. C-02-2952

MDL Docket No. 1332

Hon J. Frederick Motz

**FILED UNDER SEAL**

## MICROSOFT'S MEMORANDUM IN OPPOSITION TO BURST'S MOTION TO COMPEL MICROSOFT TO PRODUCE DOCUMENTS RELATING TO ITS DOCUMENT PRESERVATION POLICY

Although one would never know it from the length of Burst's papers, the issue presented by its motion to compel is simple and straightforward. Burst seeks the production of communications from Microsoft's legal department to employees about the application of Microsoft's document retention policy. Those communications are protected by the attorney-client privilege, and Burst provides no authority in support of its argument that they are not.

Rather than focusing on the relief sought in its motion, and the law that forecloses its demand that Microsoft turn over privileged documents, Burst devotes the first 24 pages of its brief to irrelevant allegations that Microsoft years ago failed to preserve documents it had an obligation to preserve in other matters. Those allegations, based on a selective and misleading reading of documents created several years before Burst filed its complaint, are unfounded.

## **FACTUAL BACKGROUND**

Burst devotes the bulk of its brief to a discussion of events that occurred seven years ago, long before Burst filed its complaint, and that are largely unrelated to any allegation in this case. First, Burst contends that Microsoft failed to produce documents to the U.S. Department of Justice ("DOJ") concerning Microsoft's relationship with Progressive Networks, Inc., now RealNetworks, Inc. ("Real"). Second, Burst contends that Microsoft failed to produce documents to Sun Microsystems, Inc. ("Sun")—in the first litigation between the two companies—concerning Microsoft's interactions with Intel on the Java Media Framework. Neither of those contentions has merit.

As an initial matter, Burst never explains what any of this has to do with its motion to compel, which seeks (i) legal advice attached to an email sent by Jim Allchin to various employees in his organization concerning document retention (Mot. at 3), and (ii) the text of the individual "document retention notices distributed" to specific employees by Microsoft's legal department in connection with pending litigation (*Id.*). Last week, Microsoft produced the first document to Burst based on Burst's agreement that the production would not provide a basis for arguing a waiver of the privilege. Burst's entitlement to the document retention notices—to which Burst devotes almost no attention in its motion—is an issue that can be resolved without addressing the extraneous matters Burst raises.

Moreover, the premise of Burst's allegations regarding the DOJ and Sun cases is inherently implausible. Based on its flawed reconstruction of events in which it had zero involvement, Burst asks the Court to believe that two sophisticated legal

adversaries of Microsoft failed to detect major holes in Microsoft's production of documents in response to their requests. Given the hard fought nature of both litigations, there is every reason to believe that if the DOJ or Sun were not obtaining the information they needed to pursue their claims, they would have complained vociferously. They never did. Given the fact that the DOJ explored in detail the two subjects Burst raises, namely, Microsoft's dealings with Real in the summer of 1997 and Microsoft's discussions with Intel concerning its support for Java multimedia technologies, the lack of any complaint from the DOJ is highly significant. Moreover, evidence on these two subjects was presented in the trial before Judge Jackson and he made findings of fact on both topics. Burst's second-hand complaints about Microsoft's production of documents in other litigations are off base.

Nevertheless, before turning to the issue actually raised in Burst's motion, Microsoft will address Burst's allegations because Burst's account of what happened in the DOJ and Sun cases is wrong in so many respects. In many instances, Burst's allegations are refuted by the very documents that Burst annexed as exhibits to its motion to compel.

## A.    Microsoft's Response to the 1997 Streaming Media CID

On August 8, 1997—approximately five years before Burst brought its lawsuit—the DOJ served a Civil Investigative Demand ("CID") on Microsoft concerning its activities relating to streaming media software. (Burst Exhibit 11.) To reduce the burden of the CID and to expedite Microsoft's response, the DOJ agreed to limit the search for relevant documents, and Microsoft produced documents in accordance with the CID as modified.

Burst makes four principal allegations with respect to Microsoft's response to the CID, namely that (i) Microsoft manipulated the DOJ's selection of employees whose files would be searched for responsive documents (Mot. at 8); (ii) Microsoft should have identified Chris Phillips and Eric Engstrom as the "Microsoft executives most closely involved" in Microsoft's July 18, 1997 contract with Real (Mot. at 4); (iii) Microsoft did not produce documents relating to Intel's streaming media software that were within the scope of the CID (Mot. at 9); and (iv) "critical e-mails from or to" Bill Gates are missing from the production in response to the CID (Mot. at 10). The evidence does not support any of these allegations.

### (1)    Microsoft's Negotiations with the DOJ To Limit the CID

Consistent with events that typically follow the DOJ's issuance of a CID, Microsoft and the DOJ expressed interest in, and worked towards, narrowing the scope of the CID.  Indeed, as shown below, the parties worked closely to come to an under-standing about what would be produced and when.  Thus, on August 13, 1997, the DOJ noted that Microsoft had agreed to "promptly provide certain materials responsive to the CIDs so that the [DOJ] can evaluate whether the scope of the CIDs can be narrowed." (Letter from Kenneth Gaul to David Heiner, August 13, 1997, at MS-CC-Bu 9001706 (a copy of which is included herewith as Exhibit 1).)  The DOJ planned to use these materials to "intelligently evaluate eliminating any unnecessary burden on Microsoft that might have inadvertently been imposed by the CIDs."  (*Id.*)

Microsoft agreed to make its initial production of documents in response to the CID no later than August 27, 1997.  (Letter from Kenneth Gaul to David Heiner, August 20, 1997, at MS-CC-Bu 9001694-95 (a copy of which is included herewith as

Exhibit 2).)  Microsoft also agreed to respond to the second and third interrogatories of the CID in an effort to assist the DOJ in identifying Microsoft employees knowledgeable about subjects of interest to the DOJ.  (Burst Exhibit 11.)

As promised, Microsoft responded to the second and third interrogatories on August 21, 1997.  (Burst Exhibit 15, at MS-CC-Bu 9001444.)  Interrogatory number two asked Microsoft to identify each person within the company "who was *directly involved* in the decision to invest in, or the negotiations with" Real leading to the July 18, 1997 contract.  (Burst Exhibit 15, at MS-CC-Bu 9001445 (emphasis added).)  Microsoft identified nine employees in its response.  (Burst Exhibit 15, at MS-CC-Bu 9001445.)

On September 9, 1997, after reviewing both Microsoft's initial production of documents and its answer to the second and third interrogatories, and based on evidence it already possessed, the DOJ identified eleven additional Microsoft employees who may have possessed information responsive to the CID.  (As noted below, Eric Engstrom was on the list of eleven.)  Microsoft agreed to describe the involvement of each of those eleven employees.  (Burst Exhibit 12, at MS-CC-Bu 9001675.)  In turn, the DOJ agreed to consider "eliminat[ing]" certain individuals "from the group of persons whose files must be searched in response to CID No. 16943."  (Burst Exhibit 12, at MS-CC-Bu 9001675.)

As a result of these arms-length negotiations, Microsoft and the DOJ agreed to limit the scope of the CID.  In an October 6, 1997 letter, the DOJ noted that it had "agreed to modify a number of document requests in the . . . CID, in an effort to reduce unnecessary duplication and burden, as well as to better conform the CIDs to the scope of the investigation."  (Letter from Kenneth Gaul to David Heiner, October 6,

1997, at MS-CC-Bu 9001652 (a copy of which is included herewith as Exhibit 3).)  The

DOJ also expressed its willingness to "agree to a substantial narrowing of the search

group, *with the obligation to search other [custodians] deferred*." (*Id.* (emphasis

added).)

On October 8, 1997, the <u>DOJ</u> proposed that the search for relevant docu-

ments be limited to the files of twenty employees—the nine Microsoft had identified in

its response to the second interrogatory and the additional eleven identified by the DOJ.

(Letter from Kenneth Gaul to David Heiner, October 8, 1997, at MS-CC-Bu 9001640-41

(a copy of which is included herewith as Exhibit 4).)  In making this proposal, the DOJ

noted that it had "carefully considered [Microsoft's] comments regarding the roles and

dates of involvement of each named individual, and tried to limit the search obligation

based on that and other information available." (*Id.* at MS-CC-Bu 9001641.)

On October 15, 1997, the DOJ wrote to Microsoft that "we have further

discussed the scope of the search for responsive documents that was initially proposed in

[our] October 8 letter." (Burst Exhibit 17, at MS-CC-Bu 9001615.)  The letter states that

the DOJ formulated a "*revised and narrowed* proposal for the search group and dates,"

and then lists the twenty individuals whose files are to be searched.  (Burst Exhibit 17, at

MS-CC-Bu 9001615 (emphasis added.).)

Thus, contrary to Burst's claim that Microsoft was "resistant" and tried "to

force [the] DOJ to narrow its investigation" (Mot. at 7), it is apparent from the record that

Microsoft was seeking to get the DOJ the information it needed as expeditiously as

practicable.  This point is made very clearly in a September 30, 1997 letter in which

Microsoft told the DOJ:

> [I]f Microsoft knows what information the [DOJ] is seeking, Microsoft
> can identify likely sources of such information more quickly and
> accurately than anyone outside the company could ever hope to do . . .
> Simply put, the more Microsoft knows about the nature of the [DOJ's]
> concerns, the easier it will be to get you the information you really need in
> an expeditious manner.

(Letter from David Heiner to Kenneth Gaul, September 30, 1997 at MS-CC-Bu 900166-

67 (a copy of which is included herewith as Exhibit 5).)

   In suggesting that the DOJ did not get the information it needed, Burst

argues that "the list [of twenty employees whose files were searched] was almost entirely

constructed based on Microsoft's answers to the interrogatories." (Mot. at 8.) As noted

above, however, eleven of the twenty employees were identified on the basis of "other

evidence [the DOJ] possessed relating directly to [its investigation]." (Burst Exhibit 12,

at MS-CC-Bu 9001675.) Given the DOJ's reliance on this "other evidence," Burst is

incorrect that the list of twenty employees was "constructed based on Microsoft's

answers to the interrogatories." (Mot. at 8.)

   Burst also claims that Microsoft actively hid from the DOJ the

involvement of Eric Engstrom and Chris Phillips in Microsoft's activities relating to

streaming media software. At the outset, the notion that the DOJ was unaware of Messrs.

Engstrom and Phillips is baseless. Mr. Engstrom testified at trial before Judge Jackson,

and Mr. Phillips was deposed by the DOJ in advance of the trial. Moreover,

Mr. Engstrom was on the list of twenty employees identified by the DOJ in connection

with the August 1997 CID, and the DOJ elected to defer production of documents from

his files, presumably because the DOJ decided it did not need to see them. While Burst

contends that "only a few emails" were produced from Mr. Engstrom's files and that

there is a "marked absence of documents from Mr. Phillips" (Mot. at 8), Microsoft's records show that 1,393 pages of documents from Mr. Engstrom's files and 313 pages of documents from Mr. Phillips's files have been produced to Burst. Moreover, additional documents from Messrs. Engstrom's and Phillips's files were produced in other litigation that, as part of its response to the document requests in this case, Microsoft offered to produce to Burst; Burst declined that offer.

**(2)    The July 18, 1997 Agreement with Real**

Burst asserts that Eric Engstrom and Chris Phillips were the "Microsoft executives most closely involved" in negotiations that led to the July 18, 1997 agreement with Real. (Mot. at 5.) This is simply not true. The agreement was negotiated between Bruce Jacobsen of Real and Bob Muglia of Microsoft, and they are the people who testified about the negotiations in the DOJ case. Messrs. Phillips and Engstrom played little or no role in the negotiations, which is why, we believe, the DOJ (i) omitted Mr. Phillips from its list of twenty employees whose files were to be searched, (ii) classified Mr. Engstrom in the lowest of three priority levels (Letter from Kenneth Gaul to David Heiner, October 8, 1997, at MS-CC-Bu 90001641, Exhibit 4), and (iii) eventually decided not to seek production of documents from Mr. Engstrom's files.[1]

The evidence demonstrates that Mr. Muglia was put in charge of reaching an agreement with Real in July 1997 at Real's request. On July 1, 1997, Microsoft and Real agreed to "escalate" to Mr. Muglia discussions about a possible agreement. (Burst Exhibit 10, at MS-CC-Bu 9005935.) The next day, Mr. Engstrom asked Mr. Muglia to

---

[1]    That is presumably why Mr. Engstrom "specifically disclaimed searching for 'RealNetworks' documents of 'streaming' in general" when he was deposed by the DOJ in the fall of 1998 about his interactions with Apple Computer, Inc. (Mot. at 9.)

get involved. (Burst Exhibit 3, at MS-CC-Bu 9009024.) Paul Maritz, the executive in charge of all Windows operating systems, had already asked Mr. Muglia to "step in the saddle" in dealing with Real. (July 2, 1997 e-mail from Paul Maritz to various recipients, at MS-CC-Bu 9000942 (a copy of which is included herewith as Exhibit 6).) That occurred after Real's CEO, Rob Glaser, asked Mr. Maritz to "assign[] someone fairly senior (e.g. Muglia)" to oversee the negotiations. (July 1, 1997 e-mail from Rob Glaser to Paul Maritz to various recipients, at MS-CC-Bu 9005938 (a copy of which is included herewith as Exhibit 7).)

On July 3, 1997, Mr. Muglia said he was "going to get very engaged" in the negotiations with Real. (Burst Exhibit 3, at MS-CC-Bu 9009024.) And he did. On July 5, 1997, Mr. Muglia sent an e-mail summarizing a discussion with Bruce Jacobsen of Real in which they agreed on the broad outlines of what became the July 18, 1997 agreement. (Burst Exhibit 7, at MS-CC-Bu 900906.) A few days later, Mr. Glaser told Mr. Maritz that "great progress" had been made since Mr. Muglia took over the negotia- tions. (July 9, 1997 e-mail from Rob Glaser to Paul Maritz, at MS-CC-Bu 9005887 (a copy of which is included herewith as Exhibit 8).)[2]

On July 16, 1997, Mr. Muglia reported that he was "very close" to a deal with Real and said that he "hope[d] to have [it] wrapped up by tomorrow." (July 16, 1997 e-mail from Bob Muglia to various recipients, at MS-CC-Bu 9005106 (a copy of which is included herewith as Exhibit 9).) Four days later, on July 20, 1997, Mr. Muglia

---

[2]     The few e-mails to which Burst cites referring to the "Chris Phillips deal" are a byproduct of the fact that Mr. Phillips had limited discussions with Real prior to Mr. Muglia's involvement. As the July 1997 e-mails indicate, those earlier talks did not progress. (*See* Burst Exhibits 3, 7; Exhibits 7, 8.)

reported that "[the] deal is done," and sent the executed contract to various Microsoft employees. (July 20, 1997 e-mail from Bob Muglia to various recipients, at MS-CC-Bu 9005130 (a copy of which is included herewith as Exhibit 10).)

The documents discussed above make clear that Mr. Muglia negotiated the July 18, 1997 agreement with Real, not Messrs. Engstrom and Phillips. This is confirmed by the fact that Mr. Muglia signed the contract on behalf of Microsoft. (July 18, 1997 Agreement between Microsoft and Real, at MS-CC-Bu 90001413 (a copy of which is included herewith as Exhibit 11).)

Mr. Muglia's files were searched in response to the CID and hundreds of pages of his documents were produced to the DOJ. Mr. Maritz's files were also searched. Thus, there is no basis for Burst's claim that Microsoft engaged in a "pronounced pattern of exclusion from retention and search of the documents of the people most involved" with the July 18, 1997 agreement with Real. (Mot. at 8.) On the contrary, the files of the "people most involved" were turned over to the DOJ (and made available to Burst years later). The fact that the DOJ knowingly chose not to request the complete files of Engstrom or Phillips does not even suggest misconduct on the part of Microsoft.

**(3)     Microsoft's Discussions with Intel about the JMF**

Burst contends that there is a "total absence" of documents relating to Intel's streaming media software, although these documents were "within the scope of the request" of the CID and were "likely in the files" of many of the twenty Microsoft employees whose files were searched. (Mot. at 9.) That contention is wrong. The most graphic illustration is Burst's claim that "Microsoft has not produced a single e-mail between Eric Engstrom and anyone at Intel to the best of Burst's knowledge." (Mot. at

17-18.) Burst attaches just such an e-mail as an exhibit to its motion, *i.e.*, an exchange of email between Mr. Engstrom and Barbara Dawson of Intel "clarifying Intel's position with regard to JMF [Java Media Framework]." (Burst Exhibit 34.)

   Moreover, assuming that Burst's reference to "Intel's streaming media software" is intended to refer to Intel's efforts to implement the JMF, there is no basis for Burst's contention that the DOJ had any interest in the JMF. It is not mentioned in the CID or in any correspondence between the DOJ and Microsoft concerning the CID. If the DOJ wanted additional information about Microsoft's discussions with Intel about the JMF, it was free to ask. It did not.[3]

  **(4) Documents from the Files of Bill Gates**

   Burst contends that "critical e-mails from or to Bill Gates" are missing from Microsoft's production of documents in response to the CID. (Mot. at 10.) Burst again has no evidence to support this claim, which is based entirely on speculation.

   Burst notes that Mr. Gates met with several Microsoft executives on May 30, 1997 to discuss, among other things, Microsoft's acquisition of Vxtreme, a supplier of streaming media software. A few days later, as Burst notes, "Mr. Empry sent an e-mail to Mr. Durkin saying that 'I heard that Billg sent out a mail yesterday saying that NetShow was now a high priority.'" (Mot. at 11.) (NetShow was the name of Microsoft's streaming media software.) That is all there is to buttress Burst's sweeping

---

[3] Similarly, Burst's reference (Mot. at 11) to Mr. Burt's testimony that the CID was "melded into" the DOJ's complaint does not establish that Microsoft had a duty to retain documents in 1997 concerning Intel's efforts to implement the JMF. Rather, the DOJ decided in negotiating the scope of the CID that it did not want *all* documents about streaming media, but rather a more narrowly defined set of documents from a defined group of 20 Microsoft employees.

accusation that "critical e-mails" from the files of Bill Gates are missing. (Mot. at 10.) One Microsoft employee telling another that he "heard" Mr. Gates sent an email about a particular topic does not establish that such an email was ever sent.

Burst makes other unfounded allegations with respect to Mr. Gates' emails. Burst claims incorrectly that "[n]o Bill Gates e-mails appear to have been produced" during the *Sun I* litigation. (Mot. at 19.) In fact, Microsoft designated Mr. Gates a custodian in the *Sun I* litigation and produced 1,045 pages of email from his files. All of those emails were made available to Burst long ago. Burst also claims that "Bill Gates e-mails were lost on th[e] issue" of Intel phasing out its support for the JMF. (Mot. at 19-20.) That claim is mysterious given the fact that several such e-mails are attached as exhibits to Burst's motion. (Burst Exhibits 32, 36.)[4]

## B.    Microsoft's Compliance with this Court's Discovery Order

Burst claims that "no document retention notices went out to Microsoft employees" following this Court's entry of a preservation order in May of 2000. The fact is that any employees covered by that order were *already under document retention obligations*, and those notices continued in effect. As Thomas Burt, Microsoft's Deputy General Counsel, explained in a deposition on November 16, 2000, "people were under a continuing obligation to retain" documents, so "there wasn't a need to go out and tell

---

[4]    Burst also suggests that Microsoft's document collection in *Sun I* was deficient because Microsoft did not collect documents from Messrs. Phillips, Engstrom and Brumer. (Mot. at 18-19.) But Burst does not explain why documents from those individuals should have been collected for *Sun I*, a case primarily focused on Sun's copyright and trademark claims relating to Sun's Java programming language and runtime environment. As in any complex litigation, Sun and Microsoft negotiated about the documents that would be collected and produced. Sun never complained about this issue, despite having access to all of the same documents relied upon by Burst in its present motion.

them again, 'Keep retaining the stuff you are already retaining, that you wish you didn't have to retain because it is accumulating in your office and PC.'" (November 16, 2000 Deposition of Thomas Burt taken pursuant to *Microsoft I – V Cases*, J.C.C.P. No. 4106 (Cal. Super. Ct. 2000), at 39-40 ("Burt Dep.") (a copy of which is included herewith as Exhibit 12).) Mr. Burt testified that he knew employees understood their obligation to retain documents was continuing "because I got questions from time to time about that, questions along the lines of, 'Can I quit preserving this stuff now?' 'No, you can't' would be the response. I know that people understood that." (Burt Dep. at 90, Exhibit 12.) Burst's complaint that "no general notice of the [preservation] order was sent to employees likely to have relevant documents" upon the August 2002 transfer of this action to this Court is likewise irrelevant because the requisite retention notices had already been sent. (Mot. at 22.)

       Burst acknowledges that its case raises some issues identical to issues raised in some of the cases in which document retention orders were already in effect. (Mot. at 21.)[5] Burst argues, however, that Microsoft engaged in "willful violation" of this Court's document preservation order because it "has not treated its obligation to preserve documents in . . . a segmented fashion." (Mot. at 22 n.14.) Yet, as Mr. Burt has testified, "once the stuff is preserved, it is preserved. It doesn't matter what case it is preserved for. Our obligation is to preserve it." (Burt Dep. at 60, Exhibit 12.) That

---

[5]      Burst also suggests that Microsoft was not in compliance with this Court's discovery order because, although the California consumer case contained broader allegations than the DOJ case, Microsoft did not send any additional document retention notices in connection with the consumer cases. (Mot. at 21.) That assertion is wrong. Prior to this Court's May 2000 Order, Microsoft had already sent 130 additional document retention notices in connection with the consumer cases. (*See* Burst Exhibit 19.)

"entire library of information . . . is available and is searched for the new case." (Burt

Dep. at 35, Exhibit 12.) Burst fails to explain how it has been prejudiced by being given

access to all documents in the Microsoft document library that are responsive to Burst's

requests.[6]

## ARGUMENT

**A.    Advice Concerning Document Retention Given to Employees
by Microsoft's Legal Department Counsel Is Privileged.**

As noted above, the actual issue raised by this motion is whether advice

given by Microsoft's legal department about the application of Microsoft's document

retention policy is privileged.

As stated above, Microsoft has now produced to Burst the first of the

documents at issue, *i.e.*, an attachment to a January 28, 2000, e-mail from Jim Allchin,

the Microsoft executive in charge of Windows operating systems, to Microsoft

employees in his "Platforms Group." (E-mail from Jim Allchin to the "Platforms

Group", January 28, 2000, at MS-CC-Bu 000372870 (a copy of which is included

herewith as Exhibit 13).) It should be noted that while Burst contends Mr. Allchin

"instructed thousands of employees to delete all e-mails within 30 days . . . as a matter of

'company policy'" (Mot. at 1), Mr. Allchin's January 28 e-mail contradicts that

contention. Mr. Allchin expressly cautioned employees to pay special attention to any

---

[6]    Strangely, Burst asserts that Microsoft's document retention in this case was insufficient by referring to the fact that Richard Ochs was not informed of this litigation. (Mot. at 21.) As Burst's motion makes clear (Mot. at 21), Mr. Ochs is employed in Microsoft's information technology department, and there is no reason to believe he would have documents relevant to Burst's claims. The responsibility for determining which documents were to be retained was made by Microsoft's counsel; Mr. Ochs merely continued performing his job, and any documents subject to retention obligations would not be sent to him for deletion.

"specific instructions" from Microsoft's legal department to retain documents relating to ongoing litigation, noting that "these instructions override the general policy." (*Id.*)

The second set of documents, that Burst is still seeking, are individual document retention notices sent to Microsoft employees. Those notices are plainly privileged under the "classic" test adopted in this Circuit. *United States* v. *Under Seal (In re Grand Jury Subpoena)*, 341 F.3d 331, 335 (4th Cir. 2003).[7] The notices were sent by Microsoft's legal department to employees. They were drafted by Microsoft's legal department and represent legal advice to clients.

Other courts have refused requests identical to Burst's. In *In re Honeywell Int'l, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 20602 (S.D.N.Y. 2003), the plaintiffs sought a copy of the defendant's document retention policies, as well as "documents reflecting how the documents sought by the subpoena were preserved, maintained and collected . . . for production." *Id.* at *25. To support its motion, the plaintiffs referred to an unrelated matter where the defendant allegedly altered and destroyed workpapers, and "insist[ed] that there are documents missing from [the] production that should have been produced." *Id.* After considering the plaintiffs' claims, the court ruled that the "motion to compel production of documents related to . . . document retention and destruction policies, and the efforts to preserve, maintain and collect documents, is denied." *Id.* at *26. *See also*

_____

[7]    "The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *United States* v. *Under Seal (In re Grand Jury Subpoena)*, 341 F.3d at 335.

-15-

*Ziemack* v. *Centel Corp.*, 1995 U.S. Dist. LEXIS 6942 at n. 5 (N.D. Ill. 1995) (holding

that document retention policy was shielded from production under work product

doctrine).[8]  Burst does not cite any contrary authority that would justify reaching a

different result in this case.

    One other misstatement bears mention.  Burst asserts in its motion that

Microsoft "will not confirm who received notices when, much less who was released

from retention, when and how."  (Mot. at 2.)  This is false.  Microsoft provided to Burst a

privilege log (attached as Exhibit 19 to Burst's motion) that identifies the Microsoft

employees who received document retention notices and when they received the notices.

Further, prior to Burst's motion, Microsoft offered to identify on its privilege log any

notices of release from document retention obligations that could be located.  Burst

responded by filing the present motion.

**B.**  **Microsoft Has Not Waived Privileges Applicable to**
   **Specific Document Retention Notices.**

    Perhaps recognizing the weakness of its first argument, Burst advances the

argument that Microsoft waived its privilege with respect to "any documents discussing

the subject matter of the document retention program, including why it was adopted and

how it was implemented."  (Mot. at 24.)  Burst claims that Microsoft "has disclosed, in

other cases (through depositions), the substantive contours and components of its

document retention policy" and "has testified about the asserted reasons for the policy's

---

[8]  Microsoft's document retention notices are also protected by the work product
doctrine.  *See Hanson* v. *United States Agency for Int'l Dev.*, 372 F.3d 286, 292 (4th Cir.
2004) ("To be considered attorney work product, a document must have been 'prepared
by an attorney in contemplation of litigation which sets forth the attorney's theory of the
case and his litigation strategy.'") (*citations omitted*).  The notices meet this test.

implementation and how it was implemented." (Mot. at 24-25.) Burst relies exclusively

on Mr. Burt's deposition discussed above in making its waiver claim.

   Burst nowhere informs the Court, however, that the deposition on which it

relies was conducted pursuant to an agreement between counsel that testimony given by

Mr. Burt would *not* constitute a waiver. (Burt Dep. at 5-7, Exhibit 12.) Microsoft's

counsel explained that Microsoft wanted to let Mr. Burt be "as forthcoming as he can be

in answering your questions" without waiving the privilege. Accordingly, counsel agreed

that Mr. Burt would answer questions "with the understanding that any waiver would

only extend to that particular question and his answer, and that you will not use anything

here, anything that transpires here as a basis for attacking our claims of privilege else-

where." (Burt Dep. at 5-7, Exhibit 12.) Courts routinely enforce such agreements. *See*,

*e.g.*, *Ames* v. *Black Entertainment Television*, 1998 U.S. Dist. LEXIS 18053 (S.D.N.Y.

1998); *Dowd* v. *Calabrese*, 101 F.R.D. 427, 439-40 (D.D.C. 1984). The agreement on

the record at the start of Mr. Burt's deposition alone precludes Burst's waiver argument.

   In any case, Burst provides no legal support for its assertion that Microsoft

implicitly waived the privilege for document retention notices by testifying about the

existence of such notices and when they were sent to employees. Subject matter waiver,

as implicit waiver is sometimes known, "occurs when a party claiming the privilege has

*voluntarily* disclosed confidential information on a given subject matter to a party not

covered by the privilege." *Hanson* v. *U.S. Agency for Int'l Dev.*, 372 F.3d 286, 294 (4th

Cir. 2004) (*citing Sheet Metal Workers Int'l Ass'n* v. *Sweeney*, 29 F.3d 120, 125 (4th Cir.

1994)) (emphasis in original). The Fourth Circuit has held that subject matter waiver

occurs when a party "reveals part of a privileged communication to gain an advantage in

-17-

litigation," or reveals the substance of their attorney's advice in defense of some claim. *United States* v. *Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (*citing In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) *and Garfinkle* v. *Arcata Nat. Corp.*, 64 F.R.D. 688 (S.D.N.Y. 1974)).

Neither Mr. Burt nor any other Microsoft employee has given testimony sufficient to trigger a subject matter waiver under *Hanson*. Burst claims that Mr. Burt "[gave] specific testimony regarding the *substance* of [retention] notices" that Microsoft sent to individual custodians in response to pending litigations. (Mot. at 25 (emphasis added).) He did nothing of the sort.

Burst contends that Mr. Burt "described the Caldera notice as covering subject matters relevant to the consumer action." (Mot. at 25.) In comparing the scope of document retention notices sent in the *Caldera* case and the consumer cases, Mr. Burt was not revealing the *substance* of those notices. His point was that employees who received document retention notices in *Caldera* had retained documents that were also relevant to claims made in the consumer cases. Observing the existence of an issue overlap between the two cases revealed nothing about the substance of the notices.

Mr. Burt also noted that Microsoft met its document retention obligations in the overcharge class actions by virtue of complying with its document retention obligations in previous cases, including *Sun I*, *Caldera*, and various phases of the DOJ case. *See Sun Microsystems, Inc.* v. *Microsoft Corp.*, No. Civ. A. 97-CV-20884-RMW (N.D.Cal.) ("*Sun I*"); *Caldera, Inc.* v. *Microsoft Corp.*, No. Civ. A. 96-CV-645B-DVB (D. Utah); *United States* v. *Microsoft Corp.*, No. Civ. A. 98-CV-1232-TPJ (D.D.C.) ("DOJ Liabilities"); *New York, et al.* v. *Microsoft Corp.*, No. Civ. A. 98-CV-1233-CKK

(D.D.C.) ("DOJ Remedies").  That testimony was accurate, but it revealed nothing about the substance of the document retention notices that Microsoft sent in any of the cases to which Mr. Burt referred.

Burst claims that "Mr. Burt's testimony ventured deeply into the substance of the document preservation requirements, revealing a portion of the substance of the [document retention policy distributed in 1996]." (*Id.*)  That is incorrect.  Mr. Burt testi-fied that:

> [in] June of 1996 . . . the company was [broadly] advised that unless they
> received contemporaneous instructions from the Legal Department, that
> they needed to retain documents for ongoing litigation, then existing or
> imminently threatened litigation, that they could return to ordinary
> document retention practices.

(Burt Dep. at 100, Exhibit 12.)

Mr. Burt added that "ordinary document retention practices" meant that employees should "retain information that they needed to do their job," noting that as "a rule of thumb . . . they should think about deleting" documents that "were older than six months old."  (Burt Dep. at 114-15, Exhibit 12.)  In giving this testimony, Mr. Burt did not "*voluntarily* disclose[] confidential information on a given subject matter," *Hanson* at 294, because the six-month "rule of thumb" is *not* confidential; it is noted in documents already in Burst's possession.  (E-mail from Jim Allchin to the "Platforms Group", January 28, 2000, at MS-CC-Bu 000372870, Exhibit 13.)

In sum, Mr. Burt never waived Microsoft's privilege for document reten-tion notices sent to specific employees.  Mr. Burt consistently limited his responses to (i) circumstances in which Microsoft sends document retention notices (*see, e.g.* Burt Dep. at 31-32, Exhibit 12); (ii) how Microsoft notifies employees that they must retain

-19-

documents in connection with litigation and goes about collecting responsive documents (Burt Dep. at 32-34, 40, 45-46, 50-72, 113, 156, 193, Exhibit 12); and (iii) the purpose of sending the notices, namely,

> to advise people that a case has been filed, to let them know so that they are not surprised when they are contacted later as part of our effort to collect documents; that, in effect, we are going to be coming to collect documents, and that they remember that — they understand they need to retain potentially relevant documents until we come to collect the information, and in many cases even thereafter.

(Burt Dep. at 27-29, Exhibit 12.)  Mr. Burt's testimony was not "inconsistent with maintaining the confidential nature of the attorney-client relationship," and therefore does not constitute an implicit waiver of Microsoft's privilege.  *Sweeney*, 29 F.3d 120 at 125 (*citing Jones*, 696 F.2d 1069 at 1072).

## CONCLUSION

For the foregoing reasons, Burst's motion to compel should be denied.

Dated:  September 17, 2004

Respectfully submitted,

David B. Tulchin
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

Michael F. Brockmeyer (Fed. Bar No. 02307)
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-3000

Thomas W. Burt
Richard J. Wallis
C. Andrew Culbert
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052-6399
(425) 706-8080

Charles W. Douglas
John W. Treece
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza, 10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Attorneys for Defendant Microsoft Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2004, I caused a true and correct copy of the foregoing document, Microsoft's Memorandum in Opposition to Burst's Motion to Compel Microsoft to Produce Documents Relating to Its Document Preservation Policy, to be served upon the following counsel for the Plaintiff:

Spencer Hosie  (via Email and Overnight Delivery)
Bruce J. Wecker
John McArthur
HOSIE, FROST, LARGE & McARTHUR
One Market Spear Street Tower, 22nd Floor
San Francisco, CA  94105


Robert Yorio  (via Overnight Delivery)
Mary A. Wiggins
CARR & FERRELL, LLP
2225 East Bayshore Road
Suite 200
Palo Alto, CA  94303

Michael F. Brockmeyer