Exhibit 8

ROUGH_Walters1.txt

so...

Q.    I think we probably talked about this earlier.
I'm just wondering who was in charge of maintaining the
Goldmine database during its existence at Burst?  I
think you have already mentioned Jason Boatman; correct?
A.    Correct.
Q.    And in addition to Mr. Boatman, who else would
have been in charge of maintaining Goldmine?
A.    Well, it may have been one or both of the
other two individuals I named, Gary remain me and
Crystal Neal.  At some point I know Mr. Boatman stopped
overseeing the database.  It was assumed by new
employees.
Q.    And by the time you arrived in March of 1999,
Burst was already using Goldmine actively; correct?
A.    Correct.
Q.    In the time period roughly it was being used
in March 1999 when you arrived, and then it was used at
Burst up until when?

                                                         30

UNVERIFIED ROUGH DRAFT

A.    Well, my recollection is that, again, in
August of 2000 there was a migration planned to move the
Goldmine data to Vantive.
Q.    Are you aware of any of the purposes for which
Burst acquired the Goldmine software?
A.    The purpose that I understand was to manage
sales leads and track contacts.
        (whereupon, Deposition Exhibit 3
        was marked for identification.)
        MR. JOHNSON:  Q.  Mr. Walters, I'm showing you
what's been marked as Exhibit Number 3.  It appears to
be a PowerPoint presentation with the Bates numbers
BUR0152722 through BUR0152725.  Feel free to review the
document.  Just let me know when you are done.
A.    Okay.
Q.    Have you ever seen this document before,
Mr. Walters?
A.    I don't recall seeing this before.
Q.    And I appreciate there is not a date on here.
Do you have any idea when this might have been created?
A.    Well, based on this last page, it says
"continue with Goldmine until at least second quarter
2000." it would have to be prior to that period,
obviously.
Q.    I just wanted to ask you some questions about

                                                         31

UNVERIFIED ROUGH DRAFT
the very first slide which I believe was marked as
number one in the bottom right-hand corner of the slide.
It also is marked as BUR0152722.  And under the
objectives the first one reads customers contact
database.  Did you understand that this was one of the
objectives of Burst in acquiring Goldmine, to manage, or
to create a customer contact database?
A.    Yes.
Q.    And the second objective which reads
"essential database for all employees," would you also
agree that this was an objective of Burst in acquiring
Goldmine?
A.    Yes.

**Page 14**

ROUGH_Walters1.txt

Q.   Can you explain to me how Goldmine was a central database accessed by all employees?

A.   Well, based on my own usage of the database, when, in the office at Burst, you would connect with the server and synchronize your local data with the database.

Q.   Just to clarify, you are saying when you are in the office.  Was that in the San Francisco?

A.   Correct.

Q.   Office?

A.   I also believe there was a way to connect through a dial-up connection.

32

UNVERIFIED ROUGH DRAFT

Q.   Was this -- and the San Francisco office, was this on your local network there that you would connect into Goldmine?

A.   Yes.

Q.   Could you use Goldmine without connecting to the database?

A.   There was a way to run a local copy on your laptop or computer.

Q.   So, would you say that Goldmine was a central database to the extent that employees could all log in and share information?

A.   Yes.

Q.   The third objective on this slide is track sales progress.  Did you understand that to also be an objective of Burst in acquiring Goldmine?

A.   Yes.

Q.   And can you explain for me how Goldmine tracked sales progress?

A.   Well, as I recall, there was a field in the database for the initial contact, and then who the contact was assigned to.  And as the process was underway, it could be -- the various note fields could be updated to reflect the sales process.

Q.   Could you explain for me these notes fields?

A.   There were just -- I just recall a couple of

33

UNVERIFIED ROUGH DRAFT

fields where you could enter comments and so on.

Q.   Would this be a sort of narrative description?

A.   Yes.

Q.   And was that limited in length at all, or could you write several paragraphs?

A.   I don't believe there was any limit to I.

Q.   And was this the sort of field where a sales representative could recount conversations that they had had with various prospects?

A.   They might.

Q.   Would it be used to log possibly customer complaints?

A.   Yes.  We did attempt to use it for that.

Q.   If a potential Burst customer ultimately chose not to go with the Burstware solution, would that be reflected in the notes field or in a different field?

A.   It's possible.

Q.   Did Burst generate any lost business reports?

A.   Not that I recall.

Q.   Do you know if Goldmine had the capability of

Page 15

ROUGH_Walters1.txt
producing lost business reports?
    A.  I do not.
    Q.  All right.  Back to the slide.  The fourth
objective there just states "forecasts." and did you
understand that one of the goals of Burst in acquiring

34

UNVERIFIED ROUGH DRAFT
Goldmine was to be be able to forecast sales?
    A.  As I understand it, these objectives were
things that people wanted the Goldmine database to do.
And my recollection is that Goldmine could not
accomplish all of them.  And that was the reason that we
began searching for another database that was capable of
managing all these different objectives.
    Q.  Do you know if Goldmine had any capability of
performing forecasting functions?
    A.  It may have.  I don't recall.  I never used
that myself, so...
    Q.  And the final objective, the fifth one, reads
"product direction."  Did you understand that Burst
sought to use Goldmine to influence product direction?
    A.  I'm not sure what they mean by product
direction.  But I do know we wanted a database that
would allow us to provide customer feedback.  As well as
update, you know, update -- track updates of the
product.
    Q.  You mentioned customer feedback.  So, to the
extent that a customer would comment on wanting perhaps
a particular feature in Burst, that would be included in
the Goldmine database?
    A.  Potentially.
    Q.  And if it were, that could -- those comments

35

UNVERIFIED ROUGH DRAFT
could potentially impact a -- the direction of Burst
product.
    A.  Potentially, yes.
    Q.  On the last slide on page four, Bates number
BUR0152725, the fifth point under "Recommendations"
reads -- and you mentioned this previously -- "Continue
with Goldmine until at least second quarter 2000."
    Do you know, did Burst continue with Goldmine
through that time period?
    A.  My recollection is that we did.
    Q.  Did you -- did you come to understand what
version of Goldmine Burst used?
    A.  I don't recall.
    MR. JOHNSON:  Exhibit 3.
    THE REPORTER:  This would be 4, I think.
    (whereupon, Deposition Exhibit 4
    was marked for identification.)
    MR. JOHNSON:  Q.  Showing you what's been
marked as Exhibit 4, it's a Burst.com, Inc, asset
listing report period ending September 30, 2000.  It's
also dated in the upper left hand corner 11/2/00.  It's
Bates numbers BUR5132241 through BUR5132248.  And you
are free to review this, Mr. Walters.  What I'm
interested in is page six.  That number is in the top
left hand corner.  It's also BUR5134246.  And in the

36

ROUGH_Walters1.txt

UNVERIFIED ROUGH DRAFT

MR. JOHNSON:  Q.  Showing you what's been
marked as Exhibit 9, Mr. Walters, and I'm interested in
the first e-mail there, which would be the second one on
the page so, first in chronological order the March 30th
e-mail and this document is Bates number BUR5960381.
And it's an e-mail from Jason Boatman to Tom Koshy and
it's copying Eric Walters and Dave general nine.  Do you
recall receiving this e-mail on March 30, 1999?
    A.  No, I don't.
    Q.  Any reason to believe you wouldn't have
received it?
    A.  No.
    Q.  Have you had a chance to review the e-mail?
    A.  Yes.
    Q.  I just wanted to ask you a few things about --
it appears there was an entry from Goldmine cut and
pasted into this e-mail.  Is that your understanding?
    A.  Yes.
    Q.  And the -- it starts out here with some as
risks and then it says Eric W.  Is that a reference to
yourself?
    A.  It appears to be.
    Q.  And why would that be there?  Does that mean
that you authored this particular excerpt?
    A.  I would say this was an example -- that Jason
                                             55

UNVERIFIED ROUGH DRAFT

Boatman was using an entry I had made in Goldmine as an
example of how you can cut and paste from Goldmine into
Outlook or vice versa.
    Q.  And concerning the content of the data that
you had entered and that's cut and pasted into this
e-mail, did you typically input customer questions into
Goldmine?
    A.  I did on occasion.
    Q.  And I believe you have already testified that
at times you have viewed customer complaints in Goldmine
also.
    A.  Viewed them?
    Q.  Yes.  Correct me if I am wrong, but you have
access to view other people's, other sales reps' files,
don't you?
        MR. WECKER:  You mean their comments --
        MR. JOHNSON:  Correct.
        MR. WECKER:  -- in the Goldmine database?
        MR. JOHNSON:  Correct, yes.
        THE WITNESS:  We -- as I recall, everyone had
access to all the contacts, so if someone else made an
entry into the database I could go to that entry after
they entered the data and take a look at it.
        MR. JOHNSON:  Q.  Did you view other -- why
don't we start with customer questions in the database
                                             56

UNVERIFIED ROUGH DRAFT

other than what you yourself input.
    A.  I am sorry.  Say again.
    Q.  In just viewing and working with Goldmine
since March of 1999, have you viewed other customer
questions in the database besides those you have entered

Page 25

ROUGH_Walters1.txt
period to the present Burst always required an NDA?
    A.    Yes.
    Q.    I would like to show you what's being marked
as Exhibit 11.
            MR. WECKER:  11 or 12?
            THE REPORTER:  It should be 12, I think.

                                                        61

            UNVERIFIED ROUGH DRAFT
        (whereupon, Deposition Exhibit 12
        was marked for identification.)
        MR. JOHNSON:  Q.  Mr. Walters, I have handed
you what's been marked Exhibit Number 12, which is a
PowerPoint presentation of instant video technologies,
Inc, a company snapshot dated July 27, 1999.  I will
give you a minute to page through it.
        My first question will just be whether you
recall ever seeing this before.
    A.    No, I do not.
    Q.    And the page I'd like to ask you about is --
tally, the document is BUR0168354 to BUR0168408.  And if
I can I'd like to direct your attention to BUR0168381.
    A.    Eight -- I am sorry?
    Q.    Ending in 381.
        And just -- the slide is entitled "sales" and
the second point there is "forecasting." and the first
comment made there is "currently forecasting is through
both Goldmine and manual input." and then for 1999 the
forecast is 3 million and for 2000 it's 20 million.  And
I just -- we talked about forecasting a little bit
earlier.  Does this refresh your recollection at all of
Goldmine's ability to provide forecasts for Burst?
    A.    Somewhat.  I do recall that it had tools and
templates built into it that would allow you to create

                                                        62

            UNVERIFIED ROUGH DRAFT
various reports based on the data points that are in the
database.  And forecasting obviously is one of them
here.
    Q.    The document seems to suggest that Burst used
some sort of a high bride approach relying on Goldmine
in part and also manual input?
    A.    Apparently.
    Q.    Do you have an understanding of how Goldmine
would have been used or what figures or inputs would
have been entered into Goldmine?
    A.    I do not.
    Q.    And related to that do you know how they would
have reached those figures of 3 million for 1999 and
20 million for 2000?
    A.    I do not.
            MR. JOHNSON:  Exhibit 13.
            (whereupon, Deposition Exhibit 13
            was marked for identification.)
            MR. JOHNSON:  Q.  All right, Mr. Walters, I'm
showing you what's been marked as Exhibit 13, which is
an e-mail thread.  The one most recent in time at the
top is dated July 20, 1999 from Craig Emerzian to
Richard Lang, copying Tom Koshy and Kyle Faulkner.
        I just want to ask you about the Goldmine
entry in the top e-mail.  And also, on the second

                                                        63

                    Page 28

ROUGH_Walters1.txt

UNVERIFIED ROUGH DRAFT

page -- I am sorry. The Bates number is BUR0325625 to
626. On page 626 there is an e-mail from you,
Mr. Walter, to Richard Lang, copying Tom Koshy,
forwarding an article on Apple and streaming. Do you
recall sending this e-mail on or about July 19, of 1999?

A.    I don't recall it, no.

Q.    Do you recall what Burst was able to, or any
compatibility between Burst and Apple products around
this time frame?

A.    I'm sorry.

Q.    Was there compatibility with the Burst product
at this time July 13, 1999, in any of Apple -- with
Apple's platform or their products?

A.    We did not have a Burstware player for the
MacIntosh if that's what you are asking.

Q.    Thank you. It is. Was that functionality or
feature being requested by customers?

A.    From time to time we did receive requests,
inquiries, whether we would support the MacIntosh
platform.

Q.    And asset forth in that, the July 20th e-mail
on the top of the first page here from Mr. Emerzian, I
understand that your name isn't on the "from" or "to" or
copied lines. Have you seen this apart from that?

A.    Seen which?

64

UNVERIFIED ROUGH DRAFT

Q.    Seen this 300 and the e-mail from
Mr. Emerzian?

A.    I don't recall seeing this, no.

Q.    The specific comment that says Dave G, which I
assume is Dave general nine; is that correct?

A.    Yes.

Q.    April 22nd, 1999. And in there he mentions,
and I quote, "he and you don't say San no were very
impressed with BW. Does that stand for Burstware?

A.    I would assume so, yes.

Q.    But needed it on a Mac player for their
customer. Is this an example of a customer requesting
certain functionality from Burstware and logging it in
Goldmine?

A.    It appears to be.

Q.    Have you seen other entries in Goldmine
requesting product features?

A.    I don't recall directly.

Q.    Okay. Anything else in Goldmine on the Mac
player or request for a Mac player?

A.    Do I recall any.

Q.    Correct?

A.    I don't recall any.

(Whereupon, Deposition Exhibit 14
was marked for identification.)

65

UNVERIFIED ROUGH DRAFT

MR. JOHNSON: Q. Okay. I'm just showing you
what's been marked as Exhibit 14, an e-mail from
Maribeth Riggs to Dave Egan dated January 21st, 2000,
Bates numbers BUR0078200 to BUR0078202. And attached to
this e-mail is a PowerPoint presentation. Do you recall

Page 29

ROUGH_Walters1.txt

understanding that trip reports could be included in
those fields?
    A.   I suppose it's possible.
       (Whereupon, Deposition Exhibit 8
       was marked for identification.)
       MR. JOHNSON:  Q.  Okay, Mr. Walters, I'm

52

UNVERIFIED ROUGH DRAFT

handing you what has been marked as Exhibit Number 8.
And this is a string of e-mails that's two pages long,
BUR0266530 through BUR0266531.  And on the bottom of the
first page is an e-mail from Mike Moskowitz dated
Tuesday, July 27, 1999, and it's to Roundtable, Roberta
Sanchez, Jason Boatman, Gary Ramey, Michael -- is it
Magbie?
    A.   Magbie.
    Q.   And Brad Thayer.  Were you included in the
Roundtable alias?
    A.   No.
    Q.   Do you recall receiving this e-mail or seeing
it before?
    A.   No.
    Q.   Have you had time to review it yet?
    A.   I haven't read.
    Q.   Okay.  Why don't you take a moment to skim it
over?  I'm interested in that e-mail and the one
immediately after it.
    A.   Okay.
    Q.   Does this document refresh your recollection
that trip reports would be included in Goldmine?
    A.   Well, again, it's possible that they would,
you know, enter the data into Goldmine.  I'm not sure
that it was done in every days.

53

UNVERIFIED ROUGH DRAFT

    Q.   Have you -- in all of your work with Goldmine
did you ever see a trip report in Goldmine?
    A.   I don't recall seeing one.
    Q.   But would it be unusual to see one in there?
       MR. WECKER:  Let me object to the vagueness of
the term "trip report." I could see some of these
entries in Exhibit 7 being called trip report where it
just indicates "met with so and so" versus a lengthy
document like what's attached to Exhibit 8.
       MR. JOHNSON:  Sure.  I can clarify that.
       MR. JOHNSON:  Q.  You have already testified,
Mr. Walters, that the information entered in Goldmine
could be I think very brief entries or it could be
rather lengthy entries.  And my question is, concerning
trip reports that are a little bit more lengthy, perhaps
this one is roughly a page long in an e-mail.  Did you
see entries roughly this size in Goldmine, reporting on
a trip to a customer's offices?
    A.   I do not recall seeing anything this small.
    Q.   Do you recall seeing other trip reports
recounting a visit to a customer's offices that maybe
were longer or shorter in length?
    A.   Not directly, no, I don't.
       (Whereupon, Deposition Exhibit 9
       was marked for identification.)

54

Page 24

ROUGH_Walters1.txt

receiving, or viewing this PowerPoint presentation before?

A.   I do not recall.

Q.   The slide I'm interested in is on the second page bottom right-hand corner, entitled CS&S deployment schedule special projects.

A.   You mean development schedule?

Q.   Correct.  And the first thing listed there is a 3MBS promo, the first point being automatic lead tracking in Goldmine for all download requests.  Do you have an understanding of what that refers to?

A.   My understanding would be that they wanted somehow to be able to automatically track requests from the web site and have them entered into Goldmine.  This was a desire by the CS and S people, to have that feature.

Q.   Is it your testimony that Goldmine did not have this feature at this time?

A.   As I recall, it did not.

Q.   Do you know what the three MBS promo refers

66

UNVERIFIED ROUGH DRAFT

to?

A.   No, I don't.  If you would like me to guess, I could.

Q.   No, yes want you to do that.

A.   I might point out here that the date on this is January 25, 1999.  That was prior to my hire date.

Q.   Sure.  I appreciate that.

     (Whereupon, Deposition Exhibit 15
     was marked for identification.)

     MR. JOHNSON:  Q.  The next exhibit I'm showing you is Exhibit 15.  It's an e-mail from yourself to the sales group copying the marketing, Tom Koshy and Richard Lang.  It's dated December 22nd, 1999.  And Bates numbered BUR0090563 through BUR0090567.  Just let me know when you have had a chance to review it.

A.   Okay.

Q.   Do you recall sending this e-mail on or about December 22nd, 1999?

A.   I don't recall it specifically.

Q.   Okay.  Any reason to believe you did not send it?

A.   No.

Q.   I'm interested in your first sentence here that reads, "Attached is a list of web demo visitors exported from Goldmine."  Do you know what web demo is

67

UNVERIFIED ROUGH DRAFT

being referred to at this point in time?

A.   Well, this would have been a demo that was on our web site.

Q.   And what was it demoing?

A.   Just the Burstware software, delivering video over the Internet.

Q.   Is it correct that at this point in time to view the demo a visitor to the site had to provide you with contact information?

A.   It appears that we were doing it at this point in time by December.

Q.   You testified earlier that this wasn't always

Page 30

ROUGH_Walters1.txt

the case, though; correct?

    A.   Correct.

    Q.   Do you know why Burst made a change to begin recording viewing the web site demo?

    A.   Well, there was a desire by the various departments within Burst to track who was visiting the site and viewing the demo. And eventually we did succeed in having a way to track that with demonstrations and have the information imported into Goldmine so that we could later report.

    Q.   The visitor who viewed the demonstration, did they download anything or were they just viewing this on loan?

68

UNVERIFIED ROUGH DRAFT

    A.   They were viewing it on line. They did download the bridge software in order to enable the Burst enabler product.

    Q.   Did they have to sign any kind of an agreement related to their ability to download the bridge software?

    A.   I don't recall.

    Q.   And at this point in time the web demo visitors, these were being recorded in Goldmine?

    A.   At this point they were, yes.

    Q.   Was that an automatic process?

    A.   I believe it was by this time. I seem to recall that there was quite a bit of work required in order to enable Goldmine to interface with the web site.

    Q.   I think we talked briefly before about whether any outside consultants were involved in maintaining the Goldmine database and I think you testified that you didn't recall any outside consultants. Is that the case?

    A.   Correct.

    (Whereupon, Deposition Exhibit 16 was marked for identification.)

    MR. JOHNSON: Q. Showing you what's been marked as Exhibit 16, and this is an e-mail thread. The top e-mail in this thread is from Jason Boatman to Craig

69

UNVERIFIED ROUGH DRAFT

Dahl and Rick Jones, copying Crystal Neal, Joseph Erlemann, Dave Egan, and Suzanne Lentz, dated May 4, 2000, and Bates number BUR0084810.

    Have you seen this e-mail thread before, Mr. Walters?

    A.   I don't recall seeing this before.

    Q.   The first e-mail in the thread, I guess the furthest back in time, the May 2nd, 2000 e-mail at the bottom, do you recall what the import function was in Goldmine?

    A.   Well, as I referred to earlier, Goldmine has an import function that would allow you to import data from an outside source. So, Crystal must be referring to one of those functions.

    Q.   And what sorts of outside sources would you be able to import from?

    A.   For instance, I'm just -- it would be maybe a tab delimited file, or something of that nature.

    Q.   Could you import from Outlook?

Page 31

ROUGH_Walters1.txt
was marked for identification.)
MR. JOHNSON:  Q.  Okay, Mr. Walter, I'm
showing you Exhibit 11 which is BURO040357.  And I'm
interested in the e-mail from Maribeth Riggs dated
October 6, 1999, to the sales group, business
development, and a copy to the Roundtable.  Were you
included on the sales group alias at this time?
A.   I believe I was.
Q.   Do you recall receiving this e-mail or seeing
it before?
A.   No, I do not.
Q.   Any reason to believe you didn't receive it?
A.   No.

59

UNVERIFIED ROUGH DRAFT
Q.   And I'm interested in kind of the middle part
of that e-mail that begins, "Those of you wishing to
distribute Release 1.2 CDs for evaluation purposes and
beta testing must first complete the following steps."
And the first step there is, "Enter all account
information into Goldmine beforehand, including the name
of the assigned IVT sales engineer."
Is it your understanding that Burst did track
beta Release 1.2 at this time October 6, 1999, in
Goldmine?
A.   Yes.  We would track the contact information
and the process of receiving the required paperwork.
Q.   And as we discussed before, at this time he
were also requiring a software evaluation agreement
form; correct?
A.   Correct.
Q.   And as a third point you were also requiring a
joint non-disclosure agreement form; is that correct?
A.   Yes.
Q.   I believe earlier you testified with regard to
some of the beta evaluations that you didn't always
require a non-disclosure agreement.
A.   Well, my memory may be be faulty in the sense
that at this time frame we were requiring it.  Obviously
this refreshes my memory that we did require I.

60

UNVERIFIED ROUGH DRAFT
Q.   Just at this time or that you did earlier on
also?
A.   I don't recall if every situation we did.  But
it appears that we did, you know, on this, based on this
document.  Now, are you questioning me regarding the
NDA?
Q.   Yes.  And the earlier question I had posed to
you a while back in the deposition was about the NDA
also and I believe that you testified that you couldn't
recall whether those were signed as a matter of course.
A.   Well, I remember -- I don't recall that the
NDA being part of that question.  I remember the
evaluation agreement.  I do recall that the evaluation
agreements were required.  And after reading this I do
recall now that we did require NDAs.
Q.   Okay.  During the course of your employment at
Burst from 1999 to the present?
A.   Correct.
Q.   And so it's your testimony that from that time
Page 27

ROUGH_Walters1.txt
        MR. JOHNSON:  Q.  Showing you what's been
marked as Exhibit 18 --
        THE REPORTER:  19 I think.
        MR. JOHNSON:  Q.  This document is labeled
BUR0117502 to BUR0117505.  It's an e-mail from Amy Hyde
dated April 12, 2000 to business development, marketing,
sales, engineering, I am sorry, sales engineers and the
sales group entitled "April Newsletter."
        Do you recall who Amy Hyde was?
        A.   She worked in our marketing department, as I
recall.
        Q.   And she states here in her first sentence
"Attached please find this month's newsletter which was
distributed today to our Goldmine database."  Do you

                                                          77

              UNVERIFIED ROUGH DRAFT
know what she's referring to here?
        A.   Well, I would speculate that it's a mail list
taken from Goldmine contacts.
        Q.   She attaches the newsletter in the next three
pages of this document entitled Burst bulletin.  Have
you -- did you ever receive a Burst bulletin while you
were at Burst?
        A.   I don't recall.  I do notice that this date on
here is April 12, 2000.  At that time I was no longer in
the sales department.  I was working in the legal
department.
        Q.   Would you have again included on any of the
aliases in the "to" line?
        A.   I might have.  I don't recall this bulletin,
though.
        Q.   And you don't recall that newsletters were
sent out through Goldmine?
        A.   No, I do not.
        Q.   Just a few questions, Mr. Walters, about the
access that employees at Burst had to Goldmine.  Did
everyone have the same access to Goldmine, as far as the
ability to add information, edit information, or delete
information?
        A.   I don't know.  I'm not familiar with who had
permissions.

                                                          78

              UNVERIFIED ROUGH DRAFT
        Q.   I think you mentioned a Goldmine administrator
before.  Did that person have the ability to go in and
delete information that a sales representative in the
field would have entered in?
        A.   I would assume so.
        Q.   Did sales representatives have the ability to
edit content that other sales representatives had
entered into Goldmine?
        A.   I don't recall if they did or not.
        Q.   Do you recall if any of the Goldmine files
were protected in any way, or were a read-only file?
        A.   I don't recall.
        Q.   If you wanted to delete information in
Goldmine, how would somebody go about doing that?
        A.   I cannot recall deleting any information, so I
don't know at this point.
        Q.   And we have talked about this briefly before,
but did any third parties or outside vendors have the
                        Page 35

ROUGH_Walters1.txt

117

UNVERIFIED ROUGH DRAFT
went into making the decision to erase the database?
        A.    I'm sorry.
        MR. WECKER:  Let me object to the extent that
it assumes that there was a separate decision to erase
that database as opposed to the other data that was on
that server at the time.
        MR. JOHNSON:  Q.  When Burst decided to sell
various pieces of hardware -- and it may have been at
different times -- but in general did Burst keep a copy
of any information on the servers that it was selling
before it erased them?
        A.    I'm not aware of any copies being made.
        Q.    Would you consider the information included in
the Goldmine database to be valuable customer
information?
        A.    Yes, I would.
        Q.    And why do you consider it valuable?
        A.    Well, it's valuable in the sense that it's
good to know what customers had to say about the product
and what our employees, you know, the notes they were
taking and so on, to establish time lines for certain
events.
        Q.    Isn't it also true there is a lot of value and
goodwill built up through all the contacts that your
sales staff had made and that there is just value

118

UNVERIFIED ROUGH DRAFT
inherent in all the phone numbers and attempts to make
contact with customers?
        A.    Potentially.
        Q.    Mr. Walters, have you been able to come to any
conclusions as to why someone would destroy this type of
valuable information and not keep a copy of it?
        A.    Come to a conclusion?
        Q.    Correct.  Have you been able to reach a -- do
you have an understanding as to why this information
would be destroyed?
        A.    I do not, other than the machine is being
prepared for sale.  There is no other reason for the
data to be be wiped clean.
        Q.    Have you noticed -- scratch that.  Strike
that.
            Have you in your experience with Burst since
this time and since this April 26, 2001 date, have you
had difficulty contacting customers or potential
customers because the Goldmine database no longer
exists?
        A.    No.  And the reason being we no longer are
actively selling the product.  We shifted focus to a
licensing effort, IP licensing.
        Q.    Are in I of the customers that you license to
ones that were in the Goldmine database?

119

UNVERIFIED ROUGH DRAFT
        A.    You will have to clarify that.  By license to,
what do you mean?
        Q.    What product are you licensing currently?
        A.    Well, we have the Burstware software, the last
                        Page 53

ROUGH_Walters1.txt

Q.    In your vocabulary is the term spreadsheet and database interchangeable?

A.    Yes, I do interchange them.

Q.    And do you know what this database housed, as far as content or information?

A.    It's a spreadsheet or database that listed the license keys that had been issued along with the company name and the parameters associated with the license, the key itself, which we could determine using just the key we could determine the parameters that the key has set to it.

Q.    And it's your testimony, then, that this database does not refer to the Goldmine database or the Vantive database?

122

UNVERIFIED ROUGH DRAFT

A.    That's correct.

Q.    Have you had any conversations with Mr. Lang about the missing information in Goldmine?

A.    What missing -- I am not sure what you mean by --

Q.    Well, the data that was erased in Goldmine and the fact that it's now missing.

A.    I have -- we have discussed where the server would be and when it might have been sold. Nothing beyond that.

Q.    Either -- I am sorry.  Go ahead.

A.    No, I am finished.

Q.    Has either Mr. Lang or any of the other employees at Burst ever since April 26 of 2001 ever expressed regret for having wiped clean the server that housed the Goldmine database and sold it without keeping a copy?

A.    No, they have never specifically said I regret.

Q.    Have you spoken with any Burst employees that recognized that this was a loss, the wiping clean of this database on this server was a loss of valuable information to the company?

A.    I have not discussed with any Burst employees, no.

123

UNVERIFIED ROUGH DRAFT

Q.    Do you yourself, Mr. Walters, feel that the wiping clean of this information from the server was a loss of valuable information to Burst?

A.    Yes, I do.

Q.    And it's your testimony today that you have done everything you could to determine where this information might be?

A.    Yes, I have.

Q.    Is there anything else you would like to tell me today about your efforts to locate the server that houses the Goldmine database or any copies of that information on other servers, like Vantive or any back up tapes?

MR. WECKER:  I object to the form.  You can go ahead.

MR. JOHNSON:  We can take them one at a time.

THE WITNESS:  I really don't have any additional comments at this time.

Page 55

ROUGH_Walters1.txt

MR. WECKER:  My objection was to is there
anything else you would like to tell me, not to the
compound nature.
MR. JOHNSON:  And I will ask that.
MR. JOHNSON:  Q.  Is there anything else that
you would like to tell me about your efforts to search
for this information?

124

UNVERIFIED ROUGH DRAFT
MR. WECKER:  Same objection.
THE WITNESS:  Not at this time.
MR. JOHNSON:  Q.  One other question,
Mr. Walters.  While you were at Burst from March --
let's see.  Was it March or May of 1999 to the present?
A.  No, it was March 1st.
Q.  Okay.  From March 1st, '99, to the present did
Burst consider suing anyone during that time period?
A.  Not to my knowledge.
Q.  Was one of your duties at Burst to monitor
potential infringers of Burst technology?
A.  I maintained a list of potential licensees.
Q.  Okay.  But during -- so, from March of 1999 to
the present, Burst never considered suing anyone; is
that your testimony?
A.  I don't -- I am not aware of any plans to sue
anyone in that time frame.
Q.  And obviously, other than the present
litigation?
A.  Right.
(Whereupon, Deposition Exhibit 35
was marked for identification.)
MR. JOHNSON:  Q.  Showing you an e-mail
BUR0290896, it's from Tom Koshy to employees dated
March 15, 2000.  Do you recall seeing this e-mail on or

125

UNVERIFIED ROUGH DRAFT
about this time?
A.  Vaguely, I do recall, yes.
Q.  And Mr. Koshy states, "Eric Walters is
currently working as the manager of sales support and is
transitioning into the position of manager intellectual
property effective March 23rd, 2000."  Is that correct?
Was that your understanding at the time?
A.  Mm-hmm.  Yes.
Q.  And what were your new job duties with respect
to that position?
A.  My responsibility was to oversee the patent
development process within Burst which included the
payment of patent annuities, maintenance of annuities
and so forth on our existing portfolio, and also
establish a committee and a process to evaluate
intellectual property developed by Burst employees and a
process whereby those inventions could be patented,
reviewed and patented.
Q.  And I think we just talked about this a minute
ago but was part of these new responsibilities then
monitoring other companies for possible infringement?
A.  I monitored companies or received input from
various people from time to time, not as infringers, per
se, but as potential licensees.
(Whereupon, Deposition Exhibit 36
Page 56

ability to edit the Goldmine content or delete it?
A. I don't know.
Q. If a prospect ultimately chose not to go with
the Burstware solution were they kept in the database or
moved into an inactive folder or otherwise removed?
A. It's my recollection that they would stay in
the database but be marked as inactive in some way.

79

MR. JOHNSON: Time for another break?
MR. WECKER: Lunch?
MR. JOHNSON: Yes, sure. Go off the record.
THE VIDEOGRAPHER: Going off the record, the
time is 12:14 p.m.
(Lunch recess taken from 12:14 to 1:02.)
THE VIDEOGRAPHER: Back on the record, the
time is 1:02 p.m.
MR. JOHNSON: Q. Okay, Mr. Walters. I just
want to shift gears and get a little bit more into more
of a technical nature of Goldmine and how it was
implemented in the Burst office in San Francisco and
also out in the sales field with the sales force that
was located in different parts of the country. Can you
tell me first of all a little bit how Goldmine was
configured to work in the San Francisco office?
A. I'm not sure what you mean by configured.
Q. Was the Goldmine database on a server in San
Francisco?
A. It -- yes.
Q. Okay. And as we I think previously
established, that was server four?
A. Based on that document you showed earlier,
yes.
Q. Was there also a client side version of

80

Goldmine that resided on a laptop or a PC?
A. Well, there was a client component that people
used to view data off line. And then, when the central
database was maintained on the server and they could
synchronize with it and bring their copy up to date.
Q. So, is it fair to say that an I had Burst
employee, whether in the sales -- whether in San
Francisco or out in the field, had a copy of Goldmine on
their individual PC or laptop that stored the Goldmine
information?
A. They may have, yes.
Q. If they were a Goldmine user, that's how the
configuration was set up?
A. Yes.
Q. And then how often would the individual -- I
believe you used the phrase sync up, or how often would
that happen, that they would sync up with the main
server located in San Francisco?
A. It varied from user to user. It was up to
each user to synchronize their own copy.
Q. And how did they go about synchronizing?
A. If they were in a remote office, they could
dial in to the Burst office over the phone line and
connect to the Goldmine application and synchronize that
way, using Goldmine to synchronize.
**Page 36**

ROUGH_Walters1.txt

81

UNVERIFIED ROUGH DRAFT
Q.    And if they were in the -- located in the San
Francisco office how would they sync up?
A.    It would be off the network.
Q.    So even if it wasn't the most current
collection of data, each Burst employee who had the
Goldmine software installed on their computer had on
their computer a -- the contact information that would
be in Goldmine?
A.    Yes.
Q.    In preparing for this deposition, did you go
physically to any of the old laptops or PCs that Burst
still has of former employees and look for the Goldmine
database on those hard drives?
MR. WECKER:    Let me object.    No foundation
that they still have such computers.
MR. JOHNSON:    Q.    To your knowledge, does
Burst still have any PCs or laptops of former employees
in its possession?
A.    Just the ones that I mentioned earlier.    There
were a couple of laptops that were in the -- that we
still have.    However, I don't believe that those
individuals were Goldmine users, because Goldmine is not
on them.
Q.    You reviewed those?
A.    Yes.

82

UNVERIFIED ROUGH DRAFT
Q.    Those machines and there was no Goldmine
software?
A.    Correct.
Q.    Any other hardware or machines that Goldmine
could still be on that Burst is still in possession of?
A.    Not to my knowledge.
Q.    Apart from the server four that you were going
to look into?
A.    Right.
Q.    And just to get an idea of the process of
entering data into Goldmine, how did that happen?    Was
there an icon on the desk top or what are the steps that
one took to enter information in?
A.    You would -- there's an icon either on your
desk top or you go to the start program menu and start
the Goldmine application, and from there it would open
the data file that you are using.
Q.    And at that point you are just running the
program off your hard drive and working with the data
that's stored on your hard drive?
A.    It could be, or it could be working off of the
network server, if you are connected.
Q.    Do you know how much space on the hard drive
the Goldmine application took up?
A.    I do not.

83

UNVERIFIED ROUGH DRAFT
Q.    Was it -- would you characterize it as a
fairly sizable amount of space that it took up on a hard
drive or --
A.    I don't recall the file size, to be honest
Page 37

ROUGH_Walters1.txt

with you.

Q.    Okay.  And you have mentioned synchronize --
the sing king process.  Are we talking about a dial in
where the PC sent information to the server and the
server sent information to the PC or how did that
process work?

A.    I believe it went both ways so if you had
updated your local copy it would update the server with
that.  So it would update the copy on the server.  That
copy that's been updated by other users would be singed
with the local user.

Q.    Just to make it clear when a sales
representative was out in the field and they had their
laptop with them but weren't, didn't have a connection
to the certainty or to the server in San Francisco they
could still access their Goldmine information; correct?

A.    Yes.  They had the software installed.

Q.    It would just be saved on the hard drive;
correct?

A.    Correct.

Q.    You have testified that for the most part

84

UNVERIFIED ROUGH DRAFT

Burst doesn't have the PCs or laptops of the former
employees, except for the few that you mentioned.  Do
you know what happened to those, the hard drives of
those laptops or PCs when they left Burst?

A.    Well, prior to leaving Burst they were wiped
by our IT department, and the majority of the equipment
was sold.

Q.    And by wiped clean that means they were
erased, there was no data on them?

A.    No OS or anything.

Q.    Was there any thought given at that time to,
or consideration, that the Goldmine information was
still going to be on the server so that it was okay to
erase the information on the individual PCs?

MR. WECKER:  Objection.  No foundation.

THE WITNESS:  I don't know.

MR. JOHNSON:  Q.  Did you take part personally
in any conversations about retaining the Goldmine
information when the individual -- sorry.  Strike that.

Are you aware of a time where Burst decided to
sell individual PCs or laptops of former employees?

A.    Yes.

Q.    And around that time were there any
conversations regarding the information on those laptops
and wanting to preserve a copy?

85

UNVERIFIED ROUGH DRAFT

A.    I did not engage in any conversations.

Q.    And was there any conversation about Goldmine
in particular and wanting that preserve that data?

A.    Not that I am aware of.

Q.    Mr. Walters, I believe you testified much
earlier on, toward the beginning of the deposition,
about your knowledge concerning back up procedures with
Goldmine, and that you did not have that knowledge.
Apart from the Goldmine server, if we are talking about
just individual PCs or individual hard drives, do you
have any knowledge about the back up procedures related

Page 38

ROUGH_Walters1.txt

108

UNVERIFIED ROUGH DRAFT

Q.   And based on your review of this letter, do
you have an understanding as to why they returned that
software?

A.   Apparently it did not -- they did not fulfill
the agreement signed by Burst in April of 2000, failed
to deliver all the modules.

Q.   And which modules were those?

A.   Vantive on the go and I believe one of the
modules in the engineering module, was incomplete.

Q.   Do you have any reason to believe -- actually,
strike that.

Is it your understanding that the sales staff
at Burst never received the Vantive on the Go product?

A.   Yes.

Q.   And is it also your understanding that up
through this time of December 18, 2000, that the Burst
sales staff was not using the Goldmine database either?

A.   I can't state definitively one way or the
other whether they were or were not, since I do not know
directly.

Q.   You did previously testify, though, that you
believe that they stopped using Goldmine in August of
2000?

A.   Based on that e-mail from Crystal, she said
that they were taking the Goldmine application down.

109

UNVERIFIED ROUGH DRAFT

Q.   And I believe you testified earlier today and
prior to seeing that e-mail that you also thought it was
around August of 2000 that Burst quit using the Goldmine
database?

A.   Correct.

Q.   And you don't have any reason to believe that
Burst resumed use of Goldmine at any point after August
of 2000?

A.   No, I do not.

Q.   And to your knowledge did Burst use any other
customer database after August of 2000?

A.   To my knowledge they did not.

Q.   Okay.  Mr. Walters, I'd like to talk to you a
little bit now about what ultimately happened to the
Goldmine data.  And my first question is just going to
be, approximately what time was the Goldmine database
erased, wiped clean, or sold?

A.   Well, it would have been sometime after August
of 2000.

MR. JOHNSON:  Let's go off the record.

THE VIDEOGRAPHER:  This marks the end of tape
number two in the deposition of Eric Walters.  Going off
the record, the time is 2:04 p.m.

(Recess taken from 2:04 to 2:09.)

THE VIDEOGRAPHER:  Back on the record.  This

110

UNVERIFIED ROUGH DRAFT

marks the beginning of tape number three in the
deposition of Eric Walters.  The time is 2:09 p.m.

MR. JOHNSON:  Could you read back the last
question and answer?

Page 49

ROUGH_Walters1.txt
To your understanding?
       A.    It's my understanding that it's common
practice to wipe the hard drives in order to prevent any
future user of the computer from accessing any data that
may be on the hard drives or covering data somehow of a
personal nature.
       Q.    I want to I think clarify your testimony with
respect to, based on your investigation, have you been
able to determine when the Goldmine database that was on
the server that I think the document indicated was
server number four, was over written, deleted, in some
fashion lost?
       A.    An exact date?
       Q.    Well, I understand you can't give us an exact
date.  Can you tell me what the range of possible dates
are based on your investigation?

                                                        203

            UNVERIFIED ROUGH DRAFT
       A.    It would be sometime after the August memo
from Crystal Neal indicating that Goldmine is gone or
off line, however she termed it.  And being moved to
Santa Rosa.
       Q.    So, sometime between August 2000, when that
e-mail suggests that it still exists, it's just going
off line, and when the server was sold after you moved
to Santa Rosa was the time frame in which the Goldmine
database was no longer retrievable?
       A.    Correct.
       Q.    To your understanding?
       A.    Correct.
       Q.    Within that time frame can you narrow that
time frame at all based on your investigation?
       A.    Not to a specific time, no.  It would be prior
to the move when the other computers were processed in
November or December time frame.
            MR. WECKER:  I thought I had a third area to
question you but I can't remember it.
            MR. JOHNSON:  Q.  Can I just follow up on that
briefly?
            Examination by Mr. Johnson.
            MR. JOHNSON:  Q.  I think Mr. Wecker was
characterizing it as the August 2000 time period up
until the move to the Santa Rosa office and I believe

                                                        204

            UNVERIFIED ROUGH DRAFT
you corrected him and stated it would have been
August 2000 only up to the Santa Rosa move.
       A.    Correct, because it's my understanding the
computers were not wiped once they were in our facility
in Santa Rosa or in a storage facility.  It would have
occurred prior to that.
       Q.    I believe you have testified both ways at this
point today about whether it's possible that the server
was wiped clean after you moved to Santa Rosa or whether
it happened before.  And the letter from Mr. Wecker
dated July 12, 2004, says that they were, it was wiped
clean and sold after the move; correct?
       A.    I don't believe so.
            MR. WECKER:  No, that mischaracterizes the
testimony.  That was the exact testimony I'm trying to
clarify which is the letter says the computer was sold
                    Page 91

ROUGH_Walters1.txt

after the move to Santa Rosa.  It doesn't address the
issue of when it might have been wiped clean.
          MR. JOHNSON:  Q.  So, wiped clean before the
move but then the servers were possibly kept and then
sold later?  Is that your testimony, Mr. Walters?
          A.  Yes.  They could have been -- they would have
been wiped prior to the sale, and the process of wiping
the hard drive would have occurred prior to the move to
Santa Rosa.

                                                          205

               UNVERIFIED ROUGH DRAFT
          Q.  And on what basis have you come to understand
that it was wiped clean prior to the move?
          A.  Well, that was the process that the other
computers that were sold in late December or early
December time frame, 2000, they were all wiped when they
were sold.
          Q.  But the Goldmine server was not sold in late
December of 2000?
          A.  Not to my knowledge.  I am not aware of it, if
if it is.  Was.
          Q.  So is it your testimony that the Goldmine, the
server that housed the Goldmine database was wiped clean
at the same time as the other computers, which was
December of 2000?  And those computers were sold in
December of 2000, but the server that housed Goldmine
was not sold until after the move to Santa Rosa.
          A.  As I understand, yes, because the machines
that went to sap take Rosa were much more expensive
machines than the hardware that was sold to employees
that were being laid off and so on.
          MR. JOHNSON:  I think we finally have it
clear.

          I have no further questions.
          MR. WECKER:  Okay.  Thank you.
          THE VIDEOGRAPHER:  This marks the end of tape

                                                          206

               UNVERIFIED ROUGH DRAFT
number four in the deposition of Eric Walters.  Going
off the record, the time is 5:28 p.m.
          (Discussion off the record.)
          MR. JOHNSON:  It's Microsoft's position that
this deposition remains open because Mr. Walters was not
knowledgeable about a few of the topics in the 30(b)(6)
deposition notice.  No further questions.

                                                          207

                        Page 92

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2004, I caused a copy of  the foregoing Microsoft's Motion to File Surreply Brief and attached Surreply Memorandum in Opposition To Burst's Motion to Compel Microsoft to Produce Documents Relating to its Document Preservation Policy (Filed Under Seal) by overnight courier and e-mail to:

Spencer Hosie
HOSIE, FROST, LARGE & McARTHUR
One Market Spear Street Tower, 22nd Floor
San Francisco, CA  94105


Robert Yorio
CARR & FERRELL, LLP
2200 Geng Road
Palo Alto, CA  94303


Michael F. Brockmeyer