# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION. | MDL Docket No. 1332 |
| This Document relates to: | Hon. J. Frederick Motz |
| *Burst.com, Inc. v. Microsoft Corp.*, Civil Action No. C-02-2952 | **FILED UNDER SEAL** |

## MICROSOFT'S MEMORANDUM IN OPPOSITION TO BURST.COM'S MOTION FOR ADDITIONAL TIME TO DEPOSE WILLIAM H. GATES, III

Burst asks for additional time to depose Mr. Gates on three topics other than Microsoft's relationship with Intel. Burst has already taken a day of Mr. Gates' time – for preparation and the deposition itself – and it has thoroughly asked questions about the topics on which the Court granted it leave to take the deposition, the Intel relationship and document retention. Now, Burst seeks to inconvenience Mr. Gates to ask him questions about: (1) a claim that it has dropped from its suit (the RealNetworks contract claim); (2) issues that are irrelevant to the patent and trade secret claims (his view of the Windows Media 9 "Corona" release); and (3) matters as to which Burst has not even attempted to show he has unique personal knowledge (all new issues proposed by Burst). Burst's motion should be denied.

As an initial matter, Burst insinuates that counsel for Microsoft and Mr. Gates conducted themselves during Mr. Gates' deposition in bad faith to exhaust the three hour limit on Mr. Gates' deposition. As shown in Part I below, that allegation is utterly false and professionally insulting. Microsoft invites the Court to read substantial portions of the transcript (Exhibit 2

hereto). Burst's interrogation – complete with table-pounding by Burst's counsel,[1] reading or asking Mr. Gates to read documents into the record, and asking the same question over and over again – proceeded unimpeded. Burst's unfounded insinuations about the conduct of the deposition should play no role in deciding this motion.

Nor was the three hour limit a "compromise" as Burst suggests; it was the Court's ruling after hearing the parties on the issue. (The deposition actually materially exceeded three hours inasmuch as Burst was given unlimited time to ask Mr. Gates about document retention issues, a fact that Burst's counsel noted to Mr. Gates.[2]) The Court set a limit of three hours, instead of the four that Burst requested, because Burst had utterly failed to show that Mr. Gates had any unique knowledge on two of the three topics about which Burst said it wanted to interrogate him. Specifically, Burst told the Court it wanted to ask Mr. Gates about (a) Microsoft's relationship with Intel; (b) restrictions in Microsoft's software licenses; and (c) Mr. Gates' initial personal reaction to features in Windows Media Series 9.[3] Contrary to Burst's current characterizations of Microsoft's argument, Microsoft did not contest that Mr. Gates had unique personal knowledge about aspects of the Microsoft-Intel relationship – specifically, "the one-on-one communications between Mr. Gates and Mr. Grove" (Exhibit 1 (Feb. 6, 2004 Transcript) at 44) – but Microsoft also demonstrated in its answering brief that Mr. Gates had no unique knowledge about the license terms Burst was focused on and that his personal reaction to certain features in

---

[1] Exhibit 2 at 92, lines 1-7.

[2] Exh. 2. at 153, lines 18-19 ("Well, on this one, sir, we can take all the time it takes … .").

[3] Burst.com, Inc.'s Motion to Compel Microsoft to Produce a Witness for Percipient Witness Deposition (Nov. 21, 2003) ("Burst's November 2003 Brief") at 2-6 and Exhibit A.

Windows Media Series 9 is not relevant to the patent or trade secret claims in this case.[4]  In

Burst's reply brief, it did not dispute *at all* Microsoft's showing in this regard.[5]  In light of

Burst's failure to support its request for the deposition as to two of the three topics on which it

was sought, the Court reduced the length of the deposition to three hours. (Exh. 1 at 49-50).

    Nor was there anything unfair about the way in which the three hour limit was

determined.  Again contrary to Burst's current characterizations, Microsoft did not single out Mr.

Allchin (or anyone else) as "the more knowledgeable witness" about the Microsoft-Intel

relationship, nor did it deny that Mr. Gates had unique personal knowledge about aspects of that

relationship.[6]  Microsoft instead argued that the case law required Burst to pursue "other, less

intrusive discovery" before turning to Mr. Gates.

> What Mr. Hosie says is that he wants to focus this deposition on the one-on-one
> communications between Mr. Gates and Mr. Grove that were the subject of the
> Government case ... .
>
> So we can easily identify about 47 employees as having knowledge about the
> Intel/Microsoft relationship.  Now, not all of them, of course, have this intimate
> familiarity as others on the list.  The list includes individuals like Mr. Allchin,
> whose deposition was going to go forward today, Engstrom, and several others,

---

[4] Microsoft's Brief in Opposition to Burst's Motion to Compel The Deposition of William H.
Gates, III (Dec. 11, 2003) at 2, 5-8.

[5] Burst.com, Inc.'s Reply Brief in Support of Its Motion to Compel the Deposition of William H.
Gates, III (Dec. 18, 2003).

[6] Burst's claim that Mr. Allchin "specifically denied *any* knowledge of Intel's relationship with
Microsoft" is wrong, and its reliance on this suggestion is misplaced. He answered the questions
as asked about Microsoft's relationship with Intel. *See e.g.,* Allchin Dep. at 101-102, 113-114.
Burst claims that Mr. Allchin deferred questions to Mr. Gates, but its brief conceals the fact that
in these instances, Mr. Allchin was shown a document authored by or sent to Mr. Gates and
asked questions such as, "Do you have any understanding of why Bill Gates wanted Intel to stop
supporting Java Multimedia?" Not surprisingly, Mr.Allchin responded, "Ask Bill." (Id. at 106.)
But Mr. Allchin also went on to give his understanding of the discussion that led to Mr. Gates'
comments in the exhibit. (Id.) Burst's selective parsing of the transcript is unfair and misleading.
Mr. Allchin merely declined to offer opinions on what Mr. Gates might have been thinking of or
might have meant long ago.

> that Burst itself in its motion identifies as having a very close relationship to this
> issue. ... We also point that Burst has not taken any depositions of Intel
> employees. ...
>
> So Your Honor, we argued in our response brief that under the case law, it was
> inappropriate for Burst to seek Mr. Gates' deposition when it had not exhausted
> other less intrusive discovery into the issues about which they want to question
> him.

(Exh. 1 at 44-45, emphasis added).

Mr. Gates' deposition showed all of this to be correct. While Mr. Gates had one-on-one conversations with Mr. Grove at Intel, many of his meetings with Intel were attended by many employees of both companies. But even yet, Burst has not deposed many of the attendees of these meetings, preferring instead to use Mr. Gates' time.

In sum, the Court established the three hour limit on Mr. Gates' deposition after full briefing and argument. No punches were pulled, and Burst's attempted mischaracterizations of the arguments made do not provide a basis for revisiting the issue.

Additionally, Burst's motion should be denied on the established legal principle that Burst should not be permitted to take more of Mr. Gates' time because it has failed to show that he has unique personal knowledge as to the subject matter about which he is to be interrogated. Here, Burst now claims that it wants to take his deposition on three issues (Burst Mot. at 13):

- "RealNetworks' contracts with Microsoft in 1997." Burst has made no showing that Mr. Gates has unique personal knowledge about these contracts. Indeed, Burst has claimed in briefs it recently filed with this Court that Chris Phillips was the principal negotiator of those contracts. Although Microsoft disputes that assertion (because Mr. Muglia negotiated the contract), no one has ever claimed that Mr. Gates had any unique involvement on this issue. Furthermore, pending before the Court is Burst's motion to file an amended complaint that *drops* Burst's claim based on these contracts altogether. In any event, Burst had all relevant information about the RealNetworks' contracts when it made its first request to take Mr. Gates' deposition and never raised the issue.

4

- "Multimedia delivery and playback as a middleware platform potentially threatening the OS monopoly." Burst has again failed to support its request with a showing of unique knowledge. As far as we can tell, the request appears based on a PowerPoint slide deck shown to Mr. Gates and many others. But Burst has already asked Mr. Gates -- as well as Messrs. Buecheler, Allchin, Poole, and Beckerman -- about the slides. The fact that these witnesses failed to construe a series of bullet points in the manner Burst prefers is not grounds for taking Mr. Gates' deposition.

- "E-Mails that Mr. Gates personally received concerning Burst, its technology, and how Microsoft had used that technology in its Windows Media 9 'Corona' release." Burst has failed to tell the Court that Mr. Gates received only one e-mail that mentions Burst, and it is the exact same e-mail at issue in the original motion to compel Mr. Gates' deposition, saying that it wanted to ask him about the "substantial technical innovation" reflected in Window Media Series 9.[7] Microsoft previously showed that Mr. Gates has no unique knowledge on this topic and in any event, what he felt about the technology is relevant to neither the patent infringement claims nor the trade secret claims, particularly because there is no evidence that Mr. Gates knows details about the technical implementation of these features.

Burst's utter failure even to attempt to show that Mr. Gates has unique knowledge on these three topics compels the denial of its motion. Moreover, the very timing of Burst's request belies its merit. Long before Microsoft produced Mr. Gates for his deposition on August 26, Burst had all of the Intel-related documents it used and all of the information that it now cites as reasons for more time. Yet, it never asked either Microsoft or the Court for more time for the deposition. Instead, by waiting until after the deposition, Burst seeks to maximize the inconvenience to one of the country's busiest and most productive executives for little or no apparent purpose.

## I.    MICROSOFT AND MR. GATES CONDUCTED THE AUGUST 26, 2004 DEPOSITION IN GOOD FAITH

Contrary to the insinuations underlying Burst's motion, both Mr. Gates and Microsoft's counsel approached the August 24, 2004 deposition session professionally and conducted the deposition in good faith. Burst's unsupported insinuations can play no role in resolving this

motion. As shown below, if Burst failed to accomplish what it sought to do in the time alloted, the fault cannot be laid at Microsoft's feet.

*First*, for tactical or theatrical reasons known only to Burst's counsel, a significant amount of time was taken by repeatedly reading, or asking Gates to read, passages of documents into the record. See Exhibit 2 at pages 18-19 ("Have I read that correctly, sir?"); page 26 ("Have I read that correctly?"); page 28 ("I'll read it for the record"); page 34 ("There's a paragraph that I'll read and I'm going to ask you if agree or disagree with what I read"); page 35 ("I'm going to read the language and ask you if agree or disagree with the point made, okay?"); page 66 ("That's the part I read. Did I read that correctly?"); page 75 ("Have I read that correctly, sir?"); page 79 ("Could you read the next sentence, please?"); page 88 ("if you could please read the first sentence in the carryover paragraph aloud into the record"); page 98 ("Have I read that correctly?"); page 106 ("Have I read that correctly?"); page 106 ("Could you please read aloud into the record Mr. Roberts' response to your mail?"); page 107 ("And if you could please read this into the record?"); page 117-18 ("I'll read it aloud"); and, page 120 ("Could you read that aloud into the record, please?"). As such, a substantial portion of the deposition time was spent simply reading the contents of the exhibits into the transcript of the deposition – sometimes, even when there was clearly no foundation for the exhibit in any event.

*Second*, Burst spent significant time asking Mr. Gates about documents that he apparently had never received, *e.g.*, Gates Dep. Exhs 5 and 7 (Burst Motion Exhibits 6 and 8), or emails on which he was simply one of multiple recipients, *see e.g.*, Gates Exhibit 6 and 8 (Burst Motion Exhibits 7 and 9). This was neither practical nor efficient. The interrogation concerning Gates Exhibit 5 is illustrative. This is an email thread neither authored by, nor copied to, Mr. Gates.

---

[7] Burst's November 2003 Brief at 6.

(Exh. 2 at 33-34). Nonetheless, counsel interrogated him about statements made in this document for multiple pages of the transcript. (Id., at pp. 34-37). Mr. Gates gamely responded, but this could hardly have been time well spent, particularly after Burst had previously interrogated Mr. Brumer, both a recipient and author of emails in this thread and an apparent participant in the events described, about this same document.

*Third*, and most time consuming, the deposition is full of instances in which Burst's counsel asks the same question again and again for no apparent reason other than he is dissatisfied with the answer he receives.[8] Pages 88-93 provide a good example of the afternoon Mr. Gates endured. This sequence begins with a question that Mr. Gates answered directly, in part by explaining an apparent misunderstanding in Burst's interpretation of the document:

> Q.    And you wanted Intel to understand that if Intel was helping NCs and Java, that might push Microsoft to do Windows and other software in Sun byte codes; correct?
>
> MR. DOUGLAS: Objection to the form.
>
> A.    Yeah, that was a possibility, that if byte codes got popular enough we'd feel customer demand to do our software in that form.
>
> Q.    (BY MR. HOSIE) And did you in fact make Intel understand that if Intel persisted in helping NCs and Java, Microsoft might do software in Sun byte codes?

---

[8] The excerpt of the transcript that Burst cites in its brief hardly supports its complaints, inasmuch as Mr. Gates expressly told counsel that in the context of the question, the word "concern" was ambiguous. (Exh. 2 at 56). Ignoring Mr. Gates' comment entirely, Burst's counsel continued on, looking for a sound bite about whether Mr. Gates "shared the concern" expressed in the exhibit. In any event, the questions were based on cropping the full text of the document from which they were derived. The sequence began: "Mr. Brumer goes on to say that at a high level we are most concerned that Intel is helping one of our, in bold, strongest competitors by supporting a scheme that allows first Windows to be replaced by JavaSoft work **and then subsequently allowing Intel's x86 to be replaced by Sun's CPUs for Java.** Do you see that, sir?" (emphasis added) Burst's counsel then dropped the bolded language from Mr. Brumer's email to form a new question and harangued Mr. Gates, apparently because he disagreed with counsel over the connotation that counsel wanted to impart to the word "concern."

A.   No, no, no.

Q.   Did you communicate that thought to them, sir?

A.   No. The point is that if there's customer demand for it, we might need to do it.

Burst's counsel, however, would not accept either the answer to his question or the

explanation as to how he was misinterpreting the underlying document, instead continuing with

ambiguously reformed question about "this thought:"

Q.   My question was different, Mr. Gates. Did you communicate this thought to anyone
at Intel, you personally?

MR. DOUGLAS: Objection to the form.

A.   You're mixing up issues. To the degree that those things, that byte codes catch on
and are popular, that's going to create a demand on us to support those.

Q.   (BY MR. HOSIE) My question, sir. Did you communicate to anyone at Intel, you
personally, that if Intel persisted in helping NCs in Java, Microsoft might write software
in Sun byte codes? Yes or no, sir?

A.   We certainly told them that if those byte codes became popular enough, then it
would increase customer demand and we might have to respond to that.

Q.   That was not my question. I'll ask it one last time, sir.

A.   Okay.

Q.   If you don't want to answer it I'll move on. Did you ever communicate to Intel that
if Intel persisted in helping NCs in Java, Microsoft might start writing software in Sun
byte codes? Did you ever say that to them, sir?

MR. DOUGLAS: Objection to the form of the question, the preamble, and it's been
asked and answered.

A.   First of all, it's not about rewriting software. You're confusing the issue. It's about
the form we ship it in. It's not about rewriting stuff. As it says very clearly, this isn't
rewriting in Java.

Q.   (BY MR. HOSIE) You're right, ship it in Sun byte codes. Let me ask my question -

A.   Right.

8

Q.   -- again, sir. Did you ever communicate to Intel the notion that if Intel persisted in helping NCs in Java, that Microsoft might have to ship software in Sun byte codes? Did you say that to them?

MR. DOUGLAS:  Same objection.

A.   There's nothing in here about persisted.  What it says in here is, I want them to understand that helping NCs and Java, because they'll increase the demand for this, for those things, that demand will push us to do Windows and other software in Sun byte codes.

Q.   (BY MR. HOSIE)  And did you communicate that thought to anyone at Intel?

A.   The general notion that whatever was being popularized we would have to respond to.  I'm sure Intel was aware of that.

Despite the fact that the original question had been answered directly when first posed and answered when posed repeatedly, this line of questioning continues for several more pages, as Burst's counsel elevates his accusatory tone and pounds the table:

Q.   Isn't this a threat, sir?  Didn't you very directly tell Intel more than once that, listen, Intel, if you don't stop supporting Java and NC, we may well start writing our software in Sun byte codes, which would be very bad for you, Intel?

A.   No.

MR. DOUGLAS:  Objection to form and foundation.

Q.   (BY MR. HOSIE)  You never made that threat, sir?

MR. DOUGLAS:  Hold on a minute.  Objection.  Form, foundation, and now it's just argumentative.

Q.   (BY MR. HOSIE)  You never made that threat?

A.   No.

Q.   You'd agree with me that **if you had said that, it would be a threat**; correct?

MR. DOUGLAS:  Objection.  Argumentative.

A.   First of all, you keep saying write software in Sun byte codes.  It's about the form we ship it in.

Q.   (BY MR. HOSIE)  Fine, the form you ship it in.

9

A.   Yeah, which is not -- we can ship it in different forms.

Q.   Mr. Gates, you'd agree with me that **had** you said to Andy Grove, listen, Andy, if you continue to support Java and NC, we are going to retaliate and ship our product in Sun byte codes, which would be very bad for you, Intel, that would be a threat?

MR. DOUGLAS:  **Objection to the form, foundation, the argumentative nature of the question, and the pounding on the table.** (emphasis added).

This kind of questioning, based on an admitted hypothetical and centered around the word game of what is a "threat" and what is a discussion of market reality among sophisticated businessmen continues for several more pages, causing this single line of questioning to consume 6 pages of a 160 page transcript.  This is hardly conduct meriting reward with further time to subject Mr. Gates to more of the same questioning.

## II.    THE THREE HOUR TIME LIMIT WAS NOT A "COMPROMISE"

The three hour time limit for this deposition was not a compromise, but instead resulted from the Court's application of established legal principles governing the deposition of senior executives, such as Mr. Gates.  The law is unchallenged that before deposing such top executives, a party must show that the intended deponent likely possesses "unique personal knowledge" about the expected topic of the deposition.  *See, Cardenas v. Prudential Ins. Co. of Am.*, Nos. 99-1421, 1422, 1736, 2003 WL 21293757, at *1 (D. Minn. May 16, 2003); *Evans v. Allstate Ins. Co.*, 216 F.R.D. 515, 518-19 (N.D. Okla. 2003); *Baine v. General Motors Corp.*, 141 F.R.D. 332 (M.D. Ala., 1991), and *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985).

As explained above, Burst originally sought to depose Mr. Gates on three topics: (a) Microsoft's relationships with Intel; (b) restrictions in Microsoft's software licenses that Microsoft allegedly used in its multimedia "platform battle;" and (c) Mr. Gates' initial personal reaction to features in Windows Media Series 9.  In response, Microsoft showed that Mr. Gates

10

had no unique personal knowledge as to the two areas that did not relate to Intel. As the Court

transcript reflects, the three hour limit – a reduction in just one hour from the four originally

sought by Burst – arose because Burst made no effort in its reply to provide the required showing

that Mr. Gates had any unique knowledge on these *other* topics.   (Exh. 1 at 49-50).  Burst's

suggestion that it magnanimously agreed to a compromise of only three hours deposition time

with Mr. Gates, inferring that it is being unfairly penalized now for being reasonable before,

simply does not square with the record.

### III.     BURST STILL HAS NOT SHOWN THAT MR. GATES HAS ANY UNIQUE KNOWLEDGE ON THE "REMAINING" TOPICS

Microsoft's prior submissions on this issue demonstrated that Mr.Gates has no unique

knowledge relating to the RealNetworks and other agreements for Microsoft technology that

Burst ties to an alleged "media platform battle" or relating to specific technology matters.  (*e.g.*,

Gates Decl. ¶¶ 2, 3 (Exhibit 1 to Microsoft's Dec. 11, 2003 Opposition Memorandum)).

Although Burst made no effort to rebut that showing or to meet its burden under applicable

precedent, Burst now essentially repeats its request for Mr. Gates' time on these topics.  But,

Burst still makes no effort to show that Mr. Gates possesses any unique knowledge in these

areas, and its motion must still fail.

#### A.     Burst Has Not Shown That Mr. Gates Has Any Unique Knowledge of the RealNetworks Contracts

As explained at the outset, Burst erroneously[9] refers to the RealNetworks contracts as the

"Chris Phillips" deal in another pending motion, alleging that Mr. Phillips was the Microsoft

---

[9]  As will be explained more thoroughly in Microsoft's Memorandum in Opposition to Burst's
Motion to Compel Microsoft to Produce Documents Related to its Document Retention Policy,
the record actually shows that Bob Muglia was the principal Microsoft negotiator dealing with
RealNetworks at this time.

employee most knowledgeable about the RealNetworks agreements. Yet, Burst incongruously seeks more time with Mr. Gates, even though Mr. Phillips is scheduled to be deposed on September 28. The record provides not a hint that Mr. Gates has any unique knowledge related to the RealNetworks contracts nor any other reason to reconvene his deposition on that issue.

Moreover, in the face of overwhelming evidence, Burst has recently filed a motion to file an Amended Complaint that drops its ill-founded allegation that the RealNetwork contracts constituted an unlawful act under the antitrust laws. Burst cannot provide any conceivable justification for interrogating Mr.Gates about a claim it has dropped from this case.

### B. Burst Has Not Shown That Mr. Gates Has Any Unique Knowledge of the "Battle" for Multimedia Delivery and Allegedly Related Middleware Platforms

Relying principally upon a single PowerPoint slide deck authored by someone else, Burst also seeks more time to ask questions of Mr. Gates about alleged "platform" competition related to streaming media. Yet, Burst has already questioned Mr. Gates about this topic in the first session, only to learn that Mr. Gates was able neither to endorse Burst's self-serving reading of the underlying documents nor to provide any unique insights into this topic area. (Exh. 2 at pp. 143-148). Moreover, Burst has already interrogated Messrs. Allchin, Poole, Beckerman and Buecheler about these slides. There is no reason to reconvene the deposition of Microsoft's top executive on this topic.

### C. Burst Has Not Shown That Mr. Gates Has Any Unique Knowledge Concerning Burst's Technology or Microsoft's Corona Software

Relying on exactly the same email underlying its original motion, Burst seeks to interrogate Mr. Gates about the mention of Burst and comments about the accused technology.

But, in that email, Mr. Gates asks questions about the Microsoft technology now accused by Burst in its intellectual property claims. Mr. Poole and Mr. Beckerman provide Mr. Gates with explanations of that Microsoft technology, during which Mr. Beckerman makes a passing mention of Burst's failed technology. Despite having interrogated Mr. Poole and Mr. Beckerman about the contents of that email, Burst now seeks to ask Mr. Gates what he learned from what Mr. Poole and Mr. Allchin told him.

This record shows that Burst has discovered fully the contents of the communication, the origins of the contents, and the understanding of the contents by its creators. This record provides no basis for seeking Mr. Gates' understanding of what Mr. Poole and Mr. Beckerman provided in the email.

Moreover, Burst has conducted numerous and lengthy depositions of the designers and makers of the accused Microsoft software and the businessmen who decided to include it in shipping Microsoft software. It is simply incredible to suggest that Mr. Gates has any unique knowledge about the narrow functionality involved in this case, and in fact Mr. Gates has previously averred that others at Microsoft would know more than he about this area. (Gates Decl. ¶ 3).

IV.    **BURST'S ONE-SIDED RECITATION OF INTEL-RELATED EVENTS IS NOT RELEVANT TO THIS MOTION.**

Burst seems to suggest that it should be allotted more time with Mr. Gates on topics other than Intel because it had to spend an unexpected amount of time asking Mr. Gates Intel-related questions. That is just not so. First, the significance of Mr. Gates' testimony on Intel-related topics was no more momentous at the time of the deposition than when the Court granted Burst

13

permission to depose Mr. Gates.[10]   Moreover, as explained above, the manner in which Burst

conducted the interrogation of Mr. Gates on Intel-related issues lies at the root of the amount of

time devoted specifically to such issues in the deposition.

Second, although Burst claims in this motion that Mr. Gates is "**the** Microsoft witness"

relating to Intel (Burst Mot. at 2, emphasis in original), Burst has contended in other recently-

filed papers that Mr. Eric Engstrom is the Microsoft employee who struck some sort of "deal"

with Intel and that he is the Microsoft employee at the center of the Intel issues.  See, Burst.com

Inc.'s Motion to Compel Microsoft to Produce Documents Related to its Document Preservation

Policy and Practice at pp. 12, 16-18.  Burst cannot reconcile its positions on these two motions.

The fact is that neither Mr. Gates nor Mr. Engstrom is **the** Microsoft witness on events

related to Intel.  The very exhibits used in the Gates deposition and attached to the instant motion

show that there is no one Microsoft witness for these matters.[11]   Many Microsoft and Intel

employees engaged in discussions across broad fronts.  Such communications were routine and a

practical necessity to ensure that consumers' PCs worked and that hardware and software

evolved in compatible ways.

---

[10] Burst wrongly contends at the outset of its motion that Microsoft rested its prior opposition on Mr. Gates' complete lack of unique knowledge of Intel related events.  That also is not true. Microsoft conceded that Mr. Gates may well possess unique knowledge about certain events. Microsoft resisted the motion based on the then-undisputed, and now well shown, fact that there were many other percipient Microsoft witnesses involved in the broad dealings Microsoft had with Intel in the 1990s.  Microsoft's position was simply, depose these other witnesses first, and then see if there is any value in deposing Microsoft's founder and chairman. (e.g., Exh. 1 at 45).

[11] Even a quick review of the authors and recipients of the email exhibits shows involvement by Microsoft's Marshall Brumer, Carl Stork, John Ludwig, Paul Maritz, Bob Herbold, and many others in addition to Mr Gates and Mr. Engstrom.

14

Many of these other current and ex-Microsoft employees have been deposed or are scheduled to be deposed this month. For example, Mr. Engstom is scheduled for deposition on September 30; Mr. Fitzgerald is scheduled for deposition on September 21; Mr. Ludwig was deposed in March; Mr. Brumer was deposed in July; and Mr. Allchin was deposed in June. Further, many of these witnesses were previously deposed in the government case or other actions, and Burst has been supplied transcripts.

The centerpiece of Burst's argument about Intel is a self-serving narrative of events related to communications between Microsoft and Intel in 1997 and early 1998. Burst alleges that this "chronology" establishes that Mr. Gates was the key witness to the Intel-related events, and inferentially, that more time should have been allotted for his deposition. Putting aside Burst's self-serving interpretations manifested in the "chronology," it fails to support Burst's request for two reasons. First, Burst took this deposition. The exhibits used to support the narrative were all marked at the Gates deposition, and Mr. Gates was interrogated about them. This deposition is completed and has no bearing on Burst's current request.

Second, the exhibits cited as support for this narrative, all of which were marked at the deposition, show that Burst chose to spend much of its time with Mr. Gates asking about communications as to which he had no unique knowledge, but rather was at most just one of many possible witnesses. Nearly every exhibit used at the deposition could be used to interrogate multiple other Microsoft employees. Burst's argument for more time thus rests upon the manner in which it chose to spend the time it had.

Finally, Burst's motion further contends that other Microsoft witnesses have deflected all questions concerning Intel to Mr. Gates. That is not true. For this incredible proposition, Burst

15

cites just one example, Mr. Allchin, and as explained above, the cited testimony does not support Burst's contention. (*See e.g.*, fn. 6, *supra*).

## V.   ANY COLLATERAL ESTOPPEL RULING RELATED TO INTEL ISSUES IS NOT RELEVANT TO THIS MOTION

Burst also contends in the introduction to its motion that the issue of collateral estoppel has an impact on Mr. Gates' testimony. Burst does not, and cannot, explain how that can be true. At the time that Burst was granted the three hours for Mr. Gates deposition, the Fourth Circuit ruling meant that there was no specific fact related to Intel as to which collateral estoppel attached in the Burst case as a matter of law.[12] That remains true today, and has been true throughout the intervening period. But, at no time prior to the instant motion has Burst contended that the lack of a collateral estoppel adjudication required additional time for deposing Mr. Gates.

## VI.   THE TIMING OF BURST'S REQUEST FOR MORE TIME SHOWS THE LACK OF MERIT IN ITS REQUEST

The timing of Burst's request for additional time belies every argument it advances, particularly its argument that the volume of Intel material overwhelmed the allotted time.[13] Nothing occurred between the Court's original approval of the Gates deposition and its

---

[12] It is true that Microsoft originally resisted Mr. Gates' deposition because at the time it filed its original opposition, the Fourth Circuit had not ruled, and so it appeared that Burst sought the deposition to relitigate issues that it had earlier represented would not be relitigated if its collateral estoppel motion were granted. Microsoft's Brief in Opposition to Burst's Motion to Compel the Deposition of William H. Gates, III, p. 8. Before the hearing related to Mr. Gates' deposition, however, the Fourth Circuit changed that state of affairs as the Court recognized at the hearing, and Microsoft accordingly <u>withdrew</u> any objection to Mr. Gates' deposition on the basis of collateral estoppel.

[13] The magnitude of the time sought also belies Burst's request. Burst originally requested four hours for Mr. Gates. That was reduced to three hours, as explained above. Burst now seeks two more hours, a 25% increase over what it originally sought and a 66% increase over what the

16

commencement to suggest that he possessed some unforeseeable reservoir of unique knowledge. The Allchin and Poole depositions preceded Mr. Gates' by over two months. Mr. Brumer, whose role was liaison with Intel in the period at issue, was deposed nearly six weeks before Mr. Gates. Other witnesses, such as Mr. Ludwig, who led many of Microsoft's Java-related initiatives, were deposed long before Mr. Gates. Whatever documents related to these events were produced months prior to the deposition. None of those gentlemen pointed to Mr. Gates as having any unique knowledge beyond the realm of events discussed in the course of briefing Burst's original motion. Mr. Gates' activities and knowledge are no more central to Burst's allegations now than they were in August, or July, or May or even when Burst first sought his deposition. Any conceivable reason for extending the time with Mr. Gates could have been addressed prior to the deposition. Burst never mentioned that it foresaw any difficulties with the three hour time limit imposed by the Court. Instead, Burst's counsel expended his allotted time and only now seeks to renew the process.

Further, nothing new occurred *during* the Gates deposition which would lead anyone to conclude Mr. Gates had any more unique knowledge about any relevant events than Burst originally identified nine months ago. Nor did Burst's counsel proffer any substantial objection at the conclusion of the first deposition, when all parties were convened. Yet, now, Burst seeks nearly as much time again.

## CONCLUSION

Burst's motion for additional time to depose Microsoft's founder and chairman, Mr. Gates, should be denied.

---

Court allowed, even though Burst seeks to cover the same topics it originally identified.

Dated: September 15, 2004                    MICROSOFT CORPORATION


                                   By:   _John W. Treece_____

                                         John W. Treece
                                         SIDLEY AUSTIN BROWN & WOOD LLP
                                         Bank One Plaza
                                         10 South Dearborn Street
                                         Chicago, Illinois 60603
                                         (312) 853-7000


Of Counsel:
David B. Tulchin
Marc De Leeuw                            Michael F. Brockmeyer
SULLIVAN & CROMWELL                      PIPER RUDNICK LLP
125 Broad Street                         6225 Smith Avenue
New York, NY 10004-2498                  Baltimore, Maryland 21209-3600
(212) 558-4000                           Telephone: (410) 580-4115


Thomas W. Burt
Richard J. Wallis                        Karen A. Popp (D. Md. No. 26145)
Steven J. Aeschbacher                    SIDLEY AUSTIN BROWN & WOOD, LLP
MICROSOFT CORPORATION                    1501 K Street, N.W.
One Microsoft Way                        Washington, DC 20005
Redmond, Washington 98052


                                         Charles W. Douglas
                                         David M. Schiffman
                                         SIDLEY AUSTIN BROWN & WOOD LLP
                                         Bank One Plaza, 10 South Dearborn Street
                                         Chicago, Illinois 60603

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2004, I caused a true and correct copy of

the foregoing document, Microsoft's Memorandum in Opposition to Burst.com's Motion for

Additional Time to Depose William H. Gates, III, to be served upon the following counsel for

the Plaintiff:

> Spencer Hosie  (via Facsimile and Overnight Delivery)
> Bruce J. Wecker
> John McArthur
> HOSIE, FROST, LARGE & McARTHUR
> One Market Spear Street Tower, 22nd Floor
> San Francisco, CA  94105
>
>
> Robert Yorio  (via Overnight Delivery)
> Mary A. Wiggins
> CARR & FERRELL, LLP
> 2225 East Bayshore Road
> Suite 200
> Palo Alto, CA  94303

Michael F. Brockmeyer

Exhibits 1-2
Filed manually
(voluminous)