# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


IN RE:  MICROSOFT LITIGATION

————————————————————————/



MDL 1332
Friday, February 6, 2004
Baltimore, Maryland



Before:   Honorable J. Frederick Motz, Judge



Appearances:

    On Behalf of Sun Microsystems:
    Lloyd R. Day, Jr., Esquire

    On Behalf of Burst:
    Spencer Hosie, Esquire

    On Behalf of Defendant Microsoft:
    David B. Tulchin, Esquire
    John W. Treece, Esquire

(NOTE:  Only those who verbally participated
        have been listed.)



Reported by:
Mary M. Zajac, RPR
Room 3515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

41

1     what he wants, show it to you.  If you've got some problem with

2     it ahead of time, let me know.  But after you've agreed upon it,

3     submit it to me as an order and I will order that that is what

4     the 30(b) witness say.  But Mr. Hosie should show it to you

5     first because it could be that there's something in there that

6     just doesn't make any sense.

7              But that would set the court order and give Mr. Hosie

8     the protection he wants and provide you with what you need so

9     that you can educate the witness.  And that's fair, too.

10             MR. HOSIE:  Thank you, Your Honor.

11             MR. TREECE:  I'll only respond by saying that's fine,

12    Your Honor.  I'm worried about it simply because I look at

13    what'S happened in the past.  People have responded.  The notice

14    said, tell us about the change.  They explain the change.

15             THE COURT:  I understand.  It's in his ballpark to

16    now, it's his responsibility to phrase it right.  But do it,

17    show it to Mr. Treece in case, to make sure that you're on the

18    same page.  Once you've got it, present it to me as an order.

19    I'll sign it and that will give you an order rather than simply

20    a discovery dispute.

21             MR. HOSIE:  Thank you, Your Honor.  The third and

22    final motion we have on today relates to the deposition of Mr.

23    Gates.

24             Your Honor, we don't want to depose Mr. Gates because

25    of who he is.  We want to depose him because of what he's done.

42

1    Mr. Gates personally told Intel to drop its support for --

2              THE COURT:  No.  No.  He is, in the context of this

3    case, he is no Lee Iacocca.  I don't remember.  I think back

4    when I had, back when I was practicing, I think it's been a long

5    time ago, that was a run-of-the-mill products liability case,

6    wasn't it?

7              MR. HOSIE:  Very good point, Your Honor.

8              THE COURT:  And they just wanted to harass whoever it

9    was that Lee Iacocca was with, Chrysler, I guess.  Here you say

10   Mr. Gates was involved.  And it's perfectly clear from Judge

11   Jackson's, without, not being pejorative, there was personal

12   involvement.

13             MR. HOSIE:  Absolutely, Your Honor.  And that's what

14   distinguishes this case from the Chrysler case.  He's no Lee

15   Iacocca.  This is not a product liability case where the

16   witness, Mr. Gates, will have no knowledge.  These were his

17   policies, his directives, his e-mail.

18             He's the one that sent the e-mail to Andy Grove with

19   the threat of thermonuclear war if Intel didn't drop its support

20   for Java.  He had the meetings, the one-on-one meetings.  He's

21   not a witness, Your Honor, he is the witness on these fronts.

22             THE COURT:  No.  I understand.  As long as you all

23   understand.  We're not talking before about reopening discovery.

24   I don't expect you all to -- you know, Mr. Gates is a busy

25   executive.  You're going to take into account the fact that

43

1    depositions were taken.  You will use that.  You're not going to

2    re-invent the wheel.

3    But to the extent that you want to ask the questions

4    yourself or to explore something the focuses more upon you, I

5    understand, as long as you do it, you would conduct the

6    deposition in that spirit, I assume.

7    MR. HOSIE:  And we would, Your Honor.  As proof of

8    that pudding, we offered at the outset to limit it to no more

9    than four hours, just precisely to address that kind of burden.

10   Thank you.

11   THE COURT:  But again, that deposition clearly should

12   be -- not necessarily.  If that's all you want from Mr. Gates,

13   I'll hear from Mr. Treece, that could go forward immediately.

14   But it might make sense, again, to wait until the Fourth Circuit

15   has ruled on the collateral estoppel in case there's something

16   else you might want to ask.

17   MR. HOSIE:  I think it does make sense to wait, Your

18   Honor.  One other point of clarification.

19   In our papers we had ask that Sun be exempted from the

20   requirement of participating in this deposition.  Our case is on

21   a much different discovery track than the Sun case.  We have

22   different issues.  I believe in our teleconference a week or so

23   ago Mr. Treece agreed with that.

24   But I would like to clarify with the Court that when

25   this deposition goes forward, it's just Burst and not Sun.

44

1          THE COURT:  Mr. Treece.

2          MR. TREECE:  I see I'm already in an uphill here, Your

3    Honor.

4          THE COURT:  I think you are.

5          MR. TREECE:  Give it a shot.  Because there are a

6    couple, let me tell you what's happening.

7          What Mr. Hosie says is he wants to focus this

8    deposition on the one-to-one communications between Mr. Gates

9    and Mr. Grove that were the subject of the government case at

10   heart.

11         Now the fact is, however, that it had earlier, Burst

12   had earlier in its pleadings identified ten Microsoft employees

13   that it said had knowledge of the Intel Java issue.  Documents

14   cited in our discovery responses identified still more.  And

15   testimony and exhibits in the government case identified still

16   more.

17         So we can easily identify about 47 employees as having

18   knowledge about the Intel/Microsoft relationship.  Now, not all

19   of them, of course, have this intimate, as intimate familiarity

20   as others on the list.  The list includes individuals like Mr.

21   Allchin, whose deposition was going to go forward today,

22   Engstrom, and several others, that Burst itself in its motion

23   identifies as having a very close relationship to this issue.

24         So we pointed all that out in our brief, Your Honor.

25   We also pointed out that Burst had not taken any depositions of

45

1    Intel employees.

2            Now, that's critical because, unlike the government

3    case, a showing of impact is an essential element to

4    establishing liability in a private antitrust action.  So if, in

5    fact, Intel stopped investing in the Java media framework

6    player, I'll get to this in a second, but player for its own

7    independent reasons, the entire claim falls to the side because

8    there is no showing of impact.  And yet Burst, at the time they

9    noticed, they asked for Mr. Gates's deposition, had not taken

10   any Intel depositions.

11           So Your Honor, we argued in our response brief that

12   under the case law it was inappropriate for Burst to seek Mr.

13   Gates's deposition when it had not exhausted other less

14   intrusive discovery into the issues about which they want to

15   question him.

16           Now, events subsequent to our brief have, in our view,

17   validated our point.  We submitted our brief on December 11th.

18   The next week Burst subpoenaed Intel to ask exactly the

19   questions that we said they should ask.  That deposition has not

20   gone forward but this, the date is being negotiated.

21           Then on December 30th, Burst sent us a wish list for

22   further deponents.  And it included seven individuals that we

23   had pointed out have knowledge, in our brief, that have

24   knowledge about the Intel issue.

25           Finally, I will point out that Burst has not yet taken

46

Mr. Allchin's deposition who Burst itself in its motion, Page 13 and other places, says was intimately involved in the relationship with Intel.

So in our view the subsequent events have shown the truth to the argument, that it is at best premature to allow deposition of Mr. Gates because Burst has not exhausted less intrusive discovery.

Finally, Judge, there's another response to Mr. Hosie's focus on the Grove/Gates discussions that were also part of the government case or focus of the government case. You will recall that the Court of Appeals in the government case found that Microsoft had pressured Intel in 1996 and that it, quote, "Intel finally capitulated in 1997." That's 253 F.3d at 373.

And that finding was a distillation of the plaintiffs' proposed findings in the government case that were more specific. The plaintiffs had offered proposed findings saying that Intel had capitulated in the spring of 1978. That, however, is not what Burst's story is all about.

Burst says, and the public record shows, that Intel announced in mid-1998 that it was withdrawing support for the Java media player and that it would continue to provide support for the player well into 1999. And we know from the record that between 1997 and mid, and the mid-1998 announcement, Intel continued to invest in the Java media framework player because

47

1    it released two Beta versions during that time and it continued

2    to provide customer support until April of 2000.

3            So whatever role the Gates to Grove communications had

4    in the government case, it's not at all clear that they are

5    relevant to Burst allegations which involve a different time

6    period.  Instead, the relevant time period that Mr. Hosie's

7    client is worried about would focus on the 1997 to 1998 period,

8    after the end of the government's story.

9            And Burst has made no showing at all that Mr. Gates

10   has unique knowledge about that time period.  To the contrary,

11   the e-mails that lead into that period are from others at the

12   company, Mr. Engstrom, Mr. Allchin.

13           So in short, while Burst may want to ride the

14   coattails of the government case here, the facts don't fit.  And

15   the facts don't suggest that Mr. Gates has unique knowledge

16   relevant to Burst allegations.  So as a result, we suggest that

17   Burst's request to take Mr. Gates's deposition is at best

18   premature under the case law because it needs to show that Mr.

19   Gates has unique knowledge about facts that are relevant to

20   Burst.

21           THE COURT:  Mr. Hosie.

22           MR. HOSIE:  Very briefly, Your Honor.  There's no

23   small irony in Microsoft arguing the factual merits on a motion

24   where it's denying us discovery.  And that's what you just

25   heard.

48

THE COURT:  Well, it's a little more sophisticated than that.  But given the fact that it's a discovery dispute, I think it comes down pretty close to that.

In fact, it may very well be the way this plays out, you will have taken some of the other depositions first. Frankly, even if the Intel deposition, somebody denied that they capitulated, I'm not sure that that means that you couldn't take people from the Microsoft side because you don't always have to believe, even if same people, two sides of the story, say the same thing if objective evidence disproves it.

The bottom line is, you could very well be, Mr. Treece, if you distinguish between the timeframes and things, this could become important at a summary judgment stage or something.  I don't think I can parse it that thin on a discovery dispute.  And as long as, it will relate only to Sun. It will be limited in time to four hours, which even on Mr. Gates's schedule, that's a reasonable amount of time.  And that will, and the time limit will be disciplining.

MR. DAY:  Your Honor, you mentioned it would relate only to Sun.

THE COURT:  Excuse me.  Relate only to Burst.

MR. TREECE:  Actually, I was going to offer a split. We did say that this would be limited to Burst and Sun has its own issues, yes or no, for later.  Let me, however, address the four hour limitation.

49

1          If you recall the original offer by Mr. Hosie was four

2     hours of Mr. Gates's time to address three topics.  This was one

3     of them.  The first, the second was the structure in terms of

4     licensing agreements.  And in our opposition brief I think we

5     showed that he has no unique knowledge in this area.  Other

6     employees are in an undeniably better position to talk about

7     licensing terms.  In fact, none of the documents that Burst

8     cited in its brief about licensing issues even had Mr. Gates

9     name on it.

10         So therefore, it's clear to us, maybe --

11         THE COURT:  You want an hour, four divided by three?

12         MR. TREECE:  I understand the novel issue are the

13    same.  But I do think that some time is allocated to that issue.

14    And the next issue had to do, they said in the motion they

15    wanted to take his deposition to see what he thought about

16    Windows Media Series Nine as a technological innovation.  Now,

17    that would only be pertinent arguably, presumably, to support

18    the patent infringement and trade secret claims.

19         We showed in our opposition brief that patent

20    infringement claim and trade secret claims are resolved by

21    detailed analysis of claim construction.

22         THE COURT:  Can we reduce it to two and a half or

23    three, subject to the collateral estoppel ruling?

24         MR. HOSIE:  Certainly, as a matter of compromise, I'd

25    be happy to live with three.  I would say, Your Honor, that we

50

1    focused in our argument today on the Intel story.  But in our

2    brief, we point out other areas where Mr. Gates had direct

3    direct --

4                  THE COURT:  Mr. Treece in five minutes just earned an

5    hour.

6                  MR. HOSIE:  He did.

7                  THE COURT:  Good job.

8                  MR. HOSIE:  Thank you, Your Honor.

9                  THE COURT:  It will be three hours unless something --

10   and this will be subject to the collateral estoppel ruling and

11   what happens there.  It could be that this deposition's going to

12   be postponed until we go through, it's entirely up to Mr. Hosie.

13   But it could be, depending on what the Fourth Circuit does, the

14   briefing on the collateral estoppel issues, because it could be

15   that more questions have to be asked.  And then the three hours

16   will go up.  Thank you very much.

17            The only other thing I wanted to mention was,

18   implicitly, I also am going to talk to -- I was saying if I was

19   Judge Whyte I'd want to rule on the summary judgment.  I'm going

20   to call Judge Whyte and find out what he wants.  So all of this

21   is subject to my talking to him.

22                  (Conclusion of Proceedings.)

23

24

25

51

1

2

## REPORTER'S CERTIFICATE

3        I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of In Re:

5    Microsoft Litigation, Case Number(s) MDL 1332, on February 6,

6    2004.

7        I further certify that the aforegoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10        In Witness Whereof, I have hereunto affixed my

11    signature this _____ day of _____ , 2004.

12

13

14

15

16    Mary M. Zajac,
      Official Court Reporter

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

BILL GATES ; August 26, 2004

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3    _____

4

5    IN RE MICROSOFT CORP.            )

6    ANTITRUST LITIGATION.            )

7                                     )

8    this Document relates to:        ).

9    Burst.com, Inc. Vs.              )

10   Microsoft Corp.,                 )

11                                    )

12   Civil Action No. JPM-02-cv-2952 )

13   _____

14     VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

15                       OF

16                   BILL GATES

17              HIGHLY CONFIDENTIAL

18   _____

19

20                   1:11 P.M.

21               AUGUST 26, 2004

22        ONE MICROSOFT WAY, BUILDING 34

23             REDMOND, WASHINGTON

24

25   REPORTED BY:  Diane M. Mills, CCR No. 2399

BILL GATES ; August 26, 2004

Page 2

```
 1          A P P E A R A N C E S
 2
 3   FOR BURST.com:
 4      SPENCER HOSIE
        BRUCE WECKER
 5      Hosie Frost Large & McArthur
        1 Market Street
 6      Spear Street Tower, 22nd Floor
        San Francisco, California  94105
 7
 8   FOR MICROSOFT CORPORATION:
 9      CHARLES W. DOUGLAS
        JOHN TREECE
10      Sidley Austin Brown & Wood LLP
        Bank One Plaza
11      10 S. Dearborn Street
        Chicago, Illinois  60603
12
        TOM BURT
13      T. ANDREW CULBERT
        Associate General Counsel
14      Microsoft Corporation
        One Microsoft Way
15      Redmond, Washington  98052-6399
16
17
18   VIDEO OPERATOR: Peter Koslik, Royal Video Productions
19
20
21
22
23
24
25
```

Page 4

```
 1   EXHIBITS FOR IDENTIFICATION CONT'D      PAGE
 2   16 MS-CC-Bu 368895-896            83
 3   17 MS-CC-Bu 203588-589            94
 4   18 MS-CC-Bu 203590-602           108
 5   19 MS-CC-Bu 203585-587           114
 6   20 MS-CC-Bu 203581-584           121
 7   21 MS-CC-Bu 368391-395           124
 8   22 MS-CC-Bu 203612-613           129
 9   23 MS-CC-Bu 368712-713           133
10   24 MS-CC-Bu 368183-185           135
11   25 MS-CC-Bu 171364               136
12   26 MSS 64947-948, MSS 64977-978       139
13   27 Findings of Fact              141
14   28 MS-CC-Bu 29534-559            143
15   29 MS-CC-Bu 364288               155
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3   EXAMINATION BY:                 PAGE
 4   MR. HOSIE                   6
 5
 6   VIDEOTAPE NO. 1                 5
 7   VIDEOTAPE NO. 2                75
 8
 9
10   EXHIBITS FOR IDENTIFICATION         PAGE
11    1 MS98 0108939-940           8
12    2 MS-CCPMDL 292303-315          10
13    3 MS-CCPMDL 221232-239          22
14    4 None marked               NA
15    5 MS-CC-Bu 368501-503           33
16    6 MS-CC-Bu 372449-453           37
17    7 MS-CC-Bu 368260              47
18    8 MS-CC-Sun 520903-904          52
19    9 MS98 168290-291              60
20   10 MS-CC-Bu 368506              65
21   11 MS-CC-Bu 203557-559           68
22   12 MS-CC-Bu 203561-564           71
23   13 MS8 6449-451                74
24   14 MSS 5054775-776              75
25   15 None marked               NA
```

Page 5

```
 1       REDMOND, WASHINGTON; AUGUST 26, 2004
 2                 1:11 P.M.
 3                 --oOo--
 4
 5       VIDEO OPERATOR: Today is August 26, 2004.  The
 6   time on the monitor is now 1:11 p.m.  This is Volume No. 1,
 7   Tape No. 1, in the deposition of Bill Gates, in the United
 8   States District Court for the District of Maryland in the
 9   matter of Burst.com, Incorporated versus Microsoft
10   Corporation, Civil Action No. JFM-02-CV-2952.  We are at the
11   offices of Microsoft Corporation, the address is One
12   Microsoft Way in Redmond, Washington.  Today's deposition was
13   noticed by the attorney Spencer Hosie.
14       My name is Peter A. Koslik, I'm employed by Royal
15   Video Productions, Incorporated, whose principal place of
16   business is 950 Northwest Firwood Boulevard, Issaquah,
17   Washington, 98027.  The phone number there is 425-391-6809.
18   Today's court reporter is Diane Mills of Yamaguchi, Obien &
19   Mangio.
20       At this time I would like to ask all persons except
21   for the witness and the court reporter to introduce
22   themselves for the record.  Please state your name, the firm
23   you're working for, and whom you're representing in this
24   matter, starting from my right, please.
25       MR. HOSIE:  Good afternoon.  My name is Spencer
```

2 (Pages 2 to 5)

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

BILL GATES ; August 26, 2004

Page 6

1  Hosie, I represent the Plaintiff in this case, Burst.
2      MR. WECKER: Bruce Wecker, also for the Plaintiff.
3      MR. DOUGLAS: Charles Douglas representing
4  Microsoft.
5      MR. TREECE: John Treece also representing
6  Microsoft.
7      MR. BURT: Tom Burt representing Microsoft.
8      MR. CULBERT: Andrew Culbert representing
9  Microsoft.
10     VIDEO OPERATOR: Would the court reporter please
11 swear in the witness.
12
13            BILL GATES,
14     sworn as a witness by the Notary Public,
15            testified as follows:
16
17            EXAMINATION
18
19 BY MR. HOSIE:
20     Q.  Good afternoon, Mr. Gates. We have not met prior
21 to today, have we, sir?
22     A.  I don't believe so.
23     Q.  You appreciate you have been placed under oath,
24 sir?
25     A.  I just did.

Page 7

1      Q.  And you understand you have an obligation to
2  testify as fully and truthfully as possible?
3      A.  Sure.
4      Q.  Do you understand, sir, that if you actually have a
5  recollection or a memory of an event, to say "I don't recall"
6  would be untrue?
7      A.  That sounds right.
8      Q.  All right, sir. Are you represented by counsel
9  here today?
10     A.  Yes.
11     Q.  Who is your lawyer, please?
12     A.  I'm represented by Microsoft counsel.
13     Q.  And that would be Mr. Chuck Douglas sitting to your
14 immediate right?
15     A.  He's one lawyer who's here today.
16     Q.  I see four Microsoft lawyers sitting across from me
17 at the table, sir. Are they all counsel for you?
18     A.  From a layman's point of view I'd say yes. Perhaps
19 there's some legal aspect of being somebody's counsel I'm not
20 appreciating that maybe they should comment on if you're
21 curious.
22     MR. DOUGLAS: Mr. Gates, we all represent the
23 company and, therefore, you.
24     THE WITNESS: Okay.
25     Q.  (BY MR. HOSIE) Mr. Gates, let me turn the clock

Page 8

1  back to 1997. Was it true, sir, that in 1997 you viewed Java
2  as the biggest threat facing Microsoft?
3      MR. DOUGLAS: Objection to the form. Vague and
4  ambiguous.
5      A.  I wouldn't say that you can take the Java -- the
6  term Java and say that just that by itself represented any
7  type of unified threat. There were a lot of things that Sun
8  was doing around Java, other people were doing around Java,
9  some browser things that were going on that did represent
10 important competitive activity.
11     Q.  (BY MR. HOSIE) My question, sir, was a little
12 different and I'll put again.
13     Is it not true, Mr. Gates, that in 1997 you
14 personally viewed Java as the biggest threat facing
15 Microsoft?
16     MR. DOUGLAS: Same objection.
17     A.  You'll have to give me the context.
18     Q.  (BY MR. HOSIE) Let me do that, sir. Let the
19 record reflect I'm showing the witness what has been marked
20 as Exhibit 1. Counsel, copy for you.
21     (Deposition Exhibit No. 1 was marked
22            for identification.)
23     Q.  (BY MR. HOSIE) Mr. Gates, I've marked as Exhibit 1
24 an e-mail thread or string, depending on your nomenclature.
25 I'm going to direct your attention to an e-mail from you on

Page 9

1  the bottom third of the first page, dated Friday, November 7,
2  1997, 10:53 a.m. I'll give you a moment to read that, sir.
3      A.  You're talking about Ben Waldman's mail?
4      Q.  The one from Bill Gates to Ben Waldman in the
5  bottom third of the page. Do you see that, Mr. Gates?
6      A.  Right.
7      Q.  This is an e-mail you wrote?
8      A.  Yes.
9      Q.  You wrote this on or about November 7, 1997?
10     A.  It appears, yes.
11     Q.  And you sent it to Mr. Waldman?
12     A.  That's right.
13     Q.  Mr. Waldman worked at Microsoft, did he not, sir?
14     A.  At the time, yes.
15     Q.  And you wrote this e-mail in a fingers-to-keyboard
16 sense?
17     A.  I'm sorry?
18     Q.  You wrote this e-mail in a fingers-to-keyboard
19 sense? I mean, this is your --
20     A.  I have no idea what that means.
21     Q.  Did you write this e-mail, sir?
22     A.  I typed it, yes.
23     Q.  That was my question. And do you not say in this
24 e-mail, and I quote, "Java is the biggest threat to us ..."?
25     A.  This is about a very specific thing with Apple, and

3 (Pages 6 to 9)

Yamaguchi Obien Mangio, LLC * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101 * (206) 622-6875 * 1(800) 831-6973

BILL GATES ; August 26, 2004

Page 10

1  I say relative to that, I view Java as the biggest threat.
2   Q.   To Microsoft?
3   A.   Relative to the issues we were discussing about
4  Apple here.
5   Q.   Okay. Who is the "us" you were referencing in this
6  sentence, sir?
7   A.   Microsoft.
8   Q.   Now, was it the Java runtime that gave you
9  heartburn, sir?
10       MR. DOUGLAS: Objection to the form.
11   A.   What's the context? I don't think we've talked
12  about anything that would help me answer that.
13   Q.   (BY MR. HOSIE) Why don't we mark another exhibit,
14  then.
15       (Deposition Exhibit No. 2 was marked
16        for identification.)
17   Q.   (BY MR. HOSIE) Mr. Gates, before I show you what
18  I've marked as Exhibit 2, let me ask this. I suspect you had
19  a chance to meet with your lawyers to prepare yourself to
20  testify here today?
21   A.   I met with them yesterday.
22   Q.   And with whom did you meet, sir?
23   A.   With the gentlemen here today.
24   Q.   All four counsel?
25   A.   They were there, and I think maybe one other person

Page 11

1  was there.
2   Q.   Who was the other person, if you recall?
3   A.   Maybe they can help me.
4       MR. DOUGLAS: Mr. Cederoth.
5   Q.   (BY MR. HOSIE) Thank you. And how many hours did
6  this preparation session last?
7   A.   A few hours.
8   Q.   Two, three, five?
9   A.   I think close to three.
10   Q.   Three hours. And did the Microsoft lawyers show
11  you any documents during this session?
12   A.   Yeah, they did show me some.
13   Q.   And do you recall the approximate number of
14  documents they showed you?
15   A.   Maybe nine.
16   Q.   And do you recall any of the specific nine?
17       MR. DOUGLAS: Well --
18   A.   What do you mean by that?
19   Q.   (BY MR. HOSIE) Can you tell me what they were?
20   A.   No.
21       MR. DOUGLAS: And I object to that question. If
22  you're asking him to describe what was shown to him by
23  counsel in a privileged meeting, that violates the privilege
24  and I would instruct the witness not to answer that question.
25   Q.   (BY MR. HOSIE) Sir, I'd like you to answer the

Page 12

1  following question yes or no. Do you actually remember the
2  specific identity of any of those nine documents? You may
3  answer that yes or no.
4       MR. DOUGLAS: You can answer that question.
5   A.   I remember things about what I was shown. They're
6  not titled documents, they're e-mails.
7   Q.   (BY MR. HOSIE) Were all nine e-mails, sir?
8   A.   One wasn't.
9   Q.   Was one a presentation deck?
10       MR. DOUGLAS: Objection. You're asking the witness
11  now to describe what he was shown, and I instruct the witness
12  not to answer.
13   Q.   (BY MR. HOSIE) Did reviewing these nine documents
14  help refresh your recollection to any extent, Mr. Gates?
15   A.   To some extent, yes.
16   Q.   Because they related to events some years in the
17  past now; correct?
18   A.   That's correct.
19   Q.   And it was helpful for you in trying to recall what
20  had happened to review the paper record of the time; fair?
21   A.   I was receiving advice from counsel.
22       MR. HOSIE: Are you standing with your
23  instructions, Counsel?
24       MR. DOUGLAS: Absolutely.
25   Q.   (BY MR. HOSIE) I'll show you what has been marked

Page 13

1  as Exhibit 2, sir. Counsel, copy for you. Gentlemen, I
2  apologize for only bringing several copies. I didn't realize
3  this would be quite as fully attended as it in fact is.
4       Mr. Gates, I'd ask you to look at the first page to
5  familiarize yourself with this document and then I will ask
6  you about the first and second pages attached.
7   A.   (Witness reviewing document.) Yeah, go ahead.
8   Q.   Do you recognize this document, sir?
9   A.   No.
10   Q.   Was this one of the ones shown to you yesterday?
11   A.   No.
12   Q.   The cover page of the document is an e-mail from
13  Paul Maritz to you, Allchin and others, dated January 5,
14  1997. Do you see that, sir?
15   A.   Uh-huh.
16   Q.   And I'm sorry, you have to answer aloud, a yes or a
17  no, please.
18   A.   Uh-huh is not good enough? I mean, it was aloud,
19  but okay, yes, yes.
20   Q.   How about with words? Thank you.
21       MR. DOUGLAS: Something that the court reporter can
22  transcribe.
23   A.   All right. H-m-m-m.
24   Q.   (BY MR. HOSIE) This e-mail references a draft
25  series of slides for Billg to use on Monday p.m.

Yamaguchi Obien Mangio, LLC * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101 * (206) 622-6875 * 1(800) 831-6973

BILL GATES ; August 26, 2004

Page 14

1       You would be the Billg, sir?
2   A.   Yes.
3   Q.   That's your e-mail moniker or alias, as it were?
4   A.   It used to be when you used e-mail shorthand like
5   that, that's right.
6   Q.   Okay, fair enough. And you've had a chance to look
7   at the first couple pages of the attachment, sir?
8   A.   Yes.
9   Q.   And you recognize these slides, sir?
10  A.   No.
11  Q.   Do you recall attending a meeting in early 1997
12  dealing with the NC and Java challenge?
13  A.   I'm sure there were meetings that touched on that
14  topic.
15  Q.   NC, sir, is an acronym for network computer or
16  network computing?
17  A.   Computer, in most cases.
18  Q.   In your vernacular it would be network computer?
19  A.   Well, it's a term -- it can be used for other
20  things also, but it's often network computer.
21  Q.   Fair enough. Turning to the second page, sir, this
22  references a key platform challenge. And the note says, "NC
23  and Java are platform challenges."
24       In 1997, Mr. Gates, did you personally view NC and
25  Java as presenting platform challenges to Microsoft?

Page 15

1       MR. DOUGLAS: Objection to the form. Vague and
2   ambiguous.
3   A.   We were doing activities with Java, other people
4   were doing activities with Java, and some of those were
5   people we were competing with.
6   Q.   (BY MR. HOSIE) My question, sir, was a little
7   different and I'll ask it again.
8       In 1997, did you personally, Mr. Bill Gates, view
9   NC and Java as presenting platform challenges to Microsoft?
10      MR. DOUGLAS: Same objection.
11  A.   There were things about NCs and Java we chose to
12  embrace and offer and there were things we didn't choose to
13  embrace that competitors did embrace. So they were part of
14  the competitive framework.
15  Q.   (BY MR. HOSIE) With all due respect, sir, I don't
16  think you've answered my I question and I'll ask it a third
17  time.
18      Did you personally in 1997 view NC and Java as
19  presenting Microsoft with platform challenges? I think
20  that's a yes or a no.
21      MR. DOUGLAS: Same objection. And, Mr. Gates, you
22  do not necessarily have to answer a question yes or no if it
23  can't be answered yes or no. And if the answer is the same
24  as you gave him before, that's perfectly fine as well. But
25  if you'd like to have the question read back --

Page 16

1   A.   There are aspects of it that we were involved in
2   and that were part of our strategy and there are aspects that
3   weren't.
4   Q.   (BY MR. HOSIE) Is this a question you can't
5   answer, sir?
6   A.   I've answered it. A yes would be wrong because
7   certainly it was part of our strategy to do some things in
8   those areas, and a no would be wrong because there's
9   absolutely a lot of activity on the part of competitors in
10  those areas that, you know, offered alternatives to our
11  products.
12  Q.   Sir, thank you, but you are answering a question
13  that I did not ask and I will ask my question again.
14  A.   Okay.
15  Q.   Are you ready? Here it is.
16      MR. DOUGLAS: Well, Mr. Hosie, object to the
17  preamble. If you want to ask a question just ask it, but,
18  you know, that's purely argumentative and that's not going to
19  be productive.
20      MR. HOSIE: I don't mean to argue with this
21  witness. I would like an answer to my question, though.
22      MR. DOUGLAS: Well, you are, and just ask the
23  question in a professional manner.
24  Q.   (BY MR. HOSIE) Sir, here's my question. Did you
25  personally view NC and Java as presenting platform challenges

Page 17

1   to Microsoft in 1997?
2       MR. DOUGLAS: And I have the same objection. Vague
3   and overbroad.
4   A.   They weren't purely challenges, but there are
5   aspects of things that people were doing with them that were
6   challenges.
7   Q.   (BY MR. HOSIE) Challenges to your platform?
8   A.   To various of our products.
9   Q.   What aspects of what others were doing did you view
10  as presenting platform challenges to Microsoft?
11  A.   They were creating competitive products using those
12  approaches.
13  Q.   This slide goes on to note of a "possible emergence
14  of a set of APIs and underlying system software that lead to
15  lesser or no role for Windows."
16      Have I read that correctly, Mr. Gates?
17  A.   You're just asking me about your reading?
18  Q.   Right now that's correct.
19  A.   Okay, let's take a look.
20  Q.   I think literally I'd like first to get you on the
21  same page.
22  A.   Yeah, that'll help.
23  Q.   That'll help.
24  A.   What page are you talking about?
25  Q.   I'm on Page 2, sir. The title is Key Platform

5 (Pages 14 to 17)

Yamaguchi Obien Mangio, LLC * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101 * (206) 622-6875 * 1(800) 831-6973

BILL GATES ; August 26, 2004

**Page 18**

1  Challenge, and you see the language "NC and Java are platform
2  challenges"?
3      A.   Right.
4      Q.   The question we just went around and around on;
5  correct?
6      A.   No.
7      Q.   All right.  And then I read into the record the
8  next bullet point paragraph, and I'll do so again.  Open
9  quote, "possible emergence of a set of APIs and underlying
10  system software that lead to lesser or no role for Windows."
11          Have I read that correctly, sir?
12     A.   Uh-huh.
13     Q.   All right.  I think that was a yes?
14     A.   You read that correctly.
15     Q.   Thank you.  Now, what does that language mean to
16  you, Mr. Gates, "possible emergence of a set of APIs and
17  underlying system software that lead to lesser or no role for
18  Windows"?
19          MR. DOUGLAS:  Objection.  Form and foundation.
20     A.   It suggests exactly what it says, that somebody can
21  build an operating system that's not Windows.  And there were
22  people doing that, as there have been at all times.
23     Q.   (BY MR. HOSIE)  And that would not be a good thing
24  for Microsoft; correct?
25     A.   No, there's always been people doing other

**Page 19**

1  operating systems.
2      Q.   Well --
3      A.   It's competition.
4      Q.   Sure.  And since there's always been to some modest
5  extent other operating systems, why in 1997 was Microsoft or
6  were you personally concerned about NC and Java presenting
7  platform challenges?
8          MR. DOUGLAS:  Objection to the form.  Vague,
9  ambiguous and overbroad.
10     Q.   (BY MR. HOSIE)  In short, Mr. Gates, what was
11  different about NC and Java?
12          MR. DOUGLAS:  Same objection.
13     A.   Different from what?
14     Q.   (BY MR. HOSIE)  From, say, an Apple operating
15  system.
16     A.   Well, you just showed me a piece of mail that was
17  talking about Apple's Java strategy.
18     Q.   Yeah.
19     A.   There's no distinction.  Apple, like many operating
20  system people, they adopted a strategy with respect to Java,
21  so did Microsoft, so did Sun, so did Netscape.  Likewise,
22  anybody building hardware platforms was going to decide how
23  much they embraced the idea of very limited computers.  For
24  example, it couldn't do multimedia, couldn't do like
25  streaming video, like low end network computers or more

**Page 20**

1  powerful PCs that use latest chips and therefore could let
2  you, for example, see streaming video.
3      Q.   Were you concerned that the marriage, if you will,
4  of Java and network computing might lead to the emergence of
5  a series of thin client computers not dependent on the
6  Microsoft OS?
7          MR. DOUGLAS:  Objection to the form.
8      A.   As I've said, there's always been competitive
9  operating systems that use Java to some degree.  A thin
10  device doesn't run anything.  That's why it's called thin, is
11  it doesn't have multimedia capabilities, rich things on it.
12  So when you get down to the thin end, there's essentially no
13  runtime there at all, it's all been abstracted away.
14          So in your question there's two distinct things
15  that aren't the same.  There's the idea of a super thin
16  device, which we participated in that, we didn't happen to
17  call ours a network computer.  In fact, we were a very
18  significant market participant in doing those thin devices.
19     Q.   (BY MR. HOSIE)  Hydra?
20     A.   No, Windows Terminal Server.  Hydra is a code name
21  that we've used around here many times, and I don't -- no
22  shipping product has ever been called Hydra.  Many projects
23  under development were called Hydra.  I don't know if Windows
24  Terminal Server was one of those, but Windows Terminal Server
25  is the product name we used for our thin computing offering.

**Page 21**

1  And so it doesn't run Java or a competitor or anything on it
2  because it's purely thin.
3      Q.   My question, Mr. Gates, is, were you concerned
4  about the marriage of Java and network computing leading to
5  the emergence of a paradigm that would give Microsoft's OS
6  little or no role?
7          MR. DOUGLAS:  Objection to the form.  Vague and
8  ambiguous.
9      A.   Java and network computers are two distinct things.
10  There were aspects of Java that our competitors were adopting
11  that created competition that had nothing to do with network
12  computers.  And in most cases network computers had very,
13  very little to do with Java.
14     Q.   (BY MR. HOSIE)  So are you saying that you were not
15  concerned about the emergence of network computers running
16  some sort of Java runtime as presenting a threat to you at
17  Microsoft?
18     A.   Now, you're talking about the marriage of two
19  things that are basically separate.  We were concerned about
20  what competitors were doing with Java, we were concerned
21  about what competitors were doing with network computers, but
22  by and large, those are two separate things.  If you put them
23  together, it's actually not really a network computer, it's
24  kind of a halfway, you know, kind of a medium fat thing.
25          (Deposition Exhibit No. 3 was marked

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

BILL GATES ; August 26, 2004

Page 22

1          for identification.)
2     Q.    (BY MR. HOSIE) Let me show you what I've marked as
3  Exhibit 3, sir. For the record, I've marked as our next in
4  order Exhibit 3 an April 22, 1997 memo from Jeff Raikes to
5  Bill Gates and Steve Ballmer.
6     A.    That's not correct. It's copied to Bill Gates and
7  Steve Ballmer.
8     Q.    Thank you, it is. And --
9     A.    It's to WWSMM.
10    Q.    And what's the WWSMM acronym stand for?
11    A.    Worldwide sales and marketing meeting. It's a
12  bunch of people.
13    Q.    It's an e-mail alias?
14    A.    It's the set of people who came to a meeting. I
15  don't think it's an e-mail alias, but it's a fairly sizeable
16  group of people who came to an annual meeting called the
17  worldwide sales and marketing meeting.
18    Q.    And you, as you noted, were a carbon copy recipient
19  of this?
20    A.    That's what it shows.
21    Q.    As is Mr. Ballmer?
22    A.    Right.
23    Q.    And it would have been your practice to read this
24  upon receipt, sir?
25    A.    Not everything I'm copied on do I read, no.

Page 23

1     Q.    Did you recall reading this, sir?
2     A.    No.
3     Q.    Is it your expectation given the nature of this
4  document that you would have read it when you received it?
5     A.    Let's see how long it is. I think there's a good
6  chance I didn't read all of this.
7     Q.    Do you think you read parts of it?
8     A.    I don't know.
9     Q.    You just can't recall?
10    A.    That's right.
11    Q.    All right, if you could turn to the second page,
12  sir. Actually, let me start on the first page. If you could
13  read to yourself the first and second sentence of the second
14  paragraph in the introduction.
15    A.    The first and second sentence of which paragraph?
16    Q.    The second paragraph, Mr. Gates.
17    MR. DOUGLAS: The one starting with "But
18  major ..."?
19    MR. HOSIE: Indeed.
20    A.    Okay. (Witness reading document.) Okay, I read
21  the whole paragraph.
22    Q.    (BY MR. HOSIE) This paragraph talks about network
23  computer, does it not?
24    A.    It mentions many competitive activities, I think
25  it's eleven.

Page 24

1     Q.    And one of them is the network computer, is it not,
2  sir?
3     A.    That's correct.
4     Q.    And another is the Java operating environment?
5     A.    That's another one.
6     Q.    And Mr. Raikes -- am I pronouncing his name
7  correctly?
8     A.    Yes.
9     Q.    Mr. Raikes observes that, and I'll quote for the
10  record, "The Network Computer (NC) and the Java operating
11  environment - led by Sun, Oracle, IBM, and Netscape -- is
12  making a big push to displace Windows."
13          Was that your personal view, sir, in 1997?
14    MR. DOUGLAS: Objection to the form and foundation.
15    A.    There were a lot of competitive activities by those
16  people, some of which involved using Java, some of which did
17  not involve using Java. Those were amongst our major
18  competitors.
19    Q.    (BY MR. HOSIE) But my question, sir, was a little
20  different and I'll ask it again.
21          Did you personally feel that network computer and
22  the Java operating environment were making a big push to
23  displace Windows in 1997?
24    MR. DOUGLAS: Same objection.
25    A.    The people making a big push are the competitors.

Page 25

1  The network computer is not making a big push, it's Sun, IBM,
2  the companies that are listed there.
3     Q.    (BY MR. HOSIE) Well, let me ask it this way,
4  Mr. Gates.
5          Do you agree or disagree with what Mr. Raikes wrote
6  here?
7     A.    I think it's sort of a very broad statement that
8  given that he wasn't involved in our platform business, and
9  you can see from the memo that most of what this is talking
10  about is the part of the business he's in charge of. And
11  he's kind of summarizing that if you take all the different
12  things those guys are doing together, picking the different
13  competitive things he's got there, I don't think he's making
14  a big mistake, but it's an introduction to his area of
15  expertise.
16    Q.    Sure. Are you saying that you agree with what he
17  wrote there or you don't think he made a big mistake but
18  perhaps made a little mistake?
19    A.    No, I think it's just oversimplistic and -- but not
20  incorrect.
21    Q.    So generally speaking, you would say this was
22  generally correct?
23    A.    No, I'd say it's oversimplistic.
24    Q.    But generally speaking correct?
25    A.    Well, oversimplistic I think captures exactly what

7 (Pages 22 to 25)

Yamaguchi Obien Mangio, LLC * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101 * (206) 622-6875 * 1(800) 831-6973

BILL GATES ; August 26, 2004

**Page 26**

1  I'd say.
2  Q.  Okay, sir.  Why don't we turn to the next page and
3  perhaps we'll have more success with this language.
4      Do you see a paragraph called Selling the Platform?
5  A.  I do.
6  Q.  Before I ask you questions about this, Mr. Gates,
7  I'd like you to take a moment and read it to yourself.
8      MR. DOUGLAS:  All three paragraphs?
9      MR. HOSIE:  No, just the first paragraph under
10 Selling the Platform.
11 A.  (Witness reading document.)  Okay.
12 Q.  (BY MR. HOSIE)  Mr. Raikes begins by saying, and
13 I'll quote for the record, open quote, "Windows is facing its
14 biggest competitive threat since inception."
15     Have I read that correctly?
16 A.  Uh-huh, yes.
17 Q.  And -- thank you.  And was that how you personally
18 felt in 1997, sir, that Windows was facing its biggest
19 competitive threat since inception?
20 A.  No.
21 Q.  So this is a statement of Mr. Raikes that you would
22 actually in fact disagree with?
23 A.  I think it's fairly classic Microsoft hyperbole to
24 say in every year we're in business, this is the year we're
25 facing the greatest competitive challenge.  And I bet you I

**Page 27**

1  could find a dozen memos a month that speak that way.  I'd
2  say that OS/2 was actually the greatest competitive threat to
3  Windows since its inception, but by the time this memo was
4  written, IBM had done a fairly poor job with OS/2.
5  Q.  People had forgotten about the OS/2 scare, if you
6  will?
7  A.  It was more than a --
8      MR. DOUGLAS:  Objection to the form.
9  Q.  (BY MR. HOSIE)  More than a scare?
10 A.  That's not a good characterization.  It wasn't just
11 a scare, it was actually a product shipped by the largest
12 company in the computer industry called OS/2.
13 Q.  Fair enough.  Would you agree with Mr. Raikes at
14 least to the extent of saying that NC and Java presented a
15 big competitive threat in 1997?
16     MR. DOUGLAS:  Well, objection to the form of that,
17 plus foundation.
18 A.  No, I'd say they were competitors doing a lot of
19 things that were competitive threats.  Amongst those there
20 was the NC work which is one thrust which we actually got
21 involved in and did pretty well in.  Then there were various
22 people using pieces of Java technology which we also to a
23 limited degree got involved in.
24 Q.  (BY MR. HOSIE)  Sure, sure, the subject of the Sun
25 One case in San Jose?

**Page 28**

1  A.  No.
2  Q.  Well, Mr. Gates, let me go on to the next sentence
3  and I'll read it for the record.  "If the NC is successful,
4  it will mean a catastrophic downside in Windows revenue, our
5  server business, our tools business, and our applications
6  business - i.e. NC's threaten the heart and body of our
7  company."
8      Sir, did you agree that network computers
9  threatened the heart and body of Microsoft as of 1997?
10 A.  Not the network computers that we created which
11 were the Windows Terminal Server ones, but if people weren't
12 buying Microsoft-related software, that is, if they bought an
13 NC that had no relationship to Windows whatsoever, that could
14 displace all the things that Mr. Raikes enumerates.
15 Q.  So -- sure.  So, for instance, if NCs running Navio
16 became the standard --
17 A.  What is Navio?
18 Q.  Does that ring a bell, sir, N-a-v-i-o, an operating
19 runtime --
20 A.  What is Navio?
21 Q.  Do you recall at all?  I take it not.
22 A.  No.
23 Q.  What runtimes do you recall that weren't Microsoft
24 based for NCs as of 1997?  Give me some names if you can
25 recall some.

**Page 29**

1  A.  Well, basically a pure NC isn't going to have an
2  operating system, it's going to have the ability to do
3  presentation.  And that's why they called it thin, because
4  you never had to update the software that was on it.  Now,
5  the problem you get into is then you can't do things like --
6  Q.  Multimedia?
7  A.  -- video to it.  Now, you know, more recently,
8  these low end devices, it's been cheaper to put things in
9  them, but they've always had big problems with things like
10 streaming video or add-ins, plug-ins, things of that nature.
11 So there's a whole spectrum of devices going from what is
12 truly a network computer like Windows Terminal Server all the
13 way up to a full-blown PC.
14 Q.  As a continuum, if you will?
15 A.  Well, essentially it was -- from a technological
16 point of view there is a continuum.  In fact, the way it's
17 turned out, most points on the continuum have not captured
18 any popularity.  The PC itself because of its rich
19 functionality is very high volume, and then there's some of
20 these true thin devices that are high volume.
21     These things that were proposed that were in the
22 middle that sort of ran local functionality but sort of
23 didn't run full applications, they were a complete failure in
24 the marketplace.  I mean, even the people who had them, you
25 know, just had them sitting there, eventually discontinued

8 (Pages 26 to 29)

BILL GATES ; August 26, 2004

**Page 30**

1 their use.
2 Q. I think you called them a few minutes ago the
3 medium fat?
4 A. Right. But in our industry not everybody agrees on
5 terminology, and so there was a tendency to use the term thin
6 or network computer in very different ways by different
7 companies.
8 Q. And for the medium fat device that you've described
9 for me twice now, can you recall some non-Microsoft runtimes
10 that were in use?
11 A. Yeah, all of the RTOSes were proposed there. IBM
12 had one. I think one of the most popular was what's called
13 Wind River was used in most of them.
14 Q. Mr. Raikes goes on to say, "This is more than just
15 an OS battle. This is about Windows clients, Windows
16 servers, Windows tools, and Windows applications."
17 Do you see that, sir?
18 A. I do.
19 Q. Would you agree with Mr. Raikes that the NC battle,
20 including the continuum from thin to medium fat to fat,
21 presented more than just an OS battle?
22 MR. DOUGLAS: Objection to the form.
23 A. I think what Mr. Raikes is saying is if you don't
24 buy a PC with Windows, then there's a number of Microsoft
25 products that require Windows you aren't a candidate to buy.

**Page 31**

1 Q. (BY MR. HOSIE) And then he goes on to note, "If
2 Microsoft technology is relegated into 'yesterday's
3 technology' in lieu of the Java operating environment and
4 Java apps, Microsoft loses."
5 What does that language mean to you, Mr. Gates?
6 MR. DOUGLAS: Objection. Form and foundation.
7 Q. (BY MR. HOSIE) The language I've just read.
8 A. I think he's saying nobody wants to be yesterday's
9 technology, that people prefer to be today's technology.
10 Q. Well, if people generally, consumers generally
11 adopted Java operating environment and Java apps, would
12 Microsoft lose, sir?
13 MR. DOUGLAS: Objection to the form. Hypothetical.
14 A. If historically they would have bought from us and
15 now they're buying from somebody else, that represents a --
16 Q. (BY MR. HOSIE) A loss?
17 A. -- a potential loss of a customer.
18 Q. And this was a competitive threat that you
19 personally were concerned about in 1997, potentially losing
20 these customers?
21 A. Which competitor are we talking about?
22 Q. I'll take them as a group, sir. You personally
23 were concerned that Microsoft was running the risk in 1997 of
24 people abandoning a Windows-based system and moving to some
25 sort of thin or medium fat NC Java-driven system?

**Page 32**

1 MR. DOUGLAS: Objection to the form. Vague and
2 ambiguous.
3 A. I think at all times I've worked at Microsoft it's
4 my job to be concerned about anything that would substitute
5 for Microsoft sales.
6 Q. (BY MR. HOSIE) All right, sir. Now, Intel was
7 actively working with Java, especially in the multimedia area
8 in 1997, was it not?
9 A. I never had a perfect understanding of what Intel
10 was and wasn't doing. They had some Java-related activities
11 in different years, and if you want to go into specifics, I
12 don't think you'll find me to be the expert on exactly what
13 they were doing at what time.
14 Q. Do you remember the Java Media Framework or JMF?
15 A. I never used it. I know there was a thing created
16 by that name.
17 Q. What was it, sir, as you understood it?
18 A. It would be best to ask Intel.
19 Q. Well, I'm asking you, Mr. Gates, what was your
20 understanding of JMF?
21 A. It must have provided some media-related
22 capabilities.
23 Q. That's all you can remember, sir?
24 A. Well, I never used it.
25 Q. Fair enough. But all you can remember about JMF

**Page 33**

1 was that it was something that provided some kind of media
2 capabilities?
3 MR. DOUGLAS: Objection to the form of the
4 question. It's vague, ambiguous and argumentative.
5 A. I never read a spec for the Java Media Framework.
6 Q. (BY MR. HOSIE) Well, I really wasn't asking if you
7 had read specs, sir, I'm asking what you recall about
8 what the JMF was.
9 MR. DOUGLAS: Objection.
10 A. I bet it's related to media just because of the
11 name, but the exact notion or even the vague notion of what
12 would have been included in that, I'm not sure.
13 Q. (BY MR. HOSIE) Give me your best sense, please.
14 A. Media-related functionality.
15 (Deposition Exhibit No. 5 was marked
16 for identification.)
17 Q. (BY MR. HOSIE) Let me show you what's been marked
18 as Exhibit 5. Mr. Gates, I've marked as Exhibit 5 an e-mail
19 thread or string. Do you call them threads or strings
20 personally?
21 A. Either one is fine.
22 Q. You're fine with either reference?
23 A. Absolutely.
24 Q. Okay. I will note, sir, that you're not copied on
25 this series of e-mails, nor are you a direct recipient as far

9 (Pages 30 to 33)

BILL GATES ; August 26, 2004

Page 34

1  as I can tell, but I'll see if I can jog your memory with
2  something that Ms. Kate Seekings says. Now, who is Kate
3  Seekings?
4      A.   No idea.
5      Q.   You recognize that she was at least a Microsoft
6  employee?
7      A.   No.
8      Q.   All right. On the bottom of this page --
9      A.   Was she?
10     Q.   Yes, she was.
11     A.   Okay.
12     Q.   There's a paragraph that I'll read and I'm going to
13  ask you if agree or disagree with what I read. Here's the
14  quote: "Intel's foray into Java development may result in a
15  crop of Intel-based" --
16     A.   Where are you?
17     Q.   First page.
18     A.   Okay. First page?
19     Q.   Yeah, right on the cover.
20     A.   I don't think so.
21     Q.   And you see these little bullet points? Your
22  counsel's pointing it out to you, Mr. Gates.
23     A.   But that's -- you see, that's this. That's not
24  from Kate Seekings' mail, that's from this article.
25     Q.   Yes. No, I know, and she is just picking up the

Page 35

1  bullet points, putting them in her own e-mail.
2      A.   I think it was just copied. It's part of the
3  article.
4      Q.   Right, and I'm about to --
5      A.   So it's not a statement from her.
6      Q.   In the sense of Kate Seekings writing the words, I
7  think that's right, but I'm going to read the language and
8  ask you if agree or disagree with the point made, okay?
9      A.   Okay.
10     Q.   Here's the language. Open quote, "Intel's foray
11  into Java development may result in a crop of Intel-based
12  network computers running native JavaOS and applications, as
13  well as forthcoming NetPCs running Java applets alongside
14  Windows."
15          Did you personally feel in 1997 that Intel's foray
16  into Java might result in a crop of Intel-based NCs?
17          MR. DOUGLAS: Objection. Form and foundation.
18     A.   It looks like they're confusing what Intel's doing
19  on with Java with what might happen in network computers.
20  And, you know, as I said, there are many ways that people
21  talked about the term network -- used the term "network
22  computer." But from my point of view, what Intel was doing
23  with Java and what they were doing with network computers,
24  those are two different things.
25     Q.   (BY MR. HOSIE) So you're saying you personally

Page 36

1  didn't believe in 1997 that Intel's foray into Java
2  development might result in a crop of Intel-based NCs?
3      A.   No. Intel could have done whatever they wanted to
4  do with NCs independently of whatever Intel did with Java.
5      Q.   Okay. Now, thinking back to Intel's work in the
6  multimedia space in 1997, is it fair to say, Mr. Gates, that
7  you personally were unhappy with that work?
8          MR. DOUGLAS: Objection to the form.
9      A.   I don't know the specific year to target it to, but
10  there were a period of years where it was frustrating that
11  some of the software work that Intel did we felt didn't
12  advance Intel's interests and complicated some things we were
13  trying to do.
14     Q.   (BY MR. HOSIE) Okay, so you recall a period of
15  time when you personally were less than happy with Intel's
16  work because you viewed them as creating imperfect software
17  that complicated things you wanted to do; fair summary?
18          MR. DOUGLAS: Objection to the form.
19     A.   At a very high level, yes.
20     Q.   (BY MR. HOSIE) That's it, that's the only thing
21  you were concerned about, sir?
22     A.   No.
23          MR. DOUGLAS: Objection to the form, plus
24  argumentative.
25     Q.   (BY MR. HOSIE) Let me put it this way, Mr. Gates.

Page 37

1  Isn't it true, sir, that you personally were distressed and
2  unhappy and even angry that Intel was working with Java?
3      A.   There were aspects of Intel's Java work that we
4  felt was bad for Intel and was something that we didn't think
5  was fruitful or good for them to do, and we -- there was a
6  period of time where we shared with them our views on where
7  Java was appropriate and where it wasn't.
8      Q.   Isn't it true, sir --
9          MR. DOUGLAS: Hold on. I'll give a belated
10  objection to form on the question. I didn't want to
11  interrupt the witness. Go ahead.
12          MR. HOSIE: Did you get your objection?
13          MR. DOUGLAS: Yes.
14     Q.   (BY MR. HOSIE) Mr. Gates, isn't it true that you
15  personally coerced Intel into abandoning its JMF work in 1997
16  and 1998?
17     A.   No.
18          MR. DOUGLAS: Objection to the form.
19          (Deposition Exhibit No. 6 was marked
20          for identification.)
21     Q.   (BY MR. HOSIE) Let me show you what I've marked as
22  next in order, Exhibit 6. Counsel, copy for you.
23          Mr. Gates, I'd ask you to keep your exhibits in a
24  pile there because there's some possibility, perhaps a
25  likelihood, that I would cycle back to some of them.

10 (Pages 34 to 37)

BILL GATES ; August 26, 2004

**Page 38**

1    MR. DOUGLAS: I am keeping them in a pile for him.
2    MR. HOSIE: Thank you.
3    Q.   (BY MR. HOSIE) For the record, Exhibit 6 is a
4    cover page, an e-mail that's been redacted on ostensibly
5    privileged grounds from Paul Maritz to David -- to Marshall
6    Brumer, Aaron Contorer and Mr. Gates.
7    Aaron Contorer was your technical assistant or TA
8    in this period, Mr. Gates.
9    A.   Looking at this e-mail, I think it's likely. I
10   don't remember exactly when he was, but it's likely.
11   Q.   When did Eric Rudder replace him, if you recall?
12   A.   I don't.
13   Q.   And was Eric Rudder replaced by Anoop Gupta or was
14   there somebody in between the two?
15   A.   Well, the nature of this so-called technical
16   assistant job was changed between what Aaron did and what
17   Eric did, but it's true that after Aaron left, Eric took the
18   job. It became a much bigger job. And then Anoop took it
19   and it was about -- treated about the same as Eric.
20   I don't remember -- each of these guys worked for
21   me for about two and a half years, I'd say. And now actually
22   Anoop is doing something else, and another person, Alex
23   Genaris, is now my technical assistant.
24   Q.   Anoop is now running your RTC group?
25   A.   That's right.

**Page 39**

1    Q.   All right. Attached to this e-mail is something in
2    the lower left which is noted as "Intel 1/30 roadmap,
3    Java/Manage." Do you see that?
4    A.   What is it?
5    Q.   That denotes an attachment, does it not, sir?
6    A.   I don't think so. Java/Manage?
7    Q.   Turn to the next page.
8    A.   It may be an enclosure.
9    Q.   Fair enough. And do you see the attached e-mail
10   dated February 3, 1997, and the subject line?
11   A.   Yeah, it looks -- on the second page it looks like
12   there's an attachment which may be that somebody took that
13   enclosure and expanded it and printed it out.
14   Q.   And do you recall receiving this February 3, 1997
15   memo, sir?
16   A.   I don't see my name on it.
17   Q.   Do you see your name on the cover page enclosing
18   the Intel 1/30 roadmap Java document?
19   A.   Well, this is confusing. What is this e-mail?
20   Q.   Well, it's hard for us to tell, Mr. Gates, because
21   the text has been redacted on privileged grounds. That's why
22   --
23   A.   A hundred percent of it?
24   Q.   Apparently so, but I would only be speculating.
25   A.   Because all I see is the word "privileged."

**Page 40**

1    Q.   That's all I see too.
2    A.   Okay, so we're seeing the same thing. I never got
3    an e-mail, I don't think ever, that just said "privileged" so
4    it's hard for me to remember, because clearly --
5    Q.   There was something here?
6    A.   -- at least in the form we're looking at it, it
7    might even have stood out even though it's seven years ago.
8    But so I don't think I got it -- anything like this.
9    Q.   All right, fair enough. And perhaps I'm not
10   understanding something about Microsoft's practices, but
11   doesn't this little envelope with the title mean there's an
12   attachment or an enclosure?
13   A.   Yeah. Actually, e-mail doesn't work that way now,
14   but back then I think that is the way it worked. I think
15   this -- I think what's going on here is they got rid of all
16   the text and they just left the -- it's not a -- enclosure
17   and attachment is basically the same idea. And they're just
18   saying that Maritz enclosed that in this thing.
19   Q.   Fair enough, okay. So the enclosure was at least
20   sent to you by the cover e-mail; correct?
21   A.   If we're interpreting what's going on here
22   correctly then I got an e-mail with unknown contents that
23   appears from this printout to have enclosed this e-mail.
24   Q.   Thank you. And you don't recall reading the
25   enclosure, do you, back then?

**Page 41**

1    A.   I wonder why he didn't send it to me directly.
2    Q.   I don't know.
3    A.   Okay.
4    Q.   Do you recall reading this, sir, back then?
5    A.   This is the kind of meeting summary that I would
6    see from time to time. I don't remember this specific one.
7    Q.   Mr. Gates, was it your practice if you received a
8    meeting summary to read it?
9    A.   Some, but absolutely not all of them.
10   Q.   Sure. It would depend on --
11   A.   I mean, this one, this is classic because, you
12   know, how many different things -- you know, like take Intel
13   code names. I see about 20 Intel code names just on the
14   first page. I wouldn't have been knowledgeable enough to
15   interpret all of those things. But typically a meeting with
16   Intel, an important meeting, somebody would put notes
17   together.
18   Q.   And if you got a meeting report about an important
19   meeting with Intel, it would be your practice to read the
20   report, I would think?
21   A.   There were a lot of meetings with Intel, and some I
22   would get reports on and some I wouldn't. This one I wasn't
23   copied on.
24   Q.   But my question, sir, was a little different. If
25   there were an important meeting with Intel and if you

11 (Pages 38 to 41)

BILL GATES ; August 26, 2004

**Page 42**

1 received a meeting report about that important meeting, it
2 would have been your practice, generally speaking, to read
3 it; correct?
4    A.  Well, it's kind of a circular definition. If I
5 didn't read it, you know, that must mean some — I exercised
6 some judgment about its relative importance to me relative to
7 the use of my time.
8    Q.  So you're not willing to agree that if there were
9 an important meeting with Intel and you got a summary of the
10 important meeting, it wouldn't be, generally speaking, your
11 practice to read the summary?
12       MR. DOUGLAS: Objection. Asked and answered.
13    A.  The important meetings were the ones I attended.
14 Those were the ones probably of the greatest importance.
15    Q.  (BY MR. HOSIE) Okay.
16    A.  Beyond that, I'm not sure what you mean by
17 important.
18    Q.  If you could turn to the third page of the
19 enclosure or attachment, given that they're synonyms, you'll
20 see at the top third a heading, Java - JohnLu/Will Swope?
21    A.  Yeah.
22    Q.  And a series of bullet points following. JohnLu
23 would of course be John Ludwig?
24    A.  Yes.
25    Q.  I'm sorry, Mr. Gates, I didn't mean to rush you.

**Page 43**

1 Why don't you take a minute to read the bullet points.
2    A.  (Witness reading document.) Okay.
3    Q.  Who was Will Swope?
4    A.  I believe he's an employee of Intel.
5    Q.  That would be correct, sir.
6    A.  Hey, what do I get if I get all the answers right?
7    Q.  How about a heartfelt thanks.
8       MR. DOUGLAS: You'd only have another 55,000
9 employees.
10    Q.  (BY MR. HOSIE) I'd like to ask you a few questions
11 about the fourth and fifth bullet points down. The fourth
12 says MM Libraries.
13       What is your understanding of an MM library, sir?
14    A.  No idea.
15    Q.  Multimedia library? Does that help?
16    A.  No.
17    Q.  Doesn't ring a bell? And then the text goes on to
18 say, "This is the area of most contention since Intel does
19 not see their work with Sun and others as bad for the overall
20 PC space, only as good for Intel."
21       Was it your understanding in 1997 thinking back,
22 Mr. Gates, that Intel, as you understood it, did not see
23 their work with Sun and others as bad for the overall PC
24 space, just good for Intel?
25    A.  I don't know what you're talking about.

**Page 44**

1    Q.  You don't know --
2    A.  When it says "this is the area," what's being
3 referred to?
4    Q.  Multimedia, JMF.
5    A.  What makes you say that?
6    Q.  MM is an acronym for multimedia libraries, sir.
7       MR. DOUGLAS: What's the question?
8    A.  Yeah, let's be clear on what you're asking me.
9    Q.  (BY MR. HOSIE) Did you personally feel that
10 Intel's work on multimedia, JMF, for example, was an area
11 where Intel did not see their work with Sun and others as bad
12 for the overall PC space, only as good for Intel?
13       MR. DOUGLAS: Objection. Form and --
14    Q.  (BY MR. HOSIE) Do you understand the question,
15 Mr. Gates?
16       MR. DOUGLAS: And objection. Form and formation.
17    A.  I don't know what Intel thought about their work
18 and I don't know that much about the work.
19    Q.  (BY MR. HOSIE) I'm asking you not to read Intel's
20 mind but for your understanding of your perception of Intel's
21 belief, if you will.
22       MR. DOUGLAS: Same objection.
23    A.  Isn't that asking me about Intel's belief?
24    Q.  (BY MR. HOSIE) No, I'm asking you about what you
25 believed Intel thought.

**Page 45**

1    A.  I don't know what Intel thought.
2    Q.  I'm asking you about what you thought Intel
3 thought.
4    A.  I didn't know what Intel thought.
5       MR. DOUGLAS: Excuse me, please. You're just
6 arguing with the witness. He's answered the question.
7    Q.  (BY MR. HOSIE) Did you have a personal belief
8 about Intel's opinion on whether its work with Java, JMF, Sun
9 and others was good for the PC space or bad for the PC space?
10       MR. DOUGLAS: Objection. Form. Vague, ambiguous,
11 and foundation.
12    A.  I've always thought about different people at Intel
13 in terms of, you know, when I was going to meet with one
14 person I would find out what they were thinking. In terms of
15 Java, I know over time different people at Intel thought
16 different things, did different things. So I don't think
17 there's any kind of monolithic, simple answer.
18    Q.  (BY MR. HOSIE) I think that's fair, because of
19 course a corporation is just composed of individuals and
20 individuals may feel differently about even the same issues;
21 correct?
22       MR. DOUGLAS: Objection to the form.
23    A.  And some may know more and some may know less.
24    Q.  (BY MR. HOSIE) All right. Was it one of your
25 personal objects in 1997 to try to persuade Intel that its

12 (Pages 42 to 45)

BILL GATES ; August 26, 2004

Page 46

1  work with Java, especially in the JMF area, was in fact bad
2  for the overall PC space?
3       MR. DOUGLAS: Objection to the form.
4       MR. BURT: Could you read the question back,
5  please?
6       (Reporter read back as requested.)
7       MR. DOUGLAS: And in addition, objection on
8  foundation grounds.
9    A.   There were definitely discussions about Java and
10 how that might hurt Intel's interests. I don't think there
11 was anything specific to Java media.
12   Q.   (BY MR. HOSIE) Do you recall discussions with
13 folks at Intel about how Intel's work with Java would hurt
14 Microsoft's interests?
15   A.   We generally didn't focus on that because, you
16 know, that wasn't really Intel's concern, but we talked to
17 them about what we were doing in Java because we had a number
18 of Java activities including a contract we'd entered into
19 with Sun and some of our own native Java work, and they were
20 sometimes confused about what we were and weren't doing.
21   Q.   My question was a little different, Mr. Gates, I'll
22 put it again.
23       Do you recall conversations with folks at Intel
24 where you expressed concern about Intel's Java work being bad
25 for Microsoft?

Page 47

1       MR. DOUGLAS: And I think that question's been
2  answered by the witness. He said no.
3    Q.   (BY MR. HOSIE) Is that a no, sir?
4    A.   I don't recall any specific question where that
5  would have come up. Intel was mostly interested in how we
6  thought things were related to Intel strategy. We from time
7  to time would share with them our strategy including what we
8  were doing with Java.
9    Q.   Do you recall having a multimedia offsite in early
10 February 1997?
11   A.   No.
12   Q.   What's the phrase "offsite" mean in Microsoft
13 vernacular, as you understand it, sir?
14   A.   I don't think we've adopted a unique definition of
15 that particular word.
16   Q.   It hasn't been extended, as it were?
17   A.   No. I think it means meeting somewhere other than
18 in the normal offices.
19   Q.   And do you recall a meeting somewhere other than
20 the normal offices focusing on multimedia in early February
21 1997?
22   A.   No.
23   Q.   Let's see if I can refresh your recollection with
24 what I've marked as Exhibit 7.
25       (Deposition Exhibit No. 7 was marked

Page 48

1       for identification.)
2    Q.   (BY MR. HOSIE) Mr. Gates, if at any time you wish
3  to take a break, just let me know.
4    A.   (Witness reading document.) Okay. What's the
5  question?
6    Q.   Does reading this MM offsite summary refresh your
7  recollection of a multimedia offsite meeting in February
8  1997?
9    A.   I wonder what the offsite -- there's clearly an
10 offsite, but I wonder what the focus of it was.
11       MR. DOUGLAS: Well, do you want the witness just to
12 read the e-mail, and your question then is does it refresh
13 his recollection of being there?
14   Q.   (BY MR. HOSIE) I'm sorry, Mr. Gates, I thought you
15 had read this e-mail.
16   A.   I've read it now.
17   Q.   Yeah, thank you. And my question was, having read
18 it, is your memory refreshed as to a MM offsite in February
19 of 1997?
20   A.   Actually, I think it was a graphics offsite.
21   Q.   Oh, okay. So you do remember the offsite meeting?
22   A.   No, I don't actually remember the meeting. This
23 memo is talking about a lot of graphics issues, and this
24 person, Deborah Black, who did work at Microsoft at the time
25 seems to be talking about some discussions including some

Page 49

1  comments by me related to graphics.
2    Q.   And let me ask you about her recounting of comments
3  attributed to you. You'll see them in the middle of the
4  page.
5    A.   Well, that's not the only place.
6    Q.   Right, but let me start there.
7       "BillG's direction on Talisman." You of course
8  would be the BillG?
9    A.   Almost certainly.
10   Q.   All right. What was Talisman, sir?
11   A.   It was a piece of graphics, hardware and software.
12   Q.   And this memo recounts that you've said, "We've
13 invested a lot in Talisman and should follow through on it."
14 Was that your view in 1997?
15   A.   I'm not sure. It's the kind of viewpoint I might
16 have of something we've invested. Turns out Talisman
17 eventually came to an end, but.
18   Q.   And the next point, and let me quote this, open
19 quote, "We need to close the Intel issue - preferably with
20 Intel as our key partner. However, we cannot give in to
21 Intel and allow them to ship Talisman technology on
22 non-Windows systems. Key issue is preventing Intel to use
23 Talisman with Java VM."
24       VM would be short for virtual machine, sir?
25   A.   Uh-huh.

13 (Pages 46 to 49)

BILL GATES ; August 26, 2004

Page 50

1    Q.   Did you personally think it was a key issue to
2    prevent Intel from using Talisman with Java Virtual Machine?
3         MR. DOUGLAS: Objection to form and foundation.
4    A.   I know we've invested a lot -- I don't recall
5    what's being discussed when Deborah wrote that. I know we've
6    invested a lot in Talisman and we'd said to Intel, are you
7    willing to pay us a royalty when our intellectual property
8    gets used. And they had said no, you have to get any benefit
9    from your inventions through the sales of Windows. And then
10   we said, okay, then we can only support it in the Windows
11   environment. And, you know, that's the way that came out.
12        Now, Talisman, you know, it became moot that even
13   though they wouldn't pay us for our inventions, we eventually
14   -- although actually we have a lot of patents that are
15   valuable today, we actually never ended up productizing that
16   work in this time frame.
17        Q.   (BY MR. HOSIE) Is it your testimony, Mr. Gates,
18   that you did feel that preventing Intel from using Talisman
19   with Java Virtual Machine was a key issue but only because of
20   IP royalty issues?
21        MR. DOUGLAS: Objection to the form.
22   A.   The issue is are we going to get paid anything when
23   Talisman is used, that's all. And we thought because we'd
24   done some invention that we ought to get paid.
25   Q.   (BY MR. HOSIE) So your testimony here today, sir,

Page 51

1    is that your only concern with Talisman being used with the
2    Java Virtual Machine was whether you were paid for your
3    intellectual property?
4         MR. DOUGLAS: Objection to the form.
5    A.   I'm not commenting at all about anything other than
6    reading this memo that reminds me of only one concern which
7    is whether we were paid at all for the Talisman inventions.
8    Q.   (BY MR. HOSIE) Do you recall that you personally
9    had any other concerns about Intel using Talisman with the
10   Java Virtual Machine?
11   A.   No.
12   Q.   So the only concern you can recall is one having to
13   do with IP royalty streams? Is that your testimony?
14   A.   Whether we got paid at all for our Talisman work,
15   just that.
16   Q.   And that's the key issue that you believe you
17   discussed at this multimedia offsite?
18   A.   I'm not sure.
19   Q.   Now, beginning in February of 1997, you had a
20   series of conversations with Andy Grove of Intel about
21   Intel's Java work, did you not, sir?
22   A.   Throughout a period of many years I had many
23   conversations with Andy. I have no idea in what time period
24   Java-related issues might have come up. It might have
25   started before that, after that, but there were many years

Page 52

1    there where I've talked to Andy about a large range of
2    topics.
3    Q.   And you recall there was a period of time when one
4    of those topics was Intel's work with Java?
5    A.   Not so much Intel's work with Java, although that
6    came up, it was just the whole notion of what was Microsoft
7    doing with Java, how is that affecting the industry. Java
8    refers to quite a range of things from a computer language to
9    an intermediate representation to various runtime activities,
10   and it's a term that was used by different people even within
11   one company in very different ways and, you know, a hot topic
12   in the computer industry. And so during the years it was a
13   hot topic, it was one of the things that would have come up
14   in my meetings with Andy.
15        (Deposition Exhibit No. 8 was marked
16        for identification.)
17   Q.   (BY MR. HOSIE) Let me show you what I've marked as
18   our next in order, 8.
19        Mr. Gates, I'll give you a chance to read this
20   before I ask questions, but let me identify it for the
21   record. It is an e-mail thread or string that ends in a
22   chronological sense with an e-mail from Marshall Brumer to
23   Bill Gates, dated February 24, 1997.
24   A.   (Witness reading document.) Okay. I mean, do I
25   need to read it all?

Page 53

1    Q.   Well, if you could read the first page I think that
2    would be helpful, sir.
3    A.   (Witness reading document.) Okay.
4    Q.   Sir, I assume you have no recollection but let me
5    ask, in the spirit of optimism. Do you recall receiving this
6    e-mail from Marshall Brumer in February 1997?
7         MR. DOUGLAS: Objection to the form.
8    A.   I don't know what you mean by optimism.
9    Q.   (BY MR. HOSIE) Well, let me rephrase my question.
10   Do you recall getting this e-mail from Marshall Brumer on or
11   about February 24, 1997?
12   A.   No.
13   Q.   All right, sir. Who is Marshall Brumer, please?
14   A.   He's an employee of Microsoft who for a period of
15   time managed our liaison with Intel.
16   Q.   Earlier you told me you weren't sure who Kate
17   Seekings is. You see that this e-mail identifies Kate
18   Seekings as a PM or project manager in the Java group?
19   A.   I wonder which group she was in.
20   Q.   Would have been a Microsoft group as you read this
21   e-mail?
22   A.   It appears to be, yes.
23   Q.   Now, the first sentence references a call that you
24   had scheduled with Andy. Do you see that reference?
25   A.   It appears to refer to the fact I'm going to talk

14 (Pages 50 to 53)

BILL GATES ; August 26, 2004

**Page 54**

1  to Andy.
2  Q.  And that would be Andy Grove of Intel?
3  MR. DOUGLAS: Objection to the form.
4  A.  Almost certainly.
5  Q.  (BY MR. HOSIE) And he was the CEO of Intel at the
6  time?
7  A.  That's right.
8  Q.  And this is the Andy Grove that you've talked to
9  frequently over the years about issues in the computer space?
10  A.  Right.
11  Q.  Mr. Brumer goes on to say that, "At a hi-level, we
12  are most concerned that Intel is helping one of OUR," in
13  bold, "strongest competitors by supporting a scheme that
14  allows first Windows to be replaced by JavaSoft work and then
15  subsequently allowing Intel's x86 to be replaced by Sun CPUs
16  for Java."
17  Do you see that, sir?
18  A.  I do.
19  Q.  And did you personally share that concern in 1997,
20  specifically that Intel was helping one of Microsoft's
21  strongest competitors?
22  MR. DOUGLAS: Objection to the form.
23  A.  Intel's always had activities with our competitors.
24  That's no surprise, if that's what you mean.
25  Q.  (BY MR. HOSIE) It wasn't my question, Mr. Gates.

**Page 55**

1  My question was were you concerned, you personally concerned
2  that Intel was helping one of Microsoft's strongest
3  competitors?
4  MR. DOUGLAS: Same objection.
5  A.  At all times we knew that Intel would be doing
6  things with our competitors.
7  Q.  (BY MR. HOSIE) Do you recall the question I asked,
8  sir?
9  A.  Uh-huh.
10  Q.  Could you please answer it?
11  MR. DOUGLAS: Objection. You're just arguing with
12  the witness.
13  And, Mr. Gates, if you'd like to have your answer
14  read back, the prior question and answer read back to
15  determine whether there's anything else you can add, you may
16  have that done as well.
17  Q.  (BY MR. HOSIE) Would you like me to put my
18  question again, sir?
19  A.  Go ahead.
20  Q.  Thank you, I will.
21  Mr. Gates, were you personally concerned in 1997
22  that Intel was helping one of Microsoft's strongest
23  competitors?
24  MR. DOUGLAS: Objection, form. Plus asked and
25  answered.

**Page 56**

1  A.  I'm not sure I know what you mean by concern.
2  Intel worked with lots of software companies including
3  Microsoft, did a lot with Microsoft, and they did a lot with
4  Microsoft's competitors at all times. So it wasn't a concern
5  in the sense that we always expected that to be the case.
6  Q.  (BY MR. HOSIE) So you're saying this is a concern
7  that you personally did not have? Is that your testimony?
8  MR. DOUGLAS: Objection to the form.
9  A.  I didn't expect that ever not to be the case. I
10  did think that we could talk to Intel about what we thought
11  would be helpful to Intel or would hurt Intel.
12  Q.  (BY MR. HOSIE) Well, I'll ask my question one last
13  time, sir.
14  Did you personally share the concern that Intel was
15  helping one of Microsoft's strongest competitors? If you
16  could answer that yes or no, I would appreciate it.
17  MR. DOUGLAS: Same objection.
18  A.  Yeah, I think I've answered that.
19  Q.  (BY MR. HOSIE) Okay. And were you personally
20  concerned that Intel was helping support a scheme that would
21  have Windows be replaced by JavaSoft?
22  MR. DOUGLAS: Objection. Form and foundation.
23  A.  Intel chose to do work related to Java, and we
24  explained, as the mail says, that that actually could work
25  against their interests. And they took our input and did

**Page 57**

1  whatever they wanted to do.
2  Q.  (BY MR. HOSIE) So your testimony, Mr. Gates, is
3  that you were concerned but it was purely altruistic, and a
4  concern for Intel's well-being?
5  A.  No, I'm --
6  MR. DOUGLAS: Objection to form and foundation.
7  A.  I'm certain that's a bad summary of what I said.
8  Q.  (BY MR. HOSIE) That doesn't sound right, does it?
9  A.  No. You have a hard time summarizing what I'm
10  saying.
11  Q.  Well, let me ask my question again.
12  Were you concerned that Intel was supporting a
13  scheme to replace Windows with JavaSoft?
14  MR. DOUGLAS: Objection to the form.
15  Q.  (BY MR. HOSIE) Do you understand the question,
16  sir?
17  A.  Yeah, you're -- are you asking me about Brumer's
18  mail or just my general feeling?
19  Q.  I'm asking you to think back and tell me whether
20  you personally were concerned in 1997 that Intel was
21  supporting a scheme to replace Windows with JavaSoft.
22  MR. DOUGLAS: Same objection.
23  A.  I think it's incorrect to say that Intel as a whole
24  was supporting such a scheme. They were doing things that
25  were -- could be viewed as helpful to that, they were doing

15 (Pages 54 to 57)

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

BILL GATES ; August 26, 2004

Page 58

1 lots and lots of things that could be viewed as not helpful
2 to that. Intel was engaged in a huge range of activities,
3 and I think the e-mail that you've got here is talking about
4 one particular Intel activity, not Intel as a whole.
5 Q. (BY MR. HOSIE) And was Intel's work to support a
6 scheme to replace Windows with JavaSoft a concern of yours,
7 Mr. Gates?
8 MR. DOUGLAS: Same objection.
9 A. Intel was doing a variety of things with Java.
10 It's not my view -- you're reading from Brumer's mail.
11 Various things they were doing could have helped various
12 aspects of Java. It was not some big Intel top level
13 strategy to cause Windows to be replaced, that I can say for
14 sure. They were doing some things that were helpful to
15 Windows, some things that were helpful to our competitors,
16 and that was always the case. The whole time we worked with
17 Intel, they chose what to do with our competitors, they chose
18 what to do with us.
19 Q. (BY MR. HOSIE) You weren't telling Intel what to
20 do, you being Microsoft?
21 A. We often would share with them our view of the
22 industry and then Intel would decide what it wanted to do.
23 Q. Because it wouldn't be -- well, strike that, let me
24 go back to my question.
25 Focusing on that aspect of Intel's work that

Page 59

1 involved Intel supporting a scheme to replace Windows with
2 JavaSoft, that aspect of the work gave you, Bill Gates,
3 heartburn; fair?
4 MR. DOUGLAS: Objection to the form. Vague and
5 ambiguous.
6 A. No. Intel didn't have a view to do something that
7 was monolithic in nature. They had ways that they were
8 engaging in optimizing Java things on the Intel architecture.
9 Some of those we thought worked against Intel's interests and
10 we shared our view on that. But they didn't -- it wasn't
11 some grand scheme at Intel related to this.
12 Q. (BY MR. HOSIE) You see there's the attached Kate
13 Seekings memo that Mr. Brumer forwarded to you?
14 A. E-mail, yes.
15 Q. Yes, thank you, e-mail memo. And there's a heading
16 called Intel's Involvement?
17 A. I see that.
18 Q. And Ms. Seekings says, "Intel is working with
19 Sun/JavaSoft and partners on defining Java Media Framework."
20 Do you see that, sir?
21 A. Uh-huh.
22 Q. And she goes on to describe something, something
23 about the JMF, does she not?
24 A. Yeah, it says telephony APIs.
25 Q. Well, JMF, comma, animation, comma, 3D, comma, and

Page 60

1 telephony. Those are separated by commas, are they not, sir?
2 A. Are you suggesting that the animation and 3D were
3 not part of JMF?
4 Q. Well, I'm going to ask you this. Has reading this
5 refreshed your recollection of what JMF was, sir?
6 A. I'm more confused now than I'm looking at this.
7 Q. Certainly the phrase "Java Multimedia" is one that
8 you yourself used back in 1997, is it not, sir?
9 A. As a formal term to refer to a particular project,
10 no, but the notion that people were doing multimedia type
11 work related to Java, certainly we knew that was going on and
12 we'd talk about the fact it was going on.
13 Q. And when you use the phrase Java Multimedia, what
14 did you mean by it?
15 A. Just any activity related to Java that involved
16 supporting multimedia.
17 Q. Let me show you our next in order, Exhibit 9,
18 Mr. Gates.
19 (Deposition Exhibit No. 9 was marked
20 for identification.)
21 MR. HOSIE: As Mr. Gates reads this, let me note
22 for the record that this is an e-mail thread that ends with
23 an e-mail from Mr. Gates to Jim Allchin, dated February 20,
24 1997.
25 A. Okay, I've read the top of it.

Page 61

1 Q. (BY MR. HOSIE) You recall this e-mail, I'm sure,
2 sir?
3 A. No.
4 Q. Was it one of the e-mails shared with you by your
5 lawyers yesterday?
6 A. I believe it was.
7 Q. And how about the other exhibits I've marked? Were
8 any of those shared with you yesterday?
9 A. We'd have to go back through them. I don't think
10 so, but do you want me to go back through them?
11 Q. If you wouldn't mind. Just quickly rifle through
12 them and tell me if any of these were part of the mysterious
13 nine.
14 MR. DOUGLAS: Objection to the form.
15 MR. HOSIE: Sounds like a bad Hollywood movie, The
16 Mysterious Nine.
17 A. Eight might have been; 7, no.
18 MR. DOUGLAS: Mr. Gates, frankly, I think we
19 shouldn't do this exercise. This does violate the
20 attorney-client privilege to go into specifically what was
21 discussed with you yesterday. And asking about the specific
22 exhibits crosses that line, so I'll instruct you not to
23 answer further.
24 Q. (BY MR. HOSIE) Mr. Gates, though, you do recall
25 that Exhibit 9 was shared by your counsel with you yesterday?

16 (Pages 58 to 61)

BILL GATES ; August 26, 2004

**Page 62**

1    MR. DOUGLAS: Well, Mr. Gates, I'll instruct you
2  not to answer. You've already answered it.
3    MR. HOSIE: I think the bell's a little rung,
4  Counsel.
5    MR. DOUGLAS: And he's already answered, but I
6  would instruct him not to --
7    Q.  (BY MR. HOSIE) Fair enough. Let me move on, then.
8  Prior to seeing this document yesterday do you recall seeing
9  it?
10   A.  No.
11   Q.  You say to Mr. Allchin in your e-mail, "If Intel
12  has a real problem with us supporting this then they will
13  have to stop supporting Java Multimedia the way they are. I
14  would gladly give up supporting this if they would back off
15  from their work on Java which is terrible for Intel. I have
16  a call with Andy on this topic coming up on Monday."
17    Sir, what was your concern with Intel's Java
18  Multimedia as you describe it here?
19   A.  What's going on here is we're talking about some
20  support we plan to do for AMD.
21   Q.  An Intel competitor?
22   A.  And we went ahead and did that work for AMD. We
23  thought that -- we were worried about how Intel would react
24  to it, and if they'd had a super negative reaction, we were
25  wondering how we were going to deal with that. In fact, we

**Page 63**

1  went ahead with this work, we did this work, and Intel didn't
2  do anything that related to that.
3    Q.  To your knowledge, Mr. Gates, did anyone at
4  Microsoft communicate to Intel that Microsoft would not
5  support AMD in this area if Intel stopped working on Java
6  Multimedia?
7    A.  No.
8    Q.  How do you know that, sir?
9    MR. DOUGLAS: Objection.
10   A.  I know what I know. I thought you asked me what I
11  knew. And how do I know what I know?
12   Q.  (BY MR. HOSIE) Yeah. How do you know that no one
13  did that?
14   A.  No, you asked me if I knew whether anyone did it,
15  and I said no, I didn't -- as far as I know, no one did it.
16  This was about our concern about what Intel would do, what --
17  how Intel would react to what we were doing with AMD.
18   Q.  Okay. You seem to have a desire to have Intel stop
19  supporting Java Multimedia here, do you not, sir?
20    MR. DOUGLAS: Objection to the form.
21   A.  No. What I'm showing is that there's an irony that
22  if Intel tells us they don't want us to do something with
23  AMD, that that wouldn't be consistent on their part. And in
24  fact, Intel did behave consistently. We went ahead with this
25  work on AMD and they went ahead with their work on Java,

**Page 64**

1  whatever they wanted to do.
2    Q.  (BY MR. HOSIE) Mr. Gates, you said in 1997, "I
3  would gladly give up supporting this if they would back off
4  from their work on Java ..."
5    Do you see that.
6    A.  ..."which is terrible for Intel."
7    Q.  What was your concern here, sir?
8    A.  I was worried that when we did this AMD work, Intel
9  would come to us and say, hey, we're upset that you're doing
10  this work. That was my concern.
11   Q.  What was your concern about Intel's work on Java,
12  Mr. Gates?
13   A.  This e-mail is about what our reaction would be if
14  they objected to our AMD work, which fortunately that didn't
15  come up.
16   Q.  My question was different and I'll put it again.
17   A.  Not related to the mail?
18   Q.  What was your concern about Intel's Java work, sir?
19   A.  That's not what this mail's about.
20   Q.  Don't you here say, you know what, we won't help
21  AMD, and in exchange we want Intel to stop supporting Java
22  Multimedia?
23    MR. DOUGLAS: Objection to the form.
24   A.  Absolutely not. It says if Intel has a real
25  problem with this, with us supporting this, which fortunately

**Page 65**

1  that didn't happen.
2    Q.  (BY MR. HOSIE) And you're here saying if Intel has
3  a real problem with this, you know what, we won't do it if
4  they stop supporting Java.
5    A.  No, I'm saying it would be inconsistent for them to
6  come to us and say we shouldn't do the AMD work.
7    (Deposition Exhibit No. 10 was marked
8    for identification.)
9    Q.  (BY MR. HOSIE) Let me show you what's been marked
10  as Exhibit 10, Mr. Gates. For the record, Exhibit 10 is an
11  e-mail thread that has as its originating e-mail a mail from
12  Mr. Gates to Paul Maritz, dated February 25, 1997.
13    Have you read it, sir?
14   A.  Yes.
15   Q.  Do you recall this e-mail?
16   A.  No.
17   Q.  Is this one of the nine reviewed with you
18  yesterday?
19    MR. DOUGLAS: Mr. Gates, I'm going to instruct you
20  not to answer.
21    And, Mr. Hosie, you know, save the time, because
22  I'll instruct him on all of the questions.
23    MR. HOSIE: Thank you. Just, I don't need to
24  preserve my record by asking if you'll stipulate that any
25  such question will draw the same instruction?

17 (Pages 62 to 65)

BILL GATES ; August 26, 2004

**Page 66**

1    MR. DOUGLAS: If you wish to ask him about any
2 question -- any exhibit, I would instruct him not to answer.
3    MR. HOSIE: Thank you.
4    Q. (BY MR. HOSIE) Mr. Gates, in your e-mail you
5 summarize a call you had on February 25th with Andy Grove;
6 correct?
7    A. That's what it appears I'm doing in this e-mail,
8 yes.
9    Q. And you say, "I called Andy today to talk to him
10 about our sensitivities about Java ..."
11    Do you see that, sir?
12    A. That's not the whole sentence.
13    Q. That's the part I read. Did I read that correctly?
14    A. You read a partial sentence correctly.
15    Q. What were your sensitivities about Java?
16    MR. DOUGLAS: Objection to the form and foundation.
17    A. As I've said, we were doing some things related to
18 Java and our competitors were doing some things related to
19 Java, and so we were interested in seeing if there were some
20 common views about the Java phenomena. In this mail I say,
21 you know, we got into a discussion of the whole Java
22 phenomena. He thinks the role of IBM is the most interesting
23 element here. He thinks mutually we need to do a better job
24 competing with Sun. Sun's one of the companies that's
25 involved with Java activities.

**Page 67**

1    Q. (BY MR. HOSIE) Sure.
2    A. And so, you know, we wanted to understand, as it
3 says here, we wanted to get some people together to talk
4 about what's going on, see if these are things that mutually
5 weaken or strengthen the things that Microsoft and Intel can
6 do together. And so it's about getting more dialogue on
7 these topics going with Intel.
8    Q. On the topic of more dialogue, third paragraph you
9 say, "He," he being Grove, "said Gelsinger made an offer when
10 they went through what they were doing to have us tell them
11 what they should be doing and that Ludwig had not sent
12 anything in response."
13    Do you recall Andy Grove making the point to you
14 that Gelsinger of Intel had made an offer to John Ludwig to
15 have Microsoft tell Intel what they should be doing?
16    MR. DOUGLAS: Objection to the form and foundation.
17    A. No. They would listen to our advice. They
18 wouldn't follow it very uniformly, but it appears that the
19 guy was open to getting our advice.
20    Q. (BY MR. HOSIE) Intel's a very big company in 1997;
21 correct?
22    A. Big and absolute and very big relative to
23 Microsoft.
24    Q. And a sophisticated company?
25    A. In general, yes.

**Page 68**

1    Q. And I mean, I think you're personally on record as
2 saying that Andy Grove is one of the most perspicacious and
3 capable high tech executives in your experience?
4    A. I don't think I ever called his perspicacious, but
5 I used very positive superlatives to talk about Andy and the
6 work he did.
7    Q. Not perspicacious but equally superlative?
8    A. I'm not sure what equally superlative means.
9 Superlative certainly.
10    Q. And then the third paragraph from the bottom said,
11 "Andy's offer was that he would get his best people together
12 (3 to 4 total) and we would do the same and we could sit down
13 and talk about what is going on. He is going to check with a
14 lawyer first to make sure it's okay to have this kind of
15 talk."
16    Did that meeting actually happen, sir, do you know?
17    A. I don't know. I know there were lots of meetings
18 related to what was going on in the industry, and one of the
19 things going on in the industry was what we all, various
20 companies did related to Java.
21    (Deposition Exhibit No. 11 was marked
22    for identification.)
23    Q. (BY MR. HOSIE) Let me show you what's been marked
24 as Exhibit 11. It is another e-mail thread. Mr. Gates, I'm
25 going to ask you about one paragraph. As a courtesy I'll

**Page 69**

1 tell you what it is. It's the second paragraph from the
2 bottom on the second page which is in the body of an e-mail
3 you wrote to a whole series of folks at Microsoft on
4 Wednesday, April 9th.
5    A. Okay.
6    Q. First, sir, please identify that this is in fact in
7 part an e-mail you sent on April 9th to Paul Maritz and
8 others at Microsoft.
9    A. Yeah, it appears to be a mail I'm sending to a
10 number of Microsoft executives, including Paul, about
11 discussions I had with Andy Grove of Intel.
12    Q. Right. And I think you begin by saying, "I had a
13 good meeting with Andy on Tuesday night."
14    A. Yeah, and this is a long piece of e-mail.
15    Q. It is, it's a dense e-mail. That would have been a
16 face-to-face meeting, sir?
17    MR. DOUGLAS: Objection to the form and preamble,
18 by the way.
19    A. Yeah, I believe this is talking about a
20 face-to-face meeting, yes.
21    Q. (BY MR. HOSIE) Now if we could turn to the
22 paragraph I've flagged for you on the second page.
23    A. What's the third, fourth, fifth, sixth, seventh,
24 eighth, ninth, tenth paragraph on that page?
25    Q. Or more efficiently, second from the bottom.

18 (Pages 66 to 69)

BILL GATES ; August 26, 2004

**Page 70**

1   A.   Okay.
2   Q.   You had a chance to read this paragraph?
3   A.   Yes.
4   Q.   Do you recall Mr. Grove asking you where Microsoft
5   was drawing the line on Java?
6   A.   We can read this paragraph into the record if you
7   want.
8   Q.   Do you recall him saying that to you, sir?
9   A.   I remember that we discussed Java in many different
10  meetings. The particular question about drawing the line,
11  no.
12  Q.   Would you have written this if in fact he hadn't
13  communicated that thought to you in substance?
14  A.   But you didn't read the sentence.
15  Q.   My question, sir, would you have written this --
16  A.   Why don't -- if you want to ask about a sentence in
17  the e-mail, don't just take two words, just read the sentence
18  and then we can talk about it.
19  Q.   Well, have you read the sentence, sir?
20  A.   Yes, sir.
21  Q.   Do you accurately capture you believe what
22  Mr. Grove communicated to you?
23  A.   I'm sure I tried to. This is a summary of a very
24  long meeting, but, you know, as I look at this paragraph, it
25  looks like I was summarizing some discussion about Java-

**Page 71**

1   related topics.
2   Q.   Okay. And you conclude by saying you think a
3   meeting is a good idea in the next month, do you not?
4   A.   I wouldn't call that a conclusion, it's one of the
5   things I note. I say, "I think we need to do this meeting
6   with Intel in the next month. Paul would have to be there
7   but I would not have to be."
8   Q.   Do you recall if that meeting ever came about?
9   A.   No.
10       (Deposition Exhibit No. 12 was marked
11       for identification.)
12  Q.   (BY MR. HOSIE) Let me show you what's been marked
13  as Exhibit 12.
14  A.   Okay.
15  Q.   For the record, Exhibit 12 is another e-mail
16  thread. You are added as a recipient on the final e-mail,
17  are you not, sir, top of the page?
18  A.   Yes.
19  Q.   And do you recall seeing this e-mail before?
20  A.   No.
21  Q.   Do you recall an issue in 1997 with Intel trying to
22  drive Java into the MPEG standard?
23  A.   Yes.
24  Q.   What was the issue, sir?
25  A.   This is nothing to do with the Java Multimedia

**Page 72**

1   Framework, this has to do with MPEG-4. And I think this is
2   still an issue as we speak today in terms of what byte codes
3   are going to be used by these -- the MPEG-4 related standard
4   side. I don't think that was ever resolved.
5   Q.   What was the issue, Mr. Gates?
6   A.   Oh, it's just the question of when international
7   standards are done like this, if people had intellectual
8   property related to it; is it available under RAND terms,
9   which the IP that Sun had was not available to us under RAND
10  terms. And so it would have meant that the MPEG-4 standard
11  was something that we weren't on an equal footing like
12  international standards generally provide for us to implement
13  that in our products.
14  Q.   Who was Charles Fitzgerald?
15  A.   A person who works at Microsoft.
16  Q.   All right, sir. Now, Mr. Fitzgerald says, and I
17  quote, "the Intel multimedia people are still complete
18  fucking coconuts. Turns out they are driving Java into the
19  MPEG standard and defend it even after being confronted."
20  Sir, do you know anything about who confronted
21  Intel about driving Java into the MPEG standard?
22  A.   No.
23  Q.   Now, John Ludwig responds to this mail, does he
24  not?
25  A.   Yes.

**Page 73**

1   Q.   And he says, and I quote, "this is a disaster of
2   the first order," closed quote.
3        Did you agree, sir, that Intel trying to drive Java
4   into MPEG was a disaster of the first order for Microsoft?
5        MR. DOUGLAS: Objection to the form.
6   A.   No, I think that's too strong. As I said, it's not
7   related to Java runtime work, this is related to intellectual
8   property in an international standard.
9   Q.   (BY MR. HOSIE) You personally thought it was
10  critically important to stop Intel trying to drive Java into
11  MPEG; correct?
12  A.   No.
13       MR. DOUGLAS: Objection to the form.
14  A.   This is about whether an international standard can
15  be licensed under RAND terms and Intel messing up
16  potentially. But as I say, I don't think anything ever
17  happened on this in the sense that the international
18  standards people realized that they didn't have the right
19  type of license grant to drive this technology because they
20  didn't have a commitment for RAND licensing. But this is
21  not -- this is related to a standard, a format standard.
22  This is not about software.
23  Q.   (BY MR. HOSIE) I know, Mr. Gates. Let me ask my
24  question again.
25       Did you not personally feel that Intel trying to

Yamaguchi Obien Mangio, LLC * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101 * (206) 622-6875 * 1(800) 831-6973

BILL GATES ; August 26, 2004

**Page 74**

1  drive Java to be part of MPEG-4 was very important from
2  Microsoft's perspective?
3          MR. DOUGLAS: Same objection, plus it's been asked
4  and answered, and argumentative.
5      A.  I knew that at some point the international
6  standard people would realize they had an intellectual
7  property problem because they have a series of check points
8  where before they really finalize something they make sure
9  the stuff is available on a RAND basis. And so even though
10  some Intel people had confused the issue by proposing certain
11  things there, I didn't think there was that much likelihood
12  that specific issue wouldn't get resolved.
13      Q.  (BY MR. HOSIE) So you weren't concerned?
14      A.  It wasn't a big issue for me personally.
15      Q.  Let me show you what's been previously marked as
16  Exhibit 13, Mr. Gates.
17          (Deposition Exhibit No. 13 was marked
18          for identification.)
19      Q.  (BY MR. HOSIE) I'm going to ask you, sir, about
20  your e-mail in the middle of the first page, dated May 13,
21  1997, 11:15 a.m.
22      A.  Okay.
23      Q.  Is this an e-mail you wrote, sir?
24      A.  It appears to be, yes.
25      Q.  Sent to David Cole and others at Microsoft?

**Page 75**

1      A.  That's right.
2      Q.  And you say, and I quote, "Did we resolve the issue
3  where Intel wanted to have Java be part of MPEG-4? This is
4  an issue I would be glad to call Andy on - it's that
5  important."
6          Have I read that correctly, sir?
7      A.  That's right.
8      Q.  Have I read the entirety of your e-mail?
9      A.  Yeah. I enclosed David Cole's e-mail, but yes.
10      Q.  Does this refresh your recollection that you
11  personally believed Intel trying to have Java be part of
12  MPEG-4 was important enough for you to personally call Andy
13  Grove?
14      A.  It's clear I was willing to make that call.
15          MR. HOSIE: Why don't we take a break. Off the
16  record.
17          VIDEO OPERATOR: The time is 2:40 p.m. This
18  concludes Tape No. 1 in the deposition of Bill Gates.
19          (Recess taken.)
20          VIDEO OPERATOR: The time is 2:53 p.m. This begins
21  Tape No. 2 in the deposition of Bill Gates.
22          (Deposition Exhibit No. 14 was marked
23          for identification.)
24      Q.  (BY MR. HOSIE) Mr. Gates, let me show you what's
25  been marked as Exhibit 14. For the record, Exhibit 14 is an

**Page 76**

1  e-mail thread that ends with an e-mail from Mr. Gates to John
2  Ludwig, categories MMedia, stamped Attorneys Eyes Only on the
3  bottom.
4          Mr. Gates, I'm going to ask you about your final
5  e-mail to John Ludwig and Aaron and Ben, as well as Paragraph
6  4 on the Some Questions attached on the second page.
7      A.  (Witness reading document.) Okay.
8      Q.  Sir, you sent the last e-mail out on May 14, 1997,
9  did you not?
10      A.  Right.
11      Q.  To John Ludwig, amongst others; correct?
12      A.  Uh-huh.
13      Q.  And the subject is MMedia. What does that mean?
14      A.  Probably multimedia.
15      Q.  That's how you would read that?
16          MR. DOUGLAS: Actually, it says subject is DirectX
17  and Talisman Update.
18      Q.  (BY MR. HOSIE) Categories, MMedia.
19      A.  Actually, that's unusual that there's a Categories
20  line there, but anyway, the subject is DirectX and Talisman.
21      Q.  And the category is MMedia. You would read that as
22  multimedia?
23      A.  Yeah, but I'm confused now whether that's something
24  that somebody added. I don't remember ever seeing a
25  Categories line like that. That's confusing.

**Page 77**

1      Q.  Your second paragraph says, "I did stick a few"
2  open quote, 'barb,' closed quote, "comments into that e-mail
3  about cross-platform which I should have avoided but it's a
4  key topic that has me worried."
5          What was it about cross-platform that had you
6  worried?
7      A.  What e-mail is being referred to?
8      Q.  Your e-mail below at the bottom of the page, sir.
9      A.  I don't think so.
10      Q.  You don't think so? Did you have a chance to read
11  the e-mail at the bottom of the page that carries over to
12  Page 2?
13      A.  Yeah, but that's all about Talisman. I think
14  there's another e-mail about cross-platform. It says that --
15  see, Ludwig's mail is about cross-platform.
16      Q.  Yes, X platform.
17      A.  But it's on top of the Talisman-related mail.
18      Q.  So you think there's another e-mail here with some
19  barb comments from you about cross-platform?
20      A.  Well, Ludwig says, "right now the only
21  communication I have with you about some of these issues is
22  as a sidebar in mail like below."
23          So what he's saying is that he thinks he's getting
24  sidebar comments that are confusing him and he'd like to meet
25  with me.

20 (Pages 74 to 77)

BILL GATES ; August 26, 2004

**Page 78**

1 Q. Fair enough. And, Mr. Gates, you may be right,
2 there may in fact be another e-mail with barbed comments from
3 you about cross-platform, but if there is we just don't have
4 it.
5 MR. DOUGLAS: Objection to the form.
6 Q. (BY MR. HOSIE) So let me ask you to turn to the
7 second page, sir. This is another e-mail from you, is it
8 not?
9 A. This is one focused on Talisman, yes.
10 Q. And you sent it out on May 13, 1997?
11 A. That's right.
12 Q. And have you had a chance to read Paragraph 4?
13 A. Yeah.
14 Q. You wrote Paragraph 4, sir?
15 A. Yes.
16 Q. These are your words?
17 A. The words I used in this e-mail, yes, that's what
18 it appears.
19 Q. You say, and I quote, "The Java platform is the
20 greatest threat to us ..." And let me stop there.
21     Did you personally believe that the Java platform
22 was the greatest threat to Microsoft as of May 1997?
23 MR. DOUGLAS: Objection to form and foundation.
24 Incomplete sentence.
25 A. In terms of what people were doing that was

**Page 79**

1 directly competitive with the Talisman software layers, yes,
2 and in many other respects. But in this mail, which is about
3 Talisman, I say in Paragraph 4, "What kind of work is going
4 on with Java in this area," which is Talisman. "I saw they
5 endorsed a particular audio approach," that is some group of
6 Java backers. "The Java platform is the greatest threat to
7 us so I want to make sure they don't benefit from any of our
8 work and we stay ahead of them."
9 Q. (BY MR. HOSIE) Could you read the next sentence,
10 please?
11 A. "We will NOT," capital N-O-T, "be doing," quote,
12 "OPEN Java animation or graphics work despite what the
13 cross-platform promoters want us to do."
14 Q. In what sense was Java's work in this area the
15 greatest threat to Microsoft?
16 MR. DOUGLAS: Same objection.
17 A. In the sense that to the degrees our competitors
18 did innovative work, that people would see that as
19 potentially -- if they did better work than we did then
20 they'd get ahead, they'd get more software developers, they'd
21 be more successful. And so a lot of this deep Talisman type
22 activity in the industry were by people who were supporting
23 particular Java runtime.
24 Q. (BY MR. HOSIE) Now, the second sentence you read,
25 "we will NOT not be doing OPEN Java," was that your personal

**Page 80**

1 view at the time?
2 MR. DOUGLAS: Objection to form. Incomplete
3 sentence.
4 A. It says, "We will NOT be doing OPEN Java animation
5 or graphics work despite what the cross-platform promoters
6 want us to do."
7 Q. (BY MR. HOSIE) What was the problem with having
8 that be cross-platform, sir?
9 MR. DOUGLAS: Objection to form and foundation.
10 A. Well, I'm glad to speculate. I'm not sure exactly
11 what I meant when I wrote this sentence.
12 Q. (BY MR. HOSIE) It has no meaning to you as you
13 read it now, sir?
14 A. No, I can say that in general the whole
15 cross-platform thing is, do you do work primarily on Windows
16 and make Windows more attractive or do you do it on multiple
17 systems. And some things we choose to, do on multiple
18 systems, like we did our browser and Internet Explorer on
19 UNIX and many other systems, and some things we choose to
20 focus, just put all the resources on doing the best we can on
21 top of Windows. And I appear to suggest here at least at
22 this point I didn't think we should do what I call open Java
23 animation or graphics work on non-Windows systems.
24 Q. Who were the cross-platform promoters, as you think
25 back?

**Page 81**

1 A. Good question.
2 Q. Would you consider this a barbed comment, sir?
3 MR. DOUGLAS: Objection to the form.
4 A. No.
5 Q. (BY MR. HOSIE) So you think the barbed comments
6 you refer to in your memo of Wednesday, May 14th must be in
7 some other e-mail?
8 A. I'm not sure.
9 Q. Sir, as of May 1997, did Microsoft have as a goal
10 getting Intel to drop its involvement in interactive MPEG-4?
11 MR. DOUGLAS: Objection to the form. Vague and
12 ambiguous.
13 A. Are you saying that we didn't want them to have any
14 involvement of any kind in MPEG-4?
15 Q. (BY MR. HOSIE) Was it a goal of yours, sir, to
16 stop Intel from driving Java into the MPEG-4 standard?
17 A. We had a goal to make sure that we could license
18 the intellectual property around MPEG-4 on reasonable and
19 non-discriminatory terms. And we had a concern that Intel or
20 anyone else who put the Java stuff in there, that would
21 create the problem that we wouldn't be able to license MPEG-4
22 and create the intraoperability.
23 Q. So you're saying yes with that explanation, you had
24 that goal?
25 MR. DOUGLAS: Objection to the form. That

21 (Pages 78 to 81)

BILL GATES ; August 26, 2004

Page 82

1  mischaracterizes the testimony.
2     A.  No, I'm not -- we had a concern that people trying
3  to put Java in there would prevent it from being licensable
4  to us under reasonable and non-discriminatory terms.  And
5  Intel was one of the people, I don't know whether in May but
6  in that general time frame, where we said, hey, if you're
7  going to put this technology into this standard, there's a
8  problem because it's not available to us on reasonable and
9  non-discriminatory terms.
10    Q.  (BY MR. HOSIE)  Was it a goal of yours to persuade
11 Intel to stop helping Sun create Java Multimedia APIs,
12 especially ones that ran well, i.e., native applications on
13 Windows?
14       MR. DOUGLAS:  Objection to form. Overbroad.
15    A.  Intel was always going to decide exactly what it
16 wanted to do.  We shared with Intel why we thought some Java-
17 related activities on their part were against their own
18 interests and we explained our own Java strategy.
19    Q.  (BY MR. HOSIE)  Didn't you personally threaten
20 Intel if it didn't stop its work on certain aspects of Java?
21       MR. DOUGLAS:  Objection to the form.
22    A.  No.
23    Q.  (BY MR. HOSIE)  That never happened, Mr. Gates?
24    A.  No.
25       MR. DOUGLAS:  Objection.  Plus it's argumentative.

Page 83

1        (Deposition Exhibit No. 16 was marked
2        for identification.)
3     Q.  (BY MR. HOSIE)  Mr. Gates, let me show you what's
4  been marked as Exhibit 16.  Counsel, copy for you.
5     A.  (Witness reading document.)  Okay, what's the
6  question?
7     Q.  Sir, I'd like to first direct your attention to the
8  e-mail from you in the middle of the page, Sunday, October
9  12.  You sent it to Jim Allchin and Marshall Brumer and
10 others.
11    A.  Right.
12    Q.  You wrote this e-mail?
13    A.  It appears to be an e-mail from me, yes.
14    Q.  And you reference a critical meeting coming up with
15 Intel?
16    A.  Yes.
17    Q.  And that would be a meeting with Andy Grove, do you
18 believe?
19    A.  I'd just be guessing.  The e-mail doesn't suggest.
20    Q.  Don't guess, sir.  I take it you have no
21 independent recollection of this e-mail?
22    A.  No.
23    Q.  Do you have any independent recollection of the
24 meeting you reference here?
25    A.  No.  At least as of the mail, it appears to be

Page 84

1  something that might happen in the future.
2     Q.  Sure.  But thinking back now, you don't recall the
3  meeting that's referenced here, do you?
4     A.  I know I met with Andy a number of times.  I know I
5  met with Intel groups with and without Andy a number of
6  times.  But a specific meeting that might be referred to
7  here, no.
8     Q.  You say in your mail to Jim Allchin and others that
9  you want to convince Intel that they need to stay away from
10 Oracle NCs.  Do you see that, sir?
11    A.  Are you going to read the whole sentence?
12    Q.  Well, let me stop there and ask you, what's an
13 Oracle NC?  Or more accurately, what in early 1997 was your
14 understanding of an Oracle NC?
15    A.  I'm not sure what they ever shipped, to be frank.
16 Sun shipped some things they called NCs, but I think the
17 Oracle project self-destructed before it ever shipped.  So
18 it's very different than various Java things where aspects of
19 Java did, some we supported, some we didn't become popular.
20 NCs actually were a complete bust in the marketplace and many
21 proposed things never got in the marketplace.  If Oracle NCs
22 did get in the marketplace it's in miniscule numbers where
23 they never really finished it.
24    Q.  And you just told me that the Oracle NC never was a
25 commercial success, but my question actually was a little

Page 85

1  different, Mr. Gates.
2     A.  Okay.
3     Q.  And let me put it again, which is specifically,
4  what as you recall was an Oracle NC as of early 1997?
5     A.  Well, when you ask me about a product, I think
6  about, okay, what did they eventually ship.  Here Oracle was
7  making a lot of noise about what they were going to do in the
8  NC, and so we can go back and look at what they were saying,
9  why they thought it was good, what they were saying they were
10 going to go after.  But even, you know, in those early
11 announcement days they changed what they were talking about,
12 and then there was no concrete product success that came out
13 of that.
14    Q.  Sir, you reference here an Oracle NC, do you not?
15    A.  It's the Oracle NC announcements and discussions.
16 As of this time I'm pretty sure there was no such product,
17 that Oracle was talking about doing some work.
18    Q.  And what product did you have in mind when you
19 reference an Oracle NC in this e-mail you typed yourself?
20       MR. DOUGLAS:  Objection to form and foundation
21 because it doesn't necessarily reference a specific product.
22 It talks about Oracle NCs.
23    A.  Yeah, Oracle was definitely talking about a
24 strategy of having these very thin network computers.
25    Q.  (BY MR. HOSIE)  So these would be the thin ones

22 (Pages 82 to 85)

BILL GATES ; August 26, 2004

**Page 86**

1  with no multimedia capacity or what you earlier described as
2  a medium fat?
3  A.  I'm not sure what at this point they were talking
4  about. They eventually shipped something that was very thin,
5  and I think that was just in beta or I don't know if it was
6  final. I know they got enough customer feedback that the
7  whole thing fell apart.
8  Q.  Okay. You've given me your best recollection as
9  you sit here now?
10  A.  Yes.
11  Q.  Why did you want to convince Intel to stay away
12  from Oracle NCs as of May 1997, Mr. Gates?
13      MR. DOUGLAS: Objection to form and foundation.
14  A.  Our view was that we should try and convince them
15  to do what it says here, which is work more closely with
16  Microsoft.
17  Q.  (BY MR. HOSIE) My question was a little different.
18  Why did you want them to stay away from Oracle NCs?
19      MR. DOUGLAS: Objection to the form and foundation
20  because the language of the document is that they need to
21  stay away.
22  Q.  (BY MR. HOSIE) Are you more comfortable if I use
23  that formulation? I will, let me ask it that way.
24  A.  No, when you misquote the e-mail it's not a
25  question of comfort.

**Page 87**

1  Q.  Why did you want to convince Intel that they needed
2  to stay away from Oracle NCs?
3      MR. DOUGLAS: You still -- still same objection.
4  You still leave the last part of the sentence off, "and work
5  more closely with Microsoft."
6  A.  We thought it would be advantageous if Intel chose
7  to work with us and focus on things that we were doing.
8  Q.  (BY MR. HOSIE) You go on to say, "I will have to
9  spend some time reviewing the low end and how they screwed
10  us ..."
11      Do you see that, sir?
12  A.  Uh-huh.
13  Q.  By "the low end" you mean the very thin, simple
14  network computer client?
15  A.  No.
16  Q.  What do you mean?
17  A.  I mean their arm strategy.
18  Q.  Explain, please.
19  A.  This is below a PC, like a hand-held PDA or pocket
20  device, and they had recently gotten into chips for that.
21  Q.  And how had they screwed you there, sir?
22  A.  Well, we had done a product called Windows CE which
23  runs on these machines -- it actually runs on some of those
24  thin devices but mostly it runs on pocket-sized devices. And
25  they had not given us good support in terms of getting

**Page 88**

1  Windows CE onto their processors. That was our opinion.
2  Q.  You say here, "I will send separate mail to the
3  groups who focus on low end, Java and NCs to get their
4  input." Correct?
5  A.  To the different groups, yes.
6  Q.  Do you believe you actually sent the mail you
7  reference here?
8  A.  I don't know.
9  Q.  At the bottom of the page, sir, if you could please
10  read the first sentence in the carryover paragraph aloud into
11  the record. It begins, "I want them ..."
12  A.  (Witness reading document.) Okay. You're saying
13  at the bottom?
14  Q.  Yeah.
15  A.  It says, "I want them to understand that helping
16  NCs and Java will push us to do Windows and other software
17  Sun byte codes even if we don't rewrite them in Java."
18  Q.  And the "them" is Intel, is that not true, sir?
19  A.  Yes.
20  Q.  And you wanted Intel to understand that if Intel
21  was helping NCs and Java, that might push Microsoft to do
22  Windows and other software in Sun byte codes; correct?
23      MR. DOUGLAS: Objection to the form.
24  A.  Yeah, that was a possibility, that if byte codes
25  got popular enough we'd feel customer demand to do our

**Page 89**

1  software in that form.
2  Q.  (BY MR. HOSIE) And did you in fact make Intel
3  understand that if Intel persisted in helping NCs and Java,
4  Microsoft might do software in Sun byte codes?
5  A.  No, no, no.
6  Q.  Did you communicate that thought to them, sir?
7  A.  No. The point is that if there's customer demand
8  for it, we might need to do it.
9  Q.  My question was different, Mr. Gates. Did you
10  communicate this thought to anyone at Intel, you personally?
11      MR. DOUGLAS: Objection to the form.
12  A.  You're mixing up issues. To the degree that those
13  things, that byte codes catch on and are popular, that's
14  going to create a demand on us to support those.
15  Q.  (BY MR. HOSIE) My question, sir. Did you
16  communicate to anyone at Intel, you personally, that if Intel
17  persisted in helping NCs in Java, Microsoft might write
18  software in Sun byte codes? Yes or no, sir?
19  A.  We certainly told them that if those byte codes
20  became popular enough, then it would increase customer demand
21  and we might have to respond to that.
22  Q.  That was not my question. I'll ask it one last
23  time, sir.
24  A.  Okay.
25  Q.  If you don't want to answer it I'll move on.

23 (Pages 86 to 89)

BILL GATES ; August 26, 2004

---

**Page 90**

1     Did you ever communicate to Intel that if Intel
2 persisted in helping NCs in Java, Microsoft might start
3 writing software in Sun byte codes? Did you ever say that to
4 them, sir?
5     MR. DOUGLAS: Objection to the form of the
6 question, the preamble, and it's been asked and answered.
7     A. First of all, it's not about rewriting software.
8 You're confusing the issue. It's about the form we ship it
9 in. It's not about rewriting stuff. As it says very
10 clearly, this isn't rewriting in Java.
11     Q. (BY MR. HOSIE) You're right, ship it in Sun byte
12 codes. Let me ask my question --
13     A. Right.
14     Q. -- again, sir.
15     Did you ever communicate to Intel the notion that
16 if Intel persisted in helping NCs in Java, that Microsoft
17 might have to ship software in Sun byte codes? Did you say
18 that to them?
19     MR. DOUGLAS: Same objection.
20     A. There's nothing in here about persisted. What it
21 says in here is, I want them to understand that helping NCs
22 and Java, because they'll increase the demand for this, for
23 those things, that demand will push us to do Windows and
24 other software in Sun byte codes.
25     Q. (BY MR. HOSIE) And did you communicate that

**Page 91**

1 thought to anyone at Intel?
2     A. The general notion that whatever was being
3 popularized we would have to respond to. I'm sure Intel was
4 aware of that.
5     Q. Isn't this a threat, sir? Didn't you very directly
6 tell Intel more than once that, listen, Intel, if you don't
7 stop supporting Java and NC, we may well start writing our
8 software in Sun byte codes, which would be very bad for you,
9 Intel?
10     A. No.
11     MR. DOUGLAS: Objection to form and foundation.
12     Q. (BY MR. HOSIE) You never made that threat, sir?
13     MR. DOUGLAS: Hold on a minute. Objection. Form,
14 foundation, and now it's just argumentative.
15     Q. (BY MR. HOSIE) You never made that threat?
16     A. No.
17     Q. You'd agree with me that if you had said that, it
18 would be a threat; correct?
19     MR. DOUGLAS: Objection. Argumentative.
20     A. First of all, you keep saying write software in Sun
21 byte codes. It's about the form we ship it in.
22     Q. (BY MR. HOSIE) Fine, the form you ship it in.
23     A. Yeah, which is not -- we can ship it in different
24 forms.
25     Q. Mr. Gates, you'd agree with me that had you said to

**Page 92**

1 Andy Grove, listen, Andy, if you continue to support Java and
2 NC, we are going to retaliate and ship our product in Sun
3 byte codes, which would be very bad for you, Intel, that
4 would be a threat?
5     MR. DOUGLAS: Objection to the form, foundation,
6 the argumentative nature of the question, and the pounding on
7 the table.
8     Q. (BY MR. HOSIE) I apologize for my emphasis, sir,
9 but I feel this is an important question. Do you have it in
10 mind?
11     A. Is this some hypothetical?
12     Q. Yes.
13     A. I think Andy would have been utterly confused by
14 that statement.
15     Q. My question. Would you consider that a threat,
16 sir, you personally?
17     MR. DOUGLAS: Same objection.
18     A. It's -- I don't really understand what you're
19 asking me. I think if anybody had said that from Microsoft,
20 Intel would have been confused by it.
21     Q. (BY MR. HOSIE) Would you consider it a threat,
22 Mr. Gates?
23     MR. DOUGLAS: Same objection. Asked and answered.
24     Q. (BY MR. HOSIE) Your answer, please, sir?
25     A. I'm not sure what I'd consider it, but it's not

**Page 93**

1 something that I ever communicated.
2     Q. And that's because it's a pretty blatant threat, is
3 it not?
4     A. No.
5     MR. DOUGLAS: Objection. You're just arguing with
6 the witness. Let's go on to something else. Mr. Gates --
7     A. I don't think you understand what it means for us
8 to ship the things in byte codes. You're acting like that's
9 some kind of big deal.
10     Q. (BY MR. HOSIE) Well, let me ask you this. If you
11 had shipped Microsoft code in byte codes, Sun byte codes,
12 what would that have meant for the Intel microprocessor
13 business?
14     MR. DOUGLAS: Objection to the form, foundation,
15 it's hypothetical.
16     A. I don't think it would be a big deal.
17     Q. (BY MR. HOSIE) You a couple times today said you
18 were very concerned about Intel's well-being, you thought
19 they were doing things that were inimical to their own best
20 interests.
21     A. I said that Intel sometimes is doing things we
22 thought were against Intel's own best interests.
23     Q. Right. A form of altruism on your part?
24     A. No, no. It happened that in some cases the things
25 that Intel was doing that we thought were against its own

24 (Pages 90 to 93)

BILL GATES ; August 26, 2004

**Page 94**

1 interests also were things that we thought were not helpful
2 in terms of how they allocated their resources or to things
3 we were interested in. --
4    Q.  Right, because --
5    A.  And so just like Intel would often share their
6 opinions about what they saw in the marketplace, what they
7 thought would be fruitful activity, we did the same with
8 them. And then both of us decided exactly what we would do.
9    Q.  And so let me ask you, sir, my question again.
10 If Microsoft started shipping Microsoft code in Sun byte
11 codes, what would that have meant, if anything, to the
12 microprocessor business for Intel?
13      MR. DOUGLAS: Same objection to the last --
14    A.  I don't think it would have been a big deal.
15    Q.  (BY MR. HOSIE) You don't think it would have led
16 to the potential commoditization of the Intel microprocessor?
17      MR. DOUGLAS: Same objection.
18    A.  The microprocessor business has always been a
19 competitive business.
20      (Deposition Exhibit No. 17 was marked
21      for identification.)
22    Q.  (BY MR. HOSIE) Let me show you our next in order,
23 sir.
24      MR. DOUGLAS: By the way, you went from 14 to 16.
25      MR. HOSIE: Yeah, I'm holding some of them back to

**Page 95**

1 add a sense of drama.
2      THE WITNESS: Fifteen, huh? I'm waiting for 15.
3      MR. DOUGLAS: Fifteen may have been one that
4 somebody discussed with you before.
5      MR. HOSIE: Exactly, 15 may be one of the nine.
6 We'll never know and it'll bother me for months, Chuck.
7    Q.  (BY MR. HOSIE) Sir, I've marked another e-mail as
8 Exhibit 17. And actually, I'm going to ask you about the
9 second page which I think is the same as the first page with
10 one additional e-mail attached.
11    A.  Yep.
12    Q.  Do you recall this e-mail, sir? And by e-mail I
13 mean thread or string.
14    A.  Not specifically. It appears to be an e-mail from
15 me.
16    Q.  If you could turn to the second page, please.
17    A.  Uh-huh.
18    Q.  I've added this because Mr. Roberts responds to
19 your e-mail. Do you see that at the top?
20    A.  I do.
21    Q.  All right, sir. You have a general recollection, I
22 suspect, of this exchange?
23    A.  No.
24    Q.  The middle of the page has an e-mail from you to
25 Andy Grove, does it not?

**Page 96**

1    A.  Yes.
2    Q.  And you're responding to a mail from Andy Grove to
3 you; correct?
4    A.  That's right.
5    Q.  And what's the subject of Mr. Grove's mail, please?
6    A.  It's about some Windows CE related issues.
7    Q.  I earlier asked you about Navio and you said you
8 didn't know what it was. Does refreshing -- I'm sorry, does
9 reading Mr. Grove's e-mail refresh your recollection of what
10 Navio was?
11    A.  He clearly references a thing called Navio, but I
12 still don't know what it is.
13    Q.  What's Mr. Grove talking about here, sir?
14    A.  Agenda.
15    Q.  And he's talking about a set top computer running
16 Navio and another running WinCE; correct?
17    A.  He's talking about the demonstrations he's going to
18 give at Agenda, and then he lists apparently some things
19 about what he's going to show.
20    Q.  And one of the things he was going to show was a
21 set top commuter running Navio; correct? Isn't that what he
22 says?
23    A.  Well, those are the words there. We still don't
24 know what Navio was and I bet he didn't know either.
25    Q.  Was Navio a Microsoft product?

**Page 97**

1    A.  I don't think so, but I don't know what it is. To
2 be frank, every word in the dictionary I think we've used as
3 a code name at one time or another, but I don't think -- I
4 don't recollect that one.
5    Q.  Fair enough. And of course you know what WinCE is?
6    A.  Yes.
7    Q.  And that is a Microsoft product?
8    A.  Yes.
9    Q.  And he goes on to say that the set top box running
10 Navio is working great, whereas the box running WinCE is not
11 very exciting; correct?
12      MR. DOUGLAS: Objection to the form.
13    A.  Well, I think the words speak for themselves.
14    Q.  (BY MR. HOSIE) That's what they say?
15    A.  No. As usual, you've skipped a whole bunch, but.
16    Q.  In substance, sir?
17    A.  It's very readable. Do you want me to read it?
18    Q.  I want you to tell me what it means to you,
19 Mr. Gates.
20    A.  It says he's got demos and one of them is not very
21 exciting.
22    Q.  Which one is not very exciting?
23    A.  Real 2.0.
24    Q.  And that's the Windows product; right?
25    A.  Windows CE which is not Windows.

25 (Pages 94 to 97)

BILL GATES ; August 26, 2004

Page 98

1    Q.   Right, Windows CE.
2    A.   Windows CE is not a PC operating system.
3    Q.   I understand that, sir, but this is a Microsoft
4  product?
5    A.   For non-PC things, yes.
6    Q.   And so you respond to Mr. Grove's e-mail the very
7  next day; correct?
8    A.   Yeah, that's right.
9    Q.   And you first say, "I'll see what I can do on the
10  demonstration." And then you go on, do you not?
11   A.   That's right.
12   Q.   And you say, "One thing I need some help on is to
13  understand your tentative NC plans."
14       Have I read that correctly?
15   A.   Uh-huh, you did.
16   Q.   And then you go on and say, "Will Swoope came and
17  presented a plan that had a $500 and $700 NC which were
18  cheaper than the NetPC." Correct?
19   A.   Right.
20   Q.   Does this refresh your recollection that Will
21  Swoope was indeed an Intel person?
22   A.   Gosh, I told you that I thought he was an Intel
23  person before.
24   Q.   You did, but you were --
25   A.   And you said I was right.

Page 99

1    Q.   But you weren't quite sure. And rather than me
2  having to testify, I want to ask you, does this confirm your
3  tentative belief of earlier today that in fact Will Swoope
4  was an Intel person?
5    A.   I think it's increasingly likely that Will Swoope
6  worked for Intel.
7    Q.   I suppose I'll take that, okay.
8       All right. What was a NetPC, please?
9    A.   I think we worked on a joint specification with
10  Intel and others for a low cost PC that had all the
11  advantages of a PC and yet had a lot of simplicity and was
12  very inexpensive.
13   Q.   TCO or ZAW ring a bell in that context?
14   A.   Well, those are industry buzz words. TCO means
15  total cost of ownership, ZAW means zero administration
16  workstation.
17   Q.   And so this was all mixed in your notion to build a
18  Windows PC type box?
19   A.   No, everybody talks about TCO and ZAW. That's not
20  related specifically to Windows in any way. Everybody wants
21  low TCO, low total cost of ownership, and zero administration
22  workstations. And so everybody competes in order to deliver
23  those desirable characteristics.
24   Q.   Okay. Why was it important to you to understand
25  Intel's tentative NC plans?

Page 100

1    A.   Whenever Intel did hardware plans it was of
2  interest to us.
3    Q.   That's all?
4       MR. DOUGLAS:  Objection to the form.
5    A.   Knowing Intel's plans was often interesting to us.
6  It would affect our plans.
7    Q.   (BY MR. HOSIE) In the second paragraph you go on
8  to say, "Our whole plan had been to tell people to write
9  applications assuming the latest Intel processor."
10      Do you see that?
11   A.   Uh-huh.
12   Q.   And then you go on to say at the end of the
13  paragraph, and I quote again, "However" --
14   A.   I don't know why you're skipping around.
15   Q.   Well, that's because I have a question in mind that
16  I'm building toward, how's that? Can I ask my question, sir?
17   A.   Why do you read discontinuous pieces of the e-mail?
18   Q.   Because I have three hours of your time, Mr. Gates,
19  and if I didn't do that I would get nowhere near done.
20   A.   Okay. Well, I've read the whole e-mail.
21   Q.   Good. I asked you to, did I not, sir?
22   A.   And I obeyed.
23      MR. DOUGLAS:  Is there a question?
24      MR. HOSIE:  There is, we're building to a question.
25  I was responding to Mr. Gates and his criticism of my

Page 101

1  questioning style, if you will.
2    Q.   (BY MR. HOSIE) The last sentence of that e-mail,
3  "However Intel seems now to think exposing APIs on cheap
4  clients and directing development there is a good idea."
5       What are you saying there, Mr. Gates?
6    A.   There's always been this question of the degree to
7  which software developers will assume new features in
8  software and hardware. And for Intel, getting to the right
9  applications that need high performance processors is very
10  key to their business model, because they basically in one
11  period of years have to say to you, oh, you know, your one
12  megahertz machine is dumb, get a 10 megahertz machine. But
13  then three years later they have to say, oh, you have that 10
14  megahertz machine? No, you need the 100 megahertz machine.
15  And now it's gigahertz; one gigahertz, two gigahertz, three
16  gigahertz.
17      And so this is always an interesting question for
18  software developers. Do they aim for the cheapest PC and
19  therefore not do things that would require a high performance
20  processor or do they do very advanced things. And so getting
21  an understanding of how quickly is Intel raising the clock
22  rate, how quickly are they lowering the price on that high
23  performance processors, understanding what their message is
24  going to be, we were always interested in that, because we
25  likewise are meeting with software developers saying, hey, we

26 (Pages 98 to 101)

BILL GATES ; August 26, 2004

Page 102

1  think you should do applications that take advantage of the
2  latest software. So it makes sense to me, yes.
3      Q.   Did you like Intel's drive toward exposing APIs on
4  cheap clients?
5          MR. DOUGLAS: Objection to the form. Vague.
6      Q.   (BY MR. HOSIE) You personally, Mr. Gates?
7      A.   It's part of Intel's strategy today just like it's
8  part of our strategy to support what's called Windows
9  Terminal Server. If they make that a main thrust, it works
10  against their interests.
11      Q.   And yours?
12      A.   Actually, yeah, there is somewhat of a synergy in
13  that to the degree you buy a new processor, you typically buy
14  more memory and it makes you more open minded to buy the
15  latest version of either the Windows or the Office software.
16  And so throughout the history of the PC, as we've gotten more
17  powerful machines we've developed Windows to take advantage
18  of that, people have developed applications to take advantage
19  of that. And it's this virtual cycle that has led to lower
20  cost PCs, more powerful software and, you know, the whole
21  personal computer phenomena.
22      Q.   Sir, aren't you basically saying here, listen,
23  Intel, you're exposing APIs on cheap clients, this is exactly
24  the platform threat that you were concerned about?
25          MR. DOUGLAS: Objection to the form.

Page 103

1      A.   No. Both Intel and Microsoft have low end clients
2  as part of their strategy.
3      Q.   (BY MR. HOSIE) Your last paragraph you make the
4  comment, "One of the interesting things about NCs/Java is the
5  byte codes."
6          Do you see that, sir?
7      A.   Uh-huh.
8      Q.   Why are you talking about NCs/Java here?
9      A.   There are some NCs that were not the pure NCs that
10  had some byte code capabilities, very limited in the sense
11  that things like high end multimedia typically wouldn't work
12  on those things. But some of them had local byte code
13  execution environment.
14      Q.   Java runtime?
15      A.   Yeah, Java byte code execution.
16      Q.   Okay. And you were concerned that if those NCs
17  became popular, that would be a very serious platform threat
18  to Microsoft indeed?
19          MR. DOUGLAS: Objection to form and foundation.
20      A.   No, anything that becomes popular is competition.
21  So NCs, the ones that Microsoft wasn't involved in, were
22  competition, and things where you built an operating system
23  other than Windows, that was competition.
24      Q.   (BY MR. HOSIE) Okay. My question, Mr. Gates. If
25  NCs using Java runtime became very popular, that would be a

Page 104

1  very bad thing for Microsoft; true or false?
2      A.   The ones from Oracle and Sun were competitive to
3  us. We actually had some as part of our strategy that were
4  purely thin and didn't have the JBM and some that did have
5  that capability, so if people bought our flavors of those
6  things, that wouldn't affect us at all. To the degree they
7  chose the competitive products, yes, that's something that we
8  were competing for that business, and it's all a matter of
9  degree of volume. But we wanted to offer a product that was
10  better.
11      Q.   And you wanted Intel to stop its work in support of
12  NCs with a Java runtime; correct?
13          MR. DOUGLAS: Objection to the form. Vague and
14  ambiguous.
15      A.   No. In fact, as we did the license with Sun for
16  various Java things, Intel saw us working in the Java area,
17  we had a particular view about what we were doing with Java
18  and what we weren't doing that we shared with Intel. And
19  sometimes, you know, they thought that was interesting and
20  sometimes they didn't.
21      Q.   (BY MR. HOSIE) You go on here to say, "The byte
22  codes controlled by Sun will eliminate the compatibility
23  problems of running software on different microprocessors."
24          What are you referring to here, sir?
25      A.   Just processor independence. Byte codes are

Page 105

1  different than native code. You can always abstract software
2  up one level away from the processor. That's a technique
3  that's been around for a long time.
4      Q.   And would eliminating the compatibility of problems
5  of running software on different microprocessors as you
6  viewed it be a good or a bad thing for Intel?
7          MR. DOUGLAS: Objection to the form. Ambiguous.
8      A.   It would help Intel with their Itanium processor
9  that ran a different instruction set. It would also be kind
10  of neutral relative to AMD. If other people had really good
11  price performance it might be helpful to them.
12      Q.   (BY MR. HOSIE) You go on to say, "We are assuming
13  that someone at Intel has decided that it is okay to endorse
14  byte codes."
15          You're being somewhat tongue in cheek, are you not,
16  sir?
17      A.   No. No, in fact, Intel was very involved in --
18  parts of Intel, in things where they would take Java and
19  compile it to byte codes.
20      Q.   You go on to say, "We didn't think byte codes made
21  sense but since the call from Gelsinger we have been looking
22  at this a whole new way."
23          Have I read that correctly?
24      A.   Uh-huh.
25      Q.   Do you recall a conversation you had with a Pat

27 (Pages 102 to 105)

BILL GATES ; August 26, 2004

Page 106

1  Gelsinger about byte codes at Intel?
2      A.   No.
3      Q.   And then your last -- I'm going to skip a sentence,
4  okay?
5      A.   Okay.
6      Q.   The last sentence, "One breakthrough involves the
7  ability to ship software in C, Visual Basic - all Microsoft
8  software in byte codes very easily in the next 6 months."
9           What are you saying there, sir?
10     A.   I'm saying that we've used byte codes throughout
11 the history of Microsoft. When we wanted to squeeze software
12 down into different environments we've used byte codes, and
13 so we've always had various tools that relate to byte codes.
14     Q.   Isn't this a direct threat, sir?
15     A.   No.
16     Q.   Okay. Could you please read aloud into the record
17 Mr. Roberts' response to your mail?
18     A.   You don't want to read it?
19     Q.   I'd like you to read it, Mr. Gates.
20     A.   Okay.
21     Q.   Unless you really don't want to, in which case I
22 will as a courtesy.
23     A.   That's okay. What was his job?
24     Q.   Do you know Mr. Roberts?
25     A.   I know -- I don't know what he did.

Page 107

1      Q.   He worked at Microsoft, did he not, sir?
2      A.   He did, but what -- in what group?
3      Q.   He sent you this e-mail, did he not, sir?
4      A.   It appears he did, but I'm curious if you have any
5  background on what role he had in the company.
6      Q.   And if you could please read this into the record.
7      A.   Okay.
8      Q.   Thank you, Mr. Gates.
9           MR. DOUGLAS: And I object, then, to all of that
10 discussion which you didn't want to give the witness what he
11 was asking for background and context for the questions
12 you're going to ask him.
13          Mr. Gates, the question is, read it, please read it
14 for Mr. Hosie.
15     A.   Okay. "This is a great piece of e-mail. It is not
16 a rant, but a very logical dissection of the issue with the
17 threat of thermal nuclear war very well and politely
18 delivered."
19     Q.   (BY MR. HOSIE) Mr. Gates, you see no threat in
20 your e-mail at all, do you?
21     A.   Absolutely none.
22     Q.   And you think Mr. Roberts is just out to lunch?
23          MR. DOUGLAS: Objection to the form.
24     Q.   (BY MR. HOSIE) Let me rephrase in a less
25 colloquial fashion. You think Mr. Roberts just profoundly

Page 108

1  misunderstood the message you were sending to Mr. Grove?
2      A.   You better ask Mr. Roberts what he meant. It's a
3  non sequitur when attached to this piece of e-mail.
4          (Deposition Exhibit No. 18 was marked
5           for identification.)
6      Q.   (BY MR. HOSIE) Let me show you what I've marked as
7  No. 18, Mr. Gates. Let's go off the record and give you a
8  chance to read this. Off the record, please.
9          VIDEO OPERATOR: The time is 3:35 p.m. We'll be
10 taking a break.
11         (Discussion off the record.)
12         (Recess taken.)
13         VIDEO OPERATOR: The time is 3:41 p.m., we're now
14 back on the record.
15     Q.   (BY MR. HOSIE) Mr. Gates, I wonder if you might
16 take a moment on the record and review what I've marked as
17 Exhibit 18. Specifically, I'm going to ask you about
18 Mr. Brumer's summarization of the meeting you had at Intel
19 and ask you whether you agree or disagree with his
20 summarization.
21     A.   Well, his summary's a very long summary talking
22 about things that happened seven years ago now.
23     Q.   Would you like me to --
24     A.   And the notion that I could agree or disagree with
25 this, that's asking quite a bit. I haven't read it yet, I

Page 109

1  have to admit.
2      Q.   Well, let me ask this, sir. Do you recall making a
3  lengthy presentation to Intel's strategic long range planning
4  group in 1997?
5      A.   Yeah, I know I made a presentation, I don't know
6  the time but around that time they got a group of executives
7  together. I don't remember the name, but apparently that was
8  their name for the group.
9      Q.   All right, sir. And this is a presentation that
10 you handled personally for Microsoft?
11     A.   Yeah, I made a presentation in person, personally.
12     Q.   And you understand that Mr. Brumer has forwarded to
13 you for your review Mr. Brumer's summary of that
14 presentation?
15     A.   Well, I'm seeing those words that he sent to me
16 seven years ago.
17     Q.   And in his first paragraph Mr. Brumer says that the
18 meeting was very cordial -- I'm in the middle of the first
19 paragraph, Mr. Gates. "The meeting was very cordial with
20 both sides keeping most emotions in check."
21         Is that your recollection of the meeting, sir?
22     A.   I don't recall.
23     Q.   And then he says, "The only real flareup was at the
24 end when Bill" -- you would be that Bill, sir?
25     A.   Uh-huh.

28 (Pages 106 to 109)

BILL GATES ; August 26, 2004

Page 110

1   Q.  -- "when Bill clearly articulated our" -- that
2   would be Microsoft?
3   A.  Right.
4   Q.  -- "concerns about their" -- that would be Intel?
5   A.  Yes.
6   Q.  -- "work on STB" -- that would be set top box?
7   A.  That's right, completely non-related to PCs.
8   Q.  I understand -- "and NC" -- that would be network
9   computer?
10  A.  Right.
11  Q.  -- "all happening at the same time to heat things
12  up at MS and make us wonder whether we should be pulling away
13  from work with Intel."
14      Sir, do you remember communicating to this group of
15  senior Intel executives that their, Intel's, work on STB and
16  NC was making Microsoft wonder whether Microsoft should be
17  pulling away from work with Intel?
18      MR. DOUGLAS: Objection to the form and foundation.
19  A.  I know in the case of set top box there was a
20  real question of whether there should be any work between
21  Intel and Microsoft or not because we had different
22  strategies on set top boxes. And clearly that's talking
23  about the confusion around set top boxes and network
24  computers and what -- do we have any common goals at all in
25  those two spaces.

Page 111

1   Q.  (BY MR. HOSIE) And NC, sir?  Do you recall saying
2   if they continued the work on NC, Microsoft would have to
3   consider pulling away from their work with Intel?
4   A.  No.  The question is whether there's joint work
5   together related to network computers or is there joint work
6   together related to set top boxes. The set top box thing is
7   interesting because we really tried to communicate with Intel
8   and we ended up largely on different strategies, and so some
9   work we had started with Intel no longer made sense. In
10  fact, I don't know if it's in this time frame but about this
11  time frame we actually did pull back from some set top work
12  we were doing with Intel and actually do that work with
13  Motorola.
14  Q.  If you would turn to the second page, please.
15  A.  Okay.
16  Q.  There is a series of paragraphs, three specifically
17  under the Java heading.  Do you see that?
18  A.  I'm just reading it.
19  Q.  Yeah, if you could, please.
20  A.  (Witness reading document.) Okay.
21  Q.  Mr. Brumer says that you gave, Microsoft, three
22  part Java positioning.  Do you recall giving a three part
23  Java positioning?
24  A.  No.  It shows the whole thing of what we were doing
25  on Java and what we weren't was fairly complex, but I don't

Page 112

1   remember what the three parts are.
2   Q.  That was my next question.  Mr. Brumer says that
3   "Clear direction that Microsoft was not okay with Java as a
4   platform for all the standard reasons."
5       Did you say at this meeting that Microsoft was not
6   okay with Java as a platform?
7   A.  No, I think I -- what I did is I gave our three
8   part Java positioning.
9   Q.  Okay, so you're saying you did not say that
10  Microsoft was not okay with Java as a platform?
11  A.  Well, Java's a platform.
12  Q.  Microsoft okay with Java as a platform is what I
13  said, sir.
14  A.  I don't remember any specific things in the
15  meeting.  We had competitors using Java in a way that, you
16  know, was out in the marketplace competing with us, and that
17  was a topic of discussion.
18  Q.  And he goes on to say, "for all the standard
19  reasons."
20      What are the standard reasons why Microsoft was not
21  okay with Java as a platform, Mr. Gates?
22  A.  Well --
23      MR. DOUGLAS: Objection to form and foundation.
24  A.  We had competitors that were offering non-Windows
25  solutions, some of which relied on Java, including parts of

Page 113

1   Java that we didn't think would deliver on the things that
2   they said that Java would do. And so, you know, it's just
3   classic competition in the software space.
4   Q.  (BY MR. HOSIE) And Marshall Brumer goes on to say,
5   "Gelsinger said that he thinks we are now in sync on Java
6   although Bill still sees them supporting their Java MM Libs."
7   Do you see that, sir?
8   A.  Uh-huh.
9   Q.  That would be Java Multimedia Libraries?
10  A.  I think so.
11  Q.  Do you recall Gelsinger telling you at the date of
12  this meeting that Intel now thought it was in sync with
13  Microsoft on Java?
14  A.  No.
15  Q.  And do you remember remaining concerned that Intel
16  was still supporting Java Multimedia Libraries?
17  A.  It doesn't say that.  It says "Bill still sees them
18  supporting."
19  Q.  Yeah, and my question was did that concern you,
20  that support for Java Multimedia Libraries?
21  A.  I don't recall that.  What Marshall says in
22  recounting the meeting is it said that "Bill still sees them
23  supporting their Java Multimedia Libraries."
24  Q.  And you did see them supporting their Java
25  Multimedia Libraries?

29 (Pages 110 to 113)

BILL GATES ; August 26, 2004

Page 114

1   A.   I don't recall.
2   Q.   Do you think he got it wrong?
3        MR. DOUGLAS: Objection to the form.
4   A.   I don't know.
5   Q.   (BY MR. HOSIE) Let me rephrase. Do you have any
6   reason to believe that Mr. Brumer mischaracterized your views
7   at the time, sir?
8   A.   No.
9   Q.   Can you recall why you thought that Intel was still
10  supporting its Java Multimedia Libraries?
11       MR. DOUGLAS: Objection to form and foundation.
12  A.   I don't know why. Intel gets to decide exactly
13  what they do and why they want to do it.
14  Q.   (BY MR. HOSIE) It's not a situation, your
15  relationship, Microsoft's relationship with Intel, where you
16  get to tell Intel what to do?
17       MR. DOUGLAS: Objection to form. Overbroad.
18  A.   I'm sure some people would tell them what to do but
19  that wasn't what they would do. You know, there's a high
20  level of --
21  Q.   (BY MR. HOSIE) Independence?
22  A.   -- independence between these companies.
23  Q.   As there should be.
24       (Deposition Exhibit No. 19 was marked
25       for identification.)

Page 115

1   Q.   (BY MR. HOSIE) Sir, let me show you what's been
2   marked as Exhibit 19. I'm going to be principally asking you
3   about the e-mail you wrote on October 14, 1997, it's at the
4   bottom of the page. You wrote it to a whole series of folks
5   at Microsoft. Why don't you take a minute and read that,
6   please.
7   A.   Okay.
8   Q.   This is an e-mail you wrote?
9   A.   The second one is.
10  Q.   These are your words?
11  A.   No. The first mail's not mine, the second one is.
12  Q.   And that's the one I asked you to read, is it not,
13  sir?
14  A.   Yeah, it appears to be an e-mail from me.
15  Q.   Okay. And the subject of the e-mail, please?
16  A.   "Re: Intel Visit, quick recap." But that's not my
17  subject. Do you understand how that works?
18  Q.   I do, thank you, Mr. Gates. You're joining a
19  thread with a preexisting subject line and you have a change
20  in subject?
21  A.   Right, so I have no issue.
22  Q.   You are just joining a thread?
23  A.   Exactly.
24  Q.   I do understand that. You say, "Two critical
25  points: 1, we are crisis mode with Intel."

Page 116

1        Was that your view then, sir?
2   A.   I don't recall. This talks about Intel's low end
3   work, and apparently when I wrote this I felt relative to low
4   end stuff there was a crisis.
5   Q.   With Intel?
6   A.   Yes.
7   Q.   Okay. You go on to say, "If they" -- the "they"
8   would be Intel?
9   A.   Yes.
10  Q.   "If Intel goes ahead with their NC plans we
11  certainly won't be working with them on Windows CE and most
12  other things as well."
13       That's what you said, Mr. Gates, is it not?
14  A.   That's what the sentence says, yes.
15  Q.   Was that your view at the time, sir?
16  A.   I don't recall. This is apparently related to low
17  end things. I felt like there was a course of action that
18  would have us working separately.
19  Q.   Okay. And do you have any reason to believe that
20  this e-mail which you wrote yourself somehow inaccurately
21  captured your thoughts as of October 14, 1997?
22       MR. DOUGLAS: Objection to the form.
23  A.   It appears to be an e-mail I wrote.
24  Q.   (BY MR. HOSIE) Okay. And in this e-mail you
25  wrote, you go on to say, "Until I say so" -- that would be

Page 117

1   you, Bill Gates, the "I;" correct?
2   A.   Where are you reading?
3   Q.   Paragraph 1 under your two critical points.
4   A.   Oh, yeah, sure.
5   Q.   "Until I say so every conversation with Intel
6   should say that you have been told that we are reevaluating
7   all of our work with them based on their NC plans and what
8   happened on the set top box issue."
9        Did you tell people at Microsoft to pass on to
10  Intel that Microsoft was reevaluating all of its work with
11  Intel based on Intel's NC plans?
12  A.   Well, this is sent to the people who are working on
13  a specific set of products.
14  Q.   And you told these folks to tell Intel that
15  Microsoft was reevaluating all of its work with Intel based
16  on Intel's NC plans; correct?
17  A.   Yeah, I'm not sure what scope of work I'm talking
18  about there, but that is what I say.
19  Q.   That's a threat, is it not, sir?
20  A.   No.
21       MR. DOUGLAS: Objection to the form.
22  Q.   (BY MR. HOSIE) Turn to the next page, please. The
23  last paragraph of your e-mail, and I'll read it aloud. "My
24  view is that if Intel thinks people are that cheap then we
25  should make sure we support byte codes with all our software

30 (Pages 114 to 117)

BILL GATES ; August 26, 2004

---

Page 118

1  so that any processor can be used."
2      That's another threat, is it not, Mr. Gates?
3  A.  Absolutely not.
4      MR. DOUGLAS: Same objection.
5  A.  You're very much misconstruing what's going on in
6  this conversation. When you get down to very low cost chips,
7  Intel's not as competitive. Where they're very competitive
8  is in high performance chips. If all you want is low
9  performance then it becomes more important for us to support
10 other microprocessors. As you move up to the higher end then
11 really taking full advantage of the work Intel does, that's
12 important.
13     But where -- processor independence has always been
14 important in this set top box area. And that's -- you know,
15 there's a chain here about what's going on in the set top box
16 thing where we're reacting to, as I say, what happened on the
17 set top box issue. And in that area the idea of allowing
18 cheaper processors is something that customers were
19 demanding.
20 Q.  (BY MR. HOSIE) And not a good thing for Intel?
21 A.  The low end stuff has never been a big deal for
22 Intel. It never -- that's not a significant part of what
23 goes on for them.
24 Q.  So you're saying it's not devastating, but still
25 directionally it would not be a good thing for Intel? You

---

Page 119

1  would agree with that?
2      MR. DOUGLAS: Objection to the form.
3  A.  I'm saying that we would respond to the demand
4  customers had to use different cheap processors.
5  Q.  (BY MR. HOSIE) Then you see Mr. Roberts is on the
6  thread, joins on October 14, 1997?
7  A.  Well, you're -- are you going backwards in time?
8  Q.  I am.
9  A.  Okay, that's confusing, but go ahead.
10 Q.  And he says, "We have entered into a Cold War with
11 Intel." Does he not?
12 A.  Yeah. Once again, I'm interested. What area was
13 he working in at Microsoft?
14 Q.  Well, let's explore that, sir. Look at the people
15 he's sending his mail to. He sends it to Adam Taylor;
16 correct?
17 A.  And what area did he work in?
18 Q.  Do you know Adam Taylor?
19 A.  No.
20 Q.  He sent it to Bill Gates. That would be you?
21 A.  Yep.
22 Q.  And he sent it to Paul Maritz?
23 A.  Yeah, but that's high up the chain. What area did
24 he work in? He's not an executive or anything.
25 Q.  He's not an executive.

---

Page 120

1  A.  No.
2  Q.  Well, he's sending an e-mail to senior executives
3  here, is he not?
4  A.  Like everyone does.
5  Q.  Let me ask you this, Mr. Gates. Would you disagree
6  with Mr. Roberts' characterization that Microsoft had entered
7  into a Cold War with Intel?
8  A.  Yes. Either that or you'd have to call our entire
9  history of our relationship with Intel, you know, some
10 hyperbole like that. The point of complete agreement was
11 never reached.
12 Q.  The next sentence intrigues me, sir.
13 A.  Where are we now?
14 Q.  Oh, still back in the Jonathan Roberts' Cold War
15 with Intel mail.
16 A.  His second sentence?
17 Q.  Yeah. Could you read that aloud into the record,
18 please?
19 A.  I think you should get Jonathan, if you want
20 somebody to read Jonathan's mail the best way possible.
21 Q.  Well, this is a mail he sent to you, correct,
22 amongst others?
23 A.  I'm copied on mail from him. We're still not sure
24 what group he's in.
25 Q.  Well, Mr. Gates, if you're not comfortable, I'm

---

Page 121

1  happy to read it. Let me do so.
2  A.  No, I'm comfortable.
3  Q.  You sure?
4  A.  Either way.
5  Q.  If you could read it, please.
6  A.  I'm good at reading.
7  Q.  I gather you are, sir.
8  A.  It's what you brought me here for.
9      "The only way to maintain our current largely
10 favorable relationship is to clearly outline mutually assured
11 destruction."
12 Q.  Do you have any idea of what Mr. Roberts was
13 referring to here, sir?
14     MR. DOUGLAS: Objection. Form and foundation.
15 A.  No.
16 Q.  (BY MR. HOSIE) Isn't the threat you communicated
17 earlier that if Intel persisted in supporting NC and Java,
18 you would ship Microsoft code in byte codes?
19     MR. DOUGLAS: Same objection.
20 A.  No. That wouldn't have been a big deal to Intel.
21     (Deposition Exhibit No. 20 was marked
22     for identification.)
23 Q.  (BY MR. HOSIE) I'll show you what's been marked as
24 Exhibit 20, Mr. Gates.
25     MR. HOSIE: How's my time?

---

31 (Pages 118 to 121)

BILL GATES ; August 26, 2004

Page 122

1    VIDEO OPERATOR: 2.5.
2    Q.  (BY MR. HOSIE) For the record, Exhibit 20 is an
3  e-mail from Marshall Brumer to Jim Allchin, Bill Gates and
4  others, dated October 5, 1997.
5        Sir, my questions will principally relate to an
6  e-mail you wrote which is on the second page in the middle of
7  the thread. But please read the whole thing if you'd like.
8    A.  (Witness reading document.) Okay.
9    Q.  Sir, you wrote this e-mail Saturday, October 4th,
10  did you not?
11    A.  It appears I did, yes.
12    Q.  And this is another case where you just incorporate
13  some preexisting subject line?
14    A.  Yeah. I'm replying to a mail that Craig Mundie
15  wrote.
16    Q.  Okay. Your middle paragraph you say, "I am going
17  to speak to the Intel exec staff at an offsite they are
18  having on October 22."
19        That's the meeting we were just discussing?
20    A.  Yeah, I think so.
21    Q.  And you say, "This will be when I explain their
22  future is tied to a, a) fighting byte codes b) working with us
23  on natural interface and new low end things," and another b),
24  "working with us on Merced. Versus going off to do Oracle
25  NCs and STBs."

Page 123

1        Is that the message you communicated at your
2  presentation?
3    A.  No.
4    Q.  Your e-mail inaccurately summarizes what you in
5  fact did at the presentation, sir?
6    A.  Well, I think you'd want to look at the meeting
7  notes from that meeting if that's what you're interested in.
8    Q.  Did you ask Intel at this meeting to go away from
9  Oracle NCs and STBs?
10    A.  We explained what our strategy for competing with
11  Oracle NCs were and what we were doing, and we probably made
12  some requests for ways that we could work together on the
13  Microsoft piece.
14    Q.  Okay. And you were angry with Intel about its
15  behavior at this juncture, were you not, sir?
16        MR. DOUGLAS: Objection to the form.
17    A.  From time to time people characterized me as angry,
18  and throughout the history of the relationship with Intel I
19  was certainly one of the people who felt that Intel wasn't
20  coordinating its activities as well as it should. And, you
21  know, whether you tie that to an emotional phrase or not, I
22  know somebody who saw how hard core I was in the way I ran
23  Microsoft and in talking about the things we should do,
24  always made terms like I was emotional about it. I
25  wouldn't use that term, but that's the way people responded

Page 124

1  to my intensity sometimes.
2    Q.  (BY MR. HOSIE) You said people characterize you.
3  Sir, here you're describing your own state of mind, are you
4  not?
5        MR. DOUGLAS: Objection. Form and argumentative.
6    A.  There's a piece that I am -- yeah, okay, what
7  Craig's talking about here is the set top box work, and that,
8  there was so much miscommunication. That one I state very
9  explicitly, related to set top boxes, which has nothing to do
10  with multimedia, video, not a thing to do with any of those
11  things. I'm saying that I'm angry about the
12  miscommunication.
13        (Deposition Exhibit No. 21 was marked
14        for identification.)
15    Q.  (BY MR. HOSIE) At some point, sir, did you learn
16  that Intel had decided to walk away from the Oracle NC
17  project?
18    A.  I'm not sure.
19    Q.  Let me show you what's been marked as Exhibit 21.
20    A.  (Witness reading document.) Okay, what's the
21  question?
22    Q.  Well, for the record, this Exhibit 21 is an e-mail
23  thread that has in it an e-mail on the first page from Paul
24  Fox to you and others, dated October 16, 1997. Do you see
25  that?

Page 125

1    A.  I do.
2    Q.  And it says that, "Intel has backed down to DEFCON
3  2."
4    A.  Yeah.
5    Q.  What does that mean to you, sir?
6    A.  No idea. It's probably something to do with
7  whenever things go well with Intel, somebody uses a reverse
8  hyperbole.
9    Q.  Okay. And in this reverse hyperbole, Mr. Pat Fox
10  reports that Intel's agreed to 90 percent of what Microsoft
11  wants?
12    A.  That's what it says in the e-mail.
13    Q.  Was that your understanding at the time, sir?
14    A.  I don't remember this episode very specifically.
15    Q.  Who was Pat Fox?
16    A.  Don't know.
17    Q.  And he goes on to say, "This is a result of their
18  meeting with Andy this morning."
19    A.  Who are "they"?
20    Q.  Well, that's my question, who are "they"?
21        MR. DOUGLAS: Objection. Form and foundation.
22    A.  There's something funny here because in the second
23  sentence "they" appears to be Intel. Oh, maybe there was an
24  internal meeting at Intel. I'm confused about that.
25    Q.  (BY MR. HOSIE) Wouldn't you read it that way, sir,

32 (Pages 122 to 125)

Yamaguchi Obien Mangio, LLC * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101 * (206) 622-6875 * 1(800) 831-6973

BILL GATES ; August 26, 2004

Page 126

1    that there was an internal meeting at Intel with senior staff
2    of Andy Grove, and as a function of that meeting with Andy,
3    Intel agreed to 90 percent of what Microsoft wanted?
4        MR. DOUGLAS: Objection to the form.
5    A.   I don't know.
6    Q.   (BY MR. HOSIE) Is that how you would read it, sir?
7        MR. DOUGLAS: Objection. Form and foundation.
8    A.   Let me look at the rest of this.
9    Q.   (BY MR. HOSIE) If you could.
10    A.   (Witness reading document.) Yeah, I think he means
11    that there's some -- a different "they" which is another set
12    of Intel people.
13    Q.   Meeting with Andy Grove of Intel?
14    A.   That's my guess, yeah.
15    Q.   All right, fair enough. And through this e-mail
16    from Mr. Fox you learn of this and you learn that Mr. Fox at
17    least reports that Intel has now agreed to 90 percent of what
18    Microsoft wants; correct?
19    A.   Well, yeah, apparently there was some notion
20    relative to low end things that we had a proposal in to them
21    that they still didn't like completely.
22    Q.   And you were told that Intel no longer wants to do
23    an NC; correct?
24    A.   I think it's much more a question of whether they
25    used that term. I think if you look at this e-mail thread,

Page 127

1    Intel is still doing pretty much the notion of a low end
2    device that some people would call an NC. But as you'll see
3    in the e-mail thread, we didn't like them using the term NC
4    because we thought that would be confused with another thing
5    that didn't use an Intel processor.
6        So I think what he means here is that they won't
7    use that term, and then there's this whole thing about the
8    bill of materials. They're basically doing the same thing,
9    they're just not positioning it as an NC.
10    Q.   The second bullet point, sir, "They want to do a
11    terminal reference design ('rich terminal') with WinCE as
12    preferred implementation." Correct?
13    A.   That's what it says.
14    Q.   That's what you learned from this e-mail back in
15    October of 1997?
16    A.   Apparently so, yes.
17    Q.   Then the next bullet point, their WPD -- I'm sorry,
18    WB as in bravo, T.  What's that an acronym for, sir?
19    A.   In this spectrum, this mail's talking about doing
20    multiple points on the spectrum, one of which would have a
21    browser in JVM and one of which wouldn't. And the WBT
22    appears to be the very truth, the thinnest, all the way at
23    the end of the spectrum.
24    Q.   And by spectrum, you're referring to what we
25    earlier described as the continuum?

Page 128

1    A.   Yeah, the thin versus thick continuum.
2    Q.   So the WBT, which is the thinnest of the thin,
3    "would have NO local processing, NO browser, NO JVM"?
4    A.   That's what his mail says.
5    Q.   And that was good news from your perspective,
6    Mr. Gates?
7        MR. DOUGLAS: Objection to the form.
8    A.   There's always been devices in the market that are
9    at that extreme end both from us and from our competitors,
10    and so the fact that Intel -- the fact here that he's saying
11    we're more in line on some activities, yeah, that's probably
12    a good thing, but it's not a big thing.
13    Q.   (BY MR. HOSIE) Let's go to the e-mail right above.
14    It's from Adam Taylor responding to Pat Fox and also sent to
15    you.
16    A.   It's actually below it.
17    Q.   In a chronological sequence it's later in time and
18    it's higher on the page as it's printed out here.
19    A.   Oh, I'm sorry, I was going in the wrong direction.
20    Q.   Yeah. So you're now looking at the e-mail from
21    Adam Taylor to Pat Fox and you and others?
22    A.   That's right.
23    Q.   And he says, Adam Taylor -- do you know Adam?
24    A.   No.
25    Q.   Mr. Taylor says, "Great work turning them around,

Page 129

1    Pat (with thanks to Bill's mail I suspect)."
2        What mail is that, Mr. Gates?
3    A.   I'm not sure.
4        MR. DOUGLAS: Objection to form and foundation.
5    Q.   (BY MR. HOSIE) Don't you think it could be that
6    October e-mail where you say, gee, I'm not sure why you all
7    think cheap clients are a good thing but, you know,
8    incidentally, we can ship everything in Sun byte codes in six
9    months?
10        MR. DOUGLAS: Objection to form, plus you're asking
11    him to speculate.
12    A.   What was the date of that e-mail?
13    Q.   (BY MR. HOSIE) It was slightly earlier in October.
14    A.   I don't know. It would just be speculation. If
15    the date was after, I'd speculate one way.
16    Q.   Fair enough. Mr. Gates, if the date were after I
17    wouldn't have asked you the question.
18    A.   Okay, good job.
19        (Deposition Exhibit No. 22 was marked
20        for identification.)
21    Q.   (BY MR. HOSIE) Let me show you what's marked as
22    Exhibit 22, Mr. Gates. Counsel, copy for you. For the
23    record, Exhibit 22 is another e-mail thread. This one is
24    forwarding an article from InfoWorld and Eric Rudder whom I
25    believe was your TA as of this time, forwards it to you,

33 (Pages 126 to 129)

BILL GATES ; August 26, 2004

Page 130

1 Mr. Gates, on November 25, 1997.
2    A.   Right.
3    Q.   Have you had a chance to read the e-mail from
4 Mr. Rudder to you?
5    A.   I did.
6    Q.   And he's referring to this attached InfoWorld
7 report, is he not?
8    A.   That's right.
9    Q.   And Mr. Rudder says to you, "I know you" -- that
10 would be Mr. Gates, you?
11    A.   Me.
12    Q.   Yeah. "I know you," Bill Gates, "talked about this
13 with Gelsinger."
14         That would be Pat Gelsinger of Intel?
15    A.   Right.
16    Q.   "It's sad that Intel is delivering 'branded' java
17 beans."
18    A.   He's sad.
19    Q.   Yeah. Then he goes on to say, "Even if they had a
20 'commitment,'" in quotes, "this is still kind of an odd
21 announcement."
22         Now, what commitment is he referring to here, sir?
23         MR. DOUGLAS: Objection. Form and foundation.
24    Q.   (BY MR. HOSIE) I'll rephrase. Mr. Gates, isn't it
25 true that Intel made a commitment to Microsoft at about this

Page 131

1 time that it would drop its Java work, including JMF, except
2 as it had preexisting commitments to companies?
3         MR. DOUGLAS: Same objection.
4    Q.   (BY MR. HOSIE) Is that not true, sir?
5    A.   Intel chose to do what whatever they chose to do in
6 this area. There was never anything where there was an
7 agreement with us about what they would or wouldn't do.
8    Q.   My question, sir, isn't it true that Intel made you
9 a commitment that they would drop JMF and other Java work
10 except to the extent they had preexisting commitments to
11 companies?
12    A.   No.
13         MR. DOUGLAS: And same objections.
14    Q.   (BY MR. HOSIE) Do you recall talking with
15 Gelsinger about that kind of commitment, sir?
16    A.   No. You can use the word "commitment" in many
17 different ways.
18    Q.   Well, let me rephrase that. Do you see the word
19 "commitment" in Mr. Rudder's mail to you?
20    A.   I do.
21    Q.   And he uses it in quotes, does he not?
22    A.   Right.
23    Q.   Okay. And he says, "I know you talked about this
24 with Gelsinger." Correct?
25    A.   I think "this" refers to the general question of

Page 132

1 the multimedia work at Intel.
2    Q.   What was said in your conversation with Gelsinger?
3    A.   I don't have any specific recollection, but I've
4 been in many meetings with Pat Gelsinger about various
5 software topics, including video Codecs and realtime
6 activities, all sorts of things.
7    Q.   Did you not have a conversation with Mr. Gelsinger
8 where he said, we'll make the commitment to drop Java in JMF
9 except insofar as we have preexisting commitments to
10 customers?
11         MR. DOUGLAS: Objection to form and foundation.
12    A.   Intel never made any such commitment to us.
13    Q.   (BY MR. HOSIE) You never had an agreement with
14 Intel, sir, along those lines?
15         MR. DOUGLAS: Same objection.
16    A.   They made their plans, we made our plans.
17    Q.   (BY MR. HOSIE) Intel is a rational economic
18 enterprise, is it not, sir?
19    A.   Imperfect.
20    Q.   As are so many of us. But generally speaking, you
21 would view Intel as a rational economic enterprise, would you
22 not?
23         MR. DOUGLAS: Objection to the form.
24    A.   They -- I'm not sure what you mean by that. Intel
25 certainly does things that I think have been mistakes,

Page 133

1    Q.   (BY MR. HOSIE) As has Microsoft from time to time?
2    A.   Absolutely. I can give you more examples of that.
3    Q.   Do you think a rational economic company would
4 ignore threats from Microsoft?
5         MR. DOUGLAS: Objection to the form. Foundation.
6    A.   I'm not sure how to respond to a hypothetical. If
7 you have a specific set of facts, I'll be glad to comment on
8 it.
9         (Deposition Exhibit No. 23 was marked
10         for identification.)
11    Q.   (BY MR. HOSIE) Let me show you what's been marked
12 as Exhibit 23. Sir, Exhibit 23 is another e-mail string.
13 I'm only going to ask you about the first e-mail which is
14 referencing the same InfoWorld article.
15    A.   Okay.
16    Q.   Who is Eric Engstrom?
17    A.   He worked in a group at Microsoft.
18    Q.   Did you know him?
19    A.   Yes.
20    Q.   This e-mail reports that Eric Engstrom has done a
21 deal with Intel. Were you aware that Eric Engstrom had done
22 a deal with Intel?
23         MR. DOUGLAS: Objection. Form and foundation. The
24 witness didn't even receive a copy of this.
25    A.   I know that at one time there was discussion around

34 (Pages 130 to 133)

BILL GATES ; August 26, 2004

Page 134

1  an MOU with Intel. And I don't think we ever reached a deal,
2  but I know there was some draft discussion about some
3  graphics-related work.
4     Q.  (BY MR. HOSIE) Sir, he goes on to say, "Eric
5  Engstrom has done a deal with them and we agreed that they
6  could complete the work they are already doing."
7     Does that refresh your recollection about the
8  commitment that Intel made you?
9     MR. DOUGLAS: Same objections.
10    A.  Intel did not make a commitment to stop doing
11 something, not that I was party to or involved with.  It
12 points out, apparently when this InfoWorld thing came out, I
13 said it wasn't a big deal.
14    Q.  (BY MR. HOSIE) And that's because you knew that
15 Intel had agreed not to do an NC and had agreed to basically
16 drop its support for Java, specifically Java Media Framework;
17 correct?
18    MR. DOUGLAS: Objection. Form and foundation.
19    A.  That's -- this is where Intel's actually shipping
20 Java Media Framework, so I think you're a little confused.
21 So this is actually putting it into the marketplace.
22    Q.  (BY MR. HOSIE) Right. And that act prompts this
23 e-mail string where people at Microsoft said, wait a second,
24 we have a deal, and then others say no, no, the deal allowed
25 them to finish preexisting commitments.

Page 135

1     And it's that very deal, Mr. Gates, that you deny,
2  is that not true, sir?
3     MR. DOUGLAS: Objection to form and foundation.
4     A.  You're mischaracterizing this e-mail.
5     (Deposition Exhibit No. 24 was marked
6     for identification.)
7     Q.  (BY MR. HOSIE) Let me show you Exhibit 24. This
8  is another e-mail dated December 1, 1997. I'm going to ask
9  only about the e-mail on the top from Russell Barck of Intel
10 to Marshall Brumer of Microsoft. Mr. Barck says, "Marshall,
11 my understanding of the original agreement was that we would
12 stop new evangelism efforts, but would continue to support
13 existing customer commitments.  As far as I can tell, this is
14 one of them," referring to the same InfoWorld article;
15 correct?
16    MR. DOUGLAS: Objection to the form and foundation.
17 He didn't receive the document.
18    A.  I'm not copied on this.
19    Q.  (BY MR. HOSIE) Wasn't that the deal, sir?
20    A.  No.
21    MR. DOUGLAS: Same objection. No foundation.
22    MR. HOSIE: I'd like to take a brief break off the
23 record, if we might.
24    MR. BURT: Where are we on time?
25    VIDEO OPERATOR: The time is 4:17 p.m. We'll be

Page 136

1  taking a break in testimony.
2     (Recess taken.)
3     (Deposition Exhibit No. 25 was marked
4     for identification.)
5     VIDEO OPERATOR:  The time is 4:23 p.m. We're now
6  back on the record.
7     Q.  (BY MR. HOSIE) Mr. Gates, we took a break.  With
8  the benefit of that break, is there any aspect of your
9  testimony earlier this afternoon you'd like to change, modify
10 or otherwise amend?
11    A.  No.
12    Q.  I've marked as our next in order Exhibit No. 25.
13 It's an e-mail thread again. I'm going to be focusing on a
14 e-mail from Bob Herbold to you, amongst many others, dated
15 February 15, 1998.
16    A.  Right.
17    Q.  And in it Mr. Herbold is recounting a conference
18 call that he had with Dennis Carter, VP of Marketing of
19 Intel, and Russ Barck of Intel, is he not, sir?
20    A.  Right. Those are marketing people.
21    Q.  Right. Halfway down the page there's a paragraph
22 with the heading Java.  Do you see that?
23    A.  Uh-huh.
24    Q.  And this says that, "Charles Fitzgerald" -- he was
25 a Microsoft guy?

Page 137

1     A.  Exactly.
2     Q.  -- "is talking with Barbara Dawson of Intel."
3     A.  It says of Intel there.
4     Q.  Do you know Barbara?
5     A.  No.
6     Q.  -- "Barbara Dawson of Intel on almost daily basis
7  and we seem to have good agreement here. As long as we're
8  talking 'native' with respect to Java, both parties are
9  happy. Dennis reiterated once again that the Java Media
10 Framework activity between Sun and Intel is very, very low
11 priority and they expect it to die a natural death."
12    Do you recall learning in February 1998 that Intel
13 had communicated to Microsoft that Intel was letting JMF die?
14    MR. DOUGLAS: Objection to the form and foundation.
15    A.  It says they expect it to die.
16    Q.  (BY MR. HOSIE) A natural death. Did you recall
17 learning that, sir?
18    A.  I don't recall the specific e-mail, no.
19    Q.  Do you recall learning the fact that as of
20 February, Intel had assured Microsoft that Intel was letting
21 JMF die a natural death?
22    MR. DOUGLAS: Same objection.
23    A.  I don't see that here.
24    Q.  (BY MR. HOSIE) My question, sir. Do you recall
25 hearing at or about the time of this e-mail that Intel had

35 (Pages 134 to 137)

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

BILL GATES ; August 26, 2004

Page 138

1  assured Microsoft that Intel had made its JMF work a very,
2  very low priority?
3      MR. DOUGLAS: Objection. Form and foundation.
4      A.   There's nothing in here about assurance. It says
5  they expect it to die a natural death. And then the next
6  sentence says, "There was general agreement that Netscape's
7  disinvestment in Java certainly puts Java at the crossroads."
8      And so apparently something Netscape is doing is
9  causing certain Java things to be less popular.
10     Q.   (BY MR. HOSIE) Well, here's a question I have,
11  Mr. Gates. Why is Intel sharing this kind of confidential
12  business information with Microsoft anyway?
13     MR. DOUGLAS: Objection. Form, foundation, and
14  you're asking him to speculate.
15     A.   What do you mean confidential business information?
16  I mean, certainly we shared each other's secret product plans
17  with each other under non-disclosure on a very regular basis.
18     Q.   (BY MR. HOSIE) Technical engineering information
19  under NDA?
20     A.   Among other things.
21     Q.   Right. But is it your experience in business that
22  it's normal for companies to share their confidential
23  business plans with other companies?
24     MR. DOUGLAS: Objection to the form and foundation.
25     A.   Some business plans are shared.

Page 139

1      Q.   (BY MR. HOSIE) And some are not?
2      A.   And some are not.
3      (Deposition Exhibit No. 26 was marked
4      for identification.)
5      Q.   (BY MR. HOSIE) Let me show you what's been marked
6  as Exhibit 26, sir. Not to catch you off guard, Mr. Gates,
7  not that I think I could, but we're turning the clock back in
8  time earlier to September 1996 with this e-mail. I'm going
9  to be asking you about your e-mail in the middle of the page
10  to Aaron Contorer.
11     A.   Right.
12     Q.   What's the subject of your e-mail, sir?
13     A.   It's a forward of a mail -- I guess -- well,
14  there's a long chain here and the subject line gets changed
15  during the chain. One of them is Think Week.
16     Q.   Who is Adam Bosworth?
17     A.   He was a product management type person.
18     Q.   He's writing here about Java to you in the mail to
19  which you immediately respond?
20     A.   His view of Java in 1996, that's right.
21     Q.   And you say, "This scares the hell out of me."
22  Correct?
23     A.   Yeah, I say that -- it's not so much about Java,
24  it's about what will our OS offer the Java client
25  applications, that is, how will we distinguish ourselves as

Page 140

1  being the best OS to run Java client applications, clearly
2  talking about the fact there will be a lot of Java client
3  applications.
4      Q.   And why did that scare the hell out of you,
5  Mr. Gates?
6      A.   Well, whatever the new popular class of
7  applications are, we need to make sure our operating system
8  is providing the most value to those. And since there was a
9  trend at this time -- later, you know, many aspects of Java
10  didn't pan out to be as popular as we and others thought they
11  would, but at this time it looked like there would be a lot
12  of Java client applications code, and we wanted to make sure
13  our OS ran it best and we wanted to move very quickly to do
14  that.
15     Q.   You mentioned several times today a continuum or a
16  spectrum of devices.
17     A.   Right.
18     Q.   Isn't it true, sir, that you personally believed
19  that it was essential that all the devices across that
20  spectrum rely on a single set of APIs and that those be
21  Microsoft APIs?
22     MR. DOUGLAS: Objection to the form and foundation.
23     A.   No, the world has always been heterogeneous, that
24  is, there have been machines from Apple, set top boxes,
25  phones. There never has been or will there ever be complete

Page 141

1  uniformity of devices.
2      (Deposition Exhibit No. 27 was marked
3      for identification.)
4      Q.   (BY MR. HOSIE) I'd like to show you Exhibit 27.
5  These are Judge Jackson's Findings of Facts, sir. I'm going
6  to point you to one in specific, it's on Page 23, and it's
7  Finding 112. If you could turn there, please, Mr. Gates.
8  It's Page 23, Finding 112.
9      A.   Okay, go ahead.
10     Q.   This finding says, "At the end of May 1997, Gates
11  told a group of Microsoft executives that multimedia
12  streaming represented strategic ground that Microsoft needed
13  to capture."
14     Is that true, sir? Did you do that?
15     A.   I know that at about this time we talked about
16  being one of the companies that offered multimedia streaming
17  capabilities and we did invest in creating a product that
18  competed in that area. We were one of many companies who
19  offered products in that area.
20     Q.   And why did you feel multimedia streaming
21  represented strategic ground that you needed to capture?
22     A.   What I said is that we -- I don't know anything
23  about strategic ground. We created a product to compete in
24  that space. We actually overestimated the revenue potential
25  out of that space.

36 (Pages 138 to 141)

BILL GATES ; August 26, 2004

Page 142

1    Q.   We've been talking hitherto today about the
2  platform challenge represented by NC and Java runtime
3  environments.
4        Isn't it true, sir, that by 1997 you were concerned
5  about another kind of platform challenge, specifically that
6  arising out of multimedia delivery and playback?
7        MR. DOUGLAS: Objection to the form. Vague and
8  overbroad.
9    A.   No.
10   Q.   (BY MR. HOSIE) You don't recall believing that you
11 were in a platform battle with RealNetworks in 1997?
12   A.   We were competing with Real but they didn't offer a
13 complete operating system, no.
14   Q.   You weren't concerned that if Real won the
15 multimedia format war that it would have the exclusive
16 product for multimedia playback and delivery?
17       MR. DOUGLAS: Objection to the form. Vague and
18 ambiguous and no foundation.
19   A.   You're saying if they had 100 percent share would
20 they have 100 percent share?
21   Q.   (BY MR. HOSIE) No, if they won the format battle.
22 Let me start by asking you, do you recall that you were in a
23 format battle with RealNetworks?
24       MR. DOUGLAS: Same objection. Form, foundation,
25 vague and ambiguous.

Page 143

1    A.   There are many aspects to our competition with
2  RealNetworks. They support their own formats, they support
3  our formats, they support industry standard formats. We --
4  the actual revenue competition is for software
5  implementations, but one of the features of those software
6  implementations is different video formats that we support.
7  And we certainly invented new video formats that we
8  positioned as solving problems for customers.
9        (Deposition Exhibit No. 28 was marked
10       for identification.)
11   Q.   (BY MR. HOSIE) Sir, I've marked as Exhibit 28 an
12 e-mail with the subject line of "Review with BillG on
13 2/26/99," and attached to that is a presentation deck that
14 has the title Windows Media Technologies, BillG Review,
15 2/26/99.
16       Do you recall participating in a Windows Media
17 Technologies Review in late February 1999, sir?
18   A.   Not in particular, but it appears that I did.
19   Q.   And along with Steve Ballmer and Paul Maritz?
20   A.   Where do you see that they participated?
21   Q.   First line of the e-mail.
22   A.   Yep, the e-mail recounts that SteveB and PaulMa
23 were there.
24   Q.   Senior guys?
25   A.   Very senior.

Page 144

1    Q.   Extremely. As of course were and are you?
2    A.   I try. Every year I get more senior.
3        MR. HOSIE: As do we all.
4        MR. DOUGLAS: And we're also getting to three hours
5  so we need to wrap this up.
6    Q.   (BY MR. HOSIE) Do you recall this review, sir?
7    A.   Not in particular, but it appears I attended a
8  review.
9    Q.   If you could turn to the presentation deck. A
10 presentation deck is internal Microsoft vernacular for
11 PowerPoint slides?
12   A.   Well, we just called them PowerPoint slides. I
13 mean, it's actually our trademark so I think we love calling
14 it PowerPoint slides.
15   Q.   And these are PowerPoint slides, are they not, sir?
16   A.   Absolutely. They appear to be PowerPoint slides
17 that at least the mail suggests these were slides presented
18 at some kind of product review.
19   Q.   If you could turn to the page that has 5 in the
20 lower right. The title is Platform Battle is Similar for
21 Netscape, But Different Playbook. Are you there?
22   A.   I don't know where you are. Oh, gosh, I turned
23 right to it.
24   Q.   Serendipity. Or was that just purely
25 perspicacious?

Page 145

1        MR. DOUGLAS: Do we have a question?
2        MR. HOSIE: We are building to a question, slowly
3  but relentlessly.
4    Q.   (BY MR. HOSIE) Sir, the title is Platform Battle
5  is Similar to Netscape, But Different Playbook.
6        Did you personally view the platform battle with
7  Real as being similar to the browser battle?
8    A.   No.
9    Q.   So this is a statement that you would disagree
10 with?
11   A.   This is a group presenting the work they're doing
12 as being as important as something else, and that's very
13 typical inside Microsoft.
14   Q.   The next page, What It Means to Lose.
15   A.   Probably more of the same. Let's take a look.
16   Q.   Let's take a look. And you can tell me what you
17 agree with and what you disagree with. What It Means to
18 Lose. You would read that as what it means to lose the
19 multimedia platform battle?
20   A.   No, I'm not sure. I'm not sure if this is about
21 formats or servers or clients.
22   Q.   Or all of the above?
23   A.   No, I don't think it's about all of the above.
24       MR. DOUGLAS: Do we have a substantive question?
25 Because we are past three hours.

37 (Pages 142 to 145)

BILL GATES ; August 26, 2004

---

**Page 146**

1  Q.  (BY MR. HOSIE)  What It Means to Lose.  The first
2  consequence of losing is identified as, "Real, Apple and MP3
3  phenomenon provide the required multimedia runtime on Windows
4  and WinCE."
5     Do you see that, sir?
6  A.  I don't think that's a consequence of losing, is
7  it?
8  Q.  Well, what does that language mean to you, sir?
9  A.  It's a point on the PowerPoint slide.
10 Q.  Well, what does it mean to you, sir?  You were at
11 this presentation, it's got your name, 2/26/99, BillG Review
12 on the bottom left.  You sat through this --
13 A.  It's a good thing for people to provide popular
14 multimedia software on Windows.  So when it says Real, Apple
15 and MP3 provide multimedia runtime on Windows, as opposed to
16 them not providing it on Windows, that's a good thing.
17 Q.  But if they own the proprietary standard, that
18 means that effectively they're going to control those APIs?
19    MR. DOUGLAS:  Objection to the form.
20 A.  Their work is proprietary to them, our work is
21 proprietary to us.  There's no distinction there.  The
22 relative popularity of their software would be useful to
23 them, the relative popularity of ours would be helpful to us.
24 But this is just about the media piece, it's not about
25 operating systems.

---

**Page 147**

1  Q.  (BY MR. HOSIE)  I understand.  Weren't you
2  concerned, though, that if -- well, strike that, let me ask a
3  different question.
4     In 1997, you personally believed that 'multimedia
5  was going to become an increasingly important part of the PC
6  experience going forward; fair?
7     MR. DOUGLAS:  Objection to the form.
8  A.  We thought that people because of the increased
9  bandwidth and the software improvements that we and other
10 people were making, would spend more time doing multimedia.
11 Q.  (BY MR. HOSIE)  Okay.  And you were concerned that
12 Microsoft not get locked out of that space, if you will, by
13 having Real's proprietary format become the de facto
14 standard; also fair?
15    MR. DOUGLAS:  Objection to the form.
16 A.  Well, there's many different formats.  You're never
17 going to have a case where one format is totally popular,
18 because it's trivial on a PC to have Codecs for any number of
19 formats.  In fact, today on a PC, I think you have Codecs
20 typically for 20 or 30 formats.  So you're not going to have
21 one format eliminating the other formats.
22 Q.  (BY MR. HOSIE)  Content will be encoded in
23 particular formats; correct?
24 A.  Many different formats.
25 Q.  But if one format becomes the de facto standard,

---

**Page 148**

1  that's going to be what the content's encoded in; correct?
2  A.  No, because you have so many tradeoffs.  I mean,
3  it's so trivial to download a Codec and you have so many
4  tradeoffs in terms of computation power, network bandwidths,
5  screen resolution that there's more and more Codecs all the
6  time.  As time has gone on, the variety of multimedia formats
7  has simply increased, and so no single format has any
8  particular overriding position relative to the other formats.
9  Q.  This presentation slide says at the very end of
10 this page, "Real's player becomes the browser of choice."
11    That's one consequence of losing the multimedia
12 platform battle; correct?
13    MR. DOUGLAS:  Objection to form and foundation.
14 A.  No, this is talking about multimedia.  What they're
15 saying is that Real's -- when people wanted to view
16 multimedia, if Real is super successful then they'd be using
17 Real's software to view multimedia.
18    MR. DOUGLAS:  What is the time?
19    VIDEO OPERATOR:  One moment, please.  Elapsed time
20 is three hours and five minutes, sir.
21    MR. DOUGLAS:  Mr. Hosie, now I think if you have
22 any questions that relate to document retention, we have to
23 move to those.
24    MR. HOSIE:  Well, I guess I'll continue on this
25 until you tell me to stop.

---

**Page 149**

1     MR. DOUGLAS:  I think I just did.
2     MR. HOSIE:  And you did it very graciously, Chuck.
3     MR. DOUGLAS:  Well, I think you told the judge
4  you'd be three hours and we let you continue on.
5     MR. HOSIE:  Well, we won't quarrel right now, but I
6  respect your request and I'll move on in the middle of the
7  document.
8  Q.  (BY MR. HOSIE)  Mr. Gates, I bet you don't know a
9  lot about Microsoft's e-mail retention policies and
10 practices?
11    MR. DOUGLAS:  Objection to the form.
12 A.  That's a very vague question, sir.
13 Q.  (BY MR. HOSIE)  Okay, well, let me be more
14 specific.  Do you recall attending a meeting at Intel in 1995
15 where you reported in substance that this antitrust thing
16 will blow over but we may change our e-mail retention?
17    MR. DOUGLAS:  Objection.  Form and foundation.
18 A.  You're talking about nine years ago?
19 Q.  (BY MR. HOSIE)  Yes.
20 A.  I don't remember a specific meeting where that
21 happened.
22 Q.  Do you remember ever saying that at an Intel
23 meeting, that this antitrust thing will blow over but you all
24 might have to change e-mail retention policies at Microsoft?
25 A.  No.

38 (Pages 146 to 149)

BILL GATES ; August 26, 2004

Page 150

1  Q.  All right, sir.  In 1997, Microsoft promulgated a
2  policy that e-mails should not be saved to servers subject to
3  backup.  Not to servers but servers subject to backup.
4      Do you know anything about that policy?
5      MR. DOUGLAS:  Objection.  Form and foundation.  I
6  think it mischaracterizes --
7  A.  I'm very confused about what you're saying.
8      MR. DOUGLAS:  Hold on, Mr. Gates.  Objection to the
9  foundation as well because it mischaracterizes the company
10  policy.
11  Q.  (BY MR. HOSIE)  Sir, do you recall that at some
12  point Microsoft promulgated a policy that e-mails should not
13  be saved to servers subject to backup?
14      MR. DOUGLAS:  Same objection.
15  A.  I think you're going to have to explain better what
16  you're talking about.  That doesn't -- I can't parse that.
17  Are you talking about mail servers?
18  Q.  (BY MR. HOSIE)  No, not the Exchange servers, just
19  your file servers.
20  A.  But Exchange servers are mail servers, right?
21  Q.  Yes.
22  A.  Okay, and that --
23  Q.  And you also have file servers in addition to
24  Exchange servers; correct?
25  A.  Yeah.  Those are among the many, many types of

Page 151

1  servers we have.
2  Q.  And are you aware that your e-mail Exchange servers
3  are -- the backup tapes are written over every 28 days?
4      MR. DOUGLAS:  Same objection.  Form and foundation.
5  A.  I don't know.
6  Q.  (BY MR. HOSIE)  Are you aware of a policy at
7  Microsoft that says do not save your e-mails to file servers
8  subject to backup?
9      MR. DOUGLAS:  Same objection.
10  A.  I'm not sure, because mail's on your mail server.
11  Q.  (BY MR. HOSIE)  Can't people archive in a PST file
12  on a file server, sir?
13  A.  On a file server?
14  Q.  Yes.
15  A.  I don't think many people do that.
16  Q.  Well, haven't you personally done that from time to
17  time, sir?
18  A.  No.
19  Q.  Do you recall asking your TA in 1997 or '98, Aaron
20  Contorer, to recall some backup tapes of e-mail and delete
21  some e-mails from them?
22      MR. DOUGLAS:  Same objection.  Form and foundation.
23  A.  No.
24  Q.  (BY MR. HOSIE)  All right, sir.  But going back to
25  my root question, you know nothing about the policy of not

Page 152

1  saving e-mail to servers but only those servers subject to
2  backup?
3      MR. DOUGLAS:  Objection.  Plus it's overbroad and
4  vague.
5  A.  Again, what you're saying doesn't parse.
6  Q.  (BY MR. HOSIE)  Doesn't make sense to you?
7  A.  No.  What you're saying just doesn't make sense.
8  Look, if you want to go through the different kinds of
9  servers and the policies you can tell me things and I'll say,
10  hey, I'm not aware of the policies.. But what you're saying
11  is just -- the sentence doesn't make sense.
12  Q.  Why?  What's confusing you about it?
13  A.  Because you've got to talk about different servers.
14  Mail servers is where most of the mail is.
15  Q.  Right.  And there are file servers to which people
16  have assigned shares; correct?
17  A.  File shares.
18  Q.  Yes.  And people can archive with a dot PST prefix,
19  archive e-mail to those file shares; correct?
20  A.  I'm not -- technologically, yes.  I don't think
21  many people do that, I don't know why they would.  But yes,
22  technologically one could do that.
23  Q.  And for those dot PST archived files, are you aware
24  of a policy at Microsoft that said thou shalt not do that to
25  servers subject to backup?

Page 153

1      MR. DOUGLAS:  Objection.  Form and foundation.
2  A.  I don't know what you mean subject to backup.
3  Q.  (BY MR. HOSIE)  Ah.  Backup retention?
4  A.  I don't know what you mean.  You're saying that --
5  I mean, the fact is, I don't know anything about this whole
6  area.  But I don't even -- you're not even getting to the
7  point where I can say I don't know what the policy is.
8      Are you talking about that people don't do it or --
9  what are you saying?  You're saying they don't do it?
10  Q.  No, Mr. Gates, people in fact did archive e-mails
11  in dot PST files even though there was a policy saying don't
12  do it to servers subject to document retention backup via
13  tape.
14      And my question is, do you know about that policy?
15      MR. DOUGLAS:  Objection.  Form and foundation.
16  A.  I think you're mixing together backup and
17  archiving, but --
18  Q.  (BY MR. HOSIE)  Well, on this one, sir, we can take
19  all the time it takes, so let me go slowly and carefully.
20  A.  Okay.
21  Q.  Microsoft has Exchange servers for its e-mail;
22  correct?
23  A.  Those are our mail servers, yes.
24  Q.  Are those e-mail servers backed up?
25  A.  Under some policy, yes.

Yamaguchi Obien Mangio, LLC  *  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  *  (206) 622-6875  *  1(800) 831-6973

BILL GATES ; August 26, 2004

**Page 154**

1    Q.   Are you aware that the backup tapes are erased
2  every 28 days?
3    A.   No, but I'm not surprised.
4    Q.   Why does that not surprise you?
5    A.   If you accidentally delete e-mail, that gives you
6  plenty of time to remember that you did.
7    Q.   What is Microsoft's policy on e-mail retention,
8  please?
9    MR. DOUGLAS: Objection. Form and foundation.
10    A.   People keep whatever there's a business requirement
11  for or a legal requirement for past some date.
12    Q.   (BY MR. HOSIE) How -- and what is that date?  Is
13  it one month, six months, a year, do you know?
14    MR. DOUGLAS: Same objection.
15    A.   I'm not sure.
16    Q.   (BY MR. HOSIE) Now, are you aware that people at
17  Microsoft have in fact saved under a dot PST prefix e-mails
18  to file servers?
19    MR. DOUGLAS: Same objection.
20    A.   No, but I know it's technologically possible.
21    Q.   (BY MR. HOSIE) And do you know anything about a
22  policy that directs Microsoft employees not to save mail on
23  servers subject to backup?
24    A.   No.
25    Q.   In 1997, Microsoft's internal policy guidelines

**Page 155**

1  said that that policy was due to legal reasons. Do you know
2  anything about the legal reasons underlying that policy?
3    MR. DOUGLAS: Form and foundation.
4    A.   Yeah, I don't have a foundation for that.
5    Q.   (BY MR. HOSIE) Fair enough. And if you don't
6  know, Mr. Gates, say I don't know.
7    A.   I don't have a foundation for the whole sentence.
8    Q.   Fair enough. And, sir, are you aware that at some
9  point Microsoft programmed its backup system to delete
10  e-mails that had been archived?
11    MR. DOUGLAS: Objection. Form and foundation.
12    A.   No.
13    Q.   (BY MR. HOSIE) Who sets e-mail retention policy at
14  Microsoft?
15    A.   Some combination of business people and legal
16  people and technical people.
17    (Deposition Exhibit No. 29 was marked
18    for identification.)
19    Q.   (BY MR. HOSIE) I'd like to show you what's been
20  marked as Exhibit 29, sir.
21    A.   (Witness reading document.) Okay. I'm not copied
22  on this.
23    Q.   To your understanding, was it one of Mr. Allchin's
24  job responsibilities to police Microsoft's e-mail policies?
25    MR. DOUGLAS: Objection to the form.

**Page 156**

1    A.   He's in the management chain but it's not his
2  specific responsibility.
3    Q.   (BY MR. HOSIE) Do you have any explanation for why
4  Mr. Allchin was telling Windows division employees not to be
5  foolish and not to archive e-mail in January of 2000?
6    MR. DOUGLAS: Objection. Form and foundation.
7    A.   It appears somebody kept so much e-mail that it got
8  corrupted, and it's not clear who that's from. And then
9  Brian appears to say -- I've never seen this before -- hey,
10  if you keep that much your e-mail box is going to get big and
11  unreliable. And then Jim talks about his view.
12    Q.   (BY MR. HOSIE) And Mr. Allchin says that it was
13  company policy to purge e-mail after 30 days. Was that the
14  company's policy?
15    MR. DOUGLAS: Objection to form and foundation --
16    A.   I'd have to check.
17    MR. DOUGLAS: -- mischaracterizes the document.
18    A.   Certainly the policy always said that you retain
19  things that there's a business reason to keep or a legal
20  reason to keep. And, you know, those things we keep
21  indefinitely.
22    Q.   (BY MR. HOSIE) A business reason to keep?
23    A.   Or a legal reason.
24    Q.   And by business reason what do you mean?
25    A.   Things that you want to keep around.

**Page 157**

1    Q.   Things that might be important for future
2  reference, that kind of thing?
3    A.   Right.
4    Q.   And is Mr. Allchin's e-mail consistent with your
5  understanding of that policy?
6    MR. DOUGLAS: Objection. Form and foundation, it's
7  overbroad.
8    A.   I haven't spoken with Jim about this. I think
9  common sense says that this is about the e-mail that you
10  don't need longer for the business or legal requirements.
11  But unless you put that in there, he's misstating our policy.
12    Q.   (BY MR. HOSIE) Where would you go to check what --
13  you said I'd have to go check what the policy is. Where
14  would you go to do that?
15    A.   The employee handbook.
16    Q.   What's the employee handbook?
17    A.   It's an online document.
18    Q.   And it has, amongst other things, document
19  retention policies?
20    A.   I think if you did a search on that page you'd
21  eventually find something.
22    Q.   That's a handbook that's readily available to all
23  Microsoft employees online here?
24    A.   Yeah, I believe you can search online. I haven't
25  done this. My e-mail is retained on a regular monthly basis,

40 (Pages 154 to 157)

BILL GATES ; August 26, 2004

Page 158

1  which is why, you know, I don't go looking up at the general
2  online policy. Mine gets archived every month.
3     Q.   This employee handbook, I mean, what, there are
4  55,000 or so Microsoft employees now?
5     A.   Around that, yes.
6     Q.   And any one of them could theoretically get online
7  and read the --
8     A.   Well, we should check to make sure. That's my
9  belief, my guess, though, because I haven't gone and actually
10 checked that. I know my mail is handled -- it's archived
11 every month.
12    Q.   Well, let's talk about your mail, then. When did
13 that begin, the policy and practice of keeping every single
14 Bill Gates mail?
15       MR. DOUGLAS: Objection to the form.
16    A.   A long, long time ago when there was some type of
17 ongoing criteria that, you know, ongoing mail would be within
18 the scope of some request. Many, over five years ago, we can
19 find out exactly when, but it was when requests came in that
20 had an ongoing nature.
21    Q.   (BY MR. HOSIE) And mechanically how does the
22 preservation of your mail work, if you know?
23    A.   It goes to legal on a monthly basis.
24    Q.   So somebody from legal comes up and basically takes
25 a dump from your mail archive?

Page 159

1     A.   I think my assistant does the dump and then she --
2  after she gets rid of personal e-mails, sends it over to
3  legal. I'm not even sure it's a dump. Somehow, I don't know
4  the technical approach that's used, but the file is sent to
5  legal on a monthly basis.
6     Q.   And is that a copy of the file or the original? I
7  mean, do you maintain a separate copy yourself?
8     A.   Well, there's the active copy.
9     Q.   One moment, please.
10       Sir, if you wanted to find e-mails from, say,
11 October of 1997, what would you do?
12       MR. DOUGLAS: Objection to the form. It's
13 overbroad.
14    A.   My e-mails?
15    Q.   (BY MR. HOSIE) Sure.
16    A.   I'd go to legal.
17    Q.   Because they keep the complete historical set of
18 Gates e-mails?
19    A.   That's my understanding. I mean, that they -- you
20 know, subject -- the personal mail gets deleted by Christine,
21 but other than that, yes.
22    Q.   And Christine is your executive assistant?
23    A.   Yeah, she's the current one.
24    Q.   Fair enough. Document retention notices. Do you
25 know what a document retention notice is, Mr. Gates?

Page 160

1     A.   Yes.
2     Q.   It's a piece of paper that says we've got this
3  legal issue, please preserve documents of the following
4  nature and category?
5     A.   In our case it's generally transmitted through
6  e-mail, but yes.
7     Q.   Okay. And you have received, I'm sure, numerous
8  document retention notices over the years?
9     A.   Yes, sir.
10    Q.   Have you ever received what I would call a release
11 from retention notice?
12    A.   Rarely. I think recently I did get one. It was
13 for a legal matter that was so old it was unbelievable. But
14 in my case the policy of archiving my e-mail monthly, you
15 know, just keeps going on.
16       MR. HOSIE: Fair enough. Mr. Gates, I've kept you
17 here until 5:00 and I will pass the witness at this point.
18       MR. DOUGLAS: We have no questions. We will
19 reserve the right for the witness to read the transcript when
20 the deposition is completed.
21       VIDEO OPERATOR: One moment, please. I'll bring
22 the tape to a close and we'll go off the record.
23       The number of tapes used in today's deposition were
24 two. This concludes today's deposition of Bill Gates. We
25 are going off the record, the time is 4:54 p.m.

Page 161

1        (Deposition concluded at 4:54 p.m.)
2        (Signature reserved.)

Yamaguchi Obien Mangio, LLC  •  www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101  •  (206) 622-6875  •  1(800) 831-6973

BILL GATES ; August 26, 2004

Page 162

CORRECTION & SIGNATURE PAGE

RE: BURST.com, INC. Vs. MICROSOFT CORPORATION
U.S. DISTRICT COURT; DISTRICT OF MARYLAND
CIVIL ACTION NO. JFM-02-cv-2952
DEPOSITION OF: BILL GATES; AUGUST 26, 2004
Reported By: Diane M. Mills

I, BILL GATES, have read the within transcript taken
AUGUST 26, 2004, and the same is true and accurate except for
any changes and/or corrections, if any, as follows:

PAGE/LINE        CORRECTION        REASON

Signed at _____, Washington,

on this date: _____

BILL GATES

---

Page 163

REPORTER'S CERTIFICATE

I, DIANE M. MILLS, the undersigned Certified Court
Reporter and Notary Public, do hereby certify:
That the testimony and/or proceedings, a transcript of
which is attached, was given before me at the time and place
stated therein; that any and/or all witness(es) were by me
duly sworn to tell the truth; that the sworn testimony and/or
proceedings were by me stenographically recorded and
transcribed under my supervision, to the best of my ability;
that the foregoing transcript contains a full, true, and
accurate record of all the sworn testimony and/or proceedings
given and occurring at the time and place stated in the
transcript; that I am in no way related to any party to the
matter, nor to any counsel, nor do I have any financial
interest in the event of the cause.

WITNESS MY HAND AND SEAL this 2nd day of September
2004.


DIANE M. MILLS
Certified Court Reporter
CCR No. 2399
Notary Public in and for the
State of Washington, residing
in King County. Comission
expires 10/10/06.

Yamaguchi Obien Mangio, LLC * www.yomreporting.com
520 Pike Street, Suite 1320, Seattle, Washington 98101 * (206) 622-6875 * 1(800) 831-6973