IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

IN RE MICROSOFT CORP.
ANTITRUST LITIGATION.

This Document relates to:

*Burst.com, Inc. v.
Microsoft Corp.,*

Civil Action No JFM-02-cv-2952

MDL Docket No. 1332

Hon. J. Frederick Motz

**PUBLIC VERSION**

---

# BURST.COM, INC.'S MOTION FOR SPOLIATION INSTRUCTION, WITNESS PRECLUSION, AND RELATED RELIEF

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY                                                        1

II. IN SPITE OF ALL THIS ONGOING LITIGATION AND THE PRESERVATION
    ORDER, MICROSOFT REPEATEDLY TOLD ITS EMPLOYEES NOT TO SAVE
    E-MAIL                                                                         4

    A.  1995: Microsoft's First Do-Not-Save-E-Mail Directive                       5

    B.  The Allchin "Do Not Be Foolish" 30 Day E-Mail Destruction Rule            13

    C.  Chris Phillips Tells An Apple Employee That Microsoft Employees Delete
        E-Mail So As Not To Create An Adverse "Paper Trail"                       18

III. MICROSOFT POLICED ITS DO-NOT-SAVE-E-MAIL RULES BY
     PROGRAMMING ITS COMPUTERS TO DELETE E-MAIL                                   19

    A.  Microsoft's Rule To Exclude E-Mails From Back-Up                          19

    B.  The E-Mail Exchange Servers: If You Want To Use E-Mail, You Must Auto
        Delete On Your Exchange Server Account                                    21

IV. MICROSOFT DISABLED ITS INSTITUTIONAL DATA RESTORATION
    PROCESS TO FURTHER HIDE E-MAILS AND OTHER DOCUMENTS                           23

    A.  Microsoft Decides To Keep Documents By Individual, Not Subject Matter, But
        Then Pretends Not To Keep A List Of Which Individuals Used Which
        Computers                                                                 23

    B.  Microsoft Destroys Its Back-Up Tape Catalogues, Making The Tapes
        Essentially Impenetrable                                                  27

V.  MICROSOFT DESTROYED KEY EMPLOYEE DOCUMENTS BY ITS
    SELECTIVE USE OF RETENTION NOTICES                                           28

    A.  Mr. Gates' Assistant Retrieves And Deletes Mr. Gates' E-Mail             28

    B.  The Streaming Media CID: Chris Phillips And Eric Engstrom Delete Their
        Documents                                                                29

    C.  William Friedman And David del Val Leave Microsoft And Microsoft Does
        Not Keep Their Documents                                                 34

D.    William Schiefelbein Does Not Get A Notice And Mass Deletes His Documents    35

E.    The Streaming Media I.T. Administrator Does Not Get A Notice And Continues To Delete Files For His Group    36

VI.    THE LEGAL STANDARD    37

VII.    MICROSOFT'S CONDUCT IS FAR MORE EGREGIOUS THAN OTHER SPOLIATION CASES    41

VIII.    MICROSOFT'S FAILURE TO PRESERVE DOCUMENTS HAS MATERIALLY PREJUDICED BURST    45

A.    Eric Engstrom And Intel    45

B.    Chris Phillips And RealNetworks    46

C.    Friedman And Schiefelbein    47

IX.    BURST IN ENTITLED TO A NARROW SPOLIATION INSTRUCTION, PRECLUSION OF ERIC ENGSTROM AS A WITNESS, AND THE RECOVERY OF ITS COSTS    50

## TABLE OF AUTHORITIES

### Cases

                                                                    **Page**

Adolph Coors Co. v. Amer. Ins. Co.,
    164 F.R.D. 507 (D. Colo. 1993)                          39

Chambers v. Nasco, Inc.,
    501 U.S. 32 (1996)                                      3, 37

Glover v. BIC Corp.,
    6 F.3d 1318 (9th Cir. 1993)                           38

Lewy v. Remington Arms Co., Inc.,
    836 F.2d 1104 (8th Cir. 1988)                         38-39

National Hockey League v. Metropolitan Hockey Club,
    427 U.S. 639 (1976)                                     37

Residential Funding v. Degeroge Financial Corp.,
    306 F.3d 99 (2d Cir. 2002)                              38

Silvestri v. General Motors Corporation,
    271 F.3d 583 (4th Cir. 2001)                          3, 37-38, 42

Thompson v. United States Dep't of Hous. & Urban Dev.,
    219 F.R.D. 93 (D.Md. 2003)                              38

Trigon Ins. Co. v. United States,
    204 F.R.D. 277 (E.D. Pa. 2001)                          41

U.S. v. Phillip Morris,
    No. 99-2496, U.S.D.C. (D.C., Jul. 21, 2004)             39-40

Vodusek v. Bayliner Marine Corporation,
    71 F3d 148 (4th Cir. 1995)                            38, 41

Zimmerman v. Associates First Capital Corp.,
    251 F.3d 376 (2d Cir. 2001)                             39

Zubulacke v. UBS Warburg LLC,
    2003 WL 22410619 (S.D.N.Y. Oct. 22, 2003)               38, 40, 50

### Miscellaneous

Leonard B. Sand et al., Modern Federal Jury Instructions 75-7 (2004)     41

## Statutes

Federal Rule of Civil Procedure 16(f)                              37
Federal Rule of Civil Procedure 37(b)(2)                          37

*"[G]et rid of it – don't store it in PSTs, don't keep it around – just get rid of it!"*
Valentine to Allchin, January 22, 2000

*"Do not archive your mail.  Do not be foolish.  30 days."*
Allchin to Windows Division, January 23, 2000

## I.    <u>INTRODUCTION AND SUMMARY</u>

Microsoft has been enmeshed in high stakes litigation from 1994 forward.  It has been obvious throughout this period that internal emails and documents of key employees would be critical evidence in a variety of lawsuits and so needed to be preserved.  Yet Microsoft adopted three distinct but connected institutional policies ensuring that e-mails and other key documents, including those of direct importance to this case, would be destroyed.  It continued these policies even in the face of this court's explicit preservation order.

In 1994, the DOJ initiated its first antitrust investigation.  Plaintiffs filed the <u>Caldera</u> case in 1996.  Sun filed what would become known as <u>Sun I</u> in October 1997.  In mid-1997, the DOJ initiated its streaming media investigation, which was "melded into" the big DOJ case filed in May 1998.  That case was tried in 1999, decided in November, and appealed by Microsoft in November 2000.

On a parallel track, counsel filed the first private class action case in February 1999.  By early 2000, more than 100 class actions were pending across the country.  Many of those cases were consolidated in this court.  AOL (Netscape) filed in January 2002; Sun filed in August 2002; Be filed in February 2002.  And Burst filed this case in June 2002.

On May 3, 2000, this court included a preservation order as part of its Order no. 1.  This Order provided "Each party shall preserve all documents and other records containing information potentially relevant to the subject matter of this litigation."  In addition, "parties may continue routine erasures of computerized data pursuant to existing programs, but they shall (1)

immediately notify opposing counsel about such programs and (2) preserve any printouts of such data." Exhibit 1. Microsoft did not comply with its prior general duty to preserve documents given existing and reasonably foreseeable litigation, or with the directives in the May 3, 2000 order.

Given this array of litigation, Microsoft had a concrete duty to preserve relevant documents. But it did not. Instead, it implemented three distinct, reinforcing and institutionalized practices to make sure that incriminating documents disappeared. Microsoft has hidden those policies in past litigation, and has fought vigorously to prevent Burst from learning of them in this case. Much of what follows has been uncovered in no prior case.

The policies are as follows. First, beginning in 1995, Microsoft told its employees not to save e-mails to corporate servers. It confirmed a broader e-mail destruction policy through its senior executive Jim Allchin in January 2000, on the heels of the DOJ trial, but this time making clear that the injunction included all e-mails anywhere.

Second, Microsoft policed its do-not-save-emails policy by programming its back-up computers to exclude e-mails, by having e-mail exchange servers that compelled individual employees to "auto-delete" e-mail, and by destroying catalogues of its backup tapes. At no time did Microsoft voluntarily inform counsel in this MDL proceeding of these policies or preserve printouts of the deleted data.

Third, Microsoft carefully limited the employees it asked to preserve documents for litigation, and excluded key employees. Because of the scope of its general destruction policy, this has meant that a large number of core documents simply no longer exist. Because Microsoft had put in place policies that swept documents – particularly e-mails – towards deletion, it was critical that Microsoft serve retention notices with the right scope on the right people at the right time and so preserve documents for litigation. Yet Microsoft did not do so. Obvious employees

who should have received wide ranging retention notices received none. <u>See</u> § V, below. Other employees received notices but of strangely circumscribed scope. When employees left the company, Microsoft destroyed their documents, even for employees under retention. <u>See</u> § V.B, below.

Finally, to protect and preserve its e-mail destruction policies, Microsoft has concealed or falsely described its document retention practices in past litigation and on many occasions in this litigation. It provided many explanations that even it has had to abandon as false.

Microsoft's failure to preserve documents has materially prejudiced Burst. Microsoft destroyed the files of the key business executives working with Burst, and with other companies in the streaming media space. Documents that should have been preserved in earlier cases were not, including on such key issues as Microsoft's arrangement with Intel over Java and Microsoft's discussions and agreement with Real Networks over media streaming. These documents are just gone. It matters not that Microsoft failed to preserve some of these documents before Burst filed suit: if Microsoft had an obligation to preserve *then* documents important *now*, and wrongfully did not, it is accountable for the lapse.

Microsoft violated both this Court's order, and its common-law duty to preserve documents that may be relevant to anticipated or reasonably foreseeable litigation. <u>See</u> <u>Silvestri v. General Motors Corporation</u>, 271 F.3d 583, 590 (4th Cir. 2001) (If a party either destroys evidence, or willfully fails to preserve evidence, courts have inherent power to grant redress, *citing* <u>Chambers v. Nasco, Inc.</u>, 501 U.S. 32, 45-46 (1996)).

The relief Burst seeks in this motion is very narrowly tailored to redress the harm caused by Microsoft's deliberate failure to preserve documents. Burst first seeks a jury instruction on an adverse inference, <u>i.e.</u>, that Microsoft failed to retain documents it should have retained, and that the jury is free to infer that Microsoft did so because the contents of the documents were

adverse to Microsoft. Second, Burst seeks to exclude Eric Engstrom as witness. As set forth in detail below, Mr. Engstrom was a critically important executive, but Microsoft did not preserve his documents. As a consequence, Mr. Engstrom now is free to remember history in a way most convenient for Microsoft, a luxury he would not enjoy had Microsoft preserved his document as was its obligation. Finally, Burst seeks to recover the costs of its repeated motions to compel and multiple depositions to uncover the truth of these document deletion policies.

## II.    IN SPITE OF ALL THIS ONGOING LITIGATION AND THE PRESERVATION ORDER, MICROSOFT REPEATEDLY TOLD ITS EMPLOYEES NOT TO SAVE E-MAIL.

E-mail is important at Microsoft.

# REDACTED

As senior in-house litigation counsel Tom Burt put it, e-mail "is the central nervous system of the company." Exhibit 3, 11/16/00 Tom Burt Depo. at 97:16-23.

But for Microsoft's email destruction policies, employees generally could save email on corporate servers in a "server-farm" on its Redmond, Washington campus; on an exchange server for emails; on a business group server if their group maintained a group server (as did the streaming media group), or on their personal computers. Instead, Microsoft's destruction policies reached each source of documents. The longest running destruction policy thus far unearthed concerns the corporate servers, on which many employees tried to save their emails. Microsoft had in place practices from at least 1994 on to prevent employees from thus saving emails.

Employees who want to use farm servers request a "server share," that is, allocated space on a particular server or disk drive on a server. See below § A. In the event of data loss, or

catastrophic failure, these corporate servers are all subject to tape back-up; Microsoft carefully keeps 160,000 plus tapes in deep storage off-site.

In 1994, Microsoft directed all employees not to save any e-mail to these corporate servers. In January 2000, in spite of the DOJ case which was still pending and numerous class cases, Microsoft substantially expanded on this directive by instructing all Windows Division employees to delete any saved e-mail after just 30 days. This directive included e-mails on personal computers. Microsoft took no steps to reverse these general destruction policies, which contradict the May 3, 2000 Order no. 1, after this court issued that Order.

## A.     1995: Microsoft's First Do-Not-Save-E-Mail Directive.

In 1995, Microsoft told employees not to save e-mails to servers subject to tape back-up. Its corporate representative has claimed that this was a matter of "company policy." See, e.g., Exhibit 4, Doug Brown Decl. at ¶ 4 ("Company policy is that e-mail .pst files should not be stored on file servers."). From 1995 forward, every employee who asked for and received space on a file server received this directive in writing. Exhibit 5, 9/30/03 Brown Depo. at 39-40. See also Exhibit 6, 4/21/04 Brown Depo. at 50:6-7 ("people weren't allowed to keep e-mail files on file servers…").

Microsoft says that it adopted the "do-not-save" policy sometime between 1994-1996. Exhibit 5, 9/30/03 Doug Brown Depo. at 40. But *why* this became Microsoft's policy has proven an intractable question. In over a year of discovery, three motions, and two court orders, Microsoft has ventured various, conflicting explanations. What is not disputed, however, is that the do-not-save policy existed. The policy is flatly inconsistent with Microsoft's obligation to preserve evidence for ongoing and foreseeable litigation.

Microsoft's first answer was to deny any knowledge whatsoever of this policy. In his first 30(b)(6) appearance, corporate representative Brown ("Back-up Operations Manager,

OTG") testified that no one at Microsoft knew anything about why Microsoft had this do-not-save policy, who put it in place, or its purpose. Exhibit 5, 9/30/03 Brown Depo. at 40 ("I have not been able to come to an understanding of why that was written the way it was."); id. at 41 ("I don't know why they wrote that."). Nor did he know why e-mails were singled out for destruction but not other kinds of documents. Id. at 75:25-76:1. This remained Brown's position for over 40 pages of testimony.

Microsoft had prepared its corporate witness to sponsor this blanket denial. The odds were extremely high that Burst would accept this position, because until the day before the deposition, Microsoft had produced no documents showing otherwise. But one sheet of information in a set of documents produced the afternoon before the deposition contradicted Brown's testimony that the company could not explain its policies, and Burst found that document. The document – "OTG File Server Policies & Guidelines" – reads in part:

> **Due to legal issues, mail files (PST files) cannot be stored on any corporate servers that are backed up to tape.** This applies to all servers in the data center.

<u>See</u> Exhibit 7 (emphasis ours).

This document confirmed a company policy of preventing employees from saving e-mails on corporate servers "due to legal issues." Once shown the document, Mr. Brown, who had not mentioned anything like this in his testimony, admitted that he not only knew about the "legal issues" description, but had seen the document both historically and in his preparation session, and had even included the "due to legal issues" language in a back-up group "policy statement" that he personally posted on his group's internal website.[1] Exhibit 5, 9/30/03 Doug Brown Depo. at 43:23. He then acknowledged "this [due to legal reasons] was the basis for

---

[1]     Thus Mr. Brown had seen this document as recently as the day before his deposition. Exhibit 5 at 12:13-16; 13:8-11.

policy of our [back-up] file exclusion." Id. at 45:7-9. But Mr. Brown claimed he had been unable to learn anything further about the decision, including who made it, when it was made, or what the "legal issues" were.[2]

With this record, Burst had to file a second e-mail related motion to compel. Burst asked the Court to order Microsoft to locate and properly educate a witness on the origin of this policy. The Court granted the motion on March 17, 2004, ordering Microsoft to produce for deposition the person or persons most knowledgeable concerning Microsoft's directive (1) "not to store e-mails on servers that are subject to backup...," (2) "[t]he reasons why the decisions that resulted in the directives... above were made, and the individuals involved in making, implementing, or disseminating those decisions," and (3) "[t]he nature of the legal issues and concerns and/or matters referred to in" the due-to-legal-issues directive. See Exhibit 8, March 17 Order.

Pursuant to this order, Microsoft produced Mr. Brown again. This time, Mr. Brown testified that a Ms. Stark imposed the "do not save" rule as an economy measure. Now it wasn't that e-mails were unimportant, as Mr. Brown had said earlier, but that they were too important: Microsoft employees saved too many e-mails[3] and backing these archives up would consume valuable resources:

> Q:    So it's your understanding that don't save e-mails to servers subject to backup originated in a desire to conserve resources?
>
> A:    To conserve server and disk resources.

Exhibit 6, 4/21/04 Doug Brown Depo. at 35:6-9.

---

[2]    Id. at 46:22-47:6 ("Q: Did you ask anyone in your many conversations to prepare yourself? A: I asked to try to find out what that was, and I was unable to find anybody who could answer that question. Q: Do you know who made the decision that resulted in this guidance that due to legal issues, they should not store archived e-mails? A: I do not. Q: Do you know when that decision was made? A: I don't know....").

[3]    This assertion directly contradicted Mr. Brown's earlier sworn declaration, in which he testified that "[t]o my knowledge, very few employees save their .pst e-mail files to a file server." Before there were too few emails;

On the "due to legal issues" language, Mr. Brown testified that Ms. Stark "guessed" as

follows:

> Candy's best guess in our conversation this week was that those
> words "due to legal issues" were put in the document to give it
> teeth because her team was getting kickback from – excuse me,
> pushback from end-users who were waiting to challenge the policy
> to not store PST files on file servers.

Id. at 47:4-9.  See also 47:19-22 ("her team was getting a lot of customer dissatisfaction about –

about the policy and that they put the words in there to add teeth to the policy.").  Mr. Brown

could not say whether someone outside the ITG directed Ms. Stark to adopt that policy, or

whether Ms. Stark even discussed that policy with Microsoft officers or executives.  Id.[4]

This testimony led to Burst's third motion, filed on April 29, 2004.  In a hearing on May

20, 2004, this Court granted Burst's motion, stating that:

> I want to know as much as I can how that "due to legal issues"
> language got in there and I want you to search your legal files to
> find it.  And I also want you to educate somebody and have them
> deposed.  I want this to come out.
>
> It could very well, it could be that the [Microsoft] explanation is
> right.  I'm not saying that it is wrong.  But I want to know the
> answer.

Exhibit 10, 5/20/04 Tr. at 18-19.

Pursuant to this second court order, Microsoft again produced Mr. Brown.  This time,

Brown testified that Candy Stark, acting alone, created the "do not save" policy, unilaterally

deciding to exclude an entire class of documents from back-up without discussing it even once

---

now there were too many, so many that this vastly wealthy corporation had to adopt economy measures.  Exhibit 2
at ¶ 4.

[4]     The "due to legal issues" language changed to "because of legal constraints" sometime later.  Microsoft has
not been able to explain at all who rewrote this key language of his September 2004 deposition.  Exhibit 9, 9/14/04
Doug Brown Depo. at 69:10-17.  Did they think it was imaginary?

with Microsoft executives or counsel.[5]  See, e.g., Exhibit 9, 9/14/04 Doug Brown Depo. at 38:12-14.

On "due to legal issues," Mr. Brown now claimed that this language was actually added in 1996, not 1997 as he testified previously.  Id. at 85.  Compare Exhibit 6, 4/21/04 Doug Brown Depo. at 42:9-10 ("July of '97") with Exhibit 9, 9/14/04 Doug Brown Depo.  On the why of it, Mr. Brown testified again that it reflected Ms. Stark's desire to economize.  Exhibit 9 at 37:10-18.  He added that Ms. Stark's policy had been very unpopular in 1995, and she received significant "pushback" from executives who wanted to archive e-mail.  Ms. Stark first countered by making "do not save" a written directive, because a written directive has more "gravity."[6]  Id. at 72.  But this didn't work, and executives continued to complain.  So, Brown testified, Stark then decided to tell the unhappy executives[7] that the "do not save" rule was not hers, but originated with Microsoft's General Counsel, Bill Neukom:

> And then they [Ms. Stark's group] refer it back to, **this isn't my rule but look at Microsoft's general document retention policy**.... She said she began referring people back to the general Microsoft retention practices that were referred to in an e-mail from Bill Neukom [the 1996 e-mail].

Id. at 72-74.

But this did not work, either.  According to Microsoft (speaking through Mr. Brown), Ms. Stark then fabricated the "due to legal issues" language to add "teeth" to her do-not-save directive.  Corporate representative Brown testified that she did this entirely on her own.  Id. at 43:13-14 ("she derived that policy.  It was of her choosing.").  Id. at 44:2-4.  At the end of the day, after two court orders and three depositions, Microsoft's sworn corporate position was that

---

[5]     And so the "company policy" of Mr. Brown's August 2003 Declaration now became the "Candy Stark" policy.

[6]     Something that Ms. Stark later denied in her own deposition.  See below.

there were no "legal issues" at all, and that Ms. Stark – a brand new hire in a low-level I.T. position who supervised just one person – created the policy and fabricated the "due to legal issues" explanation just to win her battle against unhappy executives. Id. at 77:12-14 (Ms. Stark "speculated in my conversation with her that they added that language to the document to add teeth to it to further discourage pushback."). And, says Microsoft, she did all of this because "she did not want that [e-mail] data consuming her resources." Id. at 57:21-22. See also id. at 57:7-9 ("archived mail was consuming a considerable amount of space on her consolidated file servers.").

But then Burst deposed Candy Stark

REDACTED

REDACTED

REDACTED

---

[7]    Unhappy because they wanted to save e-mail. See Exhibit 6, 4/21/04 Brown Depo. at 48:13-15 (people "complaining that the policy was too restrictive, that **they wanted to save PST files.**").

REDACTED


REDACTED


But there is a bigger problem.  Microsoft has produced a server share form dated "1994" which contains the language "Please note that MMF [early e-mail files] files are not to be stored on ITG Corporate Servers that are backed up to tape."  See Exhibit 12.  And Microsoft has said that server share forms from *1994* forward contained the do not save language.  See Microsoft Opposition to Burst's Renewed E-Mail Gap Motion, October 28, 2003 at 6 (see "the OTG file share request forms from 1994-1996 through the present, *each of which includes a statement that mail files are not to be stored on servers that are backed-up to tape.*").  Yet in 1994, Ms. Stark was not even a Microsoft employee, but rather the employee of an outside contractor called Apex Co.  Exhibit 11, 10/20/04 Candy Stark Depo. at 4.  At Apex, Ms. Stark was responsible for "server maintenance," so she "had to go out and reboot servers for Microsoft teams or employees as well as restore data."  Id. at 5.  She joined Microsoft on May 6, 1995, as a "Supervisor...

11

inventory control," after the 1994 forms containing the policy Microsoft claims Ms. Stark created. Id. at 6. How could a solitary worker for an outside contractor set Microsoft policy on what could be stored and what not? This is not even remotely plausible.

For that matter, the "do not save" point in the written directive is explicit to servers "subject to back-up." *It is the "back-up" that creates the issue, not the server.* This is why Mr. Brown – who was the OTG back-up manager – put the "do not save due to legal reasons" in his group's policy statement. Exhibit 5, 9/30/03 Doug Brown Depo. at 45:5-9.   REDACTED

Exhibit 11, 10/20/04 Candy Stark Depo. at 8-9.

REDACTED

\.[8]

Regardless of the reason for this policy, the testimony shows that Microsoft had in place from at least the mid-1990s a policy that prevented employees from saving e-mails on a server they otherwise would use for that purpose. Microsoft has produced no evidence that this policy was altered in the slightest because of the court's preservation order, and Microsoft did not inform any of the parties to the MDL litigation, or anyone else, about the policy.

---

[8]     We believe this e-mail says something along the lines of "generally, don't keep e-mail for longer than six months." We believe that this was the understanding at Microsoft as early as 1994, and that it originated with Microsoft's lawyers. But Microsoft will not produce this document, even after this showing of relevance, and Burst has renewed its motion to compel its production. At the conclusion of the Stark deposition, Burst counsel requested that Microsoft produce the Neukom e-mail. Microsoft refused, stating it was privileged. Exhibit 11 at 48 ("our position is it is privileged..."). Yet this court had already ruled that the email is not privileged. October 5, 2004 Hearing Tr. at p. 4. And Burst fully laid its relevancy foundation in the Stark deposition.

**B.**    **The Allchin "Do Not Be Foolish" 30 Day E-Mail Destruction Rule.**

Microsoft may object that employees would have saved e-mails on their own computers, but the company had a strict policy against that, too.  In January 2000, just weeks after Judge Penfield released his November 1999 findings in the DOJ case in which internal emails were so harmful to Microsoft, senior Microsoft executive Jim Allchin received an e-mail from another senior executive, Brian Valentine.  Mr. Valentine had learned that a lower level employee was archiving e-mail, and wrote Allchin to get this practice stopped:

> I mean this – purge every 30 days… I personally only keep 15 days... to prove it here is the property page (right click on the folder) on my Sent Items folder (but it's the same on all my folders)… **get rid of it – don't store it in PSTs, don't keep it around – just get rid of it!**  Auto-Archive is set up in the Tools-Options-Other tab as to how often it runs...

Exhibit 13, at MS-CC-BU 372874 (emphasis ours).

Mr. Allchin responded the next day.  In an e-mail he sent to the "Windows Division," he told the entire group that they could not elect to save e-mails, and that company policy prohibited archiving e-mails:

> Being even more hard core….
>
> This is not something you get to decide.  This is company policy. Do not think this is something that only applies to a few people. Do not think it will be ok if I do this; it hasn't caused any problems so far.  **Do not archive your mail.  Do not be foolish.  30 days.**
>
> **Jim.**

Id. (emphasis ours).

Within a day of the Allchin e-mail, Mr. Allchin received questions about what he meant. What, exactly, fell under his 30 day policy, "Everything?  Non-technical issues?  Check in

mail?"[9]  See id., e-mail from A.S. Kabir to Jim Allchin, Saturday, January 23, 2000.

Allchin sent the question to Microsoft Chief Operating Officer Bob Herbold. Id. at MS-

CC-BU 372873 ("Can you help me out here?").  Herbold in turn forwarded the e-mail to

lawyers, and these lawyers forwarded the mail to senior Microsoft in-house litigation counsel

Tom Burt.[10]  Id.  Mr. Burt testified that he communicated with Mr. Allchin about the Allchin e-

mail, and provided Mr. Allchin legal counsel.  Exhibit 15, 9/8/04 Tom Burt Depo. at 51-52.

Thus the next Microsoft policy on email deletion was reviewed by top Microsoft business *and*

legal officers.

As a result, after at least six e-mails that Microsoft has redacted in toto as privileged, on

January 28, 2000 Mr. Allchin sent out another document retention e-mail, this time to the entire

"Platforms Group."  Exhibit 13 at MS-CC-BU 372870.  In this e-mail, Mr. Allchin underscored

his new 30 day policy for e-mail deletion:

> To the best of your ability I would like us to follow the general rule
> of around 30 days for EMAIL.  Some of you may be in unique
> circumstances that require particular information be kept for longer
> than 30 days to do your job effectively.  **My direction to you is**

---

[9]      Check-in e-mail refers to the e-mail record reflecting when co-developers log into source code in the development process.  This is an important development record, and such check-in mail is routinely preserved.
[10]      In July 1999, in the middle of the DOJ trial, Microsoft senior in-house litigation lawyer Tom Burt – the in-house lawyer with line-level responsibility for the DOJ case – drafted and circulated a new document retention memo.  See Exhibit 14, Tom Burt to Erica Couch et al., re: "Document Retention Policy," "Importance: High," July 9, 1999.  In it, he described a special short-fuse deletion policy for documents, including e-mail specifically:

> Unless you are instructed to do otherwise by a member of the legal department
> or the tax group, you should keep only those documents that are necessary for
> you to perform your job, or for someone else to perform his or her job…. **As a**
> **general matter, no e-mail message should be kept for more than six months**
> **unless it is absolutely essential that it be retained longer….**

Id. (emphasis ours).  Far from cautioning employees to keep documents, this directive from Legal urged destruction unless (1) the employee received a specific contrary instruction, or (2) the document was "necessary to the performance of your job, or necessary to the performance of someone else's job." Id.  But even necessary e-mails were to be destroyed; on e-mails, only e-mails "absolutely essential" were to be kept. Id.  This was an instruction to destroy, not to keep, information; issued during trial by one of Microsoft's legal officers.  Microsoft produced this document for the first time in any litigation just several weeks ago during Mr. Burt's deposition.  Mr. Allchin's January e-mail narrowed Mr. Burt's delete-after-six-months e-mail rule, which had circulated just a few months earlier, to a one-month rule, and cut five of six months out of the retention period.

> **that I want you to think about this issue at least once a month and delete items that are no longer needed, including all of your general email. Don't just blindly archive email!**

Id. (emphasis ours, save the exclamation point). Mr. Allchin did add that people need to honor any document preservation orders received from "Legal to retain certain documents or e-mail..."; but as shown below, that selective process skipped many of the witnesses most critical to this and other cases.

Microsoft apparently did not produce either Allchin e-mail in *any* prior case. Under the pressure of another motion to compel, Microsoft provided Burst a special interrogatory response on this point last June. Microsoft affirmed that it checked its production record in a long list of cases, including the <u>DOJ</u> cases, the <u>Sun</u> case, the <u>Be</u> case, the <u>Netscape</u> case, the <u>California Overcharge</u> case, and the <u>MDL Overcharge</u> case. Through that review, Microsoft "concluded that the Subject Document (Allchin e-mail) was not previously produced in any of the Cases." <u>See</u> <u>id</u>. at p. 3. This even though the Allchin e-mail was squarely requested. <u>See</u>, <u>e.g.</u>, Burst Reply Brief on E-mail Retention Policies (describing Sun's requests for retention documents, Microsoft's agreement to produce such documents, and that the Allchin e-mails were not produced).

While Microsoft never before *produced* the actual Allchin e-mail, Mr. Allchin has previously testified about its contents in deposition. But his testimony gave no indication of his blunt instruction "Do not archive your mail. Do not be foolish." In the final days of the remedies phase of the <u>DOJ</u> case in mid-February 2002, DOJ counsel deposed Mr. Allchin about e-mail practices. DOJ remained unaware of the Allchin email, but the day before the deposition, another Microsoft employee had mentioned in deposition that "Jim Allchin has a policy that says we don't keep E-mails, that saves him trouble." <u>See</u> Exhibit 16, 2/13/02 Jim Allchin Depo.

Excerpt at p. 3. DOJ therefore asked Mr. Allchin about his e-mail retention habits generally, and his e-mail specifically. Here is his testimony:

> But outside of [retention] we do encourage people, separate from litigation, **we just encourage people to own and keep documents based on business need**... I am sure that I have – I've told people that unless you have business reasons to keep it, there's no reason to keep the E-mail. In Microsoft **we have a policy of generally for people have 100 megabytes of storage for E-mail.** They obviously run out of that pretty quickly. I get nothing but complaints about running out of storage. And so I encourage people to discard stuff. **It's also confusing stuff when you have old specs that aren't the current specs.** I want the things to be current.

Id. at pp. 2-4 (emphasis ours).

Neither Messrs. Valentine nor Allchin's e-mails cited discuss any concern about "storage" limitations, or confusing "old specs." There is no fair way to reconcile Mr. Allchin's bland testimony with the actual text of the e-mail, which the DOJ lawyer did not have. Id.[11]

Mr. Burt was deposed as Microsoft's § 2025 (California equivalent of a federal 30(b)(6) witness) on e-mail retention issues in November 2000. This was mere months after he participated in creating the new 30-day Allchin e-mail rule. Over the course of a 219 page deposition, Mr. Burt did not once mention the Allchin rule, that Microsoft had any unique rule for e-mails, that it instructed employees not to keep e-mail, or the 30-day period. To the contrary, all of his testimony created the impression that Microsoft people were "pack rats" and that Microsoft did not have *any* policies pushing e-mails toward deletion:

---

[11]    The tone and instructions in the Allchin e-mail are contrary to Allchin's DOJ testimony. The DOJ testimony reads as if Allchin "encourage[s] people to own and keep documents based on business need," with discarding unnecessary e-mail an exception to that policy. But the two e-mails call e-mail deletion, not retention, "company policy," and tell employees "Do not archive your mail. Do not be foolish. 30 days." Only the second email even has a slight exception for "unique circumstances" that might require keeping information more than 30 days. Allchin also did not mention in his deposition the short 30-day time period that was to be the outside retention period except for "unique" periods. Nor did he mention that there was a "general rule of around 30 days for EMAIL." The Allchin e-mails destruction orders were not just suggestions or "encouragements," they were specific company directives.

Q:     Were there any efforts or directives from Microsoft following the <u>DOJ</u> case to transact less business by e-mail?

\*\*\*

THE WITNESS:     None whatsoever that I am aware of or that I have observed. It is the central nervous system of the company.

Exhibit 3, 11/16/00 Tom Burt Depo. at 97.

Q:     Were there some written procedures for the preservation of documents?

\*\*\*

A:     **The ordinary practice to which people were encouraged to return was to retain information that they needed to do their job. And it was a rule of thumb that they should retain things that – things that were older than six months old, they should think about deleting.**[12] All of that was subject to determination on a department or group basis working with managers.

\*\*\*

<u>Id</u>. at 114-15.

To my knowledge Microsoft documents have been retained to a fault. Everybody at Microsoft retains stuff for a long, long, long time. Despite what we described earlier as the document retention practice, that the general rule at Microsoft is that that practice is ignored and people just keep everything. But I – that is my understanding of the general practice.

\*\*\*

**But I don't know of any instance where anybody destroyed or deleted or got rid of any information that Microsoft had any obligation to retain.**

<u>Id</u>. at 127-28 (emphasis ours). The actual rule is unrecognizable in this testimony.

---

[12]     As with Mr. Allchin's testimony, so in Mr. Burt's Microsoft's actual policy is unrecognizable in this testimony, given to a DOJ lawyer who did not have the written policies themselves. People were not "encouraged to . . . retain information that they needed to do their job"; to the contrary, they were encouraged, indeed instructed, to delete information unless they were in "unique circumstances." They were told to use only 30 days, not six months, as the outside period. The rule was company policy, not a department, group, or manager level policy. The rule was that documents should be deleted ("Do not be foolish"), not that for older documents "they should think about

In short, in the very middle of high stakes litigation, after a very adverse trial that turned heavily on emails, as Microsoft began to prepare its appeal, and as the class cases began to gather force, Microsoft adopted a new, short-fuse no preservation rule for e-mail *and told no plaintiff*.

### C.    <u>Chris Phillips Tells An Apple Employee That Microsoft Employees Delete E-Mail So As Not To Create An Adverse "Paper Trail."</u>

The Allchin policy was part of Microsoft's culture, and it and Mr. Burt's directives surely were not the beginning of the no-e-mail policy.  Microsoft employees were understandably circumspect in telling outsiders about the directives to delete e-mails.  But the curtain occasionally slips.  One example lies in what Microsoft's Chris Phillips told his counterpart at Apple.

Just as the DOJ case gathered speed, Mr. Phillips met with Apple's Timothy Schaaff, who was responsible for Apple's streaming media product "Quicktime."  The meeting was in October, 1997, well before the Burt and Allchin directives.  Mr. Schaaff testified that in a quiet meeting following the group meeting, Chris Phillips explained why Microsoft was not worried about the DOJ investigation, and the way Microsoft's e-mail retention policies contributed to that confidence:

> [He said that the investigation] did not threaten Microsoft terribly. There was a sense that the pace at which the investigations proceeded relative to the pace at which technology moves ahead were so – there was such a discrepancy between the two of them that by the time the Department of Justice or other, you know, kinds of governing bodies that might have a stake in what occurs here – by the time they were able to figure out what was really going on, that it didn't matter if they understood the whole picture, because Microsoft would - it wouldn't matter anymore…

---

deleting."  No one knowing that this policy had been set loose could believe that "Everybody at Microsoft retains stuff for a long, long, long time."

The other interesting thing that he stated at that time was – and I don't recall exactly how this particular point come out, but he indicated that part of what made – part of what made it difficult for people to track what Microsoft's thinking was on particular topics **was that there was an understanding that you don't – you don't necessarily save all of your e-mails…. And my understanding was that that was a view that was held more broadly within the company. And the point of view was that you don't save all your e-mails because those create a paper trail that can be used against you in many of these cases, and that was a lesson he had learned early on in his time in Microsoft.**

Exhibit 17, 1/13/99 Timothy Schaaff Depo. at 209-210 (emphasis ours).[13]

## III.    MICROSOFT POLICED ITS DO-NOT-SAVE-E-MAILS RULES BY PROGRAMMING ITS COMPUTERS TO DELETE E-MAIL.

Microsoft enforced its do-not-save policies in two separate ways: (1) by mechanically excluding from back-up e-mails archived on corporate servers despite the policy; and (2) by limiting capacity on its e-mail exchange servers so that people could not both save mail and have functioning e-mail.

### A.    Microsoft's Rule To Exclude E-Mails From Back-Up.

In opposing Burst's first e-mail motion to compel, Microsoft represented to the Court that it only programmed its back-up computers to exclude from back-up e-mails archived contrary to policy at that time, as of April 2000:

> The Court:    But I understood this [system change] did not affect preexisting e-mail, but only e-mails that one tries to put on the server after April 2000. Is that right, Mr. Treece?
>
> Mr. Treece:    Yes, in terms of the backup. In other words, if it had been backed up prior to that time, it would be – if somebody had kept in March of 2000 had violated company policy, put an e-mail, it would have been backed up.

---

[13]    # REDACTED

But it is entirely consistent with Microsoft's email-destruction policy, (see below), and why would Mr. Schaaff make this up?

Exhibit 19, 8/28/03 Hearing Tr. at 27:4-13.

In fact, Microsoft's practices did not change in April 2000. In Douglas Brown's first deposition as Microsoft's corporate representative, he testified that the practice of programming the back-up system to exclude archived e-mails dated from 1994-1996, *not* April 2000:

> Q:     Sir, how sure are you that the e-mail backup exclusion was in effect from 1994 through 1996 forward?
>
> A:     <u>I'm very sure.</u>

Exhibit 5, 9/30/03 Doug Brown Depo. at 56:13-15 (emphasis added). Microsoft later relied on Brown's testimony in asking that this Court deny Burst's request for it to review back-up tapes. <u>See</u> Exhibit 20, 2/6/04 Hearing Tr. at 32 ("the evidence has been *unambiguous* that [.pst] files have been excluded from file server back-ups since the 1994-96 period.") (emphasis ours).

But as Burst, apparently the first plaintiff to seriously challenge Microsoft on its document retention claims, pressed discovery on this point, Microsoft changed its position. In his April 2004 (second) deposition, Mr. Brown modified his prior declaration, and his prior deposition testimony. Now he testified that the back-up exclusion was *not* in place in March of 2003. Exhibit 6, 4/21/04 Doug Brown Depo. at 12:3-13:9.[14] But he said that March 2003 was aberrational, and the exclusion had been in effect earlier.

In his third deposition, Mr. Brown's testimony changed yet again. This time, he claimed that the exclusion was *not* turned on in April 2000 either. <u>See</u> Exhibit 9, 9/14/04 Doug Brown Depo. at 12:8-12 ("Q: And now you have confirmed for me that according to Chris Jacobs, the file exclusion was also not turned on in April of 2000; correct? A: That's her recollection."). He said he did not know and could not tell if it was turned on earlier. <u>Id</u>. at 16:22-25.

Mr. Brown testified that he knew Microsoft was engaged in litigation when he implemented the exclusion in April 2003, but that he had never received a retention notice and did not check with counsel before acting. Id. at 26:12-14 ("I did not give any thought to talking – to talk to a lawyer before making that decision because I was completely empowered to make that decision."). See also id. at 40:18-25 (Brown was not told anything about document retention obligations by any lawyer).

On this record, Microsoft's corporate position is that its always had a policy to exclude e-mails, and may well have programmed its computers to achieve this for big periods of time, but that it cannot be sure when the exclusion was on and when off. Certainly, the policy did not begin or end in April 2000. And equally certainly, Microsoft made no effort to change the policy to preserve documents for ongoing litigation, not even after the May 3, 2000 Order, nor did it tell any of the parties in the MDL litigation about the exclusion.[15]

## B.  The E-Mail Exchange Servers: If You Want To Use E-Mail, You Must Auto Delete On Your Exchange Server Account.

Nor could Microsoft employees save e-mails on the exchange servers, a separate set of company computers dedicated to e-mails alone. Here Microsoft had a policy of carefully limiting the capacity to save e-mails by any individual Microsoft employee. Once an employee reached his exchange storage capacity, the user can no longer send or receive e-mails until accumulated e-mails are deleted. As Doug Brown testified:

> Q:     Are you aware, sir, of limitations on size imposed on Microsoft employees for their live e-mail files on Exchange servers?

---

[14]     Mr. Brown testified he learned of this implementation problem for the exclusion in April 2003, just months *before* he gave his contrary declaration in September of 2003. Id. at 27:9-14. Brown's September 2003 declaration did not include any of this information.

[15]     Microsoft says that this was not a deletion because other copies of the e-mails existed. But the very point of Microsoft's series of rules, including the Allchin e-mails, was to make sure that other copies *didn't* exist, as set forth within.

A:     Yes.

Q:     What are those limitations, please?

A:     I believe my limitation is 200 megabytes.

\*\*\*

Q:     And have you ever been capacity constrained where the Exchange server says you've got too much, you've got to clear it up before it'll let you get more?

A:     Yes.

\*\*\*

Q:     How often has that happened to you?

A:     It's happened in the – it hasn't happened for probably a year, but it happened **when I had my system misconfigured to not purge deleted mail**.

Q:     What's your auto delete option, you personally?

A:     **I auto delete every time I exit Outlook.**

See Exhibit 9, 9/14/04 Doug Brown Depo. at 60:18-61:23.  See also Exhibit 16, Jim Allchin

2/13/02 Depo. Excerpt at p. 3 ("[W]e have a policy of generally for people [to] have 100

megabytes of storage for E-mail.  They obviously run out of that pretty quickly.").[16]

At Microsoft, systems were "misconfigured" if they did not automatically delete e-mail.

Brown, supra.  And how many e-mails would be covered by a 100 to 200 meg limit?  For the

typical Microsoft user, it would appear to be about one to two month's supply.

# REDACTED

---

[16]     Numerous other Microsoft employees have testified to being capacity constrained, and so being forced to delete e-mails.  See, e.g., Exhibit 21, 8/6/04 Amir Majidimehr Depo. at 123:23-124:10 ("If I'm traveling my e-mail fills up much quicker, and then when I come back I may have to clean it up to be able to use my e-mail functionality.").

Even if an employee succeeded in saving email onto a backup capacity, Microsoft made sure the e-mail's life expectancy remained short. Microsoft's policy is to keep back-up tapes for the exchange e-mail servers for no more than 28 days. Exhibit 22, 12/15/98 Mark Johnson 30(b)(6) Depo. at 77:16-78:1. No tapes are ever kept longer. Id. at 78. The corporate server back-up tapes, which are not supposed to contain e-mail, are kept for far longer periods.

## IV. MICROSOFT DISABLED ITS INSTITUTIONAL DATA RESTORATION PROCESS TO FURTHER HIDE E-MAILS AND OTHER DOCUMENTS.

Along with directing employees not to save e-mails, and programming its computers to enforce this policy, Microsoft effectively disabled the way its institutional data restoration process worked lest employees find another way to save documents despite all obstacles.

### A. Microsoft Decides To Keep Documents By Individual, Not Subject Matter, But Then Pretends Not To Keep A List Of Which Individuals Used Which Computers.

Microsoft does not maintain subject matter files, e.g., "Intel: streaming media." See Exhibit 23, Declaration of Microsoft Counsel Martha Dawson at ¶ 4. As Ms. Dawson put it, "Microsoft documents were retained by or on behalf of individual employees." Id. By its own election, Microsoft must search for documents by individual – the individual is the irreducible starting point in locating documents for any purpose, whether data restoration, institutional memory, or litigation discovery.

Despite keeping documents by individual, Microsoft repeatedly has insisted that it does not "map" custodians (employees) to servers. In opposing Burst's first e-mail gap motion in August 2003, Microsoft emphasized that "Microsoft does not keep a record of which custodian's files are located on which file servers." Id. at ¶ 12. See also Exhibit 4, Douglas Brown Declaration submitted August 2003 in opposition to Burst's e-mail gap at ¶ 2 ("There is no record which tracks which employee's files are located on which of these 963 file servers.").

23

Because it said it did not keep a spreadsheet tracking users to computers, Microsoft could argue in this case that looking for missing e-mails on back-up tapes would be prohibitively expensive and futile:

> Each back-up tape is identified by the file server it backed up. The tape is not identified by the employees who happened to use that file server. **Nor is there a record of which file servers were used by which individuals.** So as a result, Your Honor, in order even to conceivably start a search of the type that Burst proposes, the custodian would have to know which file servers he used during the period. **Absent that identification, it would be a virtual impossibility, and I would say certainly an impractical possibility to start looking through 25,000 tapes, looking for clues as to whether a particular custodians' files are on a particular tape.** By our estimate, it would take over a million hours to do that....

Exhibit 19, August 28, 2003 Hearing Tr. at 16.

This is not a new Microsoft argument. For example, in the <u>Sun I</u> litigation before Judge Whyte in California, Microsoft made exactly the same point in resisting a request that it search for missing e-mail files:

> Microsoft has no documentation reflecting whose documents occupy a given server, and, as a consequence, Microsoft has no centralized mapping system of its servers. Microsoft employees' files may be situated, without a time record, in various servers in Microsoft's network of 1600 servers. There is no way to identify any individual's "server history," and no way to locate an individual's previous servers after a move to a new server.

Exhibit 24 at 3, Microsoft's Opposition to Sun's Motion to Compel the Production of Backup Files, July 1, 1998 (internal citations omitted).

These facts let Microsoft oppose discovery requests for searching backup tapes as an impossible task, the position Microsoft took in this case and in <u>Sun I</u>. This seems the only reason for not having a retrieval system that would actually work. It is like a library throwing away its Dewey Decimal file cards, or a file room where someone carefully removed the labels from the

files. Microsoft's system would be one of planned irretrievability. As even Microsoft put it, without a list of users to servers, "locating a custodian's files on file server back-up tapes would be tantamount to the proverbial search for a needle in a haystack." Microsoft's Opposition to Burst's Amended Motion to Compel at 11-12.

After Burst's August 2003 first e-mail gap motion, Burst served its first 30(b)(6) notice inquiring into Microsoft's gaps and retention policies. Microsoft produced the ubiquitous Mr. Brown as its witness, and he testified that, after a diligent investigation, he was sure that his company did not keep a simple spreadsheet mapping custodians to servers. See Exhibit 5, 9/30/03 Doug Brown Depo. It was, he said, "too laborious" to keep a list and "unnecessary." Id. at 90. He said this was true even though the entire data restoration process would fail if an employee were unable to remember which servers they used over time. Id. at 91:18-25 (If a user cannot remember the server name, then Brown would "inform them that I'm unable to fulfill their [restore] request.").

This remained Microsoft's position for well over a year, across two additional hearings and numerous e-mail gap and retention briefs and depositions. But it is untrue.

REDACTED

Exhibit 11, 10/20/04 Candy Stark Depo. at 20:3-6.

REDACTED

REDACTED

REDACTED

REDACTED

Id. at 23:6-24:20 (objections omitted).  See also id. at 25:20-24.

REDACTED

REDACTED

# REDACTED

Microsoft's outside counsel were no doubt startled by this testimony. **But the point here is that their client had to know the truth all along.** It is inconceivable that the IT people at Microsoft didn't understand that the team managing the servers necessarily tracked shares by owner. Mr. Brown by his own admission prepared extensively for his deposition, and presumably did some checking before providing his August 2003 declaration. Any diligence by Microsoft would have given him this information.[17]

There is no way to view this episode except as a blunt attempt by Microsoft to distort the facts in an effort to prevent discovery into missing e-mails. Microsoft has done so before, as evidenced by its position in Sun I.

### B.    Microsoft Destroys Its Back-Up Tape Catalogues, Making The Tapes Essentially Impenetrable.

Microsoft decided not to keep the "catalogues" for the back-up tapes. See Exhibit 4, Brown Decl. at ¶ 7 ("Catalogs of file server back-up tapes are kept for 90 days and are then recycled."). These catalogues index the contents of the tapes by file name and date. Without these catalogues, the back-up tapes are a largely impenetrable mass of undifferentiated information. Id. at ¶ 6 ("There is no way to know what is on each back-up tape until it is

---

[17]    So too for Ms. Dawson, the lawyer "primarily responsible for the overall document review, production and management for Microsoft in all major litigation" for years. Exhibit 23, Dawson Dec. at ¶ 1. Ms. Dawson was actively involved in the Sun I discovery dispute discussed above, and presented witnesses at deposition claiming that Microsoft had no way of tracking users to servers. See, e.g., Exhibit 22, 12/15/98 Mark Johnson 30(b)(6) Depo. at 21:20-23. How could Microsoft not let her know it *did* have a way of tracking that information precisely, just as common sense would suggest?

cataloged."). But Microsoft affirmatively pulled the catalogue tapes, erased them, and reused them. Tapes are cheap; the back-up process became hugely more difficult and expensive without the catalogues. Why would Microsoft decide not to keep its catalogues for as long as it kept the back-up tapes themselves?

## V.  MICROSOFT DESTROYED KEY EMPLOYEE DOCUMENTS BY ITS SELECTIVE USE OF RETENTION NOTICES.

Given the do-not-save e-mail directives, and Microsoft's efforts to police those rules, the natural result was that e-mails were deleted unless saved by a specific document retention notice. With deletion as the default, it was essential that Microsoft give the right retention notices to the right people on the right subjects at the right time. It did not. We set out several critical examples below, instances where key executives were not asked to retain documents, and did not. These failures left significant document gaps that materially prejudice Burst today.

### A.  Mr. Gates' Assistant Retrieves And Deletes Mr. Gates' E-Mail.

A prime early example comes from the head of the company, Mr. Gates. In at least one instance, Microsoft retrieved back-up tapes (how it did so, if it did not index the tapes as it has claimed, is an important question) and carefully deleted Gates' e-mails that had been achieved contrary to policy. In December 1997, Bill Gates' technical assistant asked Microsoft's ITG to retrieve and print out several back-up tapes containing Bill Gates' files. ITG did, and discovered e-mail files for Mr. Gates for 1996 and 1997. ITG gave the tapes (with the e-mails included) to the technical assistant, who returned the tapes several weeks later. When ITG subsequently ran the tapes to recover the e-mails, they discovered that the TA had deleted Mr. Gates' e-mail files wholesale, leaving just empty file folders:

> Q:    Subsequently when you went to look at the tape, the data
> from those two files wasn't there anymore?

A:     When we were requested by counsel to restore those files recently, it was then when we got these errors that I recalled what had taken place.

Q:     Do you believe that those two files were erased by Mr. Gates' technical assistant?

A:     It's only assumption.

Q:     Would that be your conclusion?

A:     Probably.

Exhibit 22, 12/15/98 Mark Johnson 30(b)(6) Depo. at 42.  If Mr. Gates were under retention, this was wrong; if he were not under retention, he should have been.  These e-mails will never be recovered.[18]

**B.     The Streaming Media CID: Chris Phillips And Eric Engstrom Delete Their Documents.**

In August 1997, the Department of Justice served a Civil Investigative Demand on Microsoft seeking documents concerning Microsoft's streaming media business as part of an antitrust investigation.  See Exhibit 26.  As set forth in prior briefing,[19] the CID broadly sought documents relating to Microsoft's streaming business, including its investment in Progressive Networks (later known as RealNetworks).  Id.  Microsoft concedes that this CID was later "melded into" the 1998 DOJ case, tried in 1999.[20]

As part of the process, DOJ served Microsoft with an interrogatory asking Microsoft to "[i]dentify each person within your company who was directly involved in the... negotiations with, (i) [RealNetworks]...."  See Exhibit 26, at MS-CC-BU 9001732.

---

18

## REDACTED

19     See Burst's August 23, 2004 Motion to Compel Microsoft to Produce Documents Relating to Document Preservation Policy and Practice.

20     "The Government was allowed to expand their case to include allegations relative to Real Network, which is the successor name of Progressive Network.  **So that notice [the 1997 CID] is related to topics that the**

Microsoft answered this interrogatory by identifying the lawyer who attended one meeting and drafted the contracts, and other executives briefly involved or involved at the very end. It did not, however, identify the two key Microsoft business development executives who negotiated directly with RealNetworks over a three-month period: Chris Phillips and Eric Engstrom. Chris Phillips met with RealNetworks numerous times, negotiated the "core deal," and "agreed on all major business issues" with RealNetworks.[21]

REDACTED

Microsoft has defended its omission of Engstrom by saying that another executive came in in the last several weeks to close the deal. But DOJ asked Microsoft to identify the pitchers, not just the reliever.

REDACTED

REDACTED

---

Government was interested in investigating that had been melded into the DOJ case." Exhibit 3, 11/16/00 Tom Burt Depo. at 47:5-11.

[21]     Microsoft has also withheld as privileged 39 e-mails from or to Mr. Phillips in an eight week period addressing this deal. See Burst's Reply to Compel Microsoft to Produce Documents Relating to Its Document Preservation Policy at 17. This is inexplicably substantial activity indeed for someone who, Microsoft has claimed, "played little or no role in the negotiations." See Microsoft's Opposition to Burst's Motion to Compel Microsoft to Produce Documents Relating to Its Document Preservation Policy at 8.

## REDACTED

Phillips and Engstrom were the Microsoft executives in the market day after day trying to cut market division deals with Apple and Real – the very subject of the CID that was "melded into" the DOJ litigation (see below). Engstrom is even several times cited by name in Judge Jackson's Findings of Fact. See Exhibit 27, FOF 108 (Apple); 406 (Intel JMF).

Because they were not identified to the DOJ, Justice did not insist that Phillips and Engstrom become document custodians. Because they were not custodians, Microsoft did not send either of them document retention notices.

## REDACTED

Eric Engstrom testified three times on his e-mail retention habits, twice in the DOJ case in 1998, and expansively several weeks ago in this Burst case. The first time he admitted deleting emails (a position that seemed likely to cut off DOJ discovery at that time).

## REDACTED

## REDACTED

REDACTED

REDACTED

But this is not what Mr. Engstrom said before.  In his DOJ deposition, Mr. Engstrom, under oath, testified exactly to the contrary:

> **What I do is every month I go mark all the ones from the last month and just whack them.**

See Exhibit 28, 9/28/98 Eric Engstrom Depo. at 90-91.

And Mr. Engstrom echoed this testimony as a trial witness in the DOJ case:

> **What I do is I delete mail that is two months old on a regular basis** because I work on a hard disk on a laptop.  The machine is fairly old, the reason for that being I tend to test the software my group is producing, and I'd like to make sure that it runs on what a customer's machine is typically to be.  **So, as a routine basis, I delete all mail, you know, two months old....**

See Exhibit 29, 2/23/99 Transcript of Trial at 18.

There is no way to reconcile Mr. Engstrom's <u>Burst</u> testimony        REDACTED

with his earlier DOJ testimony ("so as a routine basis I delete all mail after two months old... I go mark all the ones from last month and just whack them.").

Both Chris Phillips and Eric Engstrom left Microsoft in late 1999.

REDACTED

Burst has asked Microsoft to confirm that it destroyed Chris Phillips and Eric Engstrom documents when both left the company. Microsoft has equivocated, saying only that "other documents, including documents that may have resided on a computer hard drive when those employees left the firm, *may not have been retained* because, at the time, *the company had no business or legal obligation to retain them*." <u>See</u> Exhibit 30, letter from David Tulchin to Spencer Hosie, October 11, 2004. This is untrue; in 1999 the DOJ case was far from over, and the class actions had been filed. Phillips and Engstrom were critical witnesses in both.

REDACTED

**C.**    **William Friedman And David del Val Leave Microsoft And Microsoft Does Not Keep Their Documents.**

William Friedman was the key Microsoft streaming media business development executive dealing with Burst, and with other companies in that marketplace. Microsoft has conceded that Mr. Friedman was the Microsoft executive most closely involved with Burst. See Exhibit 19, 8/28/03 Hearing Tr. at 7 ("But the significant majority of these [e-mail gaps] are to or from Will Friedman, the individual who left in September 2000, long before the case got filed, and the individual who Burst's principal contact, in fact, the contact for Burst at Microsoft so that the so-called gap is not surprising.").

Mr. Friedman left Microsoft in September 2000. Microsoft concedes it did not preserve any of his documents. See Exhibit 31, letter from Susan Harris to Spencer Hosie, May 30, 2003. At about the same time, Microsoft employee David del Val also left Microsoft's employ. Microsoft did not preserve Mr. del Val's documents.[22] Id.

There are very real, and significant, gaps in Microsoft's Burst related e-mail. Simply comparing e-mail sent from Burst to Microsoft, or from Microsoft to Burst, produced by Burst to what Microsoft produced shows 118 separate e-mails that Burst maintained but which Microsoft did not. These were e-mails that existed once at Microsoft but which no longer do. See Exhibit 32. [List of Burst-Microsoft e-mails not produced by Microsoft].

Microsoft explains this failure by saying that it did not anticipate litigation from Burst in 2000. But this of course overlooks that Microsoft was even then thoroughly enmeshed in litigation raising either similar or identical issues, e.g. the streaming media issues "melded" into

---

[22]    As did Jim Durkin, who ran a portion of Microsoft's Streaming Media Division in 1997 and 1998. Although it designated Mr. Durkin as a custodian, Microsoft deleted his documents when he left the company. See Exhibit 31.

the <u>DOJ</u> case and Intel issues actually tried. If it had obligations to retain documents for **these** cases, then the documents should have been retained.

Wholly apart from this point: Microsoft has withheld from production numerous Burst specific documents dated in the fall of 2000 under the work product doctrine, that is, **documents prepared in anticipation of litigation with Burst.** <u>See</u> Exhibit 33 (Microsoft privilege log). That is, on the one hand, Microsoft says it did not anticipate litigation with Burst in 2000 and 2001 and so did not preserve Friedman, del Val and Schiefelbein documents; on the other, it withholds documents from the identical time period as prepared in anticipation of the litigation with Burst.

Finally, the few Microsoft Burst documents that survived (the key document being a set of handwritten notes) make plain that Microsoft absolutely anticipated litigation from Burst in 2000 when Microsoft decided to "write [its] own patents" for its version of Bursting. <u>See</u> Exhibit 34, Friedberg July 6, 2000 handwritten notes at MS-CC-BU 252971. It knew that it was inviting litigation by appropriating as its own what it had learned from Burst. <u>Id.</u> at 252972 ("will be adding our own method – *wait for conflict*."). In fact, Microsoft's entire strategy in the fall of 2000 – when it destroyed the Friedman files – was to use the Burst technology and hope that Burst went out of business before it sued Microsoft. <u>See, e.g.,</u> Exhibit 35, Beckerman to Bawcutt and Schiefelbein, November 18, 2000 at MS-CC-BU 192839 ("I see it somewhat as a cross between a game of chicken, and a calculated risk…").

**D.    <u>William Schiefelbein Does Not Get A Notice And Mass Deletes His<br>Documents.</u>**

Microsoft's Bill Schiefelbein met frequently with Burst, and worked closely with William Friedman on Burst matters for Microsoft. Mr. Schiefelbein was a central figure in developing Microsoft's fast-streaming Corona product. Microsoft modified Mr. Schiefelbein's

responsibilities in the late summer and fall of 2001. With this reassignment, Mr. Schiefelbein testified that he mass deleted all of his existing e-mail. Exhibit 36, 9/19/03 Schiefelbein Depo. at 91-92.

Even though streaming media issues were very much at issue in the <u>DOJ</u> case Microsoft had appealed, at issue in the numerous federal and state consumer class cases, and even though Microsoft had by this time anticipated litigation with Burst, Mr. Schiefelbein did not receive a retention notice and destroyed all of his Burst related e-mails. <u>Id</u>. at 94-95.

### E.   <u>The Streaming Media I.T. Administrator Does Not Get A Notice And Continues To Delete Files For His Group</u>.

Each business group at Microsoft has its own IT person and business group servers. For Microsoft's Multimedia Group, this is a Mr. Ochs. In past briefing on these document issues, Microsoft has claimed servers under Mr. Ochs' control are most relevant to the <u>Burst</u> case. <u>See</u>, <u>e.g.</u>, Microsoft Opposition to Third Motion to Compel at 18.

If this were true, one would assume that Mr. Ochs would have received a retention notice. He did not. In deposition, he testified that he routinely destroyed documents after Burst filed its lawsuit. He had annual clean-ups, and deleted files wholesale. <u>See</u> Exhibit 37, 10/3/03 Richard Ochs Depo. at 49:9-15 ("Q: And as a result of the audit, are all the shares [computer folders] that are identified as unnecessary then deleted? A: On the request of the user. So a user comes to me, he says, I got your note, we don't need this anymore. Q: But you do the deletion, you don't rely on the user to do that. A: At that point I do the deletion, yes.").

Mr. Ochs testified that he did not know of the Burst litigation, and never received a document retention notice. ("Q: [W]hen do you first recall becoming aware that Burst.com had sued Microsoft? A: When I was contacted by our legal department. Q: In connection with this deposition? A: In connection with the deposition, yes.... Q: Have you within that last 15

months or so since June 2002 ever become aware of any document collection being done by Microsoft to preserve records in the Digital Media Division?  A: Generic records specific to this lawsuit?  Q: The servers that you manage.  A: No, nothing's come across my desk.").  Id. at 70-71.

## VI.    <u>THE LEGAL STANDARD</u>.

A litigant has a duty to preserve evidence likely to be relevant to filed or reasonably foreseeable litigation.  Spoliation refers to the destruction or failure to preserve such evidence. See <u>Silvestri v. General Motor Corporation</u>, 271 F.3d 583, 590 (4th Cir. 2001) (upholding dismissal of automobile liability case by plaintiff who failed to preserve allegedly defective automobile).[23]  If a party either destroys evidence, or willfully fails to preserve evidence, courts have inherent power to grant redress commensurate with the scope of the problem.  Id. at 590. This duty to preserve potentially relevant evidence reflects "the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth."  Id. Federal Rules of Civil Procedure 16(f) and 37(b)(2) also afford broad statutory authority for the imposition of sanctions for violation of a pretrial or discovery order.  See Fed. R. Civ. P. 16(f) (provides for sanctions when party disobeys judicial order), and Fed. R. Civ. P. 37(b)(2) (broad range of sanctions for violation of discovery order); <u>see also</u> <u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639, 640 (1976) (Rule 37(b)(2) intended to "enforce strict adherence to responsibilities counsel owe to the Court and their opponents").

As <u>Silvestri</u> specifically held, the duty to preserve "extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to the anticipated litigation."  <u>Silvestri</u>, 271 F.3d at 591 (citation omitted).  Once a party reasonably

---

[23]    <u>Silvestri</u> cites <u>Chambers v. Nasco, Inc.</u>, 501 U.S. 32, 45-46 (1991) to root this power in the inherent judicial authority to fashion appropriate sanctions for conduct that disrupts the judicial process.  <u>See</u> 271 F.3d at 590.

anticipates litigation, it should suspend any routine document purging system in effect and to put in place a litigation hold to ensure the preservation of relevant documents. Id. at 591; see also Lewy v. Remington Arms Co., Inc., 836 F.2d 1104, 1112 (8th Cir. 1988) (once litigation is reasonably anticipated, "a corporation cannot blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy."); Thompson v. United States Dep't of Hous. & Urban Dev., 219 F.R.D. 93, 101 (D.Md. 2003).

In crafting a remedy for spoliation, fault matters, but the court does not necessarily have to find bad faith or the highest level of intent. Generally in imposing sanctions in the Fourth Circuit, "a court must find some degree of fault." Silvestri at 590. But the Fourth Circuit explained in Vodusek v. Bayliner Marine Corporation, 71 F.3d 148, 156 (4th Cir. 1995), as it discussed spoliation of an allegedly defective motor boat, that "[w]hile a finding of bad faith suffices to permit such an inference, it is not always necessary." Id. at 156 (citing Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993)). In Thompson, the district court applied the general test that proof of spoliation requires (1) an obligation to preserve evidence, (2) destruction accompanied by a "culpable state of mind," and (3) relevance of the destroyed information. 219 F.R.D. at 101. The culpable state of mind could fall into any of three categories: "bad faith/knowing destruction; gross negligence, and ordinary negligence." Id. (citing Residential Funding v. Degeroge Financial Corp., 306 F.3d 99, 107-08 (2d Cir. 2002); and Zubulacke v. UBS Warburg LLC, 2003 WL 22410619 (S.D.N.Y. Oct. 22, 2003) (Zubulacke IV)). The court added that if the destruction occurs "intentionally or willfully," relevance is presumed. Thompson, 219 F.R.D. at 101 (citation to Residential Funding and Zubulacke IV omitted). A spoliation instruction "is justified without a finding of bad faith when there has been intentional destruction of documents (as here) by a party under an affirmative legal duty to retain those

38

documents."[24] <u>Zimmerman v. Associates First Capital Corp.</u>, 251 F.3d 376, 383-84 (2d Cir. 2001) (emphasis added).

When considering a party's culpability, courts consider the sophistication of the spoliator and its attorneys, and the behavior of the offending party throughout discovery. As noted in <u>Adolph Coors Co. v. Amer. Ins. Co.</u>, 164 F.R.D. 507 (D. Colo. 1993) "the specific discovery dispute underlying [the moving party's] current motion for sanctions must be viewed against the background of [the disobedient party's] other behavior during the discovery phase of this lawsuit." <u>Id</u>. at 509.

Two recent cases illustrate these principles. This issue arose recently in <u>U.S. v. Phillip Morris</u>, No. 99-2496, U.S.D.C. (D.C. Jul. 21, 2004) in which the trial court had entered an order requiring preservation of "all documents and other records containing information which could be potentially relevant to the subject matter of this litigation." Exhibit 38 Memorandum Opinion at 1. There are striking similarities between the tobacco company's spoliation, and Microsoft's here.

First, Phillip Morris had a company policy of deleting e-mail more than 60 days old, and continued this practice for at least two years after a preservation order. <u>Id</u>. at 1-2. Second, certain key employees did not follow preservation policies at all, including some of the

---

[24]      Similarly, <u>Lewy v. Remington Arms Co.</u>, 836 F.2d 1104, 1112 (8th Cir. 1988), in laying out the standard that the lower court should apply to Remington Arm's document retention policy on remand, the court held:

> In cases where a document retention policy is instituted in order to limit damaging evidence available to potential plaintiffs, it may be proper to give an instruction similar to the one requested by the Lewys…. [I]f the corporation knew or should have known that the documents would become material at some point in the future then such documents should have been preserved. Thus, a corporation cannot blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy.

<u>Id</u>. at 1112.

company's highest officers. Id. at 2-3. And third, Phillip Morris failed to follow the Order's "print and retain" policy for deleted emails, which as a result were irretrievably lost. Id. at 4.

In this case, similarly, first, Microsoft has an even tougher, thirty-day policy, which continues in effect to this very day; second, Microsoft failed to preserve evidence of the key negotiators with Real, Intel and Burst, as well as its own misuse of Burst's trade secret and patent information. And third, like Phillip Morris, Microsoft failed to follow that provision of this court's order.

There is another, larger point of similarity. Both Phillip Morris and Microsoft (and their lawyers) are extraordinarily sophisticated and seasoned in litigation, including electronic discovery. Noting that "Phillip Morris is a particularly sophisticated corporate litigant," id., Phillip Morris court fined the company and precluded various witnesses from testifying at trial.

Another very recent case governing email deletion is Zubulacke v. UBS Warburg LLC, et al., 204 WL 1620866 (S.D.N.Y. July 20, 2004). Exhibit 39. In this "relatively routine employment discrimination dispute," the defendant failed to preserve documents, specifically e-mails. Although much of the case concerned late-produced documents, a substantial part of the opinion focused on one key deleted email. Id. at *3.[25] After two years of discovery, and several prior motions, it became clear that UBS executives had deleted e-mails, and erased or misplaced back-up e-mail tapes. Id. at *10-*12. The court found that even though counsel had disseminated a variety of preservation instructions, neither client nor counsel had acted reasonably to preserve e-mails. "Counsel failed to communicate the litigation hold order to all key players." Id. at *12. Particularly irksome to the court was that the proof of destruction came late, after much discovery, and was only "uncovered by Zubulacke during court-ordered re-

---

[25] For Zubulacke's holding that culpable intent can include gross negligence, see id. at *12 n.96.

depositions." Id. That has happened here, too. As a remedy, the court awarded costs, and gave an adverse jury instruction.[26]

A district court has broad discretion to choose an appropriate remedy for spoliation. This can range from financial sanction, to a jury instruction on an adverse inference, to witness or claim preclusion, or even outright dismissal. See, e.g., Vodusek v. Bayliner Marine Corporation, 71 F.3d 148, 156 (4th Cir. 1995). Once a movant has shown that the adverse party had a duty to preserve the allegedly spoiled documents and that they were intentionally destroyed, the "degree of culpability and the prejudice suffered by the moving party will guide the court in its formulation of remedial and punitive action." Trigon Ins. Co. v. United States, 204 F.R.D. 277, 286 (E.D. Pa. 2001). In cases where "intentional conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." Vodusek v. Bayliner Marine Corporation, at 156.

## VII.    MICROSOFT'S CONDUCT IS FAR MORE EGREGIOUS THAN OTHER SPOLIATION CASES.

Microsoft designed and put into place policies, programs and practices of email destruction that are far more intricate, interlocking and egregious than the acts of spoliation in the cases cited above. These aggressive actions, while thoroughly enmeshed in litigation, can only be explained as furthering its aim of ensuring that no archive of Microsoft email would exist and thus be available for discovery.

Microsoft had to know that streaming media documents would be relevant to both existing and pending litigation, and it absolutely knew it had a continuing duty to preserve its potential relevant emails for the government and follow-on litigation. The Justice Department

---

[26]    Id. at *15. The court drew the instruction from Leonard B. Sand et al., Modern Federal Jury Instructions

initiated its streaming media investigation in 1997, and Microsoft concedes this was melded into

the DOJ case. Yet there is no evidence that Microsoft changed in any way its general destruction

policies. (Even it concedes, we believe, that documents would routinely be destroyed unless it

named all of the right individuals "custodians.") Streaming media issues were tried in the DOJ

case, as were Intel issues, and it was entirely foreseeable that these issues would prove important

in the private class cases. Against this backdrop, it is undisputed that Microsoft acted

intentionally to make sure potentially relevant e-mails were destroyed. This evidence, discussed

in detail in the previous pages, can be summarized as follows:

**Microsoft's Systematic E-Mail Eradication Efforts.** Microsoft went to remarkable

lengths to eradicate emails from any electronic medium that might capture and preserve them for

discovery. First, beginning in 1994, Microsoft told its employees not to save e-mails to

corporate servers, an unnatural and inefficient edict that so chafed Microsoft employees – whose

lifeblood was email communication -- that Ms. Stark claims she constantly battled to enforce it,

even by adopting the "due to legal reasons" rationale to give teeth to her efforts.

Microsoft's senior management had a duty to **suspend** any routine document purging

system then in effect and to put in place a litigation hold to ensure the preservation of relevant

documents. See Silvestri v. Gen. Motors Corp., 271 F.3d at 591.[27] But Microsoft did not do this.

It did the opposite – it sped up the machinery of email destruction, even as its duty to preserve

these documents became ever more urgent. The Burt e-mail sets an extraordinarily short six-

---

75-7 (2004).

[27]    In addition, Microsoft was obliged to: (1) send document retention notices to each and every appropriate Microsoft "custodian"; (2) list the correct people as custodians, and have done so in the DOJ case and other related antitrust litigations, and (3) diligently search their files and preserve their documents for production in subsequent cases.

month period for documents generally, and the Allchin e-mail proscribes retention of email beyond thirty days.[28]

Next, while Microsoft had a general policy of destroying e-mail, it never told any of the MDL litigants about this policy, in violation of Order no. 1, and it did not print and preserve the documents before destruction. The Allchin email emanated just four months before Order no.1, yet Microsoft told no one about this policy.

The flatly inconsistent and irreconcilable testimony of Burt and Allchin on document practices (as well as Microsoft's many stories about "due to legal reasons") also show an intent to hide these policies.[29] No lawyer eliciting Mr. Burt's testimony about document policies would believe that a problem existed; nor would the government lawyer eliciting Allchin's initial testimony.

**Programmed Deletion.** Microsoft policed its do-not-save-emails policy by programming its back-up computers to exclude e-mails, by having e-mail exchange servers that compelled individual employees to "auto-delete" e-mail, and by destroying catalogues of its backup tapes. At no time did Microsoft voluntarily inform counsel in this MDL proceeding of

---

[28]    The authors, timing, and content of these instructions indicate an intent to destroy. Far from being a general policy manual or handbook as in most companies, the Allchin e-mails were directives from one of Microsoft's highest officers. Why is Mr. Allchin – who runs the Windows Platform Group – concerning himself with document retention issues? And on timing: Burt sent his email right in the middle of the DOJ trial, before final arguments; Allchin, a witness at trial, followed up by circulating his e-mails little over a month after Judge Jackson issued his very critical findings. And then there is the content. Company retention policies are supposed to tell employees what documents have to keep, and allow them to discard other documents. In other words, they are careful to ensure that documents that have to be kept are maintained. The Burt and Allchin emails are the opposite. They ensure that employees knew to destroy documents generally within six months and e-mails in only thirty days, with no meaningful description of which documents employees should save (Allchin ordered the destruction of all emails unless "absolutely essential"). The message was clear: "Do not archive your mail. Do not be foolish."
[29]    Microsoft's many pretextual explanations of its "legal reasons" are germane to its intent. Microsoft inconsistently claimed that it could not explain these "legal reasons" at all; then, that Ms. Stark "guessed" she had come up with it; then, third, that she certainly did. Yet even Microsoft's last position defies common sense. Although Stark's testimony would indicate she came up with the language in 1995, after getting complaints from executives, Microsoft documents carry this language back in 1994, when Ms. Stark was just an employee of an outside vendor with no direct responsibility for the corporate servers.

these policies or preserve printouts of the deleted data. These practices worked hand in hand with its explicit instructions not to save documents, particularly e-mails, on any medium where they might be preserved.

Microsoft's explanations of all this (as its other explanations) have been all over the map. But it has been clear on its intent: it intended to exclude e-mails from back-up from 1994 forward. The fact that Microsoft still has not owned up to who really authored this policy – it being totally implausible that Ms. Stark, one employee of an outside vendor did so in 1994 – only further undercuts Microsoft's credibility.[30]

**The "Custodian" Problem**. Microsoft carefully limited the employees it asked to preserve documents for litigation, and excluded key witnesses. Because of the scope of its general destruction policy, this has meant that a large number of core documents simply no longer exist. Microsoft failed to notify key people, time and again: Phillips, Engstrom, Friedman, Schiefelbein, and so forth. And when employees left the company, Microsoft destroyed their documents, even for employees under retention.

**Pretext and Roadblocks**. Finally, to protect and preserve its e-mail destruction policies, Microsoft has concealed or incorrectly described its document retention practices in past litigation and on many occasions in this litigation. See Appendix A. It provided many explanations that even it has had to abandon as false.

Each of Microsoft's corporate destruction policies meshed with others; wheels within wheels. Employees were told not to save emails, period, on servers or personal computers, but if they tried to do so, the corporate servers were supposed to exclude them, and the exchange

---

[30]     Microsoft's corporate position was that it did not map users to file servers, so that it could claim impossibility in searching backup tapes for any individual employee's files. But Ms. Stark testified just this month that users were indexed to servers; Microsoft's propagation of the contrary, false position in the Sun Litigation, in this case, and presumably elsewhere is direct evidence of an intent to conceal. Employees used the exchange server

servers would not work if too many were saved; if that failed, the backup tapes were routinely erased, and the means to search the archives were destroyed. Taken together, Microsoft's policies, practices and directives demonstrate an objective intent to ensure that Microsoft e-mails not be preserved, and that no comprehensive repository of e-mails survived for discovery.

## VIII. MICROSOFT'S FAILURE TO PRESERVE DOCUMENTS HAS MATERIALLY PREJUDICED BURST.

Microsoft's failure to preserve documents in the past materially prejudices Burst today.

### A. Eric Engstrom And Intel.

In late 1997, Eric Engstrom "did a deal" with Intel. See, e.g., Exhibit 40, Brumer to Stork et al., December 3, 1997. ("ericeng [Engstrom] has done with a deal with [Intel] and we agreed that they could complete the work they are already doing."). The precise nature of the bargain struck is a principal issue in contention in this case. Burst believes that Eric - working with others from Microsoft (including Mr. Gates himself) - coerced Intel into agreeing to drop its Java Media Framework program. Microsoft was deeply opposed to this work, because it viewed Intel's sophisticated and well-funded work as giving great momentum to Sun's Java in a business area critically important to Microsoft, i.e., multimedia and the PC.[31] Microsoft denies this, arguing instead that it merely provided "advice" to Intel, and any "deal" struck merely involved the pro-competitive adoption of Microsoft technologies.

That Intel quietly abandoned JMF in 1998 is undisputed. That Burst was one of the few ISV's to be working closely with Intel on JMF is equally undisputed. It is a simple matter of fact that Burst had released a JMF player just before Intel abandoned the platform. In short, this episode *matters* in this Burst case.

---

to send and receive emails, but if they had any volume of emails they had to turn on an auto delete feature for emails to have space to continue. Backup tapes were kept for the e-mail exchange servers, but only for 90 days.

[31]    This basic factual story has been the subject of several recent briefs, including most recently Burst.com, Inc.'s Motion for Additional Time to Depose William H. Gates, III, served September 1, 2004.

Microsoft's conduct toward Intel generally was one of the items actually litigated in the 1998 DOJ case. Mr. Engstrom was a trial witness, and his work with Intel was a subject of litigation. It is also the subject of a specific Finding of Fact. See Exhibit 27, FOF 406 ("Eric Engstrom, a Microsoft executive with responsibility for multimedia development, wrote to his superiors that one of Microsoft's goals was getting 'Intel to stop helping Sun create Java Multimedia APIs, especially ones that run well (ie native implementations) on Windows.'" This Intel material was part of Microsoft's 2000 appeal, and 406 is a Finding of Fact that Microsoft refuses to credit with collateral estoppel effect in this Burst case.

Microsoft appreciated Mr. Engstrom's importance then, because it named him a custodian in late 1998, and asked Mr. Engstrom to search his documents. As noted above, he did, but only for "Apple" related documents. All other documents were either mass deleted by Eric Engstrom at the time (version one) or destroyed by Microsoft when Mr. Engstrom left the company in 1999 (version two).

One thing in all this is certain: Eric Engstrom would have had e-mails and perhaps other documents concerning his meetings and negotiations with Intel. These e-mails would have been highly germane to the precise contours of Engstrom's negotiation with Intel and the nature of the bargain struck. The evidence strongly suggests that these e-mails would have aided Burst and hurt Microsoft. Had Microsoft honored its obligations to preserve documents germane to then pending litigation, they would now exist. And Mr. Engstrom would not have the liberty to recall his negotiations with Intel in a fashion now most convenient to Microsoft.

## B.      Chris Phillips And RealNetworks.

Beginning in April 1997, Microsoft's Chris Phillips met with RealNetworks to negotiate an important agreement. The parties now dispute exactly what Microsoft intended, as well as the nature of the ultimate deal struck. Burst alleges that Microsoft asked Real to agree not to

46

compete in the multimedia "platform" space, but instead become a "value-added" ISV building on top of Microsoft's streaming media platform. See, e.g., Exhibit 41, Real's Bruce Jacobson's Spring 1997 notes of call with Microsoft's Bob Muglia ("If [we] wanted to do value add on top of their video, fine; if not, we were an OS contender and msft [Microsoft] would target us for obliteration."). In short, Burst believes that Microsoft approached Real with exactly the same sort of market division agreement that it proposed to Apple, but where Apple adamantly refused, Real initially agreed. See Exhibit 42, Bay to Ahern et al., July 3, 1997 (Microsoft will let Real "build added value products on top" of the Microsoft platform).

The deal reached between the two was the subject of the August 1997 DOJ streaming media CID, explicitly and directly. The DOJ asked for documents broadly, as well as an identification of every person involved in the negotiations. As noted above, Microsoft not only did not give Mr. Phillips a retention notice, it did not even *tell* him about the DOJ CID until more than a year later. As a consequence, he admitted to "mass deleting" all of his documents.

These Phillips documents would have addressed the precise nature of the negotiations, the demands that Microsoft made, and Microsoft's intent in approaching Real, one of its principal competitors in the streaming media space. This is all evidence centrally relevant to this Burst case. All the evidence suggests that these e-mails would have been damning to Microsoft. But they no longer exist.

## C. Friedman And Schiefelbein.

Messrs. Friedman and Schiefelbein were the Microsoft executives who worked most directly with Burst. Starting in 1999, they met repeatedly with Burst, spoke to Burst customers, and over a period of five months became powerful believers in Burst's technological approach. See, e.g., Exhibit 43, "Revisiting Burst.com," April 12, 2000 e-mail.

As pointed out in past briefing, there are numerous, peculiar gaps in Microsoft's internal e-mail coverage concerning Burst. To cite two examples here:

*The October 1999 Meeting*

Burst met with Microsoft in October 1999, and over several hours (and all under NDA) walked Microsoft through the Burst approach. The day following the meeting, Microsoft's Brett O'Rourke wrote a memo summarizing the meeting and Burst's approach, and sent it to scores of Microsoft employees and engineers, including all members of such e-mail alias as "Windows Media Mktg Fulltime Employees" and "Windows Media Program Management." See O'Rourke memo, Exhibit 44.

# REDACTED

32

This was a significant meeting and memo. In the months just prior to meeting with Burst, Microsoft had spent over $100 million committing itself to a very different technology for sending video over the Internet, so-called "edge caching," where companies place thousands of servers throughout the country at the "edge of the Internet cloud." Exhibit 46. Burst's material proved that edge caching would not work, that the redundant servers would ultimately prove logistically unworkable and too expensive, and that a very different approach was needed, *i.e.* the approach sponsored by Burst. Given Microsoft's commitment to edge caching, however,

---

32     Microsoft says it does not know who got a copy of the memo. It says it does not maintain alias member lists, and couldn't even tell Burst from its organization chart who reported to whom when the memo circulated in October and early November. This is significant, because it appears from the alias distribution that many of the Microsoft engineers who shortly thereafter claimed to have "independently" developed Microsoft's bursting technology in fact received this O'Rourke memo. By pretending it does not know who got the memo, Microsoft retains deniability on this point. This is an example of how Microsoft uses the absence of a documentary record to its advantage in litigation.

this was heretical, and this explains Microsoft's initial hostility toward the Burst technology. See, e.g., Exhibit 47, Schiefelbein e-mail, September 1999.

The peculiar thing in all of this is that Microsoft's documents reflect no e-mail response to the broadly distributed memo. No one said "well what does this mean about edge caching?": no one questioned (at least, not in any surviving document) what this meant about Microsoft's own development work in a different direction. Significantly, given Microsoft's current litigation claim that it was working on its own faster-than-real-time technology, no one commented back that "Hey – this is what we're doing in-house anyway." There is just silence. This is a rock thrown into a pond that produced no ripples. There would have been Schiefelbein and Friedman e-mails on point. They would have been extremely relevant to this case, and their production would have sharply circumscribed Microsoft's ability to recast past events in the light most favorable given current litigation.

### The July 6, 2000 Meeting

After initially encouraging Burst to build a bridge to the Microsoft media player, by late spring 2000, Microsoft changed its mind, believing that the Burst technology was too good, and would be too popular with what should have been important Microsoft customers, e.g., Excite@Home, AOL, SBC, and the like. In a July 6 meeting, Bill Schiefelbein outlined how much better the Burst technology was than Microsoft's Windows Media Technology, how it was a "necessary feature," and how Microsoft should write its own patents. Exhibit 34. At this meeting, Microsoft debated whether to "push Burst away," or buy the company, or build its own technology. The meeting ended without a result being reached, and the debate raged on.

But it, too, raged on in silence. There is just one e-mail about this push-away-or-not subject after this July 6, 2000 meeting, the morning of the meeting itself. Microsoft is a company that conducts its day to day business by e-mail. It is simply not possible that Messrs.

Friedman and Schiefelbein and others did not debate these issues in their e-mails. But we will never know what they said, because neither Friedman nor Schiefelbein were asked to retain documents and did not.

## IX.   **BURST IS ENTITLED TO A NARROW SPOLIATION INSTRUCTION, PRECLUSION OF ERIC ENGSTROM AS A WITNESS, AND THE RECOVERY OF ITS COSTS.**

Burst seeks the following relief:

First, it seeks an adverse jury instruction that Microsoft did not preserve documents it had an obligation to preserve, and that the jury may, but not must, infer that the contents of the e-mails would be adverse to Microsoft. Cf. Zublacke v. UBS Warborg LLC, 204 WL 1620866 (S.D.N.Y. July 20, 2004) at 15 *quoting* an adverse instruction given in that case. This remedy would advise the jury specifically of the loss of Engstrom, Phillips and Gates e-mail on the subject of communications with Intel regarding its Java multimedia efforts. It would also identify the loss of Schiefelbein and Friedman e-mails that may have concerned Microsoft's discussions with Burst during 1999 and 2000.

Second, Burst requests an order precluding Eric Engstrom as a witness.

Third, Burst requests that it be awarded costs it incurred in pursuing the truth concerning Microsoft e-mail retention and deletion over the past 15 months, four motions, and numerous depositions.

DATED:  October 29, 2004

SPENCER HOSIE (Ca Bar # 101777)
BRUCE J. WECKER (Ca Bar # 078530)
JOHN BURRITT McARTHUR (Ca Bar # 159793; Texas Bar #13325650)
GEORGE F. BISHOP (Ca Bar # 89205)
JAMES T. McCARTT (Ca Bar # 121983)
GEORGE FROST (Ca Bar #178528)
HOSIE, FROST, LARGE & McARTHUR
One Market, Spear Street Tower, 22nd Floor
San Francisco, CA 94105
Telephone: 415-247-6000

ROBERT YORIO (Ca Bar # 93178)
COLBY SPRINGER (Ca Bar # 214868)
CARR & FERRELL, LLP
2200 Geng Road
Palo Alto, CA 94303
Telephone: 650/812-3400

By: _____
       Spencer Hosie
Attorneys for Plaintiff Burst.com, Inc.

# APPENDIX A

# INCONSISTENT MICROSOFT EXPLANATIONS

## The 1994 Do Not Save Injunction

- Microsoft has no corporate knowledge whatsoever of the 1994 do not save injunction.

*Brown's first deposition*

- Ms. Stark originated the do not save rule as an economy measure.

*Brown's second deposition*

- Ms. Stark originated the do not save rule because e-mails are not collaborative data.

*Ms. Stark's deposition*

- Ms. Stark originated the rule, even though she was not even a Microsoft employee in 1994 when the rule first appears on Microsoft documents.

*Ms. Stark's deposition*

- The do not save injunction came because e-mails were unimportant.

*Brown's second deposition*

- The do not save injunction came because e-mails were too important, and people saved too many.

*Brown's third deposition*

- Microsoft has no corporate knowledge about the origin and meeting of the "due to legal issues" language.

*Brown's first deposition*

- Ms. Stark did not know where the "due to legal language" came from, but "guessed" that someone on her team made it up to add teeth to the policy.

*Brown's third deposition*

i

- Ms. Stark is sure she added the language.

*Stark deposition*

## On Mapping Custodians To Servers

- Microsoft does not keep a simple spreadsheet mapping users to servers.

*Repeated briefs*

- Ms. Stark's group kept an excel spreadsheet very precisely mapping users to servers, and her group could not function without this spreadsheet.

*Ms. Stark's deposition*

## On E-Mail Retention

- Microsoft August 2003 brief. "Microsoft's recommended guideline is for employees to retain only the documents and e-mail needed to do their work and not to retain that material for more than 6 months unless essential…." Not so; Allchin's e-mail "Do not be foolish. 30 days."

- Allchin 2002 testimony. "[W]e just encourage people to own and keep documents based on business needs." Not so; "Do not archive your e-mail…. 30 days."

- Tom Burt 2000 testimony. "[P]eople were encouraged… to retain information that they needed to do their job. And it was a rule of thumb that… things that were older than six months old, they should think about deleting." Not so.

## Programming Computers To Exclude E-Mails From Back-Up

- E-mails were not excluded from back-up prior to April 2000.

*August 2003 Microsoft position*

- E-mails were excluded from back-up beginning 1994 forward.

*May 2004 Microsoft position*

- Microsoft does not know when e-mails were excluded from back-up.

*Current Microsoft position*

## Eric Engstrom On E-Mail Retention

- "What I do is every month I go mark all the ones from last month and just whack them." Eric Engstrom's September 28, 1998 deposition.

- "What I do is I delete mail that is two months old on a regular basis...." Eric Engstrom's trial testimony, February 23, 1999 Trial Testimony.

- 

# REDACTED

## **PROOF OF SERVICE**

I am employed in the State of California, County of San Francisco. I am over 18 years of age and am not party to the within action. My business address is One Market, Spear Tower, Suite 2200, San Francisco, California 94105.

On October 29, 2004, I served BURST.COM, INC.'S MOTION FOR SPOLIATION INSTRUCTION, WITNESS PRECLUSION, AND RELATED BRIEF upon counsel named below as indicated:

John W. Treece *(via facsimile)*
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
Fax: 312.853.7036

Executed this 29th day of October, 2004.

_____
Jerry Shaw