# TAB G

THE SEDONA CONFERENCE℠ WORKING GROUP SERIES

wgs℠

# THE SEDONA PRINCIPLES:
## *Best Practices Recommendations & Principles for Addressing Electronic Document Production*

A Project of The Sedona Conference℠
Working Group on
Best Practices for Electronic Document
Retention & Production

January 2004



THE SEDONA CONFERENCE℠ WORKING GROUP SERIES

> The defendants argue that it would be unduly burdensome for them to search the backup tapes containing the archived e-mail. The plaintiffs respond that computer-based discovery is no different than paper-based discovery.

*Id.* at *10.

The answer to this question—"why is electronic discovery different?"—lies in the subtle, but sometimes profound, ways in which electronic documents present unique opportunities and problems for document production. In *Byers*, Magistrate Judge Nolan reflected on some of these differences:

> Computer files, including e-mails, are discoverable…However, the Court is not persuaded by the plaintiffs' attempt to equate traditional paper-based discovery with the discovery of e-mail files…. Chief among these differences is the sheer volume of electronic information. E-mails have replaced other forms of communication besides just paper-based communication. Many informal messages that were previously relayed by telephone or at the water cooler are now sent via e-mail. Additionally, computers have the ability to capture several copies (or drafts) of the same e-mail, thus multiplying the volume of documents. All of these e-mails must be scanned for both relevance and privilege. Also, unlike most paper-based discovery, archived e-mails typically lack a coherent filing system. Moreover, dated archival systems commonly store information on magnetic tapes which have become obsolete. Thus, parties incur additional costs in translating the data from the tapes into useable form."

*Id.* at *31-33. There are many ways in which producing electronic documents is qualitatively and quantitatively different from producing paper documents. They can be grouped into six broad categories of differences.

### A.   Volume and Duplicability

First and foremost, there are vastly more electronic documents than paper documents, and electronic documents are created at much greater rates than paper documents. As a result, the amount of information available for potential discovery has exponentially increased with the introduction of electronic data. For example, the use of e-mail has risen dramatically in recent years. In 1998, the U.S. Postal Service processed approximately 1.98 billion pieces of mail. During that year, there were approximately 47 million e-mail users in the United States who sent an estimated 500 million e-mail messages per day, for a total of approximately 182.5 billion e-mail messages per year—more than 90 times as many messages as the U.S. Postal Service handled the same year. In 2003, it is projected that there will be 105 million e-mail users in the United States, who will send over 1.5 billion e-mail messages a day (approximately 547.5 billion e-mail messages per year)—nearly as many messages in a day as the U.S. Postal Service handles in a year.

The dramatic increase in e-mail usage and electronic file generation poses special problems for large corporations. A single large corporation can generate and receive millions of e-mails and electronic files each day. At least 93 percent of information created today is first generated in digital format,[3] 70 percent of corporate records may be stored in electronic format,[4] and 30 percent of electronic information is never printed to paper.[5] Not surprisingly, the proliferation of the use of electronic data in corporations has resulted in vast accumulations. While a few thousand paper documents are enough to fill a file cabinet, a single computer tape or disk drive the size of a small book can hold the equivalent of millions of printed pages. Organizations often accumulate thousands of such tapes as data is stored, transmitted, copied, replicated, backed up, and archived.

Partly responsible for this phenomenon is the fact that electronic documents are more easily duplicated than paper documents. Electronic information is subject to rapid and large scale user-created and automated replication without degradation of the data. E-mail provides a good example. E-mail users frequently send the same e-mail to many recipients. These recipients, in turn, often forward the message, and so on. At the same time, e-mail software and the systems that are used to transmit the messages automatically create multiple copies as the messages are sent and resent. Similarly, other business applications are designed to periodically and automatically make copies of data. Examples of these include web pages that are

*The Sedona Principles for Electronic Document Production* January 2004

case. The Federal Rules do not require such a search, and the handful of cases are idiosyncratic and provide little guidance.").

When backup tapes exist to restore electronic files that are lost due to system failures or through disasters such as fires or tornadoes, their contents are, by definition, duplicative of the contents of active computer systems at a specific point in time. Thus, employing proper preservation procedures with respect to the active system should render preservation of backup tapes on a going-forward basis redundant. Further, because backup tapes generally are not retained for substantial periods, but are instead periodically overwritten when new backups are made, preserving backup tapes would require the time-consuming and costly process of reprogramming backup systems, manually exchanging backup tapes, and purchasing new tapes or hardware.

In some organizations, however, the concepts of backup and archive are not clearly separated, and backup tapes are retained for a relatively long period of time to provide for retention of files that may need to be accessed in the future. Backup tapes may also be retained for long periods of time out of concern for compliance with record retention laws. Under these circumstances, there is a possibility that the stored backup tapes contain the only remaining copy of data or documents that may be relevant in a case.

Organizations that use backup tapes for archival purposes should be aware that this practice is likely to cause substantially higher costs for evidence preservation and production in connection with litigation. *Compare Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, 205 F.R.D. 421, 429-30 (S.D.N.Y. 2002) (in determining whether to shift costs, considering "the purposes for which the responding party maintains the requested data," because "[i]f a party maintains electronic data for the purpose of utilizing it in connection with current activities, it may be expected to respond to discovery requests at its own expense"); *with Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003) (concluding that "'the purposes for which the responding party maintains the requested data' are typically unimportant," which suggests that using backup tapes for archival purposes may not adversely affect the cost-shifting analysis).

Organizations seeking to preserve data for business purposes or litigation should, if possible, consider employing means other than traditional disaster recovery backup tapes. *Cf.* 26 C.F.R. 1234.24(c) ("[B]ackup tapes should not be used for recordkeeping purposes.").

> *Illustration i.* Pursuant to an information technology management plan, once each day a producing party routinely copies all electronic information on its systems and retains, for a short period of time, the resulting backup tape for the purpose of reconstruction in the event of an accidental erasure, disaster or system malfunction. A requesting party seeks an order requiring the producing party to preserve, and to cease reuse of, all existing backup tapes pending discovery in the case. Complying with the requested order would impose large expenses and burdens on the producing party, which are documented in factual submissions. No credible evidence is shown establishing the likelihood that, absent the requested order, the producing party will not produce all relevant information during discovery. The producing party should be permitted to continue the routine recycling of backup tapes in light of the expense, burden and potential complexity of restoration and search of the backup tapes.

Finally, if it is unclear whether there is a reasonable likelihood that unique, relevant data is contained on backup tapes, the parties and or the court may consider the use of sampling to better understand the data at issue. *See McPeek v. Ashcroft*, 212 F.R.D. 33, 36 (D.D.C. 2003) (declining to order searches of backup tapes where plaintiff had not demonstrated a likelihood of obtaining relevant information after review of sample; *cf. Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280 (S.D.N.Y. 2003) (using sampling to determine that other backup tapes likely contained relevant data that should be produced). Depending on the circumstances of the case, sampling may establish that there are few, if any, unique documents on the tapes and that there is no need for the tapes to be retained or restored. Similarly, sampling techniques may establish that it is reasonable to retain and restore only certain intervals of available tapes (such as every tenth tape) to satisfy the party's good faith compliance with its preservation and production obligations. *See* Cmt. 11.c, *infra*.