## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION<br><br>This Document relates to:<br><br>*Burst.com, Inc.* v. *Microsoft Corp.*,<br>Civil Action No. C-02-2952 | MDL Docket No. 1332<br><br>Hon J. Frederick Motz<br><br>**PUBLIC VERSION** |

## MICROSOFT'S MEMORANDUM IN OPPOSITION TO BURST'S MOTION FOR SPOLIATION INSTRUCTION, WITNESS PRECLUSION, AND RELATED RELIEF

<div style="display:flex">

<div>

Charles W. Douglas
Richard A. Cederoth
John W. Treece
David M. Schiffman
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza, 10 South Dearborn
Chicago, Illinois 60603
(312) 853-7000

David B. Tulchin
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

</div>

<div>

Michael F. Brockmeyer (Fed. Bar No. 02307)
Jeffrey D. Herschman (Fed. Bar No. 00101)
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-3000

Thomas W. Burt
Richard J. Wallis
Steven J. Aeschbacher
C. Andrew Culbert
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98502
(425) 936-8080

</div>

</div>

*Attorneys for Defendant Microsoft Corporation*

December 2, 2004

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.   Microsoft Has Preserved and Produced Documents in a Responsible and Proper Manner. .................................................................................................................... 8

II.  Legal Standards ................................................................................................... 12

    A.   Corporations Have No General Obligation to Preserve Documents, and May Discard Materials They Have No Duty to Retain. ................................. 12

    B.   Burst Has the Burden of Showing That Microsoft Had a Duty to Preserve Specific E-Mails at the Time They Were Deleted. ............................................... 14

    C.   Burst Has the Burden of Showing That Microsoft Knew It Was Deleting Evidence Relevant to Litigation. .......................................................................... 16

    D.   Burst Has the Burden of Showing It Was Prejudiced by the Loss of Evidence Favorable to Its Position. .................................................................. 18

III. Microsoft Has Satisfied Its Document Preservation Obligations in This Case. .............. 21

    A.   Microsoft Had No Duty To Preserve Burst-Related Documents at the Time the Friedman and Schiefelbein Files Were Deleted .................................... 21

    B.   Burst Has Not Shown Any Prejudice from the Loss of Friedman or Schiefelbein E-Mails. ...................................................................................... 25

        1.   There Is a Comprehensive Evidentiary Record of Microsoft's Dealings with Burst. ......................................................................................... 25

        2.   Burst Has Not Shown That Significant Burst-Related E-mails Are Missing or Any Likelihood That Such E-Mails Would Have Supported Burst's Position. .............................................................................. 27

    C.   Microsoft Has Been Prejudiced by Burst's Extensive Destruction of Important Documents. ......................................................................................... 29

IV.  Microsoft Satisfied Its Document Preservation Obligations in Earlier Proceedings, Including the Government Case. ......................................................................... 34

    A.   Microsoft Complied with its RealNetworks and "Streaming Media" Production and Retention Obligations. ................................................................ 35

B.    Microsoft Complied with Its Document Obligations in the Government Case.... 38

C.    Burst Has Not Shown That Any Evidence in *This* Case Was Lost Due to a Failure by Microsoft to Meet Obligations in *Earlier* Cases.............................................. 39

   1.    There Is a Robust Evidentiary Record of Microsoft's Dealings with Intel. ...................................................................................................................... 39

   2.    Burst Has Not Shown That Any E-Mails Are Missing............................ 41

V.    Microsoft's E-mail Policies Are Reasonable and Lawful.................................... 45

A.    Microsoft's E-mail Retention Schedule Is Reasonable and Lawful. .................... 45

B.    Microsoft's Backup Tape Policies Are Reasonable and Lawful. ........................ 48

   1.    There Is No Duty to Make Backup Tapes of E-Mails; the Failure to *Copy* Is Not *Destruction*....................................................................................... 48

   2.    At Microsoft, It Is Easy to Copy and Preserve E-Mails. ........................ 49

   3.    E-Mail Backup Tapes Are Copies of Copies, Which Are Made for Disaster Recovery, Not Information Retrieval. ....................................... 51

   4.    The OTG Policy Against Using Centralized Servers for E-Mail Was Not an "E-mail Destruction Policy." ............................................................. 52

CONCLUSION................................................................................................................. 59

# TABLE OF AUTHORITIES

## CASES

*Bashir* v. *Amtrak*, 119 F.3d 929 (11th Cir. 1997) ...................................................17, 20

*Concord Boat Corp.* v. *Brunswick Corp.*, 1997 U.S. Dist. LEXIS 24068 (E.D. Ark. 1997) .......14

*Ellicott Machine Corp. Int'l* v. *Jesco Constr. Corp.*, 199 F. Supp. 2d 290 (D. Md. 2002) ......3, 15, 19

*Gates Rubber Co.* v. *Bando Chem. Indus., Ltd.*, 167 F.R.D. 90 (D. Colo. 1996) ..................20, 29

*Hartford Ins. Co.* v. *American Automatic Sprinkler Sys., Inc.*, 23 F. Supp. 2d 623 (D. Md. 1998) ..............................................................................................................17, 18, 33

*Hodge* v. *Wal-Mart Stores, Inc.*, 360 F.3d 446 (4th Cir. 2004) ................................3, 16

*Kronisch* v. *United States*, 150 F.3d 112 (2d Cir. 1998) ...............................................14

*Lekkas* v. *Mitsubishi Motors Corp.*, 2002 U.S. Dist. LEXIS 18390 (N.D. Ill. 2002) ..................15

*McGinnity* v. *Metro-North Commuter R.R.*, 183 F.R.D. 58 (D. Conn. 1998) .............................18

*Morris* v. *Union Pac. R.R.*, 373 F.3d 896 (8th Cir. 2004) ............................................17

*National Union Fire Ins. Co.* v. *Murray Sheet Metal Co.*, 967 F.2d 980 (4th Cir. 1992) ...........24

*Potomac Elec. Power Co.* v. *Electric Motor Supply, Inc.*, 192 F.R.D. 511 (D. Md. 2000) .....7, 16, 29

*Residential Funding* v. *DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) ..................................16

*Silvestri* v. *General Motors Corp.*, 271 F.3d 583 (4th Cir. 2001) ..........................................2, 15, 16

*Skeete* v. *McKinsey & Co.*, U.S. Dist. LEXIS 9099 (S.D.N.Y. 1993) .........................................19

*Stevenson* v. *Union Pac. R.R. Co.*, 354 F.3d 739 (8th Cir. 2004) ..............................................17

*Thompson* v. *HUD*, 219 F.R.D. 93 (D. Md. 2003) ........................................................3

*Trigon Ins. Co.* v. *United States*, 204 F.R.D. 277 (E.D. Va. 2001) .........................................12, 18

*Turner* v. *Hudson Transit Lines, Inc.*, 142 F.R.D. 68 (S.D.N.Y. 1991) ........................................19

*United States* v. *Microsoft Corp.*, 1998 WL 614660, 1 (D.D.C. Sept. 2, 1998) .........................39

*United States* v. *Philip Morris USA, Inc.*, 327 F. Supp.2d 21 (D.D.C. 2004) .............................50

*Vodusek* v. *Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995) ............................................7, 19, 29, 33

*Zubulake* v. *UBS Warburg LLC*, 2004 U.S. Dist. LEXIS 13574 (S.D.N.Y. 2004) ......................19

*Zubulake*  v. *UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ....................................12, 13, 15, 16, 24

## MISCELLANEOUS

American Bar Association, Civil Discovery Standards, August 1999, Standard No. 10 ........15, 24

7 James W. Moore, *Moore's Federal Practice* § 37A.11[3][a], at 37A-37 (3d ed. 2003) .....15, 24

*The Sedona Principles: Best Practices Guidelines & Commentary for Managing Information & Records in the Electronic Age* (Sedona Conference, Sept. 2004 Public Comment Draft) .....8, 9, 52

*The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production* (Sedona Conference, Jan. 2004) ............................................13, 51

*Manual for Complex Litigation* § 11.442 (Fourth) ......................................................................15

## INTRODUCTION

For two years, Burst has been proclaiming that it has ample evidence to support its charges against Microsoft, both from the Government Case and from its own discovery efforts. Yet, with respect to the issues at the center of its case, Burst has come up dry. As a result, it has tried in a series of motions to shift the focus away from the merits of its claims and toward alleged deficiencies years ago in Microsoft's document retention (while ignoring its own large-scale destruction of documents at the very time it was preparing to sue). In pursuit of this strategy, Burst has now filed a motion that is based on factual misrepresentations, asking the Court to draw sweeping inferences that are entirely unwarranted.

Burst's motion falsely accuses Microsoft of violating this Court's document preservation order. As shown below, Microsoft has scrupulously complied with the Court's order, and in fact Burst does not even assert that any e-mails were improperly deleted since this action was filed. *See* pages 21-25, *infra*. Burst also alleges the destruction of documents belonging to "employees under retention" – that is, employees who had been told by Microsoft's legal department to save documents. Again, there is no truth to this accusation, and Burst has not identified a single instance in which documents of employees under retention were deleted in violation of the notice. *See* pages 21 and 41-45.

Finally, Burst accuses Microsoft of adopting "institutional policies ensuring that e-mails and other key documents, including those of direct importance to this case, would be destroyed." Motion at 1. This accusation is also untrue, and simply cannot be reconciled with Microsoft's exemplary record of preserving, reviewing and producing millions of pages of documents in many lawsuits over the years. In this very case, Microsoft has produced more than 1,800,000 pages to Burst, including 550,000 pages in response to Burst's individual requests for documents uniquely relevant to

its claims. *See* page 11 *infra*. Nearly all of these documents were generated in 2001 or earlier, and thus would not have existed when Burst sued in June 2002 if Microsoft's document retention practices were as Burst describes them. These 550,000 pages of documents were retained and produced to Burst precisely because Microsoft has never had the kind of "institutional policies" of destruction that Burst falsely alleges. Indeed, Burst has been provided with a robust evidentiary record of the dealings between the two companies – at least from Microsoft's side.

Microsoft's extensive production of relevant documents is not restricted to this lawsuit. During the last few years, Microsoft has produced more than 6,000,000 pages of documents to the Department of Justice and various private plaintiffs. It has collected and preserved materials, including e-mails, from more than 2,100 employees. *See* pages 11-12, *infra*. These facts prove false the assertion that Microsoft has "institutional policies ensuring" the destruction of e-mails and other documents pertinent to litigation.

Of course, Microsoft did not save every e-mail ever created, nor was it obliged to do so. Every company in the United States destroys unneeded business documents on a daily basis and has every right to do so. It is only when the law imposes a duty to retain documents that a defendant must take reasonable steps to ensure that relevant information is retained.

The courts in this Circuit impose three specific requirements before the loss of evidence may be viewed as spoliation and an adverse inference instruction may be awarded. First, the litigant must have been under a *duty to preserve* the documents at the time they were destroyed. Such a duty applies only if the documents were "evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001). Second, the party must have *intentionally* destroyed documents it knew to be evidence. As the Fourth Circuit said earlier this year, "an [adverse]

inference 'cannot be drawn merely from [a party's] negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.'" *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004), *quoting Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). Finally, even if wrongful destruction were shown, courts will not give an adverse inference instruction unless there is good reason to conclude that the lost evidence would have supported the movant's position. *See Ellicott Machine Corp. Int'l v. Jesco Constr. Corp.*, 199 F. Supp. 2d 290, 294 (D. Md. 2002).

Most of Burst's complaints about Microsoft's retention practices have absolutely nothing at all to do with the documents it claims are missing or with the relief it seeks. This memorandum will address even these irrelevant accusations to show that they are unfounded. But it will focus on what Burst is asking the Court to do. Burst is seeking an adverse inference jury instruction that "would advise the jury specifically of … the loss of Schiefelbein and Friedman e-mails that may have concerned Microsoft's discussions with Burst during 1999 and 2000." Motion at 50. Burst wants a similar instruction about "the loss of Engstrom, Phillips and Gates e-mail on the subject of communications with Intel regarding its Java multimedia efforts." *Id.* This kind of instruction is an "extreme sanction," which, as Judge Grimm recently observed, "often ends the litigation" in the eyes of the jury. *Thompson v. HUD*, 219 F.R.D. 93, 100 (D. Md. 2003) (quotation omitted). There is no justification for such an instruction, which would invite the jury to speculate about the contents of hypothetical e-mails, instead of rendering a verdict based on the extensive body of evidence gathered during years of discovery. Nor is there any justification for Burst's request for "an order precluding Eric Engstrom as a witness." Motion at 50.

**Friedman and Schiefelbein.** These claims are disposed of easily. Burst contends it was spoliation for Microsoft to recycle William Friedman's computer when he left the company in September 2000, and for William Schiefelbein to delete his files when he returned from paternity leave and began a new job with different responsibilities in the fall of 2001, without in either case preserving any "e-mails that may have concerned Microsoft's discussions with Burst during 1999 and 2000." *Id.* But Microsoft had no duty to preserve the e-mails at the times in question – in 2000 and 2001 – because it had no reason to expect that Burst would bring suit in June 2002. Neither Friedman nor Schiefelbein was under a duty to retain documents for the unexpected Burst suit, nor for any other case that was then pending or anticipated. Microsoft's conduct stands in stark contrast to Burst's wholesale destruction of important documents at a time when it knew it would be pursuing litigation. *See* pages 29-33, *infra*.

Additionally, Burst has failed to show that any significant e-mails were lost. Burst has its own copies of communications between the two companies, and Microsoft has produced e-mails about every substantive meeting. *See* pages 25-27, *infra*. Burst offers only speculation that Friedman and Schiefelbein may have deleted e-mails concerning Burst that were not preserved by others, and it has utterly failed to present any basis for believing that such hypothetical e-mails would have supported its position in this case.

The principal example Burst cites is the absence of any e-mails responding to a scathing review of Burst's technology by Microsoft engineers. *See* Burst Ex. 44 ("Our assessment is that the technology will not work in most environments and for most scenarios that customers require"). However, other than speculation, Burst offers no evidence that Friedman or Schiefelbein (or anyone else) ever sent an e-mail response, and in any case there is no basis for concluding that any such e-mail would *help* Burst's case. *See* page 28 *infra*.

4

**Engstrom, Phillips and Gates.**  Burst's second spoliation claim relates to the alleged "loss of Engstrom, Phillips and Gates e-mail on the subject of communications with Intel regarding its Java multimedia efforts" – a loss which supposedly occurred during the course of the Government Case, long before Microsoft had any reason to expect Burst's lawsuit.  This claim has no merit.

During the Government Case, Microsoft preserved and produced e-mails from the files of 167 custodians, including Messrs. Engstrom, Phillips and Gates.  There was a specific request for documents about Mr. Gates' communications with Intel.  Microsoft  also collected many thousands of documents from Mr. Engstrom and Mr. Phillips.  Although few of these Engstrom and Phillips documents were responsive to the Justice Department's requests, all of them were preserved.  *See* page 39, *infra*.

The discovery in the present case has yielded a robust record about Microsoft's dealings with Intel.  Microsoft has made available to Burst every document that it produced in the Government Case (and in several other proceedings).  It has also conducted new searches of the files of approximately 120 current and former employees and other sources – including Messrs. Engstrom, Phillips and Gates – for documents bearing on Burst's Intel allegations.  In particular, Microsoft has produced to Burst e-mails between Mr. Gates and Intel and also between Mr. Engstrom and Intel.  (Burst does not even claim that Mr. Phillips had any relevant dealings with Intel.)  In addition, Burst has received Intel's documents, and it has taken depositions of witnesses from both Intel and Microsoft.  *See* pages 39-40 and 41-45, *infra*.

The evidence shows that Burst's antitrust allegations are false.  Burst alleges that Microsoft "coerced Intel into agreeing to drop its Java Media Framework [JMF] program."  Motion at 45.  The Intel witnesses, however, testified that they cancelled the JMF program for reasons unrelated to

Microsoft – specifically, because Sun Microsystems (the creator of Java) refused to license Intel's Java Media Framework implementation and would not even allow Intel to participate in the ongoing development of the JMF specifications. *See* pages 40-41, *infra*. This evidence contradicts Burst's theory, so Burst is reduced to arguing that the evidence it hoped to find must have been destroyed.

Burst has not only failed to show that any e-mails on this subject are missing, it has also failed to establish that Microsoft had a duty to preserve documents on this topic, given that Burst's claim differs significantly from those made by the Justice Department in the Government Case. Microsoft's duty in the Government Case was to retain and produce documents requested by the DOJ relating to the DOJ's actual claims, not to preserve documents (if any existed) that the Government did not request, which may have had a bearing on claims that the Government did not assert. *See* page 42, *infra*. Burst is unable to cite any authority for its remarkable view that Microsoft should then have anticipated Burst's 2002 claims about the JMF that the DOJ never made.

Even weaker is Burst's complaint that Mr. Engstrom and Mr. Phillips were not named as document custodians when Microsoft responded to the DOJ's August 1997 Civil Investigative Demand ("CID") concerning Microsoft's acquisition of VXtreme and its investments in RealNetworks and VDONet. The record shows that the Justice Department and Microsoft reached an express agreement about which employees would be designated as custodians and whose files would be searched. Later, during the course of the Government Case, Microsoft collected and preserved documents from the files of Mr. Engstrom and Mr. Phillips. Furthermore, all of the testimony about file deletions that Burst now cites – flimsy though it may be – came from depositions taken by the DOJ. Yet the Justice Department never claimed that Microsoft had violated any document preservation orders or otherwise failed to comply with its document obligations.

6

In any event, the CID had nothing to do with the subject upon which Burst wants an adverse inference: "communications with Intel regarding its Java multimedia efforts." Even if the CID topics touched upon Burst's original allegations of a conspiracy between Microsoft and RealNetworks, Burst has dropped that claim from its Amended Complaint.

**Burst's Document Destruction.** Finally, Burst's own destruction of documents is a compelling reason not to give an adverse inference instruction against Microsoft. Such jury instructions are given "for the purpose of leveling the evidentiary playing field." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Potomac Elec. Power Co. v. Electric Motor Supply, Inc.*, 192 F.R.D. 511, 514 (D. Md. 2000). But here, the playing field is tilted *against* Microsoft. Burst has the benefit of a large evidentiary record that covers all of Microsoft's dealings with Burst, as well as its dealings with Intel and RealNetworks. Burst also has the benefit of the enormous body of evidence compiled in earlier proceedings. Microsoft, however, is not on an equal footing, for Burst intentionally destroyed its critical evidence at a time when it was adopting litigation as a business strategy.

In November 2000, Burst terminated most of its employees, including engineers and the sales force. It then "wiped clean" their computers and the server that housed its customer relationship management database. And, with limited exceptions, it threw out the papers left behind by the terminated employees. Without the files of Burst's engineers, Microsoft is missing the actual evidence about Burst's undocumented technical assertions – that its software worked better with Intel's JMF Player than Sun's JMF Player, and that it was crippled by alleged compatibility problems with Microsoft software. In addition, without the customer database (which included customer complaints and comments about Burst's products), Microsoft is handicapped in responding to Burst's claims that it lost

customers and sales due to Microsoft's actions, as opposed to deficiencies in Burst's own products and services. *See* pages 29-33, *infra*.

This is not a situation where a few e-mails on a topic may be missing – which is the most that Burst can claim about Microsoft's production (and even that claim is unsupported). On critical issues, Burst intentionally destroyed key sources of documentary evidence.

## I.     Microsoft Has Preserved and Produced Documents in a Responsible and Proper Manner.

Like many American corporations, Microsoft has adopted guidelines about when documents should be saved and when they should be discarded. There are a variety of statutory and regulatory requirements for preserving documents, and Microsoft's guidelines in those areas are not challenged.[1] Microsoft has also developed practices for preserving documents relevant to litigation, which are described below. Outside of these areas, Microsoft urges its employees to keep documents only so long as they are needed for business purposes.

Companies are not expected to retain every document. This has always been true, but the costs of retention have grown considerably in the computer age. Saving electronic information is far more costly than is commonly recognized. The burdens are aptly described in *The Sedona Principles: Best Practices Guidelines & Commentary for Managing Information & Records in the Electronic Age* (Sedona Conference, Sept. 2004 Public Comment Draft) (*see* Compendium of Unpublished Authorities and Secondary Sources ("Compendium") Tab F):

---

[1] Microsoft has produced 393 pages of document retention guidelines in various areas, such as Corporate, Finance, Human Resources, Legal, Product Development, Facilities and World Wide Operations. Declaration of Martha J. Dawson ¶ 13, Ex. 1.

> Retaining superfluous electronic information has associated direct and indirect costs and burdens that go well beyond the cost of additional electronic storage. The direct costs include additional disk space, bandwidth, hardware, software, archival systems and the cost of their related media migration requirements and possibly even storage area networks to store such information. The cost of storage alone can be significant. . . .    The indirect costs include the cost of technical staff for maintaining such information [and] the cost of personnel classifying such information. . . .
>
> Managing superfluous information does not merely result in unnecessary costs.  It also drains an organization's limited internal and external human and material resources.  It diverts the organization's internal resources from advancing the organization's principal business objectives of efficiency and productivity.  It diminishes the organization's ability to compete in the marketplace, while unduly increasing the cost of doing business.

*Id*. at 24-25 (footnotes omitted).  These costs underlie one of the Sedona Principles:  "an organization may destroy or delete electronic information when there is no continuing value or need to retain it." *Id.* at 24.

Microsoft's guidelines are fully consistent with these well-recognized principles.  In its motion, Burst has included the following statement of Microsoft's "Document Retention Policy":

> Unless you are instructed otherwise by a member of the legal department or the tax group, you should keep only those documents that are necessary for you to perform your job, or for someone else to perform his or her job.  The documents that are necessary to the performance of your job, or necessary to the performance of someone else's job, will vary from person to person.  You should discuss any questions you have about what you should retain with your manager, and if you continue to have questions, you should contact the docinfo alias.  As a general matter, no email message should be kept for more than six months, unless it is absolutely essential that it be retained longer.

Burst Ex. 14.

Four points should be noted about this policy.  First, it focuses on need:  "keep only those documents that are necessary for you to perform your job."  Second, it specifies a general retention period of six months, unless there is an essential need to keep a document longer.  Third, it tells

Microsoft employees what to do if they have questions: they should ask their managers or send questions to a special e-mail address. Finally, and most importantly, the policy makes it clear up front that precedence must be given to directions received from lawyers: "Unless you are instructed otherwise by a member of the legal department. . . ."

This is a proper and responsible policy. No one can seriously argue otherwise.

Microsoft also recognizes and meets its obligations when faced with litigation. "[W]e had a very clear policy that when we learned of actual or threatened litigation, we would retain all information that we reasonably believed was likely to be relevant to that dispute." Dep. of T. Burt at 42:13-18 (Sept. 8, 2004), Ex. 2.

Microsoft's approach to documents is necessarily "custodian-based." Most documents at Microsoft are maintained by or on behalf of individual employees, rather than in centralized subject-matter files. Thus, when a litigation matter arises, Microsoft seeks to identify those employees – known as "custodians" – who are likely to have documents relevant to the subject matter. Ex. 1 ¶ 3. Depending on the nature of the case, the legal department may take one or more actions: it may copy the employee's documents immediately; it may speak directly with the employee about the need to retain documents; and it may issue a formal directive (sometimes known as a retention order) instructing the employee to preserve relevant categories of documents. Ex. 2 at 97:23-98:8.

It is common for Microsoft to negotiate with its litigation adversaries about who the custodians will be – *i.e.*, whose documents will be searched. In this case, Burst served separate requests for documents and also participated in requests made jointly with three other plaintiffs (Netscape, Sun and Be). Initially, Microsoft identified 66 custodians for Burst's separate requests and 131 custodians

for the joint requests.  Later, in response to Burst's demands, Microsoft agreed to expand the list to 126 custodians for Burst's separate requests and 178 custodians for the joint requests.  Ex. 1 ¶ 11.

In some cases, the parties reach agreements that certain custodian searches will be limited to particular issues.  Here, for instance, Burst has raised allegations about Microsoft's dealings with Intel concerning the Java Media Framework.  In connection with those allegations, the parties agreed on a list of 20 current and former Microsoft employees who would be designated as "Intel" custodians, and their files were reviewed for documents responsive to Burst's requests on that topic.  *Id.*

A similar custodian-based approach was used when Microsoft responded to requests by the Justice Department, both during the Government Case itself and during earlier investigations.  As described more fully below, Microsoft reached agreements about whose documents would be preserved and searched, and on what topics.

Microsoft takes seriously its obligation to preserve documents, and its procedures have resulted in the retention for litigation purposes of a vast amount of information.  Microsoft has preserved 2,800 gigabytes of electronic files (roughly 140,000,000 pages) from more than 2,100 custodians.  *Id.* ¶ 4.  Although at most a tiny percentage of this material could be remotely relevant to any particular lawsuit, Microsoft has preserved the materials nonetheless.  *Id.*; Ex. 2 at 68.

By carefully following these procedures, Microsoft has been able to produce a staggeringly large number of documents to its litigation adversaries.  At last count, Microsoft had provided to Burst 555,801 pages of documents in response to its separate requests and 1,324,810 pages in response to its joint requests.  Ex. 1 ¶ 12.  Microsoft has also made available to Burst more than 4,000,000 pages of documents that were produced in other litigation.  *Id.*

Microsoft has provided to Burst far more documents than were needed even for the Government Case. In terms of the breadth of the issues and what was at stake, the Government Case was much larger than Burst's lawsuit. It was also hard fought. Yet Microsoft produced 348,850 pages in that case,[2] and the Justice Department never claimed that it had improperly destroyed documents or failed to produce materials it was required to save.

## II.    Legal Standards

### A.    Corporations Have No General Obligation to Preserve Documents, and May Discard Materials They Have No Duty to Retain.

The heart of Burst's motion is an attack upon Microsoft's instruction that employees should delete old e-mails if they are not under retention obligations and no longer have a business need to keep them. But that instruction was entirely proper and perfectly ordinary. Absent a specific legal duty to save particular documents, corporations are entitled to discard them without being accused of spoliation. "[I]t is a necessary predicate of the controlling Fourth Circuit decisions that such a duty exists, because, without such an obligation, there would be no wrongdoing in destroying relevant documents." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 286 (E.D. Va. 2001). *See also Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("It goes without saying that a party can be sanctioned for destroying evidence only if he had a duty to preserve it.").

---

[2] Ex. 1 ¶ 6. These documents have been made available to Burst, along with (a) 325,968 pages of materials that Microsoft produced to the DOJ and the FTC in connection with their investigations prior to the Government case, (b) 139,915 pages of documents produced during the remedies phase of the Government Case, and (c) 1,275,665 pages produced to the MDL class action plaintiffs. Microsoft has also offered Burst the productions from a number of other matters, such as *Sun I*, *Sun II*, *Bristol* and *Caldera*. *Id*.

American corporations commonly establish policies and guidelines about the retention and destruction of documents. Many courts – including this one – have recognized that a company implementing a reasonable document retention policy will almost certainly destroy materials that might be relevant to some later-filed litigation. *See* Transcript, May 20, 2004 Hearing at 4-5, Ex. 3. Nevertheless, such policies are proper and legitimate, for there is no general duty to retain documents on the chance that they might be relevant to claims in some future litigation. Of course, when litigation is commenced or known to be imminent, a corporation must make reasonable efforts to preserve potentially relevant evidence.

It would be impractical to promulgate a rule requiring more than this. The *Sedona Principles for Electronic Document Production* provide a glimpse of the staggering costs in resources and labor that would be needed if corporations were required to keep every e-mail that might later become potentially relevant in some future litigation:

> A single large corporation can generate and receive millions of e-mails and electronic files each day. . . . While a few thousand paper documents are enough to fill a file cabinet, a single computer tape or disk drive the size of a small book can hold the equivalent of millions of printed pages. Organizations often accumulate thousands of such tapes as data is stored, transmitted, copied, replicated, backup up, and archived. . . . E-mail users frequently send the same e-mail to many recipients. These recipients, in turn, often forward the message, and so on. At the same time, e-mail software and the systems that are used to transmit the messages automatically create multiple copies as the messages are sent and resent.

*The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production* (Sedona Conference Jan. 2004) at 3 (Compendium Tab G). In *Zubulake* v. *UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003), a trial court asked and then answered this same question:

13

> Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape?  The answer is clearly, "no".  Such a rule would cripple large corporations . . . that are almost always involved in litigation.  As a general rule, then, a party need not preserve all backup tapes even when it reasonably anticipates litigation.

*Id.* at 217 (footnotes omitted).  Burst is thus wrong to imply that the ordinary deletion of e-mail on a fixed schedule is sinister.

### B.     Burst Has the Burden of Showing That Microsoft Had a Duty to Preserve Specific E-Mails at the Time They Were Deleted.

As noted above, the failure to retain a document cannot be "spoliation" unless there was a duty to preserve it at the time.  "This obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

Rather than attempting to meet its burden of proof, Burst sweepingly asserts that Microsoft had a duty to preserve virtually all its documents because "it has been enmeshed in high stakes litigation from 1994 forward."  Motion at 1.  A similar argument was decisively rejected in *Concord Boat Corp. v. Brunswick Corp.*, 1997 U.S. Dist. LEXIS 24068, at *16-17 (E.D. Ark. 1997) (Compendium Tab A):

> Plaintiffs argue that because Defendant was embroiled in various antitrust matters from 1992 to present, Defendant was under a duty to preserve all e-mail relevant to antitrust issues from that date on.

> The Court has several problems with this argument.  First, to hold that a corporation is under a duty to preserve all e-mail potentially relevant to any future litigation would be tantamount to holding that the corporation must preserve all e-mail. . . .  Any corporation the size of Defendant (or even much smaller) is going to be frequently involved in numerous types of litigation.  Whether it be patent, trademark, labor or antitrust suits, the threat of litigation is ever present for large, successful corporations. Arguably, most e-mails, excluding purely personal communications, could fall under the umbrella of "relevant to potential future litigation."

14

The duty to preserve is much more focused. The documents must be "evidence in pending or reasonably foreseeable litigation." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *Ellicott Machine Corp. Int'l v. Jesco Constr. Corp.*, 199 F. Supp. 2d 290, 293 (D. Md. 2002). This test has three dimensions: *When* does the duty attach? *Who* must save documents? *What* must be saved?

Probable litigation. The duty to preserve evidence is triggered only when "litigation is probable or has been commenced." American Bar Association, Civil Discovery Standards, August 1999, Standard No. 10 ("Preservation of Documents"). Thus, "litigation must be probable and not merely possible." 7 James W. Moore, *Moore's Federal Practice* § 37A.11[3][a], at 37A-37 (3d ed. 2003) (Compendium Tab H). The duty to preserve evidence does not arise "if there was merely a potential for litigation." *Lekkas v. Mitsubishi Motors Corp.*, 2002 U.S. Dist. LEXIS 18390, *9 (N.D. Ill. 2002) (Compendium Tab B).

"*Key Players.*" Once the duty to preserve documents arises, a corporation is not expected to tell every employee to hold relevant materials. Rather, the obligation is to notify "the 'key players' in the case." *Zubulake*, 220 F.R.D. at 218.

Evidence. It would, of course, "cripple large corporations" if they had to halt all normal document destruction activities when a lawsuit was filed. *Id.* at 217. *See also Manual for Complex Litigation* (Fourth) § 11.442 (Compendium Tab I) ("A blanket preservation order may be prohibitively expensive and unduly burdensome for parties dependent on computer systems for their day-to-day operations"). Thus, the retention obligations must be tied to the issues in a specific case. As the court stated in *Zubulake*, a litigant "must not destroy unique, relevant evidence that might be useful to an adversary." 220 F.R.D. at 217.

**C.    Burst Has the Burden of Showing That Microsoft Knew It Was Deleting Evidence.**

Burst incorrectly argues, based on cases from the Second Circuit, that an adverse inference instruction may be appropriate if a party was "negligent" in not preserving evidence.  Motion at 38.[3]  In its most recent decision on spoliation, the Fourth Circuit rejected this view, declaring that negligence is not a sufficient basis for granting an adverse inference instruction.  "[S]uch an inference 'cannot be drawn merely from [a party's] negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.'"  *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004), *quoting Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).  *See also Potomac Elec. Power Co. v. Electric Motor Supply, Inc.*, 192 F.R.D. 511, 515 (D. Md. 2000) ("Of course, defendants must first establish that plaintiff knew the evidence was relevant to an issue at trial and that its willful conduct resulted in the destruction of evidence.")[4]  This rejection of a negligence standard was in keeping with the decisions of other Circuits.[5]

---

[3] Burst cites *Residential Funding v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107-08 (2d Cir. 2002), and *Zubulake*, 220 F.R.D. at 220-21.

[4] In *Silvestri,* the Fourth Circuit held that a finding of spoliation requires "conduct 'which abuses the judicial process.'"  271 F.3d at 590 (4th Cir. 2001), *quoting Chambers v. Nasco*, 501 U.S. 32, 45-46 (1991).  The opinion noted that some New York courts had found spoliation in cases where there was negligent destruction of evidence.  *Id.* at 593.  But the Court did not have to decide the point because of the extreme facts in that case:

> Silvestri's attorney knew that the vehicle was the central piece of evidence in his case against General Motors and that he had been reminded that this piece of evidence should be preserved or that General Motors should be notified.  As it turned out,  the vehicle was not preserved, and neither Silvestri nor his attorneys notified General Motors of Silvestri's claim until almost three years after the accident; by then, the evidence had been destroyed by the repair of the vehicle. Whether Silvestri's counsel believed he was securing advantage to his client's case by deliberately remaining silent for three years or

For example, in *Hartford Ins. Co. v. American Automatic Sprinkler Sys., Inc.*, 23 F. Supp. 2d 623 (D. Md. 1998), *aff'd*, 201 F.3d 538 (4th Cir. 2000), a malfunctioning sprinkler system caused extensive flood damage to a motel. The sprinkler company, American, was called in to make repairs and it removed the damaged pipe, which it then discarded. The motel's insurer, Hartford, subsequently sued American. When it learned that the damaged pipe had been thrown out, Hartford claimed spoliation and sought an adverse inference instruction. Judge Davis refused to give one, finding that American was responsible, at most, for the "negligent loss or destruction of evidence." 23 F. Supp. 2d at 627. He explained:

> Although American is the party responsible for the disappearance of the piping, it is not disputed that [plaintiff's representative] did not make American aware that there might be a lawsuit. Thus, Hartford has not made a *prima facie* showing that American knew or should have known, at the critical time, the "evidence was [or might be] relevant to some issue at [a potential] trial."

*Id.* (brackets in original; *quoting Vodusek*, 71 F.3d at 156).[6]

---

whether he simply ignored his responsibilities through carelessness is not revealed in the record.

*Id.* at 593-594. Thus, in *Silvestri*, the misconduct was either intentional or reckless.

[5] In the Eighth Circuit, for example, "there must be a finding of intentional destruction indicating a desire to suppress the truth." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 747 (8th Cir. 2004); *Morris* v. *Union Pac. R.R.*, 373 F.3d 896, 903 (8th Cir. 2004) (reversing jury verdict because the trial judge improperly gave an adverse inference instruction). Similarly in the Eleventh Circuit: "'Mere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (*quoting* McCormick, *Evidence* § 273 at 660-61 (1972)).

[6] These principles are illustrated by a contrasting pair of recent Eighth Circuit decisions, both involving adverse inference instructions against railroads that had destroyed audio tapes of conversations between crew members. In *Morris*, the Court of Appeals reversed a jury verdict, finding the instruction to be improper because the railroad had not intentionally destroyed a tape that it knew to be evidence; it had merely followed its routine practice of recycling tapes after 90 days. 373 F.3d 896, On the other hand,

Judge Davis's decision illustrates another important principle: a company that is considering litigation ought to notify its adversary of its plan if it wants the adversary to alter its usual retention policies and preserve materials that would otherwise be discarded in the ordinary course. *See also McGinnity v. Metro-North Commuter R.R..*, 183 F.R.D. 58, 61 (D. Conn. 1998) (railroad was "under no duty" to save audio tapes where "[n]o attorney or insurance adjuster requested that defendant retain the tapes"). It is common knowledge – particularly among public companies like Burst and the lawyers who represent them – that many corporations have policies to retain documents for only a limited period of time. Yet, despite its aggressive stance on this motion, Burst never notified Microsoft of its plan to bring suit before filing its complaint in June 2002.

### D.     Burst Has the Burden of Showing It Was Prejudiced by the Loss of Evidence Favorable to Its Position.

Even when courts find that evidence was improperly destroyed, they will not give an adverse inference instruction to the jury unless the movant can show prejudice from the loss of the evidence. *Hartford Ins. Co.*, 23 F. Supp. 2d at 626 ("The application of this rule 'must take into account ... the prejudice suffered by the opposing party'"); *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 288 (E.D. Va. 2001). Any assessment of prejudice involves at least three issues.

*Are there copies of the documents?* Many of Burst's complaints in this case are merely about missing *copies* of documents. For example, Burst has referred to a number of "e-mails that Burst

---

an adverse inference instruction was upheld in *Stevenson*. 354 F.3d 739. The court found "an intent to destroy evidence for the purpose of obstructing or suppressing the truth" because the railroad had "made an immediate effort [after the accident] to preserve other types of evidence but not the voice tape," yet it had been "careful to preserve a voice tape in other cases where the tape proved to be beneficial." *Id.* at 747-48.

maintained but which Microsoft did not." Motion at 34. Yet Burst has its own copy of those e-mails, so any loss of Microsoft's copy did not result in any prejudice.

> _Are the lost documents relevant and important?_ To justify an adverse inference, Burst must do more than show that lost documents would have been _discoverable_; it must show that they were relevant and important. As the Fourth Circuit has pointed out: "To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue at trial and otherwise naturally have been introduced into evidence." _Vodusek v._ _Bayliner Marine Corp._, 71 F.3d 148, 156 (4th Cir. 1995).

> For example, in _Skeete v. McKinsey & Co._, U.S. Dist. LEXIS 9099 (S.D.N.Y. 1993) (Compendium Tab C), the plaintiff in an employment discrimination case had thrown out a number of audio tapes of voicemail messages and conversations with co-workers. Even though she improperly destroyed these materials, the court ruled that an adverse inference instruction was unwarranted because there was no showing that the conversations and messages on the lost tapes were important to the issues in the case. _Id._ at *23.

> _Were the documents favorable to the movant's position?_ Even if important documents were lost, courts do not give adverse inference instructions unless the movant presents a good reason to believe that the missing evidence would have supported its position. "Where, as here, there is no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator, no adverse inference is appropriate." _Turner v. Hudson Transit Lines, Inc._, 142 F.R.D. 68, 77 (S.D.N.Y. 1991). _Accord Zubulake_, 2004 U.S. Dist. LEXIS 13574 at *28 (Compendium Tab D) (adverse inference instruction requires a showing "that the destroyed evidence would have been favorable to the movant"); _Ellicott Machine Corp._, 199 F. Supp. 2d at 294 (denying adverse inference

instruction because movant did not provide good reason to believe lost evidence would have supported its position).  As one court explained:

> The burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the [lost material] would have produced evidence favorable to his cause.

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996) (citations and internal quotations omitted; brackets in original).

This principle is well illustrated by the Eleventh Circuit's decision in *Bashir v. Amtrak*, 119 F.3d 929 (11th Cir. 1997), a wrongful death action brought against a railroad, where plaintiff had the burden of proving that the train was going more than 80 miles per hour at the time of the accident. Three railroad employees testified that the speed was 70 or less, but a tape was missing that had continuously recorded the train's speed.  Obviously this tape might have been critical evidence.  Yet, even though the loss of the tape was "wholly unexplained," the Eleventh Circuit upheld the refusal to give an adverse inference instruction because plaintiff failed to offer any reason to believe the tape would have supported the plaintiff's allegation that the train's speed was above 80.  *Id*. at 932.

<p style="text-align:center">*     *     *</p>

As demonstrated below, Burst cannot satisfy *any* – let alone all – of the requirements for an adverse inference instruction:  (1) that Microsoft had a duty to preserve any lost e-mails at the time they were allegedly deleted, or (2) that Microsoft knew these e-mails would be evidence in litigation, or (3) that the allegedly lost e-mails were important and likely to support Burst's position.  Indeed, Burst has failed to show that any significant e-mails were lost.

### III.    Microsoft Has Satisfied Its Document Preservation Obligations in This Case.

On May 3, 2000, this Court entered Order No. 1 in the MDL proceeding.  That order requires each party to "preserve documents and other records containing information potentially relevant to the subject matter of this litigation."  *See* Burst Ex. 1 ¶ 4(d).[7]  At that point, of course, "this litigation" consisted only of consumer class actions.  Those complaints did not mention Burst in any way, nor did they mention streaming media.  Until Burst filed its complaint on June 18, 2002, Microsoft had no idea that Burst intended to bring a lawsuit.

Microsoft fully complied with both the specific preservation obligations imposed by this Court's Order as well as the more general common-law obligations imposed on all litigants.  Indeed, Burst does not contend that there has been any improper loss of evidence subsequent to the commencement of this action.

### A.    Microsoft Had No Duty to Preserve Burst-Related Documents at the Time the Friedman and Schiefelbein Files Were Deleted.

Burst has moved for an adverse inference jury instruction that "would advise the jury specifically of . . . the loss of Schiefelbein and Friedman e-mails that may have concerned Microsoft's discussions with Burst during 1999 and 2000."  Motion at 50.  Such relief is plainly unwarranted because Microsoft was under no duty to retain copies of their e-mails at the time.

---

[7] The order expressly stated that the parties "may continue routine erasures of computerized data pursuant to existing programs, but they shall (1) immediately notify opposing counsel about such programs and (2) preserve any printouts of such data."  *Id.*  Microsoft complied fully, notifying lead counsel that the "programs at issue concern only back-up tapes created to permit disaster recovery." Information Concerning Routine Re-Use of Back-up Tapes for Services at Microsoft, Ex. 4.  Also, as discussed below, Microsoft never had printouts of the backup tapes or their catalogs, so there were no printouts to preserve.  *See* pages 56-57, *infra*.

The circumstances are not in dispute. William Friedman left Microsoft in September 2000. At the time, his files were not encompassed within any document preservation obligations then in force (and, of course, Microsoft was not on notice of the lawsuit that Burst would file two years later). He had not received any retention notice. Therefore, when he turned in his computer, its drive was wiped clean and the machine was recycled – all in accordance with Microsoft's usual procedures. *See generally* Dep. of C. Stark at 62:1-20 (Oct. 20, 2004), Ex. 5 (normal practice).

William Schiefelbein went on paternity leave in the summer of 2001. Upon his return to work in the fall of 2001, he took on a new job with different responsibilities. At the time, he had not been identified as a custodian in any case and was not under any document retention obligations. Because his old e-mails were irrelevant to his new work, he deleted them. Dep. of W. Schiefelbein at 89:20-91:20 (Sept. 19, 2003), Ex. 6.

Burst does not allege an improper motive in the deletion of these files. It argues, however, that Microsoft should have told Friedman and Schiefelbein to retain their documents about "discussions with Burst during 1999 and 2000" because the Government Case involved "streaming media issues." Motion at 34-36. But when these files were deleted, the trial of the Government Case was over and the record was closed. The complaint in the Government Case never even mentioned streaming media, and although the DOJ had raised narrow issues about Microsoft's interactions with RealNetworks and Apple regarding their media players, it had not made an issue out of streaming media generally. In fact, there had not been a single Request for Production asking for documents generally about streaming media, and Burst had never come up in any way.[8] Ex. 1 ¶ 7. Before bringing that case,

---

[8] Similarly, in the consumer cases pending in this Court, none of the Requests for Production asked for documents about streaming media. *Id.*

the DOJ had served a CID upon Microsoft about its investments in three streaming media companies

(RealNetworks, VXtreme and VDONet), but neither Friedman nor Schiefelbein had anything to do with

those transactions. Indeed, as discussed more fully below (see pages 35-38 *infra*), the DOJ and

Microsoft reached agreement on a list of employees whose documents would be searched in response to

the CID. These men were not on the list.

Burst's argument, in short, rests on an *ipse dixit*: (1) the Government Case had raised

some issues in the "streaming media" area; (2) Friedman and Schiefelbein worked in the "streaming

media" area; ergo (3) Microsoft had a duty to preserve all of their e-mails about "streaming media,"

including their dealings with Burst. This paints with far too broad a brush. As noted earlier, the duty to

preserve is limited to "key players." By no stretch of the imagination were Friedman or Schiefelbein

key players – or even minor players – in the Government Case.[9]

Burst also asserts that in December 2000 (three months after Mr. Friedman left),

Microsoft had a duty to preserve documents because it expected to be sued by Burst. That is not true.

Burst's only support for this claim is the listing of documents on Microsoft's Privilege Log. The

documents that Microsoft withheld reflect its legal counsel's thought process and legal analysis in

evaluating whether or not particular patents were of any interest to the company. Microsoft is frequently

made aware of patents and regularly has its lawyers evaluate such patents to determine if the company

might be interested in licensing them, or should consider design-around strategies, or should be

concerned about litigation. These particular documents are the result of such an analysis of the Burst

---

[9] Burst has also complained about the failure to retain the documents of David del Val, another
Streaming Media Division employee who left the company in 2000. *See* Motion at 34. Like Friedman
and Schiefelbein, however, he was not on the DOJ list and was not involved in any of the antitrust issues
in the Government Case.

patents (but not any threatened litigation by Burst), and are protected from discovery under both the work product doctrine and the attorney-client privilege.

The existence of these documents does not in any way give rise to an implication that Microsoft anticipated imminent litigation with Burst, only that it studied "events that reasonably could result in litigation." *National Union Fire Ins. Co.* v. *Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992). That possibility does not give rise to broad document retention obligations, which (as noted earlier) are triggered only when "litigation is probable or has been commenced." American Bar Association Civil Discovery Standards, August 1999, Standard No. 10 ("Preservation of Documents") (Compendium Tab J). *Cf. Zubalake*, 220 F.R.D. at 217 ("Merely because one or two employees contemplate the possibility [of a lawsuit] does not generally impose a firm-wide duty to preserve."); 7 James Wm. Moore, Moore's Federal Practice, § 37A.11[3][a] at 37A-37 (3d ed. 2003) (Compendium Tab H) (explaining that retention obligations do not arise until a party learns of litigation or potential litigation that is "probable and not merely possible"). Microsoft would be pleased to submit the documents to the Court for *in camera* inspection should the Court wish to confirm that these documents do not show that Microsoft believed litigation was at all imminent or probable.

The decisive fact here is that Burst did not threaten a lawsuit. At the time of the December 2000 meeting between the parties, Burst undoubtedly knew of the November 1999 findings in the Government Case (on which it now relies). Yet Burst did not provide any kind of notice to Microsoft that would have triggered a duty to preserve Burst-related documents. Moreover, it is important to note that nine more months passed before Schiefelbein returned from paternity leave and deleted his old files – yet during all that time there was still no sign whatsoever that Burst was contemplating any suit.

**B.      Burst Has Not Shown Any Prejudice from the Loss of Friedman or Schiefelbein E-Mails.**

Only five pages out of Burst's 50-page brief are devoted to arguing that Burst was prejudiced by the loss of documents, and only two of those pages concern *Burst-related* documents. *See* Motion at 47-49. Burst asks the Court to review its "past briefing" for a list of "numerous, peculiar gaps in Microsoft's internal e-mail coverage concerning Burst." *Id.* at 48. This ploy is disingenuous. For one thing, a "gap" (in Burst's lexicon) is an e-mail that Burst has a copy of but Microsoft does not. By definition, these "gaps" are not lost documents. Furthermore, as Burst knows perfectly well, Microsoft has produced e-mail for nearly all of the Burst–Microsoft "episodes" noted in Burst's earlier motion by fixing a vendor error and adding custodians. Thus, Burst is left with only two examples of claimed prejudice from the loss of documents, and, as explained below, neither is significant or persuasive. Burst has not shown any likelihood that important e-mails are actually missing – let alone that they would have been favorable to Burst.

**1.      There Is a Comprehensive Evidentiary Record of Microsoft's Dealings with Burst.**

On July 22, 2003, Burst filed a "Motion to Compel Microsoft to Search for and Produce Key E-mails." The motion complained that Microsoft had produced relatively few documents about the five "meetings" between the companies and other "exchanges" involving Burst. Subsequently, however, Microsoft took two important steps. First, upon learning that the vendor hired to conduct electronic word searches had made an error that caused certain documents to be overlooked, Microsoft re-examined the files and found a substantial number of additional responsive documents, which were produced to Burst. Second, Microsoft significantly expanded the list of custodians whose files were

searched.  In addition, at Burst's insistence, Microsoft searched backup tapes.  That step – though very

costly – did not yield any additional documents related to Burst.  Ex. 1 ¶ 14.

        All told, Microsoft located and produced more than 180 e-mails about the meetings

between the companies and other exchanges involving Burst.  *See* Chart of E-mails Produced by

Microsoft That Relate to the Burst – Microsoft "Episodes" Previously Identified by Burst ("Chart"), Ex.

7.

- October 1999 meeting between Burst and Microsoft:  21 e-mails produced, including a substantive post-meeting summary evaluating the meeting and Burst's technology.

- December 1999 Streaming Media Conference:  4 e-mails produced, despite the fact that the streaming conference was so busy that the parties never met as scheduled.

- December 1999 Burst ROI White Paper:  7 e-mails produced, including substantive comments on the Burst paper.

- March 2000 discussion between the companies regarding ASF:  4 e-mails produced, including a comprehensive evaluation by Mr. Poole.

- April 2000 discussions between Microsoft and Burst:  5 e-mails produced.

- May 2000 communications regarding WMP 7.0 issues:  16 e-mails produced, including numerous exchanges among Microsoft engineers discussing substantive incompatibility issues.

- June and July 2000 communications concerning third-party N-Cube:  9 e-mails produced relating to the discussions that occurred over a three-day period.

- July 6, 2000 internal Microsoft meeting:  4 documents produced, including handwritten notes and analyses.

- August 2000 communications with Burst:  3 e-mails produced.

- October and November 2000 communications with Burst regarding third-party SBC:  4 e-mails produced.

- November 2000 Approach Report:  3 e-mails produced, each of which suggests that none of the involved Microsoft employees had time to review the document.

- <u>November 17, 2000 meeting between Microsoft and Burst</u>: 25 e-mails produced, including a number of substantive comments both preceding and following the meeting.

- <u>November 21, 2000 internal Microsoft "meeting"</u>: 13 e-mails produced.

- <u>December 1, 2000 internal Microsoft meeting</u>: 14 e-mails produced, including a summary of discussions between the companies.

- <u>December 6, 2000 meeting between Microsoft and Burst</u>: 30 e-mails produced, including a privileged summary of the meeting (redacted) and numerous substantive comments from various employees.

- <u>February 2001 correspondence concerning third-party UGC</u>: 6 e-mails produced, including Mr. Poole's substantive analysis and recommendations.

- <u>January through March 2001 discussions between Microsoft and Burst</u>: 16 e-mails produced, including a number of messages summarizing Microsoft's substantive evaluation of Burst.

Microsoft's production of these e-mails to Burst – years after they were created and distributed – proves the falsity of Burst's reckless assertion that Microsoft adopted "institutional policies ensuring that e-mails and other key documents, including those of direct importance to this case, would be destroyed." *See* Motion at 1. Every one of these documents was more than a year old when Burst brought suit.

### 2. Burst Has Not Shown That Significant Burst-Related E-mails Are Missing or Any Likelihood That Such E-Mails Would Have Supported Burst's Position.

In its current motion, Burst has tried to offer examples of lost Burst-related documents. It has managed to come up with only two possibilities. In neither case has Burst shown that any e-mails are actually missing, let alone offered any good reason to believe that the hypothetical documents would have supported its position in this action.

**The October 1999 Meeting.**  Burst's first example concerns an October 1999 meeting during which Burst presented its technology to several Microsoft employees.  As noted above, Microsoft has produced 21 e-mails concerning this meeting.  *See* Ex. 7.  Among the documents produced by Microsoft was a memorandum by Bret O'Rourke, a Microsoft engineer who attended the October 1999 meeting.  In scathing language, the O'Rourke memo set forth the collective view of the Microsoft team:

> Our assessment is that the [Burst] technology will not work in most environments
> and for most scenarios that customers require. . . .  [W]e are very hesitant to do
> [*sic*] integrate, use, or license their technology. . . .  Burstware is lacking in so
> many areas – it's for on-demand content only, there's no
> authentication/authorization, they don't handle any kind of playlists or metafiles,
> they don't support MBR, etc, etc.

Burst Ex. 44.  In contrast, Burst's Vice President of Marketing attended this meeting and took notes, but Burst destroyed them in November 2000.  Dep. of M. Moskowitz at 23, 48-49 (Oct. 10, 2003), Ex. 8.

Burst's only complaint is that "Microsoft's documents reflect no e-mail *response* to the [O'Rourke] memo."  Motion at 49 (emphasis added).  But there was no reason for any response to be written.  The O'Rourke evaluation – which was consistent with the poor reception Burst's technology received in the market – was hardly cause for others to devote more time discussing Burst's technology.  There is simply no evidence that Friedman, Schiefelbein or anyone else replied to the O'Rourke memo.  Moreover, if any responses existed, they most likely would have gone to a large number of people (just as the O'Rourke memo did), and those e-mails would not have been lost simply by the deletion of copies on the two computers.  The fact that Microsoft produced 21 e-mails relating to this meeting shows that Friedman and Schiefelbein did not have the only copies of such documents, and confirms the absence of any policy or program to delete documents related to Burst or the meeting.

Beyond that, there is no reason to believe that any hypothetical e-mail responding to O'Rourke's devastating memo would have been favorable to Burst. Burst has failed entirely to meet its burden.

**The July 6, 2000 Meeting**. Although Burst does not disclose this fact, the July 6 meeting referred to in its motion was not between Burst and Microsoft; it was an internal Microsoft meeting. Four Microsoft documents concerning this meeting were produced, including both typed and handwritten notes. *See* Ex. 7; Burst Ex. 34. Burst characterizes this meeting as a "debate," and finds it inconceivable "that Messrs. Friedman and Schiefelbein and others did not debate these issues in their e-mails." Motion at 49-50. But Mr. Friedman did not even attend the meeting (Dep. of W. Friedman at 18:19-20:7 (Dec. 2, 2003), Ex. 9), and there is no evidence – as opposed to speculation – that he or Schiefelbein discussed these issues in follow-up e-mails. Burst has failed to meet its burden of presenting "concrete evidence rather than a fertile imagination" that any e-mails were lost or that they would have been "favorable to [its] cause." *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996).

C.     **Microsoft Has Been Prejudiced by Burst's Extensive Destruction of Important Documents.**

The relief that Burst has sought in its motion – an instruction to the jury that it may draw adverse inferences about the content of lost evidence – is given "for the purpose of leveling the evidentiary playing field." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Potomac Elec. Power Co. v. Electric Motor Supply, Inc.*, 192 F.R.D. 511, 514 (D. Md. 2000). In this case, the playing field is not level; it is tilted *against* Microsoft because of Burst's destruction of key evidence.

29

By November 2000, Burst had decided to adopt litigation as a business strategy, although its initial target at the time was RealNetworks, not Microsoft.  On November 1, 2000, Burst's Board of Directors met.  The "RealNetworks Status Report" in the Board minutes includes a resolution that "authorizes management to work with [the law firm of] Brown & Bain, P.A. to pursue measures necessary to protect the Company's intellectual property against infringement."  BUR5131721-1724, Ex. 10.  A week later, the Board was presented with the following proposal:

> **Proposal**  Engage a banker to package and help shop Burst to the Internet media community. . . .  Make the sale more provocative by filing an infringement suit against Real Networks as soon as possible. . . .  The infringement suit will focus the street on Burst's value and Real's vulnerability.  Real will be motivated to come to the table, while Real competitors will potentially be motivated to keep the transaction away from Real.
>
> **Recommendation**  . . .  Proceed immediately with the Real litigation process.

BUR5131713-1720, at 1718, Ex. 11.

At the same meeting, the Board approved management's plan to lay off all non-essential employees.  Yet, despite the company's financial straits, Burst then retained Richard Lang, at an annual salary of $240,000, to "Manage IP and litigation."  *Id.* at BUR5131715.

Later that month, Burst terminated more than fifty employees, including its Chief Technology Officer and nearly all of its software engineers, as well as the entire Business Development department and the overwhelming majority of its sales staff.  BUR0027225-234, Ex. 12.  Their computers were "wiped clean" and, with limited exceptions, any hard-copy documents they left behind were "discarded."  Dep. of R. Lang at 35-36 (Nov. 24, 2003), Ex. 13.

It is, to say the least, incongruous for Burst to be complaining that Microsoft recycled William Friedman's computer in September 2000, when Burst itself erased the computers of more than

fifty employees in November 2000 – at the very time that Burst was embarking on a litigation strategy to "focus the street's attention on Burst's value."

Burst also "wiped clean" the server on which its "Goldmine" customer relationship management database resided. Dep. of E. Walters at 212-15 (Sept. 23, 2004), Ex. 14. Copies of the Goldmine database had also resided on the hard drive of each individual who had access to it, but every one of those copies was also destroyed. *Id.* at 41, 89, 91-93. The database had tracked "what customers had to say about the product." *Id.* at 127. It had included, among other things, evaluations by Burst's customers (and potential customers) of Burstware and complaints they may have voiced about its products and services. *Id.* at 41-42, 49. As shown below, this conduct by Burst deprived Microsoft of important evidence that not only would have been highly relevant, but that likely would have contradicted Burst's claims in this action.

**The Intel JMF Player Allegation.** Burst's principal remaining antitrust claim is that Microsoft "coerced" Intel to halt development of its implementation of the JMF Player. Burst claims it was injured by this action because it then had to work with a different implementation of the JMF Player being developed by Sun and IBM, which allegedly did not work as well with Burst's software. First Am. & Supplemental Compl. ¶ 71, Ex. 15. Yet Burst failed to preserve the documents of its own engineers, several of whom tested and worked with both versions of the JMF Player.

Indeed, the surviving documentary evidence from Burst is flatly inconsistent with its current claim. On March 27, 1998, Burst's Chief Technology Officer, Kyle Faulkner, sent an e-mail to the CEO giving his "impression that the Sun implementation of JMF *may be better suited for us* and may be ahead of the Intel implementation." BUR0024583-84, Ex. 16 (emphasis added). He went on to say: "We in engineering are going to be looking into this and doing some comparisons." *Id.* Although

31

Burst has not produced these engineering comparisons of the Sun and Intel JMF implementations –

presumably because they were destroyed – it later praised the Sun JMF in a press release: "Sun

Microsystems' Java Media Framework Rates High in IVT Burstware Debut."  BUR5050709-10, Ex. 17.

       From the standpoint of the "evidentiary playing field," the contrast is stark.  Microsoft

produced its technical evaluations of Burst's technology.  Burst, by contrast, did *not* produce its

engineering evaluations of the JMF Players, although the surrounding evidence – both the Chief

Technology Officer's assessments before the tests were conducted and the press release afterwards –

indicate that such evidence probably would have refuted Burst's position in this suit.

       **The WMP 7.0 Incompatibility Claim**.  Another Burst allegation is its claim of being

injured by incompatibility problems when Microsoft upgraded its Windows Media Player ("WMP")

from version 6.4 to version 7.0.  Burst asserts "that by making WMP 7.0 incompatible with the Burst

bridge, . . . Microsoft made it largely impossible for Burst to succeed in its efforts to sell its products or

obtain revenue from them, and was the major impediment to Burst making sales or obtaining revenues

from that point forward."  Burst's Third Supplemental Resp. to Fourth Set of Interrogs. Propounded by

Microsoft at 4, Ex. 18.  The surviving documentation, however, contradicts this assertion and indicates

that Burst quickly overcame any incompatibility issues.[10]  But the likely best evidence on this point – the

files of the Burst engineers who worked on the problem – has been destroyed.

       **Burst's Lost Sales Claims**.  Burst claims that it might have lost business from more than

60 companies as a result of Microsoft's conduct.  *Id.* at 11-13.  Yet, having destroyed its Goldmine

---

[10] An e-mail dated August 26, 2000, reports that "the current Burstware plug-in" has a "limitation around ASF" files delivered to WMP 7.0; but also states that a new release is available that "works perfectly with current Burstserver software, to deliver ASF (and WMA) to WMP-7."  BUR0076631-32, Ex. 19.

customer database and the files of its sales force, Burst has little contemporaneous documentation showing why these companies chose not to purchase from Burst. If it were true that the WMP 7.0 incompatibility problem was a "major impediment" to sales, then complaints about that problem would have been found in the Goldmine database and in the sales files. But the relatively small number of surviving e-mails on the subject suggest that Burst lost customers for reasons entirely unrelated to Microsoft's conduct.[11]

In short, an instruction against Microsoft certainly cannot be justified based on the two factors that the Court "must take into account," namely, "the blameworthiness of the offending party and the prejudice suffered by the opposing party." *See Hartford Ins. Co. v. American Automatic Sprinkler Sys., Inc.*, 23 F. Supp. 2d 623, 626 (D. Md. 1998), *aff'd*, 201 F.3d 538 (4th Cir. 2000). The recycling of Mr. Friedman's computer and the deletion of Mr. Schiefelbein's files plainly had nothing to do with the prospect of litigation, and do not warrant an "adverse inference about a party's consciousness of the weakness of his case." *Vodusek*, 71 F.3d at 156. The same cannot be said about Burst's mass destruction of engineering and sales files shortly after its Board of Directors charted a course toward litigation.[12]

---

[11] For example, a Burst document reports that Fusion.com ended its relationship because Burst's software "won't work in Netscape; Inconsistent ability to download plug-in by web visitors (especially their investors); No Mac Player; Inability to play media after plug-in download." BUR0093562-63, Ex. 20. Another allegedly lost customer listed by Burst, Worldscapes Media, discontinued its contract with Burst because it went out of business. BUR0084829, Ex. 21. A third customer, Primestream, paid only one-tenth of the purchase price for Burstware because Burst had not completed the eight conditions that Primestream had imposed on Burst – at a time before WMP 7.0 had even been deployed. Dep. of C. Lisman at 18-22, 99 (Jan. 8, 2004), Ex. 22; BUR5004731-32, Ex. 23.

[12] Microsoft reserves its right to move for a spoliation instruction against Burst at the proper time, after the parties know what issues will actually be tried.

IV.   **Microsoft Satisfied Its Document Preservation Obligations in Earlier Proceedings, Including the Government Case.**

The second branch of Burst's motion is a request for an adverse inference instruction (and an order precluding former Microsoft employee Eric Engstrom from testifying) because of the alleged "loss of Engstrom, Phillips and Gates e-mail on the subject of communications with Intel regarding its Java multimedia efforts."[13]  Motion at 50.  Before considering the details of Burst's claims, the Court should put them in perspective.  All of these allegations relate to litigation conduct that predates not only Burst's filing but any part of this MDL proceeding.  To the extent that Microsoft had any document retention obligations at that time, they arose from the Government Case.  And all of the evidence that Burst points to in its effort to prove an alleged "loss of Engstrom, Phillips and Gates e-mail" came from depositions that the DOJ took in the Government Case.

Therefore, it is highly significant – indeed, it should be dispositive – that the DOJ never claimed that Microsoft failed to comply with its preservation obligations.  Because the DOJ had no objection, and because it did not ask Microsoft to produce or preserve additional documents from particular custodians, Burst (which was never a party to those proceedings) should not be allowed to ask this Court for sanctions based on Microsoft's response to the Government Case and the CID.[14]  Litigants

---

[13] The Court should note the shift by Burst from its specific allegation concerning the Java Media Framework, to the much more general reference here to "Java multimedia efforts."  Burst hopes that if it can demonstrate that Microsoft had a duty to preserve documents concerning certain issues related to Java and "multimedia," then this would somehow translate into a duty to retain documents concerning the Java Media Framework project at Intel, even though that project was never the focus of any claim in any prior case.

[14] Microsoft does not question this Court's authority to grant relief where warranted to level the evidentiary playing field.  But Microsoft is not aware of any authority that would allow one court to entertain a motion for sanctions based on alleged failures to preserve evidence during proceedings before another court, especially where the adverse litigant in the earlier case (1) negotiated the scope of document obligations, (2) knew that the particular documents were not being retained, and (3) did not

frequently reach agreements regarding the scope of discovery. It would be counterproductive to the efficient management of litigation to permit second-guessing years later by other litigants.

A.     **Microsoft Complied with Its RealNetworks and "Streaming Media" Production and Retention Obligations.**

Burst argues that Microsoft improperly failed to produce documents from the files of Eric Engstrom and Chris Phillips when the DOJ was investigating Microsoft's dealings with RealNetworks. *See* Motion at 29-34. It is puzzling why Burst is raising this subject, for although it once alleged a conspiracy between Microsoft and RealNetworks, it has now dropped that claim from its amended complaint. In any event, Burst's allegations are unfounded.

On August 8, 1997, the DOJ served a CID on Microsoft concerning its acquisition of VXtreme and its investments in two other streaming media companies, RealNetworks and VDONet. The record demonstrates that Microsoft cooperated with the DOJ, and the DOJ never contended otherwise. The parties negotiated the scope of what Microsoft was obligated to retain and produce, and Microsoft complied fully with its agreement, producing approximately 29,000 pages of documents in response. Ex. 1 ¶ 5.

Burst now insinuates that Microsoft concealed from the DOJ the involvement of Messrs. Engstrom and Phillips in matters relevant to the CID. As a result, Burst argues, the DOJ never asked for their documents relating to RealNetworks and streaming media, which in turn meant that Engstrom's and Phillips' documents were not available when Burst sued five years later.

It is absurd to suggest that Microsoft hid these two witnesses (and their files) from the Department of Justice. The truth is that, as is commonly the case with CIDs, Microsoft negotiated with

---

object.

the DOJ over its obligations. Within days of being served, Microsoft made an initial production of documents so that the DOJ could (in its words) "evaluate whether the scope of the CIDs can be narrowed," thereby "eliminating any unnecessary burden on Microsoft that might have inadvertently been imposed by the CIDs." MS-CC-BU 9001705-1707, at 1706, Ex. 24. In addition to providing these initial documents on an expedited basis, Microsoft answered an interrogatory asking it to identify "who was directly involved in the decision to invest in, or the negotiations with" RealNetworks leading to the July 1997 contract. MS-CC-Bu 9001444-1447, at 1445, Ex. 25. Microsoft answered the interrogatory by identifying nine individuals who were directly involved. *Id.* Neither Engstrom nor Phillips was on that list because their involvement was not as direct or significant as the work of the nine people listed.

On September 9, 1997, after reviewing Microsoft's initial production of documents and the information it possessed from other sources, the DOJ identified eleven additional Microsoft employees whom it thought might possess information responsive to the CID. Eric Engstrom was on the DOJ list; Chris Phillips was not. Microsoft agreed to describe the involvement of each person, and the DOJ, in turn, agreed to consider eliminating them, if appropriate, "from the group of persons whose files must be searched." MS-CC-BU 9001672-1676, at 1675, Ex. 26. On October 6, 1997, the DOJ "agreed to modify a number of document requests in the . . . CID, in an effort to reduce unnecessary duplication and burden, as well as to better conform the CIDs to the scope of the investigation." MS-CC-BU 9001650-1655, at 1652, Ex. 27. The DOJ also agreed "to a substantial narrowing of the search group, with the obligation to search other [custodians] deferred." *Id* at MS-CC-Bu 9001655.

Ultimately, the parties agreed as follows: the Justice Department provided three lists of Microsoft employees, which it referred to as Priority 1, Priority 2 and Priority 3. The DOJ classified Mr. Engstrom as Priority 3 and did not list Mr. Phillips at all. MS-CC-BU 9001640-1643, at 1641-1642, Ex.

28. Microsoft committed to search the files of the Priority 1 employees by an agreed-upon date, and the DOJ said it would "set return dates for the 'Priority 2' and 'Priority 3' search group documents after the Department has evaluated the extent to which we must require Microsoft to make further productions." MS-CC-BU 9001608-1610, at 1609, Ex. 29. After it received the Priority 1 documents, the Department never asked Microsoft to conduct the Priority 2 and Priority 3 searches. However, as noted below, Microsoft did collect thousands of documents from Engstrom and Phillips during the Government Case, and it has preserved all of them.

Burst is plainly wrong in asserting that the DOJ excluded Phillips and Engstrom simply because they were not listed in Microsoft's interrogatory answers. The Department had received Microsoft's documents (and presumably also RealNetworks' documents). As the DOJ stated in its letter to Microsoft, the agreement to "limit the search obligation" reflected what the Department had learned from Microsoft as well as "other information available to the Department." Ex. 28 at MS-CC-BU 9001641.

The Justice Department's decision to limit the CID made perfect sense. Although Burst asserts that Mr. Engstrom "negotiated directly with RealNetworks" (Motion at 30), the evidence Burst cites does not support this assertion. Mr. Engstrom testified that he was "involved in negotiations over technical matters with folks from RealNetworks," but had "zero" involvement in negotiating the deal. Dep. of E. Engstrom at 143, 146 (Sept. 30, 2004), Ex. 30. "What Chris Phillips and I were working on was the technology piece that we were still involved in, not the terms of the agreement." *Id.* at 144:1-5. He testified that a more senior Microsoft executive negotiated the contract in question "without talking to me." *Id.* at 121:10-11. Mr. Phillips (who worked for Engstrom at the time) testified that the meeting he attended with RealNetworks was an "introduction and relationship building" session. Dep. of C.

Phillips at 14:14-15:19, 18:23-19:12 (Sept. 28, 2004), Ex. 31.  Mr. Phillips confirmed that neither he nor Mr. Engstrom had responsibility for completing the deal that was later entered into with RealNetworks. *Id.* at 27:4-23, 100:5-13.

In sum, Microsoft complied with its obligations to provide the DOJ with the RealNetworks and streaming media documents requested in the CID.  From its review of those documents, the DOJ was well aware of Engstrom and Phillips, and never asked for additional documents from their files at that time.

### B.    Microsoft Complied with Its Document Obligations in the Government Case.

On May 18, 1998, the Department of Justice and 20 States brought the "Government Case" against Microsoft.  The court did not issue any document preservation orders.  Discovery was extremely expedited.  Microsoft searched the documents of 167 custodians in order to respond to the Government's requests.  Ex. 1 ¶ 6.  The trial was initially scheduled for September 1998 and it actually began in October 1998, just five months after the case had been filed.  Although there were some disputes about the scope of document production, the Government never claimed that Microsoft failed to meet its obligations to preserve or produce documents.

One particular discovery issue should be noted.  In August 1998, the DOJ served its Third Joint Request for Production of Documents.  Request No. 2 asked for "documents relating to any meetings or communications between Paul Maritz or Bill Gates and any representative of Intel Corporation that took place between January 1, 1995 and December 31, 1997."  Request No. 4 sought "documents relating to any meetings or communications between Eric Engstrom or Chris Phillips of Microsoft and any representative of Apple Computer, Inc. that occurred between January 1, 1996 and August 14, 1998."  *See United States v. Microsoft Corp.*, 1998 WL 614660, *1 (D.D.C. Sept. 2, 1998)

(Compendium Tab E).  Microsoft objected to these requests as going well beyond the scope of the

pleadings.  The court, however, ordered Microsoft to produce the requested documents.  *Id.*  Microsoft

did so.

       Thus, Microsoft produced to the DOJ (and has since produced to Burst) all e-mails and

other documents it found following a reasonable search regarding the meetings and communications that

Mr. Gates or Mr. Maritz had with Intel (on any subject) during the period at issue.

       Microsoft also gathered documents from the files of Mr. Engstrom and Mr. Phillips.  This

occurred during August 1998.  Although Microsoft collected many thousands of documents from each,

only a small number were responsive to the requests and produced to the DOJ.  All of them were

preserved, however, and all of them were searched in responding to Burst's requests in this case.  Ex. 1

at ¶¶ 9-10.

       Mr. Engstrom testified during the trial of the Government Case.  The DOJ also took the

depositions of both Mr. Phillips and Mr. Gates.

### C.    Burst Has Not Shown That Any Evidence in *This* Case Was Lost Due to a Failure by Microsoft to Meet Obligations in *Earlier* Cases.

#### 1.    There Is a Robust Evidentiary Record of Microsoft's Dealings with Intel.

       In its complaint, Burst alleges that "[b]y late 1997, Microsoft had reached an agreement

with Intel whereby Intel would phase out its support for its Java Media Framework."  Ex. 15 ¶ 67.  Burst

has had a full opportunity to take discovery about this allegation.  It had access to every single document

that Microsoft produced to the DOJ, either in the Government case or in the prior investigations.  But

that was not all.  For this case, Microsoft began by searching the files of approximately 100 custodians

for documents bearing on the Intel claim.  This search included all the documents that were collected

from Messrs. Engstrom, Phillips and Gates in the Government Case. Then, when Burst objected that this was not enough, Microsoft and Burst agreed upon a list of 20 additional current and former Microsoft employees, and their documents were also searched specifically for documents pertaining to Burst's Intel allegations. Ex. 1 ¶ 11. All told, Microsoft has produced to Burst more than 3,600 Intel-related documents (not pages). *Id.*

Beyond that, Intel produced its own documents in response to subpoenas from both Burst and Microsoft. Burst deposed a number of Microsoft witnesses about its theory, including Mr. Gates, Mr. Engstrom and Mr. Phillips. Burst also took the depositions of Doug Sommer and Greg Eastman, the key Intel witnesses involved in the Java Media Framework program.

The Intel witnesses demolished Burst's theory about the reason why Intel stopped work on its implementation of the Java Media Framework. ███████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████



Thus, there is a robust evidentiary record regarding Microsoft's dealings with Intel in connection with its Java Media Framework program – both from Intel's side and from Microsoft's side.

### 2.    Burst Has Not Shown That Any E-Mails Are Missing.

Burst has not shown that any documents on this topic are missing.  In fact, its amended complaint quotes an e-mail to Intel written by Mr. Gates and another e-mail by Mr. Engstrom.  Ex. 15 ¶¶ 68, 72.  Furthermore, Burst affirmatively states that its allegations are supported by "Microsoft's internal documents and deposition testimony."  *Id*. ¶ 72.  Burst's speculation about missing e-mails is based entirely on a few snippets of deposition testimony in the Government Case suggesting that some e-mails (on subjects unspecified) may have been deleted *before the Government Case had even been brought*. The testimony falls far short of showing the loss of any e-mails relevant to this lawsuit, or that there was anything improper about deleting the e-mails at the time any deleting occurred, or that the loss involved anything more than copies of e-mails that were saved elsewhere and produced.

**Mr. Engstrom.**  Eric Engstrom left Microsoft in November 1999.  He now runs a company making Linux-based cell-phones.  At the time he left, he was not under any document retention orders, and so his computer was recycled and any e-mail stored on his computer was deleted.

There is no basis for Burst's claim that Mr. Engstrom should have been under document retention orders in November 1999. By then, thousands of his documents had been collected and preserved; the documents requested by the DOJ had been produced; Mr. Engstrom had already testified; the trial had ended; the record had been closed; and the District Court had entered its Findings of Fact.

Moreover, Microsoft had no reason to retain documents on the specific subject cited by Burst: communications with Intel about its Java Media Framework program. That topic was never raised as an issue in the Government Case or any other proceeding. The Government had not requested any documents on this topic or given Microsoft any reason to believe that Intel's JMF program was relevant to the case. Ex. 1 ¶ 8.

Nevertheless, in August 1998, Microsoft collected and preserved 7,780 documents (not pages) from Mr. Engstrom, with dates ranging from June 1996 through August 1998. Ex. 1 ¶ 9. It is true that the DOJ's document request referred to Mr. Engstrom's dealings with Apple, and 109 pages of his documents were responsive to that request. But Microsoft preserved all 7,780 documents and has in fact produced to Burst 1,393 pages from Mr. Engstrom's files. *Id.*

Burst also speculates that some of Mr. Engstrom's e-mails might have been lost *before* his documents were collected and preserved in the Government Case. Burst cites a statement he made about deleting "mail that is two months old on a regular basis." Burst Ex. 2 at 18. Regardless of what Mr. Engstrom's general practice may have been,[15] it does not appear that he deleted e-mail about his dealings with Intel. As noted earlier, Burst quoted one such e-mail in its complaint. And in an earlier motion, Burst attached a chain of correspondence between Mr. Engstrom and Intel's Barbara Dawson,

---

[15] As Burst points out, Mr. Engstrom testified in this case that he generally saved his e-mails. Burst Ex. 2 at 14-18.

which specifically concerned the JMF (though it does not support Burst's theory).  *See* Burst.com Inc.'s

Motion to Compel Microsoft to Produce Documents Relating to Its Document Preservation Policy and

Practice at 17-18, Ex. 34 to Preservation Policy (collectively Microsoft Ex. 34).

In any event, at the time in question, Mr. Engstrom would not have been breaching any

document preservation obligation if he had deleted e-mails.  According to Burst, "[i]n late 1997, Eric

Engstrom 'did a deal' with Intel."  Motion at 45.  In late 1997, the Government Case had not been

brought and the DOJ had never told Microsoft that its dealings with Intel might be an issue in litigation.

As noted above (*see* page 38), Microsoft's dealings with Intel (on any subject) did not become an issue

until August 1998, when the DOJ first served a discovery request on this topic.  Thus, the DOJ had no

basis to object – and did not object – when Mr. Engstrom made the statements (now quoted by Burst)

about deleting e-mails.

**Mr. Phillips.**  Burst's motion does not claim that Chris Phillips had anything to do with

the subject matter on which it is seeking an adverse inference:  "communications with Intel regarding its

Java multimedia efforts."  *See* Motion at 50.  In fact, Burst's deposition of Mr. Phillips established the

contrary.[16]  Rather, Burst claims that he was a key player in Microsoft's negotiations with

---

[16]    Q. Were you involved in any discussions with Intel representatives wherein Microsoft asked
         Intel to stop its work on JMF?
       A. No.
        Q. Were you aware of any threats that Microsoft made to Intel to persuade Intel to drop JMF?
       A. No.
       Q. Did Eric Engstrom do a deal with Intel with regard to Intel dropping support for JMF?
       [Objection]
       A. I'm not aware of any deals.
       Q. Certainly none that you negotiated?
       A. No.

Ex. 31 at 129:5-19.  Burst asked no further questions of Mr. Phillips on this topic.

RealNetworks. But as pointed out above (*see* page 37), Phillips did not have a significant role in the transaction with RealNetworks that was the subject of the CID, and the Justice Department – after having read the documents – did not even ask Microsoft to search his files in response to the CID.

During the Government Case, Microsoft designated Mr. Phillips as a custodian, and it collected and preserved his documents in August 1998. His files were searched again in 2003 for the MDL cases. All told, Microsoft collected and preserved 7,588 of Mr. Phillips' documents from the period 1995-1998. Ex. 1 ¶ 10.

Burst cites Mr. Phillips' testimony that "if I'm not on retention then yes, I mass-delete" e-mails. Burst Ex. 18 at 119. But he also testified – in the very next sentence, which Burst omits from its quotation – that he was under retention in the Government Case. *Id*. Plainly he did not "mass-delete" his e-mails from the time in question; that is why Microsoft was able to collect and preserve 7,588 documents from his files.

**Mr. Gates.** Citing speculative testimony resting only on an "assumption,"[17] Burst contends that a technical assistant may have deleted some of Mr. Gates' e-mails from a backup tape. Even if this occurred – which is questionable – it has no bearing here because it happened during 1996, long before the Government Case was brought.[18] Burst baldly asserts that "if he [Mr. Gates] were not

---

[17] Burst quotes from the December 1998 deposition of Mark Johnson, who stated that two years earlier, in 1996, a technical assistant to Mr. Gates was given a tape of certain files "stored on the server." Dep. of M. Johnson at 42 (Dec. 15, 1998), Ex. 35. Subsequently, the files could not be found on the tape, and Mr. Johnson said he made the "assumption" that the assistant had "[p]robably" erased them. *Id*.

[18] Burst's motion erroneously states that the tapes were lost in "December of 1997." Motion at 28. Perhaps "December 1997" was a typographical error and not a misrepresentation. The deposition that Burst alludes to – in pages omitted from its Exhibit 22 – states clearly that "[t]his happened in December of 1996" and involved backup tapes from 1996. Ex. 35 at 38:12-39:14. Indeed, the last time Burst raised this point, it gave the correct date, "1996." *See* Burst.com, Inc.'s (1) Renewed Motion to Compel Microsoft to Search for and Produce Key E-Mails, Etc., at 9, Ex. 36.

under retention, he should have been." Motion at 29. But Burst cannot identify any case pending in 1996 that required Microsoft to retain or collect Mr. Gates' e-mails about Intel.

In any event, any e-mails from 1996 pre-date this claim. It was not until 1997 that RealNetworks introduced a streaming video player. Ex. 15 ¶ 42. According to Burst, it was not until 1997 that Microsoft adopted a streaming media strategy. *Id.* ¶¶ 43-46. And Burst alleges that in "late 1997, Microsoft had reached an agreement with Intel whereby Intel would phase out its support for its Java Media Framework." *Id.* ¶ 67. Thus, if any e-mails from 1996 were lost, they would not have been pertinent to Burst's allegation.

## V.     Microsoft's E-mail Policies Are Reasonable and Lawful.

### A.     Microsoft's E-mail Retention Schedule Is Reasonable and Lawful.

In its motion, Burst has included the following statement of Microsoft's "Document Retention Policy":

> Unless you are instructed otherwise by a member of the legal department or the tax group, you should keep only those documents that are necessary for you to perform your job, or for someone else to perform his or her job. The documents that are necessary to the performance of your job, or necessary to the performance of someone else's job, will vary from person to person. You should discuss any questions you have about what you should retain with your manager and if you continue to have questions, you should contact the docinfo alias. As a general matter, no email message should be kept for more than six months, unless it is absolutely essential that it be retained longer.

Burst Ex. 14.

Burst asserts, without any evidentiary support whatsoever, that the six-month period is "extraordinarily short" and calls it "a special short-fuse deletion policy for documents." Motion at 42, 14 n.10. Yet its lead lawyer previously told the Court, "if a company had a policy that said we want to

purge our e-mails every 30 days, 60 days or 6 months, in a vacuum that's perfectly innocent." Ex. 3 at 8.

Burst argues that Microsoft should be treated differently because it has "been under document retention orders from 1997 forward." *Id.* at 8. This conflates two separate issues. Of course, Microsoft must comply with its actual retention obligations, and it has done so. But that has nothing to do with how long documents should be kept when such obligations do not apply. Large companies are always involved in litigation and always have obligations to preserve certain documents. That is why retention policies deal with litigation separately. In the above-quoted Microsoft policy, the very first words are: "Unless you are instructed otherwise by a member of the legal department. . ." This policy is proper and ordinary.

Burst focuses on two e-mails from Mr. Allchin in January 2000. In the first, which Burst calls the "Do Not Be Foolish" e-mail, Mr. Allchin told the employees in his group not to archive e-mail. Motion at 13; Burst Ex. 13 at MS-CC-BU 372874. Burst insinuates that this e-mail was a response to the Findings of Fact entered in the Government Case, but the e-mail itself makes clear that it was provoked by the "foolishness" of an employee who "lost 3 years of mail archives" because he let his "file get as large as 2 GB [gigabytes]." *Id.* In any case, Mr. Allchin clarified his directive a few days later in an e-mail to the entire Platform Products Group dated January 28, 2000. This e-mail cited the six-month guideline and attached the previously-quoted "Document Retention Policy," which Mr. Allchin described as the "written 'official policy.'" Burst Ex. 14. He then stated:

> To the best of your ability I would like us to follow the general rule of around 30 days for EMAIL. Some of you may be in unique circumstances that require particular information to be kept for longer than 30 days to do your job effectively. My direction to you is that I want you to think about this issue at least once a month and delete items that are no longer needed, including all your general email. Don't just blindly archive email!

> Also, many of you have received specific instructions from Legal to retain certain documents or email that may be related to pending litigation.  These instructions override the general policy.  You should follow those instructions carefully and ask Legal if you have any questions.

*Id.*

There is nothing wrong with Mr. Allchin's directive to his group.  It leaves no doubt that instructions from "Legal" take precedence.  He implored his people "to think about this issue at least once a month and delete items that are no longer needed."  *Id.*  Even Burst's counsel agreed that there was nothing per se wrong with a 30-day period for keeping unneeded e-mail.  And this Court agreed: "[I]t does not strike me that a company policy of not keeping e-mails after 30 days is necessarily sinister."  Ex. 3 at 5.

In any event, Mr. Allchin's e-mails have nothing to do with the alleged loss of documents that is the basis for Burst's motion.  Engstrom and Phillips were not even working at Microsoft when Mr. Allchin sent these e-mails.  And the directive was not aimed at Mr. Gates (who did not work for Mr. Allchin).  Furthermore, the Allchin e-mails are not the reason why Mr. Friedman's computer was recycled when he left the company; that was standard policy.  Nor was it relevant to Mr. Schiefelbein's decision to delete his old e-mails after he returned from paternity leave.  Had Schiefelbein been following the Allchin policy, he would have deleted the Burst-related e-mail *before* leaving.[19]  Indeed, the difference between these two retention periods – six months or 30 days – has no bearing whatsoever on the relevant Burst-related e-mails because all of them were more than six months old when Burst filed suit in June 2002.

_____

[19] In fact, the Allchin e-mails do not appear to have had any significant impact on e-mail retention.  The average number of e-mails saved did not decrease at all between December 1999 (the month before Allchin's directive) and February 2000 (the month after).  Actually, e-mails were being saved at a higher rate afterwards.  Ex. 1 ¶ 16.

**B.      Microsoft's Backup Tape Policies Are Reasonable and Lawful.**

        **1.      There Is No Duty to Make Backup Tapes of E-Mails; the Failure to *Copy* Is Not *Destruction*.**

The first (and longest) section of Burst's brief is not about the destruction or loss of documents, but only about Microsoft's alleged failure to make backup copies of some e-mails. *See* Motion at 5-12. Most of Burst's factual assertions in this area are false or misleading, but there is a greater fallacy underlying its argument. Burst cannot cite a single decision suggesting that corporations have a duty to make backup copies of their e-mails or other documents.

Although Burst is wrong in claiming that Microsoft had a general policy of not making backup tapes of e-mails, it bears emphasis that such a policy would not violate any document retention obligations. The *failure to make a copy* of a document is not the same thing as the *destruction* of a document. As this Court pointed out: "In terms of this OTG policy, it is not about destruction." Ex. 3 at 4. Corporations are not obligated to make tape copies of their e-mails, just as "[t]here certainly is no requirement that all telephone conversations be taped and the tapes be kept in the ordinary course of business." *Id.* at 4-5 (noting also that e-mails are "in a way more akin to telephone conversations").

Indeed, it is significant that when companies *do* make backup tapes of e-mails, they are generally not required to put a "litigation hold" to prevent the normal recycling of the tapes, even those that contain copies of e-mails relevant to pending litigation. The document preservation order in this case expressly authorizes the parties "to continue routine erasures of computerized data pursuant to existing programs." Burst Ex. 1 ¶ 4(d). If there is no obligation to save backup tapes that already exist, then, *a fortiori*, there is no obligation to create backup tapes in the first place.

### 2.     At Microsoft, It Is Easy to Copy and Preserve E-Mails.

There are two principal e-mail software products that Microsoft uses internally and distributes with great success to customers around the world.  "Outlook" is a part of the "Office" suite of productivity applications that PC users have on their computers.  When Microsoft employees create e-mails, they are using Outlook, and their active e-mails are stored in Outlook.  These e-mails are placed in folders such as "Inbox," "Sent Items" and "Deleted Items."  Users can also create "subfolders" within Outlook, or in separate folders that are stored on their PC or another computer as a "PST" file.

"Exchange" is a server application that distributes, routes and stores e-mail generated by the Outlook client software.  Each user's mailbox is stored on the Exchange server and typically "mirrored" on the local PC.  All Microsoft employees are given a certain amount of e-mail storage space on an Exchange server.  For many, this provides sufficient capacity to store all their e-mails.  *See, e.g.*, Burst Ex. 9 (Microsoft deponent Doug Brown testified that he has generally not been "capacity constrained").

Employees who wanted to keep larger quantities of e-mail (either for longer-term business reasons or because they did not take the time to decide what could be discarded) had other options.  First, they could store a very large amount of old e-mail on their personal computers as "PST" files.  Many Microsoft employees did this.  Dep. of D. Brown at 33:11-19 (Sept. 30, 2003), Ex. 37.  In addition, e-mails could be stored on general-purpose file servers.  A file server is different from an Exchange server.  Dep. of M. Johnson at 12:16-13:10 (April 21, 1998), Ex. 38.  The latter is dedicated to e-mail and, as noted, it not only stores a copy of active e-mails, it also handles routing and distribution.  A file server, by contrast, is designed mainly for storage and it can handle many kinds of files, not just e-mails.

Burst has falsely asserted that the Microsoft's Exchange servers "compelled individual employees to 'auto-delete' e-mail." Motion at 2. In Burst's words, the policy was: "If You Want To Use E-Mail, You Must Auto Delete On Your Exchange Server Account." *Id.* at 21. There is no evidence for this assertion, and Burst does not even bother to explain what "auto delete" actually is.

Microsoft Outlook is designed to prevent unintended deletions of e-mails, not to erase e-mails that the user wants to save. When a person tells the computer to delete an e-mail, nothing is actually removed. Instead, to guard against inadvertent losses, the e-mail is placed in the "Deleted Items" Folder. To remove the e-mail altogether, the user must take a further step, such as clicking the "Empty 'Deleted Items' Folder" button.

The "auto delete" feature is an optional setting in Outlook that (if activated) asks the user, each time he or she logs off, whether the Deleted Files folder should be emptied. When this feature is turned on, the only e-mails deleted are those that the user has previously selected for deletion.[20] Contrary to Burst's assertion, Microsoft never "compelled" employees to turn on the auto delete setting.[21] Each employee could decide whether to turn the auto delete setting on or off. *See, e.g.*, Burst

---

[20] This standard feature of Outlook is very different from the automatic deletion system described in *United States v. Philip Morris USA, Inc.*, 327 F. Supp.2d 21 (D.D.C. 2004). In that case, Philip Morris evidently had a program that deleted every e-mail "which was over sixty days old, on a monthly systemwide basis for a period of at least two years." *Id.* at 23. By contrast, with Outlook – whether the "auto delete" feature is turned on or off – the only e-mails that are deleted are those that the user chooses to delete on an individual basis.

[21] Burst's sole evidence for its "auto delete" assertions is the deposition of Doug Brown. When asked, "What's your auto delete option," he answered, "I auto delete every time I exit Outlook." Burst Ex. 9 at 61. Earlier in the deposition, he testified that the 200 megabytes of e-mail storage he has "feels like a lot" and he has not been "capacity constrained." *Id.* at 60-61. He said he had a problem once "when I had my system misconfigured to not purge deleted mail." *Id.* at 61. In other words, the only time Mr. Brown did *not* have enough capacity to store all the e-mail he wanted to save was when the e-mails he *thought* he was deleting were not being removed because the auto-delete feature he wanted to use was mistakenly turned off. Mr. Brown did not refer to any company policy about auto delete.

Ex. 28 at 90:24-91:2 (Engstom did not use auto delete); Ex. 5 at 59:16-18 (Stark does not use auto delete).

3.    **E-Mail Backup Tapes Are Copies of Copies, Which Are Made for Disaster Recovery, Not Information Retrieval.**

Microsoft has a routine practice of making "backup tapes" containing the contents of each of its Exchange servers and many of its file servers. Because Burst has focused so much attention on this issue, it is worth emphasizing what backup tapes are and are not.

First, backup tapes are mere duplicate copies of files residing on a server. "When backup tapes exist to restore electronic files that are lost due to system failures or through disasters such as fires or tornadoes, their contents are, by definition, duplicative of the contents of active computer systems at a specific point in time." *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production* (Sedona Conference Jan. 2004) (Compendium Tab G) at 25. Indeed, for e-mails, these backup tapes are really copies of copies. As noted earlier, the "original" e-mail resides on a server and a "mirrored" copy resides on a PC.

Second, Microsoft's backup tapes are made for "disaster recovery." Ex. 37 at 48:25-49:2. If a server's hard drive crashes or the server itself fails, the backup tape provides a way to restore the server's contents (as of the time of the backup). This fact has been explained to Burst on many occasions, so it is disingenuous for Burst to accuse Microsoft of "not having a retrieval system that would actually work" – complaining, for example, that the tapes were not well indexed or organized into "subject matter files." Motion at 23, 24. As Burst knows perfectly well, backup tapes are designed for *recovery*; they are not an information *retrieval* system for locating and extracting individual files. This distinction was pointed out by the Sedona Conference:

51

> There is general consensus that regardless of the various capabilities of different
> backup systems, those systems are designed for the purpose of business continuity
> and should not be used as a substitute for records management. While the back-up
> systems can provide critical capabilities to recover data when necessary, those
> capabilities are fundamentally different from what is required for information and
> records management. Moreover, after a relatively short period of time, it is simply
> impractical for back up systems to retrieve efficiently or effectively specific,
> targeted information.

*The Sedona Principles: Best Practices Guidelines & Commentary for Managing Information & Records*

*in the Electronic Age* (Sedona Conference, Sept. 2004 Public Comment Draft) (Compendium Tab F) at

21.

### 4.    The OTG Policy Against Using Centralized Servers for E-Mail Was Not an "E-mail Destruction Policy."

Burst's focus is on the policy of a unit in Microsoft's Operations and Technology Group

("OTG," formerly "ITG").  At the outset, it is important to recognize that OTG's policy of not allowing

e-mails on its file servers applied to only a small fraction of Microsoft's servers.  As of September 2003,

OTG managed 963 centralized file servers, out of many thousands of servers at Microsoft.  Ex. 37 at

127:9-20.

Other Microsoft servers stored e-mails and many were routinely backed up onto tape.  As

noted above, all of the Exchange servers had backup tapes.  Also, the various product units and software

development labs at Microsoft maintained their own file servers, and these were also commonly

available for e-mail; they too were usually subject to tape backup.  Ex. 37 at 173:1-12; Dep. of D.

Brown at 50:1-22 (Sept. 14, 2004), Ex. 39; Dep. of R. Ochs at 9:10-19, 62:19-22 (Oct. 3, 2003), Ex. 40.

For example, the Digital Media Division of Microsoft – the group that dealt with Burst – had a number

of file servers that were used to store various data including e-mails, and those servers were backed up

onto tape.  Ex. 40 at 35:22-36:5, 37:11-15, 73:7-14.  Indeed, at the Court's urging, Microsoft searched a

52

number of backup tapes for e-mail. These searches, which were very costly, did not turn up any additional Burst-related e-mails that had not already been found in the custodian files. Ex. 1 ¶ 14. This fact underscores two points: Microsoft *did* make backup tapes of e-mails – contrary to Burst's assertions about "corporate policy" – and those tapes were merely copies of copies.

**The OTG Policy.** The policy questioned by Burst originated in 1994 when Candace Stark was asked to create a new "centrally managed file service" at Microsoft. Ex. 39 at 33:10-16. Prior to that time, the various product units and software development labs at Microsoft "owned" individual file servers, many of which were located at a data center. In 1994, these existing servers were sent to the product units and labs, and OTG established its own set of file servers, from which it "allocated disk space to Microsoft employees or teams to manage their data." *Id.*; Ex. 5 at 11:16-19. Thereafter, a product unit or lab could rely on its own file servers or else it could use the OTG-managed file servers.

To carry out her mission, Ms. Stark "built a data farm" with "brand new servers." *Id.* at 11:16-19, 18:17. She emphasized "that I didn't take over this service, I built this service." *Id.* at 38:18-19. One of her assigned objectives was "to come up with a strategy to reduce the number of servers" and also to "reduce space in our data center." *Id.* at 12:17-13:21. Ms. Stark therefore established rules about what kinds of files could be stored on the OTG-managed file servers, and she decided to exclude e-mail: "I stated to people they could not store their mail files on my servers." *Id.* at 34:7-8. The record leaves no doubt that this was Ms. Stark's decision:

> Q.   Did anyone ask you to give that instruction to people?
> A.   No.
> Q.   Did you talk to anyone about that instruction before you gave it?
> A.   No.
> Q.   What was your reason for telling people that they should not archive e-mail to your servers?

A.  Just as I stated, this was a shared data storage, data to be shared, so it's Microsoft's business data that groups can share.

Q.  Okay.

A.  You cannot share mail files.

Q.  And so you viewed e-mail as a category of document that shouldn't be saved on your servers at all.

A.  That is correct….

Q.  Okay.  How did you come by your understanding that your servers that you owned and managed were only for collaborative information?

A.  I came up with that decision.

Q.  And when did you come up with that decision?

A.  When I was asked to take on this service or actually build this service offering.

*Id.* at 34:15-36:9.

If a Microsoft employee wanted space on the OTG file servers, he or she would be asked to fill out a form.  The form stated that e-mail files could not be stored on file servers subject to OTG backup.  Ex. 39 at 36:1-2.  Notwithstanding Ms. Stark's rules, some Microsoft employees did in fact use their allotted server space to store e-mail files.  Ex. 37 at 182:11-13 (e-mails found on back-up tapes).

Burst misstates the facts in asserting that this policy was a source of controversy among "unhappy executives," who "continued to complain" about OTG's policy of not allowing e-mail on these servers.  Motion at 9.  The reality, as Ms. Stark testified, is that "no executives" even asked about the policy, let alone complained about it.  Ex. 5 at 41:3-5.  In fact, "it would mostly be lower level employees" who inquired.  Ex. 39 at 44:23-25.  Also, "I wouldn't say [there was] resistance to the policy.  We had individuals that would escalate and ask for further clarification."  Ex. 5 at 46:19-21.  When people asked why Ms. Stark would not allow e-mail on her servers, "she would respond back because it's to save space, we're trying to consolidate from 1,500 servers down to 500 servers, we don't have the space to store these large files.  You have other options."  Ex. 39 at 37:13-20.  She would

explain "that they're perfectly able to save the e-mail on their own servers in their own lab or . . . their hard drive or elsewhere." *Id.* at 36:3-9.

      Thus, Burst is clearly wrong in asserting that "Microsoft told its employees not to save e-mails to corporate servers." Motion at 2. This policy applied only to the relatively small number of file servers managed by Ms. Stark's unit in OTG, not to the Exchange servers or the file servers managed by the product units and labs. It is unfortunate that Burst continues to depict the OTG policy as applicable to all file servers, given that its counsel recently acknowledged the opposite:

> Q.  [By Mr. Hosie:]  So, your archive choices are OTG servers, your own servers, your hard drive?
>
> A.  Other servers in – that the business units have.  Remember we talked about *this policy was just on OTG file servers*, not on the file servers that they owned.
>
> Q.  *I totally understand that*, sir.
>
> A.  So as the consolidated file service took shape, people would get their old server back, so they had the option of saving it on their old server if they wanted to.
>
> Q.  Right.  And Candy's [Ms. Stark's] domain was only the OTG managed servers?
>
> A.  Correct.

Ex. 39 at 36:20-37:9 (emphasis added).

      There is no evidence that OTG decided to exclude e-mails from its centralized service *because* the servers were backed up onto tape. The testimony quoted above shows that the policy was intended to save space and money by limiting the centrally-managed servers to "shared data storage" – *i.e.*, files accessed by multiple users. Ex. 5 at 34:23-25. E-mail files are not shared. Also, it is noteworthy that Ms. Stark's policy was established in 1994, long before the Government Case or any of the events giving rise to the present lawsuit.

      It is also misleading for Burst to claim that "Microsoft policed its do-not-save-emails rule by programming its back-up computers to exclude e-mails." Motion at 2. In the first place, this

"programming" pertained only to the OTG-managed file servers (which were, in fact, sometimes being used to store some e-mail files, notwithstanding the policy). The programming did not apply to the Exchange servers or the other file servers at Microsoft that stored e-mail. Ex. 37 at 8:17-25; Ex. 40 at 7:24-8:14, 12:6-8, 62:19-22. Furthermore, even at OTG, this programming was not implemented until 2003 – long after the events in question. At that time, the backup software used by OTG was configured so that several types of files – not just e-mails – would be excluded from the backup process. Ex. 37 at 48:18-50:15; Ex. 39 at 11:23-12:3.[22]

Finally, Burst is patently wrong in claiming that OTG's policy (or any other aspect of Microsoft's conduct) violated this Court's order. Burst complains that the policy was not "altered in the slightest because of the court's preservation order." Motion at 12. But nothing in the Court's order required Microsoft to change its policy and *begin* allowing e-mails on these particular servers, let alone to start making backup copies of them. Next, Burst complains that "Microsoft did not inform any of the parties to the MDL litigation, or anyone else, about the policy." *Id.* But the order contained no such requirement. It directed Microsoft to inform opposing counsel about "routine erasures of computerized data pursuant to existing programs," and Microsoft did so. Oct. 12, 2000 Ltr. to W. Butterfield from J. Pers; and Sept. 27, 2000 Ltr. to W. Butterfield and D. Furniss from J. Pers, Ex. 41. The order did not direct Microsoft to disclose its policies of *not* allowing e-mails on particular servers. Burst also objects that Microsoft did not preserve the "catalogs" (*i.e.*, the file listings) of the backup tapes. Motion at 27. But the order instructed Microsoft to save any "printouts" of computerized data that it routinely erased.

---

[22] It appears that OTG had planned to configure its software this way in April 2000, but the change was not then made, and it was not until April 2003 that OTG discovered it was still copying e-mails onto backup tapes. Ex. 39 at 9:17-10:15, 22:22-23:1. This sequence of events does not fit Burst's portrait of a company with a strong policy of not making backup tapes of e-mails.

A catalog is not a printout; it is an electronic "binary file" that resides on the server. Ex. 38 at 46:10-17. The Court's order did not require Microsoft to create printouts of server files, only to retain the printouts that already existed.

**"Due to legal issues."** Burst has raised an issue about four words that were added to the OTG policy against storing e-mails on OTG servers: "Due to legal issues." In accordance with the Court's directive, Microsoft has gathered all available information about the origin of this phrase.[23] The investigation confirmed two points.

First, the OTG unit's policy of not allowing e-mail on its servers originated well before the "due to legal issues" language was added. As noted above, Ms. Stark adopted this policy at the time her unit was created in 1994. Ex. 5 at 47:12-48:9.

Second, it was Ms. Stark who made the decision to add this phrase to her form, and there is no indication whatsoever that any lawyers advised her to do this or gave any legal advice on which this language was based. "[N]o legal advice was sought from LCA [the law department] and none was given." Dep. of D. Brown at 47:3-4 (April 21, 2004), Ex. 42. Among the people on Ms. Stark's team, "no one recalls any legal issues per se that prompted that verbiage . . . they put the words in there to add teeth to the policy." *Id.* at 47:18-22. Ms. Stark testified that she added these words after Microsoft's

---

[23] As part of this investigation, Microsoft conducted inquiries of numerous current and former OTG managers and staff, including Candy Stark, Laurie Brown, Mark Johnson, Dan Ulrich, Ron Gann, Joshua Freund, Chris Nelson, Joe McGinn, Adam Bogobowicz, Jason Gregory, Shiloh Cleofe, Josh Toporosky, John Arnold, Calvin Keaton, Sunjeev Pandey, Freddie Sohl, James Prets, and Jeff Albrecht. Ex. 39 at 17:2-18:3, 92:8-94:14. On the legal side, Microsoft asked (1) William Neukom, its General Counsel during the relevant period, (2) lawyers within Microsoft's LCA group who had responsibility for advising OTG during the relevant period, including Kevin Cahill, Muriel Knapp, and Chris Breunig, and (3) lawyers within LCA and Preston Gates & Ellis, Microsoft's outside counsel responsible for advising the company about document retention issues. *Id.* at 94:15-95:13, 102:18-103:19; Ex. 1 ¶ 15. In addition, Microsoft reviewed the litigation servers used by LCA during the relevant timeframe for communications between OTG and LCA regarding backup policies and procedures. Ex. 39 at 90:8-92:7.

General Counsel, William Neukom, circulated an e-mail setting forth the company's document retention policy.  When asked whether she added the "due to legal issues" phrase "because of the Neukom e-mail," she answered: "I wouldn't say it was due to the Neukom e-mail.  I leveraged the Neukom e-mail."  Ex. 5 at 48:5-9.  Ms. Stark testified that "adding the words due to legal issues . . . decreased the push-back" from employees who wanted to store e-mails on her servers.  *Id.* at 49:13-15.

        In any event, as explained earlier, there is nothing wrong with a policy of not making backup tape copies of a company's e-mail.

## CONCLUSION

Burst has made no showing that Microsoft failed to comply with any document retention obligation in this or any other case. It has not shown that any important e-mails are missing. It has not shown that Microsoft destroyed evidence it was obligated to preserve or that Burst has been prejudiced in any manner. And it certainly has not shown any intentional destruction of evidence. In sum, there is no justification for (a) giving the jury an adverse inference instruction, (b) excluding Mr. Engstrom from testifying, or (c) awarding other sanctions.

Respectfully submitted,

December 2, 2004

Charles W. Douglas
Richard A. Cederoth
John W. Treece
David M. Schiffman
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza, 10 South Dearborn
Chicago, Illinois 60603
(312) 853-7000

David B. Tulchin
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

Michael F. Brockmeyer (Fed. Bar No. 02307)
Jeffrey D. Herschman (Fed. Bar No. 00101)
PIPER RUDNICK LLP
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-3000

Thomas W. Burt
Richard J. Wallis
Steven J. Aeschbacher
C. Andrew Culbert
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98502
(425) 936-8080

*Attorneys for Defendant Microsoft Corporation*

59

## CERTIFICATE OF SERVICE

Jeffrey D. Herschman, an attorney, hereby certifies that on December 2, 2004, he caused a true and correct copy of the following documents to be served on counsel for the plaintiff: (1) Microsoft's Memorandum In Opposition To Burst's Motion For Spoliation Instruction, Witness Preclusion, and Related Relief to be served upon the following counsel for the Plaintiff (Public Version); (2) Compendium of Unpublished Authorities and Secondary Sources; (3) Exhibit Index To Microsoft's Memorandum In Opposition To Burst's Motion For Spoliation Instruction, Witness Preclusion, And Related Relief (Public Version); and (4) Exhibits 1-42 (Exhibits 32 and 33 remain under seal).

Spencer Hosie  (via Overnight Delivery)
Bruce J. Wecker
HOSIE, FROST, LARGE & McARTHUR
One Market Spear Street Tower, 22nd Floor
San Francisco, CA  94105


Robert Yorio  (via Overnight Delivery)
Mary A. Wiggins
CARR & FERRELL, LLP
2225 East Bayshore Road
Suite 200
Palo Alto, CA  94303


Jeffrey D. Herschman