# TAB D

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

LAURA ZUBULAKE, Plaintiff, - against - UBS WARBURG LLC, UBS WARBURG, and UBS AG, Defendants.

02 Civ. 1243 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

July 20, 2004, Decided
July 20, 2004, Filed

**PRIOR HISTORY:** Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 2003 U.S. Dist. LEXIS 18771 (S.D.N.Y., 2003)

**DISPOSITION:** Plaintiff's motion for sanctions allowed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee, in an employment discrimination dispute, filed a Fed. R. Civ. P. 37 motion to sanction defendant for its failure to produce relevant information and for its tardy production of such material.

**OVERVIEW:** Plaintiff presented evidence that, inter alia, defendant's personnel had deleted relevant e-mails, some of which were subsequently recovered from backup tapes (or elsewhere) and thus produced to plaintiff long after her initial document requests, and some of which were lost altogether. The district court awarded Fed. R. Civ. P. 37 sanctions, noting that because defendant's spoliation was willful, the lost information was presumed to be relevant. Specifically, defendant failed to preserve relevant e-mails, even after receiving adequate warnings from counsel, resulting in the production of some relevant e-mails almost two years after they were initially requested and resulting in the complete destruction of others. Further, the court observed that defendant's counsel had failed to communicate the litigation hold to all of the litigation's key players and failed to ascertain each of the key players' document management habits such that for "unknown" reasons, defendant's employees ignored many of the instructions. Accordingly, the court held that defendant and its counsel had not taken all necessary steps to guarantee that relevant data was both preserved and produced.

**OUTCOME:** The district court ordered sanctions, including payment for re-deposing and of expenses incurred in moving for sanctions, related to defendant's willful destruction of presumed relevant e-mails.

**CORE TERMS:** e-mail, tape, backup, deleted, deposition, discovery, relevant information, personnel, recovered, duty to preserve, destruction, player, duty, retention, spoliation, preservation, conversation, adverse inference, re-deposition, destroyed, restored, stored, outside counsel, electronic, preserved, spoke, technology, responsive, restoration, communicate

## LexisNexis(TM) Headnotes

### Civil Procedure > Sanctions > Discovery Misconduct

[HN1]Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis. The authority to sanction litigants for spoliation arises jointly under Fed. R. Civ. P. 37 and the court's inherent powers. Further, sanctions under the court's inherent power can include drawing adverse evidentiary inferences.

### Civil Procedure > Sanctions > Discovery Misconduct

[HN2]The spoliation of evidence germane to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

### Civil Procedure > Sanctions > Discovery Misconduct

[HN3]In the United States Court of Appeals for the Second Circuit, a "culpable state of mind" for purposes of a spoliation inference includes ordinary negligence. When evidence is destroyed in bad faith (i.e., intentionally or willfully), that fact alone is sufficient to demonstrate relevance. By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions.

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

*Civil Procedure > Sanctions > Discovery Misconduct*

*Evidence > Relevance > Relevant Evidence*

[HN4]In the context of a request for an adverse inference spoliation instruction, the concept of "relevance" encompasses not only the ordinary meaning of the term, Fed. R. Evid. 401 and Fed. R. Civ. P. 26(b)(1), but also that the destroyed evidence would have been favorable to the movant. This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him. This is equally true in cases of gross negligence or recklessness; only in the case of willful spoliation does the degree of culpability give rise to a presumption of the relevance of the documents destroyed.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN5]Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. As a general rule, that litigation hold does not apply to inaccessible backup tapes (e.g., those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. On the other hand, if backup tapes are accessible (i.e., actively used for information retrieval), then such tapes would likely be subject to the litigation hold. A party's discovery obligations do not end with the implementation of a "litigation hold"--to the contrary, that is only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents. Proper communication between a party and her lawyer will ensure (1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis; and (3) that relevant non-privileged material is produced to the opposing party.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN6]Once a "litigation hold" is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified and placed "on hold." To do this, counsel must become fully familiar with her client's document retention policies, as well as the client's data retention architecture. This will invariably involve speaking with information technology personnel, who can explain system-wide backup procedures and the actual (as opposed to theoretical) implementation of the firm's recycling policy. It will also involve communicating with the "key players" in the litigation, in order to understand how they stored information. Unless counsel interviews each employee, it is impossible to determine whether all potential sources of information have been inspected.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN7]It is not sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched. This is not to say that counsel will necessarily succeed in locating all such sources, or that the later discovery of new sources is evidence of a lack of effort. But counsel and client must take some reasonable steps to see that sources of relevant information are located.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN8]Once a party and her counsel have identified all of the sources of potentially relevant information, they are under a duty to retain that information and to produce information responsive to the opposing party's requests. Fed. R. Civ. P. 26 creates a "duty to supplement" those responses. Fed. R. Civ. P. 26(e). Although the Rule 26 duty to supplement is nominally the party's, it really falls on counsel.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN9]Although a party signs the answers, it is his lawyer who understands their significance and bears the responsibility to bring answers up to date. In a complex case all sorts of information reaches the party, who little understands its bearing on answers previously given to interrogatories. In practice, therefore, the lawyer under a continuing burden must periodically recheck all interrogatories and canvass all new information. Fed. R. Civ. P. 26(e) advisory committee note.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN10]The continuing duty to supplement disclosures under Fed. R. Civ. P. 26(e) strongly suggests that parties also have a duty to make sure that discoverable information is not lost. Indeed, the notion of a "duty to preserve" connotes an ongoing obligation. Obviously, if information is lost or destroyed, it has not been preserved.

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN11]Once on notice that evidence is relevant, the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN12]There are thus a number of steps that counsel should take to ensure compliance with the preservation obligation of Fed. R. Civ. P. 26(e). While these precautions may not be enough (or may be too much) in some cases, they are designed to promote the continued preservation of potentially relevant information in the typical case. First, counsel must issue a "litigation hold" at the outset of litigation or whenever litigation is reasonably anticipated. The litigation hold should be periodically re-issued so that new employees are aware of it, and so that it is fresh in the minds of all employees. Second, counsel should communicate directly with the "key players" in the litigation, i.e., the people identified in a party's initial disclosure and any subsequent supplementation thereto. Fed. R. Civ. P. 26(a)(1)(A). Because these "key players" are the employees likely to have relevant information, it is particularly important that the preservation duty be communicated clearly to them. As with the litigation hold, the key players should be periodically reminded that the preservation duty is still in place.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN13]Counsel in ensuring compliance with its preservation obligation under Fed. R. Civ. P. 26(e), should instruct all employees to produce electronic copies of their relevant active files. Counsel must also make sure that all backup media which the party is required to retain is identified and stored in a safe place. In cases involving a small number of relevant backup tapes, counsel might be advised to take physical possession of backup tapes. In other cases, it might make sense for relevant backup tapes to be segregated and placed in storage. Regardless of what particular arrangement counsel chooses to employ, the point is to separate relevant backup tapes from others. One of the primary reasons that electronic data is lost is ineffective communication with information technology personnel. By taking possession of, or otherwise safeguarding, all potentially relevant backup tapes, counsel eliminates the possibility that such tapes will be inadvertently recycled.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN14]While, of course, it is true that counsel need not supervise every step of the document production process and may rely on their clients in some respects, counsel is responsible for coordinating her client's discovery efforts.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN15]It is a well-established and longstanding principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. A showing of willfulness or gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN16]The chosen sanction upon finding that a party failed to preserve evidence under Fed. R. Civ. P. 26(e) should (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*Civil Procedure > Disclosure & Discovery > Mandatory Disclosures*

[HN17]The Federal Rules afford litigants 30 days to respond to document requests. Fed. R. Civ. P. 34(b).

**COUNSEL:**  [*1]  For Plaintiff: James A. Batson, Esq., LIDDLE & ROBINSON, LLP, New York, New York.

For Defendants: Kevin B. Leblang, Esq., Norman C. Simon, Esq., KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York.

**JUDGES:** Shira A. Scheindlin, United States District Judge.

**OPINIONBY:** Shira A. Scheindlin

**OPINION: OPINION AND ORDER**

SHIRA A. SCHEINDLIN, U.S.D.J.:

Commenting on the importance of speaking clearly and listening closely, Phillip Roth memorably quipped, "The English language is a form of communication! ...

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

Words aren't only bombs and bullets -- no, they're little gifts, containing meanings!" n1 What is true in love is equally true at law: Lawyers and their clients need to communicate clearly and effectively with one another to ensure that litigation proceeds efficiently. When communication between counsel and client breaks down, conversation becomes "just crossfire," n2 and there are usually casualties.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n1 PHILIP ROTH, PORTNOY'S COMPLAINT (1967).

n2 *Id.*

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## I. INTRODUCTION

This is the fifth **[*2]** written opinion in this case, a relatively routine employment discrimination dispute in which discovery has now lasted over two years. Laura Zubulake is once again moving to sanction UBS for its failure to produce relevant information and for its tardy production of such material. In order to decide whether sanctions are warranted, the following question must be answered: Did UBS fail to preserve and timely produce relevant information and, if so, did it act negligently, recklessly, or willfully?

This decision addresses counsel's obligation to ensure that relevant information is preserved by giving clear instructions to the client to preserve such information and, perhaps more importantly, a client's obligation to heed those instructions. Early on in this litigation, UBS's counsel -- both in-house and outside -- instructed UBS personnel to retain relevant electronic information. Notwithstanding these instructions, certain UBS employees deleted relevant emails. Other employees never produced relevant information to counsel. As a result, many discoverable e-mails were not produced to Zubulake until recently, even though they were responsive to a document request propounded on June 3, 2002. n3 **[*3]** In addition, a number of e-mails responsive to that document request were deleted and have been lost altogether.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n3 *See Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 312 (S.D.N.Y. 2003)* ("*Zubulake I*") (quoting Zubulake's document request, which called for "all documents concerning any

communications by or between UBS employees concerning Plaintiff," and defining "document" to include "without limitation, electronic or computerized data compilations.").

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Counsel, in turn, failed to request retained information from one key employee and to give the litigation hold instructions to another. They also failed to adequately communicate with another employee about how she maintained her computer files. Counsel also failed to safeguard backup tapes that might have contained some of the deleted e-mails, and which would have mitigated the damage done by UBS's destruction of those e-mails.

The conduct of both counsel and client thus calls to mind the now-famous words of the prison captain in *Cool Hand* **[*4]** *Luke:* "What we've got here is a failure to communicate." n4 Because of this failure by *both* UBS and its counsel, Zubulake has been prejudiced. As a result, sanctions are warranted.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n4 Captain, Road Prison 36, in COOL HAND LUKE (1967), found at http://ask.yahoo.com/ask/20011026.html.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## II. FACTS

The allegations at the heart of this lawsuit and the history of the parties' discovery disputes have been well-documented in the Court's prior decisions, n5 familiarity with which is presumed. In short, Zubulake is an equities trader specializing in Asian securities who is suing her former employer for gender discrimination, failure to promote, and retaliation under federal, state, and city law.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n5 *See Zubulake I, 217 F.R.D. 309* (addressing the legal standard for determining the cost allocation for producing e-mails contained on backup tapes); *Zubulake v. UBS Warburg LLC, 2003 U.S. Dist. LEXIS 7940, No. 02 Civ. 1243, 2003 WL 21087136 (S.D.N.Y. May 13, 2003)* ("*Zubulake II*") (addressing

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

Zubulake's reporting obligations); _Zubulake v. UBS Warburg LLC, 216 F.R.D. 280 (S.D.N.Y. 2003)_ ("_Zubulake III_") (allocating backup tape restoration costs between Zubulake and UBS); _Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003)_ ("_Zubulake IV_") (ordering sanctions against UBS for violating its duty to preserve evidence).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*5]

## A. Background

Zubulake filed an initial charge of gender discrimination with the EEOC on August 16, 2001. n6 Well before that, however -- as early as April 2001 -- UBS employees were on notice of Zubulake's impending court action. n7 After she received a right-to-sue letter from the EEOC, Zubulake filed this lawsuit on February 15, 2002. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 See _Zubulake I, 217 F.R.D. at 312_.

n7 See _Zubulake IV, 220 F.R.D. at 217_ ("Thus, the relevant people at UBS anticipated litigation in April 2001. The duty to preserve attached at the time that litigation was reasonably anticipated.").

n8 See _Zubulake I, 217 F.R.D. at 312_.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Fully aware of their common law duty to preserve relevant evidence, UBS's in-house attorneys gave oral instructions in August 2001 -- immediately after Zubulake filed her EEOC charge -- instructing employees not to destroy or delete material potentially relevant to Zubulake's claims, and in fact to segregate such material into separate [*6] files for the lawyers' eventual review. n9 This warning pertained to both electronic and hard-copy files, but did _not_ specifically pertain to so-called "backup tapes," maintained by UBS's information technology personnel. n10 In particular, UBS's in-house counsel, Robert L. Salzberg, "advised relevant UBS employees to preserve and turn over to counsel all files, records or other written memoranda or documents concerning the allegations raised in the [EEOC] charge or any aspect of [Zubulake's] employment." n11 Subsequently -- but still in August 2001 -- UBS's outside counsel met with

a number of the key players in the litigation and reiterated Mr. Salzberg's instructions, reminding them to preserve relevant documents, "including e-mails." n12 Salzberg reduced these instructions to writing in e-mails dated February 22, 2002 n13 -- immediately after Zubulake filed her complaint -- and September 25, 2002. n14 Finally, in August 2002, after Zubulake propounded a document request that specifically called for e-mails stored on backup tapes, UBS's outside counsel instructed UBS information technology personnel to stop recycling backup tapes. n15 _Every_ UBS employee mentioned in [*7] this Opinion (with the exception of Mike Davies) either personally spoke to UBS's outside counsel about the duty to preserve e-mails, or was a recipient of one of Salzberg's e-mails. n16

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 See _Zubulake IV, 220 F.R.D. at 215_.

n10 See _id._

n11 See 10/14/03 Letter from Norman Simon, counsel to UBS, to the Court ("10/14/03 Simon Ltr.") at 1.

n12 _Id._ at 1 n.1.

n13 See Ex. A to 10/14/03 Simon Ltr.

n14 See Ex. C to 10/14/03 Simon Ltr.

n15 See _Zubulake IV, 220 F.R.D. at 215_. See also 10/14/03 Simon Ltr. at 2 ("In late August 2002, plaintiff first requested backup e-mails from certain UBS employees. Thereafter, I advised UBS's information technology personnel to locate and retain all existing backup tapes for employees identified by plaintiff. I re-emphasized that directive and confirmed that these tapes continued to be preserved both orally and in writing on several subsequent occasions.").

n16 Specifically, UBS's outside counsel spoke with Matthew Chapin on August 29, 2001, with Joy Kim and Andrew Clarke on August 30, 2001, and with Jeremy Hardisty, John Holland, and Dominic Vail on August 31, 2001. See 10/14/03 Simon Ltr. at 1 n.1. Holland, Chapin, Hardisty, Brad Orgill, James Tregear, Rose Tong, Vail, Barbara Amone, Joshua Varsano, and Rebecca White were all direct recipients of Salzberg's e-mails. See Ex. A to 10/14/03 Simon Ltr.



2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*8]

**B. Procedural History**

In *Zubulake I,* I addressed Zubulake's claim that relevant e-mails had been deleted from UBS's active servers and existed only on "inaccessible" archival media (*i.e.,* backup tapes). n17 Arguing that e-mail correspondence that she needed to prove her case existed only on those backup tapes, Zubulake called for their production. UBS moved for a protective order shielding it from discovery altogether or, in the alternative, shifting the cost of backup tape restoration onto Zubulake. Because the evidentiary record was sparse, I ordered UBS to bear the costs of restoring a sample of the backup tapes. n18

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n17 *See generally* Zubulake I, 217 F.R.D. 309.

n18 *See* *id.* at 324.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

After the sample tapes were restored, UBS continued to press for cost shifting with respect to any further restoration of backup tapes. In *Zubulake III,* I ordered UBS to bear the lion's share of restoring certain backup tapes because Zubulake was able to demonstrate that [*9] those tapes were likely to contain relevant information. n19 Specifically, Zubulake had demonstrated that UBS had failed to maintain all relevant information (principally e-mails) in its active files. After *Zubulake III,* Zubulake chose to restore sixteen backup tapes. n20 "In the restoration effort, the parties discovered that certain backup tapes [were] missing." n21 They also discovered a number of e-mails on the backup tapes that were missing from UBS's active files, confirming Zubulake's suspicion that relevant e-mails were being deleted or otherwise lost. n22

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n19 *See* Zubulake III, 216 F.R.D. at 289.

n20 4/22/04 Oral Argument Transcript ("Tr.") at 29-30.

n21 Zubulake IV, 220 F.R.D. at 215.

n22 *See id.; see also* Zubulake III, 216 F.R.D. at 287.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

*Zubulake III* begat *Zubulake IV,* where Zubulake moved for sanctions as a result of UBS's failure to preserve all relevant backup tapes, and UBS's deletion of relevant e-mails. Finding fault [*10] in UBS's document preservation strategy but lacking evidence that the lost tapes and deleted e-mails were particularly favorable to Zubulake, I ordered UBS to pay for the re-deposition of several key UBS employees -- Varsano, Chapin, Hardisty, Kim, and Tong -- so that Zubulake could inquire about the newly-restored e-mails. n23

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n23 *See* Zubulake IV, 220 F.R.D. at 222 (finding that spoliation was not willful and declining to grant an adverse inference instruction).

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

**C. The Instant Dispute**

The essence of the current dispute is that during the re-depositions required by *Zubulake IV,* Zubulake learned about more deleted e-mails and about the existence of e-mails preserved on UBS's active servers that were, to that point, never produced. In sum, Zubulake has now presented evidence that UBS personnel deleted relevant e-mails, some of which were subsequently recovered from backup tapes (or elsewhere) and thus produced to Zubulake long after her initial document requests, and some of which were [*11] lost altogether. Zubulake has also presented evidence that some UBS personnel did not produce responsive documents to counsel until recently, depriving Zubulake of the documents for almost two years.

**1. Deleted E-Mails**

Notwithstanding the clear and repeated warnings of counsel, Zubulake has proffered evidence that a number of key UBS employees -- Orgill, Hardisty, Holland, Chapin, Varsano, and Amone -- failed to retain e-mails germane to Zubulake's claims. Some of the deleted e-mails were restored from backup tapes (or other sources) and have been produced to Zubulake, others have been altogether lost, though there is strong evidence that they once existed. Although I have long been aware that certain e-mails were deleted, n24 the redepositions demonstrate the scope and importance of those documents.

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n24 See *Zubulake III,* 216 F.R.D. at 287.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**a. At Least One E-Mail Has Never Been Produced**

At least one e-mail has been irretrievably lost; the existence of that e-mail is known only [*12] because of oblique references to it in other correspondence. It has already been shown that Chapin -- the alleged primary discriminator -- deleted relevant e-mails. n25 In addition to those e-mails, Zubulake has evidence suggesting that Chapin deleted at least one other e-mail that has been lost *entirely.* An e-mail from Chapin sent at 10:47 AM on September 21, 2001, asks Kim to send him a "document" recounting a conversation between Zubulake and a co-worker. n26 Approximately 45 minutes later, Chapin sent an e-mail complaining about Zubulake to his boss and to the human resources employees handling Zubulake's case purporting to contain a verbatim recitation of a conversation between Zubulake and her co-worker, as overheard by Kim. n27 This conversation allegedly took place on September 18, 2001, at 10:58 AM. n28 There is reason to believe that immediately after that conversation, Kim sent Chapin an e-mail that contained the verbatim quotation that appears in Chapin's September 21 e-mail -- the "document" that Chapin sought from Kim just prior to sending that e-mail -- and that Chapin deleted it. n29 That e-mail, however, has never been recovered and is apparently lost.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n25 *See id.* (finding that Chapin "was concealing and deleting especially relevant e-mails").

[*13]

n26 *See* 9/21/01 e-mail from Chapin to Kim, UBSZ 001400.

n27 7/21/01 e-mail from Chapin to Holland, Varsano and Tong, UBSZ 001399.

n28 *See id.*

n29 Kim sent an e-mail at 11:19 AM on September 18, bearing the subject "2," which appears to contain a *different* verbatim quotation from Zubulake. *See* UBSZ 004047. The e-mail containing the quotation that Chapin used in his

September 21 e-mail would have borne the subject "1" and been sent sometime between 10:58 AM and 11:19 AM. *See also* 2/6/04 Deposition of Matthew Chapin at 565 (Chapin testifying that he might have pasted the quotation from another document); *id.* at 587 (Chapin testifying that he wasn't sure whether the quotation was a paraphrase or pasted from another e-mail).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Although Zubulake has only been able to present concrete evidence that this one e-mail was irretrievably lost, there may well be others. Zubulake has presented extensive proof, detailed below, that UBS personnel were deleting relevant e-mails. Many of those e-mails were recovered from backup tapes. The UBS record retention policies called [*14] for monthly backup tapes to be retained for three years. n30 The tapes covering the relevant time period (circa August 2001) should have been available to UBS in August 2002, when counsel instructed UBS's information technology personnel that backup tapes were also subject to the litigation hold.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n30 *See* *Zubulake I,* 217 F.R.D. at 314 ("Nightly backup tapes were kept for twenty working days, weekly tapes for one year, and monthly tapes for three years. After the relevant time period elapsed, the tapes were recycled.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Nonetheless, many backup tapes for the most relevant time periods are missing, including: Tong's tapes for June, July, August, and September of 2001; Hardisty's tapes for May, June, and August of 2001; Clarke and Vinay Datta's tapes for April and September 2001; and Chapin's tape for April 2001. n31 Zubulake did not even learn that four of these tapes were missing until after *Zubulake IV.* Thus, it is impossible to know just how many relevant e-mails have been lost in their entirety. [*15] n32

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n31 *See* Current List of Missing Monthly Backup Tapes, Ex. E to 5/21/04 Reply Affirmation of James A. Batson, counsel to

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

Zubulake ("Batson Reply Aff."). UBS does have some weekly backup tapes for portions of these times for everyone but Tong. *See id.* n.1.

n32 In *Zubulake IV*, I held that UBS's destruction of relevant backup tapes was negligent, rather than willful, because whether the duty to preserve extended to backup tapes was "a grey area." 220 F.R.D. at 221. I further held that "litigants are now on notice, at least in this Court, that backup tapes that can be identified as storing information created by or for 'key players' must be preserved." *Id.* at 221 n.47.

Because UBS lost the backup tapes mentioned in this opinion well before *Zubulake IV* was issued, it was not on notice of the precise contours of its duty to preserve backup tapes. Accordingly, I do not discuss UBS's destruction of relevant backup tapes as proof that UBS acted willfully, but rather to show that Zubulake can no longer prove what was deleted and when, and to demonstrate that the scope of e-mails that have been irrevocably lost is broader than initially thought.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*16]

**b. Many E-Mails Were Deleted and Only Later Recovered from Alternate Sources**

Other e-mails were deleted in contravention of counsel's "litigation hold" instructions, but were subsequently recovered from alternative sources -- such as backup tapes -- and thus produced to Zubulake, albeit almost two years after she propounded her initial document requests. For example, an e-mail from Hardisty to Holland (and on which Chapin was copied) reported that Zubulake said "that all she wanted is to be treated like the other 'guys' on the desk." n33 That e-mail was recovered from Hardisty's August 2001 backup tape -- and thus it was on his active server as late as August 31, 2001, when the backup was generated -- but was not in his active files. That e-mail therefore *must* have been deleted subsequent to counsel's warnings. n34

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

N33 7/23/01 e-mail from Hardisty to Holland, UBSZ 002957.

n34 Because the e-mail was dated July 23, 2001, the same cannot be said of Chapin or Holland. Although they had a duty to preserve relevant e-mails starting in April 2001, counsel did not specifically warn them until August 2001. Chapin and Holland might have deleted the e-mail prior to counsel's warning.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*17]

Another e-mail, from Varsano to Hardisty dated August 31, 2001 -- the very day that Hardisty met with outside counsel -- forwarded an earlier message from Hardisty dated June 29, 2001, that recounted a conversation in which Hardisty "warned" Chapin about his management of Zubulake, and in which Hardisty reminded Chapin that Zubulake could "be a good broker." n35 This e-mail was absent from UBS's initial production and had to be restored from backup; apparently neither Varsano nor Hardisty had retained it. n36 This deletion is especially surprising because Varsano retained the June 29, 2001 e-mail for over two months before he forwarded it to Hardisty. n37 Indeed, Varsano testified in his deposition that he "definitely" "saved all of the e-mails that [he] received concerning Ms. Zubulake" in 2001, that they were saved in a separate "very specific folder," and that "all of those e-mails" were produced to counsel. n38

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n35 8/31/01 e-mail from Varsano to Hardisty, UBSZ 002968. Because the header information from Hardisty's June 29, 2001 e-mail was cropped when Varsano forwarded it, it is not clear who -- besides, presumably, Varsano -- received that message.

[*18]

n36 *See* Example of Relevant E-Mails, in Chronological Order, That Were Restored From April to October 2001 Backup Tapes, Ex. I to the 4/30/04 Affirmation of James A. Batson ("Batson Aff."). This chart does not clearly indicate from which backup tape the e-mail was restored.

n37 *See id.; see also* 6/29/01 e-mail from Hardisty to Holland, Amone and Varsano, UBSZ 004097 (the underlying e-mail, also restored from a backup tape).

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

n38 1/26/04 Deposition of Joshua Varsano ("Varsano Dep.") at 289-90. If Varsano's testimony is credited, then counsel somehow failed to produce those e-mails to Zubulake.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

As a final example, an e-mail from Hardisty to Varsano and Orgill, dated September 1, 2001, specifically discussed Zubulake's termination. It read: "LZ -- ok once lawyers have been signed off, probably one month, but most easily done in combination with the full Asiapc [downsizing] announcement. We will need to document her performance post her warning HK. Matt [Chapin] is doing that." n39 Thus, Orgill and Hardisty had decided to terminate Zubulake as early as September 1, 2001. Indeed, [*19] two days later Orgill replied, "It's a pity we can't act on LZ earlier." n40 Neither the authors nor any of the recipients of these e-mails retained any of them, even though these e-mails were sent within days of Hardisty's meeting with outside counsel. They were not even preserved on backup tapes, but were only recovered because Kim happened to have retained copies. n41 Rather, all three people (Hardisty, Orgill and Varsano) deleted these e-mails from their computers by the end of September 2001. Apart from their direct relevance to Zubulake's claims, these e-mails may also serve to rebut Orgill and Hardisty's deposition testimony. Orgill testified that he played no role in the decision to terminate Zubulake. n42 And Hardisty testified that he did not recall discussing Zubulake's termination with Orgill. n43

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n39 9/3/01 e-mail from Orgill to Hardisty and Varsano (replying to and attaching 9/1/01 e-mail from Hardisty to Varsano and Orgill), UBSZ 002965.

n40 Id.

n41 These e-mails were some of the ones fortuitously recovered from Kim's active files, as discussed below. See Memorandum of Law in Support of Plaintiff's Motion for Sanctions ("Pl. Mem.") at 6 n.18. And, indeed, Kim did not have all of the original e-mails, but retained only the last e-mail in the chain of correspondence, which had the earlier e-mails in the same chain embedded in it. It is not clear why or how she obtained this e-mail.

[*20]

n42 See 3/4/03 Deposition of Brad Orgill at 43.

n43 See 2/26/03 Deposition of Jeremy Hardisty at 262.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

These are merely examples. The proof is clear: UBS personnel unquestionably deleted relevant e-mails from their computers after August 2001, even though they had received at least two directions from counsel not to. Some of those e-mails were recovered (Zubulake has pointed to at least 45), n44 but some -- and no one can say how many -- were not. And even those e-mails that were recovered were produced to Zubulake well after she originally asked for them.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n44 See The Actual Number of E-Mails not Retained by UBS Executives Post-Dating the August EEOC Filing, Ex. H to Batson Reply Aff.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**2. Retained, But Unproduced, E-Mails**

Separate and apart from the deleted material are a number of e-mails that weren't from UBS's initial production even though they were not deleted. These e-mails existed in the [*21] active, on-line files of two UBS employees -- Kim and Tong -- but were not produced to counsel and thus not turned over to Zubulake until she learned of their existence as a result of her counsel's questions at deposition. Indeed, these e-mails were not produced until after Zubulake had conducted thirteen depositions and four re-depositions. n45

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n45 See Batson Reply Aff. P 6.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

During her February 19, 2004, deposition, Kim testified that she was never asked to produce her files regarding Zubulake to counsel, nor did she ever actually produce them, n46 although she was asked to retain them. n47 One week after Kim's deposition,

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

UBS produced seven new e-mails. The obvious inference to be drawn is that, subsequent to the deposition, counsel for the first time asked Kim to produce her files. Included among the new e-mails produced from Kim's computer was one (dated September 18, 2001) that recounts a conversation between Zubulake and Kim in which Zubulake complains about the way women are treated at UBS. n48 [*22] Another e-mail recovered from Kim's computer contained the correspondence, described above, in which Hardisty and Orgill discuss Zubulake's termination, and in which Orgill laments that she could not be fired sooner than she was.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n46 See 2/19/04 Deposition of Joy Kim at 44-45.

n47 See id. at 35.

n48 See UBSZ 004047.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

On March 29, 2004, UBS produced several new e-mails, and three new e-mail retention policies, from Tong's active files. n49 At her deposition two weeks earlier, Tong explained (as she had at her first deposition, a year previous) that she kept a separate "archive" file on her computer with documents pertaining to Zubulake. n50 UBS admits that until the March 2004 deposition, it misunderstood Tong's use of the word "archive" to mean backup tapes; after her March 2004 testimony, it was clear that she meant active data. Again, the inference is that UBS's counsel then, for the first time, asked her to produce her active computer files.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n49 See Ex. M to the Batson Aff.

[*23]

n50 See 3/10/04 Deposition of Rose Tong at 97, 140; see also 3/4/03 Deposition of Rose Tong at 66-67.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Among the new e-mails recovered from Tong's computer was one, dated August 21, 2001, at 11:06 AM, from Mike Davies n51 to Tong that read, "received[.] thanks[,] mike," n52 and which was in response to an e-mail from Tong, sent eleven minutes

earlier, that read, "Mike, I have just faxed over to you the 7 pages of Laura's [EEOC] charge against the bank." n53 While Davies' three-word e-mail seems insignificant in isolation, it is actually quite important.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n51 Davies, Tong's supervisor, was -- as far as the record before the Court shows -- not specifically instructed about the litigation hold by UBS's counsel.

n52 8/21/01 e-mail from Davies to Tong, UBSZ 004352.

n53 8/21/01 e-mail from Tong to Davies, UBSZ 004351.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

Three hours after sending that three word response, Davies sent an e-mail to Tong with [*24] the subject line "Laura Zubulake" that reads:I spoke to Brad [Orgill] -- he's looking to exit her asap [by the end of month], and looking for guidance from us following letter? we sent her re her performance [or does he mean PMM]

I said you were on call with US yesterday and that we need US legal advise etc, but be aware he's looking to finalise quickly! -- said if off by end August then no bonus consideration, but if still employed after aug consideration should be given? n54Davies testified that he was unaware of Zubulake's EEOC charge when he spoke with Orgill. n55 The timing of his e-mails, however -- the newly produced e-mail that acknowledges receiving Zubulake's EEOC charge coming three hours before the e-mail beginning "I spoke to Brad" -- strongly undercuts this claim. The new e-mail, therefore, is circumstantial evidence that could support the inference that Davies knew about the EEOC charge when he spoke with Orgill, and suggests that Orgill knew about the EEOC charge when the decision was made to terminate Zubulake. n56 Its relevance to Zubulake's retaliation claim is unquestionable, and yet it was not produced until April 20, 2004. n57

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n54 8/21/01 e-mail from Davies to Tong, UBSZ 004353. The text of this e-mail was part of UBS's initial production.

[*25]

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

n55 *See* 3/11/03 Deposition of Mike Davies at 21 ("The EEOC application was something new to me, so it did stand out in my mind, and I hadn't had a conversation with anyone about it, so I hadn't spoken to Brad about it"); *see also id.* (Davies replying "no" in response to the question "Did you ever speak to Brad about it?").

n56 It is also plausible that Orgill and Davies spoke days earlier -- before either knew about the EEOC charge -- and Davies might have omitted that information from his initial e-mail to Tong. The newly discovered e-mail, however, is helpful to Zubulake in arguing her view of the evidence.

n57 Ostensible copies of these e-mails were produced on March 29, 2004 -- from where is not clear -- but they appear to have the incorrect time/date stamps. The copies produced on April 20, because they came directly from Tong's computer, are more reliable.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

* * *

Zubulake now moves for sanctions as a result of UBS's purported discovery failings. In particular, she asks -- as she did in *Zubulake IV*-- that an adverse inference instruction be given to the jury that eventually [*26] hears this case.

## III. LEGAL STANDARD

[HN1]Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." n58 "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." n59 The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's inherent powers. n60

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n58 *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999).

n59 *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir. 2001).

n60 *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y. 1991) (Francis, M.J.) (citing Fed. R. Civ. P. 37); *see also Shepherd v. American Broadcasting Cos.,* 314 U.S. App. D.C. 137, 62 F.3d 1469, 1474 (D.C. Cir. 1995) ("When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap."); *id.* at 1475 (holding that sanctions under the court's inherent power can "include ... drawing adverse evidentiary inferences").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*27]

[HN2]The spoliation of evidence germane "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." n61 A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. n62

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n61 *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998).

n62 *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107-12 (2d Cir. 2001). An adverse inference instruction may also be warranted, in some circumstances, for the untimely production of evidence. *See Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir. 2002).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*28]

[HN3]In this circuit, a "culpable state of mind" for purposes of a spoliation inference includes ordinary negligence. n63 When evidence is destroyed in bad faith (*i.e.,* intentionally or willfully), that fact alone is sufficient to demonstrate relevance. n64 By contrast,

when the destruction is negligent, relevance must be proven by the party seeking the sanctions. n65

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n63 *See Residential Funding,* 306 F.3d at 108.

n64 *See id.* at 109.

n65 *See id.*

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN4]In the context of a request for an adverse inference instruction, the concept of "relevance" encompasses not only the ordinary meaning of the term, n66 but also that the destroyed evidence would have been favorable to the movant. n67 "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." n68 This is equally true in cases of gross negligence or recklessness; **[*29]** only in the case of *willful* spoliation does the degree of culpability give rise to a presumption of the relevance of the documents destroyed. n69

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n66 *See* Fed. R. Evid. 401; Fed. R. Civ. P. 26(b)(1).

n67 *See Residential Funding,* 306 F.3d at 108-09 ("Although we have stated that, to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses, our cases make clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.") (quotation marks, citations, footnote, and alterations omitted).

n68 *Turner,* 142 F.R.D. at 77 (citing *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 924 n.7 (2d Cir. 1981)).

**[*30]**

n69 *See Residential Funding,* 306 F.3d at 109.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## IV. DISCUSSION

In *Zubulake IV,* I held that UBS had a duty to preserve its employees' active files as early as April 2001, and certainly by August 2001, when Zubulake filed her EEOC charge. n70 Zubulake has thus satisfied the first element of the adverse inference test. As noted, the central question implicated by this motion is whether UBS and its counsel took all necessary steps to guarantee that relevant data was both preserved and produced. If the answer is "no," then the next question is whether UBS acted wilfully when it deleted or failed to timely produce relevant information -- resulting in either a complete loss or the production of responsive information close to two years after it was initially sought. If UBS acted wilfully, this satisfies the mental culpability prong of the adverse inference test and also demonstrates that the deleted material was relevant. n71 If UBS acted negligently or even recklessly, then Zubulake must show that the missing or late-produced information was relevant.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n70 *See Zubulake IV,* 220 F.R.D. at 216-17.

**[*31]**

n71 *See Residential Funding,* 306 F.3d at 109 ("Only in the case of *willful* spoliation is the spoliator's mental culpability itself evidence of the relevance of the documents destroyed.")

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## A. Counsel's Duty to Monitor Compliance

In *Zubulake IV,* I summarized a litigant's preservation obligations:[HN5]Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. As a general rule, that litigation hold does not apply to inaccessible backup tapes (*e.g.,* those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. On the other hand, if backup tapes are accessible (*i.e.,* actively

used for information retrieval), then such tapes *would* likely be subject to the litigation hold. n72A party's discovery obligations do not end with the implementation of a "litigation hold" -- to the contrary, that's only the beginning. [*32] Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents. Proper communication between a party and her lawyer will ensure (1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis; and (3) that relevant non-privileged material is produced to the opposing party.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n72 *Zubulake IV,* 220 F.R.D. at 218 (emphasis in original); *see also id.* ("It does make sense to create one exception to this general rule. If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of "key players" to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available. This exception applies to *all* backup tapes.") (emphasis in original).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## 1. Counsel's Duty to Locate Relevant Information

[HN6]Once a "litigation [*33] hold" is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified and placed "on hold," to the extent required in *Zubulake IV.* To do this, counsel must become fully familiar with her client's document retention policies, as well as the client's data retention architecture. n73 This will invariably involve speaking with information technology personnel, who can explain system-wide backup procedures and the actual (as opposed to theoretical) implementation of the firm's recycling policy. It will also involve communicating with the "key players" in the litigation, n74 in order to understand how they stored information. In this case, for example, some UBS employees created separate computer files pertaining to Zubulake, while others printed out relevant e-mails and retained them in hard copy only. Unless counsel interviews each employee, it is impossible to determine whether all potential sources of information have been inspected. A brief conversation with counsel, for example, might have

revealed that Tong maintained "archive" copies of e-mails concerning Zubulake, and that "archive" meant a separate on-line computer [*34] file, not a backup tape. Had that conversation taken place, Zubulake might have had relevant e-mails from that file two years ago.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n73 *Cf. Zubulake I,* 217 F.R.D. at 324 ("it is necessary to thoroughly understand the responding party's computer system, both with respect to active and stored data").

n74 *Zubulake IV,* 220 F.R.D. at 218.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

To the extent that it may not be feasible for counsel to speak with every key player, given the size of a company or the scope of the lawsuit, counsel must be more creative. It may be possible to run a system-wide keyword search; counsel could then preserve a copy of each "hit." Although this sounds burdensome, it need not be. Counsel does not have to review these documents, only see that they are retained. For example, counsel could create a broad list of search terms, run a search for a limited time frame, and then segregate responsive documents. n75 When the opposing party propounds its document requests, the parties could negotiate a list [*35] of search terms to be used in identifying responsive documents, and counsel would only be obliged to review documents that came up as "hits" on the second, more restrictive search. The initial broad cut merely guarantees that relevant documents are not lost.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n75 It might be advisable to solicit a list of search terms from the opposing party for this purpose, so that it could not later complain about which terms were used.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In short, [HN7]it is *not* sufficient to notify all employees of a litigation hold and expect that the party will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched. This is not to say that counsel will necessarily succeed in locating all such sources, or that the later discovery of new sources



is evidence of a lack of effort. But counsel and client must take *some reasonable steps* to see that sources of relevant information are located.

## 2. Counsel's Continuing [*36] Duty to Ensure Preservation

[HN8]Once a party and her counsel have identified all of the sources of potentially relevant information, they are under a duty to retain that information (as per *Zubulake IV*) and to produce information responsive to the opposing party's requests. Rule 26 creates a "duty to supplement" those responses. n76 Although the Rule 26 duty to supplement is nominally the party's, it really falls on counsel. As the Advisory Committee explains,[HN9]Although the party signs the answers, it is his lawyer who understands their significance and bears the responsibility to bring answers up to date. In a complex case all sorts of information reaches the party, who little understands its bearing on answers previously given to interrogatories. In practice, therefore, the lawyer under a continuing burden must periodically recheck all interrogatories and canvass all new information. n77To ameliorate this burden, the Rules impose a continuing duty to supplement responses to discovery requests *only* when "a party[,] or more frequently his lawyer, obtains actual knowledge that a prior response is incorrect. This exception does not impose a duty to check the [*37] accuracy of prior responses, but it prevents knowing concealment by a party or attorney." n78

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n76 Fed. R. Civ. P. 26(e).

n77 1966 Advisory Committee Note to Fed. R. Civ. P. 26(e).

n78 *Id.* The Rules also create a duty to supplement in two other instances: (a) when the Court so orders, and (b) with respect to Rule 26(a) initial disclosures, "because of the obvious importance to each side of knowing all witnesses and because information about witnesses routinely comes to each lawyer's attention," *id. See* Fed. R. Civ. P. 26(e).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN10]The *continuing* duty to supplement disclosures strongly suggests that parties also have a duty to make sure that discoverable information is not lost. Indeed, the notion of a "duty to preserve" connotes an ongoing obligation. Obviously, if information is lost or destroyed, it has not been preserved. n79

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n79 *See* OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining "preserve" as "to keep safe from harm or injury; to keep in safety, save, take care of, guard"); *see also id.* (defining "retain" as "to keep hold or possession of; to continue having or keeping, in various senses").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*38]

The tricky question is what that continuing duty entails. What must a lawyer do to make certain that relevant information -- especially electronic information -- is being retained? Is it sufficient if she periodically re-sends her initial "litigation hold" instructions? What if she communicates with the party's information technology personnel? Must she make occasional on-site inspections?

Above all, the requirement must be reasonable. A lawyer cannot be obliged to monitor her client like a parent watching a child. At some point, the client must bear responsibility for a failure to preserve. At the same time, counsel is more conscious of the contours of the preservation obligation; a party cannot reasonably be trusted to receive the "litigation hold" instruction once and to fully comply with it without the active supervision of counsel. n80

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n80 *See Telecom International Am. Ltd. v. AT&T Corp.*, 189 F.R.D. 76, 81 (S.D.N.Y. 1999) [HN11]("Once on notice [that evidence is relevant], the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.") (citing *Kansas-Nebraska Natural Gas Co. v. Marathon Oil Co.*, 109 F.R.D. 12, 18 (D. Neb. 1983)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*39]

[HN12]There are thus a number of steps that counsel should take to ensure compliance with the preservation obligation. While these precautions may not be enough (or may be too much) in some cases, they are designed

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

to promote the continued preservation of potentially relevant information in the typical case.

*First,* counsel must issue a "litigation hold" at the outset of litigation or whenever litigation is reasonably anticipated. n81 The litigation hold should be periodically re-issued so that new employees are aware of it, and so that it is fresh in the minds of all employees.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n81 *See Zubulake IV,* 220 F.R.D. at 218.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

*Second,* counsel should communicate directly with the "key players" in the litigation, *i.e.,* the people identified in a party's initial disclosure and any subsequent supplementation thereto. n82 Because these "key players" are the "employees likely to have relevant information," n83 it is particularly important that the preservation duty be communicated clearly to them. As **[*40]** with the litigation hold, the key players should be periodically reminded that the preservation duty is still in place.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n82 *See* Fed. R. Civ. P. 26(a)(1)(A).

n83 *Zubulake IV,* 220 F.R.D. at 218.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

*Finally,* [HN13]counsel should instruct all employees to produce electronic copies of their relevant active files. Counsel must also make sure that all backup media which the party is required to retain is identified and stored in a safe place. In cases involving a small number of relevant backup tapes, counsel might be advised to take physical possession of backup tapes. In other cases, it might make sense for relevant backup tapes to be segregated and placed in storage. Regardless of what particular arrangement counsel chooses to employ, the point is to separate relevant backup tapes from others. One of the primary reasons that electronic data is lost is ineffective communication with information technology personnel. By taking possession of, or otherwise **[*41]** safeguarding, all potentially relevant backup tapes, counsel eliminates the possibility that such tapes will be inadvertently recycled.

*Kier v. UnumProvident Corp.* n84 provides a disturbing example of what can happen when counsel and client do not effectively communicate. In that ERISA class action, the court entered an order on December 27, 2002, requiring UnumProvident to preserve electronic data, specifically including e-mails sent or received on six particular days. What ensued was a comedy of errors. First, before the court order was entered (but when it was subject to the common law duty to preserve) UnumProvident's technical staff unilaterally decided to take a "snapshot" of its servers instead of restoring backup tapes, which would have recovered the e-mails in question. (In fact, the snapshot was useless for the purpose of preserving these e-mails because most of them had already been deleted by the time the snapshot was generated.) Once the court issued the preservation order, UnumProvident failed to take any further steps to locate the e-mails, believing that the same person who ordered the snapshot would oversee compliance with the court order. But no one told him **[*42]** that.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n84 2003 U.S. Dist. LEXIS 14522, No. 02 Civ. 8781, 2003 WL 21997747 (S.D.N.Y. Aug. 22, 2003).

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Indeed, it was not until January 13, when senior UnumProvident legal personnel inquired whether there was any way to locate the e-mails referenced in the December 27 Order, that anyone sent a copy of the Order to IBM, who provided "email, file server, and electronic data related disaster recovery services to UnumProvident." n85 By that time, UnumProvident had written over 881 of the 1,498 tapes that contained backup data for the relevant time period. All of this led to a stern rebuke from the court. n86 Had counsel in *Kier* promptly taken the precautions set out above, the e-mails would not have been lost. n87

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n85 2003 U.S. Dist. LEXIS 14522, [WL] at *4.

n86 2003 U.S. Dist. LEXIS 14522, [WL] at *13 ("If UnumProvident had been as diligent as it should have been ... many fewer [backup] tapes would have been inadvertently overwritten."). Rather than order sanctions, the court recommended that the parties determine the fetjjsjbility of

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

retrieving the lost data and the extent of prejudice to the plaintiffs so that an appropriate remedy could be determined.

[*43]

n87 See also*Metropolitan Opera Assoc., Inc. v. Local 100*, Hotel Employees & Restaurant Employees International Union, 212 F.R.D. 178, 222 (S.D.N.Y.2003) (ordering default judgment against defendant as a discovery sanction because "counsel (1) never gave adequate instructions to their clients about the clients' overall discovery obligations, [including] what constitutes a 'document'...; (2) knew the Union to have no document retention or filing systems and yet never implemented a systematic procedure for document production or for retention of documents, including electronic documents; (3) delegated document production to a layperson who ... was not instructed by counsel] that a document included a draft or other nonidentical copy, a computer file and an e-mail; ... and (5) ... failed to ask important witnesses for documents until the night before their depositions and, instead, made repeated, baseless representations that all documents had been produced.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**3. What Happened at UBS After August 2001?**

As more fully described above, UBS's in-house counsel issued a litigation [*44] hold in August 2001 and repeated that instruction several times from September 2001 through September 2002. Outside counsel also spoke with some (but not all) of the key players in August 2001. Nonetheless, certain employees unquestionably deleted e-mails. Although many of the deleted e-mails were recovered from backup tapes, a number of backup tapes -- and the e-mails on them -- are lost forever. n88 Other employees, notwithstanding counsel's request that they produce their files on Zubulake, did not do so.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n88 *See Zubulake IV*, 220 F.R.D. at 218-19 ("By its attorney's directive in August 2002, UBS endeavored to preserve all backup tapes that existed in August 2001 (when Zubulake filed her EEOC charge)

that captured data for employees identified by Zubulake in her document request, and all such monthly backup tapes generated thereafter. These backup tapes [all should have] existed in August 2002, because of UBS's document retention policy, which required retention for three years. In August 2001, UBS employees were instructed to maintain active electronic documents pertaining to Zubulake in separate files. Had these directives been followed, UBS would have met its preservation obligations by preserving one copy of all relevant documents that existed at, or were created after, the time when the duty to preserve attached. In fact, UBS employees did not comply with these directives.") (footnotes omitted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*45]

**a. UBS's Discovery Failings**

UBS's counsel -- both in-house and outside -- repeatedly advised UBS of its discovery obligations. In fact, counsel came very close to taking the precautions laid out above. *First*, outside counsel issued a litigation hold in August 2001. The hold order was circulated to many of the key players in this litigation, and reiterated in e-mails in February 2002, when suit was filed, and again in September 2002. Outside counsel made clear that the hold order applied to backup tapes in August 2002, as soon as backup tapes became an issue in this case. *Second*, outside counsel communicated directly with many of the key players in August 2001 and attempted to impress upon them their preservation obligations. *Third*, and finally, counsel instructed UBS employees to produce copies of their active computer files. n89

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n89 Kim testified that she was not so instructed.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

To be sure, counsel did not fully comply with the standards set forth above. Nonetheless, under the standards existing [*46] at the time, counsel acted reasonably to the extent that they directed UBS to implement a litigation hold. Yet notwithstanding the

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

clear instructions of counsel, UBS personnel failed to preserve plainly relevant e-mails.

### b. Counsel's Failings

On the other hand, UBS's counsel are not entirely blameless. [HN14]"While, of course, it is true that counsel need not supervise every step of the document production process and may rely on their clients in some respects," n90 counsel is responsible for coordinating her client's discovery efforts. In this case, counsel failed to properly oversee UBS in a number of important ways, both in terms of its duty to locate relevant information and its duty to preserve and timely produce that information.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -



n90 *Metropolitan Opera,* 212 F.R.D. at 222.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

With respect to locating relevant information, counsel failed to adequately communicate with Tong about how she stored data. Although counsel determined that Tong kept her files on Zubulake in an "archive," they apparently **[*47]** made no effort to learn what that meant. A few simple questions -- like the ones that Zubulake's counsel asked at Tong's re-deposition -- would have revealed that she kept those files in a separate *active* file on her computer.

With respect to making sure that relevant data was retained, counsel failed in a number of important respects. *First,* neither in-house nor outside counsel communicated the litigation hold instructions to Mike Davies, a senior human resources employee who was intimately involved in Zubulake's termination. *Second,* even though the litigation hold instructions were communicated to Kim, no one ever asked her to produce her files. And *third,* counsel failed to protect relevant backup tapes; had they done so, Zubulake might have been able to recover some of the e-mails that UBS employees deleted.

In addition, if Varsano's deposition testimony is to be credited, he turned over "all of the e-mails that [he] received concerning Ms. Zubulake." n91 If Varsano turned over these e-mails, then counsel must have failed to produce some of them. n92

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n91 Varsano Dep. at 289.

**[*48]**

n92 I have no reason not to credit Varsano's testimony, given that he is a human resources employee who is not implicated in the alleged discrimination against Zubulake.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In sum, while UBS personnel deleted e-mails, copies of many of these e-mails were lost or belatedly produced as a result of counsel's failures.

### c. Summary

Counsel failed to communicate the litigation hold order to all key players. They also failed to ascertain each of the key players' document management habits. By the same token, UBS employees -- for unknown reasons -- ignored many of the instructions that counsel gave. This case represents a failure of communication, and that failure falls on counsel and client alike.

At the end of the day, however, the duty to preserve and produce documents rests on the party. Once that duty is made clear to a party, either by court order or by instructions from counsel, that party is on notice of its obligations and acts at its own peril. Though more diligent action on the part of counsel would have mitigated some of the damage caused by UBS's deletion of emails, UBS deleted the **[*49]** e-mails in defiance of explicit instructions not to.

Because UBS personnel continued to delete relevant e-mails, Zubulake was denied access to e-mails to which she was entitled. Even those e-mails that were deleted but ultimately salvaged from other sources (*e.g.,* backup tapes or Tong and Kim's active files) were produced 22 months after they were initially requested. The effect of losing potentially relevant e-mails is obvious, but the effect of late production cannot be underestimated either. "As a discovery deadline ... draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court." n93 Here, as UBS points out, Zubulake's instant motion "comes more than a year after the Court's previously imposed March 3, 2003 discovery cutoff." n94 Although UBS attempts to portray this fact as evidence that Zubulake is being overly litigious, it is in fact a testament to the time wasted by UBS's failure to timely produce all relevant and responsive information. With the discovery deadline long past, UBS "was under an obligation to be *as cooperative as possible.* **[*50]** " n95 Instead, the extent of UBS's spoliation was uncovered by Zubulake during court-ordered re-depositions.

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n93 *Residential Funding, 306 F.3d at 112*.

n94 Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Sanctions ("Def. Mem.") at 3.

n95 *Residential Funding, 306 F.3d at 112* (emphasis in original); *see also id.* (suggesting that breach of that obligation might "constitute[] sanctionable misconduct in [its] own right").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

I therefore conclude that UBS acted wilfully in destroying potentially relevant information, which resulted either in the absence of such information or its tardy production (because duplicates were recovered from Kim or Tong's active files, or restored from backup tapes). Because UBS's spoliation was willful, the lost information is presumed to be relevant. n96

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n96 *See Kronisch, 150 F.3d at 126* [HN15]("It is a well-established and longstanding principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.") (cited in *Residential Funding, 306 F.3d at 109*); *see also Residential Funding, 306 F.3d at 109* ("[A] showing of [wilfullness or] gross negligence in the destruction *or untimely production* of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party.") (emphasis added); *see also id. at 110* ("Just as the intentional or grossly negligent *destruction* of evidence in bad faith can support an inference that the destroyed evidence was harmful to the destroying party, so, too, can intentional or grossly negligent acts that hinder discovery support such an inference ....") (emphasis in original).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*51]

**B. Remedy**

Having concluded that UBS was under a duty to preserve the e-mails and that it deleted presumably relevant e-mails wilfully, I now consider the full panoply of available sanctions. n97 In doing so, I recognize that a major consideration in choosing an appropriate sanction -- along with punishing UBS and deterring future misconduct -- is to restore Zubulake to the position that she would have been in had UBS faithfully discharged its discovery obligations. n98 That being so, I find that the following sanctions are warranted.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n97 *See Fujitsu, 247 F.3d at 436* (holding that the choice of sanctions for spoliation and failure to produce evidence "is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis").

n98 *See West, 167 F.3d at 779* (explaining that [HN16]the chosen sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'") (quoting *Kronisch, 150 F.3d at 126*); *see also Pastorello v. City of New York, 2003 U.S. Dist. LEXIS 5231, No. 95 Civ. 470, 2003 WL 1740606, at *8 (S.D.N.Y. Apr. 1, 2003)*.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*52]

*First,* the jury empanelled to hear this case will be given an adverse inference instruction with respect to e-mails deleted after August 2001, and in particular, with respect to e-mails that were irretrievably lost when UBS's backup tapes were recycled. No one can ever know precisely what was on those tapes, but the content of e-mails recovered from other sources -- along with the fact that UBS employees wilfully deleted e-mails -- is sufficiently favorable to Zubulake that I am convinced that the contents of the lost tapes would have been similarly, if not more, favorable. n99

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

n99 *Cf. Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir. 1994) ("'employers are rarely so cooperative as to include a notation in the personnel file' that their actions are motivated by factors expressly forbidden by law. Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.") (quoting *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir. 1989)) (citations omitted); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir. 1988) ("[In] reality ... direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it. Employers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier.")

Note that I am *not* sanctioning UBS for the loss of the tapes (which was negligent), but rather for its *willful* deletion of e-mails. Those e-mails happen to be lost forever because the tapes that might otherwise have contained them were lost.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*53]

*Second,* Zubulake argues that the e-mails that *were* produced, albeit late, "are brand new and very significant to Ms. Zubulake's retaliation claim and would have affected [her] examination of every witness ... in this case." n100 Likewise, Zubulake claims, with respect to the newly produced e-mails from Kim and Tong's active files, that UBS's "failure to produce these e-mails in a timely fashion precluded [her] from questioning any witness about them." n101 These arguments stand unrebutted and are therefore adopted in full by the Court. Accordingly, UBS is ordered to pay the costs of any depositions or re-depositions required by the late production.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n100 Tr. at 10.

n101 Pl. Mem. at 10.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*Third,* UBS is ordered to pay the costs of this motion. n102

- - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n102 Fed. R. Civ. P. 37(b)(2).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Finally, I note that UBS's belated production [*54] has resulted in a self-executing sanction. Not only was Zubulake unable to question UBS's witnesses using the newly produced e-mails, but UBS was unable to prepare those witnesses with the aid of those e-mails. Some of UBS's witnesses, not having seen these e-mails, have already given deposition testimony that seems to contradict the newly discovered evidence. For example, if Zubulake's version of the evidence is credited, the e-mail from Davies acknowledging receipt of Zubulake's EEOC charge at 11:06 AM on August 21, 2001, puts the lie to Davies' testimony that he had not seen the charge when he spoke to Orgill -- a conversation that was reflected in an e-mail sent at 2:02 PM. Zubulake is, of course, free to use this testimony at trial.

These sanctions are designed to compensate Zubulake for the harm done to her by the loss of or extremely delayed access to potentially relevant evidence. n103 They should also stem the need for any further litigation over the backup tapes.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n103 Another possible remedy would have been to order UBS to pay for the restoration of the remaining backup tapes. Zubulake, however, has conceded that further restoration is unlikely to be fruitful. *See* Tr. at 30-31.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*55]

## C. Other Alleged Discovery Abuses

In addition to the deleted (and thus never- or belatedly produced) e-mails, Zubulake complains of two other perceived discovery abuses: the destruction of a September 2001 backup tape from Tong's server, and the belated production of a UBS document retention policy.

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

## 1. Tong's September 2001 Backup Tape

Zubulake moves for sanctions because of the destruction of Tong's September 2001 backup tape. In *Zubulake III,* I ordered UBS to pay 75% of the cost of restoring certain backup tapes. n104 Understandably, one of the tapes that Zubulake chose to restore was Tong's tape for August 2001, the month that Zubulake filed her EEOC charge. That tape, however, had been recycled by UBS. Zubulake then chose to restore Tong's September 2001 tape, on the theory that "the majority of the e-mails on [the August 2001] tape are preserved on the September 2001 tape." n105 When that tape was actually restored, however, it turned out not to be the September 2001 tape at all, but rather Tong's October 2001 tape. This tape, according to UBS, was simply mislabeled. n106

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n104 *See Zubulake III, 216 F.R.D. at 291.*

[*56]

n105 *Zubulake IV, 220 F.R.D. at 221.*

n106 *See* Def. Mem. at 12 n.8; Tr. at 57 (attributing mislabeling of tape to "human error"); *see also* Declaration of James E. Gordon, Vice President of Pinkerton Consulting & Investigations, Inc. (detailing UBS's investigation into the missing September 2001 tape), Ex. I to the 5/14/04 Declaration of Norman C. Simon ("Simon Decl.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

Zubulake has already (unintentionally) restored Tong's October 2001 tape, which should contain the majority of the data on the September 2001 tape. In addition, UBS has offered to pay to restore Varsano's backup tape for August 2001, which it has and which has not yet been restored. n107 Varsano was Tong's HR counterpart in the United States, and was copied on many (but not all) of the e-mails that went to or from Tong. n108 These backup tapes, taken together, should recreate the lion's share of data from Tong's August 2001 tape. UBS must therefore pay for the restoration and production of relevant e-mails from Varsano's August 2001 backup tape, and pay for any re-deposition of Tong or Varsano that [*57] is necessitated by new e-mails found on that tape.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n107 *See* Tr. at 58-59.

n108 *See id.*

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

## 2. The July 1999 Record Management Policy

Zubulake also moves for sanctions in connection with what she refers to as "bad faith discovery tactics" on the part of UBS's counsel. n109 In particular, Zubulake complains of a late-produced record management policy. n110 The existence of this policy was revealed to Zubulake at Varsano's second deposition on January 26, 2004, n111 at which time Zubulake called for its production. n112 Zubulake twice reiterated this request in writing, in the hopes that she would have the policy in time for Hardisty's deposition on February 5, 2004. UBS did not produce the policy, however, until February 26, 2004. n113

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n109 Pl. Mem. at 8.

n110 *See* June 1999 UBS Record Management Policy for the Americas Region (the "June 1999 policy"), Ex. M to the Batson Aff.

n111 *See* Varsano Dep. at 489-94.

[*58]

n112 *See id.* at 494.

n113 *See* 4/26/04 Letter from Norman Simon, counsel to UBS, to James Batson, Ex. N to the Batson Aff.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

The late production of the July 1999 policy does not warrant sanctions at all. *First,* UBS's production of the policy was not late. Zubulake requested it at Varsano's deposition on January 26, 2004, and UBS produced it one month later, on February 26. [HN17]The Federal Rules afford litigants thirty days to respond to document requests, n114 and UBS produced the policy within that time. The fact that Zubulake wanted the document earlier is immaterial -- if it was truly necessary to confront Hardisty with the policy, then his deposition should have been rescheduled or Zubulake should have requested relief from the Court. n115 Not having done so, Zubulake cannot now complain that UBS improperly delayed its production of that document.

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n114 *See* Fed. R. Civ. P. 34(b).

n115 *See id.* (reserving to the court the authority to lengthen or shorten the time in which a party must respond to a document request).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*59]

*Second,* even if UBS was tardy in producing the policy, Zubulake has not demonstrated that she was prejudiced. She suggests that she would have used the policy in the depositions of Hardisty and perhaps Chapin, but does not explain how. Nor is it at all clear how Zubulake might have used the policy. With respect to e-mail, the policy states: "Email is another priority. We will have a separate policy regarding email with appropriate reference or citation in this policy and/or retention schedules." n116 Prior to these depositions, Zubulake had a number of UBS document retention policies that post-dated the June 1999 Policy. n117

- - - - - - - - - - - - - Footnotes - - - - - - - - - -

n116 June 1999 Policy § 3.2.

n117 *See* Retention of Back-up Tapes of Email Servers (dated June 2001), Ex. H to Simon Decl.; Retention of Back-Up Tapes of E-mail and Interchange (dated October 2001), Ex. K to Simon Decl.; *see also* Ex. M to Batson Aff. (consisting of four UBS document retention policies, including one entitled "Use of Electronic Mail, Chat and Text Messaging," dated November 2002).

- - - - - - - - - - - - End Footnotes- - - - - - - - -

[*60]

## V. CONCLUSION

In sum, counsel has a duty to effectively communicate to her client its discovery obligations so that all relevant information is discovered, retained, and produced. In particular, once the duty to preserve attaches, counsel must identify sources of discoverable information. This will usually entail speaking directly with the key players in the litigation, as well as the client's information technology personnel. In addition,

when the duty to preserve attaches, counsel must put in place a litigation hold and make that known to all relevant employees by communicating with them directly. The litigation hold instructions must be reiterated regularly and compliance must be monitored. Counsel must also call for employees to produce copies of relevant electronic evidence, and must arrange for the segregation and safeguarding of any archival media (*e.g.,* backup tapes) that the party has a duty to preserve.

Once counsel takes these steps (or once a court order is in place), a party is fully on notice of its discovery obligations. If a party acts contrary to counsel's instructions or to a court's order, it acts at its own peril.

UBS failed to preserve relevant [*61] e-mails, even after receiving adequate warnings from counsel, resulting in the production of some relevant e-mails almost two years after they were initially requested, and resulting in the complete destruction of others. For that reason, Zubulake's motion is granted and sanctions are warranted. UBS is ordered to:1. Pay for the re-deposition of relevant UBS personnel, limited to the subject of the newly-discovered e-mails;

2. Restore and produce relevant documents from Varsano's August 2001 backup tape;

3. Pay for the re-deposition of Varsano and Tong, limited to the new material produced from Varsano's August 2001 backup tape; n118 and

4. Pay all "reasonable expenses, including attorney's fees," n119 incurred by Zubulake in connection with the making of this motion.In addition, I will give the following instruction to the jury that hears this case:You have heard that UBS failed to produce some of the e-mails sent or received by UBS personnel in August and September 2001. Plaintiff has argued that this evidence was in defendants' control and would have proven facts material to the matter in controversy.

If you find that UBS could have [*62] produced this evidence, and that the evidence was within its control, and that the evidence would have been material in deciding facts in dispute in this case, you are permitted, but not required, to infer that the evidence would have been unfavorable to UBS.

In deciding whether to draw this inference, you should consider whether the evidence not produced would merely have duplicated other evidence already before you. You may also consider whether you are satisfied that UBS's failure to produce this information was reasonable. Again, any inference you decide to draw

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

should be based on all of the facts and circumstances in this case. n120The Clerk is directed to close this motion [number 43 on the docket sheet]. Fact discovery shall close on October 4, 2004. A final pretrial conference is scheduled for 4:30 PM on October 13, 2004, in Courtroom 15C. If either party believes that a dispositive motion is appropriate, that date will be converted to a pre-motion conference.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n118 Rulings numbered (1) and (3) may both result in the re-deposition of Tong and Varsano. Obviously, each should only be re-deposed once.

**[\*63]**

n119 Fed. R. Civ. P. 37(b)(2).

n120 This instruction was adapted from LEONARD B. SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS 75-7 (2004); *see also Zimmerman v. Associates First Capital Corp., 251 F.3d 376, 383 (2d Cir. 2001)* (affirming district court's use of a similar charge); *cf.* NEW YORK PATTERN JURY INSTRUCTIONS-- CIVIL 1:77 (3d ed. 2004).

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

## VI. POSTSCRIPT

The subject of the discovery of electronically stored information is rapidly evolving. When this case began more than two years ago, there was little guidance from the judiciary, bar associations or the academy as to the governing standards. Much has changed in that time. There have been a flood of recent opinions -- including a number from appellate courts -- and there are now several treatises on the subject. n121 In addition, professional groups such as the American Bar Association and the Sedona Conference have provided very useful guidance on thorny issues relating to the discovery of electronically stored information. n122 Many courts have adopted, or are considering adopting, local rules addressing **[\*64]** the subject. n123 Most recently, the Standing Committee on Rules and Procedures has approved for publication and public comment a proposal for revisions to the Federal Rules of Civil Procedure designed to address many of the issues raised by the discovery of electronically stored information. n124

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n121 *See* MICHAEL ARKFELD, ELECTRONIC DISCOVERY AND EVIDENCE (2003); ADAM I. COHEN & DAVID J. LENDER, ELECTRONIC DISCOVERY: LAW AND PRACTICE (2004).

n122 *See* Memorandum from Gregory P. Joseph & Barry F. McNeil, *Electronic Discovery Standards -- Draft Amendments to ABA Civil Discovery Standards* (Nov. 17, 2003), available at http://www.abanet.org/litigation/taskforces /electronic/document.pdf; The Sedona Conference, *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production* (January 2004), available at http://www.thesedonaconference.org/publi cations_html.

n123 *See, e.g.,* E.D. Ark. Local Rule 26.1; W.D. Ark. Local Rule 26.1; D. Wy. Local Rule 26.1; D.N.J. Local Rule 26.1(d); *see also* Memorandum from the Ninth Circuit Advisory Board, *Proposed Model Local Rule on Electronic Discovery,* available at http://www.krollontrack.com/LawLibrary/ Statutes/9thCirDraft.pdf, D. Kan. *Electronic Discovery Guidelines;* D. Del. *Default Standards for Discovery of Electronic Document.* In addition, a number of states have adopted rules governing electronic discovery. *See, e.g.,* Miss. R. Civ. P. 26; Tex. R. Civ. P. 193.3,196.4. With the exception of the proposed Ninth Circuit model rule, all of these rules are collected at http://www.kenwithers.com/rulemaking/.

**[\*65]**

n124 The proposals forwarded from the Civil Rules Advisory Committee to the Standing Committee can be found on pages 20-70 of the memorandum available at http://www.kenwithers.com/rulemaking/ci vilrules/report051704.pdf. Those proposals were subsequently revised by the Standing Committee; the final text of the proposed rules that will be published for comment should be available some time in August 2004.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

2004 U.S. Dist. LEXIS 13574; 94 Fair Empl. Prac. Cas. (BNA) 1; 85 Empl. Prac. Dec. (CCH) P41,728

Now that the key issues have been addressed and national standards are developing, parties and their counsel are fully on notice of their responsibility to preserve and produce electronically stored information. The tedious and difficult fact finding encompassed in this opinion and others like it is a great burden on a court's limited resources. The time and effort spent by counsel to litigate these issues has also been time-consuming and distracting. This Court, for one, is optimistic that with the guidance now provided it will not be necessary to spend this amount of time again. It is hoped that counsel will heed the guidance provided by these resources and will work to ensure that preservation, [*66] production and spoliation issues are limited, if not eliminated.

SO ORDERED:

Shira A. Scheindlin

United States District Judge

Dated: New York, New York

July 20, 2004

Page 23