## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION<br><br>This Document relates to:<br><br>*Burst.com, Inc.* v. *Microsoft Corp.*,<br>Civil Action No. JFM-02-cv-2952 | MDL Docket No. 1332<br><br>Hon J. Frederick Motz<br><br>**PUBLIC VERSION** |

### MICROSOFT'S SUR-REPLY IN OPPOSITION TO BURST'S MOTION FOR SPOLIATION INSTRUCTION, WITNESS PRECLUSION, AND RELATED RELIEF

Charles W. Douglas
Richard A. Cederoth
John W. Treece
David M. Schiffman
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza, 10 South Dearborn
Chicago, Illinois 60603
(312) 853-7000

David B. Tulchin
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

G. Stewart Webb, Jr.
(Fed. Bar No. 00828)
VENABLE, LLP
Two Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201
(410) 244-7400

Thomas W. Burt
Richard J. Wallis
Steven J. Aeschbacher
C. Andrew Culbert
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98502
(425) 936-8080

*Attorneys for Defendant Microsoft Corporation*

March 9, 2005

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

I.      BURST'S REPLY IS BUILT ON FALSEHOODS. ..........................................................3

II.     MICROSOFT SATISFIED ITS DOCUMENT OBLIGATIONS TO BURST..................7

      A.      Burst's Own Destruction of Documents Frames Its Allegations About
            Microsoft's Document Retention............................................................................9

      B.      Microsoft Had No Duty to Retain Burst-Related Documents in September
            2000 or October 2001. ..........................................................................................13

III.    MICROSOFT SATISFIED ITS DOCUMENT OBLIGATIONS IN THE
       GOVERNMENT CASE. ...............................................................................................16

      A.      Intel Documents....................................................................................................16

      B.      RealNetworks Documents .....................................................................................18

IV.     MICROSOFT'S E-MAIL POLICIES ARE REASONABLE AND LAWFUL................19

      A.      E-Mail Retention Policies Are Legitimate.............................................................20

      B.      The Allchin "Directive" Was Entirely Proper. ......................................................22

      C.      Microsoft Complied With This Court's Document Preservation Order.................23

CONCLUSION...................................................................................................................24

## TABLE OF AUTHORITIES

### CASES

*Anderson v. National Railroad Passenger Corp.*, 866 F. Supp. 937 (E.D. Va. 1994) ....................8

*Blinzler v. Marriott Int'l Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996)....................................................8

*Hynix Semiconductor, Inc. v. Rambus, Inc.*, No. CV-00-20905-RMW, at 7 (N.D. Cal. Jan. 31, 2005) ...........................................................................................................................................7

*Struthers Patent Corp. v. Nestle Co.*, 558 F. Supp. 747 (D.N.J. 1981) ........................................8

*Trigon Ins. Co.* v. *United States*, 204 F.R.D. 277 (E.D. Va. 2001) ...............................................12

*Zubulake* v. *UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ...........................................21

### MISCELLANEOUS

American Bar Association, Civil Discovery Standards, August 1999, Standard No. 10 ................7

7 James W. Moore, *Moore's Federal Practice* § 37A.11[3][a], at 37A-37 (3d ed. 2003) .............7

*The Sedona Principles: Best Practices Guidelines & Commentary for Managing Information & Records in the Electronic Age* (Sedona Conference, Sept. 2004 Public Comment Draft) 20

# INTRODUCTION

Burst has tried to plug the gaping holes in its spoliation motion by submitting another 96 exhibits and 58 pages of briefs. The holes still remain, however, and they fatally undermine both branches of Burst's motion. One branch concerns "the loss of Schiefelbein and Friedman e-mails that may have concerned Microsoft's discussions with Burst during 1999 and 2000." Motion at 50. Any loss of e-mails occurred well before Burst brought this lawsuit in June 2002, and thus before Microsoft had a duty to collect and retain Burst-related documents. Friedman's laptop was recycled when he left Microsoft in September 2000, and Schiefelbein deleted all his e-mails when he returned from paternity leave in September-October 2001. There is no support for Burst's argument that Microsoft should have anticipated a lawsuit back then, and this argument is refuted by Burst's wholesale destruction of its own documents during the same period. Burst justifies this action by saying it had no intention of suing Microsoft at the time. It follows, therefore, that Microsoft had no reason to believe a lawsuit from Burst was probable. In any event, even though Friedman and Schiefelbein deleted their own copies of e-mails, Microsoft has produced a comprehensive record of its dealings with Burst.

The other branch of Burst's motion alleges "the loss of Engstrom, Phillips and Gates e-mail on the subject of communications with Intel regarding its Java multimedia efforts." *Id.* But that alleged loss of e-mails occurred in 1997, before any litigation on this topic was pending or even threatened. The Government Case had not been brought, and the streaming media CID served on Microsoft had not sought any documents about Microsoft's dealings with Intel. Burst's only answer is to argue that Microsoft "had an independent duty to preserve relevant documents." Burst Reply at 12. But Microsoft fulfilled its document obligations to the DOJ, and the Department never claimed otherwise. Microsoft has made available here all of the documents it produced in response to the CID and in the Government Case. Burst has utterly

1

failed to support its novel theory that Microsoft somehow owed Burst and other future litigants an "independent duty" to preserve e-mails that the DOJ never requested. Having preserved and produced documents to the satisfaction of the Justice Department, Microsoft fully discharged its obligations under the CID and in the Government Case.

Burst's Reply rests on the false assertion that "Microsoft decided at the highest levels to push e-mails toward deletion" in order to "avoid leaving a 'paper trail.'" Burst Reply at 1. But the only "high level" decision Burst can point to is the decision to adopt a document retention policy that tells employees, "Unless you are instructed otherwise by a member of the legal department or the tax group, you should keep only those documents that are necessary for you to perform your job." Burst Ex. 14. Even Burst's lead counsel agreed that "in a vacuum that's perfectly innocent." Ex. 3 to Microsoft's opposition brief ("Opp.") at 8.

Burst makes no attempt to reconcile its allegations with the facts – particularly, the massive "paper trail" that Microsoft has preserved and produced. In this case, Microsoft has provided Burst with more than 1,800,000 pages of documents, including more than 550,000 pages in response to Burst's individual requests for material uniquely relevant to its claims. The vast majority of these documents date from 2000 or earlier. If Burst's description of Microsoft's practices were accurate, these documents would not still have existed when Burst brought suit in June 2002. But they did exist (in huge quantities) and Microsoft produced them. The falsity of Burst's charge is perhaps best illustrated by examining the practices of the Microsoft employees whom Burst describes as the "prime contact" on each issue.

**The Intel Prime Contact.** Burst states that "Microsoft's prime contact with Intel" was Marshall Brumer (not Engstrom or Phillips), and it claims that Brumer's e-mails provide crucial evidence about what happened in 1997. Burst Reply Appendix at 9 n.8. Yet, as Burst is forced to admit, when Brumer's files were searched in 2004, he still had his e-mails

about the dealings with Intel in 1997. Burst says it is only by "sheer luck" that Brumer "didn't destroy these documents." *Id.* Rather than "sheer luck," the continued presence of these e-mails shows that Burst has presented a totally false picture of Microsoft's practices and policies.

**The Burst Prime Contact.** Burst states that Bill Schiefelbein had the most important role in "the events at issue in the Burst case." *Id.* at 17. Although Schiefelbein deleted his e-mails, that was not because of any directive from the "highest levels of Microsoft." He did so because, when he took paternity leave, he had a staggering number of e-mails in his files – his estimate was 100,000. Dep. of B. Schiefelbein at 99 (Nov. 30, 2004), Sur-reply Ex. 43. He had not been deleting e-mails after 30 days, or even after six months. Schiefelbein testified that when he "came back to a different role at Microsoft" in the fall of 2001, "I purged all my e-mails whether it was, you know, a letter from my mom or, you know, work or whatever." *Id.* His action was perfectly appropriate. There was no Burst lawsuit at the time. He had not received a retention notice (and there was no reason he should have received one). This was not spoliation.

## I.    BURST'S REPLY IS BUILT ON FALSEHOODS.

Burst's Reply Brief rests on a series of statements that range from the misleading to the downright false.

**The Shook Hardy Opinion That Burst Back-Dates.** In an attempt to show that Microsoft was expecting litigation with Burst well before this suit was filed in 2002, Burst asserts that Microsoft "hired outside law firm Shook, Hardy & Bacon *in 2001* to give it a no-willfulness patent opinion – an opinion designed to provide a litigation defense." Burst Reply at 3 (emphasis added). That is false; Burst has misstated the year. The Shook Hardy opinions were given in August 2002, after Burst filed this lawsuit. *See* Sur-reply Ex. 44 (privilege log entries for opinion letters). In fact, all of Microsoft's consultations with Shook Hardy about the Burst

patents were during 2002. *See* Burst Reply Ex. 66 at 35, 105, 107 (privilege log entries cited by Burst).

**"Copying" Preston Gates with One E-Mail.** Burst also claims that Microsoft "began to copy outside counsel at the Preston Gates firm on Burst-specific correspondence in 2000." Burst Reply at 3. This phrasing – "began to copy" – was no doubt intended to create the impression that Microsoft frequently asked its outside counsel to review "Burst-specific correspondence." In fact, there was only one message that Microsoft forwarded to Preston Gates & Ellis. This was an August 2000 e-mail from Burst seeking Microsoft's "assistance in helping get some definitive, concrete answers for our engineering team." Burst Reply Ex. 64. Clearly, a consultation with counsel about a single e-mail does not mean Microsoft anticipated a lawsuit.

**Four Pages Becomes "Scores" of Documents.** Burst falsely states that Microsoft "withholds from production scores of Burst-specific documents from 2000 and 2001 because they were 'drafted in anticipation of litigation.'" Burst Reply at 3. Actually, Microsoft has withheld only three such work product documents, totaling four pages. Each is a legal memorandum written by John Weresh, an in-house patent lawyer, and two of the three memos did not involve any of the patents at issue in this case.[1] As previously indicated (Opp. at 24), Microsoft would be pleased to submit these documents to the Court for an *in camera* review to confirm that they do not show any belief on Microsoft's part that litigation from Burst was probable or expected.

---

[1] The three memos are discussed below at pages 14-16. Microsoft has identified multiple copies of each on its privilege logs. The first memo, from December 2000, is PBUR 5001207-08, PBUR 5002026-27, PBUR 5002065-66, PBUR 5002098-99 and P MS-CC-Bu 3413-14. The second memo is PBUR 5001205, PBUR 5002028, PBUR 5002095, PBUR 5002220 and P MS-CC-Bu 3409. The third memo is PBUR 5001209, PBUR 5002024, PBUR 5002068 and PBUR 5002101. In addition to these memos, which were not produced, Microsoft has redacted passages from a string of e-mails in December 2000 (P MS-CC-Bu 36406-26) that are related to the December 2000 memo. The Court is, of course, welcome to review those e-mails as well.

**The "Deleted" Bill Gates E-Mail That Microsoft Produced in 1998.**  Burst has repeatedly distorted the record in an attempt to show that relevant e-mails from Bill Gates were lost.  Burst's motion alleged that in "December 1997," copies of some "1996 and 1997" e-mails were deleted from a back-up tape.  Motion at 28.  Actually, the incident in question occurred in 1996 – the date Burst itself identified in an earlier motion.  *See* Opp. Ex. 36 at 9.  In its spoliation motion, however, Burst changed the date of the alleged file deletion from 1996 to "December 1997," and it omitted the deposition pages that revealed the correct date.[2]  Burst misstated the year because it knew that documents from 1996 are irrelevant to its streaming media allegations about Intel – a point made graphically in Burst's diagram of "Streaming Media Events," the earliest of which was in February 1997.  *See* Burst Reply at 9.  Microsoft pointed out this misstatement in its opposition brief (Opp. at 44-45 & nn. 17-18), yet Burst provided no reply.

Instead, Burst has invented another false story.  It now contends that someone deleted an "October 15, 1997 e-mail" sent by Mr. Gates to the head of Intel.  Burst Reply at 10.  Burst argues that this message must have been deleted because, supposedly, Microsoft "did not have" the e-mail in its files.  But Microsoft produced it in the Government Case (with the "MS98" prefix) and produced it again here (with the "MS-CC-Bu" prefix).  Sur-reply Ex. 45 (MS98 017140); Burst Reply Ex. 54.[3]

---

[2] Burst's source for this allegation was the deposition of Mark Johnson (Dec. 15, 1998).  *See* Motion at 28-29.  But the deposition excerpt that Burst attached to its spoliation motion (Burst Ex. 22) left out the transcript pages in which Johnson gave the date:  "This happened in December of 1996."  Opp. Ex. 35 at 38:23-24.

[3] Burst's underlying assertion – which it has never tied to any documents relevant to this case – is that a technical assistant to Mr. Gates "was apparently deleting his e-mail."  Burst Reply at 10.  Actually, when the assistant was deposed in the Government Case, he testified that one of his responsibilities in working for Mr. Gates was to "make sure the e-mail is backed up in case of catastrophic failure on the portable so that we can restore the e-mail files."  Dep. of E. Rudder at 31 (Dec. 15, 1998), Burst Reply Ex. 56 at 31.  During the backups, he would "copy every single file within the e-mail box, including the in-box, sent items and delete items."  *Id.* at 79.  Mr.

**The Engstrom "Litigation Hold" Agreement That Never Existed.** A further misrepresentation is Burst's attempt to create a duty on Microsoft's part to preserve Mr. Engstrom's Intel documents in 1997, before the Government Case was brought and before the Justice Department raised any Intel allegations. Burst asserts that during the fall of 1997, amidst the negotiations with the DOJ over the scope of the CID, Microsoft "agreed to preserve Mr. Engstrom's documents" and made a "promise" to "put [him] on litigation hold." Burst Reply at 8-9, 10. But the letter Burst cites (Burst Reply Ex. 51) says nothing of the kind, and the Court is respectfully urged to review it. This letter, which was written by the DOJ, does not refer to Mr. Engstrom or any other document custodian. It does not address the issue of whose documents should be searched, or when. And it does not discuss putting people on litigation hold.

The purpose of the letter, as stated in its first sentence, was "to put together a full list of the Document Requests in the above referenced CID as modified during our negotiations." In the paragraphs that followed, the letter described the categories of documents that the DOJ was still seeking. As to a few categories, the DOJ did not ask Microsoft to produce the actual documents, but simply asked that they be preserved for the time being: "We agreed that Microsoft's obligation to produce materials in response to a limited number of document requests is deferred . . . on the understanding that, until completion of this investigation or any litigation arising therefrom, Microsoft will preserve and maintain the deferred information and documents." Burst Reply Ex. 51 at 5. None of these "deferred" categories involved the subject

---

Gates also maintained "legal search folders" for e-mails that "may be called for in litigation," but those were another person's responsibility; "somebody filters through the mail and intentionally keeps what may be relevant to litigation." *Id.* at 72.

In any event, this allegation does not remotely amount to spoliation because (1) deleting a back-up copy does not delete the e-mail, and (2) Burst has not shown that Microsoft had a duty at that time to retain any documents of Mr. Gates that are material to this case.

of Burst's motion: "communications with Intel regarding its Java multimedia efforts."[4]  Thus, it

is a complete falsehood for Burst to assert that "Microsoft did not provide e-mails in the DOJ

Case, even though it promised DOJ that it would."  Burst Reply at 5.  Microsoft kept its

promises, both as to the CID and in the separate Government Case – and the DOJ never claimed

otherwise.

## II.     MICROSOFT SATISFIED ITS DOCUMENT OBLIGATIONS TO BURST.

Burst claims that Microsoft had a duty to preserve its Burst-related documents in

2000 and 2001 because this lawsuit "was far from unexpected."  Burst Reply at 16.  But Burst

has misstated the facts, and its legal premise is wrong.  The duty to preserve documents is not

triggered merely because litigation is "far from unexpected."  As Microsoft demonstrated in its

opposition brief, the duty arises only when "litigation is probable or has been commenced."

American Bar Association, Civil Discovery Standards, August 1999, Standard No. 10

("Preservation of Documents").  *Accord* 7 James W. Moore, *Moore's Federal Practice*

§ 37A.11[3][a], at 37A-37 (3d ed. 2003) ("litigation must be probable and not merely possible").

Only last month, Judge Whyte framed the test as follows:  "The question, then, is whether

Rambus had commenced *or intended to commence litigation* at the time it implemented its

document retention policy and began destroying documents." *Hynix Semiconductor, Inc. v.

Rambus, Inc.*, No. CV-00-20905-RMW, at 7 (N.D. Cal. Jan. 31, 2005) (emphasis added), Sur-

reply Ex. 46.

---

[4] The letter identified three "deferred" categories of documents.  One involved the back-up
support for Microsoft's quantification of "the reasons for" its investments in RealNetworks and
VDOnet and its acquisition of VXtreme.  Another asked about any "post-employment
restrictions" on certain former employees of VXtreme.  The third concerned "Microsoft's
investment in or agreements with any person . . . relating to the acquisition or license by
Microsoft of audio or video streaming technology or software."  Burst Reply Ex. 51 at 1-2, 4.

The cases that Burst cites (Reply at 36-37) do not lower that standard. In *Anderson v. National Railroad Passenger Corp*, 866 F. Supp. 937, 945-46 (E.D. Va. 1994), the parties were already in litigation and plaintiff's counsel had told defendant that he wanted to inspect the accident site before the defendant bulldozed it; that is what the court referred to when it said defendant was "on notice that the evidence 'might be necessary' to some party's claim" – and even then, in a portion of the sentence that Burst omits, the court stated that it "was not subscribing to this as the proper standard." *Id.* In *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1159 (1st Cir. 1996), the First Circuit required proof of "circumstances that are *likely* to give rise to future litigation." *Id.* (emphasis added). Burst also misstates the holding in *Struthers Patent Corp. v. Nestle Co.*, 558 F. Supp. 747 (D. N.J. 1981), where plaintiff, upon settling its patent suit against General Foods, destroyed documents from that action and sued Nestle two months later for infringing many of the same patents. At one point in the opinion, the court stated that when the documents were destroyed, plaintiff "knew or should have known that litigation against Nestle on the patents at issue was a distinct possibility." *Id.* at 759. Burst quotes the opinion's "distinct possibility" language, but omits the court's statement of the "applicable rule": "'The proper inquiry here is whether [a party], *with knowledge that this lawsuit would be filed*, willfully destroyed documents which it knew or should have known would constitute evidence relevant to this case.'" *Id.* at 765 (*quoting Bowmar Instr. Corp. v. Texas Instruments, Inc.*, 25 Fed.R.Serv. 2d 423, 427 (N.D. Ind. 1977)) (emphasis added).

Burst has never shown that the lawsuit it ultimately filed in June 2002 was "probable" or "intended" in September 2000, when Friedman left the company, or in September-October 2001, when Schiefelbein returned from paternity leave. Furthermore, Burst does not have a coherent answer to two key questions: What kind of suit does it claim was probable –

patent or antitrust?  And if Burst itself did not then expect to bring a lawsuit against Microsoft,

how can it legitimately claim that Microsoft should have expected to be the target of such a suit?

### A.    Burst's Own Destruction of Documents Frames Its Allegations About Microsoft's Document Retention.

Burst's conduct in November 2000 establishes that a lawsuit against Microsoft

was neither probable nor intended.  At that time, Burst terminated more than 50 employees,

including nearly all of its software engineers and sales personnel.  According to Burst's 30(b)(6)

witness on document preservation, the computers of the terminated employees were "wiped

clean" and, with limited exceptions, any hard-copy documents they left behind were "discarded."

Dep. of R. Lang at 35-36 (Nov. 24, 2003), Opp. Ex. 13.  For example, there is no dispute that

Burst's Vice President of Product Marketing and Business Development destroyed his notes of

the October 1999 meeting in which Burst presented its technology to Microsoft.  Dep. of M.

Moskowitz at 23, 48-49 (Oct. 10, 2003), Opp. Ex. 8.  This is the meeting that led Microsoft's

engineers to conclude "that the [Burst] technology will not work in most environments and for

most scenarios that customers require."  Burst Ex. 44.

Burst responds that it was able to produce some documents of the terminated

employees, presumably because copies existed elsewhere.[5]  The same is true, of course, for large

numbers of Friedman and Schiefelbein e-mails.  Although their personal copies were deleted,

other copies remained.  *See* Chart of E-mails Produced by Microsoft That Relate to the Burst-

Microsoft "Exchanges" Previously Identified by Burst, Opp. Ex. 7.

---

[5] Burst says it was able to produce some documents from two of its engineers, Faulkner and Thayer, but lamely acknowledges that it "may not have had all their e-mail from some five years previous."  Burst Reply at 32.  Also, Burst admits that it "had an engineering staff of *four*" at the time (*id.* at 34), even though it only produced documents from two.

Burst destroyed documents that were clearly important to its claims against Microsoft. For example, Burst no longer has any documentation of the work performed by its engineers when they examined the Sun and Intel Java Media implementations. Burst now asserts that its engineers "compared Intel and Sun in side by side performance tests" (Burst Reply at 34), but it destroyed any records of those tests and the results. This loss prejudiced Microsoft's ability to defend against the claim that Burst was harmed by having to use the Sun version. The issue here is not, as Burst puts it, whether its engineers "concluded that the Sun version was better" (*id.* at 34 n.16), but whether the Sun version could meet Burst's needs. Burst's position would be undermined if its engineers had concluded that the differences between the two versions were unimportant. But Burst destroyed all records of the engineering comparisons. It also wiped clean the computers of the engineers who could confirm or deny Burst's assertions about alleged "compatibility" problems with Windows Media 7.0.

Furthermore, Burst destroyed its "Goldmine" customer relationship management database, which tracked (among other things) the comments and complaints made by Burst's customers and potential customers. Burst now tries to downplay the significance of this data, but its Vice President of Operations testified that the aptly-named Goldmine was "valuable in the sense that it's good to know what customers had to say about the product." Dep. of E. Walters at 127 (Sept. 23, 2004), Opp. Ex. 14. Although copies of the database resided on the hard drive of each individual who had access to it, every one of those copies was destroyed. *Id.* at 41-42, 49, 89, 91-93, 212-15. Burst replies that the date it purged the Goldmine database is not "clear," although it admits that the destruction occurred "sometime between August 2000 and November of 2000." Burst Reply at 34. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████ Sur-reply Ex. 47, BUR5024746. ████████████████

████████████████████████████████████████████████████

███████████████████████████ *Id.*

Burst tries to justify its destruction of engineering and sales documents in late 2000 by asserting that "████████████████████████" Burst Reply at 34.

████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* at 33

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ *Id.*

These statements by Burst are important. First, they refute any argument that Microsoft should have expected Burst to bring an antitrust suit. ███████████████████

███████████████████████████████████████████████ (1) it had just disbanded its workforce, (2) it allegedly blamed Microsoft for its business failure, and (3) the Findings of Fact in the Government Case (on which it now relies) had been entered a year earlier. Burst does not contend that anything changed after November 2000 that should have led Microsoft to expect an antitrust suit.

Second, Burst's decision to "wipe clean" the computers of more than 50 departing employees in November 2000 precludes any claim that Microsoft had a duty to preserve the Burst-related documents on the computer of one departing employee, Will Friedman, who left in September 2000. Burst contends that Microsoft must have expected a lawsuit from Burst because, in August 2000, Friedman had forwarded to outside counsel a single Burst e-mail. This message said that Burst's "engineering team" wanted Microsoft's "assistance" in developing "a

Burst Plug-In for WMP-7," and warned that "we are in serious danger of losing [a] great

prospect" if the plug-in was not completed. Burst Reply Ex. 64, at 2. As explained above, the

mere fact that Friedman consulted with a lawyer before responding to this e-mail does not show

that Microsoft thought a lawsuit was probable. ████████████████████████████████

████████████████████████.

       Third, Burst agrees that for document retention purposes, "patent infringement"

claims are very different from "trade secret or antitrust" claims. Burst Reply at 33. In patent

cases, the issues are narrower and therefore, Burst states, the retention obligations are more

limited. *Id.* Yet Burst ignores this distinction when the shoe is on the other foot. It first argues

that Microsoft should have expected a patent suit, and then chides Microsoft for not retaining

every document about its "discussions with Burst during 1999 and 2000" that might relate to a

potential antitrust claim.

       Most telling is Burst's justification for destroying its employee's documents and

the Goldmine database: Burst says it had "no business reason to maintain" them and did not

believe they "would be needed for litigation." Burst Reply at 34. This is precisely the rationale

for Microsoft's document retention policy: "Unless you are instructed otherwise by a member of

the legal department or the tax group, you should keep only those documents that are necessary

for you to perform your job." Burst Ex. 14. Absent a legal duty to preserve particular

documents, a company is free to discard them. *See Trigon Ins. Co. v. United States*, 204 F.R.D.

277, 286 (E.D. Va. 2001) ("[W]ithout such an obligation, there [is] no wrongdoing in destroying

relevant documents.")

**B.    Microsoft Had No Duty to Retain Burst-Related Documents in September 2000 or October 2001.**

Even if Burst's own document destruction did not prove the point, there is no basis for finding a duty on Microsoft's part to preserve documents about its dealings with Burst in either September 2000 (when Friedman left) or September-October 2001 (when Schiefelbein returned to his new job). In its Reply Brief, Burst argues that Microsoft expected patent litigation. As shown below, this allegation is contrary to the evidence, and it fails for two reasons that should be noted at the outset.

First, the Friedman and Schiefelbein deletions occurred well before the alleged infringement even began. Burst alleges that its patents were first infringed by the Windows Media 9 Series. *See* Amended Complaint ¶ 10; *see also* Burst.com, Inc.'s Initial Expert Report Concerning Patent Infringement ¶¶ 15-21, Sur-reply Ex. 48 (███████████████████████ ████████████████████████). But the first sale of an allegedly infringing Windows Media 9 Series product did not occur until April 2003 with the launch of Windows Server 2003. Expert Report of Sharon Oster at 34-35, Sur-reply Ex. 49. Burst admits that "Schiefelbein deleted his mail before Windows Media 9 Series was even introduced." Burst Reply Appendix at 18.

Second, even if it could be said that Microsoft should have expected a patent suit back in 2000 or 2001, Burst has made no attempt to show that Friedman's or Schiefelbein's e-mails would be evidence in such a suit, and thus within the scope of any retention duty. On the contrary, Burst admits that, despite its own plan to bring a patent suit against RealNetworks, it was free to wipe clean the computers of its engineers and sales personnel because their documents were not relevant to the anticipated suit. In any event, Microsoft has shown that it

produced numerous e-mails about every meeting between the companies and every exchange regarding Burst. *See* Opp. at 26-27.[6]

Burst asserts that in "late 2000, Microsoft viewed the situation with Burst as a 'game of chicken' with the clear threat of litigation." Burst Reply at 17. This passage refers to a November 2000 meeting that occurred soon after Burst had terminated most of its employees. Burst proposed that Microsoft buy the whole company (including its patents). At this meeting, the implied threat was, "if you don't buy us, you know, there's a high chance . . . we're going to sue." Dep. of M. Beckerman at 204 (Nov. 4, 2003), Burst Reply Ex. 67. Burst now admits what Microsoft recognized at the time: This was a hollow "threat." Microsoft was not infringing any of Burst's patents, ███████████████████████████████████████████ ████████████████████████████████. Burst Reply at 33-34. In any event, the "threat" status in November 2000 is irrelevant, for Friedman had left two months earlier, before any threat was made, and Schiefelbein did not delete his files until almost a year later, long after Burst had ceased its threats.

On December 6, 2000, Burst met with Microsoft and brought its patent lawyer, who described Burst's patent portfolio and expressed the view that "████████████████." MS-CC-Bu 270898-99, Sur-reply Ex. 50. Burst's CEO told Microsoft that he wanted

████████████████████████████████████████████████████

███████ *Id.* Microsoft had little interest. "We have passed on 'buy the patents insurance policies' many times." *Id.* A few days later, Mr. Weresh wrote the first of his legal memos,

---

[6] Burst argues that "Schiefelbein's e-mail would have clarified the discussions with Mr. Friedberg." Burst Reply at 26. The person referred to here – Jeff Friedberg – should not be confused with Will Friedman. Jeff Friedberg still had Burst-related e-mails and they were produced. Hence, there is every reason to believe that if Schiefelbein had exchanged any other e-mails with Friedberg, Microsoft would have found them during document production.

which the Court is invited to examine *in camera* if it wishes to see Microsoft's view of the Burst patents.

On February 8, 2001, the parties spoke by telephone. Microsoft told Burst that it was not interested in buying the company, "and that the only opportunity that made sense to us was to get a license to specific patents as an insurance policy, and that the cost for that would have to be well under $1 Mill." MS-CC-Bu 284084-85, Sur-reply Ex. 51. In an internal Burst e-mail, the Vice President of Sales wrote: "█████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████" BUR90903-04, Sur-reply Ex. 52. The reply: "███████████ ████████████████████████████████████████████" *Id.* █████████████████ ████████████████████████████████████████████████ BUR56459, Sur-reply Ex. 53. ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ BUR72377, Sur-reply Ex. 54. There were no further negotiations.

Mr. Weresh's second legal memo was dated June 7, 2001. As Burst admits, this was "long after the negotiations over licensing Burst technology had ended." Burst Reply at 17. The memo did not discuss any of the Burst patents at issue in this lawsuit. Burst tries to cast a sinister light on this half-page memo by stating: "Mr. Schiefelbein destroyed his e-mail soon after receiving this communication. *Id.* at 18. Actually, what happened "soon after" he received the memo is that his daughter was born. Then he went on paternity leave. Then he returned to a new job in September-October 2001. And then he deleted all his old e-mail.

This history refutes the claim that Microsoft was expecting a lawsuit from Burst. At the time Schiefelbein deleted his e-mails, Microsoft had not yet distributed, licensed, beta-

tested or even announced any products that allegedly infringed Burst's patents. It had offered

Burst a sum that was far less than the costs of litigation. This is not the behavior of a company

that believes an infringement suit is probable. Then, after Microsoft rejected Burst's counter-

proposal, months went by and nothing happened. Burst did not sue Microsoft. It did not send

threatening letters. ██████████████████████████████████████

██████████████████████████████. Under these circumstances, it simply

cannot be said that a Burst lawsuit was probable at the time Schiefelbein returned from paternity

leave and deleted his e-mail.

The final legal memo that Burst cites was sent in November 2001, and it is doubly

irrelevant. Not only did this half-page memo come after Schiefelbein's deletions, but (like the

June 2001 memo) it did not discuss any of the patents at issue in the lawsuit.

In sum, Burst has failed to show that Microsoft breached a duty to preserve Burst-

related e-mails; it has failed to show that any important e-mails were actually lost; and it has

offered no reason to believe that any allegedly missing e-mails would have supported Burst's

position in this lawsuit.

## III.    MICROSOFT SATISFIED ITS DOCUMENT OBLIGATIONS IN THE GOVERNMENT CASE.

### A.    Intel Documents

Burst has moved for a jury instruction about "the loss of Engstrom, Phillips and

Gates e-mail on the subject of communications with Intel regarding its Java multimedia efforts."

Motion at 50. But Burst has failed to show that any e-mails were lost at a time when Microsoft

had an obligation to retain documents on this topic. There was certainly no duty before the

Government Case was filed in May 1998. Indeed, as Microsoft pointed out in its Opposition,

this topic did not become an issue in the Government Case until August 14, 1998, when the DOJ

16

served its Third Joint Request for Production of Documents. *See* Opp. at 38-39, 43. Microsoft

acted immediately. Within days, it had collected documents from Engstrom and Phillips,

preserving not only the specific materials requested by the DOJ but also a very large number of

documents that were *not* requested.[7]  Opp. Ex. 1, ¶¶ 9-10.

Burst's objection rests on testimony that Engstrom and Phillips deleted their e-

mails every month or two. *See* Burst Reply at 10 (quoting Engstrom: "As a routine basis, I

delete all mail, you know, two months old"); *id.* at 5 ("Phillips 'mass-deleted' his e-mails

generally"). Thus, any deletion of e-mails about their dealings with Intel would have occurred

soon after the messages were sent – and Burst unequivocally places those communications in

1997. *See, e.g.*, Burst Reply Appendix A at 4-14 (relevant matters occurred during 1997);

Amended Complaint ¶ 67 ("By late 1997, Microsoft had reached an agreement with Intel

whereby Intel would phase out its support for its Java Media Framework"); Motion at 45 ("In

late 1997, Eric Engstrom 'did a deal' with Intel").

Thus, although Burst complains that Engstrom and Phillips deleted their Intel-

related e-mails in 1997, those actions occurred (1) before the Government Case was brought, (2)

before the DOJ raised allegations about Intel, and (3) before the DOJ sought any discovery about

Microsoft's dealings with Intel. In sum, the alleged deletions occurred at a time when Microsoft

had no duty to preserve such documents. Burst has no response to this decisive point, except to

argue that, somehow, the Justice Department's CID in 1997 required Microsoft to preserve its

communications with Intel regarding Java multimedia efforts. But the CID never mentioned

Intel. *See* Burst Ex. 26. The DOJ was investigating Microsoft's investments in RealNetworks,

---

[7] Engstrom and Phillips both left Microsoft in 1999. Because their documents had already been
collected and reviewed, Microsoft did not conduct a new search when they left. Burst does not
argue that any relevant events occurred between August 1998, when their documents were
collected, and their departures in 1999.

VXtreme and VDOnet, not its dealings with Intel about Java. *Id.* The Justice Department understood this fact. That is why it never claimed that Microsoft violated any preservation orders or otherwise failed to comply with its document obligations, even though all of the testimony that Burst now relies on about the alleged loss of Engstrom, Phillips and Gates e-mails was elicited by the DOJ in the Government Case.

### B.    RealNetworks Documents

Though challenged to do so (Opp. at 35), Burst cannot establish the relevance of its allegations about RealNetworks documents. Its motion does not seek any relief on this topic, and its Amended Complaint dropped the claim of a conspiracy between RealNetworks and Microsoft. In fact, Burst's economic expert barely mentioned RealNetworks in his report.[8] Thus, Burst's arguments about RealNetworks documents is a red herring. And once again, Burst has failed to show that Microsoft destroyed documents it had a duty to preserve.

**Mr. Phillips.** There is no dispute that the DOJ reached an agreement with Microsoft about the specific employees whose files would be searched in response to the 1997 CID, and that Mr. Phillips was not on the list. *See* Opposition at 35-37. Burst replies that Phillips must have had an important role in the negotiations because he met with RealNetworks' "chief technical person." Burst Reply at 12. That is precisely the point; the evidence establishes that his role was directed at technology issues. *See* Dep. of C. Phillips at 27 (Sept. 28, 2004), Opp. Ex. 31 ("I started negotiating about their adoption of DirectX technologies and alignment on some file formats and for them using our framework for their codecs, but I never

---

[8] ███████████████████████████████████████████ Expert Report of Jeffrey J. Leitzinger, Sur-reply Ex. 55 at 17, 29.

consummated an agreement with them."); Dep. of E. Engstrom at 144:1-5, Opp. Ex. 30 ("What Chris Phillips and I were working on was the technology piece that we were still involved in, not the terms of the agreement."). Burst may be interested in the technology details, but the Justice Department was not, and so it did not ask Microsoft to search or collect Mr. Phillips' documents. That was the DOJ's call to make in 1997, not Burst's in 2005.

      **Mr. Engstrom.** During the negotiations over the CID, the Justice Department designated Mr. Engstrom as a "Priority 3" employee. MS-CC-Bu 9001640-1643, at 90011641-42, Opp. Ex. 28. The DOJ asked Microsoft to collect documents from the Priority 1 employees, but never asked it to search the files of those designated as Priority 2 or 3. Indeed, the DOJ did not even reach the point of specifying the time period that would apply if it later asked for Engstrom's documents. *See id.* at 9001641 ("dates t.b.d." for Engstrom). It then terminated the CID investigation, and when it filed the Government Case, its Complaint did not mention RealNetworks or streaming media.

      In all, Microsoft produced some 29,000 pages in response to the CID. Opp. Ex. 1, ¶ 5. The DOJ was satisfied that it had discovered the facts about the RealNetworks deal, and Burst has not shown otherwise.

## IV.    MICROSOFT'S E-MAIL POLICIES ARE REASONABLE AND LAWFUL.

      Burst renews its attacks on Microsoft's general e-mail policies, but has no answer to four key points. First, it was (and is) easy for Microsoft employees to keep and save their e-mail. Although the OTG servers were not intended to be used for storing e-mail (a fact that makes Burst's continued complaints about the OTG back-up policies even more irrelevant), other storage methods have always been readily available (in addition to the Exchange servers). Employees primarily saved e-mails on their computers. They could also save e-mails on other

file servers or on storage devices such as zip drives. Opp. at 49-50. Second, the record shows

that an employee's e-mails were not deleted unless he or she affirmatively chose to delete them.

None of Microsoft's systems deleted e-mails that an employee wanted to keep. *Id.* at 50. Third,

the failure to make back-up tapes did not destroy any e-mails; it only meant that Microsoft did

not create another extra copy. *Id.* at 48. And fourth, Microsoft's guidelines have always had an

explicit exception for documents that must be saved in connection with litigation. *Id.* at 46-47.

### A.    E-Mail Retention Policies Are Legitimate.

Burst's lead lawyer previously told this Court that "if a company had a policy that

said we want to purge our e-mails every 30 days, 60 days or 6 months, in a vacuum that's

perfectly innocent." Opp. Ex. 3 at 8. Now Burst claims that such a policy is "irrational, absent a

larger corporate decision not to maintain a permanent e-mail record." Burst Reply at 22. Burst

got it right the first time. Corporations around the globe have established similar guidelines,

which have come to be recognized as "best practices." *See The Sedona Principles: Best*

*Practices Guidelines & Commentary for Managing Information & Records in the Electronic Age*

at 24 (Sedona Conference, Sept. 2004 Public Comment Draft) (Tab F of the Compendium of

Unpublished Authorities and Secondary Sources submitted with Microsoft's Opposition). In

fact, one of the Sedona Principles, set forth in boldface type, is that "an organization may destroy

or delete electronic information when there is no continuing value or need to retain it." *Id.* at 24.

It is perfectly legitimate to adopt a corporate policy that tells employees to delete

e-mails they have no business or legal reason to keep. E-mail storage is expensive.[9] Burst

---

[9] Burst misquotes Microsoft's Deputy General Counsel in at attempt to argue that storing e-mails
is cheaper than deleting them. A recent *Business Week* article cited Thomas Burt's statement
that "it costs you more to think about whether to delete something than simply to leave it on your
computer." Burst Reply Ex. 74. Mr. Burt was not saying that it was cheaper for the company if
employees save all their e-mail, but rather that many individuals, who do not personally bear the

blithely asserts that, at "$50 a tape," it "would cost just $30,000 a year" for Microsoft to save copies of all its e-mails. Burst Reply at 22. Burst knows this claim is false. As already pointed out, the cost of the tapes is only the beginning. When more e-mails are stored, a company must pay for "additional disk space, bandwidth, hardware, software, archival systems and the cost of their related media migration requirements," together with "the cost of technical staff for maintaining such information." *Sedona Principles, supra*, at 24-25. It would "cripple large corporations" if they had to maintain "every e-mail or electronic document, and every back-up tape." *Zubulake* v. *UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).

Furthermore, Burst never explains why corporations should be expected to keep a "permanent record" of all e-mails. Like most companies, Microsoft makes backup tapes of some records for "short-term disaster recovery," but there is no need to maintain a permanent archive of messages that employees have chosen to delete. Burst states that e-mail "has replaced the phone call, and the candid conversation in the conference room." Burst Reply at 19. But corporations generally do not record telephone calls or bug conference rooms to maintain a "permanent record."

Burst tries to impugn Microsoft's policy by quoting a statement, which it attributes to Microsoft, that e-mail "worries legal departments around the world." Burst Reply at 20. This quotation actually comes from an article in *Windows NT* magazine, a non-Microsoft publication aimed at IT administrators. And Burst neglects to include the immediately preceding sentence, which was the main point of the article. The author explained that when people save too much e-mail, one result is "extremely long backup times"; another is that "getting the server

---

storage costs, may find it easier to save everything by default. This, of course, explains how Schiefelbein built up a backlog of 100,000 e-mails, and it is precisely why corporations adopt policies urging employees to delete unneeded e-mail.

back online quickly after hardware failures [is] a difficult task." Sur-reply Ex. 56. That is why the author urged IT administrators to "control mailbox size by encouraging users to regularly clean-up their mailboxes." *Id.* In short, this article demonstrates the legitimate interest that companies have in reducing the amount of stored e-mail.

### B.    The Allchin "Directive" Was Entirely Proper.

Although Burst criticizes Jim Allchin's e-mail "directive" (Burst Ex. 14), it never explains precisely what is wrong with the policy, let alone how the policy violates any legal requirements. The actual language bears repeating:

> To the best of your ability I would like us to follow the general rule of around 30 days for EMAIL. Some of you may be in unique circumstances that require particular information to be kept for longer than 30 days to do your job effectively. My direction to you is that I want you to think about this issue at least once a month and delete items that are no longer needed, including all your general email. Don't just blindly archive email!
>
> Also, many of you have received specific instructions from Legal to retain certain documents or email that may be related to pending litigation. These instructions override the general policy. You should follow those instructions carefully and ask Legal if you have any questions.

Instead of addressing the substance of this policy, Burst questions Allchin's motive.[10] Burst insists it is "absurd to say that Mr. Allchin was concerned about file corruption," and states that the "e-mail speaks for itself." Burst Reply at 22. Indeed it does. The e-mail chain that led to Mr. Allchin's directive (Burst Ex. 13) begins with the following exchange:

---

[10] Burst also falsely accuses Mr. Allchin and Mr. Burt of giving misleading deposition testimony (in another case) about the e-mail retention policy, and it has proposed an evidentiary hearing in which they (and Mr. Engstrom, who left Microsoft in 1999 and lives in Washington State) will be "called as witnesses." Burst Reply at 3-4, 23-24, 39. A review of the deposition transcripts will confirm that their testimony was accurate and truthful. *See* Burst Ex. 16, Burst Reply Ex. 76. Burst has already had a full opportunity to question each of these men, and there is no conceivable reason for any of them to be called to testify once again.

**Here is email I saw the other day:**
-- Original Message --

just an fyi – **NEVER LET YOUR PST FILE GET AS LARGE AS 2GB, OR IT WILL BE TOTALLY CORRUPTED.** Thanks to this bug, I lost 3 years of mail archives.

Burst has also failed to show that the Allchin e-mail is pertinent to the alleged e-mail losses at issue here. Though challenged to do so (Opp. at 47), Burst cannot show a link. If any Engstrom, Phillips or Gates files were deleted, that occurred long before Allchin sent his e-mail in January 2000. In fact, Engstrom and Phillips no longer worked at Microsoft when Allchin sent his e-mail, and Bill Gates never worked for Allchin or in his group. Moreover, the Allchin e-mail is not the reason why Friedman's computer was recycled when he left the company; that was standard policy. Nor was it relevant to Schiefelbein's decision to delete his old e-mails after returning from paternity leave. Further, the difference between these two retention periods – six months or 30 days – has no bearing on Burst-related e-mails, for all of them were much older than six months when Burst filed suit in June 2002.[11] Burst's effort to make an issue of the Allchin e-mail is a canard.

### C.     Microsoft Complied With This Court's Document Preservation Order.

In its Reply Brief, Burst raises several claims that Microsoft failed to comply with this Court's Order of May 3, 2000. All of these claims are false.

First, Burst argues that Microsoft "should have abandoned its process of rotating e-mail back-up tapes." Burst Reply at 28. But the Order expressly authorized the parties to

---

[11] Even among the people in Mr. Allchin's group, there is no support for Burst's assertion that the directive led to "massive deletions of e-mail after just thirty days." Burst Reply at 29. All indications are that Allchin's message had little impact. As Microsoft pointed out previously, the average number of e-mails saved did not decrease at all between December 1999 (the month before Allchin's directive) and February 2000 (the month after); in fact, e-mails were being saved at a higher rate afterwards. Opp. Ex. 1 ¶ 16.

"continue routine erasures of computerized data pursuant to existing programs." Order ¶ 4(d),

Burst Ex. 1. Burst also suggests that Microsoft was required to notify plaintiffs' counsel about

Allchin's directive. Burst Reply at 27. But Allchin's e-mail did not deal with "routine erasures

of computerized data," and Allchin explicitly told employees to follow all instructions to retain

"documents or email that may be related to pending litigation." Burst Ex. 14.

Next, Burst objects that Microsoft took four months to identify the additional

custodians – besides those already under retention in the Government Case – for the new issues

raised by the Consumer Cases. No one at the time objected that four months was too long,

particularly for a process that required negotiations between plaintiffs and Microsoft. And Burst

never explains how the amount of time this process took – whether four days or four months –

has any bearing on its own case. The consumer complaints did not mention Burst in any way,

nor did they mention streaming media.

Finally, Burst complains that when employees who were once under retention left

the company, Microsoft erased their computers. But Microsoft reached an explicit agreement

with plaintiffs' counsel that "after we have collected documents from a custodian, that custodian

will have no obligation to retain documents in the future." Opp. Ex. 41. Hence, Microsoft had

no duty to collect or preserve additional documents when these employees left Microsoft.

## CONCLUSION

Burst has made no showing that Microsoft failed to comply with any document

retention obligation in this or any other case, and it has failed to provide any legal support for the

notion that Microsoft owed an "independent duty" to future litigants to preserve documents that

the Justice Department never requested. Burst has certainly failed to meet its burden on this

motion to show that Microsoft intentionally destroyed evidence it was obligated to retain, or

prejudice as a result of the loss of any documents. In sum, there is no justification for (a) giving the jury an adverse inference instruction, (b) excluding Mr. Engstrom from testifying, or (c) awarding sanctions.

Respectfully submitted,

March 9, 2005

Charles W. Douglas
Richard A. Cederoth
John W. Treece
David M. Schiffman
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza, 10 South Dearborn
Chicago, Illinois 60603
(312) 853-7000

David B. Tulchin
Marc De Leeuw
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

G. Stewart Webb, Jr.
(Fed. Bar No. 00828)
VENABLE LLP
Two Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201
(410) 244-7400

Thomas W. Burt
Richard J. Wallis
Steven J. Aeschbacher
C. Andrew Culbert
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98502
(425) 936-8080

*Attorneys for Defendant Microsoft Corporation*

BA2/263731

25

## CERTIFICATE OF SERVICE

G. Stewart Webb, an attorney, hereby certifies that on March 9, 2005, he caused a true and correct copy of the following documents to be served on counsel for the plaintiff: (1) Microsoft's Sur-reply In Opposition To Burst's Motion For Spoliation Instruction, Witness Preclusion, and Related Relief (Public Version) to be served upon the following counsel for the Plaintiff; and (2) Exhibit Index to Microsoft's Sur-reply In Opposition To Burst's Motion For Spoliation Instruction, Witness Preclusion, and Related Relief (Public Version) to be served upon the following counsel for the Plaintiff. (Exhibits 47, 48, 50, 52, 53, 54, and 55 remain under seal.)

Spencer Hosie  (via Facsimile and Overnight Delivery)
Bruce J. Wecker
HOSIE, FROST, LARGE & McARTHUR
One Market Spear Street Tower, 22nd Floor
San Francisco, CA  94105

Robert Yorio  (via Overnight Delivery)
Mary A. Wiggins
CARR & FERRELL, LLP
2200 Geng Road
Palo Alto, CA  94303

G. Stewart Webb

BA2/263738